## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | |
| **AFFILIATED MEDIA, INC.,**[1] | **Chapter 11** |
| **Debtor.** | **Case No. 10-10202 (KJC)** |

### DECLARATION OF RONALD A. MAYO, VICE PRESIDENT
### AND CHIEF FINANCIAL OFFICER OF AFFILIATED MEDIA, INC.,
### IN SUPPORT OF FIRST DAY RELIEF

Pursuant to 28 U.S.C. § 1746, I, RONALD A. MAYO, being duly sworn, depose and state:

1. I am Vice President and Chief Financial Officer of Affiliated Media, Inc., a corporation organized under the laws of the State of Delaware ("AMI" or the "Debtor"). I have served as Vice President and Chief Financial Officer of the Debtor since February 2001. Prior to my current position, I served as Vice President of Finance and Controller of the Debtor from July 1994 to February 2001. As such, I am generally familiar with the Debtor's day-to-day operations, financial condition, business affairs, and books and records. I have also been associated with the newspaper industry for over 25 years. Prior to joining AMI, I was a Senior Manager at Ernst & Young.

2. I submit this declaration (the "Declaration") on the Debtor's behalf in conjunction with its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), filed on January 22, 2010 (the "Petition Date") commencing the above-captioned chapter 11 case (the "Chapter 11 Case"), and the various types of relief

---

1. The last four digits of the Debtor's federal tax identification number are 5553. The Debtor's mailing address and corporate headquarters is 101 W. Colfax Avenue, Suite 1100, Denver, CO 80202.

requested in certain applications and "first day" motions (each, a "<u>First Day Motion</u>" and collectively, the "<u>First Day Motions</u>").

3.    I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion (i) is necessary to enable the Debtor to operate in chapter 11 with minimum disruption or loss of productivity or value; (ii) constitutes a critical element in achieving a successful reorganization of the Debtor; and (iii) is in the best interests of the Debtor, its estate and creditors.

4.    Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of the Debtor's books and records, on information prepared or collected and supplied to me by other members of the Debtor's management teams and/or professionals retained by the Debtor, my discussions with other members of the Debtor's management team, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtor's operations, financial condition and present liquidity needs, and the newspaper industry. In making statements based on my review of the Debtor's books and records, relevant documents, and other information prepared or collected by the Debtor's employees, I have relied upon these employees accurately recording, preparing, or collecting any such documentation and other information.

5.    I am over the age of 18 and am competent to testify.

6.    If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtor.

7.    Part I of this Declaration provides an overview of the Debtor's business operations and describes the Debtor's corporate history and pre-petition capital and debt

structure and the circumstances surrounding the commencement of the Chapter 11 Case. Part II sets forth the relevant facts in support of each of the First Day Motions.

<h1 style="text-align:center">PART I[2]</h1>

8.      In order to enable the Debtor to minimize the adverse effects of the commencement of the Chapter 11 Case on its business operations, the Debtor has requested various types of relief in certain First Day Motions. The First Day Motions seek relief aimed at, among other things: (i) preserving customer relationships; (ii) maintaining vendor confidence and employee morale; (iii) ensuring the continuation of the Debtor's cash management systems and other business operations without interruption, and (iv) establishing certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process. Gaining and maintaining the support of the Debtor's and its Subsidiaries' customers, employees, vendors and suppliers, and certain other key constituencies, as well as maintaining the Debtor's and its Subsidiaries' day-to-day business operations with minimal disruption, will be critical to the success of the Chapter 11 Case and the Debtor's reorganization efforts.

### A.    <u>Overview of the Debtor</u>

9.      William Dean Singleton and Richard B. Scudder founded the Debtor, which is headquartered in Denver, Colorado, in March 1985. It has grown since that time primarily through strategic acquisitions, partnerships and, to a lesser extent, internal growth. Today, the Debtor and its Subsidiaries constitute the second largest newspaper publisher in the United States in terms of paid daily circulation under management. The Debtor, through its Subsidiaries, publishes daily and weekly newspapers and niche publications and owns and

---

[2]   Terms used but not otherwise defined herein have the meanings assigned to such terms in the Prepackaged Plan and the Disclosure Statement.

operates Internet websites related thereto. The Debtor, through its Subsidiaries, also operates a television station in Alaska and four radio stations in Texas. Including all of its operations, the Debtor serves markets in twelve (12) states. AMI has formerly conducted business under the names of Affiliated Newspapers Investment, Inc., Garden State Newspapers, Inc. and MediaNews Group, Inc.

### (i) The Debtor and its Subsidiaries

10. The Debtor is the ultimate parent of twenty-nine (29) wholly owned Subsidiaries and owns 95% of the outstanding equity interests of Alaska Broadcasting Company, Inc. ("Alaska Broadcasting"). Only the Debtor has commenced a chapter 11 case.

11. In addition, the Debtor's wholly owned Subsidiaries also hold equity interests in various partnerships, joint operating agreements ("JOAs"), and other businesses in which one or more third parties are also equity-interest holders (the "Partnerships"), including (i) a 58% profit interest in the Salt Lake City JOA, Newspaper Agency Company LLC, held by Kearns-Tribune LLC, a wholly owned Subsidiary of the Debtor, (ii) a 54.23% partnership interest in California Newspapers Partnership and a 67.36% partnership interest in Monterey Newspapers Partnership held by West Coast MediaNews, LLC, a wholly owned Subsidiary of the Debtor, (iii) a 59.4% partnership interest in Texas-New Mexico Newspapers Partnership held by Northwest New Mexico Publishing Company, a wholly owned Subsidiary of the Debtor, and (iv) a 79.9999% limited liability company interest in The Denver Newspaper Agency LLP held by DPC DNA Holdings LLC, a wholly owned Subsidiary of The Denver Post Corporation ("DPC") and an indirect wholly owned Subsidiary of the Debtor.

12.     The Debtor's Subsidiaries are not anticipated to commence chapter 11 cases.  The Debtor intends to operate its business in the ordinary course throughout the Chapter 11 Case as it has prior to the Petition Date.

13.     A summary organizational chart of the Debtor and the Guaranteeing Subsidiaries (defined below) is attached hereto as **Exhibit "A"**.

**(ii)     The Debtor's Operations**

14.     Through its Subsidiaries, the Debtor publishes fifty-four (54) daily and over 100 non-daily newspapers in eleven (11) states (and owns and operates Internet websites related thereto), including suburban markets in close proximity to the San Francisco Bay Area, Los Angeles, Baltimore, Boston and El Paso.  The Debtor's Subsidiaries also own or operate several metropolitan daily newspapers including *The Denver Post*, *San Jose Mercury News*, *St. Paul Pioneer Press*, *Contra Costa Times*, *Los Angeles Daily News*, *The Salt Lake Tribune*, *The Detroit News*, and *Oakland Tribune*.  The daily newspapers that the Debtor and its Subsidiaries control have a combined daily and Sunday paid circulation of approximately 2.3 million and 2.4 million, respectively, as of September 30, 2009.

15.     A significant portion of the Subsidiaries' operations are conducted through JOAs and partnerships with third parties, such as California Newspapers Partnership, Texas-New Mexico Newspapers Partnership and Monterey Newspapers Partnership.  JOAs represent an operating structure that is unique to the newspaper industry.  I am informed that pursuant to the Newspaper Preservation Act of 1970, under certain circumstances, competing newspapers within the same market are permitted to combine their business operations while maintaining separate and competitive news operations.  A JOA performs the production, sales, distribution and administrative functions for two or more newspapers under the terms of a joint operating

agreement, while editorial control and news functions of each newspaper party to the joint operating agreement remain separate from the JOA. West Coast MediaNews LLC owns a 54.23% interest in California Newspapers Partnership and a 67.36% interest in Monterey Newspapers Partnership, each of which owns and operates newspapers in California (including the *Contra Costa Times, San Jose Mercury News* and *The Monterey County Herald*). Northwest New Mexico Publishing Company owns a 59.4% interest in Texas-New Mexico Newspapers Partnership, which owns and operates newspapers in New Mexico and Texas (including the *El Paso Times*), as well as in York, Pennsylvania (including the *York Daily Record* and *The York Dispatch*), which are operated through the York JOA. Each of the applicable partnership agreements to which the Subsidiaries are party includes a provision requiring that distributions be made to the partners on a regular basis in an amount equal to the partnership's available earnings and other available funds less amounts required to be retained for working capital for the continuing operations of the business of the partnership (including capital expenditures). As of the Petition Date, the Debtor's Subsidiaries, directly or indirectly, participate in JOAs in Salt Lake City, Utah; York, Pennsylvania; Detroit, Michigan; and Charleston, West Virginia.

16.     MediaNews Group Interactive, Inc., a wholly owned Subsidiary of the Debtor, manages the centralized technology infrastructure that supports each of the Debtor's local websites, including websites for the Subsidiaries. The Debtor's strategy is to use the Internet and other electronic media to enhance and broaden its position as the leading provider of news, information and services in its local media markets. The Debtor's interactive operations are increasing market share and extending the profitability of its local media franchises by leveraging the newsgathering resources, print and online sales infrastructures of the Debtor and its Subsidiaries, and partnering with providers of emerging technologies and industry leaders,

including Internet portals, broadband, Internet video and wireless, thus expanding the Debtor's ability to provide both news and advertising across a broad platform of digital media devices. The Debtor has expanded its offerings in the rapidly growing online video marketplace, including the integration of video into the Debtor's online recruitment, auto and real estate advertising packages. The Debtor and its Subsidiaries also provide online video news stories to complement the print and online text versions of their newspapers. In addition, the Debtor and its Subsidiaries are cultivating relationships with new and existing advertisers and readers by proactively seeking to address their needs by providing multimedia packages and 24/7 news operations geared toward breaking news online first and providing video content to enhance the online experience.

17.     The Debtor provides numerous management and operational services to its Subsidiaries for a fee based on contractual obligations and on an allocation of cost basis where no contractual obligation exists. These services are in the nature of operating, administrative, accounting, electronic media and other support services, newsprint purchase services, financial reporting services, human resource services, risk management services, payroll services, tax reporting and tax return preparation services and cash management. The Debtor also provides accounting shared services and sales and marketing services to its Subsidiaries for a fee based on an allocation of the actual costs incurred by the Debtor in providing such services. These intercompany services are critical to the operations of the Debtor and its Subsidiaries.

18.     The Debtor's main source of cash flow is from distributions and dividends from its Subsidiaries. Advertising is the largest component of the revenues of the Debtor's Subsidiaries, followed by circulation revenue. Advertising rates at each of the Debtor's newspapers are established based upon market size, circulation, readership, demographic

makeup of the market and the availability of alternative advertising media in the marketplace. While circulation revenue is not as significant as advertising revenue, circulation volume trends can impact the decisions of advertisers and advertising rates. Advertising revenue categories include retail (such as local and national department stores, specialty shops, preprinted advertising circulars, local retailers and direct mail), national (such as national brand advertising accounts), classified (such as employment, automotive, real estate, legal notices and private party "listings") and interactive (online component of classified advertising, search revenue and banner revenue).

19.    In addition to selling advertising in its core newspaper product, the two other major revenue drivers of the Debtor's Subsidiaries include (i) advertising in niche publications, such as those related to home improvement, health and fitness, and weddings, and (ii) Internet advertising. The Debtor's niche publications are designed to reach a highly targeted audience and to appeal to non-traditional newspaper advertisers. In addition, the Debtor's Subsidiaries niche publications provide valuable content that expand the Debtor's Subsidiaries Internet offerings. The Debtor 's are developing new local websites, in addition to its local news websites, designed to provide a more comprehensive source of local information and services and new advertising opportunities. Other revenue of the Debtor's Subsidiaries is generated primarily from commercial printing and distribution of third party publications.

**(iii)    Broadcast Operations**

20.    The Debtor, through its Subsidiary, Graham Newspapers, Inc., owns four radio broadcast stations licensed to serve communities in Texas. Additionally, the Debtor, through its Subsidiary, Alaska Broadcasting, in which the Debtor holds a 95% ownership interest, owns a CBS-affiliated television broadcast station licensed to serve Anchorage, Alaska.

The combined revenues of these non-newspaper operations comprised less than 1.0% of the Debtor's consolidated revenues for the fiscal year ended June 30, 2009 and are not considered significant to the Debtor's operations.

**(iv)   Employees**

21.     The Debtor's workforce consists of approximately 100 employees, of whom approximately 80 are salaried employees and 20 are hourly employees.  None of the employees of the Debtor is covered by a collective bargaining agreement.  The employees are mainly located in Colorado.  In addition, the Debtor has no independent contractors.  The Debtor and its Subsidiaries together employ approximately 8,700 employees.

**(v)   Recent Operations**

22.     As a result of cyclical and secular changes in advertising spending in newspapers, the Debtor 's Subsidiaries have experienced a substantial decrease in operating revenues and cash flow.  From the fiscal year ended June 30, 2008 to the fiscal year ended June 30, 2009, total consolidated revenues of the Debtor and its Subsidiaries fell by $121.4 million.  During the same time, advertising revenues, which remain the largest component of the consolidated revenues of the Debtor and its Subsidiaries, dropped $130.2 million or 14.0%.  The Debtor and its Subsidiaries' total consolidated revenues have fallen from $1.330 billion for the fiscal year ended June 30, 2007 to $1.060 billion for the fiscal year ended June 30, 2009.

23.     Although the Debtor's performance, to the best of my knowledge and experience, has been comparable, and in some areas superior, to that of its peers, operations have nevertheless been adversely affected by the general deterioration in the newspaper publishing industry and the current economic recession.  Notwithstanding the Debtor's aggressive efforts to reduce expenses, enhance revenues and monetize various assets, the impact of an unprecedented

economic downturn has left it with operating cash flows insufficient to support the Debtor's current debt obligations.

**B.    Equity Structure**

24.    As of the Petition Date, the authorized capital stock of the Debtor consists of (i) 3,000,000 shares of Class A Common Stock, $0.001 par value per share ("Old Class A Common Stock"), 2,278,352 shares of which are issued and outstanding; (ii) 150,000 shares of Class B Common Stock, $0.001 par value per share, none of which are issued or outstanding ("Old Class B Common Stock"); (iii) 100 shares of Class C Common Stock, $0.001 par value per share ("Old Class C Common Stock"), 48 of which are issued and outstanding; and (iv) 100,000 shares of Preferred Stock, par value $0.001 per share ("Old Preferred Stock"), none of which are issued and outstanding.

25.    William Dean Singleton, the Scudder family, and their respective family trusts have the power to vote approximately 93% of the outstanding Old Class A Common Stock. On December 21, 2009, the Debtor retired (i) all of the Old Preferred Stock formerly held by Subsidiaries of The Hearst Corporation ("Hearst") and (ii) 52 shares of the 100 shares of the Old Class C Common Stock formerly held by Hearst MNG Holdings, LLC, a subsidiary of Hearst, for $1.  As a result, no shares of the Debtor's Old Preferred Stock are currently outstanding and Hearst's equity interest in Debtor's non-San Francisco Bay Area newspapers has been reduced to 14.88%.

**C.    Summary of Pre-petition Indebtedness**

26.    As of the Petition Date, the Debtor owed approximately $930 million to its Senior Lenders, holders of the Subordinated Note Claims and other debt holders.  The Debtor's obligations consist of (i) amounts owing under the Senior Credit Agreement, (ii) amounts owing

with respect to the Subordinated Notes under the Indentures (each as defined below), (iii) notes issued or assumed by the Debtor or certain of its Subsidiaries in connection with various acquisitions and (iv) amounts owing under the Aircraft Note (as defined below). The following is a brief summary of the Debtor's obligations.

**(i)     Credit Agreement**

27.     On December 30, 2003, the Debtor entered into a credit agreement among AMI, as borrower, certain Subsidiaries as guarantors (the "<u>Guaranteeing Subsidiaries</u>")[3], the Senior Lenders from time to time party thereto, Bank of America, N.A., as administrative agent (the "<u>Administrative Agent</u>"), The Bank of New York, as syndication agent, and Fleet National Bank and Wachovia Bank, National Association, as co-documentation agents (as amended, restated, supplemented and/or otherwise modified from time to time, the "<u>Senior Credit Agreement</u>"). As of the Petition Date, the Debtor's obligations under the Senior Credit Agreement consist of (i) a $175 million revolving credit facility (matured December 30, 2009), (ii) a $100 million term loan "A" facility (maturing December 30, 2010), (iii) a $147.3 million term loan "B" facility (maturing December 30, 2010) and (iv) a $350 million term loan "C" facility (maturing August 2, 2013). The approximate outstanding balances under the revolving credit facility, term loan "A," term loan "B" and term loan "C" are $166.5 million, $59.2 million, $105.1 million and $252.4 million, respectively. In addition, $6.375 million of contingent reimbursement claims on letters of credit are outstanding under the revolving credit facility. As a result of the occurrence of events of default under the Senior Credit Agreement, the Debtor is no longer able to borrow amounts under the revolving credit facility other than to obtain letters

---

3**.**     A true and accurate list of Guaranteeing Subsidiaries is attached hereto as **Exhibit "B"**.

of credit and renew existing letters of credit (within the limits of the revolving credit commitments).

28.     The Senior Credit Agreement is guaranteed by all of the Guaranteeing Subsidiaries and secured by first-priority liens and security interests in the Debtor's interest in the capital stock (or other ownership interests) of each of the Guaranteeing Subsidiaries and also grants a security interest in each Guaranteeing Subsidiary's interest in the capital stock (or other ownership interests) of certain partnerships and joint ventures.  In addition, pursuant to the Forbearance Agreement, (i) Alaska Broadcasting granted to the Administrative Agent for the benefit of the Senior Lenders a first-priority security interest in substantially all of its assets and (ii) LADN Holdings, LLC, a Subsidiary of the Debtor, granted to the Administrative Agent for the benefit of the Senior Lenders a first-priority security interest in its facility located in Valencia, California, which was subsequently sold on December 1, 2009, and in 50% of the equity interests in a limited liability company formed to hold certain property located in Boulder, Colorado (the "Boulder Property").  The Senior Credit Agreement contains a number of covenants that, among other things, restrict the Debtor's ability to dispose of assets, incur additional indebtedness, pay dividends, make capital contributions, create liens on assets, make investments and acquisitions and engage in mergers or consolidations.  The foregoing restrictions were further expanded under the Forbearance Agreement.  In addition, the Senior Credit Agreement requires compliance with certain financial ratios, including a maximum consolidated total leverage ratio, a maximum consolidated senior debt to consolidated operating cash flow ratio and a minimum consolidated operating cash flow to consolidated fixed charges ratio.  Beginning with the end of the fiscal quarter ending March 31, 2009, the Debtor was not in compliance with certain of the financial covenants set forth in the Senior Credit Agreement.  The

Debtor did not pay the $166.5 million in principal due on December 30, 2009 under the Senior Credit Agreement and has not made any payments of principal on account of the term loans since December 31, 2008.

**(ii)     Subordinated Notes**

29.     The Debtor's outstanding subordinated notes were issued pursuant to (i) the indenture, dated as of November 25, 2003 (the "6⅞% Indenture"), between AMI and The Bank of New York Mellon Trust Company, N.A., as successor trustee (the "Indenture Trustee"), with respect to AMI's outstanding 6⅞% Senior Subordinated Notes due 2013 (the "6⅞% Notes"), and (ii) the indenture, dated as of January 26, 2004 (the "6⅜% Indenture," and together with the 6⅞% Indenture, the "Indentures"), between AMI and the Trustee with respect to AMI's outstanding 6⅜% Senior Subordinated Notes due 2014 (the "6⅜% Notes;" the 6⅞% Notes and the 6⅜% Notes are referred to collectively as the "Subordinated Notes"). The Subordinated Notes are not guaranteed by, nor do they constitute obligations of, any of the Subsidiaries of the Debtor; they are solely liabilities of the Debtor.

**a.     6 ⅞% Notes**

30.     The 6 ⅞% Notes were privately placed on November 25, 2003, in an original aggregate principal amount of $300 million. The Debtor subsequently completed an exchange offer on April 28, 2004, which replaced the subordinated notes originally issued on November 25, 2003 with substantially identical subordinated notes registered under the Exchange Act (as defined below). As of the Petition Date, an aggregate principal amount of $204.1 million of the 6 ⅞% Notes remained outstanding. Interest on the 6 ⅞% Notes is payable semiannually, on April 1 and October 1 of each year. The 6 ⅞% Notes bear interest at the rate of

6 ⅞% per annum.  The Debtor did not make interest payments to holders of the 6 ⅞% Notes in 2009.

        **b.**      **6 ⅜% Notes**

        31.      The 6 ⅜% Notes were privately placed on January 14, 2004, in an original aggregate principal amount of $150 million.  The Debtor subsequently completed an exchange offer on April 28, 2004, which replaced the subordinated notes originally issued on January 14, 2004 with substantially identical subordinated notes registered under the Exchange Act.  As of the Petition Date, an aggregate principal amount of $121.8 million of the 6 ⅜% Notes remained outstanding.  Interest on the 6 ⅜% Notes is payable semiannually, on January 1 and July 1 of each year.  The 6 ⅜% Notes bear interest at the rate of 6 ⅜% per annum.  The Debtor did not make the July 1, 2009 or the January 1, 2010 interest payments to holders of the 6 ⅜% Notes.

      **(iii)**     **Supplemental Indentures**

        32.      On April 4, 2008, both of the Indentures were amended to end the Debtor's obligation to file reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), on a voluntary basis and make certain changes to covenants (and definitions used therein) to bring them more into line with comparable covenants in the Senior Credit Agreement.  The obligation to comply with the Exchange Act was replaced with an obligation to deliver to the holders of the Subordinated Notes quarterly and annual consolidated financial statements of the Debtor and its Subsidiaries.

      **(iv)**     **Other Indebtedness**

        33.      In connection with various acquisitions, the Debtor and its Subsidiaries have issued notes and assumed certain debt obligations, some of which is secured, totaling

approximately $4.84 million as of the Petition Date. The notes payable and other debt obligations bear interest at rates ranging from 0.0% to 8.0% per annum.

34.     As of December 10, 2009, an aggregate principal amount of $10.26 million remains outstanding under the Restated and Amended Promissory Note dated March 12, 2004 (as amended, the "Aircraft Note" together with the notes and other debt obligations (the "Other Indebtedness"), issued by the Debtor to Fifth Third Bank to finance the purchase of a private jet aircraft. The Aircraft Note bears interest at a fixed rate of 8.0% per annum. The Aircraft Note is secured by a first-priority security interest on the aircraft under the Restated and Amended Aircraft Security Agreement dated as of March 12, 2004, as amended by the First Amendment dated December 10, 2009, by and between Fifth Third Bank and the Debtor.

**D.     Circumstances Leading To The Commencement of the Chapter 11 Case**

**(i)     The Newspaper Industry**

35.     The newspaper publishing industry is in the midst of an unprecedented decline that has only been exacerbated by the current recession. In recent years, the newspaper industry has suffered declining circulation and advertising revenues due to alternative choices for readers and advertisers and has had to adapt and react to new digitally-oriented competitors in an increasingly competitive marketplace for delivery of advertising and news. The recent global recession has placed an even greater burden on an already distressed industry, leading to significant industry-wide revenue declines. Industry-wide circulation for September 2009 is 10.6% less than September 2008 as reported by the Audit Bureau of Circulation. The slumping retail market has reduced demand for retail advertising, and the rise in the national unemployment rate, coupled with the decline in the real estate and auto sectors, has led to significant declines in classified advertising. In response, newspapers have significantly cut

operating costs by, among other things, reducing their workforces, adjusting wages to reflect deteriorating market conditions, curtailing employee benefits, renegotiating collective bargaining agreements with labor unions, reducing or eliminating unprofitable circulation, and in some cases, have simply ceased operating. In addition, newspaper companies have attempted to improve their balance sheets by renegotiating the terms of their indebtedness and by selling assets. A number of major newspaper publishing companies have commenced bankruptcy proceedings, such as The Tribune Company, Journal Register Company, Freedom Communications, Inc., Philadelphia Newspapers, LLC, Star Tribune Holdings Corporation, Sun-Times Media Group, Inc., American Community Newspapers LLC and Triple Crown Media Inc.

36.     Approximately 80% of consolidated AMI's revenue is generated from advertising sales. Advertisers generally reduce their advertising spending during economic downturns. The current economic conditions have been, and could continue to be, a negative factor affecting the Debtor's advertisers, and such conditions have caused, and could continue to cause, the Debtor's advertisers to decrease their advertising spending in the future.

37.     The Debtor's Subsidiaries' ability to generate advertising revenues has and will continue to be affected by the current economic recession, consumer confidence, advertiser solvency and the regional economic conditions in each of the markets in which the Debtor's Subsidiaries operate as well as by the economic performance and changes in the national and sometimes international economy. The level of advertising spending, which is affected by macroeconomic trends, affects the newspaper publishing industry in general and the revenues of individual newspapers in particular. The Debtor's Subsidiaries have experienced significant declines in all advertising categories, including retail (such as local and national department stores, specialty shops, preprinted advertising circulars, local retailers and direct

mail), national (such as national brand advertising accounts), classified (such as employment, automotive, real estate and private party "listings") and Internet.

38. The Debtor's Subsidiaries' advertising revenues depend upon a variety of other factors specific to the communities that they serve. These factors include, among others, the size and demographic characteristics of the local population, the concentration of retail stores and other businesses, the level of online connectivity and local economic conditions in general.

39. With the continued development of alternative forms of media, particularly those based on the digital delivery of news and advertising, the business of the Debtor's Subsidiaries faces increased competition. Alternative media sources also affect circulation as more people turn to the Internet for news information. This competition could make it difficult for the Debtor's Subsidiaries to grow or maintain its print advertising and circulation revenues, which the Debtor believes will challenge the company to expand the contributions of its digital business.

**(ii)  The Debtor's Deteriorating Financial Condition, Cost Reductions and Strategic Initiatives**

40. As mentioned above, the Debtor's Subsidiaries' revenues dropped as a result of cyclical and secular changes in advertising spending in newspaper. Beginning in 2006, the Debtor and its Subsidiaries began to implement a number of strategic initiatives to enhance operating cash flow and to reduce costs in response to the structural changes occurring in the industry. The Debtor and its Subsidiaries pursued cost reductions across all areas of its business and reduced its operating costs on a same newspaper basis but before adjusting for minority interest, by more than $385 million or 31% since the 2006 calendar year. It has continued to restructure and realign its workforce to meet developing business conditions through the present date. Strategic initiatives aimed at generating incremental cash flow through cost savings have

included, among other things, headcount and benefit reductions, consolidating production, editorial and back office facilities and functions, improving operating efficiencies, outsourcing selected distribution, printing, advertising production and design activities, and reducing web width (newspaper page size), resulting in permanent newsprint volume savings and elimination of unprofitable circulation.

41.     Revenue enhancement initiatives have included offering creative solutions to advertisers (e.g., multi-platform packages and zoning), launching new niche publications and building new local Internet websites.  Additionally, the Debtor's Subidiaries have either sold or are currently marketing real estate assets not currently utilized in the production of its newspapers.  The Debtor also sold its interests in the *Connecticut Post* in August 2008.

42.     In August 2009, the Debtor completed the restructuring of The Denver Newspaper Agency LLP ("DNA"), which owns and operates *The Denver Post*.  Pursuant to an Amended and Restated Credit Agreement between DNA and its senior lenders (the "DNA Amended Credit Facility"), the $130.5 million in outstanding borrowings under the DNA Credit Agreement was reduced to $80.0 million and a new revolving credit facility with a borrowing limit of $15.0 million was established.  In connection with the DNA Amended Credit Facility, DNA granted its senior lenders a security interest in substantially all of its assets and DNA's senior lenders acquired a membership interest in DNA.  The debt under the DNA Amended Credit Facility is non-recourse to the Debtor and will be funded exclusively by DNA.

E.      **Summary of Restructuring Negotiations**

43.     Over the last twelve (12) months, the Debtor, the Administrative Agent, and Senior Lenders have been negotiating the terms and conditions of the Debtor's restructuring.

(i)     **Forbearance Agreement and Development of Restructuring**

44.     Owing to the recession and the secular effects of industry-wide change in advertising trends, and in spite of its significant cost-cutting and other strategic initiatives, the Debtor was unable to comply with certain financial covenants under the Senior Credit Agreement.  In anticipation of a potential breach of one or more of its financial covenants as of the end of the fiscal quarter ending March 31, 2009, the Debtor advised the Administrative Agent that it had undertaken to develop a comprehensive restructuring plan and asked the Administrative Agent and the Senior Lenders to forbear from exercising remedies against the Debtor and its Guaranteeing Subsidiaries for a limited period of time.  On March 31, 2009, the Debtor was obligated to repay $6,465,681 of the principal amount of the loans outstanding under the Senior Credit Agreement and failed to make such payments.  The Debtor also failed to make the interest payments with respect to the 6 ⅞% Notes that were due and payable on April 1, 2009, among other defaults.  Subsequently, the Debtor, the Guaranteeing Subsidiaries, Senior Lenders and the Administrative Agent entered into the Forbearance Agreement, pursuant to which it was agreed that Senior Lenders would forbear from exercising remedies against the Debtor and the Guaranteeing Subsidiaries on account of certain specified defaults, including (i) the failure to make mandatory principal payments on any of the loans under the Senior Credit Agreement (other than a prepayment of 50% of the proceeds of the Boulder Property, (ii) the failure to make interest payments on the Subordinated Notes and (iii) a breach of any of the financial covenants in the Senior Credit Agreement as currently in effect.

45.     The forbearance period during which the Administrative Agent and Senior Lenders agreed not to exercise their remedies was initially scheduled to expire on September 30, 2009.  The Senior Lenders, however, had the right to terminate such forbearance period earlier than such date upon the occurrence of certain specified events.

46.     Pursuant to the Forbearance Agreement, the Debtor was required to grant (or cause its applicable Subsidiaries to grant) liens on (i) substantially all of the assets of Alaska Broadcasting, (ii) certain real property located in Valencia, California, which was subsequently sold on December 1, 2009 and (iii) 50% of the equity interests in a limited liability company formed to hold the Boulder Property.  The Forbearance Agreement also required the Debtor, in addition to retaining a financial advisory firm of recognized national standing (the Debtor and its Subsidiaries hired Rothschild Inc. ("Rothschild") in December 2008 as its financial advisor and investment banker to assist in developing a comprehensive restructuring plan and in connection therewith exploring various strategic alternatives), to retain a turnaround/restructuring firm of recognized national standing reasonably satisfactory to the Administrative Agent (the Debtor hired Carl Marks Advisor Group LLC) in May 2009 as its restructuring advisor) and to deliver on or prior to June 15, 2009 a comprehensive restructuring proposal.

47.     As a condition to the effectiveness of the Forbearance Agreement, the Debtor was required to obtain from New Paperco, Inc., a wholly owned Subsidiary of Hearst and the holder of approximately 51% of the outstanding principal amount of the Subordinated Notes ("New Paperco"), a forbearance agreement (the "Hearst Forbearance Agreement"), pursuant to which New Paperco agreed not to (i) exercise any remedies available to it or (ii) instruct the Indenture Trustee to exercise any remedy that may be exercised by the Indenture Trustee, in each case in respect of the Subordinated Notes, until the earlier of (a) the termination of the Forbearance Agreement or (b) September 30, 2009.

48.     On June 15, 2009, the Debtor provided the Senior Lenders with a restructuring proposal.  The Debtor's senior management and advisors engaged in discussions with the Senior Lenders to explore a consensual restructuring of the Debtor's obligations.

Concurrently with these discussions, the Debtor also worked with potential third parties who expressed an interest in participating in a restructuring transaction with the Debtor. Rothschild sought out potential acquirers of or investors in the Debtor. Several potential investors performed in-depth due diligence on the Debtor and its Subsidiaries. To date, however, no third party has been willing to place a valuation on the Debtor and its Subsidiaries that the Debtor and its advisors believe would be acceptable to the Senior Lenders.

49.     The Forbearance Agreement was extended until November 30, 2009 pursuant to the First Supplement to the Forbearance Agreement dated as of September 30, 2009. New Paperco similarly agreed to extend the outside date for the expiration of the "standstill period" provided for in the Hearst Forbearance Agreement with the Debtor to a date no earlier than November 30, 2009. The First Supplement to the Forbearance Agreement provided that the forbearance period could be terminated by the Senior Lenders on two weeks' notice if the Debtor, the Administrative Agent and certain Senior Lenders failed to agree upon a term sheet providing for a comprehensive restructuring of the Debtor on or before October 30, 2009. The parties finalized a term sheet that was approved by the Debtor's board of directors on October 29, 2009, and upon which the Prepackaged Plan is based.

**(ii)     Restructuring Support Agreement**

50.     On November 30, 2009, the Debtor, Senior Lenders and the Administrative Agent entered into the Restructuring Support Agreement. Pursuant to the Restructuring Support Agreement, Senior Lenders indicated their support for the material terms of a reorganization of the Debtor as set forth in the prepackaged plan term sheet approved by the board of directors of the Debtor and Senior Lenders and agreed to extend the forbearance period under the Forbearance Agreement to March 31, 2010, provided certain additional conditions are

met.  Concurrently with the execution of the Restructuring Support Agreement, New Paperco agreed to amend the Hearst Forbearance Agreement to extend the date for the expiration of the "standstill period" provided for in the Hearst Forbearance Agreement to a date no earlier than March 31, 2010.

      **F.**    **The Prepackaged Plan**

      51.    Prior to the Petition Date, the Debtor solicited votes on the Prepackaged Plan of Reorganization of Affiliated Media, Inc., dated December 18, 2009 (including exhibits thereto and as amended and supplemented, the "<u>Prepackaged Plan</u>"), through a disclosure statement distributed in accordance with sections 1125 and 1126(b) of the Bankruptcy Code (including exhibits thereto, the "<u>Disclosure Statement</u>"), both filed contemporaneously herewith.

      52.    Under the terms of the Prepackaged Plan, each Senior Lender will receive its Pro Rata share of (i) $150 million of New Senior Secured Term Notes, guaranteed by all of AMI's wholly owned Subsidiaries and secured by first-priority liens on substantially all of the assets of Reorganized AMI and its wholly owned Subsidiaries; (ii) with respect to those Senior Lenders holding revolving loans and commitments under the existing facility, a $6.375 million letter of credit facility, resulting from an automatic rollover of the Debtor's existing letters of credit outstanding as of the Effective Date (the "<u>Tranche A Facility</u>"), and (iii) 88.0% of the equity of Reorganized AMI.  In addition, a $7.5 million letter of credit facility (the "<u>Tranche B Facility</u>") will be provided as a separate new extension of credit by certain of the Senior Lenders. Collectively, the Tranche A Facility and the Tranche B Facility make up the $13.875 million letter of credit facility (the "<u>LOC Facility</u>").  The remaining 12% of the equity of Reorganized AMI is reserved for issuance to its management.  Dean Singleton, the Chairman and Chief

Executive Officer of the Debtor, is receiving warrants to purchase up to 8% of the equity of Reorganized AMI.

53.     Because the holders of the Subordinated Note Claims voted to accept the Prepackaged Plan, each holder will receive its Pro Rata share of the Subordinated Note Warrants offered to them under the Prepackaged Plan.  The Subordinated Note Warrants provide the Subordinated Note holders the right to purchase, in aggregate, up to 8.25% of the Class B New Common Stock of Reorganized AMI in certain circumstances.

54.     In addition, the Prepackaged Plan provides for the payment in full of (i) allowed administrative expense claims, (ii) federal, state, and local tax claims, and (iii) certain other priority non-tax claims.  Holders of Other Indebtedness will either have their claims paid in full or have their claims reinstated upon confirmation of the Prepackaged Plan.  Trade creditors and certain other holders of general unsecured claims against AMI are unimpaired under the Prepackaged Plan and will receive payment of their claims in the ordinary course as those claims become due and payable.  Holders of existing equity interests in AMI will not receive a distribution on account of such interests.

55.     The Prepackaged Plan contemplates a comprehensive financial restructuring of the Debtor's existing capital structure that will allow the Debtor to delever its balance sheet by reducing its approximately $930 million total debt to approximately $179 million (composed of the New Senior Secured Term Notes in the amount of $150 million, the LOC Facility in the amount of $13.875 million and the Other Indebtedness in the amount of $15.1 million), through a short and consensual chapter 11 case, and emerge from chapter 11 poised for future growth and stability.

56.     Concurrently with the filing of this Chapter 11 Case, the Debtor has filed a
number of First Day Motions,[4] consisting of procedural motions and motions relating to the
Debtor's business operations.  The approval of each First Day Motion is an important element of
the Debtor's reorganization efforts and is necessary to ensure a smooth transition into chapter 11
with minimal disruption to its operations.  I have reviewed each of the First Day Motions,
including the exhibits thereto, and believe that the relief requested therein is critical to the
Debtor's ability to achieve a successful reorganization.  Factual information with respect to each
First Day Motion is provided below and in each First Day Motion.

A.     **Motion For an Order (I) Authorizing the Debtor to (A) Continue Its Existing
Cash Management System and (B) Maintain Existing Bank Accounts and
Business Forms and (II) Granting an Extension of Time to Comply with
Section 345(b) of the Bankruptcy Code (the "Cash Management Motion")**

57.     To manage its business efficiently and seamlessly, the Debtor uses a cash
management system (the "Cash Management System") to collect and transfer the funds
generated by the operations of its Subsidiaries and the Partnerships and to disburse funds to
satisfy the financial obligations of the Debtor, its Subsidiaries and certain of the Partnerships.
The Cash Management System facilitates the Debtor's cash monitoring, forecasting and
reporting, and enables the Debtor to maintain control over the administration of its bank accounts
(the "Bank Accounts") located at Wells Fargo & Company("Wells Fargo") and M&T Bank
(collectively, the "Banks"), including those Banks listed on Exhibit 1 to the Order for the Cash
Management Motion.  By the Cash Management Motion, the Debtor requests, pursuant to
sections 105(a), 345(b) and 363(c) of the Bankruptcy Code, and Rule 6003(a) of the Federal

---

4**.**   Terms used but not otherwise defined herein have the meanings assigned to such terms in the First Day
Motions.

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), entry of an order granting it (i) authorization to (a) continue its existing Cash Management System and (b) maintain existing Bank Accounts and business forms and (ii) an extension of time to comply with section 345(b) of the Bankruptcy Code. Without the requested relief, I believe that the Debtor would be unable to maintain its financial operations effectively and efficiently, which would cause significant harm to the Debtor, its estate, the Subsidiaries and the Partnerships.

58.     In addition, the Debtor requests that the Court authorize and direct the Banks to continue to maintain, service and administer the Bank Accounts and to debit the Bank Accounts in the ordinary course of business on account of: (i) all checks, wires or Automated Clearing House ("ACH") transfers authorized by order of this Court irrespective of whether or not such payments relate to pre-petition services; (ii) all checks drawn on the Bank Accounts which are cashed at the Banks or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (iii) all checks or other items deposited in one of the Bank Accounts with the Banks prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent that the Debtor was responsible for such items prior to the Petition Date and (iv) all undisputed pre-petition amounts outstanding as of the Petition Date, if any, owed to the Banks as service charges for the maintenance of the Cash Management System.

59.     In the ordinary course of its operations, the Debtor maintains an integrated network of bank accounts that facilitate the timely and efficient collection, concentration, management and disbursement of funds generated by the Debtor's business operations. This

network is comprised of fifty-six (56) bank accounts in the Debtor's name maintained with Wells Fargo and one account at M&T Bank, through which the Debtor collects, transfers and disburses funds generated by its operations.  In addition, several of the Debtor's Subsidiaries and certain of the Partnerships maintain and use depository accounts of several institutions, none of which is Wells Fargo, held in the name of those Subsidiaries, which are not the subject of the Cash Management Motion.  The Debtor also maintains a system designed to accurately record such collections, transfers and disbursements as they occur.

60.     The Cash Management System has three (3) main components: (i) cash collection, including the collection of payments made to the Debtor, its Subsidiaries and certain of the Partnerships, (ii) cash concentration; and (iii) cash disbursements to fund the Debtor's operations and the operations of its Subsidiaries, primarily consisting of payroll and payments to the vendors and service providers that supply the goods and services which the Debtor uses to operate its business.  The Cash Management System is managed by the Debtor's finance department.  A diagram of the Debtor's Cash Management System is attached as Exhibit B to the Cash Management Motion.

61.     When I, along with other members of management, determine there is excess cash in the Concentration Account, the Debtor transfers funds from the Concentration Account at Wells Fargo to its non-interest bearing account at M&T Bank.  The majority of the Debtor's cash on hand is kept in the non-interest bearing account of M&T Bank.  The funds on deposit in the M&T Bank account are approximately $40 million as of the Petition Date.

62.     The funds of the M&T Bank account are maintained in cash, which amounts are insured by the United States government through the Federal Deposit Insurance Corporation's ("FDIC") Transaction Account Guarantee ("TAG") program.  Under this program,

non-interest bearing transactional accounts are fully insured by the FDIC. The TAG program was initially set to expire on December 31, 2009, but M&T Bank informed the Debtor that on August 26, 2009 the FDIC has extended the TAG program through June 30, 2010. Therefore, it is our understanding that the entire amount in the account at M&T Bank is insured by the United States government.

63. The Cash Management System is an ordinary course and essential business practice that provides significant benefits to the Debtor, including, among other things, the ability to (i) control corporate funds; (ii) ensure the maximum availability of funds when and where necessary; (iii) reduce administrative expenses by facilitating the movement of funds and (iv) develop more timely and accurate account balance information. I believe that maintenance of the existing Cash Management System is in the best interest of the Debtor, its Subsidiaries and the Partnerships.

64. Given the size and complexity of the Debtor's operations, which include 29 wholly owned Subsidiaries, Alaska Broadcasting and approximately 8,700 employees, and given the operations of the Partnerships, I do not believe that the Debtor can efficiently facilitate its restructuring efforts if there is substantial disruption in its Cash Management System. I believe that the delays that would result from opening new bank accounts, revising cash management procedures and instructing customers to redirect payments would cause a severe disruption to the Debtor's and its Subsidiaries' business. It is therefore essential that the Debtor be permitted to continue to manage its cash and transfer monies from its various Bank Accounts as needed and in amounts necessary to continue the operation of its business. If the Debtor is required to close its existing Bank Accounts and create a new cash management system, the Debtor will suffer, in my opinion, significant harm from the resultant operational paralysis.

65.     I believe that the continued use of existing correspondence and other business forms relating to the Bank Accounts will avoid the adverse effects to the Debtor's operations which would be expected to occur if the Debtor was required to suspend essential business functions pending the production of and transition to new forms.  To minimize both the disruption and expense to the Debtor's estate, the Debtor requests authority to continue to use all correspondence and business forms including, but not limited to, checks, letterhead, purchase orders and invoices, as such forms were in existence immediately prior to the Petition Date.

66.     The Debtor will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by separate order of this Court.  To prevent the possible inadvertent unauthorized payment of pre-petition claims, I and the Debtor's management team will work closely with the Banks to ensure that appropriate procedures are in place to prevent checks issued pre-petition from being honored without this Court's approval.

67.     Additionally, I am informed that "cause" exists pursuant to section 345(b) of the Bankruptcy Code to extend the time to comply with that section's requirements because, among other considerations, (i) the Debtor's Banks are federally chartered banks subject to supervision by federal banking regulators; (ii) the Debtor retains the right to remove funds held at the Banks and establish new bank accounts as needed; (iii) the cost associated with satisfying the requirements of section 345 is burdensome and (iv) the process of satisfying those requirements would lead to needless inefficiencies in the management of the Debtor's business and the businesses of its Subsidiaries.  Moreover, strict compliance with the requirements of section 345 of the Bankruptcy Code would be impractical in this prepackaged Chapter 11 Case.

A bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such a bond is available at all.

68.     I believe that the relief requested in the Cash Management Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtor's estate, its Subsidiaries, the Partnerships and their respective creditors. Accordingly, I believe the relief requested in the Cash Management Motion should be granted.

**B.     Motion to Continue Providing Intercompany Services to Subsidiaries (the "Intercompany Services Motion")**

69.     Prior to the Petition Date, the Debtor provided numerous management and operational services to its Subsidiaries (the "Intercompany Services"). As stated above, none of the Subsidiaries has filed a chapter 11 petition. These Intercompany Services consist of four broad categories: (1) payroll services and processing, (2) intercompany employee benefit services and coverages, (3) processing and payment of other operating expenses of Subsidiaries, whether by cash or through an American Express corporate purchasing card, and (4) advertising and management services.

70.     By the Intercompany Services Motion, the Debtor requests, pursuant to section 363(b) of the Bankruptcy Code, entry of an order authorizing and approving (i) the Debtor's continued provision of the Intercompany Services and granting administrative priority status to post-petition claims against the Debtor in connection with provision of such services, (ii) the Debtor's continued use of the Intercompany Services Payment System; (iii) the Debtor's continued use and maintenance of the P-Card Agreement (as defined below) and the letter of credit that supports it and (iv) granting related relief.

71.     The Debtor's main source of revenue consists of distributions and dividends from the Subsidiaries and the Partnerships. Prior to the Petition Date, and in the

ordinary course of business, funds were transferred on a regular and continuous basis to the Debtor from its Subsidiaries. Also in the ordinary course, the Debtor used those transferred funds to pay the wholly owned Subsidiaries' operating and personnel costs, including costs incurred in connection with the wholly owned Subsidiaries' operating, administrative, accounting, electronic media and other support services, newsprint purchase services, financial reporting services, human resource services, risk management services, payroll services, tax reporting and tax return preparation services and cash management requirements. In certain instances, the Debtor pays certain costs of the Partnerships, for which it is reimbursed.

72. The Debtor provides and administers payroll services, including but not limited to payroll-related tax reporting and tax withholding functions ("Payroll Services") for its Subsidiaries (except for Alaska Broadcasting), and the Debtor processes and funds the payroll ("Payroll Processing") for employees of certain of the Subsidiaries (the "Payroll Subsidiaries"). I estimate that the monthly payroll the Debtor funds on the Payroll Subsidiaries' behalf totals approximately $4.6 million. The Payroll Services and Payroll Processing are sometimes referred to herein as the "Intercompany Payroll Services and Processing."

73. The Debtor also provides, sponsors, and administers various employee benefit plans, programs, and arrangements for the current and former employees (and their respective dependents) for certain of the Subsidiaries, including, but not limited to (i) medical, dental, vision and prescription drug coverage, (ii) flexible spending accounts and transportation and expense accounts, (iii) a voluntary employee beneficiary association ("VEBA"), (iv) life and accidental death & dismemberment insurance, (v) long-term disability and short-term disability coverage, (vi) COBRA coverage, (vii) workers' compensation, (viii) a defined contribution retirement plan, and (ix) three tax-qualified defined benefit plans, as such plans, programs, and

arrangements may exist from time to time (the "Intercompany Employee Benefits"). I estimate that the monthly cost of providing the Intercompany Employee Benefits is approximately $3.5 to $4 million.

74.     For Intercompany Employee Benefits that are considered health and welfare benefit plans and programs ("Intercompany Welfare Plans") and that are provided on a fully-insured basis, each Subsidiary reimburses the Debtor for its allocable share of any costs on account of such plans, while each Partnership pays its costs on account of such plans directly to the applicable third-party insurance provider. For Intercompany Welfare Plans that are provided on a self-insured basis, the Subsidiaries and the Partnerships pay their allocable share of the costs on account of such plans to the Debtor and/or the VEBA. In addition, each of the Subsidiaries reimburses the Debtor for its allocable share of any administrative fees that the Debtor pays third-party providers on account of the administration of certain of the Intercompany Welfare Plans.

75.     The Debtor maintains a tax-qualified defined contribution plan for the benefit of approximately 10,400 current and former employees of certain of the Subsidiaries. In the case of the Payroll Subsidiaries whose employees participate in the plan, the Debtor deducts contributions from the participating employees' paychecks and remits the employee contribution amounts to the plan's third-party trustee. In the case of the Subsidiaries whose employees participate in the plan and for which the Debtor does not provide Payroll Processing and in the case of the Partnerships whose employees participate in the plan, each such Subsidiary or Partnership remits its participating employee contribution amounts directly to the plan's third-party trustee. Matching and/or profit sharing contributions for participating employees entitled to receive them are paid or reimbursed by the relevant Subsidiary or Partnership.

76.     The Debtor maintains three noncontributory tax-qualified defined benefit pension plans for the benefit of the employees and former employees of certain of the Subsidiaries, including the MediaNews Group Defined Benefit Plan for Certain Employees (the "MNG Plan"), the Northwest Publications Pension Plan for Guild Employees of Saint Paul Division (the "St. Paul Guild Plan"), and the San Jose Mercury-News Inc. Amended Retirement Plan Covering Employees Represented by the San Jose Newspaper Guild (the "San Jose Plan") (collectively referred to herein as the "Pension Plans").  The Pension Plans are all frozen as to new participants and benefits accruals, except that certain union employees of a Subsidiary of the Debtor still accrue benefits under the MNG Plan.

77.     The Debtor is required to make minimum funding contributions to the Pension Plans.  I estimate that the Debtor's contribution to the Pension Plans for the 2010 calendar year is approximately $6.75 million, or approximately $1.6875 million per quarter.  The Debtor made its first quarterly contribution on January 15, 2010, and its second quarterly contribution is due on April 15, 2010.  Each applicable Subsidiary pays or reimburses the Debtor for its allocable share of the minimum funding contributions on account of the MNG Plan and the St. Paul Guild Plan.  In the case of the San Jose Plan, all contributions are funded directly by the California Newspapers Partnership, whose employees are covered by the San Jose Plan.

78.     The Debtor also pays vendors' invoices for itself and for the Subsidiaries and the Partnerships in cash or with an American Express Purchasing Card (known as a "P-Card"), issued to the Debtor pursuant to a certain Corporate Services Commercial Account Agreement effective as of July 14, 2009 (the "P-Card Agreement") between the Debtor and American Express Travel Related Services Company, Inc. ("American Express").  Some 1,800 employees of the Debtor, the Subsidiaries and the Partnerships use the P-Card for a wide array of

business expenses, including payment of invoices and the costs of travel, lodging, professional seminars and conventions, meals, supplies, and miscellaneous business expenses. The Debtor processes over 120,000 transactions on the P-Card annually.

79.    The American Express relationship is a significant part of the Debtor's transaction processing functionality. The Debtor charges approximately $80 million per year to the P-Card. The credit limit on the P-Card is $2,000,000, and the Debtor's outstanding obligations at any time are backstopped by a $2,000,000 letter of credit issued in favor of American Express.

80.    To maintain the balance owing on the P-Card to less than $2,000,000, the Debtor routinely pays American Express weekly, and, at month end when transaction volumes increase, it pays as often as daily.

81.    Using the P-Card to buy goods and services creates an efficient method for processing, tracking and managing purchases. The particular employees at each Subsidiary or Partnership who directly procure the goods or services for such Subsidiary or Partnership pay the invoices for such goods or services using the P-Card. Payment transactions and account codings are then uploaded and reconciled automatically. Eliminating the need for manual input, which would require approximately eight (8) full time employees, reduces expenses and improves the accuracy and timeliness of cost reporting.

82.    At the end of each year, the Debtor receives a cash rebate from American Express, in an amount based on the amount charged on the P-Card. The amount of the rebate is subject to confidentiality restrictions in the P-Card Agreement, but it is significant to the operation of the Debtor's business.

83.     Pursuant to Section 6 of the P-Card Agreement, American Express contends that it may terminate the agreement effective immediately upon the Debtor's filing of this bankruptcy case.  American Express has agreed not to terminate or attempt to terminate the P-Card Agreement if this Court approves the relief sought in the Intercompany Services Motion.

84.     Collecting the Subsidiaries' receipts and Partnerships' fees and reimbursements, and providing the Intercompany Services, Intercompany Payroll Services and Processing, Intercompany Employee Benefits and paying other operating expenses of the Debtor and the Subsidiaries and the Partnerships, whether with cash or by the P-Card, is fundamental to the Debtor's business model.  If the Debtor were required to discontinue any of these business practices post-petition, I believe that the operation of the entire enterprise would be disrupted.  In turn, the Debtor's financial viability as well as the Subsidiaries and their Partnerships, as well as its ability to consummate the Prepackaged Plan, which is premised upon the continuation of the Debtor's current business practices, would be severely jeopardized.

85.     Were the Debtor, its Subsidiaries and the Partnerships required to obtain from third parties the services, and in the case of the Intercompany Employee Benefits, employee benefit plan coverages, they currently receive through the Intercompany Services, Intercompany Payroll Services and Processing, Intercompany Employee Benefits or the Intercompany Services Payments System on a per company basis, aside from incurring excessive financial burdens in identifying appropriate providers of these services and coverages and entering into individual agreements for providing these services and coverages, the Debtor's management would be required to divert its attention and efforts from the goal of achieving a financial restructuring, on terms already agreed to, with minimal effect on business operations.

86.     The American Express relationship is similarly very important to the Debtor and the success of this case.  Unless American Express is protected by the continued effectiveness of the letter of credit supporting the Debtor's obligations to American Express, American Express will terminate the P-Card Agreement and draw on the letter of credit, causing the Debtor to lose one of its primary means of procuring goods and services necessary to its business with no immediate prospect of replacing that ability.  Additionally, my management team has estimated that the Debtor would have to hire approximately eight full time employees and incur significant cost to process the invoices that are currently paid automatically via the P-Card process.  Some 1,800 employees of the Debtor, the Subsidiaries and the Partnerships use the P-Card for a wide array of business expenses, including payment of invoices and the costs of travel, lodging, professional seminars and conventions, meals, supplies, and miscellaneous business expenses.  The Debtor processes over 120,000 transactions on the P-Card annually.  Expeditious payment of the Debtor's vendors is a crucial aspect to the success of the Prepackaged Plan.  The P-Cards are the mechanism that allows such payments to happen in a timely manner.

87.     Based on the foregoing, I believe that the relief requested in the Intercompany Services Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtor's estate and its creditors.  Accordingly, I believe the relief requested in the Intercompany Services Motion should be granted.

**C.** **Debtor's Motion (I) Authorizing the Debtor to Pay Certain Pre-petition (A) Wages, Salaries and Other Compensation, (B) Reimbursable Employee Expenses and (C) Employee Benefits, (II) Authorizing and Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests and (III) Granting Related Relief (the "Employee Wage Motion")**

88.     As of the Petition Date, the Debtor employs approximately 100 Employees.  Prior to the Petition Date, the Debtor incurred payroll and various other obligations and offered standard employee benefits funded by either the Debtor, its employees or both.  The payroll and various other obligations as well as the standard employee benefits were designed to be an integral part of the compensation the Debtor's employees receive.  By the Employee Wage Motion, the Debtor seeks the entry of an order authorizing, but not requiring, the Debtor to pay or otherwise honor, in its sole discretion, (i) pre-petition employee-related obligations, including wages, salaries, overtime pay, commissions, bonuses, vacation pay, personal leave pay, sick leave pay, holiday pay and other accrued compensation, that were earned prior to the Petition Date, but that are scheduled to be paid post-petition, (ii) employer taxes and withholding taxes owed to local, state and federal authorities, (iii) deductions of certain amounts from employees' paychecks for garnishments and contributions to various plans, programs, and arrangements, including, without limitation, the 401(k) savings plan, health and welfare benefit plans, flexible spending and dependent care accounts, transportation and parking accounts, and other similar plans, programs and arrangements, and (iv) outstanding claims for unreimbursed business expenses (all of the foregoing pre-petition employee obligations are collectively referred to hereinafter as the "Employee Obligations").

89.     The Debtor also seeks authorization, but not direction, to maintain, honor and continue to offer its plans, programs and policies for its employees, former employees and their respective eligible dependents, including, among other things, (i) medical, dental, vision

and prescription drug coverage, (ii) flexible spending accounts and transportation and parking accounts, (iii) a voluntary employee beneficiary association ("VEBA") trust, (iv) basic, supplemental, and executive term life and basic, supplemental, and executive accidental death & dismemberment insurance, (v) long-term disability and short-term disability coverage, (vi) tuition reimbursement, (vii) COBRA coverage, (viii) a defined contribution retirement plan, and (ix) other miscellaneous benefits (all the foregoing plans, programs, and policies are collectively referred to hereinafter as the "Employee Benefits") as they were in effect on the Petition Date, and as such may be modified, amended or supplemented from time to time in the ordinary course of business, and to make any necessary contributions to such programs and pay any unpaid premium, claim or amount owed as of the Petition Date.

90.     In addition, the Debtor seeks an order authorizing and directing all banks and other financial institutions to receive, process, honor and pay any and all checks or wire transfers drawn on the Debtor's accounts with respect to payments described in the Employee Wage Motion. The Debtor additionally requests that the Court authorize it to issue new post-petition checks to replace any checks that may be dishonored and to reimburse any expenses that employees may incur as a result of any bank's failure to honor a pre-petition check.

91.     In the ordinary course of the Debtor's business, the Debtor pays wages, salaries and compensation to its Employees (collectively, "Wage Obligations") on a bi-weekly or monthly basis. The Debtor has approximately eighty (80) employees who are paid once a month (the "Monthly Pay Employees"). On or about the fifteenth day of each month, the Debtor pays the Monthly Pay Employees two weeks in advance and two weeks in arrears with an average of $900,000 in Wage Obligations each pay period. The Debtor has approximately twenty (20) Employees who are paid bi-weekly (the "Bi-Weekly Pay Employees"). The Debtor pays the Bi-

Weekly Pay Employees in arrears with an average of $30,000 in Wage Obligations each pay period.

92.     I and my management team estimate that as of the Petition Date the Debtor's liability for earned, but unpaid, Wage Obligations to Monthly Pay Employees is $0 and its liability for earned, but unpaid, Wage Obligations to the Bi-Weekly Pay Employees is approximately $15,000 (the "Pre-petition Wage Obligations"). The aggregate amount of Pre-petition Wage Obligations could be higher as some payroll checks from prior work periods may be and/or remain outstanding and may need to be reissued due to the Debtor's filing for chapter 11 protection.

93.     Any non-exempt Employee who works over forty (40) hours a week is eligible for overtime pay ("Overtime") at the rate of 1.5 times the Employee's base hourly rate. I and my management team estimate that as of the Petition Date the Debtor's total liability on account of earned, but unpaid, Overtime is nominal.

94.     In the ordinary course of business, as an incentive to encourage and reward outstanding performance, the Debtor offers its Employees the opportunity to earn discretionary cash bonuses under an annual bonus plan ("Bonuses"). On January 15, 2010, the Debtor paid out discretionary Bonuses equal to $318,700 to forty-four (44) non-executive employees and one vice president, pursuant to his offer of employment, in each case, as a reward for performance in the 2009 fiscal year.

95.     In addition to fixed compensation, in the ordinary course of business, the Debtor offers two of its Employees commissions ("Commissions"). Commissions are paid through payroll quarterly. I and my management team estimate that as of the Petition Date the Debtor's total liability on account of earned, but unpaid, Commissions is $0.

96.     I and my management team do not believe that any claims of Employees against the Debtor for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date exceed $10,950 per individual.  To the extent that there are any such claims, they would be with respect to only a few Employees.

97.     As part of their overall compensation, Employees are entitled to receive a certain number of vacation days each year ("Vacation Days").  Employees earn up to twenty-five (25) paid Vacation Days per year, depending on their length of service with the Debtor.  Employees may carry unused Vacation Days from one year to the next year with the written approval of their supervisor up to a maximum of forty (40) hours per year.  Upon termination of employment, Employees receive "cash out" payments of any accrued but unused Vacation Days.  This policy is consistent with laws of most states, which provide that vacation benefits are vested and must be paid upon termination of employment.  I and my management team estimate that, as of the Petition Date, the Debtor's total liability for accrued, but unpaid, Vacation Days is approximately $71,025.

98.     The Debtor is required by law to withhold from its Employees' salaries and wages amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Withholding Taxes"), and remit them to the appropriate taxing authorities (the "Taxing Authorities").  In addition, the Debtor is required to make payments from its own funds on account of Social Security and Medicare taxes, and to pay, based on a percentage of gross payroll, additional amounts for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes", and together with the Withholding Taxes, the "Payroll Taxes").

99. The Debtor's Payroll Taxes, including both the employee and employer portion, typically total approximately $400,000 per pay period for the Monthly Pay Employees and approximately $10,000 per pay period for the Bi-Weekly Pay Employees. Where Employees are owed pre-petition compensation amounts, the applicable Withholding Taxes have not yet been withheld. Additionally, the Debtor may not yet have forwarded to Taxing Authorities the payments that are attributable to the Withholding Taxes that have been withheld from the Employees' paychecks. I and my management team estimate that, as of the Petition Date, the Debtor is holding Withholding Taxes aggregating $0, for remittance to the Taxing Authorities, and will be obligated to withhold approximately $3,500 in Withholding Taxes from the Pre-Petition Wage Obligations for future remittance to the Taxing Authorities. I and my management team estimate that, as of the Petition Date, the Debtor's liability on account of Employer Payroll Taxes is approximately $1,700.

100. During each pay period, the Debtor routinely deducts certain amounts from Employees' paychecks, including, without limitation: (i) amounts for various garnishments, such as tax levies, child support, and other court-ordered garnishments (collectively, the "Garnishments") and (ii) pre-tax and after-tax deductions pursuant to certain Employees' instructions for contribution or remittance to various plans, programs and arrangements, including, without limitation, the 401(k) savings plan, health and welfare benefit plans, flexible spending and dependent care accounts, transportation and parking accounts, and other similar plans, programs and arrangements (collectively, the "Designated Deductions", and together with the Garnishments, the "Deductions"). The Debtor forwards the amount of the Deductions (with the exception of amounts owing on account of self-insured programs) to various third-party recipients.

101.     The Deductions typically total approximately $75,000 per pay period from the Monthly Pay Employees' paychecks and approximately $2,100 per pay period from the Bi-Weekly Pay Employees' paychecks.  Where Employees are owed pre-petition compensation amounts, the applicable Deductions have not yet been taken.  Additionally, the Debtor may not yet have forwarded to the various third-party recipients the payments that are attributable to the Deductions that have been withheld from the Employee paychecks.  I and my management team estimate that, as of the Petition Date, the Debtor is holding Deductions aggregating approximately $0 for remittance to third parties, and will be obligated to withhold approximately $1,000 in Deductions from the Pre-petition Wage Obligations for future remittance to third parties.

102.     Before the Petition Date, certain of the Employees regularly incurred business expenses, which, consistent with ordinary practice, are reimbursable by the Debtor (the "Reimbursable Expenses").  The Reimbursable Expenses include, without limitation, expenses for work-related travel, lodging, auto expenses, telephone charges, internet charges and meals, as well as business relocation, and other reimbursable expenses.  It is difficult for me to determine the exact amount outstanding for Reimbursable Expenses at any particular time because Employees do not always submit claims for reimbursement promptly.  I and my management team estimate (based on our past experience) that, as of the Petition Date, the Debtor's total liability for accrued, but unreimbursed, Reimbursable Expenses (submitted and unsubmitted) is approximately $5,500.

103.     As of the Petition Date, the Debtor was obligated to pay certain contributions to and benefits under the plans related to such Employee Benefits (collectively, the "Benefit Contributions").  Those Benefit Contributions either (i) were due and unpaid by the

Debtor as of the Petition Date or (ii) accrued either in whole or in part prior to the Petition Date, but are not payable in the ordinary course of the Debtor's business until a later date.

104.     The Debtor offers medical and prescription drug benefits to its eligible Employees and their dependents through a self-insured plan administered by Anthem Blue Cross (the "Medical Plan"). Employees can choose between three coverage options under the Medical Plan, all of which are preferred provider organizations, but differ in certain ways such as the amount of the premium, deductibles, co-pays, and out-of-pocket maximums. Full-time Employees are eligible to participate in the Medical Plan on the first day of the month following their date of hire.

105.     At the beginning of each plan year, the Debtor has an actuarial analysis conducted to project the annual costs of providing the Medical Plan. The Debtor also uses this analysis to establish the amount that will be paid by participating Employees through employee premium payments. For calendar year 2010, I and my management team project that the Debtor will pay approximately 70% of the projected plan costs for its Employees with participating Employees paying the remaining 30% through bi-weekly or monthly payroll deductions, as the case may be. Based on the most recent actuarial analysis, I and my management team project the Debtor's net annual cost on account of the Medical Plan, with respect to the Employees and their dependents, to be approximately $365,000, or approximately $30,000 monthly.

106.     The Debtor also pays an average of approximately $3,300 per month to Anthem Blue Cross in administrative fees for its services in connection with the Medical Plan. As of the Petition Date, I and my management team estimate that there are $0 in unpaid and outstanding administrative fees on account of the Medical Plan. In addition, the Debtor pays an average of approximately $1,500 per month to Reliastar Life Insurance Company in connection

with premium expenses for stop-loss coverage.  Such stop-loss coverage fully covers any individual's claims in excess of $350,000 in a calendar year.  As of the Petition Date, I and my management team estimate that there are $0 in unpaid and outstanding premiums on account of the stop-loss insurance.  As of the Petition Date, I and my management team estimate that the Debtor's liability on account of incurred but unpaid medical claims for Employees is approximately $140,000.

107.    The Debtor offers supplemental medical benefits to certain of its eligible executive Employees and their dependents at no cost to the Employee under a fully insured plan underwritten by Executive Edge, and prior to January 1, 2010, by Jefferson Pilot Financial (the "Supplemental Medical Plan").  The Supplemental Medical Plan covers medical expenses that are not otherwise covered under the Debtor's basic medical plan.  The Supplemental Medical Plan costs the Debtor a total of approximately $1,125 per month.  As of the Petition Date, I and my management team estimate there are $0 in unpaid and outstanding premiums on account of the Supplemental Medical Plan.

108.    The Debtor offers dental benefits to its eligible Employees and their dependents through a fully insured plan administered by Delta Dental (the "Dental Plan").  Employees can choose between four coverage options under the Dental Plan, which differ in certain ways such as the amount of the premium, deductibles, co-pays, and out-of-pocket maximums.  Full-time Employees are eligible to participate in the Dental Plan on the first day of the month following their date of hire.  For calendar year 2010, I and my management team project that the Debtor will pay approximately 57% of the projected plan costs for its Employees with participating Employees paying the remaining 43% through bi-weekly or monthly payroll deductions, as the case may be.  We project that the Debtor's net annual cost on account of the

Dental Plan with respect to Employees and their dependents is approximately $45,000, or approximately $3,750 per month. As of the Petition Date, we estimate that there are $0 in unpaid and outstanding premiums on account of the Dental Plan.

109. The Debtor offers Employees and their dependents vision coverage under a fully insured plan provided by Vision Service Plan Insurance Company (the "Vision Plan") at the Employees' sole expense. Full-time Employees are eligible to participate in the Vision Plan on the first day of the month following their date of hire. If an eligible Employee elects to enroll in the Vision Plan, the Debtor withholds the appropriate premiums from such Employee's paycheck and remits the deductions to Vision Service Plan Insurance Company on such Employee's behalf. The Debtor has no direct financial obligation arising out of the Vision Plan. As of the Petition Date, I and my management team Debtor estimate that the Debtor is holding $0 in deductions related to the Vision Plan for remittance to Vision Services Plan Insurance Company, and will be obligated to withhold approximately $40 in deductions from Pre-petition Wage Obligations for future remittance to Vision Services Plan Insurance Company.

110. The Debtor offers its Employees the opportunity to contribute through pre-tax compensation deductions from the Employees' paychecks to flexible spending accounts to be used for healthcare related expenses and dependent care expenses (the "FSA"). The Debtor also offers its Employees the opportunity to contribute, through pre-tax compensation deductions from the Employees' paychecks, to a transportation plan under Section 132 of the Internal Revenue Code for qualified transportation and parking expenses (the "132 Plan"). The funds deducted from the Employees' paychecks under the FSA and the 132 Plan are remitted to PayFlex, which administers and remits reimbursements. As of the Petition Date, I and my management team estimate that the Debtor is holding FSA deductions and 132 Plan deductions

44

of $0 for remittance to PayFlex, and will be obligated to withhold approximately $100 in deductions from the Pre-petition Wage Obligations for future remittance to PayFlex. The Debtor also maintains the VEBA trust, which is a tax-exempt trust under section 501(c)(9) of the Internal Revenue Code. The VEBA trust is used to fund the benefits under the Debtor's self-funded Medical Plan. Employee contributions and contributions by the Debtor under the Medical Plan are made to the VEBA trust.

111. The Debtor provides basic life and AD&D insurance coverage to its Employees through a fully insured group term life insurance policy issued by Aetna ("Basic Life Plan") at no cost to the Employees. Full-time Employees are eligible to participate in the Basic Life Plan on the first day of the month following their date of hire. The Basic Life Plan provides a benefit equal to the Employee's base salary up to a maximum of $50,000. For calendar year 2010, the Debtor estimates that the annual costs in connection with the Basic Life Plan will be approximately $10,000, or $1,000 per month. As of the Petition Date, I and my management team estimate that there are $0 in unpaid and outstanding premiums on account of the Basic Life Plan.

112. The Debtor provides executive life and AD&D insurance coverage to certain of its executive Employees through a fully insured group term life insurance policy issued by Aetna ("Executive Life Plan") at no cost to the executive Employees. For calendar year 2010, I and my management team estimate that the annual costs in connection with the Executive Life Plan will be approximately $143,500, or $12,000 per month. As of the Petition Date, we estimate that there are $0 in unpaid and outstanding premiums on account of the Executive Life Plan.

113. Employees are entitled to elect, solely at their own expense, to purchase supplemental life insurance and dependent life insurance and accident coverage through a fully insured supplemental life insurance policy issued by Aetna ("Supplemental Life Insurance Plan"). Full-time Employees are eligible to elect coverage under the Supplemental Life Insurance Plan on the first day of the month following their date of hire. If an eligible Employee elects to enroll in the Supplemental Life Insurance Plan, the Debtor withholds the appropriate premiums from such Employee's paycheck and remits the withholdings to Aetna on such Employee's behalf. The Debtor has no direct financial obligation arising out of the Supplemental Life Insurance Plan. As of the Petition Date, I and my management team estimate that the Debtor is holding $0 in deductions related to the Supplemental Life Insurance Plan for remittance to Aetna, and will be obligated to withhold approximately $10 in deductions from the Pre-Petition Wage Obligations for future remittance to Aetna.

114. The Debtor provides long-term disability benefits to its Employees under a fully insured plan through UNUM Insurance Company (the "Long-Term Disability Plan") at no cost to Employees. After ninety (90) calendar days of total disability, an Employee is entitled to monthly benefits under the plan paid directly from UNUM Insurance Company equal to 60% of the Employee's base pay, up to a monthly maximum of $10,000. For calendar year 2010, I and my management team project that the annual costs in connection with the Long-Term Disability Plan will be approximately $81,000, or approximately $7,000 per month. As of the Petition Date, we estimate that there are $0 in unpaid and outstanding premiums on account of the Long-Term Disability Plan.

115. The Debtor provides short-term disability benefits to its Employees under a self-insured plan (the "Short-Term Disability Plan") at no cost to Employees. Employees are

entitled to benefits under the Short-Term Disability Plan after seven (7) days of Employer approved medical leave, and benefits under the Short-Term Disability Plan are paid for up to ninety (90) days of a physician certified medical leave. Benefits are equal to 70% of the Employee's base pay, up to a weekly maximum of $2,000. For calendar year 2010, the Debtor projects that the annual cost of the Short-Term Disability Plan for all eligible Employees will be approximately $10,000, or approximately $833 per month. The Debtor also pays approximately $25,000 annually, or approximately $2,000 per month, to UNUM Insurance Company in administrative fees for its services in connection with the Short-Term Disability Plan. As of the Petition Date, I and my management team estimate that the Debtor's liability on account of the Short-Term Disability Plan is approximately $2,500.

116.    The Debtor also provides its executive Employees with executive short-term and long-term disability benefits under a self-insured short term disability plan (the "Executive STD Plan") and an insured long-term disability plan (the "Executive LTD Plan"), respectively, at no cost to the Employees. As of the Petition Date, there are no amounts due and owing under the Executive STD Plan. For calendar year 2010, I and my management team project that the annual costs in connection with the Executive LTD Plan will be approximately $52,000, or approximately $4,300 per month. As of the Petition Date, we estimate that there are $0 in unpaid and outstanding premiums on account of the Executive LTD Plan.

117.    The Debtor pays in the ordinary course of business certain costs associated with the provision of COBRA extended group health benefits insurance coverage to certain former employees and their dependents (the "COBRA Coverage"). The Debtor's COBRA Coverage is administered by P & A Group for a fee of $100 per month (the "COBRA Program").

Under the COBRA Program, an Employee may elect to receive COBRA Coverage for the continuance of the Medical Plan, Dental Plan, Vision Plan, and health FSA.

118.     The Debtor maintains a tuition reimbursement program that is available to Employees for job-related or degree-plan courses that are pre-approved by the Employer (the "Tuition Reimbursement Program").  Under the Tuition Reimbursement Program, Employees are eligible to be reimbursed for up to 80% of the cost of tuition, books and fees, up to a maximum of $500 per semester, within three months following successful completion of the approved coursework, as evidenced by a passing grade of "C" or better.  For calendar year 2010, I and my management team Debtor project that the Debtor will pay approximately $0 under the Tuition Reimbursement Program.  As of the Petition Date, we estimate that the Debtor's liability on account of outstanding reimbursements under the Tuition Reimbursement Program is $0.

119.     The Debtor provides four Employees with car allowances.  The Debtor estimates that the monthly cost associated with the car allowance is approximately $2,600, and as of the Petition Date, $0 is owed with respect to such car allowances.

120.     Under the laws of the various states in which the Debtor operates, the Debtor is required to maintain workers' compensation policies and programs or participate in workers' compensation programs administered by state governments, and to provide its employees with workers' compensation coverage for claims arising from or related to their employment with the Debtor ("Workers' Compensation").  Under its Workers' Compensation insurance, the Debtor is insured through The Hartford Insurance Company for statutory liabilities with a $500,000 per occurrence deductible.  The Debtor's annual cost for its Workers' Compensation policy and state programs is approximately $245,000.  The Debtor pays amounts owed on Workers' Compensation claims on a monthly basis.  In addition, the Debtor's obligation

includes approximately $300 per year for services rendered by the third party administrator of its Workers' Compensation program.

121.     The Debtor offers a tax-qualified defined contribution retirement plan (the "401(k) Plan") for its Employees who have attained the age of 21.  Eligible Employees may contribute a percentage of their eligible compensation to the 401(k) Plan on a pre-tax basis.  The Employer currently does not make employer-matching or profit-sharing contributions under the 401(k) Plan with respect to its Employees who participate in the 401(k) Plan.  Approximately 100 Employees are currently eligible to contribute to the 401(k) Plan.  The Debtor deducts contributions from participating Employees' paychecks and remits the Employee contribution amounts to Fidelity Management Trust Company as trustee.  The approximate aggregate amount withheld from Employee paychecks for contributions to the 401(k) Plan is $35,000 per pay period for the Monthly Pay Employees, and $1,000 per pay period for the Bi-Weekly Pay Employees.  The fees of Fidelity Management Trust Company and its affiliates for their administrative and recordkeeping services are charged to the 401(k) Plan as plan expenses.

122.     The Employees' skills, knowledge, and understanding of the Debtor's business are the Debtor's most valuable asset.  The Employees perform a variety of critical functions for the Debtor's business, including sales and sales support, financial and other management and administrative functions, human resources, compliance, research service, IT services, web hosting, circulation support and general clerical and administrative support.  The Employees' skills and their specialized knowledge and understanding of the Debtor's infrastructure and operations, as well as their relationships with customers, vendors and other third parties, are essential to the Debtor's continuing operations.  Without the continued services of the Employees, I do not believe that an effective reorganization of the Debtor will be possible.

123. In this case, any delay or failure to pay Employee Obligations and Employee Benefits could irreparably impair the Employees' morale, dedication, confidence, and cooperation, and could adversely impact the Debtor's relationship with the Employees at a time when the Employees' support is critical to the success of the Chapter 11 Case. The Debtor simply cannot risk the substantial damage to its business that would inevitably attend any decline in its Employees' morale. Moreover, because this prepackaged case is advancing under a compressed schedule, paying the Employees in the ordinary course of business will enable the Debtor to operate smoothly during this case. Such relief allows the Debtor to focus on consummating the Prepackaged Plan for the benefit of its estate and creditors. Under these circumstances, approval of the requested relief is appropriate.

124. Absent an order granting the relief requested in the Employee Wage Motion, the Employees could suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question may be needed to enable certain of the Employees to meet their own personal financial obligations. Imposing such hardship on the Employees could undermine the Debtor's stability, perhaps irreparably, because it could cause otherwise loyal Employees to seek other employment alternatives. In addition, it would be inequitable to require the Employees to bear personally the cost of any business expenses they incurred pre-petition on behalf of the Debtor with the understanding that they would be reimbursed.

125. I am informed by counsel that many of the Employee Obligations relating to the period prior to the Petition Date constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code. As priority claims, these obligations must be paid in full before any of the Debtor's general unsecured obligations may be satisfied. Accordingly, the relief requested

will affect only the timing of the payment of these priority obligations, and should not prejudice the rights of general unsecured creditors or other parties in interest.

126.     The total amount sought to be paid relating to the Employee Wage Motion is relatively modest compared with the magnitude of the Debtor's overall business and the importance of the Employees to the Chapter 11 Case.  Accordingly, I submit that the relief requested in the Employee Wage Motion is in the best interests of the Debtor's estate, its creditors and parties in interest.

**D.     Debtor's Motion for Entry of an Order Authorizing Payment of Ordinary Course Claims in the Ordinary Course of Business (the "Ordinary Course Claims Motion")**

127.     The Debtor filed this prepackaged Chapter 11 Case to effectuate an agreed financial restructuring, and intends to take every action possible to minimize the effect of the filing on the business operations of the Debtor and its Subsidiaries.  Preserving the value of the Debtor's business, while right-sizing the Debtor's debt structure, is critical to the success of the Prepackaged Plan.  To that end, the Prepackaged Plan is designed to have little or no effect on unimpaired creditors:  those creditors' claims are unimpaired under the Prepackaged Plan, and will be paid as they come due in the ordinary course of business, in order to minimize disruption to the Debtor's business and maximize its value as a going concern.  By the Ordinary Course Claims Motion, the Debtor requests, pursuant to sections 105, 363, 503(b)(9), 1107 and 1108 of the Bankruptcy Code, entry of an order authorizing, but not directing, the Debtor to pay, as they come due in the ordinary course of business, the pre-petition ordinary course claims (the "Ordinary Course Claims") of holders of Other Indebtedness and providers of goods and services to the Debtor and its Subsidiaries and the Partnerships (collectively, the "Vendors") who agree to continue to provide their goods and services on the customary credit terms that existed within the

120 days prior to the Petition Date, or on such other terms and conditions as are acceptable to the Debtor, or on such other terms and conditions as are acceptable to the Debtor, up to $600,000 per month and $3 million in the aggregate.

128.     Such Ordinary Course Claims may include, but are not limited to, claims of the Debtor's (i) providers of supplies, equipment and services necessary to the Debtor's business operations and the business operations of the Debtor's Subsidiaries and the Partnerships; (ii) advertisers; (iii) rent and utility service providers; (iv) external data and technology support service providers; (v) consultants, legal advisors (except for those professionals required to file fee applications and ordinary course professionals whose employment the Debtor will be requesting pursuant to a separate motion) and auditors that are not addressed in other first day motions; and (vi) other general operational expenses.  Based on the Debtor's books and records, the Debtor estimates that the total amount of Ordinary Course Claims to be paid to the Vendors will be approximately $600,000 per month, and it will not exceed $3 million in the aggregate.

129.     The Debtor is not seeking to give priority to so-called "critical vendors." Rather, the Debtor is seeking to pay the Vendors' Ordinary Course Claims consistent with and in the spirit of the Prepackaged Plan, which proposes to pay such claims as they come due.  Under the Prepackaged Plan, claims for unsecured debt incurred in the ordinary course of business are classified as Class 4 claims.  The Prepackaged Plan provides that Class 4 claims are unimpaired and that unless the holder of such claim and the Debtor agree to different treatment, on the Effective Date, each holder of a Class 4 claim shall have its Claim reinstated.

130.     Additionally, the Prepackaged Plan provides that claims for other secured debt in Class 3 are unimpaired and that unless the holder of such claim and the Debtor agree to

different treatment, on the Effective Date, each holder of a Class 3 claim shall have its Claim reinstated.

131.     In my experience, the Debtor's relationships with its Vendors and other trade creditors (including vendors to the Debtor's Subsidiaries, whose invoices are paid by the Debtor) are critical to the continued operation of the Debtor's business during and after its bankruptcy case, and therefore it is crucial that the Debtor be permitted to honor its publicly expressed commitment to pay the Ordinary Course Claims in the ordinary course of its business.

132.     In my opinion, absent payment of the Ordinary Course Claims in the ordinary course of business, the Debtor's business may be disrupted and certain Vendors may delay delivery of goods and services or demand trade terms, including payment in advance, that are less favorable to the Debtor, as a condition to continuing a business relationship with the Debtor.  Any short term disruption could generate instability and would damage the "business as usual" message on which the Debtor's prepackaged reorganization is predicated and undermine the Debtor's efforts to repair customer confidence.

133.     Payment of the Ordinary Course Claims in the ordinary course of business is especially appropriate here because the payment of such claims in the ordinary course is already a key feature of the Debtor's reorganization, is necessary to preserve the value of its business, has been agreed to by the Senior Lenders, and will ease the administrative burden during the very limited period pending confirmation.  Accordingly, I submit that the relief requested in the Ordinary Course Claims Motion is in the best interests of the Debtor's estate, creditors and parties in interest.

**E.** **Debtor's Motion to (I) Continue Liability, Property and other Insurance Programs for the Debtor and its Subsidiaries and (II) Pay All Obligations in Respect Thereof (the "Insurance Motion")**

134.    Prior to the Petition Date, the Debtor maintained various liability, property, directors' and officers' liability, and other insurance policies and programs, including self-insurance programs.  By the Insurance Motion, the Debtor requests entry of an order pursuant to sections 105(a), 362(d), 363(b), and 503(b) of the Bankruptcy Code, authorizing the Debtor to continue various liability, property, directors' and officers' liability, and other insurance policies and programs for itself and its Subsidiaries, including any and all liability self-insurance programs (the "Insurance Programs") uninterrupted and to honor its undisputed pre-petition obligations thereunder, including the Insurance LOC Facility (the "Insurance Obligations").

135.    The Insurance Programs provide the Debtor and its Subsidiaries with insurance coverage for liabilities relating to, among other things, premises, product, automobile liability, professional, foreign, directors' and officers' fiduciaries, crime, aviation, damage to the property of Debtor and others, and various other product- and property-related and general liabilities.  Under the policies with the Hartford Insurance Company, the Debtor's obligations to the Insurance Provider are secured by cash and a letter of credit facility (the "Insurance LOC Facility") provided by Bank of America, N.A., which charges the Debtor a quarterly fee to maintain the Insurance LOC Facility.  Continuation of the Insurance Programs is essential to the operation of the Debtor's business and the businesses of its Subsidiaries and is necessary to protect the Debtor from catastrophic liability.

136.    The Debtor is required to pay premiums under the Insurance Programs based upon rates established by the applicable Insurance Carrier.  The annual premiums for these

policies aggregate approximately $6.4 million.  In most instances, the Debtor pays these premiums in full directly to the Insurance Carriers at the commencement of the respective policies.  In addition to annual premiums, pursuant to certain of the Insurance Programs, the Debtor is required to pay various deductibles and retentions for claims asserted under the policies, which are billed on a monthly basis, as well as certain retrospective premium adjustments, which are billed after the end of the policy term.  As of the Petition Date, I and my management team believe that the Debtor has paid all monthly charges and retrospective premium adjustments that have been billed by the Insurance Carriers for all periods through December 31, 2009.  As of the Petition Date, the Debtor may have liability for deductibles and retentions for the portion of the month of January 2010 preceding the Petition Date as well as liability for certain retrospective premium adjustments for policies whose terms expired in 2009. I am not able to estimate these amounts since it has not yet been billed by the Insurance Carriers, but based on prior monthly billings, my management team and I do not anticipate that the amounts allocable to the Debtor will exceed $10,000.  The Debtor is seeking authority in the Insurance Motion to pay any such undisputed obligations, in its discretion, as they come due.

137.    The Debtor provides numerous management and operational services to its Subsidiaries.  These services include the purchase and maintenance of the Insurance Programs for the benefit of its Subsidiaries.  By purchasing insurance for the Subsidiaries, the Debtor achieves significant cost-saving for the Subsidiaries, which in turn benefits the Debtor.

138.    The nature of the Debtor's business and the extent of its operations make it essential for the Debtor to maintain its Insurance Programs on an ongoing and uninterrupted basis.  The nonpayment of any premiums, deductibles, or related fees under one of the Insurance Programs could result in one or more of the Insurance Carriers terminating their existing

policies, declining to renew their insurance policies or refusing to enter into new insurance agreements with the Debtor in the future. If the Insurance Programs are allowed to lapse without renewal, I believe that the Debtor could be exposed to substantial liability for damages resulting to persons and property of the Debtor and others, which exposure could have an extremely negative impact on the Debtor's ability to successfully reorganize. Furthermore, the Debtor would then be required to obtain replacement policies on an expedited basis at what it expects to be a significantly higher cost to its estate. Accordingly, the Debtor must make all payments with respect to the Insurance Programs.

139. Based on the foregoing, the relief requested in the Insurance Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtor's estate and its creditors. Accordingly, I submit that the relief requested in the Insurance Motion is in the best interests of the Debtor's estate, creditors and parties in interest.

F. **Debtor's Motion for Authorization to (I) Continue Its Workers' Compensation Insurance Programs and (II) Pay Certain Pre-petition Workers' Compensation Claims, Premiums and Related Expenses (the "Workers' Compensation Motion")**

140. Under the laws of the various states in which the Debtor operates, the Debtor is required to maintain workers' compensation policies and programs or participate in workers' compensation programs administered by state governments in order to provide its employees with workers' compensation coverage for claims arising from or related to their employment with the Debtor (the "Workers' Compensation Program"). The Debtor's Workers' Compensation Program covers both the employees of the Debtor and the employees of its Subsidiaries and certain of the Partnerships. Under the Debtor's Workers' Compensation Program, the Debtor is insured through The Hartford Insurance Company (the "Insurance Provider") for statutory liabilities with a $500,000 per occurrence deductible. The Debtor's

obligations to the Insurance Provider in connection with the Workers' Compensation Program are secured by cash and a letter of credit facility (the "Workers' Compensation LOC Facility"), provided by Bank of America, N.A. which charges the Debtor a quarterly fee to maintain the Workers' Compensation LOC Facility.

141.    By the Workers' Compensation Motion, the Debtor seeks, pursuant to sections 105(a), 362(d), 363 and 503(b)(1) of the Bankruptcy Code, entry of an order authorizing, but not requiring, the Debtor to continue, in the reasonable exercise of its business judgment, its Workers' Compensation Program in all relevant jurisdictions, to pay certain pre-petition claims, premiums, claim handling fees and related expenses of this program, and to modify the automatic stay as it relates to valid workers' compensation claims.

142.    The Debtor's yearly obligation for its Workers' Compensation Program is approximately $6.1 million.  The Debtor's obligation includes approximately $239,000 per year for services rendered by the Insurance Provider.

143.    Claims under the Debtor's Workers' Compensation Program are processed and paid by the Insurance Provider.  The Debtor in turn pays the Insurance Provider claims and expenses within the deductible as well as the Insurance Provider's premiums and claims handling fees on a monthly basis.  As of the Petition Date, the Debtor may have liability for (i) claims and expenses within the deductible and (ii) the Insurance Provider's premiums and claims handling fees for the portion of the month of January 2010 preceding the Petition Date (collectively, the "Pre-petition Workers' Compensation Claims").  My management team and I are unable to estimate the amount of Pre-petition Workers' Compensation Claims since it has not yet been billed by the Insurance Provider.  However, we estimate that the amount of Pre-petition Workers' Compensation Claims allocable to the Debtor on behalf of its employees will be $0.

We continuously review the adequacy of the Debtor's Workers' Compensation Program, which we currently believe to be appropriate in light of the cost of insurance coverage and the type of risk being insured.

144.     The Debtor requests that it be authorized, in the Debtor's sole discretion, to pay all costs incident to its Workers' Compensation Program, such as processing costs and accrued, but unpaid, premiums, claim handling fees, and related expenses as required for the administration of the maintenance of its Workers' Compensation Program (collectively, the "Workers' Compensation Obligations").  In the ordinary course of its business, the Debtor prepays the Workers' Compensation Obligations.  I believe that the amount of any Workers' Compensation Obligations outstanding as of the Petition Date is minimal.  As a result, I believe that the amount of payments sought to be paid under the Workers' Compensation Motion will be *de minimis*, and that the Debtor seeking the relief requested in the Workers' Compensation Motion only out of an abundance of caution.

145.     Payment of the Workers' Compensation Obligations is justified because the failure to pay any such amounts might jeopardize the Insurance Provider's continued willingness to provide services.  By paying the Workers' Compensation Obligations, the Debtor may avoid even a temporary disruption of such services and thereby ensure that (i) current and former employees obtain all workers' compensation benefits without interruption and (ii) the Debtor remains in compliance with applicable state law at all times.

146.     If the Debtor's Workers' Compensation Program is allowed to lapse without renewal, the Debtor could be exposed to substantial liability for damages resulting to persons and property of the Debtor and others, which exposure could have an extremely negative impact on the Debtor's ability to successfully reorganize.  Furthermore, the Debtor would then

be required to obtain replacement policies on an expedited basis at what it expects to be a significantly higher cost to its estate. Based upon the foregoing, the relief requested in the Workers' Compensation Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtor's estate and its creditors. Accordingly, I submit that the relief requested in the Workers' Compensation Motion is in the best interests of the Debtor's estate, creditors and parties in interest.

G.   **Debtor's Motion for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Services on Account of Pre-petition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

147.   In the ordinary course of business, the Debtor regularly incurs utility expenses for local and long-distance telephone service, Internet service, Internet Web hosting, and other telecommunication services, which are provided by a single utility service provider, Qwest Communications Corporation (the "Utility Provider"). All other utility expenses are incurred by the Subsidiaries and the Partnerships themselves. The Debtor's aggregate average monthly cost for utility services is approximately $ 1,100.

148.   By the Utilities Motion, the Debtor respectfully requests, pursuant to sections 105(a) and 366 of the Bankruptcy Code, entry of interim and final orders (i) determining that the Utility Provider has been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (ii) approving the Debtor's proposed offer of adequate assurance and procedures whereby the Utility Provider may request additional or different adequate assurance; (iii) prohibiting the Utility Provider from altering, refusing or discontinuing services on account of pre-petition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance and (iv) determining that the

Debtor is not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion.

149. As of the Petition Date, I am not aware of any past due amounts owed to the Utility Provider. Overall, the Debtor has an established payment history with the Utility Provider indicating consistent payment for utility services. However, because of the timing of the filing in relationship to the Utility Provider's billing cycle, there may be utility costs that have been invoiced to the Debtor for which payment is not yet due and utility costs for services provided since the end of the last billing cycle that have not been invoiced to the Debtor.

150. Access to the utility services provided by the Utility Provider is crucial to the continued operation of the Debtor. Most essential are the Internet Web hosting services that were designed to meet the specific needs of the Debtor. Such services are crucial for both the Debtor's internal operations and externally for the operation of the Debtor's Subsidiaries. The Debtor, through its Subsidiaries, publishes daily and weekly newspapers and owns and operates Internet Web sites related thereto. The Debtor uses its Internet Web sites to enhance and broaden its position as the leading provider of news, information and services in its local media markets. Moreover, Internet advertising is one of the major revenue drivers of the Debtor's Subsidiaries. Any interruption in the services supplied by the Utility Provider, even for a brief period, would not only, in my opinion, massively disrupt the internal administrative operations of the Debtor, but would also severely damage revenues and profits generated by the operation of the Debtor's local Web sites. Further, such a disruption in utility services would be costly and harmful to the Debtor, as the Debtor would be forced from the outset of this Chapter 11 Case to focus on finding replacement services, rather than focusing on the operation and restructuring of its business.

151.    Based on the foregoing, the relief requested in the Utilities Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtor's estate and its creditors. Accordingly, I submit that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, creditors and parties in interest.

**H.    Motion for an Order Granting Adequate Protection to Certain Pre-petition Secured Parties under the Senior Credit Agreement (the "Adequate Protection Motion")**

152.    By the Adequate Protection Motion, the Debtor requests that the Court grant an order under sections 105(a), 361, and 363 of the Bankruptcy Code, and Rule 4001 of the Bankruptcy Rules authorizing the Debtor to provide the Senior Lenders with the adequate protection payments, as mandated in the Restructuring Support Agreement in order to protect such lenders from any diminution in value of their respective interests in their collateral, namely the stock of the direct and indirect Subsidiaries of the Debtor and certain assets of Alaska Broadcasting Company, for the period after the Petition Date.

153.    Specifically, the Debtor proposes (i) to make post-petition payments (A) to the Administrative Agent and the Senior Lenders in amounts equal to the amount of unpaid interest and letter of credit fees under the Senior Credit Agreement Documents, (B) to members of the Senior Lender Steering Committee in amounts equal to each such member's reasonable out-of-pocket travel and other expenses incurred in connection with service as a member of the Senior Lender Steering Committee, and (C) to the Administrative Agent in amounts equal to the fees, expenses, costs and other charges of the Administrative Agent and other amounts payable (other than principal) to the Administrative Agent pursuant to the Senior Credit Agreement Documents, in the cases of each of clauses (A) through (C) above, as and when such amounts

become due and payable and (ii) to perform under certain other obligations set forth in the Forbearance Agreement.

154.    As described in Section I, *supra*, the Debtor, the Guaranteeing Subsidiaries, certain Senior Lenders and the Administrative Agent entered into the Forbearance Agreement, which provided that the Administrative Agent, who has the power to exercise remedies under the Senior Credit Agreement, would forbear from the exercise of certain remedies against the Debtor and the Guaranteeing Subsidiaries through March 31, 2010, subject to the continued satisfaction of certain conditions and so long as a Termination Event, as defined in the Forbearance Agreement, did not occur.

155.    A chapter 11 filing by the Debtor is a Termination Event under the Forbearance Agreement.  However, under the Restructuring Support Agreement, certain of the Senior Lenders agreed under certain circumstances that the Senior Lenders would continue to forbear from exercising remedies against the Guaranteeing Subsidiaries, on the condition that the Adequate Protection Order (as defined in the Forbearance Agreement) is entered within twenty (20) days of the Petition Date

156.    As of the Petition Date, the accrued and unpaid amount of interest and letter of credit fees was approximately $2 million.  From and after the Petition Date, interest and letter of credit fees at the contract non-default rate will accrue at approximately $2.7 million per month (with the exact amount depending on LIBOR rates and the number of days in the month). These amounts will be payable in addition to the fees, expenses and other amounts (other than principal) that are or may become due and payable under the Senior Credit Agreement Documents.  There is no risk of under- or over-payment of the Senior Lenders because the amount of the Senior Lender Emergence Payment to be made pursuant to Section 4.2 of the

Prepackaged Plan will be adjusted to account for amounts paid as adequate protection during the pendency of the case.

157.    If the relief requested herein is not granted, the consequences to the Debtor may be quite negative.  If the Adequate Protection Order is not entered within twenty days of the Petition Date, a Termination Event could occur under the Forbearance Agreement and the Senior Lenders would be free to exercise remedies against the Guaranteeing Subsidiaries, which could force the Guaranteeing Subsidiaries to themselves seek chapter 11 protection.  Were the Guaranteeing Subsidiaries -- the operational core of the Debtor's business -- to become chapter 11 debtors themselves, the Debtor's ability to quickly emerge from chapter 11 as an intact operating business would be significantly impaired and the time and cost of this Chapter 11 Case likely would increase significantly.  Bankruptcy filings by the Guaranteeing Subsidiaries would cause immediate and irreparable harm to the Debtor's business and materially diminish its value as a going concern.  Accordingly, the relief requested herein is in the best interests of the Debtor, its estate and creditors.  Accordingly, I submit that the relief requested in the Adequate Protection Motion is in the best interests of the Debtor's estate, its creditors and parties in interest.

**I.    Motion Establishing the FCC Trust and Assigning
FCC Broadcast Licenses to the FCC Trust (the "FCC Trust Motion")**

158.    By the FCC Trust Motion, the Debtor requests entry of an order pursuant to sections 105(a), 363(b) and 365 of the Bankruptcy Code authorizing the Debtor to (i) establish the FCC Trust and (ii) subject to FCC approval, assume the broadcast licenses and assign them to the FCC Trust.

159.    Two of the Debtor's operating Subsidiaries between them own four radio broadcast stations and a television broadcast station, and operate those stations pursuant to

licenses from the FCC. The FCC regulates both ownership and operation of television and radio stations. Accordingly, any licensee of a broadcast station must obtain the FCC's consent to effectuate any change or transfer of control of any FCC broadcast station license.

160. As a result of the confirmation of the Prepackaged Plan, the Senior Lenders will own substantially all of the equity of the Reorganized Debtor. For the Reorganized Debtor to emerge from bankruptcy with control of FCC broadcast licenses, the prior consent of the FCC is required under procedures for statutory public notice and the filing of petitions — which could require many months and delay the emergence of the Reorganized Debtor from bankruptcy. In addition, the Reorganized Debtor would need to be organized to ensure that it would be qualified as an entity eligible to hold FCC broadcast licenses, even though the Debtor's television station and radio stations constitute only about one percent (1%) of the Debtor's business value.

161. Establishment of the FCC Trust and the transfer of the FCC Broadcast Licenses from the Debtor's Subsidiaries to the Debtor, and the subsequent assignment of the licenses by the Debtor to the FCC Trust, is a condition precedent to the effectiveness of the Prepackaged Plan, which has already been approved by the required creditors. Failure to meet the conditions set forth in the Prepackaged Plan will delay the Debtor's emergence from chapter 11 as it renegotiates a new plan of reorganization.

162. Furthermore, the assignment of the FCC Broadcast Licenses to the FCC Trust will expedite the Debtor's emergence from chapter 11. If approved by the Bankruptcy Court and by the FCC, this approach would allow Reorganized AMI to emerge from bankruptcy with the FCC Broadcast Licenses subject to the control of the FCC Trust prior to the date that the FCC grants consent for the sale of the stations to one or more third parties. This interim transfer

can be done under a quicker, streamlined process. Without FCC consent to the transfer of the FCC Broadcast Licenses to the FCC Trust, Reorganized AMI would not be able to emerge from bankruptcy until the FCC has granted long-form FCC applications.

163. I believe that failure to assign the FCC Broadcast Licenses to the FCC Trust will have a material adverse impact on the Debtor's business, on the business of Reorganized AMI and on the Debtor's success in emerging from chapter 11 since it would prolong the Debtor's stay in chapter 11 and cause Reorganized AMI to lose a revenue stream at a time when it is trying to maximize its value as a going concern for the benefit of creditors. Accordingly, I submit that the relief requested in the FCC Trust Motion is in the best interests of the Debtor's estate, its creditors and parties in interest.

**J.      Motion to Appoint Epiq Bankruptcy Solutions, LLC as Claims, Noticing and Balloting Agent (the "Claims Agent Application")**

164. I and the Debtor's advisors have evaluated several potential candidates to serve as Claims, Noticing and Balloting Agent. Following that review, and in consideration of other parties-in-interest, the nature of the Debtor's business, and the scope of the tasks for which the Debtor will require the assistance of a claims, noticing, and balloting agent, I believe, that the appointment of Epiq Bankruptcy Solutions, LLC ("Epiq") is in the best interest of the Debtor's estate, its creditors, parties-in-interest, and this Court. Based on Epiq's considerable experience in providing similar services in large chapter 11 cases, the I believe that Epiq is eminently qualified to serve as Claims, Noticing and Balloting Agent in this Chapter 11 Case. A detailed description of the services that Epiq has agreed to render and the compensation and other terms of the engagement are provided in the Claims Agent Application, the Declaration of Daniel C. McElhinney, Executive Director of Epiq and the engagement letter between and the Debtor and Epiq. I have reviewed the terms of the engagement and believe that the Debtor's estate,

creditors, parties-in-interest and this Court will benefit as a result of Epiq's experience and cost-effective methods. Accordingly, I believe that the Claims Agent Application should be approved.

**K.** **Debtor's Motion for Entry of an Order (I) Extending the Time Within Which to File the Schedules and Statements and (II) Permanently Waiving the Requirement to File the Schedules and Statements Upon Confirmation of the Prepackaged Plan (the "Schedules And Statements Motion")**

165.　By the Schedules and Statements Motion, the Debtor requests entry of an order (i) extending the time within which to file (a) schedules of assets and liabilities, (b) schedules of executory contracts and unexpired leases, (c) lists of equity holders, (d) schedules of current income and expenditures, and (e) a statement of financial affairs (collectively, the "Schedule and Statements") for an additional sixty (60) days to April 22, 2010 (for a total of ninety (90) days from the Petition Date), and (ii) permanently waiving the requirements to file the Schedules and Statements upon the confirmation of the Prepackaged Plan.

166.　I do not expect the Chapter 11 Case to be pending for very long since the Debtor hopes for speedy confirmation of its Prepackaged Plan followed by an emergence from bankruptcy. Furthermore, the Debtor's operations are varied and geographically diverse. AMI is one of the largest newspaper companies in the United States. It has a complicated corporate structure, with dozens of Subsidiaries, each of which maintains numerous business offices, plants and processing facilities to support the Debtor's business operations. The volume of materials to be gathered and analyzed from these offices and facilities in order to complete the Schedule and Statements is enormous, and presents the Debtor with a formidable task to be accomplished in limited time.

167.    Furthermore, I believe that the preparation of the Schedule and Statements will require a significant expenditure of time by the Debtor's attorneys and advisors, thereby increasing the administrative expenses in this case.

168.    In addition, I believe that much of the information that would be contained in the Schedules and Statements is already available in the Disclosure Statement.  Therefore, to require the Debtor to file the Schedules and Statements would not only be unnecessarily burdensome to the Debtor's estate, but would also be largely duplicative of information already made available in other filed documents.

169.    For the foregoing reasons, I believe that it is in the best interests of the Debtor's estate, its creditors and parties in interest that the Court grant the relief sought in the Schedules and Statements Motion.

**L.    Motion (I) Scheduling a Combined Hearing to Consider (A) Approval of the Disclosure Statement, (B) Approval of Solicitation Procedures and Forms of Ballots and (C) Confirmation of the Prepackaged Plan; (II) Establishing Deadlines and Procedures to File Objections to the Disclosure Statement, the Solicitation Procedures and the Prepackaged Plan; (III) Approving the Form and Manner of Notice of the Confirmation Hearing; and (IV) Granting <u>Related Relief (the "Confirmation Hearing Scheduling Motion")</u>**

170.    I believe that, with respect to the specific classes of claims against the Debtor that were presumed to accept or deemed to reject the Prepackaged Plan, the Solicitation Procedures undertaken by the Debtor and described herein comply with the Bankruptcy Code and should be approved.  The Debtor respectfully requests that the Court consider approval of the Solicitation Procedures with respect to these classes at the Confirmation Hearing.

171.    I believe that the adverse effects of the chapter 11 filing upon the Debtor's business and going concern value will be minimized, and the benefit to creditors maximized through prompt distributions and the reduction of administrative expenses of the estate.  I request

that this Court grant the relief sought in the Confirmation Scheduling Hearing Motion and schedule the Confirmation Hearing to be held as soon as practicable.

### M. Debtor's Motion to Employ Certain Professionals Used in the Ordinary Course of Business (the "OCP Motion")

172. In the ordinary course of its business prior to the Petition Date, the Debtor retained certain professionals to provide, among other services, legal, accounting, appraisal and consulting advice and services (the "OCPs"). By the OCP Motion, the Debtor requests, pursuant to sections 105(a), 327, 328, and 330 of the Bankruptcy Code, entry of an order (a) establishing certain procedures for the Debtor to retain and compensate the OCPs that the Debtor employs in the ordinary course of business, effective as of the Petition Date, without the (i) submission of separate employment applications and (ii) issuance of separate retention orders for each individual professional, and (b) authorizing the Debtor to compensate and reimburse such professionals, up to $100,000 per professional per month and $1,000,000 in the aggregate per month, without requiring such professionals to file individual fee applications.

173. The relief requested will save the estate the substantial expenses associated with applying separately for the employment of each OCP. Further, the relief requested will minimize fees because OCPs will not have to incur fees to prepare and support fee applications for each OCP. Moreover, because this case is prepackaged, I believe the Debtor will be in chapter 11 for only a brief period of time, making the expense of filing retention and fee applications large relative to the amounts of these professionals' invoices. Based on the foregoing, I believe that the retention of these OCPs is vital to the Debtor's business and is in the best interest of the Debtor's estate, its creditors and parties in interest.

**N.** **Debtor's Motion to Establish Procedures For Interim Compensation and Reimbursement of Professionals and Official Committee Members (the "Interim Compensation Motion")**

174.    The Debtor plans to retain several professionals during the Chapter 11 Case (the "Professionals").  By the Interim Compensation Motion, the Debtor respectfully requests entry of an order establishing certain interim compensation and reimbursement procedures for the Professionals.  The proposed procedures outlined in the Interim Compensation Motion will enable me and the Debtor's management to closely monitor costs of administration, maintain cash flow availability and implement efficient management procedures.  I believe that the efficient administration of the Chapter 11 Case will be significantly aided by establishing such compensation procedures.  Based on the foregoing, I believe that the relief requested in the Interim Compensation Motion is in the best interests of the Debtor's estate, its creditors and parties in interest.

## **Conclusion**

The requested relief in all of the First Day Motions is further supported by the prepackaged nature of this case. As set forth above, the Debtor solicited votes on the Prepackaged Plan from all classes of holders of claims entitled to vote to accept or reject the Prepackaged Plan. The votes tabulated and received from these classes are sufficient to confirm the Prepackaged Plan. The most critical and complex task required to effectuate a successful reorganization -- the negotiation and formulation of a chapter 11 plan of reorganization -- has already been accomplished. Thus, I respectfully submit that given the backdrop of this prepackaged Chapter 11 Case, the relief requested in the First Day Motions is appropriate inasmuch as such relief will assist the Debtor to move toward expeditious confirmation of the Prepackaged Plan with the least possible disruption or harm to its business. An expeditious confirmation is in the best interests of the Debtor's estate and creditors. Moreover, the relief requested is supported by the Debtor's Senior Lenders. Based on the foregoing, I believe that the relief requested in the First Day Motions is necessary and appropriate, is in the best interests of the Debtor's estate and its creditors, and should be granted in all respects.

I swear under penalty of perjury that the foregoing is correct and true. Executed on January 22, 2010.

/s/ Ronald A. Mayo
Ronald A. Mayo
Vice President & Chief Financial Officer
Affiliated Media, Inc.