## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| **AFFILIATED MEDIA, INC.,**[1] | Case No. 10-10202 (KJC) |
| **Debtor.** | |

### DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105(a), 345(b) AND 363(c) OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE ITS EXISTING CASH MANAGEMENT SYSTEM AND (B) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS, AND (II) GRANTING AN EXTENSION OF TIME TO COMPLY WITH SECTION 345(b) OF THE BANKRUPTCY CODE

The debtor-in-possession in the above-captioned chapter 11 case (the "Debtor" or

"AMI"), hereby moves (the "Motion"), pursuant to sections 105(a), 345(b) and 363(c) of title 11

of the United States Code (the "Bankruptcy Code"), Rule 6003 and 6004(h) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2015-2 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules") for an order substantially in the form attached hereto as

**Exhibit "A"** (the "Proposed Order") (i) authorizing the Debtor to (a) continue to use its existing

cash management system, and (b) maintain its existing bank accounts and business forms; and

(ii) granting an extension of time to comply with section 345(b) of the Bankruptcy Code.  In

support of the Motion, the Debtor submits the *Declaration of Ronald A. Mayo, Vice President*

---

1.  The last four digits of the Debtor's federal tax identification number are 5553.  The Debtor's mailing address and corporate headquarters is 101 W. Colfax Avenue, Suite 1100, Denver, CO 80202.

*and Chief Financial Officer of Affiliated Media, Inc., in Support of First Day Relief* (the "<u>Mayo Declaration</u>") filed contemporaneously herewith, and respectfully submits as follows:

## Background

1.      On January 22, 2010 (the "<u>Petition Date</u>"), the Debtor commenced its bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  No trustee, examiner or creditors' committee has been appointed in this case.  The Debtor is operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Prior to the Petition Date, beginning on December 18, 2009, the Debtor solicited votes on the Prepackaged Plan of Reorganization of Affiliated Media, Inc., dated December 18, 2009 (the "<u>Prepackaged Plan</u>"), through a Disclosure Statement dated December 18, 2009 (the "<u>Disclosure Statement</u>") distributed in accordance with sections 1125 and 1126(b) of the Bankruptcy Code, both filed contemporaneously herewith.  Terms used but not otherwise defined herein have the meanings assigned to such terms in the Prepackaged Plan and the Disclosure Statement.  The Prepackaged Plan has been accepted by all classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.

## The Debtor's Business

3.      The Debtor, together with its Subsidiaries, is the second largest newspaper publisher in the United States in terms of paid daily circulation under management.  Only the Debtor has commenced a bankruptcy case; none of its Subsidiaries has filed a petition for relief as of the Petition Date.  Through its Subsidiaries, the Debtor publishes fifty-four (54) daily and more than 100 non-daily newspapers in eleven (11) states (and owns and operates Internet websites related thereto), including suburban markets in close proximity to the San Francisco Bay Area, Los Angeles, Baltimore, Boston and El Paso.  The Debtor's Subsidiaries also own or

operate several metropolitan daily newspapers including *The Denver Post*, *San Jose Mercury News*, *St. Paul Pioneer Press*, *Contra Costa Times*, *Los Angeles Daily News*, *The Salt Lake Tribune*, *The Detroit News*, and *Oakland Tribune*. The daily newspapers that the Debtor and its Subsidiaries control have a combined daily and Sunday paid circulation of approximately 2.3 million and 2.4 million, respectively, as of September 30, 2009. The Debtor, through its Subsidiaries, also operates a television station in Alaska and four radio stations in Texas. As of the Petition Date, the Debtor had approximately 100 employees. The Debtor and its Subsidiaries together employ approximately 8,700 people.

4.      The Debtor is the ultimate parent of twenty-nine (29) wholly-owned Subsidiaries and owns 95% of the outstanding equity interests of Alaska Broadcasting Company, Inc. ("Alaska Broadcasting"). Attached to the Mayo Declaration as **Exhibit "A"** is a summary organizational chart of the Debtor and certain of its Subsidiaries.

5.      The Debtor operates its business through its Subsidiaries. To ensure the efficient operation of the Debtor's Subsidiaries, the Debtor provides numerous management and operational services for a fee based on contractual obligations and on an allocation of cost basis where no contractual obligation exists. These services are in the nature of operating, administrative, accounting, electronic media and other support services, newsprint purchase services, financial reporting services, human resource services, risk management services, payroll services, tax reporting services, tax return preparation services and cash management.

6.      The Debtor's main source of cash flow is distributions and dividends from its Subsidiaries as well as management fees and reimbursements from payments made on behalf of the Subsidiaries. Advertising is the largest component of the Subsidiaries' revenues, followed by circulation revenue. In addition to selling advertising in their core newspaper products, the Debtor's Subsidiaries also generate revenue through (i) advertising in niche publications, such as

those related to home improvement, health and fitness, and weddings, and (ii) Internet advertising. The Debtor's Subsidiaries also generate revenue through commercial printing for third parties and distribution of third-party publications.

7.     The Debtor's consolidated total revenues have fallen from $1.330 billion for the fiscal year ended June 30, 2007 to $1.060 billion for the fiscal year ended June 30, 2009 due to declining advertising and circulation revenues that are occurring throughout the newspaper industry. As of December 15, 2009, the Debtor estimates the fair market value of its total enterprise to be between $190 million and $230 million and its total debt to be approximately $930 million. The Debtor's estimated cash on hand as of the Petition Date is approximately $40 million.

### The Debtor's Capital Structure

8.     As of the Petition Date, the Debtor's capital structure includes:

(i)     senior secured indebtedness in the outstanding principal amount of $590 million (which amount includes $6.375 million of contingent reimbursement claims on letters of credit), owed to a syndicate of lenders (collectively, the "Senior Lenders") under a credit agreement dated December 30, 2003 (as amended, supplemented, and/or otherwise modified from time to time, the "Senior Credit Agreement") among the Debtor, Bank of America, N.A. as administrative agent (the "Administrative Agent"), the Senior Lenders and certain of the Debtor's Subsidiaries as guarantors (the "Guaranteeing Subsidiaries").[2] The Senior Lenders' claims are guaranteed by the Guaranteeing Subsidiaries and secured by first-priority liens and security interests in (a) the Debtor's interest and each Guaranteeing

---

2.   A true and accurate list of Guaranteeing Subsidiaries is attached to the Mayo Declaration as **Exhibit "B"**.

Subsidiary's interest in the capital stock (or other ownership interests) of the Guaranteeing Subsidiaries, and (b) substantially all of the assets of Alaska Broadcasting;

        (ii)     other claims in an aggregate principal amount of $15.1 million most of which is secured (the "Other Indebtedness"); and

        (iii)     unsecured subordinated notes in an aggregate principal amount outstanding of approximately $326 million (the "Subordinated Notes") issued under two Indentures between AMI (known at that time as MediaNews Group, Inc.) and the Indenture Trustee, as more fully described in the Disclosure Statement and the Mayo Declaration.

        9.     The Debtor's founders (including the Debtor's chief executive officer) and certain family trusts hold the majority of the Debtor's pre-petition voting shares of stock. There is no established public trading market for the Debtor's capital stock.

## Events Leading Up To The Filing of The Prepackaged Plan

        10.     As described in more detail in the Mayo Declaration, prior to the Petition Date, the Debtor entered into discussions with certain Senior Lenders and the Administrative Agent regarding a restructuring to reduce the Debtor's debt load and ensure that it could maintain competitive operations. The parties entered into a forbearance agreement dated as of April 30, 2009 and supplemented as of September 30, 2009 and November 30, 2009 (as so supplemented, the "Forbearance Agreement"), pursuant to which the Senior Lenders agreed to forbear from exercising certain remedies available to them as a result of certain of the Debtor's defaults so as to permit the Debtor to negotiate a comprehensive restructuring plan. The initial term of the forbearance period expired on September 30, 2009, and was extended to November 30, 2009 and then to March 31, 2010, subject to the other terms and conditions of the Forbearance Agreement.

11.     In November 2009, the Debtor reached agreement with certain Senior Lenders and the Administrative Agent on the terms of a comprehensive restructuring of the Debtor's senior secured debt involving the issuance of new senior secured debt, the execution of new secured guaranties and a debt-for-equity swap, and the Debtor agreed to seek approval of that restructuring through the Prepackaged Plan. Certain Senior Lenders and the Administrative Agent indicated their support for the Prepackaged Plan by executing the Second Supplement to Forbearance Agreement and Restructuring Support Agreement dated November 30, 2009 (the "Restructuring Support Agreement"). In addition, the holder of approximately 51% of the outstanding principal amount of the Subordinated Notes advised AMI that it supported the Prepackaged Plan in principle, and it later voted to accept the Prepackaged Plan.

12.     In accordance with the terms of the Restructuring Support Agreement, on December 18, 2009, the Debtor commenced a solicitation of votes from all classes entitled to vote under the Bankruptcy Code by mailing the Disclosure Statement, the Prepackaged Plan, ballots and related solicitation materials to the creditors in the classes entitled to vote on the Prepackaged Plan.

13.     On January 6, 2010, the Debtor mailed the First Supplement to the Disclosure Statement and Prepackaged Plan. On January 9, 2010, the Debtor mailed the Second Supplement to the Disclosure Statement and Prepackaged Plan. The Prepackaged Plan has been accepted, within the meaning of section 1126(c) of the Bankruptcy Code, by all of the impaired classes of claims entitled to vote on the Prepackaged Plan.

### The Prepackaged Plan

14.     Under the terms of the Prepackaged Plan, each Senior Lender will receive its Pro Rata share of (i) $150 million of New Senior Secured Term Notes, guaranteed by all of AMI's wholly-owned Subsidiaries and secured by first-priority liens on substantially all of the

assets of Reorganized AMI and its wholly-owned Subsidiaries; (ii) with respect to those Senior Lenders holding revolving loans and commitments under the existing facility, a $6.375 million letter of credit facility, resulting from an automatic rollover of the Debtor's existing letters of credit outstanding as of the Effective Date (the "Tranche A Facility"); and (iii) 88.0% of the equity of Reorganized AMI. In addition, a $7.5 million letter of credit facility (the "Tranche B Facility") will be provided as a separate new extension of credit by certain of the Senior Lenders. Collectively, the Tranche A Facility and the Tranche B Facility make up the $13.875 million letter of credit facility (the "LOC Facility"). The remaining 12% of the equity of Reorganized AMI is reserved for issuance to its management. Dean Singleton, the Chairman and Chief Executive Officer of the Debtor, is receiving warrants to purchase up to 8% of the equity of Reorganized AMI.

15.     Because the holders of the Subordinated Note Claims voted to accept the Prepackaged Plan, each holder will receive its Pro Rata share of the Subordinated Note Warrants offered to them under the Prepackaged Plan. The Subordinated Note Warrants provide the Subordinated Note holders the right to purchase, in aggregate, up to 8.25% of the Class B New Common Stock of Reorganized AMI in certain circumstances.

16.     In addition, the Prepackaged Plan provides for the payment in full of (i) allowed administrative expense claims; (ii) federal, state, and local tax claims; and (iii) certain other priority non-tax claims. Holders of Other Indebtedness will either have their claims paid in full or have their claims reinstated upon confirmation of the Prepackaged Plan. Trade creditors and certain other holders of general unsecured claims against AMI are unimpaired under the Prepackaged Plan and will receive payment of their claims in the ordinary course as those claims become due and payable. Holders of existing equity interests in AMI will not receive a distribution on account of such interests.

17.     The Prepackaged Plan contemplates a comprehensive financial restructuring of the Debtor's existing capital structure that will allow the Debtor to delever its balance sheet by reducing its approximately $930 million total debt to approximately $179 million (composed of the New Senior Secured Term Notes in the amount of $150 million, the LOC Facility in the amount of $13.875 million and the Other Indebtedness in the amount of $15.1 million), through a short and consensual chapter 11 case, and emerge from chapter 11 poised for future growth and stability.

18.     Additional information and more detail regarding the Debtor's business, the Debtor's capital structure, the events leading up to the Petition Date, and the Prepackaged Plan can be found in the Mayo Declaration.

### Jurisdiction and Venue

19.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

20.     To manage its businesses efficiently and seamlessly, the Debtor uses a cash management system (the "Cash Management System") to collect and transfer the funds generated by the operations of its Subsidiaries and the Subsidiaries' partnerships, joint operating agencies ("JOAs"), and other businesses in which one or more third parties are also equity-interest holders (collectively, the "Partnerships") and to disburse funds to satisfy the financial obligations of the Debtor, its Subsidiaries and certain of the Partnerships.  The Cash Management System facilitates the Debtor's cash monitoring, forecasting and reporting, and enables the Debtor to maintain control over the administration of its bank accounts (the "Bank Accounts") at Wells Fargo & Company ("Wells Fargo") and M&T Bank (collectively, the

"Banks"), including those listed in **Exhibit "1"** of the Proposed Order attached hereto. By this Motion, the Debtor seeks entry of the Proposed Order, pursuant to sections 105(a), 345(b) and 363(c), of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004(h) and Local Rule 2015-2 granting it (i) authorization to (a) continue to use its existing Cash Management System and (b) maintain existing Bank Accounts and business forms, and (ii) an extension of time to comply with section 345(b) of the Bankruptcy Code. Without the requested relief, the Debtor submits that it would be unable to conduct its financial operations effectively and efficiently, which would cause significant harm to the Debtor, its estate, and its Subsidiaries and the Partnerships.

21.     In addition to the foregoing, the Debtor requests that the Court authorize and direct the Banks to continue to maintain, service and administer the Bank Accounts and to debit the Bank Accounts in the ordinary course of business on account of: (a) all checks, wires or Automated Clearing House ("ACH") transfers authorized by order of this Court irrespective of whether such payments relate to pre-petition services; (b) all checks drawn on the Bank Accounts that are cashed at the Banks or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (c) all checks or other items deposited in one of the Bank Accounts with the Banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent that the Debtor was responsible for such items prior to the Petition Date; and (d) all undisputed pre-petition amounts outstanding as of the date hereof, if any, owed to the Banks as service charges for the maintenance of the Cash Management System.

### Overview of the Cash Management System

22.     Like most large businesses, in the ordinary course of its operations, the Debtor maintains an integrated network of bank accounts that facilitate the timely and efficient collection, concentration, management and disbursement of funds generated by the Debtor's

business operations. This network is comprised of fifty-six (56) bank accounts in the Debtor's name maintained with Wells Fargo and one bank account at M&T Bank, through which the Debtor collects, transfers and disburses funds generated by its operations. While all of the accounts are maintained in the Debtor's name, most of the accounts are primarily used in the newspaper operations of the Debtor's Subsidiaries and are accounted for on the financial statements of the Debtor's Subsidiaries. In addition to the Bank Accounts, several of the Debtor's Subsidiaries maintain and use depository accounts in their own names at several financial institutions, other than Wells Fargo, which are not the subject of this Motion.[3] Certain of the Partnerships also maintain separate bank accounts that are not the subject of this Motion. The Debtor also maintains a system designed to record accurately such collections, transfers and disbursements as they occur.

23. The Cash Management System has three (3) main components: (i) cash collection, including the collection of payments made to the Debtor and its Subsidiaries and certain of the Partnerships; (ii) cash concentration; and (iii) cash disbursements to fund the Debtor's operations and the operations of its Subsidiaries, primarily consisting of payroll and payments to the vendors and service providers that supply goods and services that the Debtor, its Subsidiaries and certain of the Partnerships use to operate their respective businesses. The Debtor's finance department manages the Cash Management System. Attached hereto as **Exhibit "B"** for demonstrative purposes is a diagram of the Debtor's Cash Management System.

---

3. Prior to the Petition Date, one of the Debtor's Subsidiaries opened two accounts at M&T Bank to process payroll and vendor payments for certain Subsidiaries and to ensure no disruption in the operations of these non-debtor entities. The Debtor transferred approximately $10 million into these accounts, and the combined balance of the two accounts as of the Petition Date is approximately $10 million.

24.     The Debtor generates revenue primarily from the sale of newspaper subscriptions and advertising by its Subsidiaries.  Payments are generally received by check, credit card or wire transfer and deposited, as cash investments, into one of a group of depository accounts set up by the Debtor on behalf of certain Subsidiaries.  The majority of the depository accounts are maintained at Wells Fargo.  The funds are swept daily to a cash concentration account maintained by the Debtor at Wells Fargo (the "Concentration Account").  The depository accounts of the Partnerships of the Subsidiaries are not swept into the Concentration Account.

25.     As mentioned above, certain Subsidiaries deposit funds into accounts maintained in their own names at institutions other than Wells Fargo.  On an as-needed basis, these Subsidiaries regularly wire excess cash held in such depository accounts into the Concentration Account.

26.     The Concentration Account also funds a number of disbursement accounts for each Subsidiary.  These disbursement accounts include payroll and vendor accounts payable to various entities.  The Debtor issues checks and ACH transactions against these disbursement accounts as a service for the benefit of its Subsidiaries.  These disbursement accounts are set up as zero-balance accounts.  Therefore, as checks or ACH transactions are presented against individual disbursement accounts, the Concentration Account funds these accounts.  Otherwise, their balance is zero.

27.     Unlike the Debtor's other operating Subsidiaries, Alaska Broadcasting issues its own checks.  Alaska Broadcasting's accounts payable and depository accounts, however, are also automatically funded by or into the Concentration Account, leaving a zero balance.

28.     Many invoices for the Debtor and its Subsidiaries are processed on the corporate American Express purchasing card (a "P-Card").  American Express charges by the Debtor and its Subsidiaries are paid through the corporate disbursement account.  The Debtor is then reimbursed by its Subsidiaries for their allocated shares of charges.

## Other Accounts

29.     In the ordinary course of its operations, the Debtor also maintains intercompany accounts to reflect: (i) cash sweeps from the depository accounts maintained by the Debtor to the Concentration Account; (ii) payments made by the Debtor on behalf of a Subsidiary; (iii) purchases of goods and services by the Debtor on behalf of its Subsidiaries and the Partnerships; and (iv) corporate management fees and allocations of certain overhead expenses.

30.     The Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity.  The continued use of the Cash Management System allows for, among other things, the efficient tracking and control of funds, while also reducing administrative costs.

## Investments

31.     When the Debtor's management determines that there is excess cash in the Concentration Account, it transfers funds from the Concentration Account (at Wells Fargo) to its non-interest bearing account at M&T Bank, where the majority of the Debtor's cash on hand is kept.  The funds on deposit in the M&T Bank account are approximately $40 million as of the date hereof.

32.     The funds in the M&T Bank account are maintained in cash, which amounts are insured by the United States government through the Federal Deposit Insurance Corporation's ("FDIC") Transaction Account Guarantee ("TAG") program.  Under this program,

the FDIC fully insures non-interest bearing transactional accounts. The TAG program was initially set to expire on December 31, 2009, but on August 26, 2009 the FDIC extended it through June 30, 2010. The Debtor expects to emerge from chapter 11 before June 30, 2010. Therefore, the Debtor submits that because of the TAG program, its account at M&T Bank complies with section 345(b) regardless of the amounts deposited into this account.

### Continuing the Cash Management System is in the Best Interests of the Debtor, its Subsidiaries, the Partnerships and All Parties in Interest

33.     The Debtor seeks authorization to continue to operate its Cash Management System, consistent with its pre-petition practices and operations. The Cash Management System is an ordinary course and essential business practice that provides significant benefits to the Debtor, including, among other things, the ability to: (i) control corporate funds; (ii) ensure the maximum availability of funds when and where necessary; (iii) reduce administrative expenses by facilitating the movement of funds; and (iv) develop more timely and accurate account balance information. Based on the foregoing, maintenance of the existing Cash Management System is in the best interest of the Debtor and its Subsidiaries.

34.     Furthermore, given the size and complexity of the Debtor's operations, which include twenty-nine (29) wholly-owned Subsidiaries and approximately 8,700 employees, the Debtor cannot efficiently facilitate its restructuring efforts if there is substantial disruption in its Cash Management System.

35.     Section 363(c)(1) of the Bankruptcy Code authorizes debtors-in-possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) is to provide a debtor-in-possession with the flexibility to engage in the ordinary transactions required to operate its business without unnecessary oversight by its creditors or the court. *See, e.g., In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("The framework of section 363 is designed to allow a

13

trustee (or debtor-in-possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary."); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (same). Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *See Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtor seeks authority under section 363(c)(1) to continue the collection, concentration, and disbursement of cash pursuant to its Cash Management System.

### Maintenance of the Debtor's Existing Bank Accounts and Business Forms is Warranted

36. The Office of the United States Trustee's "Operating Guidelines For Chapter 11 Cases" (the "Guidelines") mandate the closure of the Debtor's pre-petition bank accounts, the opening of new accounts, including special accounts for the payment of taxes and segregation of cash collateral, and the immediate printing of new checks with "Debtor-in-Possession" and other information printed on them.

37. To comply with the Guidelines, the Debtor would need, among other things, to create a new system for manually issuing checks and paying post-petition obligations.[4] The delays that would result from opening these accounts, revising cash management procedures and instructing customers to redirect payments would further disrupt the Debtor's business. It is therefore essential that the Debtor be permitted to continue to manage its cash and transfer

---

4. Notwithstanding anything herein to the contrary, the Debtor reserves its right to close its pre-petition Bank Accounts and open new accounts as may be necessary in the Debtor's business judgment. The Debtor will give notice, however, to the United States Trustee, the Administrative Agent and any official committee that may be appointed in the chapter 11 case prior to opening or closing a Bank Account.

monies from its various Bank Accounts as needed and in amounts necessary to continue the operation of its business and the operations of its Subsidiaries and the Partnerships. If the Debtor is required to close its existing Bank Accounts and create a new cash management system, the Debtor, its Subsidiaries and the Partnerships will suffer significant harm from the resultant operational paralysis, and incur costs from closing its existing Bank Accounts, opening of new accounts and printing new checks.

38. Similarly, in other cases of this size, Courts in this District have waived the requirement of closing bank accounts. *See, e.g., In re ResMae Mortgage Corp.*, No. 07-10177 (Bankr. D. Del. Feb. 13, 2007); *In re Exide Techs.*, No. 02-11125 (Bankr. D. Del. April 17, 2002); *In re W.R. Grace & Co.*, No. 01-01139 (Bankr. D. Del. Apr. 2, 2001). For the reasons set forth herein, and consistent with the relief granted in the cases cited above, the Debtor submits that it is in the best interests of its estate and creditors to obtain the relief requested.

39. In addition to mandating the closure of all bank accounts, the Guidelines require the immediate printing of new checks with the legend "Debtor-in-Possession," and other information related to the Debtor's case. Similarly, Local Rule 2015-2(a) mandates that the Debtor, upon exhausting its existing check stock, order new checks with the "Debtor-in-Possession" legend. The Debtor issues a large number of checks, and uses a large volume of purchase orders, letterhead, envelopes, promotional materials, and other business forms (collectively, the "<u>Business Forms</u>") in the ordinary course of business. In light of the expedited nature of this prepackaged case and to minimize expenses, the Debtor requests that it be authorized to continue using its existing Business Forms, including electronically generated forms, substantially in the form existing immediately before the Petition Date, without reference to its status as debtor-in-possession, and without adding the other related information required by the Guidelines.

40.     The Debtor further requests (i) a ninety (90) day extension of the time to comply with Local Rule 2015-2(a)'s requirement that any newly ordered check stock bear the "Debtor-in-Possession" legend and the bankruptcy case number and (ii) a waiver of this requirement upon confirmation of the Prepackaged Plan.  The Debtor intends to remain in chapter 11 only as long as it takes to confirm and effectuate the Prepackaged Plan.  Obtaining new Business Forms (including new check stock) and implementing new electronic check forms would create significant expense and logistical difficulties.  Once such a transition was accomplished, the Debtor would almost immediately have to start the process all over again to return to using its regular Business Forms upon emergence from chapter 11.  Furthermore, the Debtor has publicized its case filing through press releases and a pre-petition solicitation, and will send a notice of commencement to all known creditors.  Given such wide publication of the Debtor's status as a debtor-in-possession, publication on checks and other business forms will add little additional notice.  Accordingly, the Debtor requests a waiver of the requirement to mark new check stock with the debtor-in-possession status unless the Debtor remains in bankruptcy for longer than expected.

41.     In other chapter 11 cases of comparable size, bankruptcy courts in this District have allowed debtors to use their pre-petition business forms without the "Debtor-in-Possession" legend, at least until the debtors' existing stock is depleted.  *See, e.g., In re Wickes Holdings, LLC*, No. 08-10212 (KJC) (Bankr. D. Del. Feb. 5, 2008); *In re Delta Fin. Corp.*, No. 07-11880 (CSS) (Bankr. D. Del. Dec. 19, 2007); *In re Pope & Talbot, Inc.*, No. 07-11738 (CSS) (Bankr. D. Del. Nov. 21, 2007); *In re Tweeter Home Ent't Group, Inc.*, No. 07-10787 (PJW) (Bankr. D. Del. June 13, 2007).  Courts have also granted an extension of the time to comply with Local Rule 2015-2 and the Guidelines.  *See, e.g., In re Panolam Holdings Co.*, No. 09-

13889 (MFW) (Bankr. D. Del. Nov. 4, 2009); *In re NTK Holdings, Inc.*, No. 09-13611 (KJC) (Bankr. D. Del. Oct. 21, 2009).

## The Debtor Should Be Granted a 60-Day Extension of Time to Comply with the Investment and Deposit Requirements of Section 345

42.     Section 345(a) of the Bankruptcy Code authorizes such deposits or investments of money "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." Section 345(b) of the Bankruptcy Code provides:

> Except with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, the trustee shall require from an entity with which such money is deposited or invested –
>
> (1)     a bond –
>         (A)     in favor of the United States;
>         (B)     secured by the undertaking of a corporate surety approved by the United States trustee for the district in which the case is pending; and
>         (C)     conditioned on –
>                 (i)     a proper accounting of all money so deposited or invested and for any return on such money;
>                 (ii)    prompt repayment of such money and return; and
>                 (iii)   faithful performance of duties as a depository; or
> (2)     the deposit of securities of the kind specified in section 9303 of title 31; unless the court for cause orders otherwise.

43.     By this Motion, the Debtor seeks a sixty (60) day extension of the time to comply with section 345(b) of the Bankruptcy Code. During the extension period, the Debtor proposes to engage the Office of the United States Trustee in discussions to determine what modification(s) to its investment guidelines, if any, would be appropriate under the circumstances. The Debtor believes that the benefits of the requested extension far outweigh any harm to the estate. *See generally In re Serv. Merch. Co.*, 240 B.R. 894, 896-97 (Bankr. M.D. Tenn. 1999) (finding cause to extend the time to comply with section 345(b) where failure to do so would "needlessly handcuff" the debtor's reorganization efforts).

44.     In determining whether "cause" exists under section 345(b) of the

Bankruptcy Code, the Court should consider the "totality of the circumstances," using the

following factors outlined in the *Service Merchandise* case:  (i) the sophistication of the debtor's

business; (ii) the size of the debtor's business operations; (iii) the amount of the investments

involved; (iv) the bank ratings (Moody's and Standard and Poor's) of the financial institutions

where debtor-in-possession funds are held; (v) the complexity of the case; (vi) the safeguards in

place within the debtor's own business of insuring the safety of the funds; (vii) the debtor's

ability to reorganize in the face of a failure of one or more of the financial institutions; (viii) the

benefit to the debtor; (ix) the harm, if any, to the estate; and (x) the reasonableness of the

debtor's request for relief from section 345(b) requirements in light of the overall circumstances

of the case. *Id.* at 896.

45.     In addition, the Debtor believes that funds held in the Bank Accounts,

even those in its account at M&T Bank and the Concentration Account at Wells Fargo and in

excess of the usual limits insured by the FDIC under the TAG Program, are secure and that

obtaining bonds to secure those funds, as required by section 345(b) of the Bankruptcy Code, is

unnecessary and detrimental to the Debtor's estate and creditors.  Furthermore, all funds held in

the Bank Accounts are in cash.  The Debtor submits that "cause" exists pursuant to section

345(b) of the Bankruptcy Code to extend the time to comply with this section's requirements

because, among other considerations, (i) the Debtor's Banks are federally chartered banks

subject to supervision by federal banking regulators; (ii) the Debtor retains the right to remove

funds held at the Banks and establish new bank accounts as needed; (iii) the cost associated with

satisfying the requirements of section 345 is burdensome and (iv) the process of satisfying those

requirements would lead to needless inefficiencies in the management of the Debtor's business

and the businesses of its Subsidiaries and the Partnerships.  Moreover, strict compliance with the

requirements of section 345 of the Bankruptcy Code would be impractical in this prepackaged chapter 11 case. A bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such a bond is available at all.

46. Similar extensions have been granted in other chapter 11 cases in this district. *See, e.g., In re Aleris Int'l, Inc.*, No. 09-10478 (BLS) (Docket No. 36) (Bankr. D. Del. Feb. 13, 2009); *In re Landsource Communities Dev. LLC*, Ch. 11 No. 08-11111 (KJC) (Docket No. 29) (Bankr. D. Del. June 10, 2008); *In re Sharper Image Corp.*, No. 08-10322 (KG) (Docket No. 43) (Bankr. D. Del. Feb. 20, 2008).

47. In other large cases, courts have recognized that the strict enforcement of cash management requirements does not serve the rehabilitative purposes of chapter 11. As such, several courts in this District have waived such requirements and replaced them with alternative procedures that provide the same protections. *See, e.g., In re Inphonic, Inc.*, No. 07-11666 (KG) (Bankr. D. Del. Nov. 9, 2007); *In re Proxim Corp.*, No. 05-11639 (PJW) (Bankr. D. Del. June 15, 2005); *In re Maxide Acquisition Inc.*, No. 05-10429 (MFW) (Bankr. D. Del. Feb. 15, 2005). The Debtor respectfully submits that similar authorization is appropriate in this case. In light of the substantial amount of funds that will flow through the Bank Accounts, it would be imprudent for the Debtor to eliminate its current practices.

### The Banks Should Be Authorized and Directed to
### Continue to Maintain, Service and Administer the Debtor's Bank Accounts

48. The Debtor respectfully requests that the Banks be authorized and directed to continue to maintain, service and administer the Bank Accounts as accounts of the Debtor, as debtor-in-possession, without interruption and in the ordinary course. In this regard, the Banks should be authorized and directed to receive, process, honor and pay any and all checks, ACH transfers and other instructions and drafts payable through, drawn or directed on the Bank Accounts after the Petition Date by the holders, makers or other parties entitled to issue

instructions with respect thereto, *provided*, *however*, that any check, advice, draft or other notification that the Debtor advised the Banks to draw, issue or otherwise present prior to the Petition Date may be honored by the Banks only to the extent authorized by order of this Court.

        49.     The Debtor further requests that the Banks be authorized and directed to accept and honor all representations from the Debtor as to which checks, drafts, wires or ACH transfers shall be honored or dishonored consistent with any order(s) of this Court and governing law, whether such checks, drafts, wires or ACH transfers are dated prior to or subsequent to the Petition Date. The Debtor also requests that the Banks, in the event they honor a pre-petition check or other item drawn on any account that is the subject of this Motion (i) at the direction of the Debtor; (ii) in a good faith belief that the Court has authorized such pre-petition check or intends it to be honored; or (iii) as a result of an innocent mistake made despite implementation of reasonable item handling procedures, should not be deemed liable to the Debtor or to its estate on account of such pre-petition check or other item being honored post-petition. The Debtor respectfully submits that such relief is reasonable and appropriate because the Banks are not in a position to verify independently or audit whether a particular item may be paid in accordance with the Court's orders or otherwise.

        50.     In the ordinary course, the Banks charge, and the Debtor pays, honors or allows as a deduction from the appropriate account, certain service and other fees, costs, charges and expenses (collectively, the "Bank Fees"). The Debtor respectfully requests that the Banks be given the authority to (i) continue to charge the Debtor the Bank Fees and (ii) charge back returned items, whether such items are dated prior to, on, or subsequent to the Petition Date, to the Bank Accounts in the ordinary course.

51.     For the reasons set forth herein, and consistent with the relief granted in the cases cited above, the Debtor submits that it is in the best interests of its estate and creditors to obtain the relief requested.

## The Motion Satisfies Bankruptcy Rule 6003

52.     Bankruptcy Rule 6003 provides that to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may grant certain forms of relief during the twenty-one (21) days immediately following the filing date.  Fed. R. Bankr. P. 6003. As described above and in the Mayo Declaration, the Debtor believes that allowing for a "seamless" transition into and through bankruptcy will preserve the value on which Prepackaged Plan is based.  A fundamental aspect of the Debtor's efforts to minimize disruption during its chapter 11 case is the Debtor's ability to maintain its existing Cash Management System to avoid, among other things, delays or disruption in making payroll for the Debtor, its Subsidiaries, and the Partnerships.  The Debtor submits that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor, as described herein, and that Bankruptcy Rule 6003 has been satisfied.

## The Relief Requested is Appropriate

53.     The requested relief is further supported by the prepackaged nature of this case.  As set forth above and in greater detail in the Mayo Declaration, the Debtor solicited votes to accept or reject the Prepackaged Plan from all classes of holders of claims entitled to vote. The votes tabulated from these classes demonstrate acceptance of the Prepackaged Plan.  The most critical and complex task required to effectuate a successful reorganization – the negotiation and formulation of a chapter 11 plan of reorganization – has already been accomplished.  Thus, the Debtor respectfully submits that given the backdrop of this prepackaged chapter 11 case, the relief requested herein is appropriate because such relief will

assist the Debtor to move toward expeditious confirmation of the Prepackaged Plan with the least

possible disruption or harm to its business. Moreover, the Senior Lenders support the requested

relief. Based on the foregoing, the Debtor submits that the relief requested is necessary and

appropriate, is in the best interests of its estate and creditors, and should be granted in all

respects.

## Waiver of Bankruptcy Rule 6004(h)

54. The Debtor seeks a waiver of any stay of the effectiveness of the order

approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use,

sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after

entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth

above, for the Debtor to continue operating as a going concern, thereby preserving and protecting

the value of its assets and operations for the benefit of all stakeholders, it is vital that it be

permitted to maintain its existing Bank Accounts and to continue using its current Cash

Management System. Accordingly, the Debtor submits that ample cause exists to justify a waiver

of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## Notice

55. No trustee, unsecured creditors' committee or examiner has been

appointed in this chapter 11 case. Notice of this Motion shall be provided to (i) the attorneys for

the Debtor, Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, NY 10004-1482,

Attn.: Kathryn A. Coleman, Esq. and Eric J. Fromme, Esq.; (ii) the co-attorneys for the Debtor,

Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, P.O. Box 1347,

Wilmington, DE 19899-1347, Attn.: Derek C. Abbott, Esq. and Daniel B. Butz, Esq.; (iii) the

Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207,

Lockbox 35, Wilmington, DE 19801-3519; (iv) the attorneys for Bank of America, N.A.,

administrative agent under the Senior Credit Agreement, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017-3904, Attn.: John Fouhey, Esq. and Damian S. Schaible, Esq.; (v) the co-attorneys for Bank of America, N.A., administrative agent under the Senior Credit Agreement, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801-3361, Attn.: Mark D. Collins, Esq.; (vi) The Bank of New York Mellon Trust Company, N.A., as Indenture Trustee under each of the Indentures, 700 South Flower Street, Suite 500, Los Angeles, CA 90017-4101, Attn.: Raymond Torres; (vii) those parties listed on the list of creditors holding the twenty (20) largest unsecured claims against the Debtor, as identified in its chapter 11 petition; and (viii) any persons who have filed a request for notice in this chapter 11 case pursuant to Bankruptcy Rule 2002 (collectively the "Notice Parties").

## No Previous Request

56.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: January 22, 2010
      Wilmington, Delaware

Derek C. Abbott (Bar No. 3376)
Daniel B. Butz (Bar No. 4227)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

  -and-

Kathryn A. Coleman
Eric J. Fromme
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Proposed Counsel for the Debtor*