# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | |
| **AFFILIATED MEDIA, INC.,**[1] | **Chapter 11** |
| **Debtor.** | **Case No. 10-10202 (KJC)** |

### DEBTOR'S MOTION FOR ENTRY OF AN ORDER
### PURSUANT TO 11 U.S.C. §§ 105, 363, 503(b)(9), 1107 AND 1108 AND
### FED. R. BANKR. P. 6003 AUTHORIZING PAYMENT OF
### ORDINARY COURSE CLAIMS IN THE ORDINARY COURSE OF BUSINESS

The debtor-in-possession in the above-captioned chapter 11 case (the "Debtor" or "AMI"), hereby moves (the "Motion"), pursuant to sections 105, 363, 503(b)(9), 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an order substantially in the form annexed hereto as **Exhibit "A"** (the "Proposed Order") authorizing the payment of certain Ordinary Course Claims (as defined below) to providers of goods and services in the ordinary course of business and other creditors who are unimpaired under the Prepackaged Plan (as defined below) under the terms and conditions set forth herein. In support of the Motion, the Debtor submits the *Declaration of Ronald A. Mayo, Vice President and Chief Financial Officer of Affiliated Media, Inc., in Support of First Day Relief* (the "Mayo Declaration") filed contemporaneously herewith, and respectfully submits as follows:

---

1. The last four digits of the Debtor's federal tax identification number are 5553. The Debtor's mailing address and corporate headquarters is 101 W. Colfax Avenue, Suite 1100, Denver, CO 80202.

## Background

1.      On January 22, 2010 (the "<u>Petition Date</u>"), the Debtor commenced its bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  No trustee, examiner or creditors' committee has been appointed in this case.  The Debtor is operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Prior to the Petition Date, beginning on December 18, 2009, the Debtor solicited votes on the Prepackaged Plan of Reorganization of Affiliated Media, Inc., dated December 18, 2009 (the "<u>Prepackaged Plan</u>"), through a Disclosure Statement dated December 18, 2009 (the "<u>Disclosure Statement</u>") distributed in accordance with sections 1125 and 1126(b) of the Bankruptcy Code, both filed contemporaneously herewith.  Terms used but not otherwise defined herein have the meanings assigned to such terms in the Prepackaged Plan and the Disclosure Statement.  The Prepackaged Plan has been accepted by all classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.

## The Debtor's Business

3.      The Debtor, together with its Subsidiaries, is the second largest newspaper publisher in the United States in terms of paid daily circulation under management.  Only the Debtor has commenced a bankruptcy case; none of its Subsidiaries has filed a petition for relief as of the Petition Date.  Through its Subsidiaries, the Debtor publishes fifty-four (54) daily and more than 100 non-daily newspapers in eleven (11) states (and owns and operates Internet websites related thereto), including suburban markets in close proximity to the San Francisco Bay Area, Los Angeles, Baltimore, Boston and El Paso.  The Debtor's Subsidiaries also own or operate several metropolitan daily newspapers including *The Denver Post*, *San Jose Mercury News*, *St. Paul Pioneer Press*, *Contra Costa Times*, *Los Angeles Daily News*, *The Salt Lake*

*Tribune*, *The Detroit News*, and *Oakland Tribune*. The daily newspapers that the Debtor and its Subsidiaries control have a combined daily and Sunday paid circulation of approximately 2.3 million and 2.4 million, respectively, as of September 30, 2009. The Debtor, through its Subsidiaries, also operates a television station in Alaska and four radio stations in Texas. As of the Petition Date, the Debtor had approximately 100 employees. The Debtor and its Subsidiaries together employ approximately 8,700 people.

4. The Debtor is the ultimate parent of twenty-nine (29) wholly-owned Subsidiaries and owns 95% of the outstanding equity interests of Alaska Broadcasting Company, Inc. ("Alaska Broadcasting"). Attached to the Mayo Declaration as **Exhibit "A"** is a summary organizational chart of the Debtor and certain of its Subsidiaries.

5. The Debtor operates its business through its Subsidiaries. To ensure the efficient operation of the Debtor's Subsidiaries, the Debtor provides numerous management and operational services for a fee based on contractual obligations and on an allocation of cost basis where no contractual obligation exists. These services are in the nature of operating, administrative, accounting, electronic media and other support services, newsprint purchase services, financial reporting services, human resource services, risk management services, payroll services, tax reporting services, tax return preparation services and cash management.

6. The Debtor's main source of cash flow is distributions and dividends from its Subsidiaries as well as management fees and reimbursements from payments made on behalf of the Subsidiaries. Advertising is the largest component of the Subsidiaries' revenues, followed by circulation revenue. In addition to selling advertising in their core newspaper products, the Debtor's Subsidiaries also generate revenue through (i) advertising in niche publications, such as those related to home improvement, health and fitness, and weddings, and (ii) Internet

advertising. The Debtor's Subsidiaries also generate revenue through commercial printing for third parties and distribution of third-party publications.

7.     The Debtor's consolidated total revenues have fallen from $1.330 billion for the fiscal year ended June 30, 2007 to $1.060 billion for the fiscal year ended June 30, 2009 due to declining advertising and circulation revenues that are occurring throughout the newspaper industry. As of December 15, 2009, the Debtor estimates the fair market value of its total enterprise to be between $190 million and $230 million and its total debt to be approximately $930 million. The Debtor's estimated cash on hand as of the Petition Date is approximately $40 million.

## The Debtor's Capital Structure

8.     As of the Petition Date, the Debtor's capital structure includes:

(i)     senior secured indebtedness in the outstanding principal amount of $590 million (which amount includes $6.375 million of contingent reimbursement claims on letters of credit), owed to a syndicate of lenders (collectively, the "Senior Lenders") under a credit agreement dated December 30, 2003 (as amended, supplemented, and/or otherwise modified from time to time, the "Senior Credit Agreement") among the Debtor, Bank of America, N.A. as administrative agent (the "Administrative Agent"), the Senior Lenders and certain of the Debtor's Subsidiaries as guarantors (the "Guaranteeing Subsidiaries").[2] The Senior Lenders' claims are guaranteed by the Guaranteeing Subsidiaries and secured by first-priority liens and security interests in (a) the Debtor's interest and each Guaranteeing

---

2.   A true and accurate list of Guaranteeing Subsidiaries is attached to the Mayo Declaration as **Exhibit "B"**.

Subsidiary's interest in the capital stock (or other ownership interests) of the Guaranteeing Subsidiaries, and (b) substantially all of the assets of Alaska Broadcasting;

(ii)     other claims in an aggregate principal amount of $15.1 million most of which is secured (the "Other Indebtedness"); and

(iii)     unsecured subordinated notes in an aggregate principal amount outstanding of approximately $326 million (the "Subordinated Notes") issued under two Indentures between AMI (known at that time as MediaNews Group, Inc.) and the Indenture Trustee, as more fully described in the Disclosure Statement and the Mayo Declaration.

9.     The Debtor's founders (including the Debtor's chief executive officer) and certain family trusts hold the majority of the Debtor's pre-petition voting shares of stock. There is no established public trading market for the Debtor's capital stock.

### Events Leading Up To The Filing of The Prepackaged Plan

10.     As described in more detail in the Mayo Declaration, prior to the Petition Date, the Debtor entered into discussions with certain Senior Lenders and the Administrative Agent regarding a restructuring to reduce the Debtor's debt load and ensure that it could maintain competitive operations. The parties entered into a forbearance agreement dated as of April 30, 2009 and supplemented as of September 30, 2009 and November 30, 2009 (as so supplemented, the "Forbearance Agreement"), pursuant to which the Senior Lenders agreed to forbear from exercising certain remedies available to them as a result of certain of the Debtor's defaults so as to permit the Debtor to negotiate a comprehensive restructuring plan. The initial term of the forbearance period expired on September 30, 2009, and was extended to November 30, 2009 and then to March 31, 2010, subject to the other terms and conditions of the Forbearance Agreement.

11. In November 2009, the Debtor reached agreement with certain Senior Lenders and the Administrative Agent on the terms of a comprehensive restructuring of the Debtor's senior secured debt involving the issuance of new senior secured debt, the execution of new secured guaranties and a debt-for-equity swap, and the Debtor agreed to seek approval of that restructuring through the Prepackaged Plan. Certain Senior Lenders and the Administrative Agent indicated their support for the Prepackaged Plan by executing the Second Supplement to Forbearance Agreement and Restructuring Support Agreement dated November 30, 2009 (the "Restructuring Support Agreement"). In addition, the holder of approximately 51% of the outstanding principal amount of the Subordinated Notes advised AMI that it supported the Prepackaged Plan in principle, and it later voted to accept the Prepackaged Plan.

12. In accordance with the terms of the Restructuring Support Agreement, on December 18, 2009, the Debtor commenced a solicitation of votes from all classes entitled to vote under the Bankruptcy Code by mailing the Disclosure Statement, the Prepackaged Plan, ballots and related solicitation materials to the creditors in the classes entitled to vote on the Prepackaged Plan.

13. On January 6, 2010, the Debtor mailed the First Supplement to the Disclosure Statement and Prepackaged Plan. On January 9, 2010, the Debtor mailed the Second Supplement to the Disclosure Statement and Prepackaged Plan. The Prepackaged Plan has been accepted, within the meaning of section 1126(c) of the Bankruptcy Code, by all of the impaired classes of claims entitled to vote on the Prepackaged Plan.

### The Prepackaged Plan

14. Under the terms of the Prepackaged Plan, each Senior Lender will receive its Pro Rata share of (i) $150 million of New Senior Secured Term Notes, guaranteed by all of AMI's wholly-owned Subsidiaries and secured by first-priority liens on substantially all of the

assets of Reorganized AMI and its wholly-owned Subsidiaries; (ii) with respect to those Senior Lenders holding revolving loans and commitments under the existing facility, a $6.375 million letter of credit facility, resulting from an automatic rollover of the Debtor's existing letters of credit outstanding as of the Effective Date (the "Tranche A Facility"); and (iii) 88.0% of the equity of Reorganized AMI. In addition, a $7.5 million letter of credit facility (the "Tranche B Facility") will be provided as a separate new extension of credit by certain of the Senior Lenders. Collectively, the Tranche A Facility and the Tranche B Facility make up the $13.875 million letter of credit facility (the "LOC Facility"). The remaining 12% of the equity of Reorganized AMI is reserved for issuance to its management. Dean Singleton, the Chairman and Chief Executive Officer of the Debtor, is receiving warrants to purchase up to 8% of the equity of Reorganized AMI.

15. Because the holders of the Subordinated Note Claims voted to accept the Prepackaged Plan, each holder will receive its Pro Rata share of the Subordinated Note Warrants offered to them under the Prepackaged Plan. The Subordinated Note Warrants provide the Subordinated Note holders the right to purchase, in aggregate, up to 8.25% of the Class B New Common Stock of Reorganized AMI in certain circumstances.

16. In addition, the Prepackaged Plan provides for the payment in full of (i) allowed administrative expense claims; (ii) federal, state, and local tax claims; and (iii) certain other priority non-tax claims. Holders of Other Indebtedness will either have their claims paid in full or have their claims reinstated upon confirmation of the Prepackaged Plan. Trade creditors and certain other holders of general unsecured claims against AMI are unimpaired under the Prepackaged Plan and will receive payment of their claims in the ordinary course as those claims

become due and payable. Holders of existing equity interests in AMI will not receive a distribution on account of such interests.

17.    The Prepackaged Plan contemplates a comprehensive financial restructuring of the Debtor's existing capital structure that will allow the Debtor to delever its balance sheet by reducing its approximately $930 million total debt to approximately $179 million (composed of the New Senior Secured Term Notes in the amount of $150 million, the LOC Facility in the amount of $13.875 million and the Other Indebtedness in the amount of $15.1 million), through a short and consensual chapter 11 case, and emerge from chapter 11 poised for future growth and stability.

18.    Additional information and more detail regarding the Debtor's business, the Debtor's capital structure, the events leading up to the Petition Date, and the Prepackaged Plan can be found in the Mayo Declaration.

### Jurisdiction and Venue

19.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

20.    The Debtor filed this prepackaged chapter 11 case to effectuate an agreed financial restructuring, and intends to take every action possible to minimize the effect of the filing on the business operations of the Debtor and its Subsidiaries. Preserving the value of the Debtor's business, while right-sizing the Debtor's debt structure, is critical to the success of the Prepackaged Plan. To that end, the Prepackaged Plan is designed to have little or no effect on unimpaired creditors (creditors other than holders of the Debtor's pre-petition bonds and bank debt): holders of Other Indebtedness and General Unsecured Claims (as defined below) are

unimpaired under the Prepackaged Plan. This Motion, which seeks relief designed to maintain going concern value during the Debtor's stay in chapter 11 by implementing the Prepackaged Plan treatment of unimpaired creditors before the Prepackaged Plan itself is confirmed, is a critical component of the success of this chapter 11 case since paying the claims of the unimpaired creditors as they come due in the ordinary course of business will minimize disruption to the Debtor's business and maximize its value as a going concern.

21. The Other Indebtedness stems from various acquisitions where the Debtor and its Subsidiaries have issued notes and assumed certain debt obligations totaling approximately $4.84 million as of the date hereof. The notes payable and other debt obligations bear interest at rates ranging from 0.0% to 8.0% per annum. As of December 10, 2009, an aggregate principal amount of $10.26 million remains outstanding under the Restated and Amended Promissory Note dated March 12, 2004 (as amended, the "Aircraft Note"), issued by the Debtor to Fifth Third Bank to finance the purchase of a private jet aircraft. The Aircraft Note bears interest at a fixed rate of 8.0% per annum. The Aircraft Note is secured by a first-priority security interest on the aircraft under the Restated and Amended Aircraft Security Agreement dated as of March 12, 2004, as amended by the First Amendment dated December 10, 2009, by and between Fifth Third Bank and the Debtor.

22. The Debtor's relationships with its vendors and other trade creditors (including vendors to the Debtor's Subsidiaries and the partnerships, whose invoices are paid by the Debtor pursuant to the Debtor's cash management system) are critical to the continued operation of the Debtor's business during and after its bankruptcy case, and therefore it is crucial that the Debtor be permitted to honor its publicly expressed commitment to pay the Ordinary Course Claims (as defined below) in the ordinary course of its business. By this Motion, the

Debtor requests, pursuant to sections 105, 363, 503(b)(9), 1107 and 1108 of the Bankruptcy Code, entry of the Proposed Order authorizing, but not directing, the Debtor to pay, as they come due in the ordinary course of business, the pre-petition ordinary course claims (the "Ordinary Course Claims") of holders of Other Indebtedness and providers of goods and services to the Debtor, its Subsidiaries and the partnerships (collectively, the "Vendors") who agree to continue to provide their goods and services on the customary credit terms that existed within the 120 days prior to the Petition Date, or on such other terms and conditions as are acceptable to the Debtor, up to $600,000 per month and $3 million in the aggregate.[3] The Debtor is not seeking to give priority to so-called "critical vendors." Rather, the Debtor is seeking to pay the Vendors' Ordinary Course Claims consistent with and in the spirit of the Prepackaged Plan, which proposes to pay such claims as they come due.

23.     Such Ordinary Course Claims may include, but are not limited to, claims of the Debtor's (i) providers of supplies, equipment and services necessary to the Debtor's business operations and the business operations of the Debtor's Subsidiaries and the partnerships; (ii) advertisers; (iii) rent and utility service providers; (iv) external data and technology support service providers; (v) consultants, legal advisors (except for those professionals subject to filing fee applications and those ordinary course professionals for whom the Debtor will be requesting to employ under a separate motion) and auditors that are not addressed in other first day motions; (vi) holders of Other Indebtedness and (vii) other general

---

3.   Under the Prepackaged Plan, claims for debt incurred in the ordinary course of business are classified as Class 4 claims ("General Unsecured Claims").  The Prepackaged Plan provides that General Unsecured Claims are unimpaired and that unless the holder of such claim and the Debtor agree to different treatment, on the Effective Date, each holder of an Allowed General Unsecured Claim shall have its claim reinstated.  Similarly, under the Prepackaged Plan, holders of Other Indebtedness are classified as Class 3 claims.  Holders of Class 3 claims retain their legal and equitable rights under the Prepackaged Plan.

operational expenses. Based on the Debtor's books and records, the Debtor estimates that the total amount of Ordinary Course Claims to be paid to the Vendors will be approximately $600,000 per month, and it will not exceed $3 million in the aggregate.

24. The Debtor is current on its payments to the Vendors, and wishes to keep such payments current through its chapter 11 case. The Debtor proposes that all payments made under this Motion be subject to the following conditions:

a. The Debtor, in its sole discretion, subject to the terms set forth below, shall determine which Ordinary Course Claims, if any, will be paid pursuant to this Motion;

b. If a creditor accepts payment under this Motion, such creditor is deemed to have agreed to continue to provide goods and/or services to the Debtor, on terms that are as good or better than the terms and conditions (including credit terms) that existed one hundred and twenty (120) days prior to the Petition Date (the "Customary Terms"), during the pendency of this chapter 11 case;[4]

c. If a creditor accepts payment under this Motion and thereafter does not continue to provide goods and/or services on at least the Customary Terms during the pendency of this chapter 11 case, then (i) any payment on a pre-petition Claim received by such creditor will be deemed to be an unauthorized voidable post-petition transfer under Bankruptcy Code section 549, recoverable by the Debtor in cash upon written request, and (ii) upon recovery by the Debtor, any such pre-petition Claim will be reinstated as if the payment had not been made;

d. If the Debtor seeks to recover a payment from a creditor because the creditor does not continue to provide goods and/or services to the Debtor on at least the Customary Terms during the pendency of this chapter 11 case, the creditor may contest such action by making a written request (a "Request") to the Debtor to schedule a hearing before this Court. If such a Request is made, the Debtor will provide notice of a hearing on such Request to the creditor

---

4. In the event that the relationship between the creditor accepting payment under this Motion and the Debtor does not extend to 120 days before the Petition Date, the Customary Terms will mean the terms that the creditor generally extends to its customers or such terms as are acceptable to the Debtor in the reasonable exercise of its business judgment.

making the Request and other interested parties in accordance with the Bankruptcy Code and the orders of this Court; and

e.  Prior to making a payment to a creditor under this Motion, the Debtor may, in its absolute discretion, settle all or some of the pre-petition claims of such creditor for less than their face amount without further notice or hearing.

25.  In order to effectuate the purposes of this Motion, the Debtor requests that all banks and other financial institutions pursuant to this Motion be authorized and directed to receive, process, honor and pay any and all checks, drafts, wires or automated clearing house transfers (collectively, the "Disbursements"), whether issued or presented prior to or after the Petition Date. The Debtor further requests that such banks and financial institutions be authorized and directed to rely on the representations of the Debtor as to which Disbursements are authorized to be paid.

## Basis for Relief

26.  As described above and in more detail in the Disclosure Statement, the Debtor, through its Subsidiaries, publishes 54 daily and over 100 non-daily newspapers, and provides radio and television broadcast services that serve markets in 12 states. In order to centrally manage such geographically diverse entities, the Debtor relies heavily on its relationships with its Vendors to ensure that its business is able to operate without interruption. For example, the Vendors provide the Debtor with the various office supplies and equipment necessary to permit its headquarters office to function smoothly. The Vendors also include newsprint providers, ink suppliers, utility service providers, external office support consultants, express shippers and advertisers.

27.  Bankruptcy Rule 6003, when coupled with Bankruptcy Code section 363(b) and 105(a), permits this Court to authorize the Debtor to pay the Ordinary Course Claims when the relief is necessary to avoid immediate and irreparable harm. As discussed further

below, the Debtor and its creditors may suffer immediate and irreparable harm, and the consummation of the Debtor's prepackaged financial restructuring may be threatened, if the Debtor is unable to operate its business in the ordinary course.

28.     Conversely, payment of the Ordinary Course Claims will mitigate certain risks to the Debtor's business. The Debtor is making every effort to avoid interruptions in its ability to procure the goods and services necessary to its, its Subsidiaries' and the partnerships' ongoing operations. The Debtor respectfully submits that the relief requested herein is necessary to preserve its ability to continue its operations and the operations of its Subsidiaries and the partnerships without interruption. Absent payment of the Ordinary Course Claims in the ordinary course of business, the Debtor's business may be disrupted and certain Vendors may delay delivery of goods and services or demand trade terms that are less favorable to the Debtor, including payment in advance, as a condition to continuing a business relationship with the Debtor. Any short-term disruption could generate instability and would damage the "business as usual" message on which the Debtor's prepackaged reorganization is predicated and undermine its efforts to repair customer confidence.

29.     Moreover, in that regard, the Debtor does business with some of the Vendors without the benefit of contracts and, therefore, these Vendors generally are not obligated to do business with the Debtor or to honor particular trade terms in the future. As such, failure to pay the Ordinary Course Claims of the Vendors that provide goods and services would likely result in a disruption or cancellation of deliveries of goods and services and thereby undermine the Debtor's and its Subsidiaries' operations. Even if the Debtor were able to locate suitable replacement Vendors or service providers, the disruption in the flow of goods and services to or at the site of the Debtor's office would jeopardize the Debtor's ability to provide

services to its and its Subsidiaries' customers on a timely basis, thereby reducing the value of the estate. Conversely, the continued availability of trade credit will be extremely valuable to the Debtor by allowing it to preserve working capital while maintaining optimal production levels. Thus, by this Motion, the Debtor seeks to reserve the right to ensure that the Vendors will continue to supply trade credit necessary to the Debtor's and its Subsidiaries' operations.

30.    In addition, certain Vendors may have mechanic's or possessory lien rights. Any delays in payment to such Vendors may result in the assertion of those liens. Thus, the Debtor will have no alternative but to pay such vendors in full in any event in order to affect the release of any liens securing payment of such charges.

31.    Further, certain creditors will have claims based on goods received by the Debtor within twenty (20) days before the Petition Date in the ordinary course of business, entitling them to administrative expense priority under Bankruptcy Code section 503(b)(9) ("503(b)(9) Claims"). Such creditors would not only be paid in full, but are already accorded priority.

32.    Finally, payment of the Ordinary Course Claims in the ordinary course of business will not affect relative distributions to creditors under the Prepackaged Plan. The Debtor anticipates emerging from chapter 11 within a very short time period, and the payment of the Ordinary Course Claims will allow the Debtor to do so with minimal disruption to its business. As discussed above, the Prepackaged Plan provides that all General Unsecured Claims are unimpaired. As a result, granting the relief requested herein will affect only the timing of payment to holders of such claims, and no prejudice should be suffered by any other parties in interest in this chapter 11 case on account of the payment of such claims. Accordingly, the Debtor respectfully submits that payment of the Ordinary Course Claims in the ordinary course

of business is especially appropriate here because the payment of such claims in the ordinary course is already a key feature of the Debtor's reorganization, is necessary to preserve the value of its business, has been agreed to by the Senior Lenders, and will ease the administrative burden during the very limited period pending confirmation. Thus, the Debtor believes that the relief requested is reasonable and necessary, particularly under the circumstances of this chapter 11 case.

## Applicable Authority

**A.  Payment of the Ordinary Course Claims is Appropriate under Section 363(b) of the Bankruptcy Code**

33.     Bankruptcy Code section 363(b) permits a debtor to use property of the estate "other than in the ordinary course of business," after notice and a hearing. *See* 11 U.S.C. § 363(b)(1). This Court should approve a debtor's request for relief under Bankruptcy Code section 363 where a debtor demonstrates a sound business justification for seeking such relief. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("[T]he debtor must articulate some business justification, other than mere appeasement of major creditors….").

34.     Once a debtor has articulated a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res.,*

*Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

35.     The business judgment rule has "vitality" in chapter 11 cases. *See Integrated Res., Inc.*, 147 B.R. at 656; *see also Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

36.     As discussed above, it is the Debtor's business judgment that failure to pay Ordinary Course Claims will have a materially adverse impact on its business and, thus, on its efforts to implement the restructuring contemplated by the Prepackaged Plan. Moreover, paying Ordinary Course Claims is wholly consistent with the Prepackaged Plan.

**B.      Payment of Vendors Will Allow the Debtor to Avoid the Imposition of Possessory Liens under Section 546(b) of the Bankruptcy Code**

37.     The Debtor believes that failure to pay certain Vendors in the ordinary course may result in the assertion of mechanics' or possessory liens by respective claimants under applicable state law (collectively, the "Liens"). Under Bankruptcy Code section 362(b)(3), the act of perfecting such Liens, to the extent consistent with Bankruptcy Code section 546(b),[5] is expressly excluded from the automatic stay otherwise imposed by the Bankruptcy Code section 362(a). The assertion of such Liens would cause significant harm to the Debtor's business.

---

5.  Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that … permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection. . . ." 11 U.S.C. § 546(b)(1)(A).

**C. Payment of the Ordinary Course Claims is in Furtherance of the Debtor's Duties under Sections 1107(a) and 1108 of the Bankruptcy Code**

38.     The Debtor, operating its business as debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code, has a duty to protect and preserve its estate. Implicit in such a duty is the maintenance of the going-concern value of the Debtor's business, which maintenance includes preserving the accounts and relationships with the Vendors by paying such Vendors in the ordinary course of business.

39.     As described above, certain Vendors will have 503(b)(9) Claims against the Debtor on account of goods supplied to the Debtor during the twenty (20) days prior to the Petition Date. Furthermore, alternative providers would, in certain instances, be difficult to find. The harm and economic disadvantage that would result from the failure to pay any of the Ordinary Course Claims is grossly disproportionate to the amount of the pre-petition claims that would have to be paid. This is especially evident where, as here, General Unsecured Claims and holders of Other Indebtedness will be paid in full under the Prepackaged Plan.

40.     Finally, no practical or legal alternative to paying the Ordinary Course Claims exists. Practically, no alternative exists that would prevent disruption of the business and, legally, the Vendors will be unimpaired pursuant to the Prepackaged Plan. Thus, the timing of payment is the only issue. Waiting until the effective date of the Prepackaged Plan to pay the Ordinary Course Claims benefits no party in interest and is very likely to have a substantial negative effect on the Debtor's business and result in business interruption and other operational problems attendant to the damaged trade relationships caused by not paying creditors in the ordinary course. Therefore, the Debtor requests authority to pay the Ordinary Course Claims to satisfy its duties as debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

**D.  The Doctrine of Necessity, Bankruptcy Rule 6003, and Section 105(a) of the Bankruptcy Code Further Support Payment of the Ordinary Course Claims**

41.     The Debtor's proposed payment of pre-petition Ordinary Course Claims should be authorized pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 6003 and under the "doctrine of necessity."

42.     Under section 105 of the Bankruptcy Code, this Court "may issue any order ... that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a).  For the reasons set forth above, and in light of the Debtor's need to preserve the going concern value of its business pending confirmation of its Prepackaged Plan, the relief requested herein is proper and should be granted.

43.     Payment of the Ordinary Course Claims is also warranted under the doctrine of necessity.  The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain pre-petition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization. *See In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (stating that where debtor "cannot survive" absent payment of certain pre-petition claims, doctrine of necessity should be invoked to permit payment);[6] *see also In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor.") (citing *In re Ionosphere Clubs, Inc.* 98 B.R. at 177); *In re Eagle-Picher*

---

6.  The United States Supreme Court first articulated the doctrine of necessity over a century ago, in *Miltenberger v. Logansport C. & S.W. RR. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id.* at 309-14.  The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger*. *See In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation ... in serious jeopardy.").

*Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the Chapter 11 process."). The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

44.     The doctrine of necessity is a widely accepted component of modern bankruptcy jurisprudence. *See Just For Feet*, 242 B.R. at 826 (approving payment of key inventory vendors' pre-petition claims when such vendors could destroy debtor's business by refusing to deliver new inventory on eve of debtor's main sales season); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical pre-petition Vendors' claims when such Vendors agreed to provide post-petition trade credit); *In re Synteen Techs., Inc.*, No. 00-02203-W, 2000 WL 33709667, at *2-3 (Bankr. D.S.C. Apr. 14, 2000) (approving payment of pre-petition debt to key supplier); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994); *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175-176.

**E.     Certain of the Proposed Payments Are Already Accorded Priority**

45.     Certain Ordinary Course Claims may already be entitled to priority under the Bankruptcy Code. Bankruptcy Code section 503(b)(9) provides administrative expense priority for the value of any goods received by the Debtor within twenty (20) days before the Petition Date that the Debtor purchased in the ordinary course of its business. The Debtor believes that a significant portion of the Ordinary Course Claims that would be paid pursuant to

the relief requested herein is already entitled to administrative expense priority under Bankruptcy Code section 503(b)(9).[7]

46.     For the Debtor to confirm a plan of reorganization in this chapter 11 case, the Debtor would have to pay all 503(b)(9) Claims in full, in cash, on the effective date of such plan, unless the holders of such 503(b)(9) Claims agree to different treatment. *See* 11 U.S.C. § 1129(a)(9)(A).  Therefore, to the extent that the Ordinary Course Claims constitute 503(b)(9) Claims, the relief requested in this Motion is merely an extension of the treatment that will have to be provided under any plan of reorganization and an acceleration of the distributions that the Vendors holding such 503(b)(9) Claims would receive on plan consummation.  This is particularly true here, where the Debtor's proposed Prepackaged Plan already contemplates the unimpairment of all General Unsecured Claims.

47.     The Debtor thus respectfully submits that granting the relief requested in the Motion with respect to such 503(b)(9) Claims would have no substantial effect on the relative distribution of estate assets.  Further, if the relief requested in the Motion is granted, to the extent that the Debtor pays any 503(b)(9) Claims, the Debtor's estate would benefit from such Vendors continuing to provide goods and/or services to the Debtor on at least the Customary Terms during the pendency of this chapter 11 case.  In contrast, absent the relief requested in this Motion, the Vendors holding 503(b)(9) Claims would still be entitled to payment in full, in cash, upon plan consummation, but the Vendors may not be required (or will be reluctant) to continue

---

7.  The Debtor reserves all rights to challenge any assertions of section 503(b)(9) status or seeking payment of a claim under section 503(b)(9).

to provide goods or services on Customary Terms during this chapter 11 case.[8] Accordingly, granting the relief requested is not only consistent with the Bankruptcy Code's objective of ensuring that Vendors delivering goods to the Debtor within twenty (20) days of the Petition Date receive payment in full, but also helps to maximize the value of the Debtor's estate.

48.     The relief requested in this Motion is merely an extension of the treatment provided in the Prepackaged Plan. Therefore, granting the Motion would have no effect on the relative distribution of estate assets.

49.     The relief requested herein also may help to avert the institution of reclamation claims, adversary proceedings, and other creditor motions. Avoiding the time and expense of addressing such issues in the Bankruptcy Court will maximize judicial efficiency and benefit the Debtor, its estate and its creditors. Such relief, therefore, will allow the Debtor to focus on effectuating the provisions of the Prepackaged Plan.

50.     In comparison, if this Motion is not granted, the relationships the Debtor has with its Vendors may be jeopardized. Vendors may choose to terminate their relationships with the Debtor and, even if such precipitous action is not taken, such Vendors may have no incentive to continue to finance the Debtor on traditional terms. Because these risks of disruption may lengthen the Debtor's chapter 11 case unnecessarily, the transactions contemplated under the Prepackaged Plan, which are critical to the uninterrupted operation of the Debtor's business, would be jeopardized. Accordingly, the benefits of granting the Motion far outweigh any costs from granting such relief.

---

8.    If a Vendor is a party to a service or supply agreement with the Debtor, such Vendor would remain obligated to perform such agreement, in accordance with its terms, unless and until the Debtor terminated or rejected the contract. The Debtor, nevertheless, would be faced with the need to litigate with its Vendors to compel them to perform under their contracts should they refuse to provide goods and services consistent to the terms of any contract with the Debtor.

51. Absent the relief requested herein, the Debtor faces the prospect of damaged business relationships, interrupted operations, and tightened trade terms, if trade terms are available at all. In light of the proposed treatment of General Unsecured Claims under the Prepackaged Plan, therefore, the relief requested herein not only assists the Debtor in its restructuring efforts, but also preserves the value of the Debtor's business operations pending confirmation of the Prepackaged Plan and furthers the goal of this chapter 11 case.

### The Motion Satisfies Bankruptcy Rule 6003

52. Bankruptcy Rule 6003 provides that to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may grant certain forms of relief during the twenty-one (21) days immediately following the filing date. Fed. R. Bankr. P. 6003. As described above and in the Mayo Declaration, the Debtor believes that allowing for a "seamless" transition into and through bankruptcy will preserve the value upon which Prepackaged Plan is based. A fundamental aspect of the Debtor's efforts to minimize disruption during its chapter 11 case is the Debtor's ability to maintain the many relationships with the parties who supply goods and services to the Debtor. Because these relationships are critical to the continued operation of the Debtor's business during and after its bankruptcy case, it is of the highest import that the Debtor be permitted to honor its publicly expressed commitment to pay the Ordinary Course Claims in the ordinary course of business. The Debtor submits that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor, as described herein, and that Bankruptcy Rule 6003 has been satisfied.

### Waiver of Bankruptcy Rule 6004(h)

53. The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days

after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the payment of the Ordinary Course Claims in the ordinary course of business is necessary to prevent irreparable damage to the Debtor's business operations and the business operations of its Subsidiaries, and, therefore, the value of the Debtor's business pending reorganization. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

### Debtor's Reservation of Rights

54.     The relief requested herein should not (a) be construed as a request to assume, or for authority to assume, any executory contract under Bankruptcy Code section 365; (b) waive, affect or impair any of the Debtor's rights, claims or defenses, including, but not limited to, those arising from Bankruptcy Code section 365, other applicable law and any agreement; (c) grant third-party beneficiary status or bestow any additional rights on any third party; (d) be otherwise enforceable by any third party, including, but not limited to third parties that may purchase the Ordinary Course Claims; or (e) impair the Debtor's ability to contest or object to any invoice or claim of any Vendor or other creditor. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission of the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

### The Requested Relief is Appropriate

55.     The requested relief is further supported by the prepackaged nature of this case. The votes tabulated and received from each of the classes of creditors eligible to vote demonstrate overwhelming acceptance of the Prepackaged Plan. The most critical and complex task required to effectuate a successful reorganization — the negotiation and formulation of a chapter 11 plan of reorganization — has already been accomplished. Thus, the Debtor

respectfully submits that given the backdrop of this consensual prepackaged chapter 11 case, the relief requested herein is appropriate because such relief will assist the Debtor to move toward expeditious confirmation of the Prepackaged Plan with the least possible disruption or harm to its business. Based on the foregoing, the Debtor submits that the relief requested is necessary and appropriate, is in the best interests of its estate and creditors and should be granted in all respects.

## Notice

56.     No trustee, unsecured creditors' committee or examiner has been appointed in this chapter 11 case. Notice of this Motion shall be provided to (i) the attorneys for the Debtor, Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, NY 10004-1482, Attn.: Kathryn A. Coleman, Esq. and Eric J. Fromme, Esq.; (ii) the co-attorneys for the Debtor, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, P.O. Box 1347, Wilmington, DE 19899-1347, Attn.: Derek C. Abbott, Esq. and Daniel B. Butz, Esq.; (iii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801-3519; (iv) the attorneys for Bank of America, N.A., administrative agent under the Senior Credit Agreement, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017-3904, Attn.: John Fouhey, Esq. and Damian S. Schaible, Esq.; (v) the co-attorneys for Bank of America, N.A., administrative agent under the Senior Credit Agreement, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801-3361, Attn.: Mark D. Collins, Esq.; (vi) The Bank of New York Mellon Trust Company, N.A., as Indenture Trustee under each of the Indentures, 700 South Flower Street, Suite 500, Los Angeles, CA 90017-4101, Attn.: Raymond Torres; (vii) those parties listed on the list of creditors holding the twenty (20) largest unsecured claims against the Debtor, as identified in its chapter 11 petition; and (viii) any persons who have filed a request for

notice in this chapter 11 case pursuant to Bankruptcy Rule 2002 (collectively the "Notice Parties").

## No Previous Request

57. No prior request for the relief sought herein has been made by the Debtor to this Court or any other court.

WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: January 22, 2010
Wilmington, Delaware

_____
Derek C. Abbott (Bar No. 3376)
Daniel B. Butz (Bar No. 4227)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

-and-

Kathryn A. Coleman
Eric J. Fromme
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Proposed Counsel for the Debtor*