**THE SOLICITATION OF VOTES (THE "<u>SOLICITATION</u>") IS BEING CONDUCTED TO OBTAIN ACCEPTANCES OF THE PREPACKAGED PLAN UPON THE FILING OF A VOLUNTARY REORGANIZATION CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. <u>THE DEBTOR HAS NOT COMMENCED A BANKRUPTCY CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME.</u> BECAUSE A CHAPTER 11 CASE HAS NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF ITS CHAPTER 11 CASE, THE DEBTOR EXPECTS TO PROMPTLY SEEK ORDERS OF THE BANKRUPTCY COURT (i) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (ii) APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE AND (iii) CONFIRMING THE PREPACKAGED PLAN.**

**THE SOLICITATION IS BEING MADE ONLY TO PERSONS WHO ARE "ACCREDITED INVESTORS" (AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT OF 1933).**

## DISCLOSURE STATEMENT
## DATED DECEMBER 18, 2009

**Solicitation of Votes on the**
**Prepackaged Plan of Reorganization of**

# AFFILIATED MEDIA, INC.

**from the holders of outstanding**

**Senior Loan Claims &**
**Subordinated Note Claims**

| | |
|---|---|
| HUGHES HUBBARD & REED LLP | MORRIS NICHOLS ARSHT & TUNNELL LLP |
| Co-Counsel for the Debtor | Co-Counsel for the Debtor |
| One Battery Park Plaza | 1201 North Market Street, 18th Floor |
| New York, NY 10004 | P.O. Box 1347 |
| Telephone: (212) 837-6000 | Wilmington, DE 19899 |
| | Telephone: (302) 658-9200 |

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PREPACKAGED PLAN IS 5:00 P.M., PREVAILING EASTERN TIME, ON JANUARY 13, 2010, UNLESS EXTENDED BY THE DEBTOR IN A NOTICE PROVIDED TO ELIGIBLE VOTERS**

**DISCLAIMER**

FOR A COMPLETE UNDERSTANDING OF THE PREPACKAGED PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PREPACKAGED PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PREPACKAGED PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PREPACKAGED PLAN ARE CONTROLLING.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE, AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PREPACKAGED PLAN.

THE NEW COMMON STOCK AND SUBORDINATED NOTE WARRANTS EXERCISABLE FOR SUCH NEW COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "**SECURITIES ACT**"), OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. THE ISSUANCE OF SUCH SECURITIES UNDER THE PREPACKAGED PLAN WILL BE EFFECTED PURSUANT TO THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THE TRANSACTIONS CONTEMPLATED HEREIN OR DETERMINED IF THIS DISCLOSURE STATEMENT IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF AFFILIATED MEDIA, INC. SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PREPACKAGED PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS PROVIDED IN THIS DISCLOSURE STATEMENT SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS INCLUDING, BUT NOT LIMITED TO, THOSE RISKS DESCRIBED IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT AND EACH OF THE OTHER RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTOR IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY

OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

HOLDERS OF OTHER SECURED CLAIMS (AS DEFINED HEREIN), PREPETITION TRADE CLAIMS, CUSTOMERS AND EMPLOYEES WILL NOT BE IMPAIRED BY THE PREPACKAGED PLAN AND AS A RESULT THEIR RIGHTS WITH RESPECT TO EXISTING OBLIGATIONS ARE NOT ALTERED BY THE PREPACKAGED PLAN. DURING THE CHAPTER 11 CASE, THE DEBTOR INTENDS TO OPERATE ITS BUSINESS IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENTS IN THE ORDINARY COURSE AND ON A TIMELY BASIS TO ALL OTHER SECURED CREDITORS, TRADE CREDITORS, CUSTOMERS AND EMPLOYEES OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASE.

ALTHOUGH THE DEBTOR HAS ATTEMPTED TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE SPECIFICALLY NOTED, NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTOR'S MANAGEMENT WITH THE ASSISTANCE OF ITS FINANCIAL ADVISORS PREPARED THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT. THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATION CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. MOREOVER, THERE MAY BE ERRORS IN THE STATEMENTS AND/OR

FINANCIAL INFORMATION CONTAINED HEREIN AND/OR ASSUMPTIONS UNDERLYING SUCH STATEMENTS AND/OR FINANCIAL INFORMATION. THE DEBTOR AND ITS ADVISORS EXPRESSLY DISCLAIM ANY OBLIGATION TO UPDATE OR CORRECT ANY SUCH FINANCIAL INFORMATION OR ASSUMPTIONS.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PREPACKAGED PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PREPACKAGED PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PREPACKAGED PLAN, SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR AN INTEREST.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PREPACKAGED PLAN OR OBJECTING TO CONFIRMATION OF THE PREPACKAGED PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PREPACKAGED PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PREPACKAGED PLAN AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT ALL SUCH SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF UNDERLYING DOCUMENTS AND TO THE EXTENT THAT THEY MAY CHANGE AS PERMITTED BY THE PREPACKAGED PLAN AND APPLICABLE LAW. THE DEBTOR'S MANAGEMENT HAS PROVIDED FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED

TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR PRECONFIRMATION EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

       A.    Overview ....................................................................................................1

       B.    Summary of the Financial Restructuring.....................................................2

       C.    Treatment of Subordinated Note Claims Under the Prepackaged Plan ...................5

       D.    Who Is Entitled to Vote ............................................................................6

       E.    How to Vote and Voting Deadline ...........................................................7

       F.    Confirmation Hearing................................................................................8

       G.    Additional Information ..............................................................................8

II.   HISTORY AND CORPORATE STRUCTURE OF THE DEBTOR................................9

       A.    Overview of the Business............................................................................9
              1.    Publishing Operations.........................................................................9
              2.    Web-Based Operations.......................................................................10
              3.    Television and Radio Stations and FCC Licenses .......................................11
              4.    Sources of Revenue...........................................................................12
              5.    Financial Results ..............................................................................12

       B.    Current Organizational Structure ..............................................................13

       C.    Services Provided by Debtor to Subsidiaries .............................................13

       D.    Equity Structure........................................................................................14

       E.    Board of Directors, Management and Committees .....................................14
              1.    Board of Directors.............................................................................14
              2.    Management......................................................................................15

       F.    Employee and Compensation Matters........................................................16
              1.    Employees.........................................................................................16
              2.    Retirement Savings Plan ...................................................................16
              3.    Single-Employer Pension Plans ........................................................16
              4.    Multiemployer Pension Plans ...........................................................18
              5.    Welfare Benefit Plans .......................................................................18
              6.    Retiree Welfare Benefits...................................................................19
              7.    Bonus Plan .......................................................................................19
              8.    Deferred Compensation Plan ............................................................19
              9.    Employment Agreements...................................................................20

G.    Capital Structure.............................................................................20
    1.    The Credit Agreement.........................................................20
    2.    Subordinated Notes............................................................21
        a.    6 7/8% Notes.........................................................21
        b.    6 3/8% Notes.........................................................21
    3.    Supplemental Indentures......................................................21
    4.    Other Indebtedness............................................................22

III.    EVENTS LEADING TO RESTRUCTURING ............................................22

    A.    The Newspaper Industry ...................................................22

    B.    Debtor's Deteriorating Financial Condition.............................23

    C.    Cost Reductions and Strategic Initiatives................................24

    D.    Summary of Restructuring Negotiations................................24
    1.    Forbearance Agreement and Development of Restructuring.......................25

    E.    Restructuring Support Agreement.......................................26

    F.    Solicitation and Commencement of Reorganization Case .....................27

IV.    THE REORGANIZATION CASE...........................................................27

    A.    Anticipated Timeline of the Reorganization Case .....................27

    B.    Confirmation of the Prepackaged Plan..................................28

    C.    Ordinary Course Operations After the Petition Date ...................28
    1.    Payment in the Ordinary Course of Creditors Unaffected by the Filing of the Reorganization Case.....................................28
    2.    Employee Matters..............................................................29
    3.    Operation of Business.........................................................29
    4.    Motion to Waive Requirements to File Schedules and Statement of Financial Affairs ..............................................................29
    5.    Payment of Senior Lender Non-Principal Claim.........................29
    6.    Administrative Relief..........................................................29
    7.    FCC Trust.....................................................................30
    8.    FCC Applications.............................................................30

V.    SUMMARY OF THE PREPACKAGED PLAN .........................................30

    A.    Overview of Chapter 11 and the Plan Process .........................32

    B.    Classification and Treatment of Claims and Equity Interests; Cram Down ..........33
    1.    Treatment of Unclassified Claims Under the Prepackaged Plan.................34
        a.    Administrative Expense Claims...........................................34

   b. Professional Compensation and Reimbursement Claims ...................34
   c. Priority Tax Claims.................................................................................35
  2. Treatment of Classified Claims and Equity Interests ................................35
   a. Priority Non-Tax Claims (Class 1) ......................................................35
   b. Senior Loan Claims (Class 2) ..............................................................35
   c. Other Secured Claims (Class 3)...........................................................36
   d. General Unsecured Claims (Class 4) ...................................................37
   e. Subordinated Note Claims (Class 5).....................................................37
   f. Intercompany Claims (Class 6).............................................................37
   g. Securities Litigation Claims (Class 7) .................................................38
   h. Old AMI Equity Interests (Class 8) ......................................................38

C. Treatment of Subordinated Note Claims Under the Prepackaged Plan .................38

D. Summary of Capital Structure of the Reorganized Debtor ......................................39
  1. Description of New Common Stock.............................................................39
   a. Class A New Common Stock ................................................................40
   b. Class B New Common Stock and Class C New Common Stock........40
   c. Stockholders' Agreement......................................................................42
  2. New Senior Credit Facility .........................................................................43
  3. Subordinated Note Warrants........................................................................44
  4. Additional Warrants Issued to Mr. Singleton .............................................45

E. Means for Implementation and Execution of the Prepackaged Plan........................46
  1. Corporate Action.........................................................................................46
  2. Restated Certificate of Incorporation and Restated Bylaws ........................47
  3. Plan Exhibits ...............................................................................................47
  4. Plan Supplements........................................................................................48
  5. Board of Directors of Reorganized AMI .....................................................48
  6. Officers of Reorganized AMI ......................................................................48
  7. New Senior Secured Credit Agreement ......................................................49
  8. Issuance of New Common Stock.................................................................49
  9. Issuance of Subordinated Note Warrants....................................................49
  10. Stockholders' Agreement............................................................................49
  11. Cancellation of Agreements........................................................................49
  12. Settlement, Compromise and Release of Guarantee Obligations. ..............49
  13. Surrender of Existing Securities..................................................................50
  14. Cancellation of the Senior Credit Agreement, Subordinated Notes
   and Equity Interests....................................................................................51

F. Equity Incentive Plan ...............................................................................................51
  1. Amount .......................................................................................................52
  2. Dividend and Other Rights .........................................................................52
  3. Vesting .......................................................................................................52
  4. Repurchase Rights ......................................................................................53

G. Incentive Bonus Agreements.....................................................................................53

H.    Amended and Restated Employment Agreements ................................................... 54

     1.    Amended and Restated Employment Agreement by and between AMI and William Dean Singleton (the "Singleton Agreement") ................ 54

     2.    Amended and Restated Employment Agreement by and between Reorganized AMI and Joseph J. Lodovic, IV (the "Lodovic Agreement") .................................................................................. 55

I.    Existing Liens ............................................................................................ 55

J.    Compromise of Controversies ................................................................. 56

K.    Effectuating Documents; Further Transactions ....................................... 56

L.    Certain Actions Relating to FCC Broadcast Licenses .............................. 56

VI.    PROVISIONS GOVERNING DISTRIBUTIONS ............................................... 57

A.    Date of Distributions on Account of Allowed Claims ............................. 57

B.    Sources of Cash for Plan Distribution ..................................................... 58

C.    Time Bar to Cash Payments ..................................................................... 58

D.    Disbursement Agent ................................................................................. 58

E.    Record Date for Distributions .................................................................. 58

F.    Delivery of Distributions ......................................................................... 59

G.    Subordinated Note Claims and Senior Loan Claims ................................ 59

H.    Manner of Cash Payments Under Prepackaged Plan ............................... 59

I.    Fractional Shares ..................................................................................... 59

J.    Setoffs and Recoupment .......................................................................... 60

K.    Exemption from Securities Law ............................................................... 60

L.    Allocation of Payments ........................................................................... 60

M.    No Postpetition Interest on Claims .......................................................... 60

N.    Treatment of Executory Contracts and Unexpired Leases ....................... 60

O.    Conditions Precedent to Effective Date .................................................. 63

     1.    Confirmation Order ........................................................................ 63

     2.    Execution and Delivery of Other Documents ................................. 63

     3.    Corporate Formalities .................................................................... 63

|  | 4. | FCC Matters | 63 |
|  | 5. | Other Acts | 63 |
|  | 6. | AMI Waiver of Conditions Precedent | 63 |
|  | 7. | Reservation of Rights | 64 |
|  | 8. | Substantial Consummation | 64 |
| P. |  | Effect of Confirmation | 64 |
|  | 1. | Vesting of Assets | 64 |
|  | 2. | Binding Effect | 64 |
|  | 3. | Settlements, Releases and Discharges | 64 |
|  | 4. | Discharge of the Debtor | 65 |
|  | 5. | Exculpation | 65 |
|  | 6. | Releases By the Debtor and its Estate | 66 |
|  | 7. | Consensual Releases By Holders of Claims and Equity Interests | 66 |
|  | 8. | Settlement and Compromise Among Debtor, the Guaranteeing Subsidiaries and Administrative Agent | 66 |
|  | 9. | Waiver of Avoidance Actions | 67 |
|  | 10. | Term of Injunctions or Stays | 67 |
|  | 11. | Termination of Subordination Rights and Settlement of Related Claims | 68 |
|  | 12. | Indemnification Obligations | 68 |
|  | 13. | Limitation on Indemnification | 69 |
|  | 14. | Preservation of Claims | 69 |
|  | 15. | No Acquisition of a Majority of Voting Interests | 69 |
|  | 16. | No Change of Control | 70 |
| Q. |  | Retention of Jurisdiction | 70 |
| R. |  | Miscellaneous | 72 |
|  | 1. | Payment of Statutory Fees | 72 |
|  | 2. | Payment of Indenture Trustee Fees and Administrative Agent Fees Related to Distributions Received Under the Prepackaged Plan | 72 |
|  | 3. | Further Assurances | 72 |
|  | 4. | Exhibits, Appendices and Schedules Incorporated | 72 |
|  | 5. | Intercompany Claims | 72 |
|  | 6. | Amendment or Modification of the Prepackaged Plan | 72 |
|  | 7. | Inconsistency | 73 |
|  | 8. | Section 1125(e) of the Bankruptcy Code | 73 |
|  | 9. | Compliance with Tax Requirements | 73 |
|  | 10. | Determination of Tax Filings and Taxes | 73 |
|  | 11. | Exemption from Transfer Taxes | 74 |
|  | 12. | Dissolution of Any Statutory Committees and Cessation of Fee and Expense Payment | 74 |
|  | 13. | Severability of Provisions in the Prepackaged Plan | 74 |
|  | 14. | Governing Law | 74 |
|  | 15. | No Admissions | 75 |

VII.  FINANCIAL PROJECTIONS AND VALUATION ........................................................75

    A.  Financial Projections ..........................................................................................75
        1.  Note Regarding Forward-Looking Statements ...........................................75
        2.  Introduction...............................................................................................75
        3.  Qualifications ............................................................................................76
        4.  Projections.................................................................................................78
        5.  Accounting Policies ...................................................................................82
        6.  Summary of Significant Assumptions .........................................................82
            a.  Advertising Revenue.......................................................................82
            b.  Circulation Revenue........................................................................83
            c.  Commercial Printing Revenue .........................................................83
            d.  Expense Assumptions ......................................................................83
        7.  Balance Sheet Assumptions .......................................................................84
            a.  Capital Expenditures .......................................................................84
            b.  Asset Sales ......................................................................................84
            c.  Debt.................................................................................................84
            d.  Working Capital ..............................................................................85

    B.  Value of the Reorganized Debtor .......................................................................85
        1.  Overview....................................................................................................85
        2.  Estimate of Value.......................................................................................86
        3.  Valuation Methodology ..............................................................................87
            a.  Comparable Company Analysis ........................................................87
            b.  Precedent Transactions Analysis ......................................................87
            c.  Discounted Cash Flow Analysis .......................................................88
         4.  Recoveries..................................................................................................89

    C.  Liquidation Analysis ..........................................................................................90
        1.  Introduction................................................................................................90
        2.  Scope, Intent, and Purpose of the Liquidation Analysis.............................91
        3.  Global Assumptions in the Liquidation Analysis .......................................92
            a.  Primary Assets of the Debtor ...........................................................93
            b.  Forced Liquidation Sale Process......................................................93
            c.  Factors Considered in Valuing Hypothetical Liquidation Proceeds....94

    D.  Summary of the Hypothetical Liquidation Analysis ............................................94

    E.  Notes to Liquidation Analysis............................................................................96
            a.  Note 1 -- Cash and Equivalents .......................................................96
            b.  Note 2 -- Accounts Receivable .........................................................96
            c.  Note 3 -- Prepaid Expenses ..............................................................96
            d.  Note 4 -- Current Assets ..................................................................96
            e.  Note 5 -- Intercompany Balances .....................................................96
            f.  Note 6 -- Property & Equipment.......................................................97
            g.  Note 7 -- Equity Investments ...........................................................97
            h.  Note 8 -- Deposits ...........................................................................97

| | | |
|---|---|---|
| i. | Note 9 -- Other Non-Current Assets | 97 |
| j. | Note 10 - Partnership Distributions | 98 |
| k. | Note 11 -- Chapter 11 Professionals | 98 |
| l. | Note 12 -- Committee Professionals | 98 |
| m. | Note 13 -- Chapter 7 Trustee Professionals | 98 |
| n. | Note 14 -- Investment Banker Fees | 98 |
| o. | Note 15 -- Wind-down Costs | 98 |
| p. | Note 16 – Chapter 7 Trustee Fees | 99 |
| q. | Note 17 -- Secured Claims | 99 |
| r. | Note 18 -- Administrative & Priority Claims | 99 |
| s. | Note 19 -- Senior Lender Deficiency | 99 |
| t. | Note 20 -- Subordinated Notes | 99 |
| u. | Note 21 -- Pension Plans | 99 |
| v. | Note 22 -- Additional Unsecured Claims | 99 |
| w. | Note 23 -- Distribution Waterfall | 100 |

VIII.   CERTAIN RISK FACTORS AFFECTING THE DEBTOR ........................100

A.   Risk Factors Relating to the Reorganization Case ...............................100

1.   Parties in Interest May Object to the Debtor's Classification of Claims ........................100

2.   The Debtor May Object to the Amount, Secured Status or Priority Status of a Claim ........................101

3.   In Certain Instances, Any Chapter 11 Case May Be Converted to a Case Under Chapter 7 of the Bankruptcy Code ........................101

4.   The Bankruptcy Court May Decline to Confirm the Prepackaged Plan ........................101

5.   The Debtor May Fail to Meet All Conditions Precedent to Effectiveness of the Prepackaged Plan ........................103

6.   The Announcement of the Restructuring Could Adversely Affect the Value of the Debtor's Business ........................103

7.   The Debtor May Be Unsuccessful in Obtaining First Day Orders to Authorize Payment of Unimpaired Creditors in the Ordinary Course of Business ........................104

8.   The Debtor Cannot Predict the Amount of Time Needed to Implement the Prepackaged Plan, and a Lengthy Bankruptcy Case Could Disrupt the Debtor's Business, as well as Impair the Prospect for Reorganization on the Terms Contained in the Prepackaged Plan and Possibly Provide an Opportunity for Other Plans to be Proposed ........................104

9.   The Debtor May Seek to Amend, Waive, Modify or Withdraw the Prepackaged Plan at Any Time Prior to the Confirmation Date ........................104

10.   Inherent Uncertainty of Projections ........................105

11.   Certain of the Senior Lenders May Seek to Enforce Remedies against Debtor's Non-Filing Subsidiaries ........................106

12.   Conditions of Forbearance May Not Be Met Prior to Commencement of the Reorganization Case ........................106

| | | |
|---|---|---|
| B. | Risk Factors Regarding the Debtor's Business | 106 |
| | 1. Impact of the U.S. Economy | 107 |
| | 2. Impact of the Market Concentration of the Debtor's Business | 107 |
| | 3. Incurrence of Significant Losses in Recent Years | 107 |
| | 4. Digital Media Challenges | 107 |
| | 5. Advertising and Circulation Dependencies | 108 |
| | 6. Privacy Laws | 108 |
| | 7. Cost and Supply of Newsprint | 108 |
| | 8. Publishing Industry Competition | 109 |
| | 9. The Debtor's Business Operations Could Be Significantly Disrupted if It Lost Members of Its Management Team | 110 |
| | 10. Employee Relations | 110 |
| | 11. Regulation and Environmental Matters | 110 |
| | 12. Legal Proceedings | 111 |
| |     a. California Independent Contractor Litigation | 111 |
| |     b. Charleston & York JOA Litigation | 111 |
| |     c. Other Litigation | 112 |
| | 13. Leverage | 112 |
| | 14. The New Senior Secured Credit Agreement Contains Financial and Other Covenants That Impose Restrictions on the Debtor's Financial and Business Operations. | 113 |
| | 15. Adverse Publicity | 113 |
| | 16. Pension Matters | 113 |
| | 17. Self-Insurance and Deductibles on Workers' Compensation Insurance | 114 |
| | 18. Certain Tax Considerations | 114 |
| C. | Certain Risk Factors Relating to Securities to Be Issued Under the Prepackaged Plan | 114 |
| | 1. No Current Public Market for Securities | 114 |
| | 2. Potential Dilution | 115 |
| | 3. Dividends | 115 |
| D. | Risks Related to FCC Approval Requirements In Connection With Emergence From Bankruptcy | 115 |
| | 1. "Involuntary" Transfers and Assignments | 115 |
| | 2. FCC Consent Required for Emergence for Bankruptcy | 116 |
| IX. | VOTING PROCEDURES AND REQUIREMENTS | 117 |
| A. | Voting Deadline | 117 |
| B. | Voting Procedures | 118 |
| C. | Parties in Interest Entitled to Vote | 119 |
| | 1. Beneficial Owners | 120 |

D. Nominees ..................................................................................................120
    1. Pre-Validated Ballots .........................................................................120
    2. Master Ballots .....................................................................................121
    3. Miscellaneous .....................................................................................121
    4. Fiduciaries and Other Representatives................................................122
    5. Agreements upon Furnishing Ballots..................................................122
    6. Change of Vote ...................................................................................123

E. Waivers of Defects, Irregularities, etc. .................................................123

F. Further Information; Additional Copies .................................................124

X. CONFIRMATION OF THE PREPACKAGED PLAN ....................................124

A. Confirmation Hearing............................................................................124

B. Requirements for Confirmation of the Prepackaged Plan – Consensual
Confirmation .........................................................................................125
    1. Best Interests Test ..............................................................................126
    2. Acceptance ..........................................................................................127
    3. Feasibility...........................................................................................128

C. Confirmation Without Acceptance of All Impaired Classes:  The "Cram
Down" Alternative .................................................................................128
    1. Fair and Equitable ..............................................................................128
        a. Secured Creditors ......................................................................128
        b. Unsecured Creditors ..................................................................129
        c. Holders of Interests ...................................................................129
        d. Unfair Discrimination ...............................................................130

XI. HISTORICAL FINANCIAL INFORMATION ...........................................130

XII. CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS........130

A. Exemption from Registration Requirements for Issuance of New Securities.......130

B. Restrictions in the Stockholders' Agreement .........................................132

C. Subsequent Transfers of Securities .......................................................132

XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION.........................133

A. Liquidation Under Chapter 7.................................................................133

B. Alternative Plan(s) of Reorganization ...................................................133

XIV.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PREPACKAGED PLAN ...................................................................................134

    A.    Consequences to the Debtor ................................................................135
        1.    Cancellation of Debt Income ..................................................135
        2.    Potential Limitations on NOL Carryforwards and Other Tax Attributes..................................................................................136
        3.    Alternative Minimum Tax ......................................................136

    B.    Consequences to Holders of Claims....................................................137
        1.    U.S. Holders of Senior Loan Claims ......................................138
            a.    Exchange of Senior Loan Claims for New Senior Secured Term Notes and New Common Stock ................................................................138
            b.    New Senior Secured Term Notes...............................139
            c.    New Common Stock ..................................................140
        2.    U.S. Holders of Subordinated Note Claims ............................141
            a.    Exchange of Subordinated Note Claims for Subordinated Note Warrants..................................................................................141
            b.    Subordinated Note Warrants.......................................141
            c.    Failure of Holders of Subordinated Note Claims to Vote in Favor of the Prepackaged Plan ................................................................142
        3.    Other Considerations ..............................................................142
            a.    Accrued Interest .......................................................142
            b.    Market Discount........................................................142
            c.    Bad Debt Deduction..................................................143
            d.    Limitation on Use of Capital Losses..........................143

    C.    Information Reporting and Backup Withholding.................................143

XV.    CONCLUSION AND RECOMMENDATION.............................................144

## EXHIBITS

Exhibit 1      Prepackaged Plan of Affiliated Media, Inc.

Exhibit 2      Audited Consolidated Balance Sheet as of June 30, 2009 and the related Statements of Operations and Cash Flows for the Fiscal Year Ended June 30, 2009

Exhibit 3      Unaudited Consolidated Balance Sheet as of September 30, 2009 and the related Statements of Operations and Cash Flows for the Fiscal Quarter ended September 30, 2009

Exhibit 4      Corporate Organization Chart

# I.    INTRODUCTION

## A.    Overview

Affiliated Media, Inc., a Delaware corporation (the "**Debtor**" or "**AMI**"), submits this disclosure statement (the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code, as now in effect or as hereafter amended (the "**Bankruptcy Code**"), and rule 3017 of the Federal Rules of Bankruptcy Procedure, as now in effect or as hereafter amended (the "**Bankruptcy Rules**"), and ballots for use in the solicitation of votes in accordance with section 1126(b) of the Bankruptcy Code (the "**Solicitation**") on the Prepackaged Plan of Reorganization of Affiliated Media, Inc., dated as of December 18, 2009 (including all Plan Exhibits and the Plan Supplements, the "**Prepackaged Plan**").[1]  The Prepackaged Plan is being proposed by the Debtor and, so long as the Class of Senior Lenders votes in favor of the Prepackaged Plan, is anticipated to be filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  A copy of the Prepackaged Plan is annexed as Exhibit 1 to this Disclosure Statement.

The purpose of this Disclosure Statement is to assist each holder of Claims entitled to vote on the Prepackaged Plan in making an informed judgment regarding whether to vote to accept or reject the Prepackaged Plan.  This Disclosure Statement sets forth certain information regarding (i) the Debtor's prepetition operating and financial history; (ii) the Debtor's need for restructuring of its financial obligations (the "**Financial Restructuring**"); (iii) the terms of the Prepackaged Plan and alternatives to the Prepackaged Plan; (iv) certain effects of confirmation of the Prepackaged Plan; (v) certain risk factors associated with securities to be issued under the Prepackaged Plan; (vi) the manner in which distributions will be made under the Prepackaged Plan; (vii) the confirmation process and the voting procedures that holders of Claims entitled to vote under the Prepackaged Plan must follow for their votes to be counted; (viii) significant events that are expected to occur during the Reorganization Case; and (ix) the anticipated organization, operations, liquidity and financial projections of the Debtor upon emergence from chapter 11 of the Bankruptcy Code (the "**Reorganized Debtor**" or "**Reorganized AMI**").

The Debtor is the holding company for the MediaNews Group family of newspapers, websites, and television and radio broadcasters.  **The Debtor intends that the operations of the MediaNews Group newspapers, broadcast stations and Internet services will be substantially unaffected by the Reorganization Case.  The MediaNews Group's business and properties are almost completely owned and operated by the Debtor's operating Subsidiaries, and it is intended that these Subsidiaries will not be commencing chapter 11 cases.**

As described in Section II.A.3. below, the broadcasting licenses and certain associated assets of the Debtor's Subsidiaries will be assigned to a liquidating trust (the "**FCC Trust**") during the course of the Reorganization Case, subject to an order of the Bankruptcy Court and

---

[1]    Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Prepackaged Plan.

consent of the Federal Communications Commission (the "**FCC**"). To minimize disruption and maintain continuity of broadcast operations pending a future disposition of the broadcast assets, AMI's present broadcasting Subsidiaries will provide programming and operational services to the broadcast operations pursuant to time brokerage agreements (the "**Time Brokerage Agreements**"), subject to the oversight and control of the trustees of the FCC Trust.

### B.    Summary of the Financial Restructuring

Due to economic conditions affecting the newspaper industry, the Debtor's current level of debt has become unsustainable, which has led to the need to restructure that debt. The Debtor's single largest obligation is owed to the Senior Lenders, who have provided financing to the Debtor and its Subsidiaries since 2003 under the terms of the Senior Credit Agreement Documents. As of the date of this Disclosure Statement, the Senior Lenders were owed an aggregate principal amount of approximately $583.1[2] million, which amount is guaranteed by the Guaranteeing Subsidiaries. The Debtor is also obligated in respect of Secured Claims in the aggregate amount of $15.1 million. The Debtor also owes an aggregate principal amount of approximately $326 million to the holders of the Subordinated Note Claims under the Indentures.

The Prepackaged Plan reflects the terms of the Restructuring Support Agreement, entered into prior to the date of this Disclosure Statement, with certain of the Senior Lenders. The largest holder of Subordinated Notes, with approximately 51% of the total amount of the Subordinated Notes Claims, has advised the Debtor that it supports the Prepackaged Plan in principle, subject to the execution of definitive agreements.

The Prepackaged Plan allows the Debtor to deleverage its balance sheet, through a debt-for-equity swap by the Senior Lenders and extinguishment of the Subordinated Note Claims (in exchange for warrants to purchase stock in the Reorganized Debtor in certain circumstances), by reducing its approximate $930 million total debt, of which $590 million is senior secured indebtedness (which amount includes $6.375 million of contingent reimbursement claims on letters of credit), to $150 million plus the LOC Facility in the amount of $13.875 million and $15.1 million of Other Secured Claims.[3] The Senior Lenders' acceptance of the Prepackaged Plan as a Class constitutes an agreement to exchange their existing Claims and guarantees for a Pro Rata share of a new secured term loan, in a smaller principal amount but with more collateral and a more financially sound borrower, and equity of the Reorganized Debtor. Thus, following consummation of the Prepackaged Plan, each Senior Lender will hold a Pro Rata share of the new $150 million Term Loan Facility, guaranteed by the Guaranteeing Subsidiaries (a list of which is attached to the Prepackaged Plan as <u>Plan Exhibit 3</u>) and secured by Liens on substantially all assets of the Reorganized Debtor and the Guaranteeing Subsidiaries, and will

---

[2]    In addition, there are $6.375 million of letters of credit, issued under the Senior Credit Agreement.

[3]    The Debtor currently has commitments for a $13.875 million LOC Facility. The Debtor, however, forecasts that it will need a $25 million LOC Facility through the Projection Period (defined below in Section VII.A.) to secure its workers compensation and purchasing card obligations. While the Debtor anticipates it will pursue additional funding sources to meet its future needs, failure to obtain such commitments could negatively impact the Reorganized Debtor's liquidity, its ability to meet the Projections set forth in Section VII.A. and its ability to implement its post-Effective Date business plan.

own Class B New Common Stock and Class C New Common Stock, representing 88.0% of the equity of the Reorganized Debtor after giving effect to the Equity Incentive Plan but before giving effect to any exercise of the Singleton Warrants and, if applicable, the Subordinated Note Warrants. The Senior Lenders will also receive the Senior Lender Emergence Payment. In return, the Senior Lenders will have settled, compromised and released their existing claims against the Debtor and the Guaranteeing Subsidiaries.

Under the Prepackaged Plan, the Debtor's creditors and equity holders other than the Senior Lenders will receive the following treatments:

- Each Other Secured Claim will either be treated in accordance with an agreement reached between the holder of such Claim and the Debtor or, at the Debtor's option, will be unimpaired in accordance with section 1124(1) of the Bankruptcy Code.

- Each unsecured creditor, other than the holders of Subordinated Note Claims, will retain its rights unimpaired by the consummation of the Prepackaged Plan.

- If the holders of Subordinated Note Claims vote as a class to accept the Prepackaged Plan, they will receive warrants for the purchase of Class B New Common Stock of Reorganized AMI, which will provide them with the opportunity to participate in certain increases in the value of the enterprise in the future. **If, however, Class 5 votes to reject the Prepackaged Plan, the Debtor intends to "cram down" the Prepackaged Plan under section 1129 of the Bankruptcy Code, in which case the holders of Subordinated Note Claims would receive no distribution.** Such treatment would comply with section 1129 of the Bankruptcy Code. It would be "fair and equitable" pursuant to 1129(b) because no Class of Claims or Equity Interests junior to Class 5 would receive or retain any property under the Prepackaged Plan on account of such junior Claims or Equity Interests, and it would meet the "best interests" test pursuant to 1129(a)(7) because Claims in Class 5 are treated as favorably as they would be in a chapter 7 liquidation, in which the recovery to the holders of Subordinated Notes would be limited by, and give effect to, the subordination provisions of the Indentures. Thus, if the Prepackaged Plan otherwise satisfies the confirmation requirements of section 1129 of the Bankruptcy Code, then it could provide no recovery to holders of Claims in Class 5 as long as the Senior Loan Claims are not paid in full in Cash. See Section I.C. below for more detail regarding the limited rights of Subordinated Note Claims and their treatment in the Prepackaged Plan.

- Securities Litigation Claims against the Debtor will not receive any recovery under the Prepackaged Plan.

- All existing Equity Interests in AMI will be canceled and the holders thereof will receive no value under the Prepackaged Plan.

The Debtor's current management will remain in place during the Reorganization Case. Following confirmation of the Prepackaged Plan, the current Chief Executive Officer and

President of AMI, Messrs. Singleton and Lodovic respectively, will continue in such positions pursuant to the Amended and Restated Employment Agreements. Pursuant to the Amended and Restated Employment Agreements, Messrs. Singleton and Lodovic will receive 100% of the Class A New Common Stock of the Reorganized Debtor, which will entitle them to elect a majority of the Board.

The Debtor believes that implementation of the Prepackaged Plan will maximize value for the benefit of its stakeholders. The Debtor, after discussions with the Senior Lenders, concluded that the proposed Financial Restructuring should be implemented through a prepackaged plan of reorganization. The Debtor believes that the value of its business would be damaged significantly by a prolonged bankruptcy case. Therefore, so long as Class 2 (Senior Loan Claims) votes in favor of the Prepackaged Plan, the Debtor intends to file the Prepackaged Plan and this Disclosure Statement upon the commencement of the Reorganization Case. If the requisite acceptances of the Prepackaged Plan have been obtained prior to such filing, the Debtor will seek approval of this Disclosure Statement and consummation of the Prepackaged Plan as quickly as possible. If Class 5 (Subordinated Note Claims) does not vote to confirm the Prepackaged Plan, the Debtor intends to "cram down" the Prepackaged Plan under section 1129 of the Bankruptcy Code, in which case it is anticipated that the holders of Subordinated Note Claims would receive no distribution. If the Prepackaged Plan is not confirmed and consummated, the alternatives to the Prepackaged Plan include liquidation of the Debtor under chapter 7 of the Bankruptcy Code or attempting to formulate a different plan of reorganization.

A brief summary of the Classes established under the Prepackaged Plan, including the treatment and the voting rights of each Class, is set forth in the table below. A complete description of the treatment of each Class is set forth in Article IV of the Prepackaged Plan and Section V.B. of this Disclosure Statement. Parties should refer to those sections for a complete description of the proposed treatment for each Class.

| Class | Claims & Interest | Status | Treatment | Voting Rights | Estimated Recovery Under Pre-Packaged Plan | Estimated Liquidation Recovery |
|---|---|---|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Paid in Full | Not Entitled to Vote (Deemed to Accept) | 100.0% | 100.0% |
| Class 2 | Senior Loan Claims | Impaired | New Term Loan, Equity Interests and payment of certain interest, fees and expenses | Entitled to Vote | 29.4% to 35.5% | 14.6% to 21.1% |
| Class 3 | Other Secured Claims | Unimpaired | Paid in Full, Reinstated or New Agreed Terms | Not Entitled to Vote (Deemed to Accept) | 100.0% | 53.0% to 100.0%[4] |
| Class 4 | General Unsecured Claims | Unimpaired | Paid as Due in Ordinary Course | Not Entitled to Vote (Deemed to Accept) | 100.0% | 3.9% to 4.1% |
| Class 5 | Subordinated Note Claims | Impaired | Subordinated Note Warrants | Entitled to Vote | 1.0% to 2.0% | 0.0% |
| Class 6 | Intercompany Claims | Unimpaired | Paid as Due in Ordinary Course or Adjusted Discharges | Not Entitled to Vote (Deemed to Accept) | 100.0% | N/A |
| Class 7 | Securities Litigation Claims | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | 0.0% | 0.0% |
| Class 8 | Old AMI Equity Interests | Impaired | No Recovery | Not Entitled to Vote (Deemed to Reject) | 0.0% | 0.0% |

## C.  Treatment of Subordinated Note Claims Under the Prepackaged Plan

Holders of Subordinated Note Claims are not entitled to receive any value under the Prepackaged Plan because (i) Subordinated Note Claims are completely subordinated to the Senior Loan Claims by the terms of the Indentures, (ii) section 510(a) of the Bankruptcy Code provides that intercreditor agreements are enforceable in cases under the Bankruptcy Code to the same extent they are enforceable under nonbankruptcy law and (iii) Senior Loan Claims are not being paid in full through the Prepackaged Plan.

Nonetheless, the Prepackaged Plan provides that if Class 5 votes by a sufficient amount and number to accept the Prepackaged Plan, the holders of Class 5 Claims will receive warrants to purchase stock in the Reorganized Debtor under the Prepackaged Plan. If Class 5 rejects that treatment, however, the Debtor will seek to confirm the Prepackaged Plan over Class 5's objection under section 1129(b)(2)(B)(ii) of the Bankruptcy Code, in which case it is anticipated that Class 5 will receive no recovery under the Prepackaged Plan.

The Debtor believes that the Prepackaged Plan should be approved by the Bankruptcy Court under section 1129(b)(2)(B)(ii) of the Bankruptcy Code as "fair and equitable" because no

---

[4]  The holder of the Aircraft Note is expected to receive only a 53% recovery in liquidation, while other secured lenders are expected to have a 100% recovery in liquidation through foreclosing on their collateral of subsidiary properties.

Class of Claims or Equity Interests junior to the Subordinated Note Claims will receive or retain any property under the Prepackaged Plan on account of such junior Claims or Equity Interests.

Each of the Indentures provides, in Article X, for the complete payment subordination of the Subordinated Notes to the Senior Loans. Thus, the holders of Subordinated Note Claims are not entitled to receive or retain any interest or property on account of their Subordinated Note Claims until the Senior Loan Claims are indefeasibly paid in full in cash. Moreover, any recovery received by the holders of the Subordinated Notes prior to such payment in full of the Senior Loan Claims is required to be turned over to the holders of Senior Loan Claims, and if not so turned over, is deemed to be held in trust for the holders of Senior Loan Claims.

The Senior Loan Claims currently total approximately $590 million (which amount includes $6.375 million of contingent reimbursement claims on letters of credit). In respect of such Claims, the Senior Lenders are receiving an estimated non-cash recovery of, at most, between $171 million and $207 million ($150 million in New Senior Secured Term Notes and 88.9% of the equity of Reorganized AMI, which has an estimated net value of approximately $21 million to $57 million). The Senior Loan Claims thus are not being paid in cash and not being paid in full. Under these circumstances, the holders of Subordinated Note Claims are not entitled to any recovery.

### D. Who Is Entitled to Vote

This Disclosure Statement is being transmitted to certain holders of Claims for the purpose of soliciting votes on the Prepackaged Plan and to others for informational purposes. For those holders of Claims entitled to vote, the purpose of this Disclosure Statement is to provide adequate information to enable those holders to make a reasonably informed decision with respect to the Prepackaged Plan prior to exercising their right to vote to accept or reject the Prepackaged Plan.

Under section 1126 of the Bankruptcy Code, only classes of claims or equity interests that are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on a plan. PURSUANT TO THE PREPACKAGED PLAN, ONLY CLAIMS IN CLASSES 2 AND 5 ARE IMPAIRED BY AND ENTITLED TO RECEIVE A DISTRIBUTION UNDER THE PREPACKAGED PLAN, AND ONLY THE HOLDERS OF CLAIMS IN THOSE CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN. You should review this Disclosure Statement to determine whether you hold a Claim in Class 2 or 5. Claims in Classes 1, 3, 4 and 6 are unimpaired by the Prepackaged Plan, and such holders are conclusively presumed to have accepted the Prepackaged Plan. Holders of Securities Litigation Claims in Class 7 and Equity Interests in Class 8 are deemed to have rejected the Prepackaged Plan, and the holders of Claims or Equity Interests in such Classes are not entitled to vote.

ONLY "**ACCREDITED INVESTORS**," AS DEFINED BY REGULATION D OF THE SECURITIES ACT, ARE BEING SOLICITED TO VOTE. YOU ARE AN ACCREDITED INVESTOR IF YOU ARE:

- a bank, insurance company, registered investment company, business development company or small business investment company;

- an employee benefit plan within the meaning of ERISA if a bank, insurance company, or registered investment adviser makes the investment decisions, or if the plan has total assets in excess of $5 million;

- a charitable organization, corporation or partnership with assets exceeding $5 million;

- a director, executive officer or general partner of the company selling the securities;

- a business in which all the equity owners are accredited investors;

- a natural person who has individual net worth, or joint net worth with the person's spouse, that exceeds $1 million at the time of the purchase;

- a natural person with income exceeding $200,000 in each of the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year;

- a trust with assets in excess of $5 million, not formed to acquire the securities offered, whose purchases a sophisticated person makes; or

- an entity all of whose equity is owned by persons described above.

### E.      How to Vote and Voting Deadline

After carefully reviewing the Prepackaged Plan, this Disclosure Statement and the detailed instructions accompanying your ballot, you are asked to indicate your acceptance or rejection of the Prepackaged Plan by voting in favor of or against the Prepackaged Plan on the accompanying ballot.  You should complete and sign your original ballot and return it according to the instructions enclosed with the ballot.  Copies of ballots will not be accepted, nor will any other form of vote.

Each ballot reflects the Class of Claims it represents.  Accordingly, in voting to accept or reject the Prepackaged Plan, you must use only the ballot(s) sent to you with this Disclosure Statement.

PLEASE READ AND CAREFULLY FOLLOW THE VOTING INSTRUCTIONS BEFORE COMPLETING YOUR BALLOT.   IN ORDER FOR YOUR VOTE TO BE COUNTED, COMPLETE, SIGN AND DATE YOUR BALLOT AND RETURN IT TO AMI BALLOT PROCESSING CENTER SO AS TO BE <u>ACTUALLY RECEIVED</u> BY JANUARY 13, 2010 AT 5:00 P.M. PREVAILING EASTERN TIME.  BALLOTS MAY BE SUBMITTED AS FOLLOWS:

***By hand delivery, mail or overnight courier:***

AMI Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY  10017

BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.[5]

The record date for determining which holders of Claims are entitled to vote on the Prepackaged Plan is December 14, 2009 (the "**Record Date**"). The Indenture Trustee will not vote on behalf of the holders. Each holder of an existing Subordinated Note Claim must submit their own ballot.

### F.    Confirmation Hearing

The Debtor anticipates that as soon as practicable after the Petition Date, it will seek an order of the Bankruptcy Court scheduling the hearing to consider (1) the adequacy of this Disclosure Statement and the Solicitation and (2) confirmation of the Prepackaged Plan.

### G.    Additional Information

If you have any questions about (a) the procedure for voting on your Class 2 or 5 Claim, (b) the package of materials that you have received or (c) the amount of your Claim, or if you wish to obtain an additional copy of the Prepackaged Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent (as defined in Section IX.A.) at:

> Epiq Bankruptcy Solutions, LLC
> Phone:  646-282-1800
> E-mail: FBG@epiqsystems.com

---

[5]    Section 10.7 of the Prepackaged Plan  provides that each person that votes to accept the Prepackaged Plan shall be deemed to forever release, waive and discharge the Released Parties, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise at law, in equity or otherwise that is based on, relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Reorganization Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Prepackaged Plan, the business or contractual arrangements between the Debtor and any Released Party relating to the restructuring of Claims prior to or in the Reorganization Case or the negotiation, formulation or preparation of the Prepackaged Plan, or any related agreements, instruments or other documents.  Except as otherwise provided herein, upon the Effective Date, all such holders of Claims and their affiliates shall be forever precluded and enjoined from prosecuting or asserting any such discharged Claim against the Debtor or any Affiliates, including any Guaranteeing Subsidiary. Notwithstanding the foregoing, in the event that the Prepackaged Plan is not confirmed, no party shall be deemed to have released or shall release any claims or be released hereby.  Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Party in respect of any express contractual obligation of any such Released Party incurred in connection with the Prepackaged Plan or, except as provided in Sections 10.6, 10.7 and 10.8 of the Prepackaged Plan with respect to the Guaranteeing Subsidiaries, of any express contractual obligation of any non-Debtor party due to any other non-Debtor party.

For further information and general instructions on voting to accept or to reject the Prepackaged Plan, see Article IX of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTOR URGES ALL HOLDERS OF CLASS 2 AND 5 CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT TO VOTE BY COMPLETING THEIR BALLOTS AND RETURNING THEM AS QUICKLY AS POSSIBLE.

HOLDERS OF SENIOR LOAN CLAIMS REPRESENTING MORE THAN TWO-THIRDS (2/3) IN OUTSTANDING PRINCIPAL AMOUNT OF CLASS 2 CLAIMS ENTITLED TO VOTE ON THE PREPACKAGED PLAN AND WHO CONSTITUTING MORE THAN 50% OF THE AGGREGATE NUMBER OF HOLDERS OF ALLOWED CLASS 2 CLAIMS (I.E., AN AMOUNT SUFFICIENT TO SECURE APPROVAL OF THE PREPACKAGED PLAN UNDER SECTION 1126(c) OF THE BANKRUPTCY CODE) HAVE AGREED TO SUPPORT A RESTRUCTURING OF THE DEBTOR CONSISTENT WITH THE TERMS OF A PLAN TERM SHEET (THE "**PLAN TERM SHEET**") UPON WHICH THE PREPACKAGED PLAN IS BASED (SUBJECT TO THEIR RIGHT TO VOTE AGAINST THE PREPACKAGED PLAN ON THE BASIS OF DISAGREEMENT WITH ANY TERMS OR PROVISIONS NOT APPEARING IN THE PLAN TERM SHEET OR INCONSISTENT WITH THE TERMS SET FORTH THEREIN).

THE LARGEST HOLDER OF SUBORDINATED NOTES, WITH APPROXIMATELY 51% OF THE TOTAL AMOUNT OF THE SUBORDINATED NOTES CLAIMS, HAS ADVISED THE DEBTOR THAT IT SUPPORTS THE PREPACKAGED PLAN IN PRINCIPLE, SUBJECT TO THE EXECUTION OF DEFINITIVE AGREEMENTS.

## II.     HISTORY AND CORPORATE STRUCTURE OF THE DEBTOR

### A.     Overview of the Business

William Dean Singleton and Richard B. Scudder founded the Debtor, which is headquartered in Denver, Colorado, in March 1985. It has grown since that time primarily through strategic acquisitions, partnerships and, to a lesser extent, internal growth. Today, the Debtor and its operating Subsidiaries constitute the second largest newspaper publisher in the United States in terms of paid daily circulation under management. The Debtor, through its Subsidiaries, publishes daily and weekly newspapers and niche publications and owns and operates Internet websites related thereto. The Debtor, through its Subsidiaries, also operates a television station in Alaska and four radio stations in Texas. Including all of its operations, the Debtor serves markets in 12 states. AMI has formerly conducted business under the names of Affiliated Newspapers Investment, Inc., Garden State Newspapers, Inc. and MediaNews Group, Inc.

### 1.     Publishing Operations

Through its Subsidiaries, the Debtor publishes 54 daily and over 100 non-daily newspapers in 11 states, including suburban markets in close proximity to the San Francisco Bay Area, Los Angeles, Baltimore, Boston and El Paso. The Debtor's Subsidiaries also own or operate several metropolitan daily newspapers including *The Denver Post*, *San Jose Mercury*

*News*, *St. Paul Pioneer Press*, Los Angeles *Daily News*, *The Salt Lake Tribune*, *The Detroit News*, and *Oakland Tribune*. The daily newspapers that the Debtor and its Subsidiaries control have a combined daily and Sunday paid circulation of approximately 2.4 million and 2.5 million, respectively, as of September 30, 2009. The Debtor's Subsidiaries also own and operate non-daily publications.

A significant portion of the Debtor's operations is conducted through partnerships with third parties, such as California Newspapers Partnership, Texas-New Mexico Newspapers Partnership and Monterey Newspapers Partnership. West Coast MediaNews LLC, a wholly-owned Subsidiary of the Debtor ("**West Coast MediaNews**"), owns a 54.23% partnership interest in California Newspapers Partnership, which owns and operates twenty-five daily newspapers in California (including the *Contra Costa Times*, *San Jose Mercury News*, *The Oakland Tribune* and *San Gabriel Valley Tribune*) and related publications and websites. West Coast MediaNews also owns a 67.36% partnership interest in Monterey Newspapers Partnership, which owns and operates the *Monterey County Herald* and related publications and websites. The Debtor's wholly-owned Subsidiary, Northwest New Mexico Publishing Company, owns a 59.4% partnership interest in Texas-New Mexico Newspapers Partnership, which owns and operates five daily newspapers in New Mexico and the *El Paso Times,* and five newspapers in Pennsylvania, as well as related publications and websites for each of these newspapers.

The Debtor, through its partnerships and Subsidiaries, currently participates in joint operating agencies ("**JOAs**") in Salt Lake City, Utah; York, Pennsylvania; Detroit, Michigan; and Charleston, West Virginia. JOAs represent an operating structure that is unique to the newspaper industry. Pursuant to the Newspaper Preservation Act of 1970, under certain circumstances, competing newspapers within the same market are permitted to combine their business operations while maintaining separate and competitive editorial news operations. A JOA performs the production, sales, distribution and administrative functions for two or more newspapers under the terms of a joint operating agreement, while editorial control and news functions of each newspaper continue to be separate from and outside of the JOA.

## 2.     Web-Based Operations

MediaNews Group Interactive, Inc., a wholly-owned Subsidiary of the Debtor, manages the centralized technology infrastructure that supports each of the Debtor's local websites. The Debtor's strategy is to use the Internet and other electronic media to enhance and broaden its position as the leading provider of news, information and services in its local media markets. The Debtor's interactive operations are increasing market share and extending the profitability of its local media franchises by leveraging the newsgathering resources, print and online sales infrastructures of the Debtor and its Subsidiaries, and partnering with providers of emerging technologies and industry leaders, including Internet portals, broadband, Internet video and wireless, thus expanding the Debtor's ability to provide both news and advertising across a broad platform of digital media devices. The Debtor has expanded its offerings in the rapidly growing online video marketplace, including the integration of video into the Debtor's online recruitment, auto and real estate packages. The Debtor and its Subsidiaries also provide online video news stories to complement the print and online text versions of their newspapers. In addition, the Debtor and its Subsidiaries are cultivating relationships with new and existing advertisers and readers by proactively seeking to address their needs by providing multimedia packages and 24/7

news operations geared toward breaking news online first and providing video content to enhance the online experience.

In 2006, the Debtor, together with a broad consortium of other newspaper companies, including The Hearst Corporation ("**Hearst**"), Belo Corp., Lee Enterprises, Inc., Media General and others, entered into a strategic partnership with Yahoo! Inc. to deliver search, graphical and classified advertising to consumers in the communities where they live and work. Central to this partnership is the Debtor's sales teams' focus on selling targeted online-only advertising, taking full advantage of the Yahoo! partnership and the new revenue streams it affords the Debtor and its Subsidiaries. Additionally, to expand its direct sales channels, the Debtor has added several comprehensive online self-service products to facilitate customer orders. The Debtor also has been expanding its core newspaper websites and building or expanding new sites such as LA.com, BayArea.com and InsideDenver.com as local hubs. These sites are designed for a "marketplace" strategy that centers on building audiences around certain key categories, such as activities and special interests, and leveraging the interactivity of the Internet with user-generated content, customer feedback and self-generated advertisings.

### 3.    Television and Radio Stations and FCC Licenses

The Debtor, through its Subsidiary, Graham Newspapers, Inc. ("**Graham Newspapers**"), owns four radio broadcast stations licensed to serve communities in Texas. Additionally, the Debtor, through its Subsidiary Alaska Broadcasting Company, Inc. ("**Alaska Broadcasting**"), in which the Debtor holds a 95% ownership interest, owns a CBS-affiliated television broadcast station licensed to serve Anchorage, Alaska.

The Debtor's television and radio operations (the "**Broadcast Operations**") are subject to significant regulation by the FCC under chapter 5 of title 47 of the United States Code (as amended, the "**Communications Act**"). A television or radio station may not operate in the United States without the FCC's authorization. The FCC's approval is required for the issuance, renewal, transfer, assignment or modification of station operating licenses. In particular, the Broadcast Operations depend upon AMI's ability, through its Subsidiaries, Alaska Broadcasting and Graham Newspapers, to continue to hold television and radio broadcasting licenses issued by the FCC, which generally have a term of eight years (collectively, the "**FCC Broadcast Licenses**").

These non-newspaper operations comprised less than 1.0% of the Debtor's consolidated revenues for the fiscal year ended June 30, 2009 and are not considered significant to its operations.

To avoid possible delays associated with obtaining the consent of the FCC to a transfer of control of the FCC Broadcast Licenses to Reorganized AMI, including delays arising from requirements to demonstrate the qualifications of Reorganized AMI and all Persons holding relevant interests in Reorganized AMI to hold such FCC Broadcast Licenses (as described in more detail in Section VIII.D., below), the Debtor intends to establish the FCC Trust and assign the FCC Broadcast Licenses and certain associated assets to the FCC Trust, free and clear of all Liens. The assignments to the FCC Trust would take place pursuant to (1) an order of the Bankruptcy Court, which would be sought immediately following the commencement of the Reorganization Case, and (2) the consent of the FCC to the assignment of the FCC Broadcast

Licenses to the FCC Trust, which would be sought using abbreviated *pro forma* procedures applicable to involuntary assignments. Assignment of the FCC Broadcast Licenses to the FCC Trust would facilitate the emergence of Reorganized AMI from bankruptcy promptly following confirmation of the Prepackaged Plan. The FCC Trust would then hold the FCC Broadcast Licenses and certain associated assets pending a final disposition of those assets, thereby removing those assets from control by the Debtor and obviating the need to obtain FCC consent to the transfer of control of those licenses to Reorganized AMI and the attendant delay.

Subsidiaries of the Debtor also hold a limited number of FCC private radio and other non-broadcast licenses that are used in connection with other aspects of its operations (the "**FCC Non-Broadcast Licenses**" and, together with the FCC Broadcast Licenses, the "**FCC Licenses**"). The FCC Non-Broadcast Licenses would not be assigned to the FCC Trust. To the extent that the Debtor's Subsidiaries determine to retain the FCC Non-Broadcast Licenses, FCC consent to the transfer of those licenses to the control of Reorganized AMI would need to be obtained.

### 4. Sources of Revenue

The Debtor's main source of cash flow is from distributions and dividends from its operating Subsidiaries. Advertising is the largest component of the revenues of the Debtor's operating Subsidiaries, followed by circulation revenue. Advertising rates at each of the Debtor's newspapers are established based upon market size, circulation, readership, demographic makeup of the market and the availability of alternative advertising media in the marketplace. While circulation revenue is not as significant as advertising revenue, circulation volume trends can impact the decisions of advertisers and advertising rates. Advertising revenue categories include retail (local and national department stores, specialty shops, preprinted advertising circulars, other local retailers, direct mail and niche publications), national (national brand advertising accounts), classified (employment, automotive, real estate and private party) and interactive (online component of classified advertising, search revenue and banner revenue).

In addition to selling advertising in its core newspaper product, the two other major revenue drivers of the Debtor's operating Subsidiaries include (i) advertising in niche publications, such as those related to home improvement, health and fitness, and weddings, and (ii) Internet advertising. The Debtor's niche publications are designed to reach a highly targeted audience and to appeal to non-traditional newspaper advertisers. In addition, the Debtor's niche publications provide valuable content that expand the Debtor's Internet offerings. The Debtor is developing new local websites, in addition to its local news websites, designed to provide a more comprehensive source of local information and services and new advertising opportunities.

Other revenue of the Debtor's operating Subsidiaries is generated primarily from commercial printing for third parties and distribution of third party publications.

### 5. Financial Results

The audited consolidated balance sheet as of June 30, 2009 and the related consolidated statements of operations and cash flows for the fiscal year ended June 30, 2009 of the Debtor and its consolidated Subsidiaries are attached hereto as <u>Exhibit 2</u>. The unaudited balance sheet as of September 30, 2009 and the related consolidated statements of operations and cash flows for the

fiscal quarter ended September 30, 2009 of the Debtor and its consolidated Subsidiaries are attached hereto as <u>Exhibit 3</u>.

**B.  Current Organizational Structure**

The Debtor is the ultimate parent of 28 wholly-owned Subsidiaries and owns 95% of the outstanding equity interests of Alaska Broadcasting.  In addition, the Debtor and its wholly-owned Subsidiaries also hold equity interests in various partnerships, JOAs, and other businesses in which one or more third parties are also equity-interest holders, including (i) a 58% profit interest in the Salt Lake City JOA, Newspaper Agency Company LLC, held by Kearns-Tribune LLC, a wholly-owned Subsidiary of the Debtor, (ii) a 54.23% partnership interest in California Newspapers Partnership and a 67.36% partnership interest in Monterey Newspapers Partnership held by West Coast MediaNews, LLC, a wholly-owned Subsidiary of the Debtor, (iii) a 59.4% partnership interest in Texas-New Mexico Newspapers Partnership held by Northwest New Mexico Publishing Company, a wholly-owned Subsidiary of the Debtor, and (iv) a 79.9999% limited liability company interest in The Denver Newspaper Agency LLP held by DPC DNA Holdings LLC, a wholly-owned Subsidiary of The Denver Post Corporation ("**DPC**") and an indirect wholly-owned Subsidiary of the Debtor.  A summary organizational chart of the Debtor and the Guaranteeing Subsidiaries is attached hereto as <u>Exhibit 4</u>.

**C.  Services Provided by Debtor to Subsidiaries**

The Debtor provides numerous management and operational services to its Subsidiaries and partnerships for a fee based on contractual obligations and on an allocation of AMI's costs where no contractual obligation exists.  These services are in the nature of operating, administrative, accounting, electronic media and other support services, newsprint purchase services, financial reporting services, human resource services, risk management services, payroll services, tax reporting and tax return preparation services and cash management.  The Debtor also provides Internet management and hosting services, accounting shared services and sales and marketing services to its Subsidiaries for a fee based on an allocation of the actual costs incurred by the Debtor in providing such services.

All cash is handled through a concentration account system, whereby receipts of the Debtor's operating Subsidiaries are swept daily from the operating Subsidiaries' cash accounts into a concentration account of the Debtor.  The Debtor then funds payroll, purchases, and other costs of operations for itself and for its Subsidiaries, including the payment of invoices for its Subsidiaries.  The Debtor also pays vendors' invoices for itself and for its Subsidiaries in cash or with a purchasing card from American Express, which is secured by a letter of credit.  Concentration accounts are also used at the partnerships of the Debtor and its Subsidiaries to sweep cash from the individual newspapers within the partnership.  From these concentration accounts the partnerships fund their payroll, purchases and other costs of operations as well as partner distributions.

The Debtor anticipates that Reorganized AMI will continue to provide operational management to its Subsidiaries and partnerships.

### D. Equity Structure

As of the date hereof, the authorized capital stock of the Debtor consists of (i) 3,000,000 shares of Class A Common Stock, $0.001 par value per share ("**Old Class A Common Stock**"), 2,278,352 shares of which are issued and outstanding; (ii) 150,000 shares of Class B Common Stock, $0.001 par value per share, none of which are issued or outstanding ("**Old Class B Common Stock**"); (iii) 100 shares of Class C Common Stock, $0.001 par value per share ("**Old Class C Common Stock**"), all of which are issued and outstanding; and (iv) 100,000 shares of Preferred Stock, par value $0.001 per share ("**Old Preferred Stock**"), of which 25,000 shares of Series A Preferred Stock, par value $0.001 per share, 25 shares of Series B Preferred Stock, par value $0.001 per share, and 15 shares of Series C Preferred Stock, par value $0.001 per share, are issued and outstanding.

William Dean Singleton, the Scudder family, and their respective family trusts have the power to vote approximately 93% of the outstanding Old Class A Common Stock. The Old Class C Common Stock and all of the Old Preferred Stock is held by wholly-owned subsidiaries of Hearst. Ownership of the Old Class C Common Stock affords Hearst an Equity Interest of 31% in all assets of the Debtor other than the Debtor's San Francisco Bay Area assets. Hearst has certain additional limited rights, but with limited exceptions, Hearst's stock carries no voting rights.

### E. Board of Directors, Management and Committees

### 1. Board of Directors

The members of the board of directors of the Debtor are as follows:

**William Dean Singleton** has served as Chief Executive Officer and as a Director of the Debtor since its inception in 1985, and more recently was elected as Chairman of the Board of Directors of the Debtor in November 2009 after having served as Vice Chairman since the Debtor's inception. He is also the Publisher of *The Denver Post* and *The Salt Lake Tribune*. Mr. Singleton began his newspaper career at the age of 15 as a part-time reporter in his hometown of Graham, Texas and bought his first newspaper at age 21. He served on the board of the Newspaper Association of America from 1993 until 2004 and is the former Chairman. Currently, Mr. Singleton is also Chairman of the Board of Directors of the Associated Press.

**Joseph J. Lodovic, IV** has served as President of the Debtor since February 2001 and was elected to the Board of Directors in November 2009. He formerly served as Executive Vice President and Chief Financial Officer from 1993 to February 2001. Mr. Lodovic joined the Debtor in 1987. He began his career in public accounting with Ernst & Whinney (now Ernst & Young), working with a variety of audit clients, ranging from small private companies to large public companies.

**Howell E. Begle, Jr.** has served as a Director of the Debtor since November 1996, and serves as the assistant secretary and general counsel to the Debtor. Mr. Begle was formerly of counsel to Hughes Hubbard & Reed LLP, which law firm is counsel to the Debtor and its Subsidiaries in this Financial Restructuring and in other matters.

## 2.     Management[6]

The Debtor's senior management team has significant industry experience and a demonstrated history of leading change not only in the Debtor's newspapers, but in the overall industry.  The senior management team of the Debtor is as follows:

**William Dean Singleton** has served as Chief Executive Officer and as a Director of the Debtor since its inception in 1985, and more recently was elected as Chairman of the Board of Directors of the Debtor in November 2009 after having served as Vice Chairman since the Debtor's inception.

**Joseph J. Lodovic, IV** has served as President of the Debtor since February 2001.  He served as Executive Vice President and Chief Financial Officer from 1993 to February 2001.  Mr. Lodovic has been with the Debtor since 1987.

**Mark J. Winkler** has served as Executive Vice President and Chief Marketing and Sales Officer of the Debtor since April 2008.  Mr. Winkler was previously Vice President and General Manager for Interactive and New Advertising Sale Technologies of Comcast Communications from 2004 to 2006 and was also Division Vice President and General Manager of Comcast's advertising sales division from 2000 to 2006.

**Stephen M. Hesse** has served as Senior Vice President of Circulation since December 2006.  Prior thereto, he served as Vice President of Circulation from 1996 to December 2005.  Mr. Hesse also served as Senior Vice President of Circulation at the Newspaper Agency Company in Salt Lake City from December 2005 to December 2006.  Mr. Hesse has been in the newspaper industry for over 35 years.  Prior to Joining AMI Mr. Hesse was with Gannett, Inc.

**Anthony F. Tierno** has served as Senior Vice President of Operations since February 2001.  Prior thereto, he served as Executive Vice President and Chief Operating Officer of the Debtor from 1993 to February 2001.  Mr. Tierno has been with the Debtor since its inception in 1985.

**Ronald A. Mayo** has served as Vice President and Chief Financial Officer since February 2001.  Prior thereto, he served as Vice President Finance and Controller from July 1994 to February 2001.  Mr. Mayo has been associated with the newspaper industry for over 25 years.  Prior to joining AMI Mr. Mayo was a Senior Manager at Ernst & Young.

**James L. McDougald** has served as Treasurer since September 1994.  Prior thereto, he was Controller for the Debtor from 1988 to 1994.

---

[6]     Additionally, Patricia Robinson has served as Secretary of the Debtor since 1986; Ms. Robinson is the sister of Mr. William Dean Singleton.

### F.        Employee and Compensation Matters

### 1.        Employees

The Debtor's workforce consists of 98 employees, of whom 96 are full-time employees and two are part-time employees. Seventy-four (74) are salaried employees and 24 are hourly employees. None of the employees of the Debtor is covered by a collective bargaining agreement. The employees are mainly located in Colorado.

In addition, the Debtor has no independent contractors and has one temporary employee.

### 2.        Retirement Savings Plan

The Debtor sponsors a tax-qualified defined-contribution 401(k) plan. Eligible employees of the Debtor and certain of its Subsidiaries participate in the plan. Effective January 1, 2009, employer matching contributions under this plan were suspended, except for certain union employees of the Debtor's Subsidiaries.

### 3.        Single-Employer Pension Plans

The Debtor sponsors three single-employer tax-qualified defined-benefit pension plans covering certain employees of the Debtor's Subsidiaries, including the MediaNews Group Defined Benefit Plan for Certain Employees (the "**MNG Plan**"), the Northwest Publications Pension Plan for Guild Employees of Saint Paul Division (the "**St. Paul Guild Plan**"), and the San Jose Mercury-News Inc. Amended Retirement Plan Covering Employees Represented by the San Jose Newspaper Guild (the "**San Jose Plan**") (collectively referred to herein as the "**Pension Plans**"). The Debtor previously sponsored the Northwest Publications, Inc. Pension Plan for Saint Paul Mechanical Employees (the "**St. Paul Mechanical Plan**"), however, effective June 1, 2009, the St. Paul Mechanical Plan was merged into the MNG Plan. The Pension Plans are all subject to ERISA.

The MNG Plan is the successor (by plan merger) to the Lowell Pension Plan, the New England Newspapers, Inc. Plan and the LA Daily News Plan. The former LA Daily News Plan and the New England Newspapers, Inc. Plan were frozen shortly after the Debtor's acquisition of each of the *Los Angeles Daily News* and New England Newspaper, Inc., respectively. The portion representing the former Lowell Pension Plan was frozen effective April 1, 2005. Effective December 31, 2008, the remaining active portions of the MNG Plan were frozen, prohibiting additional employees from becoming participants and ceasing all benefit accruals under the MNG Plan. As of December 31, 2008, the MNG Plan had 2,504 total participants. Of the 2,504 total participants, 411 were active, 669 were retired or separated and receiving benefits, 1,302 were retired or separated and entitled to future benefits, and 122 were deceased with beneficiaries who are entitled to future benefits. In addition, as further described below, in June 2009, the St. Paul Mechanical Plan was merged into the MNG Plan. Participants in the St. Paul Mechanical portion of the MNG Plan continue to accrue benefits.

In addition, in connection with the restructuring of The Denver Newspaper Agency LLC ("**DNA**") discussed in Section III.C. below, DNA assumed sponsorship of, and all liabilities under, The Denver Post-Denver Newspaper Guild Pension Plan from The Denver Post

Corporation ("**DPC**"), a wholly-owned Subsidiary of the Debtor. Additionally, in connection with the DNA restructuring, all of the liabilities and related assets of the MNG Plan with respect to the current and former employees of DPC were transferred to a defined benefit plan maintained by DNA, which is outside of the Debtor's ERISA controlled group. The transfer of liabilities and a portion of the assets have been completed, and the transfer of the balance of the assets is expected to be completed by March 31, 2010.

In conjunction with the Debtor's acquisition of the St. Paul Pioneer Press on October 19, 2007 and the San Jose Mercury News on August 2, 2006, the Debtor assumed the St. Paul Mechanical Plan, St. Paul Guild Plan and the San Jose Plan, each of which covers union employees.

- St. Paul Mechanical Plan: As mentioned above, effective June 1, 2009, the St. Paul Mechanical Plan was merged into the MNG Plan. The assets of the St. Paul Mechanical Plan are in a master trust with the assets of the San Jose Plan. After the merger, the assets remain in the master trust, and the MNG Plan assumed the St. Paul Mechanical Plan's interest in the master trust. The St. Paul Mechanical Plan is an active plan and participants of this plan continue to accrue benefits. As of December 31, 2008, the St. Paul Mechanical Plan had 212 total participants. Of the 212 total participants, 113 were active, 57 were retired or separated and receiving benefits, 32 were retired or separated and entitled to future benefits, and 10 were deceased with beneficiaries who are entitled to future benefits.

- St. Paul Guild Plan: In October 2007, the Debtor negotiated a contract with the guild workers union, which resulted in the St. Paul Guild Plan being frozen as to future participants and benefit accruals effective December 31, 2007. As of December 31, 2008, the St. Paul Guild Plan had 992 total participants. Of the 992 total participants, 350 were active, 245 were retired or separated and receiving benefits, 371 were retired or separated and entitled to future benefits, and 26 were deceased with beneficiaries who are entitled to future benefits.

- San Jose Plan: In December 2006, the Debtor froze the San Jose Plan as to future participants and subsequently froze benefit accruals as of March 1, 2007. As of December 31, 2008, the San Jose Plan had 1,675 total participants. Of the 1,675 total participants, 342 were active, 494 were retired or separated and receiving benefits, 802 were retired or separated and entitled to future benefits, and 37 were deceased with beneficiaries who are entitled to future benefits. The assets of the plan are held in a master trust along with the assets of the St. Paul Mechanical Plan.

As of September 30, 2009, the Debtor estimates that the Pension Plans are underfunded by approximately $70.4 million, including approximately $22 million underfunding for the MNG Plan, $32.5 million underfunding for the San Jose Plan, and $15.9 million underfunding for the St. Paul Guild Plan. The Debtor would be liable to the Pension Benefit Guaranty Corporation ("**PBGC**") for any unfunded benefit liabilities, as defined in ERISA, should any of the Pension Plans terminate. Prior to termination, the Debtor is liable for the contributions necessary to

satisfy minimum funding standards under ERISA and the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), and is also liable for PBGC insurance premiums.

The Debtor intends to continue each of the Pension Plans, meet the minimum funding standards under ERISA and the Tax Code, pay all insurance premiums owed to the PBGC, and administer and operate each Pension Plan in accordance with its terms, ERISA and the Tax Code. The Debtor estimates that its contributions to the Pension Plans (adjusted to reflect the minority partners' share related to the San Jose Plan) will be $6.2 million for 2010, $11.9 million for 2011, $14.9 million for 2012 and $13.0 million for 2013.

Certain of the JOAs and partnerships also sponsor single-employer defined benefit pension plans. These plans are outside of the Debtor's ERISA controlled group, and thus the Debtor does not have statutory controlled group liability with respect to these plans under ERISA.

### 4. Multiemployer Pension Plans

Certain members of the Debtor's controlled group contribute to multiemployer pension plans on behalf of their union-represented employees. The multiemployer defined benefit plans include (i) Central States, Southeast and Southwest Areas Pension Fund (covering approximately 44 employees); (ii) CWA-ITU Negotiated Pension Plan (covering approximately nine employees); (iii) GCIU Employer Retirement Fund (covering approximately 41 employees); (iv) CWA-ITU Negotiated Pension Plan (covering approximately 148 employees); (v) GCIU Supplemental Retirement and Disability Fund (covering approximately four employees); (vi) IAM National's Pension Fund, Plan A (covering approximately five employees); and (vii) Local Construction Defined Benefit Pension Plan (covering approximately three employees). Under ERISA, in the event of a complete or partial withdrawal from any of these multiemployer pension plans, the Debtor, along with the contributing sponsors in the Debtor's controlled group, would be jointly and severally liable for any withdrawal liabilities.

Certain of the JOAs and partnerships also contribute to multiemployer pension plans on behalf of their union-represented employees. Since the JOAs and partnerships are outside of the Debtor's ERISA controlled group, the Debtor would not have statutory withdrawal liability under ERISA.

### 5. Welfare Benefit Plans

The Debtor sponsors various health and welfare plans, programs, policies and agreements for its eligible employees (and dependents) and for eligible employees (and dependents) of the Debtor's Subsidiaries and partnerships, some of which are self-insured or only partially insured through stop-loss insurance. The Debtor receives reimbursement from its Subsidiaries and partnerships as consideration for providing and administering these health and welfare arrangements. These health and welfare plans, programs, policies and agreements provide for medical, dental, vision and prescription drug coverage; basic term life and supplemental life insurance; accidental death and dismemberment insurance; long-term and short-term disability insurance; flexible spending accounts; workers' compensation coverage; vacation pay; and miscellaneous other benefits provided to employees in the ordinary course of business. The Debtor makes contributions to a voluntary employee beneficiary association ("**VEBA**") in order

to fund certain of its self-insured health and welfare plan costs.  In December 2009, the Debtor made a contribution of $1.5 million to the VEBA.

In addition, the Debtor provides customary benefits to certain executives, including, among other things, supplemental medical benefits.

### 6.    Retiree Welfare Benefits

The Debtor sponsors a retiree medical benefit plan for certain of its eligible corporate executives (and their spouses).  There are minimum-age and years-of-service criteria for eligibility for benefits under this plan.

The Debtor also provides retiree medical coverage to certain employees and former employees (and their spouses) of its Subsidiaries, including at the Salt Lake City, New England Newspaper, Inc., Nashoba, Massachusetts and San Jose, California and St. Paul, Minnesota locations.

As of June 30, 2009, the Debtor had estimated accumulated unfunded postretirement benefit obligations totaling approximately $3.85 million.

### 7.    Bonus Plan

The Debtor sponsors an annual bonus plan (the "**MBO Plan**") for certain of its executive officers, Subsidiary operations executives and employees and publishers at wholly-owned Subsidiaries, which is designed to recognize the scope of each participating executive's responsibilities, reward attainment of goals set for the year, motivate future superior performance and align the interests of the executive with the Debtor's objectives.  The objectives and the amount of incentive compensation are specific to each individual and are generally based upon a combination of strategic, operational and financial performance objectives.

In certain instances, the Debtor provides its employees with discretionary annual cash bonuses.  For 2009, the Debtor will not make any discretionary annual cash bonus payments to Mr. Singleton or Mr. Lodovic.

### 8.    Deferred Compensation Plan

The Debtor sponsors nonqualified supplemental retirement plans and other nonqualified deferred compensation plans, which are offered to certain employees of the Debtor and its Subsidiaries (principally corporate officers, publishers and senior operational executives).  The plans allow participants to defer a portion of their compensation, including bonuses on a pre-tax basis and also provide for employer contributions.  The Debtor has made investments in cash surrender value life insurance policies, which may be used in the Debtor's discretion to fund liabilities under these plans.  These plans were amended to offer each participant a one-time election in October 2008 to have all or a portion of the participant's account balance distributed in January 2009.  Approximately $2.4 million was paid out to employees of the Debtor and its Subsidiaries on January 15, 2009 on account of the Debtor's supplemental executive retirement plans.  Only four participants (each an employee of a Subsidiary of the Debtor) have remaining account balances in the plans equal to approximately $600,000 in total.  The Debtor intends to

honor its obligations under these plans (including split-dollar life insurance policies and other life insurance policies) throughout the Reorganization Case, and following confirmation of the Prepackaged Plan.

### 9. Employment Agreements

The Debtor is a party to employment agreements with Messrs. Singleton and Lodovic. These agreements will be amended and restated as of the Effective Date, as described in Article V, "Summary of the Prepackaged Plan," below.

### G. Capital Structure

As of the date hereof, the Debtor owed approximately $930 million (which amount includes $6.375 million of contingent reimbursement claims on letters of credit) to its Senior Lenders, holders of the Subordinated Note Claims and other debt holders. The Debtor's obligations consist of (i) amounts owing under the Senior Credit Agreement, (ii) amounts owing with respect to the Subordinated Notes under the Indentures, (iii) notes issued or assumed by the Debtor or certain of its Subsidiaries in connection with various acquisitions and (iv) amounts owing under the Aircraft Note (as defined in Section II.G.4. below). The following is a brief summary of the Debtor's obligations.

### 1. The Credit Agreement

On December 30, 2003, the Debtor and the Guaranteeing Subsidiaries entered into the Senior Credit Agreement and related agreements. As of the date hereof, the Debtor's obligations under the Senior Credit Agreement consist of (i) a $175 million revolving credit facility maturing on December 30, 2009, (ii) a $100 million term loan "A" facility maturing on December 30, 2010, (iii) a $147.3 million term loan "B" facility maturing on December 30, 2010 and (iv) a $350 million term loan "C" facility maturing on August 2, 2013. The approximate outstanding balances under the revolving credit facility, term loan "A," term loan "B" and term loan "C" are $166.5 million, $59.2 million, $105.1 million and $252.4 million, respectively. In addition, approximately $6.4 million of letters of credit are outstanding under the revolving credit facility. As a result of the occurrence of events of default under the Senior Credit Agreement, the Debtor is no longer able to borrow amounts under the revolving credit facility other than to obtain letters of credit and renew existing letters of credit (within the limits of the revolving credit commitments).

The Senior Credit Agreement is guaranteed by all of the Guaranteeing Subsidiaries and secured by first priority liens and security interests in the Debtor's interest and each Guaranteeing Subsidiary's interest in the capital stock (or other ownership interests) of each of the Guaranteeing Subsidiaries and certain of the partnerships and JOAs of the Debtor and the Guaranteeing Subsidiaries. In addition, pursuant to the Forbearance Agreement, (i) Alaska Broadcasting granted to the Administrative Agent, for the benefit of the Senior Lenders, a first priority security interest in substantially all of its assets and (ii) LADN Holdings, LLC, a Subsidiary of the Debtor, granted to the Administrative Agent, for the benefit of the Senior Lenders, a first priority security interest in its facility located in Valencia, California, which was subsequently sold on December 1, 2009. The Senior Credit Agreement contains a number of covenants that, among other things, restrict the Debtor's ability to dispose of assets, incur

additional indebtedness, pay dividends, make capital contributions, create liens on assets, make investments and acquisitions and engage in mergers or consolidations. The foregoing restrictions were further expanded under the Forbearance Agreement. In addition, the Senior Credit Agreement requires compliance with certain financial ratios, including a maximum total leverage ratio, a maximum consolidated senior debt to consolidated operating cash flow ratio and a minimum consolidated operating cash flow to consolidated fixed charges ratio. Beginning with the end of the fiscal quarter ending March 31, 2009, the Debtor was not in compliance with certain of the financial covenants set forth in the Senior Credit Agreement. The Debtor does not intend to pay the $166.5 million in principal due on December 30, 2009 under the revolving credit facility.

## 2. Subordinated Notes

The Debtor's outstanding Subordinated Notes were issued pursuant to the 6 7/8% Indenture and the 6 3/8% Indenture. The Subordinated Notes are not guaranteed by, nor do they constitute obligations of, any of the Subsidiaries of the Debtor; they are solely liabilities of the Debtor.

### a. 6 7/8% Notes

The 6 7/8% Notes were issued in a private placement transaction on November 25, 2003 in an original aggregate principal amount of $300 million. The Debtor subsequently completed an exchange offer on April 28, 2004, which replaced the subordinated notes originally issued on November 25, 2003 with substantially identical subordinated notes registered under the Securities Act. As of the date hereof, an aggregate principal amount of $204.1 million of the 6 7/8% Notes remained outstanding, plus $17.1 million of accrued unpaid interest. Interest on the 6 7/8% Notes is payable semiannually, on April 1 and October 1 of each year. The 6 7/8% Notes bear interest at the rate of 6 7/8% per annum. The Debtor did not make interest payments to holders of the 6 7/8% Notes in 2009.

### b. 6 3/8% Notes

The 6 3/8% Notes were issued in a private placement transaction on January 14, 2004 in an original aggregate principal amount of $150 million. The Debtor subsequently completed an exchange offer on April 28, 2004, which replaced the subordinated notes originally issued on January 14, 2004 with substantially identical subordinated notes registered under the Securities Act. As of the date hereof, an aggregate principal amount of $121.8 million of the 6 3/8% Notes remained outstanding, plus $7.5 million of accrued unpaid interest. Interest on the 6 3/8% Notes is payable semiannually, on January 1 and July 1 of each year. The 6 3/8% Notes bear interest at the rate of 6 3/8% per annum. The Debtor did not make the July 1, 2009 interest payment to holders of the 6 3/8% Notes.

## 3. Supplemental Indentures

On April 4, 2008, both of the Indentures were amended to end the Debtor's obligation to file reports under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), on a voluntary basis and make certain changes to covenants (and definitions used therein) to bring them more into line with comparable covenants in the Senior Credit Agreement. The obligation

to comply with the Exchange Act was replaced with an obligation to deliver quarterly and annual financial statements of the Debtor and its consolidated Subsidiaries to the holders of the Subordinated Notes.

### 4. Other Indebtedness

In connection with various acquisitions, the Debtor and its Subsidiaries have issued notes and assumed certain debt obligations totaling approximately $15.1 million as of the date hereof. The notes payable and other debt obligations bear interest at rates ranging from 0.0% to 8.0% per annum.

As of December 10, 2009, an aggregate principal amount of $10.26 million remains outstanding under the Restated and Amended Promissory Note dated March 12, 2004 (as amended, the "**Aircraft Note**"), issued by the Debtor to Fifth Third Bank to finance the purchase of a private jet aircraft. The Aircraft Note bears interest at a fixed rate of 8.0% per annum. The Aircraft Note is secured by a first priority security interest on the aircraft under the Restated and Amended Aircraft Security Agreement dated as of March 12, 2004, as amended, by and between Fifth Third Bank and the Debtor.

### III. EVENTS LEADING TO RESTRUCTURING

### A. The Newspaper Industry

The newspaper publishing industry is in the midst of an unprecedented decline that has only been exacerbated by the current recession. In recent years, the newspaper industry has suffered declining circulation and advertising revenues due to alternative choices for readers and advertisers and has had to adapt and react to new digitally-oriented competitors in an increasingly competitive marketplace for delivery of advertising and news. The recent global recession has placed an even greater burden on an already distressed industry, leading to significant industry-wide revenue declines. Industry-wide circulation for September 2009 is 10.6% less than September 2008 as reported by the Audit Bureau of Circulation. The slumping retail market has reduced demand for retail advertising, and the rise in the national unemployment rate, coupled with the decline in the real estate and auto sectors, has led to significant declines in classified advertising. In response, newspapers have significantly cut operating costs by, among other things, reducing their workforces, adjusting wages to reflect deteriorating market conditions, curtailing employee benefits, renegotiating collective bargaining agreements with labor unions, reducing or eliminating unprofitable circulation, and in some cases, have simply ceased operating. In addition, newspaper companies have attempted to improve their balance sheets by renegotiating the terms of their indebtedness and by selling assets. A number of major newspaper publishing companies have commenced bankruptcy proceedings, such as The Tribune Company, Journal Register Company, Freedom Communications, Inc., Philadelphia Newspapers, LLC, Star Tribune Holdings Corporation, Sun-Times Media Group, Inc., American Community Newspapers LLC and Triple Crown Media Inc.

Approximately 80% of AMI's revenue is generated from advertising sales. Advertisers generally reduce their advertising spending during economic downturns. The current economic conditions have been, and could continue to be, a negative factor affecting the Debtor's

advertisers, and such conditions have caused, and could continue to cause, the Debtor's advertisers to decrease their advertising spending in the future.

The Debtor's ability to generate advertising revenues has and will continue to be affected by the current economic recession, consumer confidence, advertiser solvency and the regional economic conditions in each of the markets in which the Debtor and its Subsidiaries operate as well as by the economic performance and changes in the national and sometimes international economy. The level of advertising spending, which is affected by macroeconomic trends, affects the newspaper publishing industry in general and the revenues of individual newspapers in particular. The Debtor has experienced significant declines in all advertising categories, including retail (such as local and national department stores, specialty shops, preprinted advertising circulars, local retailers and direct mail), national (such as national brand advertising accounts), classified (such as employment, automotive, real estate and private party "listings") and Internet.

The Debtor's Subsidiaries' advertising revenues depend upon a variety of other factors specific to the communities that they serve. These factors include, among others, the size and demographic characteristics of the local population, the concentration of retail stores and other businesses, the level of online connectivity and local economic conditions in general.

With the continued development of alternative forms of media, particularly those based on the digital delivery of news and advertising, the Debtor's business faces increased competition. Alternative media sources also affect circulation as more people turn to the Internet for news information. This competition could make it difficult for the Debtor to grow or maintain its print advertising and circulation revenues, which the Debtor believes will challenge it to expand the contributions of its digital business.

### B. Debtor's Deteriorating Financial Condition

As a result of cyclical and secular changes in advertising spending in newspapers, the Debtor has experienced a substantial decrease in operating revenues and cash flow. From the fiscal year ended June 30, 2008 to the fiscal year ended June 30, 2009, total revenues of the Debtor and its Subsidiaries fell by $121.4 million. During the same time, advertising revenues, which remain the largest component of the Debtor's revenues, dropped $130.2 million or 14.0%. The Debtor and its Subsidiaries' total revenues have fallen from $1.330 billion for the fiscal year ended June 30, 2007 to $1.060 billion for the fiscal year ended June 30, 2009.[7]

Although the Debtor's performance has been comparable, and in some areas superior, to that of its peers, operations have nevertheless been adversely affected by the general deterioration in the newspaper publishing industry and the current economic recession. Notwithstanding the Debtor's aggressive efforts to reduce expenses, enhance revenues and

---

[7]  Revenues from the operations of *The Denver Post* and the discounted operations related to the sale of the *Connecticut Post*, have not been included. See Section III.C. for additional discussion related to *The Denver Post*.

monetize various assets, the impact of an unprecedented economic downturn has left it with operating cash flows insufficient to support the Debtor's current debt obligations.

## C.    Cost Reductions and Strategic Initiatives

Beginning in 2006, the Debtor began to implement a number of strategic initiatives to enhance operating cash flow and to reduce costs in response to the structural changes occurring in the industry.  The Debtor and its Subsidiaries pursued cost reductions across all areas of its business and reduced its operating costs on a same newspaper basis but before adjusting for minority interest, by more than $385 million or 31% since the 2006 calendar year.  It has continued to restructure and realign its workforce to meet developing business conditions through the present date.  Strategic initiatives aimed at generating incremental cash flow through cost savings have included, among other things, headcount and benefit reductions, consolidating production, editorial and back office facilities and functions, improving operating efficiencies, outsourcing selected distribution, printing, advertising production and design activities, reducing web width (newspaper page size), resulting in permanent newsprint volume savings, and elimination of unprofitable circulation.

Revenue enhancement initiatives have included offering creative solutions to advertisers (e.g., multi-platform packages and zoning), launching new niche publications and building new local Internet websites.  Additionally, the Debtor has either sold or is currently marketing real estate assets not currently utilized in the production of its newspapers.  The Debtor also sold its interests in the *Connecticut Post* in August 2008.

In August 2009, the Debtor completed the restructuring of DNA, which owns and operates *The Denver Post*.  Pursuant to an Amended and Restated Credit Agreement between DNA and its senior lenders (the "**DNA Amended Credit Facility**"), the $130.5 million in outstanding borrowings under the DNA Credit Agreement was reduced to $80.0 million and a new revolving credit facility with a borrowing limit of $15.0 million was established.  In connection with the DNA Amended Credit Facility, DNA granted its senior lenders a security interest in substantially all of its assets and DNA's senior lenders acquired a membership interest in DNA. The debt under the DNA Amended Credit Facility is non-recourse to the Debtor and will be funded exclusively by DNA.

Until the DNA Amended Credit Facility is paid in full, DNA is restricted from distributing cash to its parent.  Consequently, the Debtor does not anticipate receiving any distributions from DNA operations over the next five years.  Accordingly, all of the Debtor's financial projections exclude the operations, assets and liabilities of *The Denver Post*.

## D.    Summary of Restructuring Negotiations

Over the past twelve (12) months, the Debtor, the Administrative Agent and the Senior Lender Steering Committee have been negotiating the terms and conditions of the Debtor's restructuring.

### 1. Forbearance Agreement and Development of Restructuring

Due to the recession and the secular effects of industry-wide change in advertising trends, and in spite of its significant cost-cutting and other strategic initiatives, the Debtor was unable to comply with certain financial covenants under the Senior Credit Agreement. In anticipation of a potential breach of one or more of its financial covenants as of the end of the fiscal quarter ending March 31, 2009, the Debtor advised the Administrative Agent and the Senior Lenders that it had undertaken to develop a comprehensive restructuring plan and asked the Senior Lenders to forbear from exercising remedies against the Debtor and its Guaranteeing Subsidiaries for a limited period of time. On March 31, 2009, the Debtor was obligated to repay $6,465,681 of the principal amount of the loans outstanding under the Senior Credit Agreement and failed to make such payments. The Debtor also failed to make the interest payments with respect to the 6 7/8% Notes that were due and payable on April 1, 2009. Subsequently, the Debtor, the Guaranteeing Subsidiaries, certain Senior Lenders (the "**Participant Senior Lenders**") and the Administrative Agent entered into the Forbearance Agreement, pursuant to which it was agreed that the Senior Lenders would forbear from exercising remedies against the Debtor and the Guaranteeing Subsidiaries on account of certain specified defaults, including (i) the failure to make mandatory principal payments on any of the loans under the Senior Credit Agreement (other than a prepayment of 50% of the proceeds of the sale of certain real property located in Boulder, Colorado (the "**Boulder Property**")), (ii) the failure to make interest payments on the Subordinated Notes and (iii) a breach of any of the financial covenants in the Senior Credit Agreement as currently in effect.

The "forbearance period" during which the Senior Lenders agreed not to exercise their remedies was initially scheduled to expire on September 30, 2009. The Senior Lenders, however, had the right to terminate the "forbearance period" earlier than such date upon the occurrence of certain specified events.

Pursuant to the Forbearance Agreement, the Debtor was required to grant (or cause its applicable Subsidiaries to grant) liens on (i) substantially all of the assets of Alaska Broadcasting, (ii) certain real property located in Valencia, California, which was subsequently sold on December 1, 2009 and (iii) at least 50% of its equity interests in a limited liability company formed to hold the Boulder Property. The Forbearance Agreement also required the Debtor, in addition to continuing to retain Rothschild Inc. ("**Rothschild**") as its financial advisor (the Debtor and its Subsidiaries hired Rothschild in December 2008 as its financial advisor and investment banker to assist in developing a comprehensive restructuring plan and in connection therewith exploring various strategic alternatives), to retain a turnaround/restructuring firm of recognized national standing reasonably satisfactory to the Administrative Agent (the Debtor hired Carl Marks Advisor Group LLC ("Carl Marks") in May 2009 as its restructuring advisor) and to deliver on or prior to June 15, 2009 a comprehensive restructuring proposal.

As a condition to the effectiveness of the Forbearance Agreement, the Debtor was required to obtain from New Paperco, Inc., a wholly-owned Subsidiary of Hearst and the holder of more than 50% of the outstanding principal amount of the Subordinated Notes ("**New Paperco**"), a forbearance agreement (the "**Hearst Forbearance Agreement**"), pursuant to which it agreed not to (x) exercise any remedies available to it or (y) instruct the Indenture Trustee to exercise any remedy that may be exercised by the Indenture Trustee, in each case in

respect of the Subordinated Notes, until the earlier of (i) the termination of the Forbearance Agreement and (ii) September 30, 2009.

On June 15, 2009, the Debtor provided the Senior Lenders with a restructuring proposal. The Debtor's senior management and advisors engaged in discussions with the Senior Lenders to explore a consensual restructuring of the Debtor's obligations. Concurrently with these discussions, the Debtor also worked with potential third parties who expressed an interest in participating in a restructuring transaction with the Debtor. Rothschild sought out potential acquirers of or investors in the Debtor. Several potential investors performed in-depth due diligence on the Debtor and its Subsidiaries. However, to date no third party has been willing to place a valuation on the Debtor and its Subsidiaries that the Debtor believes would be acceptable to the Senior Lenders.

The Forbearance Agreement was extended until November 30, 2009 pursuant to the First Supplement to the Forbearance Agreement dated as of September 30, 2009. New Paperco similarly agreed to extend the outside date for the expiration of the "standstill period" provided for in the Hearst Forbearance Agreement with the Debtor to a date no earlier than November 30, 2009. The First Supplement to the Forbearance Agreement provided that the "forbearance period" could be terminated by the Senior Lenders on two weeks' notice if the Debtor, the Administrative Agent and the Senior Lender Steering Committee failed to agree upon a term sheet providing for a comprehensive restructuring of the Debtor on or before October 30, 2009. The parties finalized a term sheet that was approved by the Debtor's board of directors on October 29, 2009, and upon which the Prepackaged Plan is based. The Debtor believes that the Prepackaged Plan presents the best option for a consensual restructuring and the best opportunity to maximize value for its stakeholders.

## E. Restructuring Support Agreement

On November 30, 2009, the Debtor, certain Senior Lenders (the "**Consenting Senior Lenders**") and the Administrative Agent entered into the Restructuring Support Agreement. Pursuant to the Restructuring Support Agreement, the Consenting Senior Lenders indicated their support for the material terms of a reorganization of the Debtor as set forth in the prepackaged plan term sheet approved by the board of directors of the Debtor and the Senior Lender Steering Committee and agreed to extend the "forbearance period" under the Forbearance Agreement to March 31, 2010, provided certain additional conditions are met. Concurrently with the execution of the Restructuring Support Agreement, New Paperco agreed to amend the Hearst Forbearance Agreement to extend the outside date of for the expiration of the standstill period provided for in the Hearst Forbearance Agreement to a date no earlier than March 31, 2010.

On December 17, 2009, the largest holder of Subordinated Notes, with approximately 51% of the total amount of the Subordinated Notes Claims, advised the Debtor that it supports the Prepackaged Plan in principle, subject to the execution of definitive agreements.

Based on the Restructuring Support Agreement, the Debtor is prepared to seek confirmation of the Prepackaged Plan shortly after the Petition Date, so long as sufficient acceptances are received from holders of the Senior Loan Claims through the Solicitation. The Prepackaged Plan is based on a consensual arrangement with the Debtor's key stakeholders and

the Senior Lenders and accomplishes a significant deleveraging of the Debtor's balance sheet. The Prepackaged Plan provides for, among other things, the reduction of the Debtor's senior secured obligations to $150 million, the reduction to zero of the Debtor's unsecured obligations other than ongoing trade and operating obligations, and sufficient working capital for the Debtor's operations going forward. In addition to the New Senior Secured Term Notes, if it receives sufficient commitments from certain Senior Lenders for a LOC Facility, the Reorganized Debtor will maintain a $13,875,000 LOC Facility consisting of new letters of credit and existing letters of credit under the Senior Credit Agreement rolled over into the LOC Facility pursuant to the New Senior Secured Credit Documents.[8] By accepting the Prepackaged Plan as a Class, the Senior Lenders will have agreed to exchange their existing Secured Loan Claims and their Claims against the Guaranteeing Subsidiaries for (i) in the aggregate, (a) the Term Loan Facility, (b) the Senior Lender Common Stock Distribution and (c) the Senior Lender Emergence Payment and (ii) broad releases by the Debtor and the Guaranteeing Subsidiaries of any Claims against the Administrative Agent and/or the Senior Lenders.

### F. Solicitation and Commencement of Reorganization Case

On or about December 18, 2009, the Debtor commenced solicitation of acceptances of the Prepackaged Plan. The solicitation period is presently scheduled to expire on January 13, 2010 at 5:00 p.m. (prevailing Eastern time) but may be extended at the Debtor's option.

### IV. THE REORGANIZATION CASE

### A. Anticipated Timeline of the Reorganization Case

In a "prepackaged" chapter 11 case such as the Reorganization Case, agreement is reached between the debtor and one or more classes of its creditors on the terms of a restructuring before the filing occurs, and the bankruptcy case is used to implement the agreed-upon plan and to deal with any creditors with whom there is no agreement. The creditors' votes are solicited before filing, and the plan confirmation process starts immediately upon filing the chapter 11 case. Because prepackaged chapter 11 cases usually have little or no effect on the debtor's business operations, prepackaged chapter 11 cases often take less time to complete than more conventional bankruptcy cases. Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

The Debtor does not expect the Reorganization Case to be protracted, because so long as Class 2 (Senior Loan Claims) votes in favor of the Prepackaged Plan, the Debtor intends to start the process of confirming the Prepackaged Plan on the first day of the Reorganization Case, by filing the Prepackaged Plan and this Disclosure Statement. The Debtor anticipates that as soon

---

[8] The Debtor currently has commitments for a $13.875 million LOC Facility. The Debtor, however, forecasts that it will need a $25 million LOC Facility through the Projection Period (defined below in Section VII.A.) to secure its workers compensation and purchasing card obligations. While the Debtor anticipates it will pursue additional funding sources to meet its future needs, failure to obtain such commitments could negatively impact the Reorganized Debtor's liquidity, its ability to meet the Projections set forth in Section VII.A. and its ability to implement its post-Effective Date business plan.

as practicable after the Petition Date, it will seek an order of the Bankruptcy Court scheduling a hearing to consider (i) the adequacy of this Disclosure Statement and the Solicitation and (ii) confirmation of the Prepackaged Plan. The Debtor anticipates that notice of these hearings will be published and will be mailed to all known holders of Claims and Equity Interests at least twenty-eight (28) days before the dates scheduled for such hearings. See Article X below entitled "Confirmation of the Prepackaged Plan."

**B.      Confirmation of the Prepackaged Plan**

Assuming that the Bankruptcy Court approves the scheduling motion with respect to the Confirmation Hearing, the Debtor anticipates that the Confirmation Hearing will occur within approximately forty-five (45) to sixty (60) days after the Petition Date. The Debtor does not currently anticipate any significant objections to confirmation. However, if significant objections were to be raised, the anticipated timing for the Confirmation Hearing could be delayed. If Class 5 (Subordinated Note Claims) does not vote to accept the Prepackaged Plan, the Debtor will seek approval of the Prepackaged Plan under the "cram down" provisions of section 1129 of the Bankruptcy Code, which would result in the holders of Subordinated Note Claims receiving no distribution.

**C.      Ordinary Course Operations After the Petition Date**

**The Debtor intends to continue to operate its business in the ordinary course throughout the Reorganization Case as it has prior to the Petition Date. The Debtor's operating Subsidiaries are not anticipated to commence chapter 11 cases, though the Debtor reserves the right to commence a chapter 11 case for any of its Subsidiaries that is in need of the protections available to debtors in chapter 11, including the ability to reject uneconomic leases.**

To ensure "business as usual" operations and to expedite its emergence from chapter 11, on or shortly after the Petition Date, the Debtor will file motions seeking the relief detailed below, among other relief, from the Bankruptcy Court. Such relief, if granted, will facilitate the administration of the Reorganization Case. There can be no assurance, however, that the Bankruptcy Court will grant the relief sought.

These requests include, but are not limited to, the following:

**1.      Payment in the Ordinary Course of Creditors Unaffected by the Filing of the Reorganization Case**

The Debtor believes that good relations with its trade and other business vendors are essential to the continued operation of its business during the pendency of its Reorganization Case. Accordingly, and in light of the fact that the Prepackaged Plan treats such creditors as unaffected by the chapter 11 filing, the Debtor intends to request an order of the Bankruptcy Court in its Reorganization Case authorizing payments to its vendors as they become due in the ordinary course of business, including any amounts that may relate to claims arising prior to the Petition Date.

### 2. Employee Matters

On the Petition Date, the Debtor intends to seek an order of the Bankruptcy Court authorizing it to pay wages, salaries, reimbursable employee expenses and accrued and unpaid employee benefits incurred prior to the Petition Date.

### 3. Operation of Business

The Debtor will also seek various other orders to allow a smooth transition through the chapter 11 process. These include, but are not limited to, orders permitting it to (i) pay certain insurance obligations, including workers' compensation insurance, self-insured medical and pension obligations, (ii) maintain its cash management systems and (iii) continue providing management, purchasing and operating support services to its Subsidiaries and partnerships.

### 4. Motion to Waive Requirements to File Schedules and Statement of Financial Affairs

Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 direct that, unless otherwise ordered by the court, a debtor must prepare and file certain schedules of claims, executory contracts and unexpired leases and related information (the "**Schedules**") and a statement of financial affairs (the "**Statement**") within fourteen (14) days of the commencement of a reorganization case. The purpose of this requirement is to provide creditors, equity security holders and other interested parties with sufficient information to make informed decisions with respect to a debtor's reorganization. In appropriate circumstances, however, a court may modify or dispense with the filing of the Schedules and the Statement pursuant to section 521 of the Bankruptcy Code. The Debtor believes that such circumstances would exist in the Reorganization Case, and that it should not be required to file the Schedules and the Statement within the time required by the Bankruptcy Code and Rules. The Debtor thus intends to request that the Bankruptcy Court waive the necessity of filing the Schedules and the Statement to further reduce the expense and administrative burden of the Reorganization Case.

### 5. Payment of Senior Lender Non-Principal Claim

As part of the Senior Lenders' forbearance and entry into the Restructuring Support Agreement, the Debtor and/or its Subsidiaries intend to combine to pay during the Reorganization Case, and may seek court approval to pay, if necessary, interest and certain fees, expenses and other amounts due and payable under the Senior Credit Agreement Documents.

### 6. Administrative Relief

In addition, the Debtor will file motions seeking the following relief to ease the administrative burden of the Reorganization Case: (i) establishing procedures for interim compensation and reimbursement of expenses of retained professionals; (ii) establishing procedures for retention and compensation of professionals used in the ordinary course of business; and (iii) establishing noticing procedures.

### 7. FCC Trust

The Debtor will seek an order (the "**FCC Trust Order**") (1) authorizing and directing the establishment of the FCC Trust and the assignment of the FCC Broadcast Licenses and certain associated assets to the FCC Trust, subject to FCC consent and (2) approving and authorizing the FCC Trust Agreement (as defined below), the Trustees and certain other aspects of the operation of the FCC Trust, over which the Bankruptcy Court would retain supervisory jurisdiction.

### 8. FCC Applications

Separate consents of the FCC are required for (i) the transfer of control of the FCC Licenses to the Debtor as debtor-in-possession, (ii) the subsequent assignment of the FCC Broadcast Licenses from the Debtor's broadcast Subsidiaries to the Debtor as a debtor-in-possession and then to the FCC Trust, and (iii) the transfer of control of the FCC Non-Broadcast Licenses (to the extent the Debtor chooses to retain them for use in its business) from the Debtor as debtor-in-possession to the Reorganized Debtor. Soon after commencing the Reorganization Case, the Debtor will file with the FCC (1) short-form applications for FCC consent to the involuntary transfer of control of the FCC Licenses from the Debtor to the Debtor as debtor-in-possession and (2) the short-form applications for FCC consent to the assignment of the FCC Broadcast Licenses to the Debtor as debtor-in-possession and then to the FCC Trust. Subject to receipt of the FCC Trust Order and the consent of the FCC, the FCC Trust will enter into the Time Brokerage Agreements. The terms of the FCC Trust Agreement and the related Time Brokerage Agreement will reflect the 5% minority ownership interest in Alaska Broadcasting. Any subsequent assignment of the FCC Licenses from the FCC Trust to a third party will require the FCC Trust to file long form applications for FCC consent to such assignment, but neither the Debtor nor the Reorganized Debtor would be an assignor party to such an application. See Section VIII.D. below for a more detailed discussion of the FCC application process. The Debtor will also file, for any FCC Non-Broadcast Licenses that the Debtor chooses to retain, applications with the FCC for the transfer of control of those licenses from the Debtor as debtor-in-possession to the Reorganized Debtor. To the extent the Debtor determines that certain FCC Non-Broadcast Licenses are no longer useful in its business, those licenses would instead be turned in for cancellation.

In summary, the Debtor views chapter 11 as an essential tool in restructuring its balance sheet and emerging as a healthier and viable company. So long as Class 2 (Senior Loan Claims) votes in favor of the Prepackaged Plan, the Debtor intends to seek confirmation of the Prepackaged Plan to effectuate its proposed restructuring and enhance its long-term growth prospects and financial performance. The Debtor will emerge from chapter 11 a substantially deleveraged enterprise, and will be well-positioned to maintain its status as one of the leading newspaper publishers in the United States.

## V. SUMMARY OF THE PREPACKAGED PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PREPACKAGED PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PREPACKAGED

PLAN.  THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PREPACKAGED PLAN, WHICH IS <u>EXHIBIT 1</u> TO THIS DISCLOSURE STATEMENT.

THE PREPACKAGED PLAN AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR.  UPON THE EFFECTIVE DATE, THE PREPACKAGED PLAN WILL BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PREPACKAGED PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PREPACKAGED PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

The Prepackaged Plan accomplishes a significant deleveraging of AMI's balance sheet through a debt-for-equity swap by the Senior Lenders.  As a result of this swap, the Senior Lenders will hold a significantly reduced amount of debt following consummation of the Prepackaged Plan, and will become the owners, initially, of 88.0% of the capital stock of Reorganized AMI after giving effect to the grants of the Equity Incentive Plan but, before giving effect to any exercise of the Singleton Warrants and, if applicable, the Subordinated Note Warrants.  As discussed below, control of the majority of voting interests of Reorganized AMI, however, will remain with Mr. Singleton and Mr. Lodovic, because their ownership of the Class A New Common Stock entitles them to name a majority of the board of directors of Reorganized AMI.

All of AMI's unsecured creditors other than the holders of Subordinated Notes will retain their rights unimpaired by the consummation of the Prepackaged Plan.  The holders of Subordinated Notes will receive warrants, which will provide them with the opportunity to participate in any increase in the value of the enterprise in the future.

All existing Equity Interests in AMI will be canceled and the holders thereof will receive no value under the Prepackaged Plan.

The Debtor maintains that commencement of the Reorganization Case maximizes value for the benefit of its stakeholders.  The Debtor, after discussions with the Senior Lenders, concluded that the proposed restructuring should be implemented through a prepackaged plan of reorganization.  The Debtor believes that the value of its business would be damaged significantly by a prolonged bankruptcy case.  The Prepackaged Plan embodies this proposed stand-alone restructuring.  The Prepackaged Plan allows the Debtor to deleverage its balance sheet by reducing its approximate $930 million in total debt to $165.6 million, plus the LOC Facility in the amount of $13.875 million, and reducing its senior secured indebtedness from approximately $590 million (which amount includes $6.375 million of contingent reimbursement claims on letters of credit) to $150.0 million, plus the LOC Facility in the amount of $13.875 million and $15.1 million of Other Secured Claims.[9]

---

[9]   The Debtor currently has commitments for a $13.875 million LOC Facility.  The Debtor, however, forecasts that it will need a $25 million LOC Facility through the Projection Period (defined below in Section VII.A.) to

(Footnote continued on next page)

The Debtor believes that (i) through the Prepackaged Plan, holders of Allowed Claims will obtain a substantially greater recovery from the Estate of the Debtor than the recovery they would receive if (a) the Debtor filed the Reorganization Case without prior approval of the Prepackaged Plan by the Senior Lenders or (b) the Debtor filed a petition under chapter 7 of the Bankruptcy Code and (ii) the Prepackaged Plan will afford the Debtor the opportunity and ability to continue its business as a viable going concern and preserve ongoing employment for the Debtor's employees.

So long as Class 2 (Senior Loan Claims) votes in favor of the Prepackaged Plan, the Debtor intends to file the Prepackaged Plan and this Disclosure Statement upon the commencement of the Reorganization Case. If the requisite acceptances of the Prepackaged Plan have been obtained prior to such filing, the Debtor will seek approval of this Disclosure Statement and consummation of the Prepackaged Plan as quickly as possible. Even if Class 5 (Subordinated Note Claims) fails to accept the Prepackaged Plan, the Debtor intends to seek confirmation under the "cram down" provisions of section 1129 of the Bankruptcy Code.

### A. Overview of Chapter 11 and the Plan Process

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the reorganization case. The commencement of a reorganization case creates an estate that comprises all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

---

(Footnote continued from prior page)

secure its workers compensation and purchasing card obligations. While the Debtor anticipates it will pursue additional funding sources to meet its future needs, failure to obtain such commitments could negatively impact the Reorganized Debtor's liquidity, its ability to meet the Projections set forth in Section VII.A. and its ability to implement its post-Effective Date business plan.

**B.  Classification and Treatment of Claims and Equity Interests; Cram Down**

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, a prepackaged plan divides claims and equity interests into classes and sets forth the treatment for each class (other than administrative expense claims and priority tax claims (each as defined in the Bankruptcy Code) which, under section 1123(a)(1) of the Bankruptcy Code, need to be classified).  A debtor is required, under section 1122 of the Bankruptcy Code, to classify claims against and equity interests in the debtor into classes, each of which contains claims and equity interests that are substantially similar to the other claims and equity interests in such class.

Although the Debtor believes that the Prepackaged Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, it is possible that a holder of a Claim or Equity Interest may challenge the Debtor's classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Prepackaged Plan to be confirmed.  In that event, the Debtor would, to the extent permitted by the Bankruptcy Code, the Prepackaged Plan and the Bankruptcy Court, make such reasonable modifications of the classifications in the Prepackaged Plan to permit confirmation and to use the acceptances of the Prepackaged Plan that are marked on the ballots received in this Solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately would be deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class in the Prepackaged Plan, by changing the composition of such Class and the vote required of that Class for approval of the Prepackaged Plan.  Furthermore, a reclassification of a Claim or Equity Interest after approval of the Prepackaged Plan could necessitate a resolicitation of acceptances of the Prepackaged Plan.

The amount of any impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any impaired Class.  Thus, the value of the property that ultimately will be received by a particular holder of an Allowed Claim under the Prepackaged Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Equity Interests and the nature of distributions to members of each Class are summarized below.  The Debtor believes that the consideration, if any, provided under the Prepackaged Plan to holders of Claims reflects an appropriate resolution of their Claims, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and the fair value of the Debtor's assets.  In view of the deemed rejection by Classes 7 and 8, however, as set forth below, the Debtor will seek confirmation of the Prepackaged Plan pursuant to the "cram down" provisions of the Bankruptcy Code.  Specifically, section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if all impaired classes of claims and equity interests have not accepted the plan.  In order to confirm a plan under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court is required to find that a number of statutory tests are

met. Although the Debtor believes that the Prepackaged Plan can be confirmed under section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

### 1. Treatment of Unclassified Claims Under the Prepackaged Plan

#### a. Administrative Expense Claims

Each holder of an Allowed Administrative Expense Claim will receive payment in full in Cash of the unpaid portion of such Allowed Administrative Expense Claim (a) in the case of professional fees and expenses for professionals and advisors retained by the Debtor, as soon as practicable after Bankruptcy Court approval thereof, or, in the case of professionals retained by the Debtor in the ordinary course of its business, if any, on such terms as are customary between the Debtor and such professionals; (b) with respect to all other holders of Allowed Administrative Expense Claims, on the later of (i) the Effective Date and (ii) the date on which such payment would be made in the ordinary course of the Debtor's business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions, or (c) with respect to any Claim described in clauses (a) through (b) of Section 2.1 of the Prepackaged Plan, as otherwise agreed by the holder of such Claim and the Debtor. Disputed but not yet Allowed Administrative Expense Claims will receive payment on the later of (i) the date such disputed Allowed Administrative Expense Claim becomes Allowed and (ii) the date on which such payment would be made in the ordinary course of the Debtor's business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions; provided, however, that Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Reorganization Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

The Senior Loan Non-Principal Claims shall be Allowed Administrative Expense Claims (and not of the type described in Section 2.2 of the Prepackaged Plan) and shall be payable as such in Cash on the Effective Date as part of the Senior Lender Emergence Payment. However, it is contemplated that payments on account of the items listed in the definition of Senior Loan Non-Principal Claims will be paid to the Administrative Agent and the Senior Lenders during the Reorganization Case, and the Administrative Agent and the Senior Lenders shall be entitled to retain all such payments as Allowed Administrative Expense Claims.

#### b. Professional Compensation and Reimbursement Claims

Except as provided in Section 2.1 of the Prepackaged Plan, all Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is sixty (60) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtor

is authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### c. Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim against the Debtor agrees with the Debtor to a different treatment or has been paid by the Debtor prior to the Effective Date, each holder of an Allowed Priority Tax Claim shall, at the Debtor's election where applicable, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim: (a) be paid in full, in Cash, on, or as soon as reasonably practicable after, the later of the Effective Date and the date on which such Claim becomes an Allowed Claim, in accordance with the terms of any agreement between the Debtor and such holder, as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business; (b) be paid in Cash in regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) be paid such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

### 2. Treatment of Classified Claims and Equity Interests

### a. Priority Non-Tax Claims (Class 1)

On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim becomes an Allowed Claim and (iii) the date on which such Priority Non-Tax Claim becomes payable pursuant to any agreement between the Debtor and the holder of such Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim, either (A) Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim or (B) such different treatment as to which the Debtor and such holder shall have agreed in writing.

### b. Senior Loan Claims (Class 2)

The Senior Loan Claims shall be Allowed in full, without setoff, subordination, avoidance, reduction, defense, recharacterization or counterclaim, in the aggregate principal amount of $590 million (which amount includes $6.375 million of contingent reimbursement claims on letters of credit), plus all accrued and unpaid interest and other amounts payable under the Senior Credit Agreement and not paid as of the Effective Date.

Each holder of Senior Loan Claims, in full satisfaction, settlement, compromise, release, and discharge of and in exchange for the remaining amount of the Senior Loan Claims, including without limitation all such Claims against the Guaranteeing Subsidiaries (other than as otherwise provided in Section 6.7 of the Prepackaged Plan), shall receive on the Effective Date its Pro Rata share, in the aggregate, of (i) the Term Loan Facility, as defined in Section V.D.2, (ii) the Senior Lender Common Stock Distribution and (iii) the Senior Lender Emergence Payment.

The Senior Lenders shall accept the distributions on account of the Senior Loan Claims and, in respect of the settlement and compromise of the Guarantee Obligations, the benefits conferred by the Guaranteeing Subsidiaries in the Guarantee Settlement in full satisfaction, settlement, compromise, release, and discharge of and in exchange for all Claims arising under the Senior Credit Agreement Documents, including, without limitation, all such Claims against the Guaranteeing Subsidiaries, which Claims against the Guaranteeing Subsidiaries the Senior Lenders are releasing, settling and compromising hereby in exchange for, and subject to, (i) the execution by each of the Guaranteeing Subsidiaries of a guaranty of the New Senior Credit Facility, as defined in Section V.D.2, in form and substance acceptable to the Administrative Agent and the Senior Lender Steering Committee as of the Effective Date, (ii) the settlement, compromise and release by the Debtor and the Guaranteeing Subsidiaries of all Claims and causes of action against the Senior Lenders and/or the Administrative Agent of and from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or thereafter arising, in law, equity, or otherwise, based in whole or in part upon any act, omission, transaction, event or other occurrence taking place before the Effective Date that relate to the Senior Credit Agreement and Senior Credit Agreement Documents (including the Forbearance Agreement and Restructuring Support Agreement) and the transactions contemplated thereby and (iii) the granting by the Guaranteeing Subsidiaries of first priority Liens on substantially all property of the Guaranteeing Subsidiaries securing the guarantees referenced in subclause (i) of this sentence pursuant to security agreements in form and substance acceptable to the Administrative Agent and the Senior Lender Steering Committee.

### c.    Other Secured Claims (Class 3)

Class 3 consists of a separate sub-Class for each Other Secured Claim.  Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code.  The holder of any Other Secured Claim shall retain its legal and equitable rights unaltered by the confirmation or consummation of the Prepackaged Plan.

At the option of the Debtor, (i) the legal, equitable, and contractual rights of the holder of an Allowed Other Secured Claim shall be reinstated in accordance with the provisions of section 1124(2) of the Bankruptcy Code, (ii) the holder of an Allowed Other Secured Claim shall be treated in accordance with an agreement between such holder and the Debtor or (iii) the holder of the Allowed Other Secured Claim shall be paid in full on the Effective Date.  To the extent that any Allowed Other Secured Claim shall be treated as set forth in subclause (iii) above, the treatment applicable to each holder of such Allowed Other Secured Claim shall be disclosed in a filing made with the Bankruptcy Court no later than seven (7) days prior to the Confirmation Hearing.

To the extent an Other Secured Claim is an Allowed Secured Tax Claim, except to the extent that the holder of such Allowed Secured Tax Claim against the Debtor agrees to a different treatment or has been paid by Debtor prior to the Effective Date, each holder of an Allowed Secured Tax Claim shall, in full satisfaction, release, and discharge of such Allowed Secured Tax Claim: (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date; (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between

the Debtor and such holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business; or (c) be treated on such other terms and conditions as are acceptable to the Debtor and the holder of such Claim.

The Debtor's failure to object to any Other Secured Claim shall be without prejudice to the Debtor's or the Reorganized Debtor's right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Other Secured Claim holder.  Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all prepetition Liens on property of the Debtor held with respect to an Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreement governing such Claim until such Allowed Claim is paid in full unless otherwise satisfied, as agreed by the holder of such Allowed Claim.  Nothing in the Prepackaged Plan shall preclude the Debtor or the Reorganized Debtor from challenging the validity of any alleged Lien on any asset of the Debtor or the value of the property that secures any alleged Lien.

### d.    General Unsecured Claims (Class 4)

Class 4 consists of General Unsecured Claims.  The holder of any General Unsecured Claim shall retain its legal and equitable rights unaltered by the confirmation or consummation of the Prepackaged Plan.

### e.    Subordinated Note Claims (Class 5)

#### 1)    With Class 5 Acceptance

If sufficient votes accepting the Prepackaged Plan are received from holders of Claims in Class 5 to constitute an acceptance of the Prepackaged Plan by such Class pursuant to section 1126(c) of the Bankruptcy Code, then each holder of an Allowed Claim in such accepting Class shall be entitled to receive Subordinated Note Warrants as provided in Section V.D.4. below, and each such holder shall receive its Pro Rata share of the Subordinated Note Warrants in full satisfaction, settlement, compromise, release, and discharge of and in exchange for the remaining amount of its Subordinated Note Claim.

#### 2)    Without Class 5 Acceptance

If sufficient votes accepting the Prepackaged Plan are not received from holders of Claims in Class 5 to constitute an acceptance of the Prepackaged Plan pursuant to section 1126(c) of the Bankruptcy Code, then no holder of a Claim in Class 5 shall be entitled to receive any distribution from the Debtor or the Estate on account of its Subordinated Note Claims, which will be discharged pursuant to the Prepackaged Plan.

### f.    Intercompany Claims (Class 6)

With respect to each Intercompany Claim against the Debtor the legal, equitable, and contractual rights of the holder of such Intercompany Claim shall be reinstated or, with the consent of the holder, may be adjusted, continued, or capitalized, either directly or indirectly or in whole or in part.

### g. Securities Litigation Claims (Class 7)

With respect to any Securities Litigation Claim, the legal, equitable and contractual rights of the holder of such Claim shall be canceled, and no holder of a Claim in Class 7 shall be entitled to receive any distribution from the Debtor or the Estate.

### h. Old AMI Equity Interests (Class 8)

All Old AMI Equity Interests shall be canceled as of the Effective Date.

### C. Treatment of Subordinated Note Claims Under the Prepackaged Plan

Holders of Subordinated Note Claims are not entitled to receive any value under the Prepackaged Plan because (i) Subordinated Note Claims are completely subordinated to the Senior Loan Claims by the terms of the Indentures, (ii) section 510(a) of the Bankruptcy Code provides that intercreditor agreements are enforceable in cases under the Bankruptcy Code to the same extent they are enforceable under non-bankruptcy law and (iii) Senior Loan Claims are not being paid in full through the Prepackaged Plan.

Nonetheless, the Prepackaged Plan provides that if Class 5 votes by a sufficient amount to accept the Prepackaged Plan, the holders of Class 5 Claims will receive warrants to purchase stock in the Reorganized Debtor under the Prepackaged Plan. If Class 5 rejects that treatment, however, the Debtor will seek to confirm the Prepackaged Plan over Class 5's objection, under section 1129(b)(2)(B)(ii) of the Bankruptcy Code, in which case it is anticipated that Class 5 will receive no recovery under the Prepackaged Plan.

The Debtor believes that the Prepackaged Plan should be approved by the Bankruptcy Court under section 1129(b)(2)(B)(ii) of the Bankruptcy Code as "fair and equitable" because no Class of Claims or Equity Interests junior to the Subordinated Note Claims will receive or retain any property under the Prepackaged Plan on account of such junior Claims or Equity Interests.

Each of the Indentures provides, in Article X, for the complete payment subordination of the Subordinated Notes to the Senior Loans. Thus, the holders of Subordinated Note Claims are not entitled to receive or retain any interest or property on account of their Subordinated Note Claims until the Senior Loan Claims are indefeasibly paid in full in cash. Moreover, any recovery received by the holders of the Subordinated Notes prior to such payment in full of the Senior Loan Claims is required to be turned over to the holders of Senior Loan Claims, and if not so turned over, is deemed to be held in trust for the holders of Senior Loan Claims.

The Senior Loan Claims currently total approximately $590 million (which amount includes $6.375 million of contingent reimbursement claims on letters of credit). In respect of such Claims, the Senior Lenders are receiving an estimated non-cash recovery of, at most, between $171 million and $206 million ($150 million in New Senior Secured Term Notes, and initially, 88.9% of the equity of Reorganized AMI, which has an estimated net value of approximately $21 million to $57 million). The Senior Loan Claims thus are not being paid in cash and not being paid in full. Under these circumstances, the holders of Subordinated Note Claims are not entitled to any recovery.

### D. Summary of Capital Structure of the Reorganized Debtor

Pursuant to the Prepackaged Plan, Reorganized AMI expects to have the capital structure described below upon its emergence from chapter 11. The summary of Reorganized AMI's capital structure is qualified in its entirety by reference to the Prepackaged Plan and the documents contained in the Plan Supplements.

### 1. Description of New Common Stock

Reorganized AMI will have three classes of New Common Stock: Class A New Common Stock, Class B New Common Stock and Class C New Common Stock. The total number of shares of Class B New Common Stock and Class C New Common Stock will initially represent all of the equity value of Reorganized AMI (before issuance of the Class A New Common Stock pursuant to the Amended and Restated Employment Agreements and Class B New Common Stock pursuant to the Equity Incentive Plan and without taking into account any shares of New Common Stock issuable on exercise of the Subordinated Note Warrants or Singleton Warrants). In connection with the Prepackaged Plan, shares of Class B New Common Stock and Class C New Common Stock will be issued to the Senior Lenders, on a Pro Rata basis.

On the Effective Date, William Dean Singleton will receive two shares of Class A New Common Stock and Joseph J. Lodovic, IV will receive one share of Class A New Common Stock pursuant to the Amended and Restated Employment Agreements. No other Class A New Common Stock will be issued at any time.

Restricted stock units (or restricted shares) of Class B New Common Stock in an amount up to approximately 11.1% of the total number of shares of New Common Stock to be issued on the Effective Date will be granted to senior management of Reorganized AMI pursuant to the Equity Incentive Plan.

After giving effect to the issuance of the restricted stock units (or restricted shares) of the Class B New Common Stock on the Effective Date pursuant to the Equity Incentive Plan, the total amount of shares of Class B New Common Stock and Class C New Common Stock issued to the Senior Lenders will represent, initially, 88.9% of the total number of shares of the New Common Stock issued on the Effective Date.

The economic rights of the New Common Stock shall be identical. Each class of New Common Stock shall have one vote per share and vote as a single class except (i) as described below as to the election of directors, (ii) the holders of Class B New Common Stock and Class C New Common Stock, voting together as a single class on an as-converted basis, will have limited voting rights with respect to certain non-ordinary course transactions described below and (iii) each class of New Common Stock will be entitled to a separate class vote on any amendment, repeal or modification of any provision of Reorganized AMI's Restated Certificate of Incorporation that adversely affects the powers, preferences or special rights of such class in a manner different from the adverse effect on the powers, preferences or special rights of any other class of New Common Stock.

### a. Class A New Common Stock

So long as any shares of Class A New Common Stock remain outstanding, the holders of a majority of outstanding shares of Class A New Common Stock will have the right to elect a majority of the directors (i.e., four of the initial seven members of the Board) (the "**Class A Directors**"), each of whom must be a Qualified Individual. Decisions of the Board will be made by majority vote, except that (i) the separate approval by a majority of the Class B Directors (as defined below) and/or the holders of a majority of the outstanding shares of Class B New Common Stock and Class C New Common Stock, voting together as a single class on an as-converted basis, will be required for certain matters specified in the Restated Certificate of Incorporation and Stockholders' Agreement, and (ii) the Class B Directors will have the sole and exclusive power and authority with respect to certain matters specified in the Restated Certificate of Incorporation and Stockholders' Agreement relating to the employment agreements of Messrs. Singleton and Lodovic. The Class A Directors will each be subject to removal, with or without cause, and replacement by holders of the majority of the outstanding shares of Class A New Common Stock.

The shares of Class A New Common Stock will convert into shares of Class B New Common Stock (on a one-for-one basis) upon the earliest to occur of the following: (i) consummation of a Qualified Public Offering (as defined in the Restated Certificate of Incorporation); (ii) in the case of the Class A New Common Stock initially issued to Mr. Singleton and where the employment of both Mr. Lodovic and Mr. Singleton has terminated, then on the date specified by the Class B Directors following termination of his employment (which date must be within six months of the later of Mr. Singleton's termination date and Mr. Lodovic's termination date); (iii) in the case of the Class A New Common Stock initially issued to Mr. Lodovic and where the employment of both Mr. Lodovic and Mr. Singleton has terminated, then on the date specified by the Class B Directors following termination of his employment (which date must be within six months of the later of Mr. Singleton's termination date and Mr. Lodovic's termination date); and (iv) a determination by a majority of the Class B Directors to effectuate such conversion.

Shares of Class A New Common Stock will be not be assignable by either Mr. Singleton or Mr. Lodovic except (a) in the event of his incompetence or death, in which case the shares of Class A New Common Stock held by him may be transferred to his estate, executor, trustee, administrator, committee or other personal representative, (b) under agreed circumstances, for estate planning purposes and (c) as may otherwise be approved by the Class B Directors.

### b. Class B New Common Stock and Class C New Common Stock

The holders of a majority of the outstanding shares of Class B New Common Stock will have the right to elect all of the members of the Board (on a non-cumulative basis) other than the Class A Directors (i.e., three of the initial seven members of the Board) (the "**Class B Directors**"), each of whom must be a Qualified Individual. Upon or after the conversion of the last share of Class A New Common Stock into Class B New Common Stock, the Class A Directors may be replaced at the direction of the Class B Directors or holders of a majority of the outstanding shares of Class B New Common Stock, and thereafter the holders of a majority of the outstanding shares of the Class B New Common Stock will have the right to elect all of the members of the Board (on a non-cumulative basis).

Until the conversion of the last share of Class A New Common Stock into Class B New Common Stock, approval by the holders of a majority of the outstanding shares of Class B New Common Stock and the Class C New Common Stock, voting together as a single class on an as-converted basis, will be required (in addition to any other required approval) to:

(a) authorize, or increase the number of authorized shares of, any class of capital stock of Reorganized AMI ranking *pari passu* with or senior to the New Common Stock as to dividends or liquidation preference;

(b) amend Reorganized AMI's certificate of incorporation or the section of Reorganized AMI's bylaws governing the number of directors;

(c) sell, lease, license or otherwise dispose of all or substantially all of the assets of Reorganized AMI and its subsidiaries in a single transaction or a series of related transactions;

(d) in the case of Reorganized AMI only, recapitalize, reorganize or consolidate or merge with or into any person, other than a consolidation or merger of a wholly-owned subsidiary with or into Reorganized AMI (with Reorganized AMI as the surviving entity) or another wholly-owned subsidiary;

(e) issue or enter into an agreement to issue capital stock of Reorganized AMI (or any other equity securities of Reorganized AMI), except as may be provided for under (x) the Equity Incentive Plan or (y) any other management incentive plan approved by the Board and a majority of the Class B Directors; and

(f) redeem, purchase or otherwise acquire any capital stock of Reorganized AMI (or any other equity securities of Reorganized AMI) (except for purchases from employees upon termination of employment).

In order to facilitate ownership of New Common Stock by Persons that may be subject to full-voting equity ownership restrictions due to broadcast ownership regulations of the FCC, the Class C New Common Stock will be available to Senior Lenders and holders of the Subordinated Notes at their election as an alternative to Class B New Common Stock. AMI owns and operates daily newspapers of general circulation throughout the United States. The FCC restricts the common ownership of broadcast stations and daily newspapers of general circulation that serve the market, as defined in the FCC's rules. Accordingly, holders of Equity Interests that would otherwise hold five percent (5%) or more of the voting rights to elect members of the Board (thus having an attributable interest in AMI under FCC rules) and that also have attributable interests (as defined by the FCC's rules) in broadcast stations in markets served by AMI daily newspapers of general circulation could elect to receive Class C Common Stock to avoid a conflict with FCC ownership rules. Each holder of Class C New Common Stock will be entitled, at any time, to convert all or any portion of the shares of Class C New Common Stock held by it into an equal number of shares of Class B New Common Stock, except that a holder of an Equity Interest in Reorganized AMI would not be permitted to convert Class C New Common Stock to Class B New Common Stock and would be required to receive all or a portion of its shares of the Senior Lender Common Stock Distribution in the form of Class C New Common Stock if such holder of an Equity Interest in Reorganized AMI would otherwise hold five percent (5%) or

more of the voting rights to elect members of the Board of Directors of Reorganized AMI and such Equity Interest holders or any of its attributable principals should hold, independent of its prospective interest in AMI, any other interest in media subject to FCC regulation that would result in a violation of FCC rules or delay or impede the grant of consents and approvals of the FCC necessary to implement the Prepackaged Plan. Each holder of Class B New Common Stock will be entitled, at any time, to convert all or any portion of the shares of Class B New Common Stock held by it into an equal number of shares of Class C New Common Stock.

The rights of holders of Class B New Common Stock and the rights of holders of Class C New Common Stock will be identical in all respects, except that the holders of Class C New Common Stock will not be entitled to general voting rights (including the right to elect members of the Board), and will be entitled to vote as a single class, on an as-converted basis, with the Class B New Common Stock only on the matters described above.

The holders of greater than 25% of the outstanding capital stock of Reorganized AMI entitled to vote will have the right to call a special meeting of stockholders of Reorganized AMI upon proper notice but otherwise at any time. The holders of a majority of the outstanding shares of New Common Stock or a majority of the Class B Directors will have the right to cause Reorganized AMI to effect a First Public Offering and a Qualified Public Offering (each as defined in the Restated Certificate of Incorporation) and/or to cause the New Common Stock to be registered under the Exchange Act and listed or qualified for trading on a national securities exchange or quotation system in the United States, provided that unless (i) all of the Class A New Common Stock shall have been converted into Class B New Common Stock prior to such date or (ii) a majority of the Class A Directors shall have approved the offering or registration and listing, Reorganized AMI will not be required to effect such an offering or registration and listing prior to three years from the Effective Date.

The Stockholders' Agreement will also restrict sales or other transfers of AMI's equity securities to the extent necessary to ensure compliance with the securities laws and to ensure that Reorganized AMI does not have more than 500 holders of record of Reorganized AMI's equity securities for purposes of Section 12(g) of the Exchange Act (unless Reorganized AMI is already required to comply with the reporting requirements of the Exchange Act).

As to all matters requiring the separate approval of majority of the holders of the outstanding shares of Class B New Common Stock and Class C New Common Stock, voting together as a single class, on an as-converted basis, any shares of Class B New Common Stock or Class C New Common Stock sold or transferred to either of Mr. Singleton or Mr. Lodovic (or any person or entity controlled by or affiliated with either of them) shall for such purposes (but not for purposes of Delaware corporate law), so long as he holds any Class A New Common Stock, be deemed to have been voted in proportion to the votes of all holders having voting rights with respect to such matter.

### c.     Stockholders' Agreement

All of the holders of the New Common Stock, Subordinated Note Warrants and Singleton Warrants issued on the Effective Date (and the holders of any shares of New Common Stock issued upon exercise of the Subordinated Note Warrants or Singleton Warrants (each as defined below)) will be parties to a Stockholders' Agreement that provides for, among other things,

customary "tag-along" rights and "demand" and "piggyback" registration rights for the New Common Stock with customary exceptions.

A draft of the Stockholders' Agreement is attached to the Prepackaged Plan as <u>Plan Exhibit 10</u>.

### 2. New Senior Credit Facility

On the Effective Date, Reorganized AMI will issue $150 million of New Senior Secured Term Notes to the holders of the Senior Loan Claims, on a Pro Rata basis, in partial satisfaction of such claims and each Senior Lender shall release its existing Claims against the Debtor and each of the Guaranteeing Subsidiaries.

Also on the Effective Date, a new secured letter-of-credit facility (the "**LOC Facility**" and, together with the Term Loan Facility, the "**New Senior Credit Facility**") will be put into place. The LOC Facility will be split into two tranches. The "**Tranche A Facility**" will result from an automatic rollover of letters of credit outstanding on the Effective Date under the Senior Credit Agreement ($6.375 million); the Senior Lenders holding the revolving loans under the Senior Credit Agreement will continue this extension of credit pro rata based on their current participation in such revolving loans. The "**Tranche B Facility**", in the amount of $7.5 million, will be provided as a separate new extension of credit by certain of the Senior Lenders.

The New Senior Credit Facility will be guaranteed by all of Reorganized AMI's wholly-owned Subsidiaries, and all obligations thereunder will be secured by a lien on substantially all of the assets of Reorganized AMI and such guarantors.

The New Senior Credit Facility will mature on the fourth anniversary of the Effective Date (the "**Maturity Date**"). Reorganized AMI will be required, in equal quarterly installments, to repay (i) $1.0 million of the Term Loan Facility during the first year following the Effective Date, (ii) $5.0 million of the Term Loan Facility during the second year following the Effective Date, (iii) $7.5 million of the Term Loan Facility during the third year following the Effective Date and (iv) $7.5 million of the Term Loan Facility during the first three quarters of the fourth year following the Effective Date, with the balance of the Term Loan Facility payable on the Maturity Date. The New Senior Secured Term Notes will bear interest at a rate per annum equal to LIBOR plus 6.00% (with a 2.50% LIBOR floor). The LOC Facility shall be subject to a commitment fee of 1.00% per annum on the actual daily unused portion of the LOC Facility. The fees in respect of letters of credit issued under the LOC Facility will be equal to 6.00% and the participating Senior Lenders will be paid an upfront fee of 2.00% on the maximum amount available to be drawn under the Tranche B Facility. The fronting bank will also be paid a fronting fee of 0.25% per annum on the face amount of the letters of credit issued by it.

In addition to the amortization payments described above, Reorganized AMI shall be required to apply the following amounts to the prepayment of the Term Loan Facility: (a) 50% of excess cash flow (as defined in the New Senior Secured Credit Documents) determined each fiscal year beginning with the fiscal year commencing July 1, 2010, (b) 100% of all net cash proceeds from any sale of property and assets of Reorganized AMI and its Subsidiaries (excluding sales of inventory in the ordinary course of business and other exceptions set forth in the New Senior Secured Credit Documents), (c) 75% of all net cash proceeds from the issuance

of any additional Equity Interests in Reorganized AMI or any of its Subsidiaries otherwise permitted under the New Senior Secured Credit Documents, (d) 100% of all net cash proceeds from the issuance or incurrence after the Effective Date of additional indebtedness of Reorganized AMI or any of its Subsidiaries otherwise permitted under the New Senior Secured Credit Documents (excluding an agreed upon amount of unsecured, contractually subordinated indebtedness) and (e) 100% of all net cash proceeds of extraordinary receipts (as defined in the New Senior Secured Credit Documents).

Reorganized AMI may prepay the Term Loan Facility in whole or in part at any time without premium or penalty, subject to reimbursement of the Senior Lenders' breakage costs. Each such prepayment shall be applied to the principal installments of the Term Loan Facility on a pro rata basis.

The New Senior Secured Credit Documents will contain customary affirmative and negative covenants that will require the Reorganized Debtor and its Subsidiaries to comply with certain ongoing obligations and to restrict their businesses in various ways. In addition, the New Senior Secured Credit Documents will require Reorganized AMI to comply with certain financial covenants, including a minimum consolidated fixed-charge coverage ratio and a maximum consolidated leverage ratio and will restrict the ability of the Reorganized Debtor and its Subsidiaries to incur additional indebtedness other than a mutually agreed upon amount of unsecured, contractually subordinated indebtedness.

The obligations under the New Senior Credit Facility will share equally and ratably in the collateral granted under the New Senior Secured Credit Documents, except that obligations in respect of the Tranche B Facility will have a first priority claim to distribution of proceeds in the case of post-default payments or bankruptcy or other post-acceleration circumstances following the Effective Date.

A term sheet setting forth the material terms of the New Senior Credit Facility is attached to the Prepackaged Plan as <u>Plan Exhibit 6</u>.

**3. Subordinated Note Warrants**

If Class 5 (Subordinated Note Claims) votes to accept the Prepackaged Plan, Reorganized AMI will issue the Subordinated Note Warrants exercisable for shares of Class B New Common Stock to the holders of the Subordinated Note Claims. The Subordinated Note Warrants will have the following material terms:

| | |
|---|---|
| Issuer: | Debtor |
| Expiration Date: | Seven years from the Effective Date. |
| Exercise Price: | An exercise price per share equal to the value per share representing a total equity value of Reorganized AMI equal to (x) an amount equal to the aggregate Allowed Amount of the Senior Loan Claims <u>minus</u> $150 million <u>divided by</u> (y) 0.88 (as adjusted, if necessary, to the extent less than the full 12% of the equity ownership of Reorganized AMI |

reserved for issuance pursuant to the Equity Incentive Plan has been issued at the time of exercise of the warrant, to reflect the equity ownership of Reorganized AMI at such time represented by the New Common Stock issued to the Senior Lenders on the Effective Date).

| | |
|---|---|
| Amount: | 8%[10] |
| Exercisability: | Each warrant will entitle the holder thereof to purchase from the Debtor one fully paid and nonassessable share of Class B New Common Stock or Class C New Common Stock (at the election of the holder) at a price equal to the Exercise Price. All or any of the warrants may be exercised prior to the Expiration Date by surrendering the related warrant certificates to Reorganized AMI, accompanied by payment in full in respect of each warrant that is exercised. |
| Anti-dilution: | Customary adjustments for stock splits, stock dividends, mergers and stock reorganizations. |
| Stockholders' Agreement: | Subject to the terms and conditions of the Stockholders' Agreement, including the transfer restrictions set forth therein. |
| Governing Law: | State of New York. |

A term sheet setting forth the material terms of the Subordinated Note Warrants is attached to the Prepackaged Plan as Plan Exhibit 11.

### 4.    Additional Warrants Issued to Mr. Singleton

Mr. Singleton's Amended and Restated Employment Agreement will provide that in consideration for his agreement to amend and restate his employment agreement and remain as Chairman and Chief Executive Officer of Reorganized AMI (as provided in the Amended and Restated Employment Agreement), Reorganized AMI will issue to him on the Effective Date warrants for shares of Class B New Common Stock (the "**Singleton Warrants**"). The Singleton Warrants will have the following material terms:

| | |
|---|---|
| Issuer: | Debtor |
| Expiration Date: | Five years from the Effective Date. |

---

[10]   Calculated based on standard market convention.

| | |
|---|---|
| Exercise Price: | An exercise price equal to the value per share representing a total equity value of Reorganized AMI equal to (w) 1.1 multiplied by (x) an amount equal to the pre-petition aggregate principal amount of the Senior Loans minus the aggregate principal amount of the New Senior Secured Term Loan divided by (y) 0.88 (as adjusted, to the extent less than the full 12% of the equity ownership of Reorganized AMI reserved for issuance pursuant to the Equity Incentive Plan has been issued at the time of exercise of the warrant, to reflect the equity ownership of Reorganized AMI at such time represented by the New Common Stock issued to the Senior Lenders on the Effective Date). |
| Amount: | 8%[11] |
| Exercisability: | Each warrant will entitle the holder thereof to purchase from the Debtor one fully paid and nonassessable share of Class B New Common Stock at a price equal to the Exercise Price. All or any of the warrants may be exercised prior to the Expiration Date by surrendering the related warrant certificates to the Company, accompanied by payment in full in respect of each warrant that is exercised. |
| Stockholders' Agreement: | Subject to the terms and conditions of the Stockholders' Agreement, including the transfer restrictions set forth therein. |
| Anti-dilution: | Customary adjustments for stock splits, stock dividends, mergers and stock reorganizations. |
| Governing Law: | State of New York. |

### E. Means for Implementation and Execution of the Prepackaged Plan

### 1. Corporate Action

Upon the occurrence of the Effective Date, all actions contemplated by the Prepackaged Plan shall be deemed authorized and approved in all respects, including (i) adoption or assumption, as applicable, of the agreements with existing management, (ii) selection of the directors and officers for the Reorganized Debtor, (iii) the issuance and distribution of the New Common Stock, (iv) the distribution of the Subordinated Note Warrants, (v) entry into the New Senior Credit Facility, (vi) the issuance of the New Senior Secured Term Notes, (vii) adoption of

---

[11] Calculated based on standard market convention.

the Incentive Bonus Agreements, (viii) entry into the Amended and Restated Employment Agreements, (ix) issuance of the warrants to be issued pursuant to Mr. Singleton's Amended and Restated Employment Agreement, (x) the adoption of the Restated Certificate of Incorporation and Restated Bylaws and (xi) all other actions contemplated by the Prepackaged Plan (whether to occur before or on the Effective Date). All matters provided for in the Prepackaged Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Prepackaged Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity security holders, directors or officers of the Debtor or the Reorganized Debtor. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Prepackaged Plan (or necessary or desirable to effect the transactions contemplated by the Prepackaged Plan) in the name of and on behalf of the Reorganized Debtor, including (x) the Subordinated Note Warrants, (y) the New Senior Secured Credit Agreement and the other New Senior Secured Credit Documents (including the New Senior Secured Term Notes to be issued pursuant thereto) and (z) any and all other agreements, documents, securities and instruments relating to the foregoing. Without limiting the foregoing, the Equity Incentive Plan shall be deemed to have been unanimously approved by the stockholders of Reorganized AMI pursuant to section 303 of the Delaware General Corporation Law.

### 2.     Restated Certificate of Incorporation and Restated Bylaws

The Restated Certificate of Incorporation and the Restated Bylaws shall be amended or deemed amended as may be required to be consistent with the provisions of the Prepackaged Plan and the Bankruptcy Code and will be satisfactory to the Senior Lender Steering Committee. The Restated Certificate of Incorporation will be amended or deemed amended to, among other purposes, (i) authorize the New Common Stock; and (ii) pursuant to section 1123(a)(6) of the Bankruptcy Code, add (a) a provision prohibiting the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code, and, if applicable, (b) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends. Any modification to the Restated Certificate of Incorporation as originally filed may be filed after the Confirmation Date and may become effective on or prior to the Effective Date. After the Effective Date, the Reorganized Debtor may file an amended and restated certificate of incorporation (or other formation documents, if applicable) with the Secretary of State in any appropriate jurisdiction.

Drafts of the Restated Certificate of Incorporation and the Restated Bylaws are attached to the Prepackaged Plan as <u>Plan Exhibits 8</u> and <u>7,</u> respectively.

### 3.     Plan Exhibits

The Plan Exhibits include drafts of the following documents:

1.     List of Guaranteeing Subsidiaries

    2.        Restated Certificate of Incorporation

    3.        Restated Bylaws

    4.        Stockholders' Agreement

The Plan Exhibits include term sheets for the following documents:

    1.        New Senior Secured Credit Facility

    2.        Subordinated Note Warrants

    3.        Singleton Warrants

    4.        Equity Incentive Plan

    5.        Amended and Restated Employment Agreements

    6.        Incentive Bonus Agreements

## 4.    Plan Supplements

The Plan Supplements, which will include a listing of directors and officers for the Reorganized Debtor and any amendments to the Plan Exhibits, will be filed with the clerk of the Bankruptcy Court at least seven (7) Business Days prior to the date of the commencement of the Confirmation Hearing. Upon such filing, all documents included in the Plan Supplements may be inspected in the office of the clerk of the Bankruptcy Court during normal business hours or may be accessed online at www.deb.uscourts.gov (cm/ecf) or http://chapter11.epiqsystems.com/.

## 5.    Board of Directors of Reorganized AMI

On the Effective Date, the operation of Reorganized AMI shall become the general responsibility of its Board, subject to, and in accordance with, the Restated Certificate of Incorporation, the Restated Bylaws and the Stockholders' Agreement. The Board shall initially be comprised of seven members. So long as any shares of Class A New Common Stock remain outstanding, the holders of Class A New Common Stock will elect four Class A Directors, and the holders of Class B New Common Stock will elect three Class B Directors. The identities of the initial Class A Directors, as designated by the holders of the Class A New Common Stock, and the initial Class B Directors, as designated by the Senior Lender Steering Committee, shall be disclosed in the Plan Supplements.

## 6.    Officers of Reorganized AMI

The individuals currently serving as the senior officers of AMI will continue to serve in the same capacities through and following the Effective Date subject to any changes disclosed in a Plan Supplement. After the Effective Date, the selection and removal of officers of Reorganized AMI shall be as provided in the respective Restated Certificate of Incorporation and Restated Bylaws or other organizational documents of Reorganized AMI.

### 7. New Senior Secured Credit Agreement

On the Effective Date, the New Senior Secured Credit Agreement, the New Senior Secured Term Notes and the New Senior Secured Credit Documents will be executed and delivered, and the Reorganized Debtor and the Guaranteeing Subsidiaries are authorized to issue the New Senior Secured Credit Documents without the need for any further corporate action and without further action by the holders of Claims or Equity Interests.

### 8. Issuance of New Common Stock

On the Effective Date, Class A New Common Stock shall be issued and distributed to Messrs. Singleton and Lodovic pursuant to the Amended and Restated Employment Agreements, and Class B New Common Stock and, if necessary Class C New Common Stock, shall be issued and distributed on behalf of Reorganized AMI to the holders of Allowed Senior Loan Claims. Each holder of a Claim that is entitled to receive a portion of the Senior Lender Common Stock Distribution pursuant to the Prepackaged Plan will be issued Class B New Common Stock, provided that any such holder will be entitled to receive all or a portion of its shares of the Senior Lender Common Stock Distribution in the form of Class C New Common Stock if such holder informs the Debtor of its intent to receive such Class C New Common Stock such date as will be announced by the Debtor in a filing on the Bankruptcy Court's docket.

### 9. Issuance of Subordinated Note Warrants

If Class 5 votes to accept the Prepackaged Plan, on the Effective Date, Subordinated Note Warrants will be issued and distributed on behalf of AMI to holders of Subordinated Note Claims and in all cases shall be governed by the Stockholders' Agreement.

### 10. Stockholders' Agreement

By their acceptance thereof, all Persons receiving New Common Stock and/or Subordinated Note Warrants pursuant to the Prepackaged Plan are deemed to be parties to and bound by the Stockholders' Agreement (including for this purpose any shares of New Common Stock issued upon the exercise of the Subordinated Note Warrants or shares of New Common Stock issued under the Equity Incentive Plan).

### 11. Cancellation of Agreements

On the Effective Date, the Senior Credit Agreement Documents and the Indentures shall be canceled and shall be of no further force and effect except as to obligations between parties other than the Debtor and its Affiliates.

### 12. Settlement, Compromise and Release of Guarantee Obligations.

By voting in favor of the Prepackaged Plan, Class 2 (the Senior Loan Claims), and each holder of a Claim in Class 2, agrees that the obligations, liabilities and claims arising under any and all (a) guarantees of the Guaranteeing Subsidiaries of obligations under the Senior Credit Agreement and (b) other agreements and obligations of the Guaranteeing Subsidiaries under Senior Credit Agreement Documents (collectively, the "**Guarantee Obligations**") shall be settled and compromised as provided in the next sentence (the "**Guarantor Settlement**"). The

Senior Lenders shall accept the distributions on account of the Senior Loan Claims and, in respect of the settlement of the Guarantee Obligations, the benefits conferred by the Guaranteeing Subsidiaries in the Guarantee Settlement, in full satisfaction, settlement, compromise, release, and discharge of and in exchange for all Claims arising under the Senior Credit Agreement Documents, including without limitation all such Claims against the Guaranteeing Subsidiaries, which Claims against the Guaranteeing Subsidiaries the Senior Lenders are releasing, settling and compromising hereby in exchange for, and subject to, (i) the execution by each of the Guaranteeing Subsidiaries of a guaranty of the New Senior Credit Facility in form and substance acceptable to the Administrative Agent and the Senior Lender Steering Committee as of the Effective Date, (ii) the settlement, compromise and release by the Debtor and the Guaranteeing Subsidiaries of all Claims and causes of action against the Senior Lenders and/or the Administrative Agent of and from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or thereafter arising, in law, equity, or otherwise, based in whole or in part upon any act, omission, transaction, event or other occurrence taking place before the Effective Date that relate to the Senior Credit Agreement and Senior Credit Agreement Documents (including the Forbearance Agreement and Restructuring Support Agreement) and the transactions contemplated thereby, and (iii) the granting by the Guaranteeing Subsidiaries of first priority Liens on substantially all property of the Guaranteeing Subsidiaries securing the guarantees referenced in subclause (i) of this sentence pursuant to security agreements in form and substance acceptable to the Administrative Agent and the Senior Lender Steering Committee.

### 13.     Surrender of Existing Securities

If Class 5 votes to accept the Prepackaged Plan and therefore holders of Subordinated Note Claims receive Subordinated Note Warrants under the terms of the Prepackaged Plan, each holder of a Subordinated Note Claim shall surrender its note(s) to the Indenture Trustee or in the event such note(s) are held in the name of or by a nominee of The Depository Trust Company, the Reorganized Debtor shall seek the cooperation of The Depository Trust Company to provide appropriate instructions to the Indenture Trustee.  No distributions under the Prepackaged Plan shall be made for or on behalf of such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from The Depository Trust Company shall be received by the Indenture Trustee or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee as applicable, which satisfaction may require such holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtor, the Reorganized Debtor, and the Indenture Trustee harmless in respect of such note and any distributions made on account thereof.  Upon compliance with Section 6.8 of the Prepackaged Plan by a holder of any note, such holder shall, for all purposes under the Prepackaged Plan, be deemed to have surrendered such note.  Any holder that fails to surrender such note or to satisfactorily explain its non-availability to the Indenture Trustee within one (1) year after the Effective Date shall be deemed to have no further Claim against the Debtor and the Reorganized Debtor (or its property) or the Indenture Trustee in respect of such Claim and shall not participate in any distribution under the Prepackaged Plan.  The Indenture Trustee shall promptly return all property in respect of such forfeited distributions, including interest thereon, to the Reorganized Debtor and any such security shall be canceled.  In the event that Class 5

votes to reject the Prepackaged Plan, the notes representing the Subordinated Debt shall be canceled and extinguished, and be of no further force and effect pursuant to Section 4.5(b) of the Prepackaged Plan. Such canceled notes shall be worthless, and neither Reorganized AMI nor any of its Affiliates shall have any obligations whatsoever under such notes.

14. **Cancellation of the Senior Credit Agreement, Subordinated Notes and Equity Interests**

On the Effective Date, except to the extent otherwise provided herein, all notes, instruments, certificates and other documents evidencing (a) the Senior Credit Agreement, (b) the 6 3/8% Notes, (c) the 6 7/8% Notes and (d) the Equity Interests shall be canceled, and the obligations of the Debtor thereunder and in any way related thereto shall be fully satisfied, released and discharged; _provided_, _however_, that such cancellation shall not itself alter the obligations or rights of any third parties, including but not limited to rights to indemnification and to seek contribution, other than the Debtor and its Affiliates vis-à-vis one another with respect to such notes, instruments, certificates or other documents. On the Effective Date, except to the extent otherwise provided in the Prepackaged Plan, the Senior Credit Agreement Documents, the Indentures and any similar agreements relating to any of the foregoing, including, without limitation, any related note, guaranty or similar instrument of the Debtor shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and discharged (i) with respect to all obligations owed by the Debtor under any such agreement and (ii) except to the extent provided herein below, with respect to the respective rights and obligations of the Administrative Agent under the Senior Credit Agreement Documents against the holders of the Senior Loan Claims and the Indenture Trustee under the Indentures against the holders of Subordinated Note Claims. Solely for the purpose of clause (ii) in the immediately preceding sentence, only the following rights of the Administrative Agent and the Indenture Trustee shall remain in effect after the Effective Date: (1) rights relating to representation of the interests in the Reorganization Case to the extent not discharged or released by the Prepackaged Plan or any order of the Bankruptcy Court of the holders of the Senior Loan Claims by the Administrative Agent in the Reorganization Case or of the holders of the 6 3/8% Notes or the 6 7/8% Notes by the Indenture Trustee and (2) rights relating to participation by the Administrative Agent or Indenture Trustee in proceedings and appeals related to the Prepackaged Plan. Notwithstanding the continued effectiveness of such rights after the Effective Date, the Administrative Agent and the Indenture Trustee shall have no obligation to object to Claims against the Debtor and the Indenture Trustee shall have no obligation to locate certificated holders of the 6 3/8% Notes or the 6 7/8% Notes who fail to surrender the 6 3/8% Notes and/or the 6 7/8% Notes in accordance with Section 6.8 of the Prepackaged Plan.

F. **Equity Incentive Plan**

On the Effective Date, Reorganized AMI shall establish the Equity Incentive Plan, which will go into effect on the Effective Date and shall provide for the issuance to certain members of management of Reorganized AMI of Equity Interests in Reorganized AMI.

The Equity Incentive Plan will be an omnibus equity plan providing for the grant, after the Effective Date, of restricted stock units, restricted shares, stock options, and stock appreciation rights and other equity-like incentives covering shares of Class B New Common Stock of Reorganized AMI and representing up to 12% of the issued and outstanding shares of

New Common Stock of Reorganized AMI, including for such purpose the shares reserved for issuance under the Equity Incentive Plan (without giving effect to the possible exercise of any of the Subordinated Note Warrants or the Singleton Warrants). Any grants thereunder after the Effective Date (or any new equity incentive plan) will be subject to approval by a majority of the Class B Directors.

The initial grants shall be grants of restricted stock units (or restricted shares), with the following terms:

**1.    Amount**

- Mr. Singleton and Mr. Lodovic, in the aggregate:    approximately 9%

- Other senior management:    approximately 2%

- The remaining shares authorized under the Prepackaged Plan are available for future senior management grants (including but not limited to new hires), subject to the approval of a majority of the Class B Directors.

**2.    Dividend and Other Rights**

- Restricted stock units will be entitled to receive dividend equivalents, whether or not vested, and will have voting rights.

- Restricted shares will, unless and until forfeited, have voting and dividend rights, whether or not vested, and recipients of restricted shares may make an election under section 83(b) of the Tax Code in connection with their grants.

**3.    Vesting**

- 50% of each grant shall vest in equal annual installments over a three-year period commencing on the Effective Date.

- 50% of each grant shall vest in equal annual installments over a three-year period, commencing on July 1, 2010 subject in each instance to achievement of EBITDA performance targets.

- In general, upon an employment termination without cause or resignation for good reason, the award holder shall retain any already vested restricted stock units (or shares), plus the vesting of any time-vested restricted stock units (or shares) will be accelerated, but any unvested performance-vested restricted stock units (or shares) shall be forfeited. However, solely in the case of Messrs. Singleton and Lodovic, (i) upon a termination without cause or resignation for good reason, if a performance target for the year of employment termination is met, he shall vest in a pro rata portion of award based on the number of days in the year of termination (and, to the extent the cumulative target is met for such year, he shall vest in the performance vested units (or shares) allocable to any prior year that had not previously vested), and (ii) good reason shall include a resignation within two

months after the conversion of all of the outstanding shares of Class A New Common Stock into Class B New Common Stock.

- Upon a resignation without good reason or termination of employment for cause, all unvested restricted stock units (or shares) are forfeited.

- Upon a change of control of Reorganized AMI or a Qualified Public Offering, in each case subject to the transaction demonstrating a benchmark level of value for the holders of the Senior Lender Common Stock Distribution, all unvested restricted stock units (or shares) shall vest.

**4. Repurchase Rights**

- Upon termination for cause, all vested shares are subject to a call by Reorganized AMI at the lesser of cost or fair market value, with the call notice to be provided within 180 days after such employment termination and the call to be consummated within 60 days after the notice is given.  If an employee's termination is by reason of death, disability, termination without cause or resignation (with or without good reason), all vested shares are subject to a call by Reorganized AMI at fair market value, with the call notice to be provided within 180 days of employment termination and the call to be consummated within 60 days after the notice is given.

- Award holders do not have a put right but are entitled to customary tag-along rights.

A term sheet setting forth the material terms of the Equity Incentive Plan is attached to the Prepackaged Plan as <u>Plan Exhibit 2</u>.

**G. Incentive Bonus Agreements**

On the Effective Date, the Reorganized Debtor will enter into the Incentive Bonus Agreements with approximately 50 key employees (excluding Mr. Singleton and Mr. Lodovic) that provide for payment of bonuses of $1.6 million in the aggregate.

The purpose of the Incentive Bonus Agreements is to encourage continued performance and contributions to AMI, Reorganized AMI and its Subsidiaries on the part of the members of Reorganized AMI's management team.

Each Incentive Bonus Agreement, as well as the Prepackaged Plan, provides that the bonus amount is payable in two equal installments.  The first installment becomes payable on the day after the Effective Date and the second installment is paid one year later.  An employee must remain employed as of each payment date in order to be entitled to payment; <u>provided</u>, <u>however</u>, that any portion of the bonus that has not been paid at the time of an employment termination without cause shall be paid not later than March 15 of the year following the year of such termination.

The Incentive Bonus Agreements are not funded and the assets used to pay the bonuses are subject to the general claims of creditors. Nothing contained in an Incentive Bonus Agreement is intended to provide a guarantee or assurance of continued service by the participant. Certain of the Debtor's Subsidiaries have agreed to be jointly and severally liable for the obligations under the Incentive Bonus Agreements in the event the Debtor is unable to pay.

A term sheet setting forth the material terms of the Incentive Bonus Agreements is attached to the Prepackaged Plan as Plan Exhibit 4.

## H. Amended and Restated Employment Agreements

On the Effective Date, Reorganized AMI will enter into the Amended and Restated Employment Agreements, and they will become effective immediately.

### 1. Amended and Restated Employment Agreement by and between AMI and William Dean Singleton (the "Singleton Agreement")

The Singleton Agreement will have a term ending June 30, 2013 and will automatically renew for additional one-year terms absent notice to the contrary by either party. It will provide for a base salary of $634,000 (in addition to a base salary of $360,000 with annual 5% cost of living adjustments which he is entitled to receive under a separate employment agreement with DPC), a grant under the Equity Incentive Plan of restricted stock units (or restricted shares) of Class B New Common Stock representing approximately 6% of Reorganized AMI's outstanding New Common Stock as of the Effective Date, and warrants to purchase shares of Class B New Common Stock representing approximately 8% of Reorganized AMI's outstanding New Common Stock (before giving effect to any exercise of Subordinated Note Warrants or the Singleton Warrants). Mr. Singleton is entitled under the Singleton Agreement to those benefits that are generally made available to executive personnel of Reorganized AMI and to annual payments to defray the cost of term life insurance that currently has an annual premium of approximately $50,000. Under the Singleton Agreement, Mr. Singleton will serve as Chairman of the Board and as Chief Executive Officer of Reorganized AMI and is eligible for an annual bonus of up to $500,000, depending on actual attainment of performance targets.

Mr. Singleton will also be subject to a noncompetition agreement that survives until one year after his employment termination.

Upon his employment termination by Reorganized AMI without cause or resignation by him for good reason (as defined in the Singleton Agreement), Mr. Singleton will be entitled to his base salary and certain of his benefits for the remainder of his employment term plus one year and his annual bonus (to the extent the applicable performance criteria are attained) for the year of employment termination. Upon his employment termination due to non-renewal of the Singleton Agreement by AMI, Mr. Singleton shall be entitled to his base salary and certain of his benefits for one year.

Mr. Singleton will also be entitled to indemnification and liability insurance coverage with respect to any claims arising as a result of his duties, responsibilities or positions held with Reorganized AMI.

2.   **Amended and Restated Employment Agreement by and between Reorganized AMI and Joseph J. Lodovic, IV (the "Lodovic Agreement")**

The Lodovic Agreement will have a term ending June 30, 2013 and will automatically renew for additional one-year terms absent notice to the contrary by either party. It provides for a base salary of $1,006,000 and a grant of restricted stock units (or restricted shares) of Reorganized AMI's Class B New Common Stock representing approximately 3% of Reorganized AMI's outstanding New Common Stock. Mr. Lodovic will be entitled to those benefits that are generally made available to executive personnel of Reorganized AMI. Mr. Lodovic will serve as President of Reorganized AMI and be eligible for an annual bonus of up to $500,000, depending on actual attainment of performance targets. Mr. Lodovic will also be entitled to a special transaction and incentive bonus consisting of (i) $250,000 (which has already been earned) for the successful restructuring of The Denver Newspapers Agency LLC, (ii) an additional $250,000 (which has already been earned) for the commencement of the Solicitation on or prior to December 18, 2009 and (iii) an additional (A) $250,000, which shall have been earned if a Lender Class Accepted Plan (as defined in the Restructuring Support Agreement) is confirmed on or prior to March 31, 2010 and is consummated on or before April 14, 2010, or (B) $125,000 if such conditions are not met but such a plan is confirmed by the Bankruptcy Court by April 30, 2010 and is consummated on or before May 14, 2010, each of which is payable 50% on the Effective Date and 50% on the first anniversary of the Effective Date.

Mr. Lodovic will also be subject to a noncompetition agreement that survives until one year after his employment termination.

Upon his employment termination by Reorganized AMI without cause or resignation by him for good reason (as defined in the Lodovic Agreement), Mr. Lodovic shall be entitled to his base salary and certain of his benefits for the remainder of his employment term plus one year and his annual bonus (to the extent the applicable performance criteria are attained) for the year of employment termination. Upon his employment termination due to nonrenewal of the Lodovic Agreement by AMI, Mr. Lodovic shall be entitled to his base salary and certain of his benefits for one year.

Mr. Lodovic will also be entitled to indemnification and liability insurance coverage with respect to any claims arising as a result of his duties, responsibilities or positions held with Reorganized AMI.

A term sheet setting forth the material terms of the Singleton Agreement and the Lodovic Agreement is attached to the Prepackaged Plan as <u>Plan Exhibit 1</u>.

I.   **Existing Liens**

Except as otherwise provided in this Disclosure Statement or in the Prepackaged Plan, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall continue in effect notwithstanding the occurrence of the Effective Date. Any Liens on assets of AMI securing obligations of AMI and the Guaranteeing Subsidiaries under the Senior Credit Agreement and Senior Credit Agreement Documents shall continue in effect securing obligations

under the New Senior Secured Credit Agreement and other New Senior Secured Credit Documents.

### J. Compromise of Controversies

In consideration for the distributions and other benefits provided under the Prepackaged Plan, the provisions of the Prepackaged Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Prepackaged Plan, including the Claims and controversies resolved by the Guarantor Settlement, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019.

### K. Effectuating Documents; Further Transactions

The chief executive officer, the president, the chief financial officer, the general counsel or any other appropriate officer of the Debtor or of the Reorganized Debtor, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Prepackaged Plan. The secretary or assistant secretary of the Debtor or the Reorganized Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

### L. Certain Actions Relating to FCC Broadcast Licenses

In connection with consummation of the Prepackaged Plan, certain FCC approvals must be obtained. The ownership, operation, assignment and transfer of control of the FCC Licenses are subject to the jurisdiction of the FCC, which acts under authority granted by the Communications Act. No Person, including the Debtor, may lawfully operate a television or radio broadcast station in the United States except pursuant to a valid station license issued by the FCC. Among other things, the FCC issues, renews and modifies station licenses; determines whether to approve changes in ownership or control of station licenses; adopts and implements regulations and policies that directly or indirectly affect the ownership and operation of stations; and has the power to impose penalties, including license revocations, for violations of its rules or the Communications Act.

The filing by the Debtor of a petition to reorganize under chapter 11 of the Bankruptcy Code will constitute, for FCC purposes, an involuntary transfer of the FCC Broadcast Licenses held by Alaska Broadcasting and Graham Newspapers from control by AMI to control by AMI as debtor-in-possession, and also a transfer of control of the FCC Non-Broadcast Licenses, all of which transfers require FCC consent and approval. Promptly after commencement of the Reorganization Case, the Debtor will use abbreviated FCC procedures to seek approval of such transfer of control of the FCC Broadcast Licenses held by Alaska Broadcasting and Graham Newspapers and also the FCC Non-Broadcast Licenses.

The emergence of the Reorganized Debtor from chapter 11 bankruptcy will also require the consent of the FCC to the transfer of control of the FCC Non-Broadcast Licenses from the Debtor as debtor-in-possession to the Reorganized Debtor (to the extent that the Reorganized Debtor seeks to retain those licenses). With respect to the FCC Broadcast Licenses, the

Prepackaged Plan provides for expediting Debtor's emergence from bankruptcy through the establishment of the FCC Trust to hold the FCC Broadcast Licenses. Soon after the commencement of the Reorganization Case, the Debtor will seek the FCC Trust Order from the Bankruptcy Court and file a short-form application with the FCC seeking approval of the involuntary assignment of the FCC Broadcast Licenses from the Debtor's broadcasting Subsidiaries to the Debtor as debtor-in-possession, and then immediately to the FCC Trust pursuant to the Prepackaged Plan to act as an interim holder of the FCC Broadcast Licenses and certain related assets pending their final disposition.

Pursuant to a separate order of the Bankruptcy Court, the Debtor will establish the FCC Trust subject to the FCC Trust Agreement by and among the Debtor and the trustees of the FCC Trust. The FCC Trust will be established for the benefit of the holders of the beneficial interests in the FCC Trust and will be subject to the jurisdiction of the Bankruptcy Court. The powers, authority, responsibilities, and duties of the FCC Trust and the trustees are set forth in and shall be governed by the FCC Trust Agreement. The FCC Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances. The FCC Trust and its trustees, including any successors, shall be bound by the Prepackaged Plan and shall not challenge any provision of the Prepackaged Plan.

A majority of the current members of AMI's board of directors will act as trustees of the FCC Trust. Pending ultimate disposition of the broadcast related assets, however, certain of the economic benefits and burdens of the Broadcast Operations will remain with the Debtor (and following its emergence from bankruptcy, with Reorganized AMI) although control of the Broadcast Operations will be vested solely in the FCC Trust. Concurrent with the assignment of the FCC Broadcast Licenses and those associated assets to the FCC Trust, Alaska Broadcasting and Graham Newspapers, on the one hand, and the FCC Trust, on the other, shall enter into "Time Brokerage Agreements" which will permit AMI, through its Subsidiaries, to provide certain programming and related services for the Broadcast Operations, subject to the oversight and ultimate control of the Trustees of the FCC Trust pending final disposition of the FCC Broadcast Licenses and FCC Broadcast License-Related Assets, thereby avoiding disruption of service to the public and preserving the value of these assets as part of an ongoing business. Pursuant to the Prepackaged Plan, the Bankruptcy Court shall retain jurisdiction over the FCC Trust after the Effective Date.

The short-form applications shall be filed with the FCC as promptly as possible after filing the Prepackaged Plan. The Debtor shall use its best efforts to cooperate in diligently pursuing and in taking all steps necessary to obtain the grant of the requisite short-form applications and shall provide such additional documents or information requested or needed by the FCC in connection with its review of such applications. For a complete description of the FCC application approval process, see "Risks Related to FCC Approval Requirements In Connection With Emergence From Bankruptcy," Section VIII.D. below.

## VI.    PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Date of Distributions on Account of Allowed Claims

Unless otherwise provided herein, any distributions and deliveries to be made under the Prepackaged Plan shall be made on the Effective Date or as soon as practicable thereafter. In the

event that any payment or act under the Prepackaged Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### B. Sources of Cash for Plan Distribution

Except as otherwise provided in the Prepackaged Plan or Confirmation Order, all Cash required for the payments to be made thereunder shall be obtained from the Debtor's and the Reorganized Debtor's operations and Cash on hand.

### C. Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Reorganized Debtor by the holder of the Allowed Claim to whom such check was originally issued. Any Claim in respect of such a voided check shall be made on or before the first anniversary of the date on which such distribution or payment was made. If no Claim is made as provided in the preceding sentence, all Claims in respect of void checks shall be discharged and forever barred and such unclaimed distributions shall revert to the Reorganized Debtor, notwithstanding any federal or state escheat laws to the contrary.

### D. Disbursement Agent

Reorganized AMI, as Disbursement Agent, or such other Person designated by Reorganized AMI as a Disbursement Agent, shall make all distributions under the Prepackaged Plan on the Effective Date. A Disbursement Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### E. Record Date for Distributions

Distributions shall only be made to the record holders of Allowed Claims as of the Confirmation Date. On the Confirmation Date, at the close of business for the relevant register, all registers maintained by AMI and Reorganized AMI, and each of their respective agents, successors and assigns, shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Prepackaged Plan. AMI and Reorganized AMI, and all of their respective agents, successors and assigns shall have no obligation to recognize, for purposes of distributions pursuant to or in any way arising from the Prepackaged Plan (or for any other purpose), any Claims that are transferred after the Confirmation Date. Instead, they shall be entitled to recognize only those record holders set forth in the registers as of the Confirmation Date, irrespective of the number of distributions made under the Prepackaged Plan or the date of such distributions. Furthermore, if a Claim is transferred twenty (20) or fewer calendar days before the Confirmation Date, the Disbursement Agent shall make distributions to the transferee only if the transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

If any dispute arises as to the identity of a holder of an Allowed Claim that is entitled to receive a distribution pursuant to the Prepackaged Plan, the Disbursement Agent or the servicers, as applicable, may, in lieu of making such distribution to such Person, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

### F.    Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to holders of Allowed Claims shall be made at the address of such holder as set forth in the books and records of the Debtor.  In the event that any distribution to any holder is returned as undeliverable, the Disbursement Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursement Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtor and the Claim of any other holder to such property or interest in property shall be discharged and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.

### G.    Subordinated Note Claims and Senior Loan Claims

(a)    The Indenture Trustee shall be deemed to be the holder of all Subordinated Note Claims for purposes of distributions to be made under the Prepackaged Plan, and all distributions on account of such notes shall be made to or on behalf of the Indenture Trustee.  The Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Subordinated Note Claims.  As soon as practicable following compliance with the requirements set forth in Section 6.8 of the Prepackaged Plan, the Indenture Trustee shall arrange to deliver such distributions to or on behalf of such noteholders.

(b)    For purposes of distributions to be made under the Prepackaged Plan, all distributions on account of the Senior Loan Claims shall be made at the direction of the Administrative Agent in accordance with the Senior Credit Agreement Documents and shall be distributed by the Debtor.

### H.    Manner of Cash Payments Under Prepackaged Plan

At Reorganized AMI's option, any Cash payment to be made under the Prepackaged Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements, or as agreed by Reorganized AMI and the claimant.

### I.    Fractional Shares

No fractional shares of New Common Stock or Subordinated Note Warrants shall be distributed and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Prepackaged Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock or Subordinated Note

Warrants that is not a whole number, the actual distribution of shares of New Common Stock or Subordinated Note Warrants shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Common Stock and number of Subordinated Note Warrants to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

### J.        Setoffs and Recoupment

Except with respect to the Senior Loan Claims and otherwise as provided in the Prepackaged Plan, the Debtor may, but shall not be required to, set off against or recoup from any Claim or Claims of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the Prepackaged Plan shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such Claim it may have against such claimant.

### K.        Exemption from Securities Law

The issuance of the New Common Stock, the Subordinated Note Warrants (and the New Common Stock for which such Subordinated Note Warrants are exercisable), the New Senior Secured Term Notes (if applicable, including any guarantees issued in connection therewith), and any other securities issued pursuant to the Prepackaged Plan and any subsequent sales, resales or transfers, or other distributions of any such securities shall be exempt from any federal or state securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

### L.        Allocation of Payments

In the case of distributions with respect to Claims pursuant to the Prepackaged Plan, other than the Senior Lender Emergence Payment, the amount of any Cash and the fair market value of any other consideration received by the holder of such Claim will be allocable first to the principal amount of such Claim (as determined for federal income tax purposes) and then, to the extent of any excess, the remainder of the Claim.

### M.        No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Prepackaged Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

### N.        Treatment of Executory Contracts and Unexpired Leases

On the Effective Date, the Debtor shall assume each executory contract and unexpired lease to which it is a party pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such contract or lease (i) previously expired or terminated pursuant to its own terms or by agreement of the Parties, (ii) is the subject of a motion to reject filed by the Debtor on or before

the Confirmation Date or (iii) is set forth in a schedule as an executory contract or unexpired lease to be rejected, if any, filed by the Debtor as part of a Plan Supplement. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, subject to the occurrence of the Effective Date.

To the extent applicable, all executory contracts of the Reorganized Debtor assumed pursuant to the Prepackaged Plan shall be deemed modified such that the transactions contemplated by the Prepackaged Plan shall not be a "change of control," however such term may be defined in the relevant executory contract, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Prepackaged Plan, and all executory contracts assumed pursuant to the Prepackaged Plan shall be assumed notwithstanding any provisions therein that purport to modify AMI's rights, or the rights of any Affiliate of AMI, thereunder as a result of AMI's commencement of the Reorganization Case.

Each executory contract assumed pursuant to the Prepackaged Plan (or pursuant to other Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Prepackaged Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

In the event that any license granted to the Debtor by a governmental unit, and in effect immediately prior to the Effective Date, is considered to be an executory contract and is not otherwise terminated or rejected by the Debtor, such license shall be deemed to be assumed pursuant to section 365 of the Bankruptcy Code under the Prepackaged Plan; provided, however, that the assumption of the licenses issued by the FCC shall be subject to compliance with the rules and regulations of the FCC.

Any monetary amounts required as Cure payments on each executory contract and unexpired lease to be assumed pursuant to the Prepackaged Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or upon such other terms and dates as the parties to such executory contracts or unexpired leases otherwise may agree. If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute.

**Through the Prepackaged Plan and this Disclosure Statement, the Debtor is giving notice that the Cure amounts for each such contract and lease shall be zero dollars unless noticed on a schedule filed by the Debtor thereafter.**

All Claims arising out of the rejection of executory contracts and unexpired leases must be served upon the Debtor and its counsel within thirty (30) days after the date of entry of an order of the Bankruptcy Court approving such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Debtor, its Estate, and its property.

Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, or as otherwise provided in the Prepackaged Plan, all benefits subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed under the Prepackaged Plan.  On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, Reorganized Debtor shall continue to pay all retiree benefits (within the meaning of, and subject to the limitations of, section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtor has obligated itself to provide such benefits.  Nothing herein shall: (a) restrict the Debtor's or Reorganized Debtor's right to modify the terms and conditions of the retiree benefits (including without limitation, the Debtor's or Reorganized Debtor's right of termination and amendment thereunder), as otherwise permitted pursuant to the terms of the applicable plans, non-bankruptcy law, or section 1114(m) of the Bankruptcy Code; or (b) be construed as an admission that any such retiree benefits are owed by the Debtor or Reorganized Debtor.

Pursuant to the Prepackaged Plan, Reorganized Debtor shall continue after the Effective Date, the Pension Plans, each of which is a qualified defined benefit pension plan covered by ERISA, maintained by the Debtor, in accordance with the terms of each such Pension Plan.  As part of the continuation of each of the Pension Plans, Reorganized Debtor shall meet the minimum funding standards under ERISA and the Tax Code, pay all insurance premiums owed to the PBGC, and administer and operate each Pension Plan in accordance with its terms and ERISA and the Tax Code.  Nothing in the Prepackaged Plan is intended to release or discharge any statutory liability or obligation of the Debtor or Reorganized Debtor with respect to the PBGC or any of the Pension Plans.  Neither the PBGC nor any of the Pension Plans shall be enjoined or precluded from enforcing such liability as a result of the Prepackaged Plan.

The MediaNews Group SERP, a non-qualified deferred compensation plan maintained by the Debtor, and the Debtor's company owned life insurance policies and any agreements, documents or instruments relating thereto, shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed.

As of the Effective Date, any and all equity-based plans of the Debtor entered into before the Effective Date (including, without limitation the MediaNews Group, Inc. Career RSU Plan and any stock option plans), and any other agreements or documents relating to such plans, shall be terminated.  To the extent that such plans, agreements, or documents are considered to be executory contracts, such plans, agreements or documents shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to section 365 of the Bankruptcy Code under the Prepackaged Plan.

Reorganized AMI shall continue, in accordance with its ordinary course of business, after the Effective Date, to provide and administer (i) payroll services for the benefit of its employees and the employees of its subsidiaries and affiliates and (ii) Benefit Plans (subject to the terms of such Benefit Plans and as they may be amended and/or terminated from time to time).

## O.    Conditions Precedent to Effective Date

The occurrence of the Effective Date of the Prepackaged Plan is subject to satisfaction of the following conditions precedent:

### 1.    Confirmation Order

The clerk of the Bankruptcy Court shall have entered the Confirmation Order in the Debtor's Reorganization Case and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto. The Confirmation Order shall be in form and substance reasonably satisfactory to both the Administrative Agent and the Debtor.

### 2.    Execution and Delivery of Other Documents

All other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Prepackaged Plan, including the Plan Documents, shall have been, in each case, approved by the Senior Lender Steering Committee in its sole discretion and effected, duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived in accordance with their respective terms.

### 3.    Corporate Formalities

The Restated Certificate of Incorporation shall be filed with the Secretary of State of the State of Delaware contemporaneously with the Effective Date.

### 4.    FCC Matters

Either, (i) (A) the FCC Trust shall have been established, approval by the Bankruptcy Court and the FCC of the assignment of the FCC Broadcast Licenses and FCC Broadcast License Related Assets to the FCC Trust shall have been received and such assignments shall have been effectuated; (B) the Time Brokerage Agreements shall be in effect and (C) approval by the FCC of the applications, if any, for the transfer of control of the FCC Non-Broadcast Licenses from AMI (as debtor-in-possession) to Reorganized AMI shall have been received or (ii) other steps reasonably acceptable to the Senior Lender Steering Committee shall have been taken to comply with any applicable FCC requirements and regulations.

### 5.    Other Acts

Any other actions the Debtor, in consultation with the Senior Lender Steering Committee, determines are necessary to implement the terms of the Prepackaged Plan shall have been taken.

### 6.    AMI Waiver of Conditions Precedent

Each of the conditions precedent in Section 9.1 of the Prepackaged Plan (except for Section 9.1(a)) may be waived, in whole or in part, by the Debtor, with approval of the Senior Lender Steering Committee, without notice or order of the Bankruptcy Court.

### 7. Reservation of Rights

The Prepackaged Plan shall have no force or effect unless and until the Effective Date. Prior to the Effective Date, none of the filing of the Prepackaged Plan, any statement or provision contained in the Prepackaged Plan or action taken by the Debtor with respect to the Prepackaged Plan shall be, or shall be deemed to be, an admission or waiver of any rights of the Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

### 8. Substantial Consummation

Substantial consummation of the Prepackaged Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

### P. Effect of Confirmation

### 1. Vesting of Assets

Except as otherwise provided in the Prepackaged Plan, on the Effective Date all property comprising the Estate shall revest in the Debtor and, ultimately, in the Reorganized Debtor, free and clear of all Liens, Claims and Equity Interests (other than as expressly provided in the Prepackaged Plan). Except as otherwise provided in the Prepackaged Plan, the Debtor, as the Reorganized Debtor, shall continue to exist on and after the Effective Date as a separate Person with all of the powers available to such Person under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law. On and after the Effective Date, the Reorganized Debtor shall be authorized to operate its businesses, and to use, acquire or dispose of assets without supervision or approval by the Bankruptcy Court, and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### 2. Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Prepackaged Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Prepackaged Plan and whether or not such holder has accepted the Prepackaged Plan.

### 3. Settlements, Releases and Discharges

The settlements, releases and discharges of Claims and Causes of Action described in the Prepackaged Plan, including releases by the Debtor and by holders of Claims, constitute good faith compromises and settlements of the matters covered thereby and are consensual. Such compromises and settlements are made in exchange for consideration and are in the best interest of holders of Claims, are fair, equitable, reasonable and are integral elements of the resolution of the Reorganization Case in accordance with the Prepackaged Plan. Each of the discharge, release, indemnification and exculpation provisions set forth in the Prepackaged Plan (a) is within the jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b) and 1334(d) of

title 28 of the United States Code, (b) is an essential means of implementing the Prepackaged Plan pursuant to section 1123(a)(5) of the Bankruptcy Code, (c) is an integral element of the transactions incorporated into the Prepackaged Plan, (d) confers material benefit on, and is in the best interests of, the Debtor, its Estate and its creditors, (e) is important to the overall objective of the Prepackaged Plan to finally resolve all Claims among or against the parties-in-interest in the Reorganization Case with respect to the Debtor and (f) is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

### 4.  Discharge of the Debtor

Except to the extent otherwise provided in the Prepackaged Plan or the Confirmation Order, the treatment of all Claims against or Equity Interests in the Debtor under the Prepackaged Plan shall be in exchange for and in complete satisfaction, discharge and release of, all Claims against or Equity Interests in the Debtor of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon (other than the Senior Loan Non-Principal Claim and subject to payment in full of the Senior Lender Emergence Payment) from and after the Petition Date, or against its Estate or properties or interests in property.  Except as otherwise provided in the Prepackaged Plan or the Confirmation Order, upon the Effective Date, all Claims against and Equity Interests in the Debtor shall be satisfied, discharged and released in full exchange for the consideration provided under the Prepackaged Plan.  Except as otherwise provided in the Prepackaged Plan or the Confirmation Order or under the terms of the documents evidencing the New Senior Credit Facility, all Persons shall be precluded from asserting against the Debtor, the Reorganized Debtor, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date and from asserting against the Guaranteeing Subsidiaries any Claim under the Senior Credit Agreement Documents.  In accordance with the foregoing, except as provided in the Prepackaged Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other debts and liabilities of the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtor or the Reorganized Debtor at any time, to the extent such judgment is related to a discharged Claim.

### 5.  Exculpation

To the extent permitted by applicable law and approved by the Bankruptcy Court, the Released Parties shall not have any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, or arising out of, the negotiation of the Restructuring Support Agreement, the negotiation and the pursuit of approval of this Disclosure Statement, the Prepackaged Plan or the solicitation of votes for, or confirmation of, the Prepackaged Plan, the funding of the Prepackaged Plan, the consummation of the Prepackaged Plan, or the administration of the Prepackaged Plan (except for any liability that results from willful misconduct as determined by a Final Order) or the property to be distributed under the Prepackaged Plan and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Prepackaged Plan.

### 6. Releases By the Debtor and its Estate

Except for the right to enforce the Prepackaged Plan, the Debtor shall, on its own behalf and on behalf of its Estate, effective upon the occurrence of the Effective Date, be deemed to forever release, waive and discharge the Released Parties (except the Guaranteeing Subsidiaries) of and from any and all Claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise. Such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Party in respect of any express contractual obligation of any such party effective from and after the Effective Date, provided that no Person who votes to reject the Prepackaged Plan will receive the benefit of a release. On the Effective Date, each Guaranteeing Subsidiary will provide each holder of a Senior Loan Claim and the Administrative Agent a release of such scope in partial consideration for the Guarantor Settlement contemplated hereby.

### 7. Consensual Releases By Holders of Claims and Equity Interests

Except for the right to enforce the Prepackaged Plan, each Person who votes to accept the Prepackaged Plan shall be deemed to forever release, waive and discharge the Released Parties, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise. Except as otherwise provided in the Prepackaged Plan, upon the Effective Date, all such holders of Claims and Equity Interests and their affiliates shall be forever precluded and enjoined from prosecuting or asserting any such discharged Claim against, or terminated Equity Interest in, the Debtor or any Affiliates, including any Guaranteeing Subsidiary. Notwithstanding the foregoing, in the event that the Prepackaged Plan is not confirmed, no party shall be deemed to have released or shall release any claims or be released hereby. Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Party in respect of any express contractual obligation of any such Released Party incurred in connection with the Prepackaged Plan or, except as provided in Sections 10.6, 10.7, and 10.8 of the Prepackaged Plan with respect to the Guaranteeing Subsidiaries, of any express contractual obligation of any non-Debtor party due to any other non-Debtor party.

### 8. Settlement and Compromise Among Debtor, the Guaranteeing Subsidiaries and Administrative Agent

On the Effective Date, all holders of Senior Loan Claims shall be deemed to have granted a release to the Guaranteeing Subsidiaries and to have released the Administrative Agent from any claims arising therefrom or in connection therewith, and the Guaranteeing Subsidiaries shall be unconditionally relieved from any liability under the Senior Credit Agreement Documents or in connection with the Senior Loan Claims; provided that such release is dependent upon and only effective upon (i) the execution by each of the Guaranteeing Subsidiaries of a guaranty of

the New Senior Credit Facility in form and substance acceptable to the Administrative Agent as of the Effective Date, (ii) the settlement, compromise and release by the Debtor and the Guaranteeing Subsidiaries of all Claims and Causes of Action against the Senior Lenders and/or the Administrative Agent of and from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or thereafter arising, in law, equity, or otherwise, based in whole or in part upon any act, omission, transaction, event or other occurrence taking place before the Effective Date that relate to the Senior Credit Agreement and Senior Credit Agreement Documents (including the Forbearance Agreement and Restructuring Support Agreement ) and the transactions contemplated thereby, and (iii) the granting by the Guaranteeing Subsidiaries of first priority Liens on substantially all property of the Guaranteeing Subsidiaries securing the guarantees referenced in subclause (i) of this sentence pursuant to security agreements in form and substance acceptable to the Administrative Agent.

Pursuant to Bankruptcy Rule 9019, the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of the good faith settlement and compromise of the claims among the Debtor, the Guaranteeing Subsidiaries, and the Administrative Agent embodied in the Prepackaged Plan, which approval shall be based on factual findings included in the Confirmation Order that such settlement and compromise is: (1) fair, equitable and reasonable; (2) necessary and essential to the Debtor's successful reorganization; (3) in exchange for good and valuable consideration provided by the Debtor, the Guaranteeing Subsidiaries and the Administrative Agent; (4) warranted by the exceptional and unique circumstances of the Debtor's reorganization; and (5) consistent with public policy and due process principles.

### 9. Waiver of Avoidance Actions

Effective as of the Effective Date, the Debtor shall have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or other applicable law that belong to the Debtor and/or which the Debtor could have prosecuted as debtor or debtor-in-possession against the Released Parties relating to distributions made on account of interest or other obligations under and relating to the Senior Credit Agreement or the Subordinated Debt.

### 10. Term of Injunctions or Stays

(a)      Except as otherwise expressly provided in the Prepackaged Plan, and except with respect to enforcement of the Prepackaged Plan, all Persons who have held, hold or may hold any Claim against, or Equity Interest in, the Debtor as of the Effective Date will be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind in any forum with respect to such Claim or Equity Interest against the Reorganized Debtor, the Guaranteeing Subsidiaries or their respective property, (ii) the enforcement, attachment, collection or recovery in any manner or by any means any judgment, award, decree or order against the Reorganized Debtor, the Guaranteeing Subsidiaries or their respective property, with respect to such Claim or Equity Interest, (iii) creating, perfecting or enforcing any Lien or other encumbrance of any kind against the Reorganized Debtor, the Guaranteeing Subsidiaries or against any property or interests in property of the Reorganized Debtor or the Guaranteeing Subsidiaries, as applicable, with respect

to any such Claim or Equity Interest, (iv) asserting a right of setoff, subrogation or recoupment of any kind against any obligation due from the Reorganized Debtor, the Guaranteeing Subsidiaries or against any property or interests in property of the Reorganized Debtor or the Guaranteeing Subsidiaries, with respect to such Claim or Equity Interest, (v) commencing or continuing any action, in any forum, that does not comply or is inconsistent with the provisions of the Prepackaged Plan and (vi) pursuing any such Claim released pursuant to Section 10.6, 10.7 or 10.8 of the Prepackaged Plan.

(b)     Unless otherwise provided, all injunctions or stays arising under or entered during the Debtor's Reorganization Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## 11.     Termination of Subordination Rights and Settlement of Related Claims

The classification and manner of satisfying all Claims and Equity Interests under the Prepackaged Plan takes into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise. All subordination rights that a holder of a Claim or Equity Interest may have with respect to any distribution to be made under the Prepackaged Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be enjoined permanently. Accordingly, distributions under the Prepackaged Plan to holders of Allowed Claims will not be subject to payment of a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

## 12.     Indemnification Obligations

Notwithstanding anything to the contrary herein or in the Prepackaged Plan, subject to the occurrence of the Effective Date, the obligations of the Debtor as provided in the Debtor's certificate of incorporation and bylaws as in effect through the Effective Date and under applicable law or other applicable agreements as in effect through the Effective Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of, the current and former directors, officers and employees of the Debtor (including in the case of officers and employees serving as directors, managers, officers and employees of any Affiliate of the Debtor or as trustee (or similar position) of any employee benefit plan or trust (or similar Person) of AMI and its Subsidiaries, in such capacities) against any damages, liabilities, obligations, claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, shall survive confirmation of the Prepackaged Plan, remain unaffected thereby after the Effective Date and not be discharged under section 1141 of the Bankruptcy Code or otherwise, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Petition Date. Any Claim based on the Debtor's obligations under the Prepackaged Plan shall not be subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

As of the Effective Date, the Restated Certificate of Incorporation and/or Restated Bylaws shall provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, directors and officers and employees of the Debtor (including in the case of officers and employees serving as directors, managers, officers and employees of any Affiliate of the Debtor or as trustee (or similar position) of any employee benefit plan or trust (or similar Person) of AMI and its Subsidiaries, in such capacities), who were directors, officers or employees of the Debtor at any time prior to the Effective Date at least to the same extent as provided in the certificate of incorporation and bylaws of AMI in effect on the Petition Date, against any damages, liabilities, obligations, claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, in connection with any event occurring before the Petition Date.

The Debtor and the Reorganized Debtor shall indemnify and hold harmless (i) the Administrative Agent, (ii) the Senior Lender Steering Committee, (iii) the Senior Lender Steering Committee's individual members, (iv) the respective advisors, officers, directors and employees of the parties described in clauses (i) through (iii) hereof, and (v) each of their respective successors and assigns (collectively, the "Indemnified Persons"), to the full extent lawful, from and against all losses, claims, damages, and liabilities incurred by them that are related to or arise out of (a) the formulation, negotiation and pursuit of the confirmation or consummation of the Prepackaged Plan or (b) the Indemnified Persons' consideration of other proposals for the reorganization of the Debtor under chapter 11 of the Bankruptcy Code.

### 13. Limitation on Indemnification

Notwithstanding anything to the contrary set forth in the Prepackaged Plan or elsewhere, the Reorganized Debtor shall not be obligated to indemnify and hold harmless any Person or entity for any claim, cause of action, liability, judgment, settlement, cost or expense that results from such Person's fraud or willful misconduct as determined by a Final Order.

### 14. Preservation of Claims

Except as otherwise provided in the Prepackaged Plan, including Sections 10.5, 10.6 and 10.7 thereof, as of the Effective Date, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, any action, cause of action, liability, obligation, right, suit, debt, sum of money, damage, judgment, claim and demand whatsoever, whether known or unknown, in law, equity or otherwise (collectively, "Causes of Action") accruing to the Debtor shall become assets of the Reorganized Debtor, and the Reorganized Debtor shall have the authority to commence and prosecute such Causes of Action for the benefit of the Estate of the Debtor. After the Effective Date, the Reorganized Debtor shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such Causes of Action without approval of the Bankruptcy Court.

### 15. No Acquisition of a Majority of Voting Interests

The confirmation and consummation of the Prepackaged Plan, and the issuance of New Common Stock pursuant thereto, shall not, and shall not be deemed to, constitute or result in an

acquisition of a majority of the voting interests of AMI or any of its Subsidiaries for purposes of any agreement to which AMI or any of its Subsidiaries is a party.

### 16. No Change of Control

None of the confirmation or consummation of the Prepackaged Plan or the consummation of any and all transactions contemplated thereby shall constitute or effect a change in control under any agreement to which AMI, Reorganized AMI or any Affiliate of AMI is a party.

### Q. Retention of Jurisdiction

Unless otherwise provided for in the Prepackaged Plan or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, or related to, the Debtor's Reorganization Case and the Prepackaged Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1. To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

2. To determine any and all adversary proceedings, applications and contested matters in the Debtor's Reorganization Case and grant or deny any application involving the Debtor that may be pending on the Effective Date;

3. To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Prepackaged Plan;

4. To hear and determine any timely objections to Administrative Expense Claims or to proofs of claim and Equity Interests, including any objections to the classification of any Claim or Equity Interest, and to allow or disallow any disputed claim in whole or in part;

5. To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

6. To issue such orders in aid of execution of the Prepackaged Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

7. To consider any amendments to or modifications of the Prepackaged Plan, or to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

8. To hear and determine all applications of retained professionals under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

9. To hear and determine any dispute concerning the compromise by and between the Senior Lenders, the Debtor and the Guaranteeing Subsidiaries, and the Senior

Lenders' release of all Claims arising under the Senior Credit Agreement Documents, including the release of all Claims against the Guaranteeing Subsidiaries;

10. To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Prepackaged Plan, the Confirmation Order, the Plan Supplements, any transactions or payments contemplated by the Restructuring Support Agreement, including the Prepackaged Plan or any agreement, instrument or other document governing or relating to any of the foregoing;

11. To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

12. During the period of time that the FCC Trust is in place, to enter and implement such orders as may be necessary or appropriate regarding the actions of the FCC Trust pursuant to the FCC Trust Agreement;

13. To hear any other matter not inconsistent with the Bankruptcy Code;

14. To hear and determine all disputes involving the existence, scope and nature of the discharges granted under Sections 10.3 and 10.4 of the Prepackaged Plan;

15. To hear and determine all disputes involving or in any manner implicating the exculpation provisions granted under Section 10.5 of the Prepackaged Plan;

16. To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any Person with the consummation or implementation of the Prepackaged Plan;

17. To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Prepackaged Plan with respect to any Person;

18. To hear and determine all disputes relating to whether any third party consent is required for the assumption under the Prepackaged Plan of any executory contract;

19. To enter a final decree closing the Debtor's Reorganization Case;

20. To hear and determine all disputes relating to whether the confirmation and consummation of the Prepackaged Plan, and the issuance of New Common Stock pursuant thereto, shall have, or shall be deemed to, constitute or result in an acquisition of a majority of the voting interests of AMI or any of its Affiliates for purposes of any agreement to which AMI or any of its Affiliates is a party;

21. To hear and determine all disputes relating to the effect of the Prepackaged Plan under any agreement to which AMI, Reorganized AMI or any Affiliate of AMI is a party; and

22. To hear and determine all disputes relating to whether any third party consent is required for the assumption under the Prepackaged Plan of any executory contract.

## R.    Miscellaneous

### 1.    Payment of Statutory Fees

All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

### 2.    Payment of Indenture Trustee Fees and Administrative Agent Fees Related to Distributions Received Under the Prepackaged Plan

If the holders of Claims in Class 5 vote to accept the Prepackaged Plan, the Reorganized Debtor shall pay all reasonable fees, costs and expenses incurred by the Indenture Trustee in connection with the distributions required pursuant to the Prepackaged Plan. The Reorganized Debtor shall pay all reasonable fees, costs and expenses incurred by the Administrative Agent in connection with the distributions required pursuant to the Prepackaged Plan or the implementation of any provisions of the Prepackaged Plan. Notwithstanding the foregoing, the fees, costs and expenses discussed in Section 12.2 of the Prepackaged Plan in respect of the Administrative Agent and the Indenture Trustee shall only be paid in the event that the Prepackaged Plan is confirmed and the Effective Date occurs.

### 3.    Further Assurances

The Debtor or the Reorganized Debtor, as applicable, may file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Prepackaged Plan.

### 4.    Exhibits, Appendices and Schedules Incorporated

All exhibits, appendices and Schedules to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if fully set forth herein.

### 5.    Intercompany Claims

Notwithstanding anything to the contrary herein, or in the Prepackaged Plan, on or after the Effective Date, any claims held by AMI against one of its Affiliates may be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged to the extent reasonably determined appropriate by the Debtor.

### 6.    Amendment or Modification of the Prepackaged Plan

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, alterations, amendments or modifications of the Prepackaged Plan may be proposed in writing jointly by the Debtor and the Senior Lender Steering Committee at any time prior to or after the Confirmation Date, but prior to the Effective Date. Holders of Claims that have accepted the Prepackaged Plan shall be deemed to have

accepted the Prepackaged Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder; provided, however, that any holders of Claims who were deemed to accept the Prepackaged Plan because such Claims were unimpaired shall continue to be deemed to accept the Prepackaged Plan only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired.

### 7. Inconsistency

In the event of any inconsistency among the Prepackaged Plan, this Disclosure Statement and any exhibit to this Disclosure Statement, the provisions of the Prepackaged Plan shall govern.

### 8. Section 1125(e) of the Bankruptcy Code

As of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of the Prepackaged Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtor (and including in the case of officers and employees serving as directors, managers, officers and employees of any Affiliate of the Debtor or as trustee (or similar position) of any employee benefit plan or trust (or similar Person) of the Debtor and its Affiliates, in such capacities each of its successors, predecessors, control persons, members, Affiliates, agents, directors, officers, employees, investment bankers, financial advisors, accountants, attorneys and other professionals) has participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities under the Prepackaged Plan. Accordingly, such entities and individuals shall not be liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Prepackaged Plan or the offer and issuance of the securities under the Prepackaged Plan.

### 9. Compliance with Tax Requirements

In connection with the Prepackaged Plan and all instruments issued in connection herewith and distributed thereunder, any party issuing any instruments or making any distribution under the Prepackaged Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Prepackaged Plan shall be subject to any withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Prepackaged Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instruments or making any distribution under the Prepackaged Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or distributing party for payment of any such tax obligations.

### 10. Determination of Tax Filings and Taxes

The Reorganized Debtor shall have the right to request an expedited determination of its tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns

filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date. The Reorganized Debtor shall have the sole right, at its expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of the AMI Group.

**11.     Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities (including issuance of warrants) under or in connection with the Prepackaged Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Prepackaged Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Prepackaged Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax

**12.     Dissolution of Any Statutory Committees and Cessation of Fee and Expense Payment**

Any statutory committees, if any, appointed in the Debtor's Reorganization Case shall be dissolved on the Effective Date. The Reorganized Debtor shall not be responsible for paying any fees and expenses incurred by the advisors and any statutory committees after the Effective Date.

**13.     Severability of Provisions in the Prepackaged Plan**

If, prior to the entry of the Confirmation Order, any term or provision of the Prepackaged Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Prepackaged Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Prepackaged Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**14.     Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Prepackaged Plan or the Plan Supplements provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties and obligations arising under the Prepackaged Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

**15.     No Admissions**

If the Effective Date does not occur, the Prepackaged Plan shall be null and void in all respects, and nothing contained in the Prepackaged Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor, (b) prejudice in any manner the rights of the Debtor or any other party in interest or (c) constitute an admission of any sort by the Debtor or other party in interest.

## VII.     FINANCIAL PROJECTIONS AND VALUATION

### A.     Financial Projections

Below are the unaudited projected pro forma Statement of Operations, Balance Sheet, Statement of Cash Flows, and EBITDA Bridge for the time period January 1, 2010 through December 31, 2013 (the "**Projections**").

### 1.     Note Regarding Forward-Looking Statements

THE FOLLOWING PROJECTIONS ARE FORWARD-LOOKING STATEMENTS THAT ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH PROJECTIONS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS PROVIDED IN THIS DISCLOSURE STATEMENT SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS SUCH AS THE TYPE DESCRIBED IN ARTICLE VIII.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTOR IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

### 2.     Introduction

As a condition to confirmation of a plan of reorganization, the Bankruptcy Code requires, among other things, that the Bankruptcy Court find that confirmation is not likely to be followed by either a liquidation or the need to further reorganize the debtor.  Since the spring of 2009, the Debtor's management has analyzed whether the Reorganized Debtor would have sufficient liquidity and capital resources to fulfill its obligations under the Prepackaged Plan while continuing to operate its business in connection with determining whether the Prepackaged Plan would satisfy the feasibility standard of section 1129(a)(11) of the Bankruptcy Code. Accordingly, the Debtor's management, with the assistance of its financial advisors, developed and prepared the Projections, which were prepared in good faith, based upon estimates and assumptions that were reasonable in light of current circumstances at the time the Projections

were prepared. The Projections were further reviewed to analyze the Reorganized Debtor's ability to meet its liquidity and debt service obligations under the Prepackaged Plan.

The Projections set forth below have been prepared based on the assumption that the Effective Date will be March 31, 2010. Although the Debtor is seeking to cause the Effective Date to occur as soon as practicable, there can be no assurance as to when or if the Effective Date will actually occur. It is also assumed that the Debtor will conduct operations substantially similar to its business currently in operation.

The Debtor, with the assistance of various professionals, prepared the Projections for each of the four years ending December 31, 2010, 2011, 2012 and 2013. The Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtor, industry performance, general business and economic conditions and other matters, most of which are beyond the control of the Reorganized Debtor. Therefore, although the Projections are necessarily presented with numerical specificity, the actual results achieved during the projection period will vary from the projected results. These variations may be material. The estimates and assumptions in the Projections, while considered reasonable by management and its financial advisors at the time of preparation, may not be realized and are inherently subject to uncertainties and contingencies. Although the Debtor believes that the assumptions underlying the Projections, when considered on an overall basis, are reasonable in light of current circumstances, no representation can be or is being made with respect to the accuracy of the Projections or the ability of Reorganized AMI to achieve the projected results of operations. In deciding whether to vote to accept or reject the Prepackaged Plan, claimants must make their own determinations as to the reasonableness of such assumptions and the reliability of the Projections.

### 3. Qualifications

The estimates and assumptions in the Projections, while considered reasonable by the Debtor's management and its financial advisors at the time of preparation, may not be realized, and are inherently subject to uncertainties and contingencies. The Projections are also based on factors such as industry performance, general business, economic, competitive, regulatory, market and financial conditions, all of which are difficult to predict and generally beyond the Debtor's control. Given the changes in the United States' economy over the past 18 months and the difficult advertising environment created by the economic difficulties, it is anticipated that the Debtor's actual financial performance for the time periods reflected herein may differ materially and negatively from the Projections.

Furthermore, because future events and circumstances may well differ from those assumed in the Projections, no representations can be made as to the accuracy of the Projections or the Reorganized Debtor's ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that the Debtor considers the Projections to be a reliable prediction of future performance. The Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Debtor has no obligation to update or otherwise revise the Projections to reflect the occurrence of future events, and will not update the Projections, even in the event that assumptions underlying the Projections are not borne out. The

Projections should be read in conjunction with the assumptions and qualifications set forth herein.

The basis for the Projections differs significantly and substantially from the Debtor's historical GAAP basis financial statement presentations. The Projections are not intended to be presented in accordance with GAAP but instead are being presented in the manner the Debtor believes best reflects the expected cash flow available to the Reorganized Debtor from its wholly owned subsidiaries, the Salt Lake City JOA, distributions from its partnerships and equity investments. The basis of presentation for the Projections is consistent with the Debtor's internal forecasting methodologies.

Key presentation differences relative to the historical GAAP basis financial statement presentation include, but are not limited to the following:

- The Projections show the Debtor and its wholly owned Subsidiaries on a consolidated basis, with the Debtor's partnerships accounted for using the cost method of accounting and the Salt Lake City JOA accounted for using pro rata consolidation in the Statement of Operations. Accordingly, the Statement of Operations includes the Debtor's share of Salt Lake City operations and does not include the operations of partnerships, but instead includes expected distributions to the Debtor from its partnerships. Expected distributions from the partnerships are included in the Statement of Operations in Distributions from Partnerships. Further, neither the partnership nor Salt Lake City JOA balance sheet accounts are reflected in the Projected Balance Sheet, including cash on hand at the partnerships and Salt Lake City JOA that has not yet been distributed.

- The Projections also exclude DNA, a 79.9999% owned subsidiary of the Debtor. In August 2009, DNA completed an out-of-court restructuring with its senior lenders, arranging for its own separate debt facility, which is non-recourse to the Debtor. As part of the DNA restructuring, the Debtor contributed the assets and liabilities of DPC into DNA, including DPC's defined benefit pension obligations. Since DNA has its own separate debt facility, all the free cash flow from DNA is expected to be used to repay the DNA debt facility. As a result, the reorganized DNA entity is not expected to contribute any cash flow, make any distributions to the Debtor or require cash contributions from the Debtor in the projection period and is therefore excluded from the Projections. DNA financial statements are consolidated with those of the Debtor in the Debtor's financial statements prepared in accordance with GAAP and included in Section VII.A.

- The Salt Lake City JOA is accounted for using the equity method of accounting when presenting financial statements in accordance with GAAP.

- The Debtor consolidates the results of operations and balance sheet accounts of the partnerships in which the Debtor is in control of the partnership when presenting financial statements in accordance with GAAP.

THE DEBTOR DID NOT PREPARE THE PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE SEC. THE DEBTOR'S INDEPENDENT AUDITORS HAVE NEITHER COMPILED NOR EXAMINED THE DEBTOR'S PROSPECTIVE FINANCIAL INFORMATION TO

DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAVE NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTOR DOES NOT, AS A MATTER OF COURSE, PUBLISH FINANCIAL PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS.  ACCORDINGLY, NEITHER THE DEBTOR NOR THE REORGANIZED DEBTOR INTENDS TO, AND EACH DISCLAIMS ANY OBLIGATION TO: (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF NEW COMMON STOCK OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE ANY SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

### 4. Projections

The Projections should be read in conjunction with the assumptions, qualifications and explanations set forth in this Section and this Disclosure Statement.

The Statement of Operations shows the Debtor's wholly-owned Subsidiaries with Pro Rata consolidation of the Salt Lake City JOA.  The Debtor's partnerships are reflected on the cost basis of accounting and accordingly only the projected distributions are included here.  Such accounting is not in accordance with GAAP.  Pro Rata consolidation is not an acceptable method of accounting under GAAP.

The Debtor's Projected Statement of Operations set forth below presents the projected results of operations of the Debtor's, its wholly-owned Subsidiaries and the Salt Lake JOA, as well as expected distributions from its partnerships for CY 2010 through CY 2013.

| Projected Statement of Operations, unaudited ($ in millions) [1],[2],[3] | | | | |
|---|---|---|---|---|
| | CY 2010 | CY 2011 | CY 2012 | CY 2013 |
| **Revenue** | | | | |
| Advertising Revenue | $218.5 | $222.1 | $228.4 | $235.8 |
| Circulation Revenue | 85.7 | 84.8 | 84.0 | 83.1 |
| Commercial Printing Revenue | 6.6 | 7.1 | 7.2 | 7.2 |
| Other Operating Revenue | 3.6 | 3.6 | 3.6 | 3.6 |
| **Total Operating Revenue** | $314.4 | $317.6 | $323.1 | $329.7 |
| **Expenses** | | | | |
| Production | 18.5 | 18.7 | 18.9 | 19.1 |
| Newsprint, Ink & Supplements | 33.8 | 35.1 | 35.7 | 35.1 |
| Circulation | 68.1 | 68.4 | 68.9 | 69.5 |
| Other | 264.5 | 265.1 | 267.1 | 269.2 |
| **Total Operating Expense** | 316.7 | 318.8 | 321.7 | 323.3 |
| **Operating Profit** | ($2.3) | ($1.2) | $1.4 | $6.4 |
| **Other Expenses** | | | | |
| Management Fee Income | (6.0) | (6.1) | (6.1) | (6.2) |
| Depreciation & Amortization [4] | 22.7 | 6.2 | 4.9 | 3.2 |
| Interest Expense [5] | 27.6 | 15.1 | 15.4 | 15.2 |
| Other [6] | 17.7 | 1.0 | 1.0 | 1.0 |
| **Total Other Expenses** | 62.0 | 16.2 | 15.2 | 13.1 |
| Distributions from Partnerships | 28.2 | 23.0 | 21.9 | 26.1 |
| Distributions from Equity Investments | 5.4 | 4.8 | 4.3 | 2.7 |
| **Net Income / (Loss) Before Taxes** | ($30.7) | $10.4 | $12.4 | $22.0 |
| Provision for Income Taxes | (0.7) | (1.2) | (3.5) | (7.4) |
| **Net Income / (Loss)** | ($31.4) | $9.2 | $8.9 | $14.6 |

(1) AMI fiscal year ends 6/30; information presented on a calendar year-basis
(2) Excludes Denver Newspaper Agency. Includes pro rata consolidation for Salt Lake JOA
(3) Does not represent a consolidated income statement prepared in accordance with GAAP. See "Qualifications" section
(4) Amounts reflected are tax basis expense. Expense assumes no §382 limitation for the tax year ending 6/30/10. Assumes §382 limitation in subsequent periods
(5) Includes pre-petition interest, including the Subordinated Notes interest, through the assumed Effective Date of 3/31/10. Accordingly, CY 2010 interest is significantly higher than subsequent years
(6) Other expenses are primarily Restructuring charges

The Debtor's Projected Balance Sheet set forth below presents the projected financial position of the Debtor and its wholly-owned Subsidiaries including the proposed new capital structure of Reorganized AMI, giving effect to confirmation and consummation of the Prepackaged Plan, as of the end of each calendar year from 2010 to 2013. The Debtor's partnership interests are reflected using the cost method of accounting. Therefore, no balance sheet accounts of the partnerships, including cash are reflected in the Projections.

| Projected Balance Sheet, unaudited ($ in millions) [1],[2],[3] | CY 2010 | CY 2011 | CY 2012 | CY 2013 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash [4] | $34.2 | $30.4 | $24.3 | $19.0 |
| Accounts Receivable | 35.8 | 36.2 | 37.2 | 38.1 |
| Inventory | 5.0 | 5.0 | 5.1 | 5.0 |
| Other Current Assets | 24.4 | 24.5 | 24.6 | 24.7 |
| Property, Plant & Equipment, net | 58.6 | 60.2 | 63.3 | 67.8 |
| Intangibles, net | 94.9 | 93.1 | 91.5 | 90.7 |
| Other Long-Term Assets [5] | 202.2 | 202.5 | 202.7 | 203.0 |
| **Total Assets** | **$455.2** | **$451.9** | **$448.5** | **$448.3** |
| | | | | |
| **Liabilities & Equity** | | | | |
| Accounts Payable | 6.7 | 6.1 | 5.5 | 5.0 |
| Accrued Compensation | 11.8 | 12.1 | 12.4 | 12.7 |
| Accrued Other | 15.1 | 15.3 | 15.6 | 15.9 |
| Unearned Income | 15.2 | 15.1 | 14.9 | 14.8 |
| Accrued Interest | 0.1 | 0.3 | 0.4 | 0.5 |
| Total Current Liabilities | 48.9 | 48.8 | 48.8 | 48.9 |
| New Term Loan | 149.3 | 141.6 | 134.7 | 125.3 |
| Other Debt | 13.8 | 12.0 | 10.1 | 8.1 |
| Other Obligations | 33.9 | 31.2 | 27.8 | 24.5 |
| **Total Liabilities** | **$245.9** | **$233.6** | **$221.4** | **$206.7** |
| **Total Equity** | **209.3** | **218.4** | **227.1** | **241.6** |
| **Total Liabilities & Equity** | **$455.2** | **$451.9** | **$448.5** | **$448.3** |

(1) The Debtor's fiscal year ends 6/30; information presented on a calendar year-basis
(2) Excludes Denver Newspaper Agency
(3) Does not represent a consolidated balance sheet prepared in accordance with GAAP. See "Qualifications" section
(4) Does not include Partnerships and JOAs cash on their balance sheets. Assumes the Company obtains a letter of credit facility of $25 million to avoid having to fund substantial cash collateral deposits. The Debtor currently has commitments for $13.875m of LOC Facilities. While the Debtor anticipates it will pursue additional LOC commitments in the future to meet its needs, failure to do so could negatively impact the Reorganized Debtor's cash projections
(5) This asset is primarily the Investment in Partnerships. Under the cost method of accounting, the balance is reduced by the distributions received from the partnerships

The Debtor's Projected Statement of Cash Flows set forth below presents the projected cash flows of the Debtor from CY 2010 through CY 2013.

| Projected Statement of Cash Flows, unaudited ($ in millions) [1],[2],[3] | CY 2010 | CY 2011 | CY 2012 | CY 2013 |
|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | |
| Net Income | ($31.4) | $9.2 | $8.9 | $14.6 |
| Adjustments to Net Income | | | | |
| Depreciation [4] | 6.2 | 4.4 | 3.3 | 2.4 |
| Amortization [4] | 16.5 | 1.8 | 1.6 | 0.8 |
| **Change in Working Capital [5]** | | | | |
| (Increase) Decrease in AR | (1.8) | (0.4) | (0.9) | (1.0) |
| (Increase) Decrease in Inventory | (1.0) | 0.1 | (0.1) | 0.1 |
| (Increase) Decrease in Other CA | (0.1) | (0.1) | (0.1) | (0.1) |
| Increase (Decrease) AP | (0.7) | (0.6) | (0.6) | (0.5) |
| Increase (Decrease) Accrued Compensation | 0.3 | 0.3 | 0.3 | 0.3 |
| Increase (Decrease) Accrued Other | - | 0.2 | 0.3 | 0.3 |
| Increase (Decrease) Unearned Income | (0.2) | (0.2) | (0.2) | (0.1) |
| Total Change in Working Capital | (3.5) | (0.8) | (1.2) | (1.0) |
| Increase (Decrease) in Accrued Interest [6] | (4.0) | 0.2 | 0.2 | 0.1 |
| (Increase) Decrease in Other LT Asset [7] | 0.1 | (0.3) | (0.2) | (0.3) |
| Increase (Decrease) Other Obligations | 1.4 | (2.7) | (3.4) | (3.4) |
| Increase (Decrease) Deferred Taxes | - | - | - | - |
| **Total Cash Flows from Operating Activities** | ($14.7) | $11.9 | $9.2 | $13.2 |
| **Cash Flows from Investing Activities** | | | | |
| Capital Expenditures [5] | (5.5) | (6.0) | (6.3) | (7.0) |
| **Total Cash Flows from Investing Activities** | ($5.5) | ($6.0) | ($6.3) | ($7.0) |
| **Cash Flows from Financing Activities** | | | | |
| Excess Cash Flow Sweep [8] | - | (3.7) | - | - |
| Mandatory Principal Paydown [9] | (2.7) | (6.0) | (9.0) | (11.5) |
| **Total Cash Flows from Financing Activities** | ($2.7) | ($9.7) | ($9.0) | ($11.5) |
| **Cash and Equivalents - Beginning of Period** | $57.1 | $34.2 | $30.4 | $24.3 |
| Change in Cash and Equivalents | (22.9) | (3.8) | (6.1) | (5.3) |
| **Cash and Equivalents - End of Period [10]** | $34.2 | $30.4 | $24.3 | $19.0 |

(1) The Debtor's fiscal year ends 6/30; information presented on a calendar year-basis
(2) Excludes Denver Newspaper Agency
(3) Does not represent a consolidated cash flow statement prepared in accordance with GAAP. See "Qualifications" section
(4) Amounts reflected are tax basis expense. Expense assumes no §382 limitation for the tax year ending 6/30/10.
    Assumes §382 limitation in subsequent periods
(5) For purpose of this presentation, only the Debtor and wholly-owned subsidiaries are included
(6) Net of equitized accrued interest related to the restructuring transaction
(7) Includes distributions from the partnerships and JOAs
(8) Assumes 50% of Excess Cash Flow is used to pay down new term loan
(9) Includes principal paydown of other debt
(10) Assumes the Company obtains a letter of credit facility of $25 million to avoid having to fund substantial cash collateral deposits

The Debtor's Projected EBITDA Bridge set forth below presents the projected EBITDA available to the Debtor for the period from CY 2010 through CY 2013.

| EBITDA Bridge, unaudited ($ in millions) [1,2] | CY 2010 | CY 2011 | CY 2012 | CY 2013 |
|---|---|---|---|---|
| Total Debtor and Wholly-Owned Operating Revenue | $314.4 | $317.6 | $323.1 | $329.7 |
| Total Debtor and Wholly-Owned Operating Expenses | (316.7) | (318.8) | (321.7) | (323.3) |
| **Debtor and Wholly-Owned Operating Profit** | **($2.3)** | **($1.2)** | **$1.4** | **$6.4** |
| AMI Share of Partnership Operating Profit | 34.4 | 35.2 | 37.3 | 42.9 |
| Distribution from Equity Investments | 5.4 | 4.8 | 4.3 | 2.7 |
| **EBITDA Available to the Company** | **$37.5** | **$38.8** | **$43.1** | **$52.0** |

(1) The Debtor's fiscal year ends 6/30; information presented on a calendar year-basis
(2) Excludes Denver Newspaper Agency

## 5.     Accounting Policies

The Debtor has historically reported on a fiscal year basis ending June 30. The Projections provided are stated on a calendar year basis. Upon emergence from chapter 11, the Reorganized Debtor is expected to be required to adopt "Fresh Start Accounting" in accordance with SOP 90-7, which, among other things, requires the Reorganized Debtor to revalue its assets and liabilities at their estimated fair value. A complete analysis for fresh start accounting has not been performed. Therefore, the Projections and the Valuation (as defined below in Section VIII.B.) do not incorporate the effects of any fresh start accounting principles. It is not anticipated that fresh start accounting principles would have a significant effect on the Valuation; however, neither the Projections nor the Valuation will be updated if fresh start accounting is used. It is anticipated that although a significant amount of the goodwill and intangibles will be written off, some amount of intangibles will remain, and therefore will be subject to testing for impairment. See Exhibit 2 to this Disclosure Statement for a summary of the Debtor's significant accounting policies used in preparing its GAAP financial statements.

## 6.     Summary of Significant Assumptions

### a.     Advertising Revenue

All advertising revenue projections through June 2010 are based on year-over-year run rates. Advertising revenues are generally forecasted to decline on a year-over-year basis through June 2010. After June 2010, the individual advertising revenue categories are projected to grow as follows:

- Retail advertising revenue was assumed to be flat for July through December 2010, with year-over-year growth beginning in January 2011 and gradually increasing through the remainder of the forecast period.

- National advertising was assumed to begin growing at approximately 1% in July through December 2010, and growing at an increasing rate throughout the remainder of the forecast period.

- Auto and real estate classifieds advertising were assumed to begin growing again at similar rates in the second half of 2010, in most markets 3-5% per year on average through the remainder of the forecast period.

- Overall employment advertising revenue has become a smaller percentage of total advertising revenue and will remain such during the forecast period, with no growth projected in print employment advertising.

### b.    Circulation Revenue

Circulation revenue is based on current run rate less known volume reduction programs, primarily due to elimination of unprofitable circulation delivery areas.  Starting July 2010, total circulation revenues are expected to decline at an approximately 1% annual rate, net of estimated 2% price increases and volume reductions.

### c.    Commercial Printing Revenue

Commercial printing revenue assumes the Debtor maintains the majority of its existing account base and also factors in the known client losses as of the date of the Projections.

### d.    Expense Assumptions

The Projections reflect a number of expense and cost reduction assumptions, including:

- A wage freeze effective January 1, 2009 for all employees who do not work under the terms of a collective bargaining agreement;

- Permanent wage reductions in the San Francisco Bay Area, implemented in steps during CY 2010;

- The elimination of 401(k) matching, effective January 1, 2009;

- The elimination of all but $1.6 million of MBO and discretionary bonuses;

- Reduction in newsprint volume due to (i) the implementation at certain papers of 44" and/or 46" web width and (ii) reduced circulation volume and paging;

- The outsourcing of printing of the *Los Angeles Daily News*, *San Gabriel Valley Tribune* and *Long Beach Press Telegram*;

- Payroll expenses are forecasted to be flat in CY 2010 and CY 2011 as further savings from consolidation and outsourcing of production, editorial, and back office functions are realized, off setting contractual wage increases, and then growing at a 1% annual rate for CY 2012 and CY 2013;

- Newsprint pricing per ton is assumed to be as follows for 30 lbs newsprint: $590 average in CY2010, $625 average in CY2011 and $650 average in CY2012 and

CY2013. Newsprint usage is projected to decline 2% each year beginning in the quarter ending September 2010, based on circulation declines;

- Total benefits excluding Debtor sponsored pension plans are assumed to increase at 4% in CY 2010 and CY 2011. In CY 2012 and CY 2013 costs increase 5%;

- Pension plan expense assumptions were provided by the actuaries for each year in the projection period;

- Advertising commissions expense increased each year based on the anticipated increase in advertising revenue;

- Circulation promotion expense was assumed to remain flat beginning in July 2010 as a result of implementing the circulation strategic plan and lower overall circulation volumes;

- The majority of all other expenses are assumed to increase 1% each year starting in September 2010; and

- Depreciation and amortization expenses reflect adjustments to the tax basis in final assets and intangibles resulting from cancellation of indebtedness income.

### 7. Balance Sheet Assumptions

#### a. Capital Expenditures

The capital expenditures of the Debtor's wholly-owned Subsidiaries are expected to be $5.5 million in CY 2010. The wholly-owned Subsidiaries' capital expenditures are projected to increase to $6.0 million in CY 2011, $6.3 million in CY 2012 and $7.0 million in CY 2013. These Projections exclude the Debtor's share of capital expenditures at the partnerships and the Salt Lake City JOA levels which have been netted in the distributions from the partnerships and JOAs. If the Debtor includes its pro rata portion of its partnerships and Salt Lake City JOA, its capital expenditures are expected to be $8.9 million in CY 2010, $9.6 million in CY 2011, $10.2 million in CY 2012 and $11.2 million in CY 2013.

#### b. Asset Sales

Total estimated net proceeds from asset sales are expected to yield approximately $4.0 million during CY 2010.

#### c. Debt

The Projections reflect the post-emergence debt balances outlined in the Prepackaged Plan. The Debtor also assumed that 50% of the Debtor's excess cash flows from operations would be used to repay the Term Loan.

### d. Working Capital

The Debtor's sole sources of liquidity are its working capital, cash flow from operations and cash on hand. These Projections exclude the partnership and JOA amounts due to the presentation basis.

### B. Value of the Reorganized Debtor

Rothschild has prepared a valuation analysis (the "**Valuation**") of the estimated value of Reorganized AMI on a going-concern basis for the purpose of evaluating whether the Prepackaged Plan meets the so-called "best interests test" under section 1129(a)(7) of the Bankruptcy Code.

### 1. Overview

In preparing the Valuation, Rothschild has, among other things: (i) reviewed certain recent available financial results of the Debtor; (ii) reviewed certain internal financial and operating data of the Debtor, including the business projections prepared and provided by the Debtor's management to Rothschild in November 2009 relating to its business and its prospects; (iii) discussed with certain senior executives the current operations and prospects of the Debtor; (iv) reviewed certain operating and financial forecasts prepared by the Debtor, including the Projections; (v) discussed with certain senior executives of the Debtor key assumptions related to the Projections; (vi) prepared discounted cash flow analyses based on the Projections, utilizing various discount rates; (vii) considered the market value of certain publicly-traded companies in businesses reasonably comparable to the business of the Debtor; (viii) considered the value assigned to certain precedent change-in-control transactions for businesses similar to the Debtor; (ix) considered certain economic and industry information relevant to the Debtor's business; (x) conducted such other analyses as Rothschild deemed necessary and/or appropriate under the circumstances; and (xi) considered a range of potential risk factors.

Rothschild assumed, without independent verification, the accuracy, completeness, and fairness of all of the financial and other information available to it from public sources or as provided to Rothschild by the Debtor or its representatives. Rothschild also assumed that the Projections have been reasonably prepared on a basis reflecting the Debtor's best estimates and judgment as to future operating and financial performance. Rothschild did not make any independent evaluation of the Debtor's assets, nor did Rothschild independently verify any of the information it reviewed. Rothschild does not make any representation or warranty as to the fairness of the terms of the Prepackaged Plan.

In addition to the foregoing, Rothschild relied upon the following assumptions with respect to the Valuation:

- The Debtor is able to maintain adequate liquidity to operate in accordance with the Projections;

- The Debtor operates consistently with level specified in the Projections;

- Future values are discounted to March 31, 2010;

- The Prepackaged Plan becomes effective on March 31, 2010 (the "**Assumed Effective Date**");

- The pro-forma net debt at closing is expected to be approximately $166 million, consisting of a new $150 million Term Loan and approximately $16 million of other debt;

- General financial and market conditions as of the Assumed Effective Date will not differ materially from those conditions prevailing as of December 15, 2009 (the "**Valuation Date**");

- Rothschild has not considered the impact of a prolonged bankruptcy case and has assumed operations will continue in the ordinary course consistent with the Projections; and

- Rothschild did not prepare a valuation analysis or other potential outcomes under alternative scenarios such as a prolonged bankruptcy case or a partial or full break-up and sale of the various businesses of the Debtor.

## 2. Estimate of Value

As a result of such analyses, review, discussions, considerations, and assumptions, Rothschild estimates the total enterprise value ("**TEV**") at approximately $190 million to $230 million, with a midpoint of $210 million. Rothschild reduced such TEV estimates by the estimated pro forma net debt levels of Reorganized AMI (approximately $166 million) to estimate the implied reorganized equity value of Reorganized AMI. Rothschild estimates that Reorganized AMI's implied total reorganized common equity value will range from $24 million to $64 million. The common equity value is subject to dilution as a result of the implementation of management equity incentive plans, the Subordinated Note Warrants and the Singleton Warrants.

| Rothschild Valuation ($m) | Low | Mid | High |
|---|---|---|---|
| TEV | $190.0 | $210.0 | $230.0 |
| Less: New Term Loan | (150.0) | (150.0) | (150.0) |
| Less: Other Debt (existing) | (16.0) | (16.0) | (16.0) |
| Plus: Excess Cash | - | - | - |
| Total common equity value | $24.0 | $44.0 | $64.0 |
| Implied TEV | $190.0 | $210.0 | $230.0 |
| 2010P EBITDA | 37.5 | 37.5 | 37.5 |
| Implied multiple | 5.1x | 5.6x | 6.1x |

These estimated ranges of values are based on a hypothetical value that reflects the estimated intrinsic value of the Reorganized Debtor derived through the application of various valuation methodologies. The implied reorganized equity value ascribed in this analysis does not purport to be an estimate of any post-reorganization market trading value. Any such trading value may be materially different from the implied reorganized equity value ranges associated with Rothschild's valuation analysis. Rothschild's estimate is based on economic, market, financial, and other conditions as they exist on, and on the information made available as of, the Valuation Date. It should be understood that, although subsequent developments may affect

Rothschild's conclusions, before or after the Confirmation Hearing, Rothschild does not have any obligation to update, revise or reaffirm its estimate.

### 3.   Valuation Methodology

The following is a brief summary of certain financial analyses performed by Rothschild to arrive at its range of estimated TEVs.  This Valuation must be considered as a whole and should be read in conjunction with the Prepackaged Plan and this Disclosure Statement. Rothschild has assigned a weighting to each methodology to arrive at its TEV range to reflect Rothschild's view of the appropriateness of each methodology for the Debtor's circumstances.

### a.   Comparable Company Analysis

The comparable companies analysis estimates the value of a company based on a comparison of such company's financial statistics with the financial statistics of publicly-traded companies with similar characteristics as the particular company being analyzed.  Criteria for selecting comparable companies for this analysis include, among other relevant characteristics, similar lines of business, business risks, growth prospects, maturity of businesses, market presence, size and scale of operations.  The analysis establishes benchmarks for valuation by deriving financial multiples and ratios for the comparable companies, standardized using common variables such as revenue or EBITDA.

Rothschild selected the following publicly traded companies for the comparable company analysis: Gannett Co., Inc., The E.W. Scripps Company, Lee Enterprises Inc., The McClatchy Company and Media General, Inc.  Rothschild analyzed multiples of trailing twelve-month EBITDA, 2009E EBITDA and 2010E EBITDA, and believes that, given the EBITDA trend in the industry, 2010E is the most relevant multiple for the comparable company analysis.

In evaluating comparable publicly traded companies, Rothschild analyzed multiples or both a face value and market value of debt basis.  Rothschild used a range of 6.0x to 7.0x multiples of 2010E EBITDA for its comparable company analysis.  Rothschild applied a weighting of 25% to the comparable company analysis to reflect Rothschild's view that the current public equity markets are not the most meaningful determinant of value of newspaper companies given the current operational challenges and overall volatility in the industry.

### b.   Precedent Transactions Analysis

The precedent transactions analysis is based on the enterprise values of companies involved in public merger, acquisition or restructuring transactions that have operating and financial characteristics similar to the Reorganized Debtor.  Under the methodology, the enterprise values of such companies are determined by an analysis of the consideration paid and the debt assumed in the merger, acquisition or restructuring transaction.  As in a comparable company valuation analysis, the precedent transaction analysis establishes benchmarks for valuation by deriving financial multiples and ratios, standardized using common variables such as revenue or EBITDA.  These derived multiples are then applied to the Reorganized Debtor's operating statistics to determine TEV.

Factors not directly related to a company's business operations can affect a valuation based on precedent transactions, including (i) circumstances surrounding a merger transaction may introduce other motivations for higher premiums (e.g., a buyer may pay an additional premium for reasons that are not solely related to competitive bidding); (ii) the market environment is not identical for transactions occurring at different periods of time; and (iii) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company is in financial distress and may receive a lower price due to weaker negotiating leverage).

Rothschild attempted to identify appropriate precedent transactions for companies similar to the Reorganized Debtor. Given the dramatic structural and economic changes in the newspaper industry over the past 18 months, there were insufficient appropriate transactions with adequate disclosed financial information to conduct the precedent transaction analysis using only merger and acquisition data. However, given the number of recent newspaper companies that have undergone a change of ownership through a financial restructuring, including chapter 11, Rothschild has included these types of transactions in its precedent transaction analysis, including the recent restructuring transactions of the Star Tribune Company and the Journal Register Co. Rothschild used a range of 4.5x to 5.5x multiples of 2010E EBITDA for its precedent transaction analysis. Rothschild applied a weighting of 45% to the precedent transaction analysis to reflect its view that recent comparable restructuring transactions provide meaningful insight into the current valuation metrics in the newspaper industry.

### c. Discounted Cash Flow Analysis

The discounted cash flow analysis ("**DCF**") estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. The DCF discounts the expected cash flows by a theoretical or observed discount rate. This approach has two components: (i) calculating the present value of the projected unlevered after-tax free cash flows for a determined period of time and (ii) adding the present value of the terminal value of the cash flows. The terminal value represents the portion of TEV that lies beyond the time horizon of the available projections.

The DCF calculations were performed on unlevered after-tax free cash flows for the period beginning April 1, 2010 through December 31, 2013, discounted to the Assumed Effective Date (the "**Projection Period**"). Rothschild used management's Projections for performing these calculations.

In performing the DCF calculation, Rothschild made assumptions for (i) the weighted average cost of capital (the "**Discount Rate**"), which is used to calculate the present value of future cash flows and (ii) the terminal EBITDA multiple, which is used to determine the value of the Reorganized Debtor represented by the time period beyond the Projection Period. Rothschild calculated a Discount Rate using a blend of (a) traditional cost of equity capital calculation using the Capital Asset Pricing Model and (b) the cost of equity that a potential third party would reasonably expect in order to participate with the Debtor. Based on this methodology, Rothschild used a Discount Rate range of 13% to 15% for the Reorganized Debtor, which reflects a number of company and market-specific factors, and is calculated based on the cost of capital for companies that Rothschild deemed comparable. Rothschild used the Debtor's terminal EBITDA multiple of 5.0x for the Reorganized Debtor, adjusted to reflect the

complexity of corporate structure and significant assets of the Debtor being included in various partnerships. Rothschild applied a weighting of 30% to the DCF to reflect the complexity of the Debtor's corporate structure, with a meaningful amount of value attributable to complex partnerships and joint operating agreements that represent significant cash flow.

The DCF assumes Reorganized AMI does not inherit any Net Operating Losses ("**NOLs**") from the Debtor, as previously accumulated NOLs are used to shield cancellation-of-indebtedness income resulting from emergence.

### 4.    Recoveries

As described above, Rothschild estimates an Equity Value range of $24 million to $64 million (the "**Equity Value**"). The midpoint of the equity valuation range is approximately $44 million. Based on the Term Loan Facility, the Equity Value estimate and a Claim from the Senior Lenders of approximately $583 million (excluding the $6.375 million of contingent reimbursement claims on letters of credit), Rothschild estimates the hypothetical recovery to the Senior Lenders to be 29% to 36%.

The projected recovery ranges listed above are estimates derived from the Projections and other assumptions. The projected recoveries are substantially based on the assumptions in the business plans underlying the Projections in Section VII.A. The projected recoveries do not take into account shares of the Reorganized Debtor to be issued under the Subordinated Note Warrants and the Singleton Warrants; the deduction of such shares will cause the projected recoveries to be lower than those specified, dependent upon future management and company performance. The actual recoveries may be different than the projected recoveries based upon, among other things: (i) the market price of shares of New Common Stock and (ii) the dilutive or accretive effects of issuance of shares of New Common Stock by Reorganized AMI from time to time (including the dilutive effect of future issuances under the Equity Incentive Plan).

The summary set forth above does not purport to be a complete description of the analyses performed by Rothschild. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of implied reorganized equity value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. In addition, estimates of implied reorganized equity value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were sold. The estimates prepared by Rothschild assume that the Reorganized Debtor will continue as the owner and operator of their businesses and assets and that such assets are operated in accordance with the Debtor's business plan. Depending on the results of the Reorganized Debtor's operations or changes in the financial markets, the Valuation as of the Assumed Effective Date may differ from that disclosed herein.

In addition, the valuation of newly issued securities, such as the New Common Stock, is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual

market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by other factors not possible to predict. Accordingly, the implied reorganized equity value estimated by Rothschild does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR OR THE REORGANIZED DEBTOR. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PREPACKAGED PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE ESTIMATED CALCULATION OF ENTERPRISE VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS AS SET FORTH IN THE PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH IS GUARANTEED AND MANY OF WHICH ARE OUTSIDE OF THE DEBTOR'S CONTROL.

THE CALCULATIONS OF VALUE SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE STATED HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZED EQUITY VALUE RANGES ASSOCIATED WITH THIS VALUATION ANALYSIS. NO RESPONSIBILITY IS TAKEN FOR CHANGES IN MARKET CONDITIONS AND NO OBLIGATION IS ASSUMED TO REVISE THIS CALCULATION OF THE REORGANIZED DEBTOR'S VALUE TO REFLECT EVENTS OR CONDITIONS THAT SUBSEQUENTLY OCCUR.

### C. Liquidation Analysis

### 1. Introduction

Under the "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code, a court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who is impaired by the plan and who does not vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To make these findings, the bankruptcy court must: (1) estimate the cash proceeds (the "**Liquidation Proceeds**") that a chapter 7 trustee would generate if the debtor's chapter 11 case were converted to a chapter 7 case on the effective date of the plan and the assets of the estate (the "**Assets**") were liquidated; (2) determine the distribution (the "**Liquidation Distribution**") that each non-accepting holder of a claim or equity interest would receive from the Liquidation Proceeds under the priority scheme dictated in the Bankruptcy Code; and (3) compare each

holder's Liquidation Distribution to the distribution under the Prepackaged Plan ("**Plan Distribution**") that such holder would receive if the plan were confirmed and consummated.

To demonstrate that the Prepackaged Plan satisfies the "best interests" test, the Debtor and its advisors have prepared the hypothetical liquidation analysis included below (the "**Liquidation Analysis**"), which is based upon certain assumptions discussed below and in the notes accompanying the Liquidation Analysis (the "**Notes**").

Under the Prepackaged Plan, only Claims and Equity Interests in Classes 2, 5, 7 and 8 are impaired. Classes 7 and 8 receive no recovery under the Prepackaged Plan and are therefore not entitled to vote on, and are deemed to reject, the Prepackaged Plan. Therefore the "best interests" test applies to every Claim or Equity Interest in each of Classes 7 and 8. As to Classes 2 and 5, which are impaired but may receive a recovery under the Prepackaged Plan if their members vote by the margins required by the Bankruptcy Code to accept the Prepackaged Plan, the "best interests" test will apply only to those holders of Claims in Class 2 or 5, if any, who vote to reject the Prepackaged Plan.

## 2.    Scope, Intent, and Purpose of the Liquidation Analysis

The determination of the costs of, and proceeds from, the liquidation of the Debtor's Assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtor, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtor, its management, and its advisors. Inevitably, some assumptions in the Liquidation Analysis may not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. In addition, the Debtor's management cannot judge with any degree of certainty the effect of the forced liquidation asset sales on the recoverable value of the Debtor's Assets.

ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE ACTUAL RECOVERIES FROM THE LIQUIDATION OF ASSETS REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTOR WERE LIQUIDATED UNDER CHAPTER 7 AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED IN THE LIQUIDATION ANALYSIS.

The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtor were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended to be, and should not be, used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. NEITHER THE DEBTOR NOR ITS ADVISORS MAKES ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Debtor estimated Allowed Claims based upon a review of the Claims contained in the Debtor's books and records. In addition, the Liquidation

Analysis includes estimates for Claims that would not be asserted in the Debtor's chapter 11 case, but which could be asserted and allowed in a chapter 7 liquidation, including certain Administrative Expense Claims, wind-down costs, trustee fees, tax liabilities and certain lease and contract rejection damages Claims. The Debtor's estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Prepackaged Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTOR. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

### 3. Global Assumptions in the Liquidation Analysis

The Liquidation Analysis presents both "High" and "Low" estimates of Liquidation Proceeds, representing a range of management's assumptions and estimates relating to the proceeds to be received from the liquidation of assets less the costs incurred during the liquidation. It is assumed that a majority of the liquidation would be performed over a six (6) month period due to the factors noted below. The Liquidation Analysis assumes conversion of the Reorganization Case to one under chapter 7 on approximately March 31, 2010 ("**Conversion Date**") and the liquidation of the Debtor would be conducted by and under the direction of a trustee appointed by the United States Trustee pursuant to the Bankruptcy Code (the "**Chapter 7 Trustee**") plus certain current employees of the Debtor who would be retained to wind down the operation and sell the Debtor's assets on a piecemeal basis, and/or at auction.

During the liquidation, the Chapter 7 Trustee would generally undertake: (i) the sale of the Debtor's Equity Interests in a number of its investments either as a going concern or liquidation of underlying assets, (ii) the orderly collection of existing accounts receivable during the wind-down, (iii) the orderly sale of inventory/equipment and other fixed assets, and (iv) the orderly wind-down of daily operations. For certain other assets, liquidation values were estimated for each asset or were assessed for assets in similar categories by estimating the percentage recoveries that a Chapter 7 Trustee might obtain for that category of asset.

The Liquidation Analysis also assumes that the gross amount of assets and the cash available for distribution would be the sum of the Liquidation Proceeds. Recovery on any preference claims is not expected to have any material effect on total proceeds available. There are no pending lawsuits against third parties that are expected to result in net proceeds to the Debtor. The Debtor does not anticipate that there would be any significant number of executory contracts and leases that would be rejected by the Chapter 7 Trustee, and therefore the recovery estimated for holders of General Unsecured Claims in the Liquidation Analysis is unlikely to be substantially further diluted by rejection claims. The gross amount then would be reduced by the costs and expenses of the chapter 7 liquidation to arrive at net proceeds available for distribution to creditors.

The Liquidation Analysis assumes that the net Liquidation Proceeds would be distributed in accordance with the priorities required by sections 726 and 507 of the Bankruptcy Code. Specifically, net value from the liquidation of the Assets after the payment of fees associated with the liquidation generally would be distributed first to satisfy secured claims to the extent of

the collateral value securing such claims, in order of priority. Next, value would flow to unsecured claims, beginning with Administrative Expense Claims (including any incremental Administrative Expense Claims that may result from the termination of the Debtor's business and the liquidation of its assets), second to unsecured Claims accorded priority under the Bankruptcy Code, third to General Unsecured Claims, provided, however, that any amounts that would otherwise be paid to the holders of Subordinated Note Claims would be paid to the holders of the Senior Loan Claims until those Claims are paid in full in cash, pursuant to the subordination provisions of the Indentures, and fourth, pari passu to the holders of Securities Litigation Claims and Old AMI Equity Interests.

### a. Primary Assets of the Debtor

The Liquidation Analysis assumes a liquidation of all of the Assets, which include accounts receivable, newsprint, other inventory, owned real estate, equipment, furniture and fixtures, and saleable equity interests in the Subsidiaries. The Liquidation Analysis assumes a range of recoveries for these Assets assuming a forced liquidation asset sale process conducted by the Chapter 7 Trustee. The liquidation value generated for the Debtor's Assets has been included with any other potential realizable Assets. The Debtor's management believes that values generated in the Liquidation Analysis do not generate a significant recovery for stakeholders as compared with the going concern valuation of the Assets. In particular, holders of Subordinated Note Claims, Securities Litigation Claims, and Old AMI Equity Interests are not expected to receive any recovery in a liquidation, while holders of General Unsecured Claims will receive significantly less than under the Prepackaged Plan.

### b. Forced Liquidation Sale Process

The estimated liquidation proceeds generated for the Debtor was derived assuming a forced liquidation and wind-down of the Debtor's operations. The Debtor's management and its advisors derived a range of potential recovery values for each class of Assets based on a number of factors, including the following: the general state of the economy, lower collection rates on accounts receivable from small local customers, the number of accounts receivable from small local customers, inventory cost for maintaining newsprint, transportation costs for shipping newsprint, local and regional market conditions, the presence of strategic buyers and the trends of their operations, and effect of change of control provisions of the JOAs. Reductions to a going-concern valuation were applied to reflect the forced sale nature of a chapter 7 liquidation. These reductions were derived by considering such factors as the shortened time period involved in the sale process, discounts buyers would require given a shorter due diligence period and therefore potentially higher risks buyers might assume, potentially negative perceptions involved in liquidation sales, the current state of the capital markets as well as the current state of the newspaper industry, the limited universe of prospective buyers, and the "bargain hunting" mentality of liquidation sales. The Liquidation Analysis assumes that a liquidation of the Assets occurs over six months to sell all of the physical Assets of the Debtor, including the Equity Interests in the Subsidiaries. This reflects an estimate of the time required to dispose of or sell the material Assets and wind down the physical operations related to the Debtor's business. This period of time would provide the Chapter 7 Trustee the necessary time to resolve claims as well as distribute proceeds from the sale of the physical Assets. The analysis also assumes all executory contracts would be rejected during the pendency of the liquidation, and an estimate of the potential claims generated by that rejection have been included in the analysis. The Debtor's

management and advisors cannot anticipate additional Claims by creditors for such contract rejections and assumes that the amounts included in the analysis may be significantly understated. If the cash flows from the sale of the Debtor's Assets are not sufficient to fund the ongoing operations during the wind-down period, the Chapter 7 Trustee may have to lower expectations related to potential recovery value for the material Assets and further reduce the recovery estimates contained in this Liquidation Analysis.

This Liquidation Analysis assumes that the estimated sale proceeds for the Debtor's Assets would be less than the tax basis of the Assets and would not generate any additional tax liabilities. Should the tax treatment and effect of this transaction result in a tax liability that is not reduced by other tax shields, recovery percentages in the Liquidation Analysis could decrease materially.

### c. Factors Considered in Valuing Hypothetical Liquidation Proceeds

The estimated Net Book Values of the Assets were primarily derived from the Debtor's books and records as of September 30, 2009. Other than cash on hand, these unaudited amounts are not expected to change materially and therefore are assumed to be the values at the time of liquidation. Accordingly, an estimate of cash on hand as of the presumed date of conversion to a chapter 7 case has been used. In addition, the net estimated Liquidation Proceeds are on a current value basis rather than a net present value basis even though the liquidation is expected to take place over a period of six (6) months.

It is also possible that distribution of the Liquidation Proceeds would be delayed while the Chapter 7 Trustee and its professionals become knowledgeable about the Reorganization Case and the Debtor's business and operations. This delay could materially reduce the value, on a "present value" basis, of the Liquidation Proceeds.

### D. Summary of the Hypothetical Liquidation Analysis

Below is summary of the Liquidation Analysis identifying the estimated recovery of each Class of Claims and Equity Interests.

**Affiliated Media, Inc.**
**Liquidation Analysis - Illustration**
**(In 000's)**

| | Balance | Estimated Recovery Rate | | Estimated Liquidation Proceeds | | Note |
|---|---|---|---|---|---|---|
| | | High | Low | High | Low | |
| **Current Assets** | | | | | | |
| Cash and Equivalents | 31,300.0 | 100% | 100% | 31,300.0 | 31,300.0 | (1) |
| Accounts Receivable - Net | 1,602.7 | 60% | 40% | 961.6 | 641.1 | (2) |
| Prepaids | 2,738.4 | 0% | 0% | - | - | (3) |
| Other Current Assets | 10,054.0 | 0% | 0% | - | - | (4) |
| Total Current Assets | 45,695.1 | | | 32,261.6 | 31,941.1 | |
| | | | | | | |
| Intercompany Receivable | 2,940.6 | 100% | 100% | 2,940.6 | 2,940.6 | (5) |
| | | | | | | |
| **Property & Equipment** | | | | | | |
| Buildings & Improvements | 950.8 | 0% | 0% | - | - | (6) |
| Machinery & Equipment | 2,396.2 | 15% | 5% | 359.4 | 119.8 | (6) |
| Construction in Process | 3,747.8 | 0% | 0% | - | - | (6) |
| Total Property & Equipment | 7,094.8 | | | 359.4 | 119.8 | |
| | | | | | | |
| **Other Assets** | | | | | | |
| Equity Investments | 442,720.9 | 25% | 15% | 112,335.9 | 68,417.6 | (7) |
| Deposits | 426.3 | 0% | 0% | - | - | (8) |
| Other Assets | 8,901.6 | 12% | 8% | 1,068.2 | 712.1 | (9) |
| Total Other Assets | 452,048.9 | | | 113,404.1 | 69,129.7 | |
| | | | | | | |
| Net Distributions from Partnerships and Other Investments | - | N/A | N/A | 7,219.2 | 5,414.4 | (10) |
| | | | | | | |
| **Total Assets & Proceeds** | 507,779.4 | | | 156,185.0 | 109,545.6 | |
| | | | | | | |
| **Less: Costs Associated with Liquidation** | | | | | | |
| Chapter 11 Professionals | | | | 8,187.5 | 7,500.0 | (11) |
| Committee Professionals | | | | 750.0 | 625.0 | (12) |
| Chapter 7 Trustee Professionals | | | | 3,800.0 | 3,200.0 | (13) |
| Investment Banker / Liquidator Fees | | | | 3,370.1 | 2,052.5 | (14) |
| Wind-Down Costs | | | | 2,800.0 | 1,400.0 | (15) |
| Chapter 7 Trustee Fees | | | | 4,141.6 | 2,866.3 | (16) |
| Total Costs Associated with Liquidation | | | | 23,049.1 | 17,643.8 | |
| | | | | | | |
| **Total Net Proceeds Available for Distribution** | | | | 133,135.8 | 91,901.8 | |
| | | | | | | |
| **Net Proceeds Available for Distribution to Secured Claim Holders** | | | | 89,286.8 | 50,773.8 | |
| **Net Proceeds Available for Distribution to Unsecured Claim Holders** | | | | 43,849.0 | 41,128.0 | |
| | | | | | | |
| Net Proceeds Available for Distribution to Secured Claim Holders | | | | 89,286.8 | 50,773.8 | |
| | | | | | | |
| **Less: Secured Claims** | | | | | | |
| Revolving Facility Claim | | | | 172,869.0 | 172,869.0 | (17) |
| Term Loan A | | | | 59,161.0 | 59,161.0 | (17) |
| Term Loan - B | | | | 105,090.9 | 105,090.9 | (17) |
| Term Loan - C | | | | 252,358.8 | 252,358.8 | (17) |
| Total Secured Lender Claims | | | | 589,479.7 | 589,479.7 | |
| | | | | | | |
| **Total Secured Lender Claims Recovery** | | | | | | |
| Estimated Payout per Dollar of Secured Claims | | | | 0.15 | 0.09 | |
| Additional Recovery from Unsecured Distribution | | | | 0.06 | 0.06 | |
| Total Estimated Recovery | | | | 0.21 | 0.15 | |
| | | | | | | |
| **Secured Lender Claim Deficiency after secured distribution** | | | | 500,192.9 | 538,705.9 | |
| **Secured Lender Claim Deficiency after secured and unsecured distribution** | | | | 465,053.1 | 503,366.2 | |
| | | | | | | |
| Total Remaining Proceeds Available for Distribution | | | | 43,849.0 | 41,128.0 | |
| | | | | | | |
| **Less: Administrative and Priority Claims** | | | | | | |
| Postpetition unpaid amounts | | | | 500.0 | 250.0 | (18) |
| Priority Tax Claims | | | | 1,000.0 | 500.0 | (18) |
| Total Administrative Claims | | | | 1,500.0 | 750.0 | |
| | | | | | | |
| **Net Proceeds Available for Distribution to Unsecured Claim Holders** | | | | 42,349.0 | 40,378.0 | |

| | Estimated Claims | | Estimated Recovery | | |
|---|---|---|---|---|---|
| | High | Low | High | Low | |
| **Less: Non-priority Unsecured Claims -** | | | | | |
| Secured Lender Claim Deficiency | 538,705.9 | 500,192.9 | 35,139.9 | 35,339.7 | (19) |
| 6-7/8 Subordinated Notes | 225,329.5 | 225,329.5 | - | - | (20) |
| 6-3/8 Subordinated Notes | 131,651.2 | 131,651.2 | - | - | (20) |
| Pension and Multi-Employer Plan Termination/Withdrawal claim | 175,000.0 | 115,000.0 | 6,865.7 | 4,741.2 | (21) |
| Airplane Note Deficiency claim | 5,000.0 | 5,000.0 | 196.2 | 206.1 | (22) |
| Operating Lease and Agreement Rejection Claims | 100.0 | 50.0 | 3.9 | 2.1 | (22) |
| Accounts Payable (Pre-Petition) | 2,000.0 | 1,000.0 | 78.5 | 41.2 | (22) |
| Unsecured Non-Priority Claims- other notes | 655.7 | 655.7 | 25.7 | 27.0 | (22) |
| Non-Priority Pre-Petition Employee Obligations | 1,000.0 | 500.0 | 39.2 | 20.6 | (22) |
| Executory Contracts - Damage claims | - | - | - | - | (22) |
| Total Unsecured Claims | 1,079,442.3 | 979,379.3 | 42,349.0 | 40,378.0 | |
| | | | | | |
| **Net Proceeds Available for Distribution to Equity Claim Holders** | | | - | - | |

### E.   Notes to Liquidation Analysis

#### a.   Note 1 -- Cash and Equivalents

Cash and equivalents include projected cash in the Debtor's bank accounts as of March 31, 2010 and do not include any check float amounts.  The amounts do not include cash balances from the JOAs/partnerships, as these entities are assumed to be ongoing and therefore the Debtor will have no rights to access its cash to pay its creditors.  We have assumed that accrued and unpaid interest, bank fees, and professional fees were brought current prior to the date on which the Debtor's Reorganization Case was filed.  Any such amounts accrued from the Petition Date through the Conversion Date would be paid out of cash on hand.  Therefore the cash balance presented is projected as net of these items.  However, it is assumed that operations, the partnerships and certain other investments would continue to generate cash and dividends to the Debtor for up to 6 months prior to the equity interests being successfully sold as going concern operations.  However, due to risks associated with the liquidation, these distributions are discounted in the analysis.  Any interest income that could be earned on cash proceeds pending distribution would be immaterial.  The amounts reflected do not include any "restricted cash" or cash in escrow accounts.

#### b.   Note 2 -- Accounts Receivable

Accounts Receivable, Net is primarily comprised of volume rebates and refunds due to the Debtor from various vendors as well as management fees and other pass through costs associated with non-filing Subsidiaries or Affiliates.  Trade Accounts Receivable net of reserves for bad debts are assets of the Debtor's Subsidiaries that are not debtors in a case under the Bankruptcy Code and are accordingly excluded from this analysis.

#### c.   Note 3 -- Prepaid Expenses

Prepaid Expenses mostly includes retainers for legal and financial advisors associated with the Financial Restructuring.

#### d.   Note 4 -- Current Assets

Other Current Assets consist primarily of the net book value of the corporate aircraft.  The aircraft is subject to its own secured financing facility and while the net book value approximates the balance outstanding on the installment purchase loan, the liquidation value of the aircraft in the current market is substantially less than the value of the secured loan.  Accordingly, no net proceeds are anticipated in liquidation.  Rather, there would likely be a deficiency claim asserted for the difference between the fair market value and the outstanding loan balance.  This deficiency claim is reflected as an unsecured claim for purposes of this liquidation analysis.

#### e.   Note 5 -- Intercompany Balances

Any intercompany receivable balance in favor of the Debtor is estimated to be fully collectible since the underlying business operations conducted by the Debtor's Subsidiaries are not affected by the Debtor's filing and thus possess the means to make payment.

### f.      Note 6 -- Property & Equipment

Property and equipment includes computers, telephone equipment, computer software and leasehold improvements as well as prepaid software licensing fees.  Proceeds from projected liquidation sales have been estimated based upon current general market conditions and an assessment by the procurement department of the Debtor.  These results accounted for certain factors relating to the equipment, including the age of the equipment and whether the equipment is for general use or specialized for the Debtor's unique facilities and in the case of software assets, whether the licenses are transferable.

### g.      Note 7 -- Equity and Partnership Investments

Equity investments in the Debtor's operating Subsidiaries were evaluated on an individual basis with consideration given to whether a sale as a going concern or, where applicable liquidation, would produce the highest possible amount recoverable.  Because the Debtor's operating Subsidiaries are almost all cash flow positive and for the most part have sales values far in excess of liquidation value, it is assumed that the Chapter 7 Trustee would make every effort to sell the Debtor's interests in these Subsidiaries instead of forcing a liquidation that would substantially reduce proceeds to the Estate.  Partnership interests were assumed to be sold by the Chapter 7 Trustee.  Valuation multiples were derived through careful consideration of not only expected performance but also current market conditions as they pertain to each individual circumstance.  For wholly-owned operating entities with pension liabilities, it was assumed that the buyers would assume the pension plans of these operations with approval from the PBGC and the purchase price paid would be adjusted appropriately to reflect the underfunded status of the applicable plans assumed.  For operating entities with assets pledged as collateral against Debtor's notes, it is assumed that the buyer(s) would adjust the purchase price paid to offset the lost value in the assets foreclosed upon by the note holder.  Finally, a discount to the "normal" market value was applied to approximate the special circumstances that would be expected to apply in the event of a chapter 7 time-compressed liquidation sale.  These special circumstances include the sale occurring during the continuing tight liquidity macro-economic environment and the relatively low valuations realized for newspaper industry assets in other recent bankruptcy sales.  If the Chapter 7 Trustee was unsuccessful in selling any or all of the Debtor's equity interests and the underlying assets were ultimately liquidated, gross proceeds available for distribution could be significantly reduced.

### h.      Note 8 -- Deposits

Deposits primarily include amounts paid for memberships and workers' compensation.  It is assumed that the deposits have no  recoverable value.

### i.      Note 9 -- Other Non-Current Assets

Other Non-Current Assets primarily reflect deferred financing fees incurred during certain of the Debtor's previous debt financings as well as amounts previously advanced to a related party that is supported by the cash surrender value under certain insurance policies. As such, recovery is expected only for the related party receivable in liquidation.

### j.     Note 10 - Partnership Distributions

Net Distributions from Partnerships and Other Investments reflect the assumption that these underlying operating entities will continue to generate cash and dividends to the Debtor for up to 6 months prior to the equity interests being successfully sold as going concern operations. These payments have been discounted due to risks associated with the liquidation process.

### k.     Note 11 -- Chapter 11 Professionals

The Estate would be responsible for paying the already incurred costs of the chapter 11 professionals.

### l.     Note 12 -- Committee Professionals

Committee-retained professionals assisting in the process are estimated to be needed for 2.5 months, which is estimated to be the amount of time the Debtor is in chapter 11 prior to the assumed conversion to chapter 7, at 50% of the assumed cost of the Debtor's professionals.

### m.     Note 13 -- Chapter 7 Trustee Professionals

The Estate would incur additional costs and claims due to the conversion of the chapter 11 case to a chapter 7 case. In addition, the Estate could bear considerable costs to liquidate the Assets with value and for the wind-down of the Estate. The services of professionals assisting in the process are estimated to be necessary for 8.5 months at a range from $500,000 to $800,000 per month.

### n.     Note 14 -- Investment Banker Fees

Investment banker and/or liquidator fees have been estimated to be approximately 3% of the net proceeds generated from the successful sale or liquidation of Assets including equity interests in investments and other valuable Assets.

### o.     Note 15 – Wind-down Costs.

It is estimated that it could take approximately 6 months to perform the following activities necessary to wind down the Estate:

a) Liquidation of Assets

    i. Sale of major owned equity interests

    ii. Collection of accounts receivable

    iii. Liquidation of remaining Assets with value

b) Close and reconcile books including reviewing accounts payable and filing all required tax returns

c) Review and reconcile various creditor claims

The major types of costs to be incurred for the wind-down of the Estate and sale of Assets include Debtor personnel and related payroll costs to oversee the process and assist the Chapter 7 Trustee, rent for office space during the wind-down process, Chapter 7 Trustee fees and the costs of claims administration.

p.      **Note 16 – Chapter 7 Trustee Fees.**

Assumed Chapter 7 Trustee fees have been calculated pursuant to section 326 of the Bankruptcy Code.

q.      **Note 17 -- Secured Lender Claims**

Secured Claims consist of amounts due under the Senior Credit Agreement Documents in connection with the Revolving Credit Facility and Term Loans (Term Loan A, Term Loan B, and Term Loan C) made available thereunder.  The amounts reflected in the Liquidation Analysis include the amount of Senior Loan Claims as of the Petition Date.  Interest and fees are assumed to be current as of the Petition Date (see Note 1 above).

r.      **Note 18 -- Administrative & Priority Claims**

Administrative and Priority Claims include estimates for potential unpaid postpetition amounts as well as unpaid taxes.

s.      **Note 19 -- Senior Lender Deficiency**

It is anticipated that the liquidation of secured lender collateral will not generate proceeds sufficient to pay Senior Loan Claims in full.  Thus, the liquidation is expected to result in the Senior Lenders holding unsecured deficiency claims.

t.      **Note 20 -- Subordinated Notes**

Subordinated Note balances presented include amounts outstanding as of September 30, 2009 plus accrued but unpaid interest through the assumed date of conversion to chapter 7 (March 31, 2010).

u.      **Note 21 -- Pension Plans**

Claims associated with termination of single employer pension and multi-employer pension plan are anticipated to be filed in connection with a chapter 7 proceeding. Amounts were projected using a range of 2 to 3 times the calculated unfunded liabilities of these plans as of September 30, 2009.

v.      **Note 22 -- Additional Unsecured Claims**

Additional unsecured claims would likely consist primarily of a deficiency claim related to the Aircraft Note and other notes payable and debt assumed in connection with certain acquisitions.  To a much lesser extent, it is estimated that there would be claims made for normal course of business accounts payable, unpaid employee obligations (some payroll and related costs are paid in arrears) and miscellaneous equipment lease rejections.

### w.    Note 23 -- Distribution Waterfall

The Senior Loan Claims are guaranteed by the Guaranteeing Subsidiaries (which are not currently expected to be debtors in cases under the Bankruptcy Code) and secured by first priority Liens and security interests in (i) the capital stock (or other ownership interests) of (x) each of the Guaranteeing Subsidiaries and (y) certain partnerships and JOAs of the Debtor and its Subsidiaries and (ii) substantially all of the assets of Alaska Broadcasting Company, Inc.  The gross proceeds derived from liquidating this Collateral, net of all expenses of the proceedings is available first to cover outstanding amounts owing to the Senior Lenders.  If the proceeds of the liquidation were in excess of the balance owed on the Senior Loan Claims, that excess would be available to pay  General Unsecured Claims.  If the proceeds of liquidation of the Collateral were insufficient to pay the Senior Loan Claims, as the Debtor expects they will be, the remaining amount of Senior Loan Claims  remaining after application of those proceeds would be General Unsecured Claims against the Debtor.    Other Assets of the Debtor, other than the Collateral described herein and Assets securing obligations to other secured creditors, are Assets available to satisfy the General Unsecured Claims.  In accordance with the subordination provisions of the Indentures, until the balances owed the Secured Lenders are fully and indefeasibly paid, proceeds otherwise due holders of the Subordinated Note Claims are required to instead be paid to the Senior Lenders, provided, however, that Subordinated Note Claims are only Claims against the Debtor and not any of its Subsidiaries, therefore, the holders of Subordinated Note Claims do not have a Claim against any of the Debtor's Subsidiaries.

## VIII.   CERTAIN RISK FACTORS AFFECTING THE DEBTOR

The holders of Claims against the Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Prepackaged Plan.  These risk factors should not, however, be regarded as constituting the only risks associated with the Prepackaged Plan and its implementation.

### A.    Risk Factors Relating to the Reorganization Case

### 1.    Parties in Interest May Object to the Debtor's Classification of Claims

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan of reorganization may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtor believes that the classification of Claims and Equity Interests under the Prepackaged Plan complies with the requirements in the Bankruptcy Code.  The Debtor believes that Claims that are subject to Indentures and contractually subordinated, including the Subordinated Note Claims are properly classified separately from each other and from the General Unsecured Claims against the Debtor, as applicable.  Certain holders of Claims may object to this.

In such event, the cost of the Prepackaged Plan and the time needed to confirm the Prepackaged Plan could increase and the Bankruptcy Court may not agree with the Debtor's classification of Claims and Equity Interests.  If the Bankruptcy Court concludes that the classification of Claims and Equity Interests under the Prepackaged Plan does not comply with the requirements of the Bankruptcy Code, the Debtor may need to modify the Prepackaged Plan.

Such modification could require a resolicitation of votes on the Prepackaged Plan. If the Bankruptcy Court determines that the Debtor's classification of Claims and Equity Interests was not appropriate or if the Bankruptcy Court determines that different treatment provided to similarly situated Claim or Equity Interest holders was unfair or inappropriate, the Prepackaged Plan may not be confirmed. If this occurs, the amended plan of reorganization that would ultimately be confirmed may be less attractive to certain Classes than the Prepackaged Plan.

### 2.     The Debtor May Object to the Amount, Secured Status or Priority Status of a Claim

The Debtor reserves the right to object to the amount, the secured status or the priority status of any Claim or Equity Interest under the Prepackaged Plan, except where indicated otherwise in the Prepackaged Plan. The estimates set forth in this Disclosure Statement cannot be relied on by a holder of any Claim or Equity Interest whose Claim or Equity Interest is or may be subject to an objection. Any such holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### 3.     In Certain Instances, Any Chapter 11 Case May Be Converted to a Case Under Chapter 7 of the Bankruptcy Code

If no plan can be confirmed, or if the Bankruptcy Court finds that it would be in the best interest of creditors and/or the Debtor, the Bankruptcy Court may convert the Debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtor's Assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in no distributions being made to holders of Subordinated Note Claims and holders of Equity Interests, and significantly smaller distributions being made to the Debtor's other creditors than those provided for in the Prepackaged Plan because of (i) the likelihood that the Assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing the Debtor's business as a going concern; (ii) additional administrative expenses involved in the appointment of a chapter 7 trustee; and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the operations.

### 4.     The Bankruptcy Court May Decline to Confirm the Prepackaged Plan

Although the Debtor believes that the Prepackaged Plan will satisfy all requirements necessary for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Prepackaged Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. In the event that the Bankruptcy Court refuses to confirm the Prepackaged Plan, the Debtor may be required to seek an alternative restructuring of its obligations. There can be no assurance that the terms of any such alternative restructuring would be similar to or as favorable to the Debtor's creditors and shareholders as the terms proposed in the Prepackaged Plan.

The confirmation of the Prepackaged Plan is subject to certain conditions and requirements of the Bankruptcy Code. If the Prepackaged Plan is filed, the Bankruptcy Court may determine that one or more of those requirements is not satisfied. For example, the Bankruptcy Court might determine that the Prepackaged Plan is not "feasible" under section 1129(a)(11) of the Bankruptcy Code. For the Prepackaged Plan to be feasible, the Debtor must establish that the confirmation of the Prepackaged Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor of the Debtor under the Prepackaged Plan unless such liquidation or reorganization is proposed in the Prepackaged Plan. While the feasibility requirement is not rigorous, it does require the Debtor to put forth concrete evidence indicating that it has a reasonable likelihood of meeting its obligations under the Prepackaged Plan and remaining a commercially viable entity.

In most chapter 11 cases, a plan of reorganization is filed and votes to accept or reject the plan are solicited after the filing of a petition commencing a chapter 11 case. When a debtor proposes a prepackaged plan before filing a petition for relief under the Bankruptcy Code, as the Debtor is proposing here, the debtor may solicit votes prior to the petition date in accordance with section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). The Bankruptcy Court could conclude, however, that this Disclosure Statement does not meet the disclosure requirements set forth therein.

With regard to the Solicitation, if the Bankruptcy Court concludes that the requirements of section 1126(b) of the Bankruptcy Code and/or Bankruptcy Rule 3018(b) have not been met, then the Bankruptcy Court could deem such votes invalid, and the Prepackaged Plan would not be confirmed without a resolicitation of votes to accept or reject the Prepackaged Plan. While the Debtor believes that the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018 will be met, the Bankruptcy Court may not reach the same conclusion. The United States Trustee or other parties in interest could move the Bankruptcy Court to "designate" the votes of the Senior Lenders that are a party to the Restructuring Support Agreement under section 1126(e) of the Bankruptcy Code, which permits a bankruptcy court to designate – and nullify for purposes of determining acceptances and rejections of the subject plan – the vote of an entity whose acceptance or rejection of a plan was not in good faith or was not solicited or procured in good faith or otherwise not in accordance with the provisions of the Bankruptcy Code.

If the Bankruptcy Court were to find any of these deficiencies, the Debtor could be required to restart the process of filing another plan and disclosure statement by (i) seeking Bankruptcy Court approval of a disclosure statement, (ii) soliciting votes from classes of claims and equity interests and (iii) seeking Bankruptcy Court confirmation of such newly proposed plan of reorganization. A resolicitation of acceptances of the Prepackaged Plan likely could not take place within a sufficiently short period of time to prevent the release of the consenting Senior Lenders from their obligations under the Restructuring Support Agreement to support the Prepackaged Plan. If this situation occurs, confirmation of the Prepackaged Plan would be delayed and possibly jeopardized. Additionally, should the Prepackaged Plan fail to be approved, confirmed, or consummated, other parties with an interest in the Debtor may be in a position to propose alternative plans of reorganization. Therefore, any failure to confirm the Prepackaged Plan would likely entail significantly greater risk of delay, expense and uncertainty, which would likely have a material adverse effect upon the Debtor's business and financial condition.

5. **The Debtor May Fail to Meet All Conditions Precedent to Effectiveness of the Prepackaged Plan**

Although the Debtor believes that the Effective Date may occur very shortly after the Confirmation Date, there can be no assurance as to such timing. Moreover, if the conditions precedent to the Effective Date, including (i) the entry of a Confirmation Order, (ii) the continued effectiveness of the Restructuring Support Agreement, (iii) execution and delivery of certain documents, and (iv) receipt of all necessary authorizations and regulatory approvals, have not occurred, the Prepackaged Plan may not be confirmed by the Bankruptcy Court.

In addition, the Restructuring Support Agreement provides that it shall be automatically terminated and votes on the Prepackaged Plan shall be withdrawn if certain key milestones are not met.

6. **The Announcement of the Restructuring Could Adversely Affect the Value of the Debtor's Business**

It is possible that announcement of the Financial Restructuring or the filing of a prepackaged bankruptcy case could adversely affect the Debtor's operations and relationships with its employees, customers, advertisers and suppliers. Due to various uncertainties, many risks exist, including the following:

> ➢ employees may be distracted from performance of their duties or more easily attracted to other employment opportunities, including with the Debtor's competitors;

> ➢ customers may delay making payments;

> ➢ advertisers may choose to advertise elsewhere;

> ➢ although the Prepackaged Plan provides for the payment of trade invoices in the ordinary course of business, vendors, customers, lessors, and other trade creditors may suspend or terminate their relationships with the Debtor and/or its Subsidiaries, partnerships or JOAs, exercise rights of setoff or similar remedies, further restrict ordinary credit terms or require guarantee of payment;

> ➢ trade creditors could require payment in advance or cash on delivery;

> ➢ the Debtor's ability to renew existing contracts and compete for new business may be adversely affected;

> ➢ the Debtor's ability to pursue acquisitions and obtain financing for such acquisitions may be negatively affected; and

> ➢ the cost to obtain insurance could increase substantially.

A delay in completing the Financial Restructuring may result in the same adverse consequences. The occurrence of one or more of these events could have a material and adverse effect on the financial condition, operations and prospects of the Debtor.

### 7. The Debtor May Be Unsuccessful in Obtaining First Day Orders to Authorize Payment of Unimpaired Creditors in the Ordinary Course of Business

There can be no guarantee that the Debtor will be successful in obtaining the necessary approvals of the Bankruptcy Court to authorize payments to its vendors as they become due and payable in the ordinary course of business, including any amounts that may relate to claims arising prior to the Petition Date. As a result, the Debtor may be unable to make certain payments to vendors, in which case the Debtor's businesses as well as those of its many Subsidiaries, for whom the Debtor performs crucial administrative responsibilities, would suffer.

### 8. The Debtor Cannot Predict the Amount of Time Needed to Implement the Prepackaged Plan, and a Lengthy Bankruptcy Case Could Disrupt the Debtor's Business, as well as Impair the Prospect for Reorganization on the Terms Contained in the Prepackaged Plan and Possibly Provide an Opportunity for Other Plans to be Proposed

The Debtor cannot be certain its Reorganization Case will be of relatively short duration (e.g., 30 to 90 days) and will not unduly disrupt the Debtor's business. It is impossible to predict with certainty the amount of time needed in bankruptcy, and the Debtor cannot be certain that the Prepackaged Plan will be confirmed. Moreover, time limitations exist for which the Debtor has an exclusive right to file a plan before other proponents can propose and file their own plans.

A lengthy chapter 11 case would also involve additional expenses and divert the attention of management from operation of the Debtor's business, as well as create concerns for employees, vendors and customers. The disruption that a lengthy chapter 11 case could inflict upon the Debtor's business would increase with the length of time it takes to emerge from chapter 11. The severity of the disruption caused by the chapter 11 case the Debtor intends to file will depend upon the attractiveness and feasibility of the Prepackaged Plan from the perspective of the constituent parties, including essential vendors, employees and customers.

If the Debtor is unable to obtain confirmation of the Prepackaged Plan on a timely basis because of a challenge to the Prepackaged Plan or a failure to satisfy the conditions to the effectiveness of the Prepackaged Plan, the Debtor may be forced to operate in bankruptcy for an extended period while trying to develop a different reorganization plan that can be confirmed. A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

### 9. The Debtor May Seek to Amend, Waive, Modify or Withdraw the Prepackaged Plan at Any Time Prior to the Confirmation Date

The Debtor reserves the right, prior to confirmation or substantial consummation of the Prepackaged Plan, subject to the provisions of section 1127 of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules, to amend the terms of the Prepackaged Plan or waive any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Prepackaged Plan. The potential impact of any such amendment or waiver on the holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Prepackaged Plan on some or all of the Classes or a change in the relative rights of

such Classes.  All holders of Claims and Equity Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances but prior to confirmation of the Prepackaged Plan, the Debtor seeks to modify the Prepackaged Plan, the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors accept the modification in writing, or (ii) the Bankruptcy Court determines, after notice has been given to designated parties, that such modification was *de minimis*, purely technical or otherwise did not materially, adversely change the treatment of holders of accepting Claims.

If a chapter 11 petition is filed by or against the Debtor, the Debtor reserves the right not to file the Prepackaged Plan.  If the Debtor files the Prepackaged Plan, the Debtor reserves the right to revoke and withdraw such Prepackaged Plan at any time prior to confirmation.  If the Debtor revokes or withdraws the Prepackaged Plan, the Prepackaged Plan and all votes thereon will be deemed to be null and void.  In such event, nothing contained in the Prepackaged Plan will be deemed to constitute a waiver or release of any Claims by or against, or Equity Interests of or in, the Debtor or any other Person or to prejudice in any manner the Debtor's rights or those of any other Person.

### 10.    Inherent Uncertainty of Projections

The Projections cover the operations of the Reorganized Debtor through calendar year 2013.  The fundamental premise of the Prepackaged Plan is the implementation and realization of the Debtor's business plan.  The Projections reflect numerous assumptions concerning the anticipated post-financial restructuring performance of the Reorganized Debtor, some of which may not materialize.  Such assumptions include, among other items, assumptions concerning (i) the general economy, (ii) industry performance, (iii) the ability to make necessary capital expenditures, (iv) the ability to establish market strength, (v) consumer trends and preferences, (vi) the ability to stabilize and grow the Debtor's circulation base and control future operating expenses, (vii) no material adverse changes in applicable legislation or regulations, or the administration thereof, (viii) no material adverse changes in generally accepted accounting principles, (ix) no material adverse changes in competition, (x) the Reorganized Debtor's retention of key management and other key employees, (xi) adequate financing, (xii) the absence of material contingent or unliquidated litigation, indemnity or other claims and (xiii) other matters, many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize.  The Debtor believes that the assumptions underlying the Projections are reasonable.  However, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the Reorganized Debtor's ability to maximize the intended benefits of the Financial Restructuring and undermine the financial results of the Reorganized Debtor.  Therefore, the actual results achieved throughout the periods covered by the Projections necessarily will vary from the projected results, and such variations may be material and adverse.  In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.

The Projections were not prepared with a view to compliance with published guidelines of the Securities and Exchange Commission regarding projections or forecasts.  The Projections have not been audited, reviewed, or compiled by the Debtor's independent public accountants.  The projected financial information contained in this Disclosure Statement should not be

regarded as a representation or warranty by the Debtor, the Debtor's advisors or any other Person that the Projections can or will be achieved.

## 11. Certain of the Senior Lenders May Seek to Enforce Remedies against Debtor's Non-Filing Subsidiaries

Section 362 of the Bankruptcy Code prevents creditors from taking or continuing any debt collection enforcement actions against entities that seek bankruptcy court protection. Unless expanded by an order of the Bankruptcy Court, these protections only extend to the chapter 11 debtor and its property and do not extend to the property of non-debtor Subsidiaries or related parties. Accordingly, the rights of creditors against non-debtors are not typically affected by the bankruptcy filing by an affiliated entity.

The Debtor and the Guaranteeing Subsidiaries are all obligated under the Senior Credit Agreement Documents. A bankruptcy filing by the Debtor is a default of the Guaranteeing Subsidiaries' obligations, and upon such an event of default, absent an agreement to waive or forbear from exercising remedies in respect of such default, the Senior Lenders would have been free to pursue remedies against the Guaranteeing Subsidiaries. However, the Senior Lenders are limited in their rights to pursue remedies by the Restructuring Support Agreement.

## 12. Conditions of Forbearance May Not Be Met Prior to Commencement of the Reorganization Case

The Restructuring Support Agreement effectuates a conditional forbearance, such that the Senior Lenders signatory to the Restructuring Support Agreement, who constitute Senior Lenders holding more than two-thirds in dollar amount of the outstanding principal amount of the Senior Loan Claims and letter of credit obligations under the Senior Credit Agreement and compromise more than one-half in number of the Senior Lenders, have agreed that so long as the conditions therein are met, the Senior Lenders will not take action to collect from the Guaranteeing Subsidiaries.

If any of the conditions to the continued forbearance cease to be met, the forbearance effectuated by the Restructuring Support Agreement could terminate and one or more Senior Lenders could take action against the Debtor prior to commencement of the Reorganization Case and the imposition of the automatic stay provided by the Bankruptcy Code.

## B. Risk Factors Regarding the Debtor's Business

The Debtor faces a number of risks with respect to its continuing business operations, including but not limited to the following: (i) the confirmation and consummation of the Prepackaged Plan; (ii) the ability to obtain relief from the Bankruptcy Court to facilitate the smooth operation of the Debtor's businesses under chapter 11 of the Bankruptcy Code; (iii) the proposed restructuring and the costs associated therewith; (iv) various factors that may affect the value of the new common stock to be issued under the Prepackaged Plan; (v) additional financing requirements post-restructuring; (vi) future financial results and liquidity, including the ability to finance operations in the normal course; (vii) its ability to increase capital expenditures in the future; (viii) the ability to retain key personnel; (ix) the growth of the market for the Debtor's new initiatives; (x) changes in the global economy and the global credit markets; (xi)

the effects of the current economic downturn on local and national advertising and paid circulation; (xii) the loss of any major advertisers; (xiii) a decline of circulation for its newspapers due to competitive alternative media or other factors; (xiv) increased consolidation among major retailers, bankruptcy or other events that may adversely affect business operations of the major customers of the Debtor's operating Subsidiaries and partnerships and depress the level of local and national advertising; (xv) fluctuations in the cost and availability of newsprint; (xvi) the relationships with and payment terms provided by trade creditors; (xvii) labor disputes which may cause revenue declines or increased labor costs; (xviii) increases in labor and employee benefit costs, such as health care and pension expenses; (xix) its ability to reserve appropriately for self-insurance liabilities due to the variability of such factors as claims experience, medical inflation, legislative changes, jury verdicts, and the effects of the chapter 11 filings; (xx) rapid technological changes and frequent new product introductions prevalent in electronic publishing, including the ongoing evolution of the Internet; (xxi) the effect of competitive products, services or pricing by competitors; (xxii) its response to the entry of new competitors into its markets; (xxiii) the ability to improve profitability and generate positive operating cash flow; future dispositions and acquisitions; (xxiv) changes in federal, state or local laws or regulations affecting manufacturing, distribution, or retailing, including environmental regulations; (xxv) changes in accounting standards, taxation requirements and bankruptcy laws; and (xxvi) each of the other risks identified in this Disclosure Statement.

### 1. Impact of the U.S. Economy

The Debtor's business is vulnerable to the U.S. economy and the varying economic and business cycles of its customers.

### 2. Impact of the Market Concentration of the Debtor's Business

The Debtor's ability to generate advertising revenues is and will continue to be affected by financial market conditions, consumer confidence, advertiser challenges and changes in the national and, sometimes, the international economy, as well as by regional economic conditions in each of the markets in which it operates. **The Debtor has significant operations in California, which makes the economic condition of this region of particular consequence to its financial condition and results of operations.** The level of advertising spending, which is affected by broad economic trends, affects the newspaper industry in general and the revenues of individual newspapers in particular. Advertisers have purchased less advertising from the Debtor's newspapers recently, due to the current decline in the national economy and in regional economies.

### 3. Incurrence of Significant Losses in Recent Years

Although the restructuring provided under the Prepackaged Plan is expected to improve the Debtor's balance sheet, there can be no assurance that the Reorganized Debtor will be, or of the extent to which it will be, profitable.

### 4. Digital Media Challenges

The Debtor has placed an emphasis on building its digital/online advertising business. If the Debtor were unable to increase revenue, it would adversely affect the Debtor's future

business growth and profitability. The Debtor seeks to increase its online revenues through a number of digital media initiatives, including developing digital products internally and entering into strategic partnerships with existing online businesses. While the Debtor has invested in successful Internet ventures to capture some of the advertising dollars that have migrated online, retaining the Debtor's historical share of advertising revenues remains a challenge and there can be no assurances that the Reorganized Debtor's digital media initiatives will be successful or result in significant online revenue growth.

### 5. Advertising and Circulation Dependencies

The Debtor's advertising revenues and, to a lesser extent, circulation revenues, depend on a variety of factors specific to the communities that the Debtor's publications and television and radio stations serve. These factors include, among other things, the size and demographic characteristics of the local population, local economic conditions in general, and the related retail segments and labor markets in particular, as well as local weather conditions. Competition from other media, including other metropolitan, suburban and national newspapers, broadcasters, cable systems and networks, satellite television and radio, websites, magazines, direct marketing, solo and shared mail programs, mobile solutions, email marketing and the Internet affects, and may continue to affect, the Reorganized Debtor's ability to retain advertising clients and raise advertising rates in the future.

The advertising revenue on which the media industry relies is currently being driven by macroeconomic trends, including, but not limited to, the current housing downturn, declining automotive sales, a declining job market, the retail sector slowdown and a shift in advertising dollars to online media. Due to structural changes in the advertising business, and other factors including the reduced consumer spending in the current market and the tight labor market, industry-wide retail and classified advertising performance is expected to continue to be significantly negatively affected in 2010.

### 6. Privacy Laws

Recent public concern over methods of information gathering has led to the enactment of legislation in certain jurisdictions that restricts the collection and use of information. The Debtor's publishing business relies in part on telemarketing and online sales, which is affected by recent "do not call" and "spam e-mail" legislation at both the federal and state levels. Further legislation, industry regulations, the issuance of judicial interpretations or a change in customs relating to the collection, management, aggregation and use of consumer information could materially increase the cost of collecting that data, or limit the Reorganized Debtor's ability to provide that information to its customers or otherwise utilize telemarketing or online sales and could adversely affect the Reorganized Debtor's results of operations.

### 7. Cost and Supply of Newsprint

Newsprint is one of the largest costs of producing the Debtor's newspapers. The Debtor buys newsprint from several suppliers under arrangements that it believes provide the Debtor and its Subsidiaries with some of the most favorable newsprint prices in the industry. The Debtor and its Subsidiaries have implemented various cost-cutting measures in an effort to reduce newsprint costs, such as decreasing their newspapers' web width and using lighter weight

newsprint. The Debtor's newsprint consumption related to its publications totaled approximately $85 million in 2009 through the Petition Date, which was approximately 9% of total revenue of its newspaper operations. The price of newsprint is currently increasing, and while the Debtor is unable to predict the amount or timing of future price increases, such increases could be substantial. Furthermore, the major suppliers of newsprint may be facing operational or financial difficulties, and if any of these newsprint suppliers cease operations it could cause significant dislocation in the market. The Reorganized Debtor's inability to obtain an adequate supply of newsprint in the future or significant increases in newsprint costs could have a material adverse effect on its financial condition and results of operations.

## 8.      Publishing Industry Competition

Each of the Debtor's newspapers competes for advertising revenue to varying degrees with magazines, yellow pages, radio, broadcast television and cable television, as well as with some weekly publications, direct mail and other advertising media, including electronic media (Internet and mobile). Competition for newspaper advertising is largely based on the circulation, price and the content of the newspaper. The Debtor's suburban and small city daily newspapers are a significant local news and information source, with strong brand name recognition and limited direct competition from similar daily newspapers published in their markets. Yet future competitors from the Internet, mobile, and other sources may become a significant competing factor in the future. In addition, in most suburban and small city daily newspapers, some circulation competition exists from larger daily newspapers, which are usually published in nearby metropolitan areas. The Debtor believes that the larger metropolitan daily newspapers that have circulation in the Debtor's suburban newspaper markets generally do not compete in any meaningful way for local advertising revenues, a newspaper's main source of revenues. However, the Debtor and its Subsidiaries and partnerships do compete to some extent with the larger metropolitan newspapers in Los Angeles, San Francisco and Boston for readers and advertising in certain categories.

Most newspapers now publish news and advertising content on the Internet. In addition, there are many news and search sites on the Internet that are advertising and/or subscription supported. Many of these sites target specific types of advertising such as employment, real estate and automotive classified. Accordingly, the Debtor has and will continue to develop partnerships and invest in online growth strategies.

Revenues in the newspaper industry primarily consist of advertising and paid circulation. Competition for advertising expenditures and paid circulation comes from local, regional and national newspapers, shopping guides, television, radio, direct mail, on-line services and other forms of communication and advertising media. Competition for newspaper advertising expenditures is based largely upon advertiser results, readership, advertising rates, demographics and circulation levels, while competition for circulation and readership is based largely upon the content of the newspaper, its price and the effectiveness of its distribution. The Debtor has many competitors for advertising revenue that are larger and have greater financial and distribution resources than the Debtor. Circulation revenue and the ability to achieve price increases for print products are affected by competition from other publications and other forms of media available in various markets, declining consumer spending on discretionary items like newspapers, decreasing amounts of free time and declining frequency of regular newspaper buying among young people. The Reorganized Debtor may incur increasing costs trying to compete for

advertising expenditures and paid circulation. If the Reorganized Debtor is not able to compete effectively for advertising expenditures and paid circulation, its revenue may decline and its financial condition and results of operations may be adversely affected.

### 9. The Debtor's Business Operations Could Be Significantly Disrupted if It Lost Members of Its Management Team

The Debtor's success depends to a significant degree upon the continued contributions of its executive officers and key employees and consultants, both individually and as a group. The Debtor's future performance will be substantially dependent on its ability to retain and motivate them. The loss of the services of any of these executive officers or key employees and consultants, particularly the Debtor's Chairman and Chief Executive Officer, Dean Singleton, and its President, Joseph J. Lodovic, IV, as well as the Debtor's other executive officers, could prevent the Debtor from executing its business strategy.

### 10. Employee Relations

Employee costs are the single largest operating cost of the Debtor and its operating Subsidiaries, representing approximately 42% of total revenues. As of the date hereof, none of the employees of the Debtor are unionized. However, portions of the workforce of the Debtor's Subsidiaries (and portions of the workforce at the JOAs) are represented by labor unions. The collective bargaining agreements covering these employees expire periodically. The Debtor has 37 union contracts at its Subsidiaries, partnerships and JOAs, of which 7 are due for negotiation in the next 12 months and 24 have expired. While the Debtor believes that it and its Subsidiaries and partnerships have satisfactory relationships with labor unions and the employees who are represented by the labor unions, no assurance can be given that the Debtor, its Subsidiaries or partnerships will be successful in any future negotiations with these labor unions in arriving at new collective bargaining agreements on terms that are acceptable to the Debtor and the employees. Any labor union strikes, threats of strikes or other resistance in connection with the negotiation of a new agreement or higher costs in connection with any renegotiated collective bargaining agreements could materially affect the Debtor's business and the Debtor's ability to implement its operating strategies. A lengthy strike at a significant newspaper location would have a materially adverse effect on the Debtor's operations and financial conditions. In addition, the formation of new labor unions could have a negative impact on operating performance.

### 11. Regulation and Environmental Matters

The Debtor is not aware of any environmental condition at any of its properties that it considers material. However, it is possible that the environmental investigations of its properties might not have revealed all potential environmental liabilities or might have underestimated certain potential environmental issues. It is also possible that future environmental laws and regulations, or new interpretations of existing environmental laws, will impose material environmental liabilities on the Debtor and its Subsidiaries, or that current environmental conditions of properties that the Debtor and its Subsidiaries own or operate will be adversely affected by hazardous substances associated with other nearby properties or the actions of unrelated third parties. The costs to defend any future environmental claims, perform any future environmental remediation, satisfy any environmental liabilities, or respond to changed

environmental conditions could have a material adverse effect on the Debtor's financial condition and operating results.

The Debtor and its Subsidiaries are subject to federal, state and local environmental and workplace health and safety laws and regulations, including requirements governing discharges to the air and water, the handling and disposal of solid and hazardous wastes, and the remediation of contaminated sites. The Debtor believes it is currently in material compliance with environmental and workplace health and safety laws and regulations. However, there can be no guarantee that the Debtor and its Subsidiaries will not incur material costs, including fines or damages, resulting from non-compliance with environmental laws and regulations. Environmental assessment reports of the Debtor and its Subsidiaries' properties have identified historic activities and conditions on certain of these properties, as well as current and historic uses of properties in surrounding areas, which may require further study or remedial measures. No material remedial measures are currently anticipated or planned by the Debtor and its Subsidiaries with respect to their properties. However, no assurance can be given that existing environmental assessment reports reveal all environmental liabilities, that any prior owner of the properties of the Debtor and its Subsidiaries did not create an environmental condition not known to the Debtor, or that an environmental condition does not otherwise exist at any such property which could result in incurrence of material cost.

If the Prepackaged Plan cannot be confirmed and the Reorganization Case is converted to a case under chapter 7 of the Bankruptcy Code, the Debtor and its Subsidiaries may face environmental liabilities upon liquidation of the Debtor's business or upon sale of various properties if the properties are used for purposes other than their current ones.

Because the Debtor and its Subsidiaries deliver certain newspapers by second-class mail, they are required to obtain permits from, and to file an annual statement of ownership with, the United States Postal Service.

## 12. Legal Proceedings

### a. California Independent Contractor Litigation

In September 2006, the Debtor and California Newspapers Partnership were named as defendants in a lawsuit, which involves, among other allegations, claims that the carriers and distributors at the Fremont *Argus* are employees and not independent contractors. Although the sole plaintiff in the lawsuit was a carrier and a distributor for the *Argus*, the scope of the litigation potentially includes various publications throughout California owned by both California Newspapers Partnership and other Subsidiaries of the Debtor. The plaintiff's allegations include claims that she represents a class of "similarly situated individuals," and she is seeking class certification. The Debtor is not in a position at this time to determine the likely outcome of these claims, but intends to vigorously defend and contest all such claims, including the class action allegations.

### b. Charleston & York JOA Litigation

In May 2004, the Debtor restructured its interests in Charleston Newspapers ("**Charleston JOA**") and The York Newspaper Company ("**York JOA**"). The Debtor and the

other participants in such restructurings subsequently received civil investigative demands from the United States Department of Justice and provided responsive information and documents concerning the restructurings of the Charleston and York JOAs. After discussions with the Antitrust Division staff in 2005, the Debtor proposed potential amendments to the agreements governing the York JOA to clarify the rights and obligations of the parties to provide for additional performance-based compensation to the manager of *The York Dispatch* under certain circumstances. The proposed amendments remain under review at the Antitrust Division. The Debtor anticipates that any such amendments would not be material to its future operating results.

With respect to the Charleston JOA, the Antitrust Division staff continued their investigation and on May 22, 2007, the U.S. government filed a lawsuit challenging the 2004 amendments to the Charleston JOA. In October 2009, the parties reached a tentative agreement on all matters. Under the proposed settlement, the Debtor will not be obligated to make any payments, but instead will have an opportunity to purchase additional equity in the Charleston JOA in the future and receive an increase in the fee it is paid for managing the *Charleston Daily Mail*. The Debtor is currently working with the other parties to implement the proposed settlement.

### c. Other Litigation

The Debtor is involved in other litigation arising in the ordinary course of business. In the Debtor's opinion, the outcome of these legal proceedings is not likely to have an adverse effect on the Debtor's financial condition or results of operation. The rights of the plaintiffs and other parties to these litigation matters will not be affected by confirmation and consummation of the Prepackaged Plan.

### 13. Leverage

The Debtor believes that it will emerge from chapter 11 with a reasonable level of debt that can be effectively serviced in accordance with its business plan. Circumstances, however, may arise that might cause the Debtor to conclude that it is overleveraged, which could have significant negative consequences, including: (1) it may become more difficult for the Reorganized Debtor to satisfy its obligations with respect to all of its obligations; (2) the Reorganized Debtor may be vulnerable to a prolonged downturn in the market in which it operates or a prolonged downturn in the economy in general; (3) the Reorganized Debtor may be required to dedicate a substantial portion of its cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements; (4) the Reorganized Debtor may be limited in its flexibility to plan for, or react to, changes in its business and the industry in which it operates or entry of new competitors into its markets; (5) the Reorganized Debtor may be placed at a competitive disadvantage compared with its competitors that have less debt, including with respect to implementing effective pricing and promotional programs; and (6) the Reorganized Debtor may be limited in borrowing additional funds.

Additionally, there may be factors beyond the control of the Reorganized Debtor that could affect its ability to meet debt service requirements. The Reorganized Debtor's ability to meet debt service requirements will depend on its future performance, which, in turn will depend on its ability to sustain sales conditions in the markets in which the Reorganized Debtor operates,

the economy generally, and other factors that are beyond its control. The Debtor can provide no assurance that the Reorganized Debtor's business will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Reorganized Debtor to pay its indebtedness or to fund its other liquidity needs. Moreover, the Reorganized Debtor may need to refinance all or a portion of its indebtedness on or before maturity. The Debtor cannot make assurances that the Reorganized Debtor will be able to refinance any of its indebtedness on commercial reasonable terms or at all. If the Reorganized Debtor is unable to make scheduled debt payments or comply with the other provisions of its debt instruments, its various lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

14. **The New Senior Secured Credit Agreement Contains Financial and Other Covenants That Impose Restrictions on the Debtor's Financial and Business Operations.**

The New Senior Secured Credit Agreement contains financial covenants that, among other things, will require Reorganized AMI to maintain certain financial ratios and meet certain tests, and restrict its ability to make capital expenditures. In addition, the New Senior Secured Credit Agreement restricts the Reorganized Debtor's ability to, among other things, incur or secure additional indebtedness, make investments, sell assets, pay dividends, repurchase stock sell assets, make capital expenditures, engage in certain mergers and acquisitions or refinance existing indebtedness. These covenants may have important consequences for the Reorganized Debtor's operations. In addition, if Reorganized AMI fails to comply with the covenants in the New Senior Secured Credit Agreement and is unable to obtain a waiver or amendment, an event of default would result under the New Senior Secured Credit Agreement. If the Reorganized Debtor is unable to repay amounts outstanding under the New Senior Secured Credit Agreement when due, the lenders thereunder could, subject to the terms of the New Senior Secured Credit Agreement, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility. Substantially all of the assets of the Reorganized Debtor and the Guaranteeing Subsidiaries will be pledged as security under the New Senior Secured Credit Agreement.

15. **Adverse Publicity**

Adverse publicity or news coverage relating to the Reorganized Debtor, including but not limited to publicity or news coverage in connection with the Reorganization Case, may negatively affect the Debtor's efforts to establish and promote name recognition and a positive image after the Effective Date.

16. **Pension Matters**

As of September 30, 2009, the liabilities of the Pension Plans exceeded the assets of the Pension Plans by an estimated amount of approximately $70 million. The underfunded amount substantially increased due to economic conditions involving weak equity performance and/or general interest rates that reduced the total value of the assets of the Pension Plans. The Debtor has approximately five years to pay the underfunded amount, or recognize sufficient asset returns to reduce the underfunded amount to zero. This yearly payback amount will vary depending

upon the valuation method selected and the relative stability of investment returns and interest rates over this time frame. If the Pension Plans continue to experience a decline in the value of plan assets, or if interest rates should decline significantly, the required contributions to the Pension Plans would increase accordingly, potentially putting an additional strain on the Debtor's liquidity.

### 17. Self-Insurance and Deductibles on Workers' Compensation Insurance

Under the Debtor's workers' compensation insurance program, the Debtor and its Subsidiaries are self-insured for liabilities in excess of $10 million per occurrence and are also responsible for the first $500,000 per occurrence; otherwise the Debtor has statutory unlimited insurance coverage for workers' compensation losses. The final cost of many of these claims may not be known for several years. The Debtor continuously reviews the adequacy of its insurance coverage, which it currently believes to be appropriate in light of the cost of insurance coverage and the type of risk being insured.

The workers' compensation insurance and self-insurance liability does not include coverage of independent contractors of the Debtor or its Subsidiaries. The Debtor believes these claims are covered under its general liability insurance (discussed below). However, if it is later determined that the independent contractors are covered under workers' compensation insurance, the Debtor's and its Subsidiaries' loss exposure (and liability) could be significantly greater than the Debtor has currently estimated.

### 18. Certain Tax Considerations

There are a number of income tax considerations, risks and uncertainties associated with consummation of the Prepackaged Plan. Interested parties should read carefully the discussions set forth in Article XIV of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Prepackaged Plan to the Debtor and the Reorganized Debtor and to certain holders of Claims who are entitled to vote to accept or reject the Prepackaged Plan.

### C. Certain Risk Factors Relating to Securities to Be Issued Under the Prepackaged Plan

### 1. No Current Public Market for Securities

The New Common Stock and the Subordinated Note Warrants to be issued pursuant to the Prepackaged Plan are securities for which there is currently no market, and there can be no assurance as to the development or liquidity of any market for such securities. The New Common Stock and the Subordinated Note Warrants are subject to restrictions on transfer under the Reorganized Debtor's Restated Certificate of Incorporation and Stockholders' Agreement, certain holders may be restricted under applicable securities laws in their ability to transfer or sell their securities, and the Reorganized Debtor has no present intention to register the sale of any of these securities under the Securities Act, nor to apply to list any of the foregoing on any national securities exchange. In addition, the Reorganized Debtor will not be required to file periodic reports with the SEC or otherwise provide financial or other information to the public, which may further impair liquidity and prevent brokers or dealers from publishing quotations. If

a trading market does not develop or is not maintained, holders of such securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for, the Reorganized Debtor.

Furthermore, Persons to whom such securities are issued pursuant to the Prepackaged Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis. Accordingly, any market that does develop for such securities may be volatile. Other factors, such as the Reorganized Debtor's current intention not to pay dividends for the foreseeable future, may further depress any market for the New Common Stock.

### 2. Potential Dilution

The shares of New Common Stock distributed on the Effective Date pursuant to the Prepackaged Plan will be subject to dilution on account of (a) the New Common Stock issued pursuant to the Equity Incentive Plan, and (b) the exercise of the Subordinated Note Warrants, if any are issued and the Singleton Warrants. In the future, similar to other companies, additional equity financings or other share issuances by AMI could further dilute the issued New Common Stock.

### 3. Dividends

The Debtor does not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock in the foreseeable future.

### D. Risks Related to FCC Approval Requirements In Connection With Emergence From Bankruptcy

The Debtor, through two of its Subsidiaries, Graham Newspapers and Alaska Broadcasting, operates television and radio broadcast stations and certain associated facilities under authority granted by the FCC. Under section 310(d) of the Communications Act, the consent of the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that holds or controls FCC licenses. Except in the case of "involuntary" assignments and transfers of control, prior consent of the FCC is required before an assignment or a transfer of control of FCC licenses may be consummated.

### 1. "Involuntary" Transfers and Assignments

The filing by the Debtor of a petition to reorganize under chapter 11 of the Bankruptcy Code will constitute, for FCC purposes, a transfer of control of Alaska Broadcasting and Graham Newspapers from the Debtor to the Debtor as debtor-in-possession. The FCC will classify the Debtor's change to status as a debtor-in-possession under chapter 11 of the Bankruptcy Code as an "involuntary" transfer of the FCC Licenses held by the Subsidiaries. The Debtor expects the FCC to grant the applications filed by the Debtor for approval of the transfer of control of Alaska Broadcasting and Graham Newspapers, but it cannot be certain the FCC will do so. Furthermore, actions ordered by the Bankruptcy Court also could require further consent of the

FCC. For example, the appointment of a chapter 11 trustee by the Bankruptcy Court would require FCC consent. The FCC typically treats changes of this sort that are ordered by the Bankruptcy Court as "involuntary" transfers for which consent may be sought under the same abbreviated procedures that the FCC uses in consenting to transfers of FCC licenses to the control of a debtor-in-possession when a parent company files a chapter 11 bankruptcy. For pro forma transfers of control and assignments of FCC broadcast licenses, including "involuntary" transfers and assignments and transfers and assignments that do not effect a substantial change in control, the FCC does not require the 30 days' prior public notice and local public notice that it requires for applications proposing a "substantial" change in control, such as the voluntary transfer or assignment that entails a change in ultimate control of the license, as discussed below. Petitions to deny may not be filed against pro forma applications, although parties may file informal objections. Although the FCC is not subject to any specific time limit for processing pro forma applications, the FCC generally grants pro forma transfer and assignment applications within 30 days after the application is filed.

### 2. FCC Consent Required for Emergence for Bankruptcy

The emergence of the Reorganized Debtor from chapter 11 bankruptcy will also require the consent of the FCC (1) to the assignment of the FCC Broadcast Licenses to the FCC Trust and (2) to the transfer of control to the Reorganized Debtor of those FCC Non-Broadcast Licenses, if any, that the Reorganized Debtor seeks to retain for its future operations.

The assignment of the FCC Broadcast Licenses to the FCC Trust (and thus outside the control of the Debtor and the Reorganized Debtor) is in lieu of seeking consent from the FCC to a transfer of control of the FCC Broadcast Licenses to the Reorganized Debtor. Generally when a debtor controlling FCC broadcast licenses emerges from a chapter 11 bankruptcy, the transfer will be deemed a voluntary "substantial" change in control, and a debtor controlling FCC broadcast licensees would be required to seek the FCC's prior consent using a "long form" application on Form 315. Even though a debtor may emerge from bankruptcy or receivership through a court order, the FCC generally will use the procedures applicable to a voluntary transfer or assignment when the consummation of the application would place the licenses in a "permanent" holder. Any such transaction may not be consummated until the FCC has granted its consent.

Upon emergence from bankruptcy, more than 50% of the voting rights in the Reorganized Debtor would be held by persons that did not hold those rights prior to the Chapter 11 filing. For that reason, an application for consent to transfer the FCC Broadcast Licenses to the Reorganized Debtor would need to be filed on a FCC "long form" application. Because of the longer and more involved processing for "long form" applications for transfer of control of broadcast licenses, the Debtor's emergence from chapter 11 might have been delayed substantially if the Prepackaged Plan had included a "long-form" broadcast transfer application. Furthermore, substantial information on ownership, media interests, and other factors would have to be obtained from the proposed shareholders of the Reorganized Debtor and evaluated to demonstrate to the FCC that the Reorganized Debtor could hold the FCC Broadcast Licenses in conformity with applicable rules, including foreign ownership limitations, and that no reportable interest holder in the Reorganized Debtor independently held any media interests that would be inconsistent with the holding of a reportable interest in the Reorganized Debtor. An inability to make such a demonstration could delay or prevent confirmation of the Prepackaged Plan.

Accordingly, to expedite the Debtor's emergence from bankruptcy and to avoid the delay and complications that would arise from a decision to retain the FCC Broadcast Licenses as assets of the Reorganized Debtor, the Debtor will form the FCC Trust and ask the FCC to grant consent for a court-approved assignment of the FCC Licenses to the control of the FCC Trust using a "short form" application, which has a shorter processing time. The FCC Licenses would be assigned to the FCC Trust, subject to the FCC Trust Order and the approval of the FCC, prior to or concurrently with the emergence of the Reorganized Debtor from bankruptcy. The FCC Trust would hold the FCC Licenses subject to the terms of the FCC Trust Agreement and the Time Brokerage Agreements. The trustees of the FCC Trust would be a majority of those individuals serving as the directors of AMI as of the date of the filing of the Reorganization Case. They would serve as trustees of the FCC Trust, subject to the oversight of the Bankruptcy Court, during the period that the FCC Trust holds the FCC Broadcast Licenses and certain related assets pending the ultimate disposition of those assets. If approved by the Bankruptcy Court and by the FCC, this approach would allow the Reorganized Debtor to emerge from bankruptcy with the FCC Licenses subject to the control of the FCC Trust without significant delay. Absent the establishment of the FCC Trust and the assignment of the FCC Licenses to the FCC Trust and thus the ability to seek the consent of the FCC pursuant to a short-form application, the Reorganized Debtor's emergence from bankruptcy otherwise could be delayed.

## IX. VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Prepackaged Plan, each eligible holder of a Claim in Classes 2 and 5 should carefully review the Prepackaged Plan attached as <u>Exhibit 1</u>, and summarized above in Section I.B., "**Summary of the Financial Restructuring**." All descriptions of the Prepackaged Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Prepackaged Plan.

IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASS 2 (SENIOR LOAN CLAIMS) AND HOLDERS OF CLAIMS IN CLASS 5 (SUBORDINATED NOTE CLAIMS) EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN.

### A. Voting Deadline

The Debtor has engaged Epiq Bankruptcy Solutions, LLC as its voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Prepackaged Plan. IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 5:00 P.M., PREVAILING EASTERN TIME, ON JANUARY 13, 2010 (THE "**VOTING DEADLINE**"). The Debtor reserves the absolute right in its sole discretion, at any time or from time to time, to extend by oral or written notice to the Voting Agent, the period of time (on a daily basis, if necessary) during which ballots will be accepted for any reason including, but not limited to, determining whether or not requisite acceptances of the Prepackaged Plan have been received, by providing written notice to the Administrative Agent, the Indenture Trustee and all known holders of Claims in Classes 2 and 5 of such extension no later than 9:00 a.m. (prevailing Eastern time) on the first business day next succeeding the previously announced Voting Deadline. Without limiting the manner in which the Debtor may choose to make any such announcement except as

otherwise set forth in the Restructuring Support Agreement, the Debtor will not have any obligation to publish, advertise or otherwise communicate any such announcement. There can be no assurance that the Debtor will exercise its right to extend the Voting Deadline.

A BENEFICIAL OWNER HOLDING SUBORDINATED NOTES IN "STREET NAME" THROUGH A NOMINEE MAY VOTE AS FURTHER DESCRIBED BELOW.

IF YOU MUST RETURN YOUR BALLOT TO YOUR BANK, BROKER OR OTHER NOMINEE, OR TO THEIR AGENT, YOU MUST RETURN YOUR BALLOT TO IT IN SUFFICIENT TIME FOR IT TO PROCESS YOUR BALLOT AND RETURN ITS MASTER BALLOT TO THE VOTING AGENT BEFORE THE VOTING DEADLINE.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT.

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PREPACKAGED PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, NY 10017
Telephone: (646) 282-2500

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the telephone number above.

## B. Voting Procedures

The Debtor is providing copies of this Disclosure Statement (including all exhibits, appendices, and schedules), related materials and a ballot (collectively, a "**Solicitation Package**") to all Classes entitled to vote, including registered holders of Subordinated Notes. Registered holders of Subordinated Notes may include brokerage firms, commercial banks, trust companies or other nominees. If such entities do not hold Subordinated Notes for their own account, they must provide copies of the Solicitation Package to their customers that are beneficial owners of Subordinated Notes as of the Record Date (as defined below). Any beneficial owner of Subordinated Notes who has not received a ballot should contact his, her or its nominee, or the Voting Agent.

Holders of Subordinated Notes should provide all of the information requested by the ballot. Holders of Subordinated Notes should complete and return all ballots received in the enclosed, pre-addressed, postage-paid envelope provided with each such ballot either to the Voting Agent or their nominee, as applicable.

The Record Date for determining which holders are entitled to vote on the Prepackaged Plan is December 14, 2009. The Indenture Trustee will not vote on behalf of the holders. Holders of Subordinated Note Claims must submit their own ballots.

## C.      Parties in Interest Entitled to Vote

Under section 1126 of the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan of reorganization. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Prepackaged Plan. Claims in Classes 1, 3, 4, and 6 are unimpaired under the Prepackaged Plan, and holders of such Claims are therefore not entitled to vote. Holders of Claims and Equity Interests in Classes 7 and 8 are impaired and deemed to reject the Prepackaged Plan and therefore are not entitled to vote.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the plan.

A vote may be disregarded if the Bankruptcy Court determines, under section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Solicitation seeks votes on the Prepackaged Plan only from "accredited investors" as such investors are defined in Regulation D promulgated under the Securities Act. Ballots that are received from persons that are not "accredited investors" will be disregarded.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims whose holders cast ballots for acceptance or rejection of the plan.

The Claims in the following classes are impaired under the Prepackaged Plan and entitled to vote to accept or reject the Prepackaged Plan:

Class 2: Senior Loan Claims

Class 5: Subordinated Note Claims

### 1.     Beneficial Owners

A beneficial owner holding Subordinated Notes as record holder in its own name should vote on the Prepackaged Plan by completing and signing a beneficial owner ballot (a "**Beneficial Owner Ballot**") and returning it directly to the Voting Agent on or before the Voting Deadline using the enclosed, pre-addressed, postage-paid envelope.

A beneficial owner holding Subordinated Notes in "street name" through a nominee may vote on the Prepackaged Plan by one of the following two methods (as selected by such beneficial owner's nominee):

Complete and sign the enclosed Beneficial Owner Ballot.  Return the ballot to your nominee as promptly as possible and in sufficient time to allow such nominee to process your instructions and return a completed master ballot (a "**Master Ballot**") to the Voting Agent by the Voting Deadline.  If no pre-addressed, postage-paid envelope was enclosed for this purpose, contact the Voting Agent for instructions; or

Complete and sign the pre-validated Beneficial Owner Ballot (as described below) provided to you by your nominee.  Return the pre-validated ballot to the Voting Agent by the Voting Deadline using the return envelope provided with this Disclosure Statement and pre-validated ballot.

Any Beneficial Owner Ballot returned to a nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Prepackaged Plan until such nominee properly completes and delivers to the Voting Agent that ballot (properly validated) or a Master Ballot casting the vote of such beneficial owner.

If any beneficial owner owns Subordinated Notes through more than one nominee, such beneficial owner may receive multiple mailings containing the Beneficial Owner Ballots.  The beneficial owner should execute a separate Beneficial Owner Ballot for each block of Subordinated Notes that it holds through any particular nominee and return each ballot to the respective nominee in the return envelope provided therewith.  Beneficial owners who execute multiple Beneficial Owner Ballots with respect to Subordinated Notes held through more than one nominee must indicate on each Beneficial Owner Ballot the names of all such other Beneficial Owner Ballot nominees and the additional amounts of such Subordinated Notes so held and voted.

### D.     Nominees

A nominee that, on the Record Date, is the registered holder of Subordinated Notes for one or more beneficial owners, can obtain the votes of the beneficial owners of such Subordinated Notes, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

### 1.     Pre-Validated Ballots

The nominee may "pre-validate" a Beneficial Owner Ballot by (1) signing the ballot; (2) indicating on the ballot the name of the registered holder and the nominee Depository Trust

Company Participant Number, the amount of Subordinated Notes held by the nominee for the beneficial owner, and the account numbers for the accounts in which such Subordinated Notes are held by the nominee; and (3) forwarding such Beneficial Owner Ballot, together with this Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, the Voting Agent, and other materials requested to be forwarded, to the beneficial owner for voting.

The beneficial owner must then complete the information requested on the Beneficial Owner Ballot, review the certifications contained on the ballot, and return the ballot directly to the Voting Agent in the pre-addressed, postage-paid return envelope so that it is RECEIVED by the Voting Agent on or before the Voting Deadline. A list of the beneficial owners to whom pre-validated ballots were delivered should be maintained by nominees for inspection for at least one year from the Voting Deadline.

## 2. Master Ballots

If the nominee elects not to pre-validate Beneficial Owner Ballots, the nominee may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned Beneficial Owner Ballots, together with this Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the nominee, and other materials requested to be forwarded. Each such beneficial owner must then indicate his, her or its vote on the Beneficial Owner Ballot, complete the information requested on the ballot, review the certifications contained on the ballot, execute the ballot and return the ballot to the nominee. After collecting the Beneficial Owner Ballots, the nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Owner Ballots, execute the Master Ballot, and deliver the Master Ballot to the Voting Agent so that it is RECEIVED by the Voting Agent on or before the Voting Deadline. All Beneficial Owner Ballots returned by beneficial owners should either be forwarded to the Voting Agent (along with the Master Ballot) or retained by nominees for inspection for at least one year from the Voting Deadline. EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL OWNERS TO RETURN THEIR BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE VOTING AGENT SO THAT IT IS RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.

## 3. Miscellaneous

All ballots must be signed by the holder of Subordinated Notes of record or any Person who has obtained a properly completed ballot proxy from the record holder of the Subordinated Notes on such date. For purposes of voting to accept or reject the Prepackaged Plan, the beneficial owners of Subordinated Notes will be deemed to be the "holders" of the Claims represented by such Subordinated Notes. Unless otherwise ordered by the Bankruptcy Court, ballots that are signed, dated and timely received, but on which a vote to accept or reject the Prepackaged Plan has not been indicated, will not be counted. Where applicable, the Debtor, in its sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the ballots. Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of Subordinated Notes who actually vote will be counted. The failure of a holder to deliver a duly executed ballot to the Voting Agent by the Voting Deadline or its Nominee with sufficient time for the Nominee to submit the vote

before the Voting Deadline will be deemed to constitute an abstention by such holder with respect to voting on the Prepackaged Plan and such abstentions will not be counted as votes for or against the Prepackaged Plan.

Except as provided below, unless the ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such ballot, the Debtor may, in its sole discretion, reject such ballot as invalid, and therefore decline to use it in connection with seeking confirmation of the Prepackaged Plan.

### 4.     Fiduciaries and Other Representatives

If a Beneficial Owner Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Debtor, must submit proper evidence satisfactory to the Debtor of authority to so act.  Authorized signatories should submit the separate Beneficial Owner Ballot of each beneficial owner for whom they are voting.

UNLESS THE BALLOT OR THE MASTER BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PREPACKAGED PLAN; PROVIDED, HOWEVER, THAT THE DEBTOR RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO REQUEST OF THE BANKRUPTCY COURT THAT ANY SUCH BALLOT BE COUNTED.

By signing and returning the ballot, each holder of a Class 2 Claim or a Class 5 Claim will be confirming that such holder (i) as of the Record Date, is the holder of a Class 2 Claim or Class 5 Claim, as applicable, or the authorized agent of such a holder and (ii) has full power and authority to vote to accept or reject the Prepackaged Plan.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan, and accordingly, holders of such claims and interests are not entitled to vote on the plan.

### 5.     Agreements upon Furnishing Ballots

The delivery of an accepting ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such ballot to accept (1) all of the terms of, and conditions to, this Solicitation; and (2) the terms of the Prepackaged Plan including the releases or exculpations set forth in Article X therein.  All parties in interest retain their right to object to confirmation of the Prepackaged Plan under section 1128(b) of the Bankruptcy Code.

### 6. Change of Vote

Any Person who has delivered a valid ballot for the acceptance or rejection of the Prepackaged Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be at the Voting Agent in a timely manner at Epiq Bankruptcy Solutions, LLC, Attention: Affiliated Media, Inc. Voting Agent, 757 Third Avenue, Third Floor, New York, NY 10017. The Debtor intends to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Prepackaged Plan have been received. As stated above, the Debtor expressly reserves the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Prepackaged Plan. In the case where more than one timely, properly completed ballot is received, only the ballot, which bears the latest date, will be counted for purposes of determining whether the requisite acceptances have been received.

### E. Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Voting Agent and/or the Debtor, as applicable, in their sole discretion, which determination will be final and binding. The Debtor reserves the right to reject any and all ballots submitted by any of its creditors not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, be unlawful. The Debtor further reserves its rights to waive any defects or irregularities or conditions of delivery as to any particular ballot by any of its creditors.

The Debtor's interpretation (including the ballot and the respective instructions thereto), will be final and binding on all parties, unless otherwise directed by the Bankruptcy Court. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtor or the Bankruptcy Court determines. Neither the Debtor nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### F.        Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the package of materials you received, or if you wish to obtain an additional copy of the Prepackaged Plan, this Disclosure Statement or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or order of the Bankruptcy Court), please contact the Voting Agent at:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, NY 10017
Telephone:  (646) 282-2500
E-mail: FBG@epiqsystems.com

## X.        CONFIRMATION OF THE PREPACKAGED PLAN

### A.        Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing.  On, or as promptly as practicable after the Petition Date, the Debtor will request that the Bankruptcy Court schedule a hearing to consider the adequacy of this Disclosure Statement and confirmation of the Prepackaged Plan.  Notice of the Confirmation Hearing will be provided to holders of Claims and Equity Interests or their representatives (the "**Confirmation Hearing Notice**") as set forth in the scheduling order of the Bankruptcy Court.  The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Any objection to confirmation of the Prepackaged Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objecting party, the nature and amount of claims or interests held or asserted by the objecting party against the Debtor's estate or property and the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon (1) Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, NY 10004, Attn.: Kathryn A. Coleman, Esq. and Eric J. Fromme, Esq., (2) Morris Nichols Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, P.O. Box 1347, Wilmington, DE 19899, Attn.: Derek Abbott, Esq., (3) Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 207, Lockbox 35, Wilmington, DE 19801, (4) Davis Polk & Wardwell LLP, 450 Lexington Avenue New York, NY 10017, Attn.:  John Fouhey, Esq. and Damian S. Schaible, Esq., and (5) such other parties as the Bankruptcy Court may order, so as to be received no later than the date and time designated in the Confirmation Hearing Notice.

Objections to confirmation of the Prepackaged Plan are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.  Requirements for Confirmation of the Prepackaged Plan –
Consensual Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied:

➢ The Prepackaged Plan complies with the applicable provisions of the Bankruptcy Code.

➢ The Debtor has complied with the applicable provisions of the Bankruptcy Code.

➢ The Prepackaged Plan has been proposed in good faith and not by any means forbidden by law.

➢ Any payment made or promised by the Debtor or by a Person issuing securities or acquiring property under the Prepackaged Plan for services or for costs and expenses in, or in connection with, the Reorganization Case, or in connection with the Prepackaged Plan and incident to the Reorganization Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Prepackaged Plan is reasonable, or if such payment is to be fixed after confirmation of the Prepackaged Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

➢ The Debtor has disclosed (i) the identity and affiliations of any individual proposed to serve, after confirmation of the Prepackaged Plan, as a director, officer or voting trustee of the Reorganized Debtor, (ii) any Subsidiary of the Debtor participating in the Prepackaged Plan with the Debtor, or a successor to the Debtor under the Prepackaged Plan, and (iii) the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider.

➢ Any governmental regulatory commission with jurisdiction, after confirmation of the Prepackaged Plan, over the rates of the Debtor has approved any rate change provided for in the Prepackaged Plan, or such rate change is expressly conditioned on such approval.

➢ With respect to each class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Prepackaged Plan or will receive or retain under the Prepackaged Plan on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date of the Prepackaged Plan, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

➢ Except to the extent the Prepackaged Plan meets the "Non-Consensual Confirmation" standards discussed below, each class of Claims or Equity Interests has either accepted the Prepackaged Plan or is not impaired under the Prepackaged Plan.

➢ Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Prepackaged Plan provides that Administrative Expense Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding five (5) years after the date of the order for relief, of a value, as of the Effective Date, equal to the allowed amount of such Claims with interest from the Effective Date.

➢ At least one (1) class of impaired Claims has accepted the Prepackaged Plan, determined without including any acceptance of the Prepackaged Plan by any insider holding a Claim in such class.

➢ Confirmation of the Prepackaged Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Prepackaged Plan, unless such liquidation or reorganization is proposed in the Prepackaged Plan. See discussion of "Feasibility" below.

➢ All fees payable under section 1930 of title 28 of the United States Code, as determined by the court at the hearing on confirmation of the Prepackaged Plan, have been paid or the Prepackaged Plan provides for the payment of all such fees on the Effective Date.

➢ The Prepackaged Plan provides for the continuation after the Effective Date of payment of all Retiree Benefits (as defined in section 1114(a) of the Bankruptcy Code), at the level established under section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Prepackaged Plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

## 1. Best Interests Test

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (i) accept the plan of reorganization or (ii) receive or retain under the Prepackaged Plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the applicable debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. This is referred to as the "Best Interests Test."

To show that the Prepackaged Plan complies with this test, the Debtor estimated a range of proceeds that would be generated from a chapter 7 liquidation of the Debtor in the Liquidation Analysis.

The first step in the Liquidation Analysis is to determine the dollar amount that would be generated from a hypothetical chapter 7 liquidation of the Debtor's assets in which a chapter 7 trustee is appointed and charged with reducing to cash any and all of the Debtor's Assets. In this hypothetical liquidation scenario, the trustee would be required to shut down the Debtor's businesses and sell the individual assets of the Debtor (and the stock of its non-Debtor Subsidiaries or their assets). The gross amount of cash available from a liquidation of the Debtor's Assets would be the sum of the proceeds from the disposition of the Debtor's Assets and cash held by the Debtor at the time of the commencement of the hypothetical chapter 7 case. The next step is to reduce that total by the costs and expenses of the liquidation, the amount of any Claims secured by such assets, and such additional Administrative Expense Claims and Priority Claims that may result from the termination of the Debtor's businesses and the use of chapter 7 for purposes of the hypothetical liquidation. Any net cash would be allocated to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code. Finally, the Debtor compares the Liquidation Analysis with the value provided under the Prepackaged Plan.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtor believes that taking into account the Liquidation Analysis and the Valuation, the Prepackaged Plan meets the "best interests" test of Bankruptcy Code section 1129(a)(7).

The Debtor believes that the holders of Claims in Classes 7 and 8 would receive no recovery in a chapter 7 liquidation. The Debtor also believes that the holders of Claims in Class 5 would receive no recovery in a chapter 7 liquidation. Creditors will receive at least as good a recovery through the distributions contemplated by the Prepackaged Plan because the continued operation of the Debtor as a going concern, rather than a forced liquidation, will allow realization of more value for the Debtor's Assets. Moreover, as a result of the Debtor's reorganization, creditors such as the Debtor's employees would retain their jobs and most likely make few, if any, other Claims against the Estate. Lastly, in the event of liquidation, the recovery of holders of General Unsecured Claims that would receive a small distribution in a liquidation would no doubt increase significantly as General Unsecured Claims are unimpaired under the Prepackaged Plan. All of these factors lead to the conclusion that recoveries under the Prepackaged Plan would be at least as much as, and in many cases significantly greater than, the recoveries available in a chapter 7 liquidation.

For additional information, as well as the Debtor's detailed Liquidation Analysis, please see the Section VII.C. entitled "Liquidation Analysis."

## 2. Acceptance

As a condition to confirmation, the Bankruptcy Code requires that each Class of impaired Claims vote to accept the Prepackaged Plan in most circumstances. Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class. For these purposes, only claims actually voting to accept or to reject the plan are counted. Holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class whose holders vote on the plan.

**3. Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the court find that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Prepackaged Plan meets this feasibility requirement, the Debtor has analyzed its ability to meet its obligations under the Prepackaged Plan. As part of this analysis, the Debtor has prepared the Projections. The Projections indicate that the Reorganized Debtor should have sufficient cash flow to pay and service its debt obligations and to fund its operations. Accordingly, the Debtor believes that the Prepackaged Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code. To support its belief in the feasibility of the Prepackaged Plan, the Debtor has relied upon the Projections, which are included in Section VII.A. of this Disclosure Statement.

**C. Confirmation Without Acceptance of All Impaired Classes: The "Cram Down" Alternative**

Notwithstanding rejection of the plan by an impaired class, the Bankruptcy Code permits confirmation of a plan of reorganization, so long as (a) the plan of reorganization otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan of reorganization without taking into consideration the votes of any insiders in such class, and (c) the plan of reorganization is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted such plan. These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

**1. Fair and Equitable**

The Bankruptcy Code establishes different tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors, and interest holders as follows:

**a. Secured Creditors**

A plan of reorganization is fair and equitable as to an impaired class of secured claims that rejects the plan if the plan provides: (a) that each of the holders of the secured claims included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, to the extent of the allowed amount of such claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan of reorganization, at least equal to the value of such holder's interest in the Estate's interest in such property; (b) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for

the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds in accordance with clause (a) or (b) of this paragraph.

With respect to Class 2, the Debtor does not anticipate seeking to confirm the Prepackaged Plan that would cram down the Senior Lenders and, in any case, the Prepackaged Plan does not seek to cram down Class 2. Other Secured Claims in Class 3 are unimpaired and thus deemed not to reject the Prepackaged Plan.

### b. Unsecured Creditors

A plan of reorganization is fair and equitable as to an impaired class of unsecured claims that rejects the plan if the plan provides that: (i) each holder of a claim included in the rejecting class receives or retains property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests.

In the event that Class 5 does not vote in favor of the Prepackaged Plan, the Debtor will also seek a cram down confirmation of the Prepackaged Plan with respect to the Claims in Class 5. In that case, Claims in Class 5 will receive no recovery. No Class junior to Class 5 will receive any recovery under the Prepackaged Plan either. The Debtor believes that it would meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to holders of Subordinated Note Claims in Class 5 because no holders of junior Claims or Equity Interests will receive distributions under the Prepackaged Plan.

Other General Unsecured Claims (Class 6) are unimpaired and thus are deemed to accept the Prepackaged Plan.

### c. Holders of Interests

A plan of reorganization is fair and equitable as to an impaired class of interests that rejects the plan if the plan provides that: (a) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled, (ii) the fixed redemption price to which such holder is entitled, and (iii) the value of the interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

In view of the deemed rejection by holders of Securities Litigation Claims in Class 7 and Old AMI Equity Interests in Class 8, the Debtor will seek confirmation of the Prepackaged Plan pursuant to the "cram down" provisions of the Bankruptcy Code.

The Debtor believes that it will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to holders of Securities Litigation Claims in Class

7 and Old AMI Equity Interests in Class 8 because no holders of junior Claims or Equity Interests will receive distributions under the Prepackaged Plan.

### d.    Unfair Discrimination

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally to other classes similarly situated and no such class receives more than it is legally entitled to receive for its claims or interests.  The Debtor does not believe that the Prepackaged Plan discriminates unfairly against any impaired Class of Claims or Equity Interests.  The Debtor believes that the Prepackaged Plan and the treatment of all Classes of Claims and Equity Interests under the Prepackaged Plan satisfy the foregoing requirements for nonconsensual confirmation of the Prepackaged Plan.

The Debtor believes the Prepackaged Plan does not discriminate unfairly with respect to the Subordinated Note Claims in Class 5, the Securities Litigation Claims in Class 7 and the Old AMI Equity Interests in Class 8.  Such Claims and Equity Interests are subordinated to other Claims under sections 510(b) or (c) of the Bankruptcy Code or sections 726(a)(2)(C), (a)(3), (a)(4), or (a)(5) of the Bankruptcy Code as incorporated into section 1129(a)(7) of the Bankruptcy Code, or are otherwise not entitled to payment under the absolute priority rule until all other creditors have been paid in full; the holders of Senior Loan Claims are not paid in full under the Prepackaged Plan.  Because all holders of Subordinated Note Claims in Class 5, Securities Litigation Claims in Class 7 and Old AMI Equity Interests in Class 8 are treated similarly to holders of Claims or Equity Interests in other Classes of equal rank, there is no unfair discrimination with respect to such holders of Subordinated Note Claims, Securities Litigation Claims and Old AMI Equity Interests.

## XI.    HISTORICAL FINANCIAL INFORMATION

The audited consolidated balance sheet as of June 30, 2009 and the related consolidated statements of operations and cash flows for the fiscal year ended June 30, 2009 of AMI and its Subsidiaries are attached hereto as Exhibit 2.  The unaudited consolidated balance sheet as of September 30, 2009 and the related consolidated statements of operations and cash flows of AMI and its Subsidiaries for the fiscal quarter ended September 30, 2009 are attached hereto as Exhibit 3.  This financial information will permit the holders of Claims and Equity Interests to better understand the Debtor's historical financial performance and the impact of the Reorganization Case on the Debtor's business.

## XII.    CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS

### A.    Exemption from Registration Requirements for Issuance of New Securities

Prior to commencement of the Reorganization Case, the Debtor is relying upon section 4(2) of the Securities Act and rule 506 thereunder and similar provisions of applicable state securities laws, as well as section 18 of the Securities Act, to exempt the offer of the New Common Stock and the Subordinated Note Warrants from the registration requirements of the Securities Act and applicable state securities laws.  In order to rely on section 4(2) of the Securities Act and rule 506 thereunder and on similar provisions of applicable state securities

laws, the offer of the New Common Stock and the Subordinated Note Warrants may be made only to persons who are "accredited investors," as defined in rule 501 under the Securities Act. A person is an accredited investor only if he, she or it is:

- a bank, insurance company, registered investment company, business development company, or small business investment company;

- an employee benefit plan, within the meaning of ERISA, if a bank, insurance company, or registered investment adviser makes the investment decisions, or if the plan has total assets in excess of $5 million;

- a charitable organization, corporation, or partnership with assets exceeding $5 million;

- a director, executive officer, or general partner of the company selling the securities;

- a business in which all the equity owners are accredited investors;

- a natural person who has individual net worth, or joint net worth with the person's spouse, that exceeds $1 million at the time of the purchase;

- a natural person with income exceeding $200,000 in each of the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year;

- a trust with assets in excess of $5 million, not formed to acquire the securities offered, whose purchases a sophisticated person makes; or

- an entity all of whose equity is owned by persons described above.

The Debtor will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New Common Stock and Subordinated Note Warrants issued pursuant to the Prepackaged Plan and the New Common Stock issuable upon the exercise of the Subordinated Note Warrants from the registration requirements of the Securities Act and any state securities laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 prepackaged plan if such securities are offered or sold in exchange for a claim against or equity in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the plan. The Debtor believes that the Reorganized Debtor is a successor to the Debtor under the Prepackaged Plan for purposes of section 1145 of the Bankruptcy Code and that the issuance of the New Common Stock and Subordinated Note Warrants under the Prepackaged Plan and the exercise of the Subordinated Note Warrants will satisfy the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state securities laws.

### B. Restrictions in the Stockholders' Agreement

The Prepackaged Plan provides that each holder of New Common Stock and Subordinated Note Warrants will be deemed to have entered into the Stockholders' Agreement with the Reorganized Debtor that provides, among other things, for certain transfer restrictions and "tag-along" rights. Transfers of securities issued under the Prepackaged Plan will be subject to the terms and conditions of the Stockholders' Agreement. Under the Stockholders' Agreement, unless the Reorganized Debtor is already required to comply with the reporting requirements of the Exchange Act, prior notice will be required to be given to the Reorganized Debtor of any proposed sale or transfer of securities, and such transfer will be restricted if the Reorganized Debtor reasonably determines that the transfer would, if effected, result in the Reorganized Debtor having 500 or more holders of record for any class of such securities (determined pursuant to the Exchange Act).

### C. Subsequent Transfers of Securities

In general, recipients of New Common Stock and Subordinated Note Warrants under the Prepackaged Plan will, subject to the Stockholders' Agreement, be able to resell their securities (and the New Common Stock issuable upon exercise of the Subordinated Note Warrants) without registration under the Securities Act pursuant to the exemption provided by section 4(1) of the Securities Act, unless the holder of such security is an "underwriter" within the meaning of section 2(a)(11) of the Securities Act. In addition, the New Common Stock and Subordinated Note Warrants issued under the Prepackaged Plan, and the New Common Stock issuable upon exercise of the Subordinated Note Warrants, generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of the New Common Stock and Subordinated Note Warrants issued under the Prepackaged Plan and recipients of the New Common Stock issuable upon exercise of the Subordinated Note Warrants, are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a prepackaged plan for the holders of such securities, (c) offers to buy securities issued under a prepackaged plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in section 2(11) of the Securities Act. Under section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer and any person under direct or indirect common control with the issuer.

To the extent that recipients of the New Common Stock and Subordinated Note Warrants issued under the Prepackaged Plan and the recipients of New Common Stock issuable upon exercise of the Subordinated Note Warrants are deemed to be "underwriters," such persons cannot rely on the exemption from registration under section 4(1) of the Securities Act for resales of such securities. Persons deemed to be underwriters may, however, be permitted to sell such securities without registration pursuant to the provisions of rule 144 under the Securities Act. This rule permits the resale of securities received by persons otherwise deemed to be "underwriters," subject to the satisfaction of applicable conditions, which may include holding

periods, availability of information regarding the issuer, volume limitations, restrictions on manner of sale, and/or notice requirements.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW COMMON STOCK, THE DEBTOR MAKES NO REPRESENTATION CONCERNING THE RIGHT OF ANY PERSON TO RESELL OR OTHERWISE TRANSFER THE SECURITIES ISSUED UNDER THE PREPACKAGED PLAN OR THE SECURITIES ISSUABLE UPON EXERCISE THEREOF. THE DEBTOR RECOMMENDS THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION

If the Prepackaged Plan is not confirmed and consummated, the alternatives to the Prepackaged Plan include (a) liquidation of the Debtor under chapter 7 of the Bankruptcy Code and (b) an alternative plan of reorganization.

### A. Liquidation Under Chapter 7

If the Prepackaged Plan cannot be confirmed, the Reorganization Case may be converted to a case under chapter 7 of the Bankruptcy Code. In such a case, a trustee would be appointed to liquidate the assets of the Debtor for distribution to the creditors in accordance with the priorities established by the Bankruptcy Code. The trustee would retain professionals at the expense of the Debtor's Estate, liquidate the Debtor's remaining assets and, if necessary, investigate and pursue causes of action on the Debtor's behalf. A discussion of the effects of a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests and the Debtor's liquidation analysis is set forth in Section VII.C., entitled "Liquidation Analysis."

The Debtor believes that liquidation under chapter 7 would result in (a) significantly smaller distributions being made to its creditors than those provided for in the Prepackaged Plan because of (i) the likelihood that the assets of the Debtor would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time in extremely poor market conditions, (ii) additional administrative expenses involved in the appointment of a trustee and its professionals, and (iii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations; and (b) significantly less recovery for holders of General Unsecured Claims.

### B. Alternative Plan(s) of Reorganization

If the Prepackaged Plan is not confirmed, the Debtor (or, in certain circumstances, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtor's businesses, or an orderly liquidation of assets, or a combination of both. With respect to an alternative plan, the Debtor has explored various alternatives in connection with the formulation and development of the Prepackaged Plan. The Debtor believes that its Prepackaged Plan enables its creditors to realize the most value under the present circumstances. In a liquidation under chapter 11, the Debtor's assets

would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater recoveries than would be obtained in chapter 7. No trustee is required in a chapter 11 liquidation, so if a trustee were not appointed, the expenses and professional fees for a chapter 11 liquidation would most likely be lower than those incurred in a chapter 7 liquidation. Although preferable to a chapter 7 liquidation, the Debtor believes that any alternative liquidation under chapter 11 is a much less attractive alternative to its creditors than the Prepackaged Plan because of the greater creditor recoveries provided by the Prepackaged Plan.

## XIV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PREPACKAGED PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the implementation of the Prepackaged Plan to the Debtor and holders of Senior Loan Claims and Subordinated Note Claims. This discussion does not address U.S. federal income tax consequences to holders of Claims who are unimpaired or otherwise entitled to payment in full in cash under the Prepackaged Plan.

This summary is based on the Tax Code, Treasury regulations promulgated thereunder, published rulings of the U.S. Internal Revenue Service (the "**IRS**") and judicial and administrative interpretations thereof, in each case as in effect and available as of the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any such other authorities. Thus no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, controlled foreign corporations, passive foreign investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, holders that are, or hold Claims through, partnerships or other pass-through entities for U.S. federal income tax purposes, U.S. persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, expatriates and former long-term residents of the United States, persons subject to the alternative minimum tax, and persons holding Claims that are part of a straddle, hedging, constructive sale or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the New Senior Secured Term Notes, New Common Stock or Subordinated Note Warrants in the secondary market.

THIS SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE BASED UPON

YOUR INDIVIDUAL CIRCUMSTANCES.  EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR.

### A.     Consequences to the Debtor

The AMI Group's consolidated U.S. federal income tax return has reported NOL carryforwards of approximately $108 million for U.S. federal income tax purposes as of June 30, 2008.  The AMI Group expects to report further net operating losses when it files its returns for its taxable years ending June 30, 2009.  The amount of any NOL and other carryforwards, and the extent to which any limitations might apply, remains subject to audit and adjustment by the IRS.

As discussed below, as a result of implementation of the Prepackaged Plan, the amount of the AMI Group's NOL carryforwards may be significantly reduced or eliminated, and other tax attributes of the AMI Group (such as tax basis in assets) may be reduced.

### 1.     Cancellation of Debt Income

The Debtor expects to realize substantial cancellation of debt ("**COD**") income as a result of the implementation of the Prepackaged Plan.  The amount of COD income realized is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor.  Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes.  The amount of COD income realized by the Debtor will depend largely on the fair market value of the New Common Stock and Subordinated Note Warrants that are issued on the Effective Date.  The Tax Code provides that a debtor generally is not required to include COD income realized pursuant to a chapter 11 plan but instead must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of COD income.  If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the other members of the group also be reduced.  Any reduction in tax attributes in respect of COD income does not occur until after the close of the taxable year in which COD is incurred.  Unless the Debtor makes the election described in the next paragraph, the Debtor expects that the realization of COD income as a result of implementation of the Prepackaged Plan will result in elimination of substantially all of the NOL carryforwards and substantial reductions in other tax attributes of the AMI Group.

Alternatively, the American Recovery and Reinvestment Act of 2009 permits the Debtor, rather than excluding all or part of the COD income and reducing its tax attributes, to elect to defer the inclusion of COD income resulting from the implementation of the Prepackaged Plan, with the amount of COD income becoming includible in its income ratably over a five-taxable year period beginning in its fourth taxable year after the COD income arises.  The collateral tax consequences of making this election are complex.  The Debtor will consider whether to make the deferral election in connection with its annual tax return preparation but currently does not expect to make the election.

## 2.    Potential Limitations on NOL Carryforwards and Other Tax Attributes

Following the Effective Date, the Debtor's remaining NOL carryforwards and certain other tax attributes (including current year NOLs) allocable to taxable periods or portions thereof prior to the Effective Date (collectively, "**pre-change losses**") will be subject to limitation under section 382 of the Tax Code as a result of implementation of the Prepackaged Plan. The section 382 limitations will apply in addition to, and not in lieu of, any attribute reduction that results from COD income realized in connection with the Prepackaged Plan.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change", the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. The issuance of the New Common Stock pursuant to the Prepackaged Plan will result in an "ownership change" of the AMI Group for this purpose.

In general, the amount of the annual limitation on loss utilization by the Debtor following a section 382 ownership change occurring as a result of the implementation of the Prepackaged Plan will be equal to the product of (i) the fair market value of the Debtor's stock immediately after the ownership change (after giving effect to the discharge of creditors' claims, but subject to certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (4.16% for ownership changes occurring in December 2009). In no event, however, can the value of the Debtor's stock for this purpose exceed the pre-change gross value of the Debtor's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses. Generally, NOL carryforwards expire after 20 years.

Section 382 of the Tax Code also limits the deduction of certain "built-in" losses recognized subsequent to the date of the ownership change. If the Debtor has a net unrealized built-in loss at the time of an ownership change (taking into account the fair market value and tax basis of its assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss), including depreciation and amortization deductions attributable to the excess of the tax basis of the assets of the Debtor over their fair market value as of the date of the ownership change, generally will be treated as pre-change losses subject to the annual limitation. The Debtor expects to have a substantial net unrealized built-in loss after the consummation of the Prepackaged Plan.

## 3.    Alternative Minimum Tax

In general, a U.S. federal alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified

or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or a consolidated group) undergoes an ownership change and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets is reduced for certain AMT purposes to reflect the fair market value of such assets as of the ownership change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

## B. Consequences to Holders of Claims

As used in this Section of this Disclosure Statement, the term "**U.S. Holder**" means a beneficial owner of a Claim, an interest in the New Senior Secured Term Notes, New Common Stock, or a Subordinated Note Warrant that is entitled to vote on the Prepackaged Plan and is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Claims, New Senior Secured Term Notes, New Common Stock, or Subordinated Note Warrants, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. A partner in a partnership holding any of such instruments should consult its own tax advisor.

This summary addresses only holders that have held Claims as "capital assets" within the meaning of section 1221 of the Tax Code, and will hold, as applicable, interests in the New Senior Secured Term Notes, New Common Stock and Subordinated Note Warrants as capital assets.

The U.S. federal income tax consequences of the Prepackaged Plan to a holder of a Claim generally will depend in part upon (1) whether such Claim constitutes a "security" for federal

income tax purposes and (2) whether all or a portion of any debt obligation included in the consideration received for such Claim constitutes a "security" for federal income tax purposes. The determination of whether a debt obligation constitutes a security for federal income tax purposes is complex and depends on the facts and circumstances surrounding the origin and nature of the claim. A significant factor considered in determining whether a debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more generally have been treated as securities. It is uncertain whether Senior Loan Claims or Subordinated Note Claims will be considered securities or whether a Pro Rata share of the Term Loan Facility (which will be received by U.S. Holders of Senior Loan Claims in partial satisfaction of their Claim) will constitute a security for federal income tax purposes and U.S. Holders are advised to consult their tax advisors with respect to this issue.

### 1.    U.S. Holders of Senior Loan Claims

Pursuant to the Prepackaged Plan, holders of Senior Loan Claims will receive, in full satisfaction of such Claims, their Pro Rata share of (1) the obligations under the New Senior Secured Term Notes, (2) New Common Stock and (3) an amount of cash equal to the Senior Lender Emergence Payment. The Debtor intends to take the position, and the discussion below assumes, that the Senior Lender Emergence Payment will be treated as a payment of accrued interest and other Senior Loan Non-Principal Claims and that the relevant exchange is an exchange of the principal amount of the Senior Loan Claims for New Senior Secured Term Notes and New Common Stock, although it is possible that the IRS may take a different view.

### a.    Exchange of Senior Loan Claims for New Senior Secured Term Notes and New Common Stock

If the Senior Loan Claims and New Senior Secured Term Notes are treated as securities for federal income tax purposes, the exchange of Senior Loan Claims for New Senior Secured Term Notes and New Common Stock will constitute a recapitalization, and U.S. Holders of the Senior Loan Claims will not recognize gain or loss on the exchange. A Senior Lender's holding period in its interest in the New Senior Secured Term Notes and the New Common Stock would include the Senior Lender's holding period in its Senior Loan Claims, and the Senior Lender would have a basis in its interest in the New Senior Secured Term Notes and the New Common Stock equal, in the aggregate, to the Senior Lender's basis in its Senior Loan Claims. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Notes and the New Common Stock would be allocated between the two in accordance with their respective fair market values.

If the Senior Loan Claims are treated as securities for federal income tax purposes, but the New Senior Secured Term Notes are not treated as securities, each Senior Lender will recognize gain, but not loss, in an amount equal to the lesser of (i) the issue price of the New Senior Secured Term Notes (as determined under "New Senior Secured Term Notes," below) and (ii) the excess of (A) the sum of (1) the fair market value of the New Common Stock it receives plus (2) the issue price of the New Senior Secured Term Notes it receives over (B) the adjusted basis of the Senior Lender in its Senior Loan Claims. A Senior Lender's holding period in its New Common Stock would include the Senior Lender's holding period in its Senior Loan Claims, while the Senior Lender would start a new holding period in its New Senior Secured

Term Notes. The Senior Lender's basis in the New Senior Secured Term Notes would equal their issue price, and the Senior Lender's basis in its New Common Stock would equal the Senior Lender's basis in its Senior Loan Claim less the issue price of its New Senior Secured Term Notes, and plus the amount of gain, if any, recognized on the exchange. Subject to the rules discussed below in "*Other Considerations - Market Discount*", any gain generally would be capital gain and would be long-term capital gain if the U.S. Holder has held its Senior Loan Claims for more than one year as of the Effective Date.

If the Senior Loan Claims are not treated as securities for federal income tax purposes, a Senior Lender generally will recognize gain or loss on the exchange of its Senior Loan Claim for New Senior Secured Term Notes and New Common Stock. Such gain or loss will generally be equal to the difference between (i) the sum of the fair market value of the New Common Stock and the issue price of the New Senior Secured Term Notes the Senior Lender receives and (ii) the Senior Lender's tax basis in the Senior Loan Claims. Subject to the rules discussed below in "*Other Considerations - Market Discount*", any gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the Senior Loan Claims for more than one year as of the Effective Date. A Senior Lender's basis in the New Senior Secured Term Notes would equal their issue price, and its basis in the New Common Stock would equal its fair market value. The holding period for the New Senior Secured Term Notes and the New Common Stock would begin the day after the Effective Date.

### b.  New Senior Secured Term Notes

*Interest and Original Issue Discount*. Payments of stated interest under the New Senior Secured Term Notes will constitute payments of "qualified stated interest" and generally will be taxable to U.S. Holders as ordinary income at the time the payments are received or accrued, in accordance with the U.S. Holder's method of tax accounting.

The New Senior Secured Term Notes generally will be treated as issued with original issue discount ("**OID**") if the principal amount of the New Senior Secured Term Notes exceeds their issue price by more than a *de minimis* amount. If the New Senior Secured Term Notes are issued with OID, a U.S. Holder of an interest in the New Senior Secured Term Notes generally will be required to include such OID in income over the term of the loan in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when the U.S. Holder receives cash payments of interest on the New Senior Secured Term Notes. Accordingly, a U.S. Holder could be treated as receiving interest income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will increase the tax basis of the U.S. Holder in its interest in the New Senior Secured Term Notes. A U.S. Holder will not be required to include separately in income cash payments received on the New Senior Secured Term Notes to the extent such payments constitute payments of previously accrued OID, and such payments will reduce its tax basis in its interest in the New Senior Secured Term Notes by the amount of such payments. If a U.S. Holder's tax basis in its New Senior Secured Term Notes exceeds its principal amount, the U.S. Holder can elect to amortize the resulting bond premium on a constant yield basis as an offset to interest income over the term of the New Senior Secured Term Notes.

The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered to be traded on an "established

securities market" at any time during the sixty-day period ending thirty days after the issue date. If neither the Senior Loan Claims nor the New Senior Secured Term Notes are traded on an established securities market, the issue price of the New Senior Secured Term Notes will be their stated principal amount. If the New Senior Secured Term Notes are traded on an established securities market, their issue price generally will be their trading price immediately following issuance. If the Senior Loan Claims are traded on an established securities market, but the New Senior Secured Term Notes are not, the issue price of a New Senior Secured Term Notes generally will be the fair market value of a Senior Loan Claim at the time of the exchange less the fair market value of New Common Stock received in the exchange. In general, a debt instrument will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying foreign securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) price quotations for it are readily available from dealers, brokers or traders. It is unclear whether the Senior Loan Claims and the New Senior Secured Term Notes will be treated as traded on an established securities market for this purpose.

*Sale, Retirement or Other Taxable Disposition*. A U.S. Holder of an interest in the New Senior Secured Term Notes will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of its interest in the New Senior Secured Term Notes equal to the difference between the amount realized upon the disposition (less the portion thereof allocable to any accrued but unpaid interest, which generally will be treated as a payment of interest) and the U.S. Holder's adjusted tax basis in its interest in the New Senior Secured Term Notes. Any such gain or loss generally will be capital gain or loss and will be long-term capital gain or loss except as discussed under "*Other Considerations - Market Discount*" below.

### c.  New Common Stock

*Distributions*. A U.S. Holder of New Common Stock generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid on the New Common Stock to the extent such distributions are paid out of the Reorganized Debtor's current or accumulated earnings and profits as determined for federal income tax purposes. U.S. Holders that are treated as corporations for federal income tax purposes may be entitled to dividends received deductions with respect to distributions paid out of earnings and profits. Distributions not treated as dividends for federal income tax purposes will constitute a return of capital and will first be applied against and reduce a U.S. Holder's adjusted tax basis in the New Common Stock, but not below zero. Any excess amount will be treated as gain from a sale or exchange of the New Common Stock.

*Sale or Other Taxable Disposition*. A U.S. Holder of New Common Stock will recognize gain or loss upon the sale or other taxable disposition of New Common Stock equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in the New Common Stock. Subject to the recapture rules under Tax Code section 108(e)(7) and except as described under "*Other Considerations - Market Discount*" below, any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the New Common Stock for more than one year as of the date of disposition. Under Tax Code section 108(e)(7) recapture rules, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if

the U.S. Holder took a bad debt deduction with respect to the Senior Loan Claims or recognized an ordinary loss on the exchange of the Senior Loan Claims for New Common Stock.

### 2. U.S. Holders of Subordinated Note Claims

#### a. Exchange of Subordinated Note Claims for Subordinated Note Warrants

If the Subordinated Note Claims are treated as securities for federal income tax purposes, the exchange of Subordinated Note Claims for Subordinated Note Warrants will constitute a recapitalization and U.S. Holders of the Subordinated Note Claims will not recognize gain or loss on the exchange except with respect to any portion of the Subordinated Note Warrants attributable to accrued but unpaid interest on the Subordinated Note Claim. In such case, a Subordinated Note Claim holder's holding period in the Subordinated Note Warrants would include the holder's holding period in its Subordinated Note Claims, and the holder would have a basis in the Subordinated Note Warrants equal to the holder's basis in its Subordinated Note Claims.

If the Subordinated Note Claims are not treated as securities for federal income tax purposes, a U.S. Holder of Subordinated Note Claims generally will recognize gain or loss on the exchange of the Subordinated Note Claims for the Subordinated Note Warrants. Such gain or loss generally will be equal to the difference between the fair market value of the Subordinated Note Warrants (other than any portion thereof attributable to accrued but unpaid interest) and the U.S. Holder's tax basis in the Subordinated Note Claims. Subject to the rules discussed below in "*Other Considerations - Market Discount*", any gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the Subordinated Note Claims for more than one year as of the date of disposition.

#### b. Subordinated Note Warrants

A U.S. Holder generally will not recognize gain or loss when the Subordinated Note Warrants are exercised to acquire the underlying New Common Stock and the U.S. Holder's aggregate tax basis in the New Common Stock acquired generally will equal the U.S. Holder's aggregate tax basis in the exercised warrants increased by the exercise price. A U.S. Holder's holding period in the New Common Stock received upon exercise of a Subordinated Note Warrant will commence on the day following the exercise of such warrant.

Upon the lapse or disposition of a Subordinated Note Warrant, a U.S. Holder generally will recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and its tax basis in the warrant. In general, such gain or loss will be a capital gain or loss, and will be long-term capital gain or loss if the holding period for the Subordinated Note Warrant is more than one year.

In addition, an adjustment to the number of shares of New Common Stock for which the Subordinated Note Warrants may be exercised (or to the exercise price of the Subordinated Note Warrants) may under certain circumstances result in constructive distributions that could be taxable to the holders of the Subordinated Note Warrants.

### c. Failure of Holders of Subordinated Note Claims to Vote in Favor of the Prepackaged Plan

If an insufficient number of votes accepting the Prepackaged Plan is received from holders of Subordinated Note Claims to constitute an acceptance of the Prepackaged Plan, and, as a result, such holders receive no distribution under the Prepackaged Plan, a U.S. Holder of a Subordinated Note Claim will recognize a loss equal to its tax basis in its Subordinated Note Claim. Such loss will be a capital loss and will be long-term capital loss if the holding period for the Subordinated Note Claim is more than one year.

### 3. Other Considerations

### a. Accrued Interest

To the extent that any consideration received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest, such consideration should be taxable to the U.S. Holder as interest income except to the extent previously included in accordance with the U.S. Holder's method of accounting. Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtor. Such loss may be ordinary, but the tax law is unclear on this point.

Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtor intends to take the position that consideration paid pursuant to the Prepackaged Plan other than the Senior Lender Emergence Payment will be allocable first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

### b. Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain recognized by a U.S. Holder of a Claim who exchanges the Claim for a portion of the New Senior Secured Term Notes, New Common Stock and/or Subordinated Note Warrants on the Effective Date may be treated as ordinary income instead of capital gain. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument at the time of acquisition is less than (1) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (2) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in either case (1) or (2), the difference is less than a specified de minimis amount. Any gain recognized by a U.S. Holder on the taxable disposition of Claims that had been acquired with market discount will be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued). To the extent that any accrued market discount on a Senior Loan Claim or Subordinated Notes Claim is not recognized pursuant to the transactions contemplated by the Prepackaged Plan (e.g., as a result of treatment

of the exchange as a recapitalization), such accrued market discount will carry over to the New Senior Secured Term Notes, New Common Stock, or Subordinated Note Warrants received.

### c.  Bad Debt Deduction

A U.S. Holder who, under the Prepackaged Plan, receives in respect of a Claim an amount less than the U.S. Holder's tax basis in the Claim may be entitled to a bad debt deduction in some amount under section 166(a) of the Tax Code.  The rules governing character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed.  Each U.S. Holder of a Claim, therefore, is urged to consult its tax advisors with respect to its ability to take such a deduction.

### d.  Limitation on Use of Capital Losses

U.S. Holders of Claims are subject to limits on their use of capital losses.  For non-corporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  Non-corporate holders may carryover unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  Corporate holders may carryover unused capital losses only for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### C.  Information Reporting and Backup Withholding

Payments of interest (including accrued OID) or dividends and any other reportable payments, possibly including consideration received pursuant to the Prepackaged Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 28%) if the recipient of those payments fails to furnish to the payor certain identifying information, and, in some cases, a certification that the recipient is not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld pursuant to these rules will generally be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate information is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally will not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning the above payments, unless an exemption applies.  You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  You are urged to consult your own tax advisor regarding these

regulations and whether the contemplated transactions under the Prepackaged Plan would be subject to these regulations and require disclosure on your tax return.

## XV.   CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Prepackaged Plan is in the best interests of the holders of Claims in Classes 2 and 5, who are entitled to vote on the Prepackaged Plan, and preferable to any of the alternatives described above because it will result in the greatest recoveries to holders of all Claims. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. Consequently, the Debtor urges holders of Claims in such Classes to vote to ACCEPT the Prepackaged Plan and to evidence their acceptance by duly completing and returning their ballots so that they are actually received by Epiq Bankruptcy Solutions, LLC on or before 5:00 p.m., Eastern Time, on January 13, 2010.

The Administrative Agent and the Senior Lender Steering Committee have reviewed the Prepackaged Plan in detail.   Subject to the approval of certain terms described in Plan Supplements prior to the Voting Deadline, the Administrative Agent and the Senior Lender Steering Committee support the Prepackaged Plan.

Respectfully Submitted

By: _____

Name:  Ronald Mayo

Title: Vice President and Chief Financial Officer

Affiliated Media, Inc.