# Exhibit 2

Audited Consolidated Balance Sheet as of June 30, 2009 and the related
Statements of Operations and Cash Flows for the Fiscal Year Ended
June 30, 2009

[THIS PAGE INTENTIONALLY LEFT BLANK]

Consolidated Financial Statements


MediaNews Group, Inc.
As of and For The Year Ended
June 30, 2009

# MEDIANEWS GROUP, INC.

## Index to Consolidated Financial Statements

The following financial statements are listed below:

| | Page |
|---|---|
| Report of Independent Auditors | 1 |
| Consolidated Balance Sheets as of June 30, 2009 and 2008 | 2 |
| Consolidated Statements of Operations for the Fiscal Years Ended June 30, 2009 and 2008 | 4 |
| Consolidated Statements of Changes in Shareholders' Equity (Deficit) for the Fiscal Years Ended June 30, 2009 and 2008 | 5 |
| Consolidated Statements of Cash Flows for the Fiscal Years Ended June 30, 2009 and 2008 | 6 |
| Notes to Consolidated Financial Statements | 7 |



Ernst & Young LLP
Suite 3300
370 17th Street
Denver, Colorado 80202-5663

Tel: +1 720 931 4000
Fax: +1 720 931 4444
www.ey.com

## Report of Independent Auditors

The Board of Directors and Shareholders
MediaNews Group, Inc.

We have audited the accompanying consolidated balance sheets of MediaNews Group, Inc. and subsidiaries as of June 30, 2009 and 2008, and the related consolidated statements of operations, changes in shareholders' deficit and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of MediaNews Group, Inc. and subsidiaries at June 30, 2009 and 2008, and the consolidated results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

The accompanying financial statements have been prepared assuming that MediaNews Group, Inc. will continue as a going concern. As more fully described in Note 1, the Company has experienced a substantial decrease in operating revenues and cash flows which have caused it to default on certain covenants of its Bank Credit Facility and its Senior Subordinated Notes. The Company currently operates under a Forbearance Agreement with respect to its Bank Credit Facility and its Senior Subordinated Notes. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 21. The 2009 financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

*Ernst & Young LLP*

December 8, 2009

1

MEDIANEWS GROUP, INC. & SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

|  | June 30, | |
|---|---|---|
|  | 2009 | 2008 |
|  | (Dollars in thousands) | |

### ASSETS
**CURRENT ASSETS**

| | | |
|---|---|---|
| Cash and cash equivalents........................................................... | $ 64,303 | $ 70,296 |
| Trade accounts receivable, less allowance for doubtful accounts of $16,017 and $12,038, at June 30, 2009 and 2008, respectively .................. | 121,371 | 138,826 |
| Other receivables............................................................................ | 10,251 | 8,656 |
| Inventories of newsprint and supplies............................................. | 19,480 | 23,177 |
| Prepaid expenses and other assets .................................................. | 54,580 | 24,167 |
| TOTAL CURRENT ASSETS ................................................ | 269,985 | 265,122 |

**PROPERTY, PLANT AND EQUIPMENT**

| | | |
|---|---|---|
| Land ................................................................................................ | 64,672 | 66,972 |
| Buildings and improvements........................................................... | 204,562 | 191,900 |
| Machinery and equipment............................................................... | 526,349 | 475,299 |
| Construction in progress ................................................................ | 7,409 | 12,969 |
| TOTAL PROPERTY, PLANT AND EQUIPMENT............................... | 802,992 | 747,140 |
| Less accumulated depreciation and amortization.......................... | (300,339) | (277,348) |
| NET PROPERTY, PLANT AND EQUIPMENT..................................... | 502,653 | 469,792 |

**OTHER ASSETS**

| | | |
|---|---|---|
| Investment in unconsolidated JOAs (Salt Lake City at June 30, 2009 and 2008, Denver at June 30, 2008)................................................. | 12,461 | 127,535 |
| Equity investments.......................................................................... | 18,412 | 42,515 |
| Subscriber accounts, less accumulated amortization of $154,348 and $157,672 at June 30, 2009 and 2008, respectively...................................... | 15,575 | 42,481 |
| Excess of cost over fair value of net assets acquired...................................... | 90,261 | 552,710 |
| Newspaper mastheads ...................................................................... | 55,470 | 251,266 |
| Advertiser lists, covenants not to compete and other identifiable intangible assets, less accumulated amortization of $194,898 and $116,304 at June 30, 2009 and 2008, respectively................................................ | 27,685 | 150,854 |
| Other ............................................................................................... | 42,342 | 43,012 |
| TOTAL OTHER ASSETS...................................................... | 262,206 | 1,210,373 |
| TOTAL ASSETS................................................................... | $ 1,034,844 | $ 1,945,287 |

See notes to consolidated financial statements

2

MEDIANEWS GROUP, INC. & SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

| | June 30, | |
|---|---|---|
| | 2009 | 2008 |
| | (Dollars in thousands, except share data) | |

### LIABILITIES AND SHAREHOLDERS' DEFICIT

**CURRENT LIABILITIES**

| | | |
|---|---|---|
| Trade accounts payable | $ 37,649 | $ 58,648 |
| Accrued employee compensation | 37,424 | 55,713 |
| Accrued interest | 19,997 | 13,951 |
| Other accrued liabilities | 46,286 | 35,456 |
| Unearned income | 65,205 | 55,735 |
| Current portion of long-term debt and obligations under capital leases | 922,235 | 32,357 |
| TOTAL CURRENT LIABILITIES | 1,128,796 | 251,860 |
| OBLIGATIONS UNDER CAPITAL LEASES | 1,519 | 5,244 |
| LONG-TERM DEBT | 84,243 | 1,047,089 |
| DEFINED BENEFIT AND OTHER POST EMPLOYMENT BENEFIT PLAN LIABILITIES | 139,920 | 37,307 |
| OTHER LIABILITIES | 21,639 | 24,550 |
| DEFERRED INCOME TAXES, NET | 28,385 | 76,600 |
| MINORITY INTEREST | 187,860 | 477,199 |
| PREFERRED STOCK | 40,395 | 26,073 |

**SHAREHOLDERS' DEFICIT**

| | | |
|---|---|---|
| Common stock, Class A, par value $0.001; 3,150,000 shares authorized: 2,314,346 shares issued; 2,278,352 shares outstanding at June 30, 2009 and 2008 | 2 | 2 |
| Common stock, Class C, par value $0.001; 100 shares authorized: 100 shares issued and outstanding at June 30, 2009 and 2008 | — | — |
| Additional paid-in capital | 346,458 | 313,658 |
| Accumulated other comprehensive loss, net of taxes: | | |
| Unrealized loss on hedging | — | (1,153) |
| Pension and other post-employment benefit liabilities | (67,373) | (26,484) |
| Accumulated deficit | (872,201) | (281,859) |
| Common stock in treasury, at cost, 35,994 shares at June 30, 2009 and 2008 | (4,799) | (4,799) |
| TOTAL SHAREHOLDERS' DEFICIT | (597,913) | (635) |
| TOTAL LIABILITIES AND SHAREHOLDERS' DEFICIT | $ 1,034,844 | $ 1,945,287 |

See notes to consolidated financial statements

## MEDIANEWS GROUP, INC. & SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Years Ended June 30, | |
|---|---|---|
|  | 2009 | 2008 |
|  | (Dollars in thousands) | |
| **REVENUES** |  |  |
| Advertising | $ 797,237 | $ 927,432 |
| Circulation | 217,047 | 205,238 |
| Other | 45,886 | 48,864 |
| TOTAL REVENUES | 1,060,170 | 1,181,534 |
| INCOME (LOSS) FROM UNCONSOLIDATED JOAS (SALT LAKE CITY, AND DENVER THROUGH FEBRUARY 26, 2009) | (17,736) | 9,346 |
| **COSTS AND EXPENSES** |  |  |
| Cost of sales | 339,733 | 364,358 |
| Selling, general and administrative | 639,711 | 667,596 |
| Depreciation and amortization | 59,034 | 84,563 |
| Interest expense | 63,396 | 76,266 |
| Other (income) expense, net | 27,907 | (37,378) |
| TOTAL COSTS AND EXPENSES | 1,129,781 | 1,155,405 |
| LOSS ON EQUITY INVESTMENTS, NET | (157) | (2,892) |
| GAIN (LOSS) ON SALE OF ASSETS AND NEWSPAPER PROPERTY TRANSACTIONS, NET | 2,689 | (842) |
| IMPAIRMENT LOSS | (687,046) | (601,699) |
| MINORITY INTEREST | 142,416 | 143,551 |
| LOSS BEFORE INCOME TAXES | (629,445) | (426,407) |
| INCOME TAX BENEFIT | 48,910 | 30,860 |
| LOSS FROM CONTINUING OPERATIONS | (580,535) | (395,547) |
| LOSS FROM DISCONTINUED OPERATIONS, NET OF TAX | (1,622) | (10,818) |
| LOSS | $ (582,157) | $ (406,365) |

See notes to consolidated financial statements

## MEDIANEWS GROUP, INC. & SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY (DEFICIT)

| | Common Stock, Class A | Common Stock, Class C | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Retained Earnings/ (Accumulated Deficit) | Common Stock in Treasury | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| | | | | (Dollars in thousands) | | | |
| BALANCE AT JUNE 30, 2007 | $ 2 | $ — | $ — | $ (17,341) | $ 101,503 | $ (2,000) | $ 82,164 |
| Adjustment for putable common stock | — | — | — | — | 33,165 | — | 33,165 |
| Repurchase of common stock | — | — | — | — | — | (2,799) | (2,799) |
| Reversal of accretion related to St. Paul, Monterey and Torrance purchase price | — | — | — | — | 15,911 | — | 15,911 |
| Hearst investment | — | — | 313,658 | — | — | — | 313,658 |
| Accretion of dividends on preferred stock | — | — | — | — | (1,073) | — | (1,073) |
| Dividends paid | — | — | — | — | (25,000) | — | (25,000) |
| Pension and postretirement adjustment related to adoption of SFAS No. 158, net of tax effect of $0 for certain unconsolidated investments | — | — | — | (1,651) | — | — | (1,651) |
| Comprehensive loss: | | | | | | | |
| Unrealized loss on hedging activities, net of tax effect of $0 | — | — | — | (1,537) | — | — | (1,537) |
| Unrealized loss on hedging activities, reclassified to earnings, net of tax effect of $0 | — | — | — | 804 | — | — | 804 |
| Amortization of pension prior service costs and actuarial losses reclassified to earnings, net of tax effect of $0 | — | — | — | 1,418 | — | — | 1,418 |
| Pension adjustment, net of tax effect of $0 | — | — | — | (9,330) | — | — | (9,330) |
| Loss | — | — | — | — | (406,365) | — | (406,365) |
| Comprehensive loss | | | | | | | (415,010) |
| BALANCE AT JUNE 30, 2008 | 2 | — | 313,658 | (27,637) | (281,859) | (4,799) | (635) |
| Accretion of dividends on preferred stock | — | — | — | — | (8,185) | — | (8,185) |
| Conversion of 6.875% and 6.375% Senior Subordinated Notes for Series B and C Preferred Stock | — | — | 32,800 | — | — | — | 32,800 |
| Comprehensive loss: | | | | | | | |
| Adjustments to unrealized gain on hedging activities and pension, net of tax benefit effect of $1,586 | — | — | — | 1,515 | — | — | 1,515 |
| Unrealized loss on hedging activities, reclassified to earnings, net of tax benefit effect of $551 | — | — | — | (82) | — | — | (82) |
| Amortization of pension prior service costs and actuarial losses reclassified to earnings, net of tax effect of $0 | — | — | — | 2,082 | — | — | 2,082 |
| Pension adjustment, net of tax effect of $0 | — | — | — | (43,251) | — | — | (43,251) |
| Loss | — | — | — | — | (582,157) | — | (582,157) |
| Comprehensive loss | | | | | | | (621,893) |
| BALANCE AT JUNE 30, 2009 | $ 2 | $ — | $346,458 | $ (67,373) | $(872,201) | $ (4,799) | $(597,913) |

See notes to consolidated financial statements

## MEDIANEWS GROUP, INC. & SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Years Ended June 30, | |
|---|---|---|
| | 2009 | 2008 |
| | (Dollars in thousands) | |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Loss from continuing operations | $ (580,535) | $ (395,547) |
| Adjustments to reconcile loss from continuing operations to net cash provided by operating activities of continuing operations: | | |
| Depreciation | 37,166 | 52,958 |
| Amortization | 23,167 | 35,297 |
| Workers compensation claim expense in excess of actuarially determined amounts | 10,576 | — |
| Impairment loss | 687,046 | 601,699 |
| Gain on early extinguishment of debt and other liabilities | (2,054) | (41,058) |
| Net (gain) loss on sale of assets and newspaper transactions | (2,689) | 801 |
| Provision for losses on accounts receivable | 22,948 | 14,752 |
| Amortization of debt discount | 707 | 765 |
| Gain on change in fair value of interest rate swap | (1,048) | — |
| Minority interest | (142,416) | (143,551) |
| Distributions of net income paid to minority interests | — | (18,422) |
| Proportionate share of net income from unconsolidated JOAs | (14,850) | (50,068) |
| Distributions of net income from unconsolidated JOAs[a] | 15,640 | 49,792 |
| Equity investment loss, net | 157 | 2,892 |
| Distributions of net income from equity investments[b] | — | 58 |
| Deferred income tax benefit | (49,275) | (32,965) |
| Change in defined benefit plan liabilities, net of cash contributions | (474) | (10,859) |
| Unrealized loss on hedging activities, and amortization of prior service costs and actuarial losses, reclassified to earnings from accumulated other comprehensive loss | 2,000 | 2,222 |
| Change in operating assets and liabilities: | | |
| Accounts receivable | 9,672 | 14,098 |
| Inventories | 8,963 | (248) |
| Prepaid expenses and other assets | (9,116) | 4,532 |
| Accounts payable and accrued liabilities | (46,579) | (13,148) |
| Unearned income | (1,241) | (1,813) |
| Change in other assets and liabilities, net | 5,791 | (8,272) |
| NET CASH FLOWS FROM OPERATING ACTIVITIES OF CONTINUING OPERATIONS | (26,444) | 63,915 |
| NET CASH FLOWS FROM OPERATING ACTIVITIES OF DISCONTINUED OPERATIONS | 1,432 | 13,508 |
| NET CASH FLOWS FROM OPERATING ACTIVITIES | (25,012) | 77,423 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Other investments, net | 6,937 | (10,870) |
| Proceeds from the sale of assets | 7,785 | 23,063 |
| Business acquisitions and related costs, net of cash acquired | — | (2,719) |
| Distributions in excess of net income from unconsolidated JOAs[a] | 22,779 | 8,510 |
| Distributions in excess of net income from equity investments[b] | 2,140 | 1,789 |
| Capital expenditures | (12,739) | (28,407) |
| NET CASH FLOWS FROM INVESTING ACTIVITIES OF CONTINUING OPERATIONS | 26,902 | (8,634) |
| NET CASH FLOWS FROM INVESTING ACTIVITIES OF DISCONTINUED OPERATIONS | 152,728 | (5,720) |
| NET CASH FLOWS FROM INVESTING ACTIVITIES | 179,630 | (14,354) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Issuance of long-term debt, net of issuance costs | 72,622 | 174,169 |
| Reduction of long-term debt and other liabilities | (209,203) | (176,408) |
| Repurchase of Common Stock | — | (3,010) |
| Proceeds from sale of Class A Common Stock | — | 211 |
| Proceeds from sale of Class C Common Stock | — | 25,908 |
| Dividends paid to Series A Preferred Stockholder (2009) and Class A Common Stockholders (2008) | (1,063) | (25,000) |
| Proceeds from sale of Series A Preferred Stock | — | 25,000 |
| Sale of minority interest in The Monterey County Herald | — | 27,350 |
| Distributions in excess of net income to minority interests | (22,567) | (42,554) |
| NET CASH FLOWS FROM FINANCING ACTIVITIES OF CONTINUING OPERATIONS | (160,211) | 5,666 |
| NET CASH FLOWS FROM FINANCING ACTIVITIES OF DISCONTINUED OPERATIONS | (400) | (7,524) |
| NET CASH FLOWS FROM FINANCING ACTIVITIES | (160,611) | (1,858) |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (5,993) | 61,211 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 70,296 | 9,085 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 64,303 | $ 70,296 |

(a) Total distributions from unconsolidated JOAs were $38.4 million and $58.3 million for fiscal years 2009 and 2008, respectively.

(b) Total distributions from equity investments were $2.1 million and $1.8 million for fiscal years 2009 and 2008, respectively.

| Supplemental schedule of noncash investing activities: | | |
|---|---|---|
| Stamford and Greenwich, Connecticut transaction | $ — | $ (62,280) |
| Investment by Hearst in the Company | $ — | $ 290,614 |
| Conversion of 6.875% and 6.375% Senior Subordinated Notes for Series B and C Preferred Stock | $ 40,000 | $ — |

See notes to consolidated financial statements

## Note 1: Basis of Presentation

MediaNews Group, Inc. ("MediaNews" or the "Company"), through its subsidiaries, publishes daily and non-daily newspapers serving markets in eleven states as of June 30, 2009. The Company also owns four radio stations and one television station; the combined revenues of these non-newspaper operations comprise less than 1.0% of the Company's consolidated revenue and are not considered significant to the Company's operations. Including these non-newspaper operations, the Company serves markets in twelve states.

As a result of secular and cyclical changes in advertising spending in newspapers, the Company has experienced a substantial decrease in operating revenues and cash flows, causing it to default on its Bank Credit Facility and its 6.875% and 6.375% Senior Subordinated Notes. The Company is currently subject to a Forbearance Agreement with respect to its Bank Credit Facility and its Senior Subordinated Notes (all of which are more fully described in Note 10: Debt). The Company is in the process of restructuring these debt obligations in the form of a comprehensive reorganization and restructuring of the Company's debt and equity, as more fully described in Note 21: Restructuring and Reorganization Plan. Despite the uncertainty with respect to the Company's restructuring plans, the financial statements have been prepared on a going concern basis. Financial statements prepared on this basis of accounting do not include any adjustments relating to the recoverability and classification of recorded asset amounts or amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

## Note 2: Significant Accounting Policies and Other Matters

Significant accounting policies for the Company involve its assessment of the recoverability of its long-lived assets, including goodwill and other intangible assets, which is based on such factors as estimated future cash flows and current fair value estimates. The Company's accounting for pension and retiree medical benefits requires the use of estimates concerning the work force, interest rates, plan investment return and involves the use of advice from consulting actuaries. Accounting for the workers' compensation obligation involves estimating ultimate claims payouts for open claims and involves the use of advice and analysis of actuaries. The Company's accounting for federal and state income taxes is sensitive to interpretation of various laws and regulations and assumptions on the realization of deferred tax assets.

### Use of Estimates

The preparation of financial statements in accordance with generally accepted accounting principles at times requires the use of estimates and assumptions. The Company uses estimates, based on historical experience, actuarial studies, valuation models and other assumptions, as appropriate, to assess the carrying values of its assets and liabilities and disclosure of contingent matters. The Company reevaluates its estimates on an ongoing basis. Actual results could differ from these estimates.

### Principles of Consolidation

All significant intercompany accounts have been eliminated.

### Revisions/Reclassifications

For comparability, certain prior year balances have been reclassified to conform to current reporting classifications.

### Joint Operating Agencies

A joint operating agency ("JOA") performs the production, sales, distribution and administrative functions for two or more newspapers in the same market under the terms of a joint operating agreement. Editorial control and news at each newspaper party to a joint operating agreement continue to be separate and outside of a JOA. The Company,

through its partnerships and subsidiaries, participates in JOAs in Salt Lake City, Utah, York, Pennsylvania, Detroit, Michigan and Charleston, West Virginia.

The Company participated in a JOA in Denver, Colorado through February 2009. On February 26, 2009, the Company entered into a Separation Agreement with its Denver JOA partner agreeing to terminate the Denver JOA. In August 2009, the closing pursuant to the Separation Agreement was consummated, and the Denver JOA was terminated. Effective with entering into the Separation Agreement, the Company began consolidating the Denver Newspaper Agency and changed its accounting for its wholly owned subsidiary, *The Denver Post*. See Note 4: Denver JOA Separation Agreement for additional discussion.

The operating results from the Company's unconsolidated JOAs (Salt Lake City, and Denver through February 26, 2009) are reported as a single net amount in the accompanying financial statements in the line item "Income (Loss) from Unconsolidated JOAs." This line item includes:

- The Company's proportionate share of net income (loss) from JOAs,

- The amortization of subscriber lists created by the original purchase, as the subscriber lists are attributable to the Company's earnings in the JOAs, and

- Editorial costs, miscellaneous revenue received outside of the JOA, and other charges incurred by the Company's consolidated subsidiaries directly attributable to the JOAs providing editorial content and news for the Company's newspapers party to the JOAs.

The Company's investments in the Denver and Salt Lake City JOAs are included in the consolidated balance sheet under the line item "Investment in Unconsolidated JOAs" at June 30, 2008. As of June 30, 2009, "Investment in Unconsolidated JOAs" includes only the Company's investment in the Salt Lake City JOA. See Note 6: Joint Operating Agencies for additional discussion of our accounting for each JOA operation in which the Company participated.

Because of the structure of the Detroit partnership and the Company's ownership interest therein, the Company's accounting for its investment only includes the preferred distributions the Company receives from the Detroit JOA. The Company's investment in The Detroit News, Inc. is included in other long-term assets.

Under the Charleston JOA, the Company is reimbursed for the cost of providing the news and editorial content of the *Charleston Daily Mail* and is paid a management fee. The Company's limited partnership interest in the Charleston JOA does not entitle the Company to any share of the profits or losses of the limited partnership.

The Company owns all of the York JOA and accordingly, consolidates its results. *The York Dispatch* (one of the newspapers in the JOA) is edited by a third party, and the Company reimburses the third party for all related expenses and pays them a management fee. These expenses are included in the Company's consolidated results.

*Cash and Cash Equivalents*

The Company considers all highly liquid investments with a maturity of three months or less when purchased to be cash equivalents.

The June 30, 2009 cash and cash equivalents balance includes $5.1 million of cash and cash equivalents related to the Denver Newspaper Agency. See Note 5: Denver Amended Credit Facility for discussion regarding restrictions on cash disbursements associated with the August 26, 2009 DNA Amended Credit Facility.

*Trade Accounts Receivable*

Trade accounts receivable are generally from advertisers, commercial printing customers, single copy newspaper outlets, newspaper subscribers and independent newspaper delivery contractors. The Company extends unsecured credit to most of its customers. Credit limits, setting and maintaining credit standards and managing the overall quality of the credit portfolio is maintained and managed at the individual newspaper locations or regional clusters. The Company maintains an allowance for doubtful accounts for estimated losses resulting from the inability of its customers to make

required payments. The allowance for doubtful accounts is based on both the aging of accounts receivable at period end and specific identification.

*Inventories*

Inventories, which largely consist of newsprint, are valued at the lower of cost or market. Cost is generally determined using the first-in, first-out method.

*Investments*

The Company has made the following strategic investments, which are accounted for under the equity method (for those investments in which the Company has less than 20% ownership, the Company accounts for these under the equity method as the Company has seats on the board and, therefore, has significant influence and ties to the entity beyond the Company's invested capital):

- Through February 26, 2009, Prairie Mountain Publishing Company, partnership that publishes the Eastern Colorado Publishing Company newspapers (comprised of several small daily and weekly newspapers) and the *Daily Camera* and *Colorado Daily*, both published in Boulder, Colorado (50% ownership interest through February 26, 2009). Beginning February 27, 2009, the Company began consolidating the results of Prairie Mountain Publishing Company. See Note 4: Denver JOA Separation Agreement for further discussion.

- CIPS Marketing Group, Inc., total market coverage delivery service in Los Angeles (50% ownership interest).

- Gallup Independent Company, publisher of the *Gallup Independent* in Gallup, New Mexico (approximately 38% ownership interest).

- Ponderay Newsprint Company, minority investment in a newsprint mill held by the Company's subsidiary, Kearns-Tribune, LLC (6.0% ownership interest and one seat on the board).

- Utah Media Partners, LLC, doing business as Hometown Values Magazine, advertising coupon magazine for small local businesses mailed to certain residential zones throughout the state of Utah (58% ownership interest, 50% voting interest).

- Kaango, LLC, acquired in November 2007, provider of online classified advertising software (40% ownership interest) and the Company's share of a fixed price call option is approximately $1.5 million.

These investments are included in the consolidated balance sheet as a component of long-term assets under the caption "equity investments" as of June 30, 2009, except for Prairie Mountain Publishing Company, which is a consolidated subsidiary at June 30, 2009, as noted above.

*Property, Plant and Equipment*

Property, plant and equipment are recorded at cost. Buildings and machinery and equipment are depreciated using the straight-line method over the expected useful lives of individual assets. Buildings and improvements are depreciated over the lesser of 40 years or the term of the lease, and machinery and equipment are depreciated over 3 to 20 years. These assets are also subject to the annual impairment testing discussed below in more detail.

*Goodwill and Other Intangible Assets and Impairment Testing*

The Company accounts for goodwill and other intangible assets under Statement of Financial Accounting Standards No. 142, *Goodwill and Other Intangible Assets* ("SFAS No. 142"). Under the standard, excess of cost over fair value of net assets acquired (goodwill) and other indefinite life intangibles (primarily mastheads) are not amortized, but instead are periodically reviewed for impairment. All other intangibles with a finite useful life continue to be amortized over their estimated useful lives. Subscriber accounts and advertiser lists are amortized using the straight-line method over periods ranging from 8 to 15 years with a weighted average remaining life based on the date of acquisitions of approximately 5 and 4 years, respectively. Other finite-lived intangibles are being amortized over periods not exceeding 12 years. As required by SFAS No. 142, the Company performed an annual impairment test for goodwill and mastheads

as of June 30, 2009 and 2008. There was also a mid-year analysis performed as of December 31, 2008, described more fully below. The testing for impairment is a two-step process. The first step is the estimation of the fair value of each of the reporting units, which is then compared to their carrying value. If the fair value is less than the carrying value of the reporting unit then an impairment of goodwill and other indefinite-lived intangibles possibly exists. Step two is then performed to determine the amount of impairment.

Under the two-step process required by SFAS No. 142, the Company made a determination of the fair value of its reporting units. Fair values were determined using a combination of an income approach, which estimated fair value based upon future revenues, expenses and cash flows discounted to their present value, and a market approach, which estimated fair value using market multiples of various financial measures compared to a set of comparable public companies.

The valuation methodology and underlying financial information that are used to determine fair value require significant judgments to be made by management. These judgments include, but are not limited to, long-term projections of future financial performance and the selection of appropriate discount rates used to determine the present value of future cash flows. Changes in such estimates or the use of alternative assumptions could produce significantly different results.

SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, addresses financial accounting and reporting for the impairment or disposal of long-lived assets. The carrying value of long-lived assets is reviewed annually. If, at any time, the facts or circumstances at any of the Company's individual newspaper or other operations indicate the impairment of long-lived asset values as a result of a continual decline in performance or as a result of fundamental changes in a market, a determination is made as to whether the carrying value of the long-lived assets exceeds estimated realizable value.

*2008 Impairment Test*

The Company concluded that under the first step the fair value of certain reporting units did not exceed the carrying value of the related net assets as of June 30, 2008 and therefore performed step two. The Company, utilizing a third-party valuation, recorded a $601.7 million, non-cash charge for the year ended June 30, 2008 to reduce the carrying value of goodwill, mastheads and other finite-lived intangibles. Of the $601.7 million impairment loss recognized, $403.5 million was related to goodwill and masthead impairment, $69.9 million was related to the impairment of finite-lived intangibles (primarily advertiser lists), and $128.3 million was to reduce the carrying value of the Company's investments in the Salt Lake City JOA and Prairie Mountain Publishing.

Effective August 7, 2008, the Company sold the *Connecticut Post* for $155.0 million, including a settlement for working capital, and cancellation of the management agreement in Connecticut (see Note 3: Connecticut Management Agreement and Discontinued Operations). As a result of the sale, the Company had an indicator of impairment as the sales price was less than the carrying value recorded on the Company's books. The Company recognized a $45.0 million impairment loss as of June 30, 2008, which is included with discontinued operations.

*2009 Impairment Test*

Operating revenues during fiscal year 2009 did not perform as forecasted in the fiscal year 2008 impairment analysis. As a result of deteriorating market conditions, the Company determined there was an indicator of potential impairment. Accordingly the Company performed a mid-year impairment analysis as of December 31, 2008.

Using updated forecasts and discounted cash flow modeling techniques, the Company determined that impairment existed at December 31, 2008. As a result, the Company recorded an additional $522.7 million, non-cash impairment charge at December 31, 2008 to reduce the carrying value of goodwill, mastheads, other finite-lived intangibles and long-lived assets. Of the $522.7 million impairment loss recognized, $352.8 million was related to goodwill and masthead impairment, $84.1 million was related to the impairment of finite-lived intangibles (primarily advertiser lists), $27.0 million was related to fixed assets and $58.8 million was to reduce the carrying value of the Company's investments in the Salt Lake City JOA, the Denver JOA and Prairie Mountain Publishing.

As of June 30, 2009, the Company performed its annual impairment review using its most recent forecasts and concluded that under the first step, the fair value of certain reporting units did not exceed the carrying value of the related net assets as of June 30, 2009 and therefore performed step two of its impairment analysis.

The Company, utilizing a third-party valuation, recorded a $164.3 million, non-cash impairment charge at June 30, 2009 to further reduce the carrying value of goodwill, mastheads and other finite-lived intangibles and long-lived assets. Of the $164.3 million impairment loss recognized, $119.2 million was related to goodwill and masthead impairment, $1.9 million was related to fixed assets, and $43.2 million was to reduce the carrying value of the Company's investments in the Denver Newspaper Agency (June 2009 adjustments were to finalize December 2008 estimates) and the Salt Lake City JOA.

Another impairment test will be performed June 30, 2010, unless events or circumstances arise that require the Company to test for impairment sooner.

Estimated amortization expense for the finite-lived intangibles for the next five years is as follows at June 30, 2009 (in thousands):

| | |
|---|---|
| 2010 ............... | $ 11,643 |
| 2011 ............... | 11,104 |
| 2012 ............... | 9,474 |
| 2013 ............... | 3,662 |
| 2014 ............... | 2,248 |

## Debt Discount

Debt discount is amortized in a manner that results in a constant rate of interest over the life of the related debt and is included as a component of interest expense.

## Income Taxes

The Company accounts for income taxes utilizing the liability method of accounting for income taxes. Under the liability method, deferred income taxes are recognized for the tax consequences of "temporary differences" by applying enacted statutory tax rates applicable to differences between the financial statement carrying amount and the tax basis of existing assets and liabilities. Valuation allowances are established when necessary to reduce deferred tax assets to the amount expected to be realized.

## Revenue Recognition

Advertising revenue is earned and recognized when advertisements are published, inserted, aired or displayed and are net of provisions for estimated rebates, credit and rate adjustments and discounts. Circulation revenue includes single copy and home delivery subscription revenue. Single copy revenue is earned and recognized based on the date the publication is delivered to the single copy outlet, net of provisions for returns. Home delivery subscription revenue net of discounts is earned and recognized when the newspaper is delivered to the customer or sold to a home delivery independent contractor. Amounts received in advance of an advertisement or newspaper delivery are deferred and recorded on the balance sheet as a current liability to be recognized into income when the revenue has been earned.

## Comprehensive Loss

At June 30, 2009, comprehensive loss for the Company includes amounts related to the Company's pension and postretirement plans as well as those at the Company's unconsolidated JOA. See Note 12: Employee Benefit Plans for further discussion. At June 30, 2008, it also included amounts related to a terminated newsprint swap agreement and the Company's share of changes in fair value of an interest rate swap agreement at the Denver Newspaper Agency. For purposes of calculating income taxes related to comprehensive loss, the Company uses its combined statutory rate for federal and state income taxes. However, in fiscal years 2009 and 2008, a deferred tax valuation allowance adjustment eliminated the tax effect from current year changes in other comprehensive loss.

*Stock Based Compensation*

The Company accounts for its Career Restricted Stock Unit ("RSU") plan under Statement of Financial Accounting Standards No. 123(R), *Share Based Payments* ("SFAS No. 123(R)"). SFAS No. 123(R) requires all share based payments to employees to be recognized in the income statement based on their fair values. The Company determines the fair value of the units in the quarter they are granted based on the RSU plan document and recognizes compensation expense over the vesting period of each grant. See Note 20: Career Restricted Stock Unit Plan for further discussion.

*Dividends*

On October 19, 2007, the Company declared a dividend of $10.98 per share on its Class A Common Stock, amounting to approximately $25.0 million in the aggregate. The payment date for such dividend was October 26, 2007. Such dividend was funded with the proceeds from the cash portion of the purchase price paid by The Hearst Corporation for its equity investment in the Company.

*Employees*

Certain employees of the Company's newspapers are employed under collective bargaining agreements, some of which have expired and are being negotiated.

*Recently Issued Accounting Standards*

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (revised 2007), *Business Combinations* ("SFAS No. 141(R)"). SFAS No. 141(R) establishes principles and requirements for how an entity which obtains control of one or more businesses (1) recognizes and measures the identifiable assets acquired, the liabilities assumed and any noncontrolling interest in the acquiree, (2) recognizes and measures the goodwill acquired in the business combination and (3) determines what information to disclose regarding business combinations. SFAS No. 141(R) applies prospectively to business combinations for which the acquisition date is on or after the beginning of the first annual report period beginning on or after December 15, 2008, or for the Company, beginning July 1, 2009.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 160, *Noncontrolling Interests in Consolidated Financial Statements—an amendment of ARB No. 51* ("SFAS No. 160"). SFAS No. 160 establishes accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that a noncontrolling interest in a subsidiary is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements. SFAS No. 160 is effective for fiscal years beginning on or after December 15, 2008, or for the Company, beginning July 1, 2009. The July 1, 2009 adoption of SFAS No. 160 resulted in the Company reclassifying its noncontrolling interests in certain newspaper partnerships to shareholders' deficit and changing the presentation of its statements of operations and cash flows.

In March 2008, the FASB issued Statement of Financial Accounting Standards No. 161, *Disclosures about Derivative Instruments and Hedging Activities, an amendment of FASB Statement No. 133,* ("SFAS No. 161"). SFAS No. 161 requires enhanced disclosures about an entity's derivative and hedging activities. These enhanced disclosures will discuss (a) how and why an entity uses derivative instruments, (b) how derivative instruments and related hedged items are accounted for under Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities,* and its related interpretations, and (c) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. SFAS No. 161 is effective for financial statements issued for fiscal years beginning after November 15, 2008, with earlier adoption permitted. The Company adopted the provisions of SFAS No. 161 for its June 30, 2009 consolidated financial statements. The adoption of SFAS No. 161 did not impact the Company's financial position or results of operations as the provisions call for disclosure only.

In May 2009, the FASB issued Statement of Financial Accounting Standards No. 165, *Subsequent Events* ("SFAS No. 165"). This pronouncement establishes standards for accounting for and disclosing subsequent events (events which occur after the balance sheet date, but before financial statements are issued or are available to be issued). SFAS No. 165 requires an entity to disclose the date subsequent events were evaluated and whether that evaluation took place on the date financial statements were issued or were available to be issued. The Company adopted SFAS No.165 as of June 30, 2009. SFAS No. 165 does not impact the Company's financial position or results of operations. Accordingly,

the Company evaluated all subsequent events through the time that it was prepared to release the financial statements on December 8, 2009.

**Note 3: Connecticut Management Agreement and Discontinued Operations**

Effective August 7, 2008, the Company sold the *Connecticut Post* for $155.0 million, including a settlement for working capital, to The Hearst Corporation ("Hearst") and terminated the related management agreement in Connecticut. The proceeds from the sale were used to pay down term loans under the Company's Bank Credit Facility.

On March 30, 2007, the Company entered into an agreement with Hearst regarding the management of *The News-Times* (Danbury, Connecticut), which was purchased by Hearst. Under the agreement, the Company controlled the management of both the *Connecticut Post* (owned by the Company) and *The News-Times* and was entitled to 73% of the profits and losses of both newspapers on a combined basis; however, the Company and Hearst retained ownership of the assets and liabilities of the *Connecticut Post* and *The News-Times*, respectively. As a result of entering into the management agreement, the Company began consolidating the results of *The News-Times* and recorded minority interest for Hearst's 27% interest beginning March 30, 2007. On November 1, 2007, the management agreement was expanded to include *The Advocate* and *Greenwich Time* in Stamford and Greenwich, Connecticut, respectively, which were both purchased by Hearst on November 1, 2007 for $62.0 million. Under the November 1, 2007 amended management agreement, the Company controlled the management of the *Connecticut Post*, *The News-Times*, *The Advocate* and *Greenwich Time*, entitling the Company to retain 60% of the profits and losses of all newspapers on a combined basis; however, the Company and Hearst continued to retain ownership of the assets and liabilities of their respective papers. As a result of the amended management agreement, the Company began consolidating the results of *The Advocate* and *Greenwich Time*, and recording minority interest for Hearst's 40% interest in the combined results beginning November 1, 2007. Due to the expansion of the management agreement, the Company had entered into a non-monetary exchange of assets for accounting purposes (pursuant to Statement of Financial Accounting Standards No. 153, *Exchanges of Non-Monetary Assets*). The Company accounted for this exchange as two separate, but simultaneous events: (1) a sale, whereby for accounting purposes, the Company sold to Hearst an additional 13% interest in the *Connecticut Post*, as well as a 13% profit interest in *The News-Times*, resulting in the Company recording a non-monetary gain of approximately $4.0 million and (2) the acquisition of a 60% interest in *The Advocate* and *Greenwich Time*. As a result of the transaction, the Company recorded the following: $59.1 million in intangible assets ($20.0 million – goodwill; $9.7 million – masthead; $5.5 million – subscriber lists; and $23.9 million in advertiser lists and other finite-lived intangibles,) and $4.5 million in tangible assets, the majority of which was related to fixed assets.

The accompanying consolidated financial statements reflect the results of the *Connecticut Post* and the other newspapers operated under the related management agreement (collectively, the "Connecticut Newspapers") as discontinued operations for all periods presented. For the period beginning July 1, 2007 through October 31, 2007, discontinued operations, net of tax, for the Connecticut Newspapers, represented the results of the *Connecticut Post* and *The News-Times* (Danbury, Connecticut), net of minority interest of 27%. For the period beginning November 1, 2007 through August 6, 2008, discontinued operations, net of tax, for the Connecticut Newspapers, represented the results of the *Connecticut Post*, *The News-Times*, *The Advocate* (Stamford, Connecticut) and *Greenwich Time*, net of minority interest of 40%.

The Connecticut Newspapers were considered a component of the Company as its operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sale and termination of the management agreement, and the Company has not had any continuing involvement in their operations.

Selected financial information related to discontinued operations is summarized as follows:

| | Year Ended June 30, | |
|---|---|---|
| | 2009 | 2008 |
| | (In thousands) | |
| Total revenues | $ 9,435 | $ 102,583 |
| Total costs and expenses | (9,632) | (137,300) |
| Gain (loss) on sale of discontinued operations | (2,438) | 4,000 |
| Minority interest | (64) | 12,724 |
| Loss from discontinued operations before income taxes | (2,699) | (17,993) |
| Income tax benefit | 1,077 | 7,175 |
| Loss from discontinued operations, net of tax | $ (1,622) | $ (10,818) |

Cash flow information is as follows:

| | Year Ended June 30, | |
|---|---|---|
| | 2009 | 2008 |
| | (In thousands) | |
| **CASH FLOWS FROM OPERATING ACTIVITIES OF DISCONTINUED OPERATIONS:** | | |
| Loss from discontinued operations | $ (1,622) | $ (10,818) |
| Adjustments to reconcile loss from discontinued operations to net cash provided by operating activities of discontinued operations: | | |
| Depreciation and amortization | 1,158 | 9,643 |
| Loss on impairment | — | 45,000 |
| Loss on sale of fixed assets | — | 41 |
| (Gain) loss on sale of business | 2,438 | (4,000) |
| Provision for losses on accounts receivable | 73 | 1,476 |
| Deferred income tax benefit | (1,077) | (7,175) |
| Minority interest | 64 | (12,724) |
| Change in operating assets and liabilities | 398 | (7,935) |
| NET CASH FLOWS FROM OPERATING ACTIVITIES OF DISCONTINUED OPERATIONS | $ 1,432 | $ 13,508 |
| **CASH FLOWS FROM INVESTING ACTIVITIES OF DISCONTINUED OPERATIONS:** | | |
| Business acquisitions | $ — | $ (2,897) |
| Capital expenditures | (613) | (2,840) |
| Proceeds from sale of assets | 153,341 | 17 |
| NET CASH FLOWS FROM INVESTING ACTIVITIES OF DISCONTINUED OPERATIONS | $ 152,728 | $ (5,720) |
| **CASH FLOWS FROM FINANCING ACTIVITIES OF DISCONTINUED OPERATIONS:** | | |
| Distributions in excess of net income to minority interests | $ (400) | $ (7,524) |
| NET CASH FLOWS FROM FINANCING ACTIVITIES OF DISCONTINUED OPERATIONS | $ (400) | $ (7,524) |

## Note 4: Denver JOA Separation Agreement

Until the February 2009 Separation Agreement between MediaNews Group and E.W. Scripps Company ("Scripps"), owner of the *Rocky Mountain News*, the Company through its wholly owned subsidiary, The Denver Post Corporation, owned the masthead of *The Denver Post* and a 50% interest in the Denver Newspaper Agency ("DNA" or the "Denver JOA"), a partnership which published *The Denver Post* and the *Rocky Mountain News,* under the terms of a JOA agreement. DNA was responsible for performing all the business functions of *The Denver Post* and, through February 26, 2009, the *Rocky Mountain News,* including advertising and circulation sales, production, distribution and

administration. News and editorial costs related to *The Denver Post* were incurred outside of the Denver JOA. Conversely, through February 26, 2009, Scripps was responsible for the news and editorial costs of the *Rocky Mountain News*.

On February 26, 2009, the Company and Scripps entered into a Separation Agreement. Effective February 27, 2009, in accordance with the Separation Agreement, Scripps stopped publishing the *Rocky Mountain News* and ceded management control, subject to certain protective rights, of the Denver JOA, as well as Prairie Mountain Publishing Company (also a 50/50 partnership between the Company and Scripps) to the Company. The closing and other conditions set out in the Separation Agreement occurred on August 26, 2009.

After the Separation Agreement was entered into, DNA continued to manage and be responsible for performing all the business functions of *The Denver Post* including advertising and circulation sales, production, distribution and administration. At that time, DNA also became exclusively responsible for the news and editorial costs related to *The Denver Post*.

Under the Separation Agreement, the Company assumed substantially all the economic risks and rewards associated with DNA and Prairie Mountain Publishing Company ("PMP"). As a result, on February 27, 2009, the Company began consolidating the financial position and results of these companies under FASB Interpretation No. 46-R, *Consolidation of Variable Interest Entities, an interpretation of ARB No. 51 (revised)* ("FIN No. 46"). Effectively, the Separation Agreement was a reconsideration event under FIN No. 46 and effective February 27, 2009, the Company became the primary beneficiary of DNA. FIN No. 46 also requires that all assets and liabilities be adjusted to fair value at the date of consolidation of a variable interest entity. The Company recorded the following at February 27, 2009 to reflect the consolidation of DNA and PMP: Denver – $7.1 million in negative working capital, $132.5 million in tangible assets, $77.6 million reflecting the fair value of the DNA Amended Credit Facility (including accrued interest; the Denver borrowings of $130.5 million were recorded at the fair value estimate of $76.6 million, based on the August 2009 DNA Amended Credit Facility discussed in Note 5: Denver Amended Credit Facility), $2.8 million for capital lease obligations and $52.2 million for pension and postretirement healthcare obligations and PMP – $8.8 million in working capital, $1.3 million in tangible assets and $6.6 million in intangible assets. The accounting for the consolidation of these entities is preliminary and subject to change.

On August 26, 2009, the closing pursuant to the Separation Agreement was consummated, and the Denver JOA was terminated. In conjunction with the closing, Scripps's 50% interest in Prairie Mountain Publishing Company was contributed to DNA. At the closing, the Company contributed substantially all the assets and liabilities of *The Denver Post* to DNA, such that DNA now owns all the assets and liabilities necessary to publish and produce *The Denver Post*. Effective with the close of the Separation Agreement and the DNA Amended Credit Facility, DNA is 79.9999% owned by the Company, and a corresponding minority interest is reflected for the remaining 20.0001% owned by the lender group (described in Note 5: Denver Amended Credit Facility).

## Note 5: Denver Amended Credit Facility

Concurrent with the August 26, 2009 closing of the Separation Agreement, DNA affected a troubled debt restructuring of its $150.0 million revolving credit facility. The restructuring of the DNA Amended Credit Facility was considered a troubled debt restructuring as the creditors for economic reasons granted DNA concessions in the terms of the debt and an equity interest was granted to the lender group. Significant terms of the August 26, 2009 amended and restated credit agreement (the "DNA Amended Credit Facility") are described below.

The $130.5 million in outstanding borrowings under the revolving credit facility at June 30, 2009 was reduced to $80.0 million, consisting of Term Loans A: $55.0 million, Term Loans B: $10.0 million, and Term Loans C: $15.0 million. In addition the DNA Amended Credit Facility established a new money Revolver with a borrowing limit of $15.0 million, which is further limited by the collateral of eligible accounts receivable and newsprint inventory. A Swap Line of credit was also established with a borrowing limit of $2.3 million. The Swap Line is available to be used to pay interest on the interest rate swaps discussed in Note 14: Hedging Activities. A Swap Term-out Loan was also established with a borrowing limit of $4.5 million. The Swap Term-out Loan is made available at the end of the swap period and all amounts then owed under the swap agreement, including amounts outstanding under the Swap Line would be rolled into the Swap Term-out Loan. The Swap Term-out Loan is not currently being utilized and remains unfunded.

The interest rate on the Revolver is LIBOR (with a floor of 200 basis points) plus a 500 basis point margin. The Revolver interest rate margin can be reduced at DNA's option by agreeing to permanently lower the Revolver commitment. Interest rates on the Term Loans are as follows: Term Loans A—LIBOR (floor of 200 basis points) plus 275 basis points; Term Loans B—LIBOR (cash interest floor of 125 basis points) plus 300 basis points and Payment in Kind or "PIK" interest --LIBOR (floor of 125 basis points) plus 400 basis points; and Term Loans C—LIBOR (floor of 125 basis points) plus 400 basis points. At August 26, 2009, the rates were set at 7.0%, 4.75%, 4.25%, 5.25% and 5.25% for the Revolver, Term Loans A, B (Cash and PIK), and C, respectively. Interest is due at the end of each calendar month through maturity on Revolver borrowings, Swap Line borrowings and Term Loans A borrowings. Such interest shall be paid in cash. However, prior to October 2010, interest due on Term Loans B shall be PIK and thus rolled into the principal balance of Term Loans B. Subsequent to October 1, 2010, Term Loans B shall be payable in cash subject to limitations based on DNA liquidity as defined in the credit agreement with amounts not payable in cash being deferred and rolled into principal. Term Loans C and the Swap Line borrowings have similar PIK interest requirements except the cash interest payment dates are January 1, 2011 and 2012, respectively. Notwithstanding the above cash interest payments, if cash interest is due on more than one Term Loan facility, cash interest will be paid in full in the following preferential order before paying cash interest on the next series of borrowings: Term Loans A, then Term Loans B, then Term Loans C, then Swap Line borrowings. All deferred interest amounts will be rolled into the principal balance of the Term Loans on which the interest was deferred.

The Revolver requires mandatory paydowns from the available cash of DNA. Operating cash receipts of DNA are required to be deposited into a bank account controlled by the administrative agent of the DNA Amended Credit Facility. So long as DNA remains in compliance with its Amended Credit Facility, it can direct the use of the cash to pay down the Revolver balance or its current operating liabilities (to an established limit); however, any excess cash can be applied at the discretion of the administrative agent to pay down Revolver borrowings. As a result, borrowings under the Revolver will be reported as a current obligation. In an event of default, the administrative agent of the DNA Amended Credit Facility has sole discretion of how the operating receipts are applied. The DNA Amended Credit Facility also requires mandatory prepayment of: (a) over advances associated with the Revolver and letters of credit; (b) asset dispositions in excess of $125,000 to the extent the related cash receipts are not used for replacement asset purchases; (c) equity offering; (d) insurance or condemnation proceeds in excess of $125,000 to the extent funds are not used for replacement asset purchases; (e) 75% of excess cash flows (as defined) determined annually; (f) DNA's share of proceeds from the sale of certain Prairie Mountain Publishing assets and the sale of its limited interest in the Colorado Rockies baseball club; and g) interest rate swap receipts. Any prepayments of loans are first applied to Term Loans A, Term Loans B, Term Loans C, Swap Term-out Loan, Swap Line and Revolver if accompanied by a permanent reduction in the commitment. The DNA Amended Credit Facility matures on May 31, 2014, at which time all outstanding borrowings are due and payable. The DNA Amended Credit Facility is secured by all of the assets and interests in assets of the Denver Newspaper Agency. The Revolver is secured with a first priority lien, the Swap Line of credit is secured by a second priority lien, Term Loans A and B are secured by a third priority lien, and Term Loans C are secured by a fourth priority lien. The Denver Newspaper Agency will pay an annual commitment fee of 0.25% on the unused portion of the Revolver commitment. In addition it has paid a 0.125% fronting fee related to the issuance, extension or renewal of letter of credit commitments provided in the DNA Amended Credit Facility.

The DNA Amended Credit Facility contains customary covenant requirements including limitations on indebtedness, transactions with affiliates and payments to the Company, maintenance of certain financial ratios, including a minimum adjusted EBITDA (as defined), debt service coverage ratio and capital expenditure limits. The DNA Amended Credit Facility also requires the Company to maintain its 79.9999% interest in the Denver Newspaper Agency. Upon execution of the DNA Amended Credit Facility, the other 20.0001% equity interest in DNA was transferred to the bank group participating in the DNA Amended Credit Facility.

The debt under the DNA Amended Credit Facility is non-recourse to the Company and will be funded exclusively by the Denver Newspaper Agency. The required principal payments on the DNA Amended Credit Facility for the next five fiscal years through maturity are as follows (in thousands):

| | Term Loans A | Term Loans B | Term Loans C |
|---|---|---|---|
| 2010 | $ — | $ — | $ — |
| 2011 | — | — | — |
| 2012 | 1,600 | 400 | — |
| 2013 | 1,600 | 400 | — |
| 2014 | 51,800 | 9,200 | 15,000 |

## Note 6: Joint Operating Agencies

*Salt Lake City JOA*

The Company, through its wholly owned subsidiary, Kearns-Tribune, LLC, owns *The Salt Lake Tribune* and a 58% profit interest in the Newspaper Agency Company LLC ("NAC" or the "Salt Lake City JOA"). Although the Company has a majority of the Salt Lake City JOA's profit interests, under the operating agreement for that entity, each of the Company and Deseret News Publishing Company (our partner in the Salt Lake City JOA) has an equal representation on that entity's management committee. The Salt Lake City JOA is the managing entity under the JOA agreement between Kearns-Tribune, LLC and the Deseret News Publishing Company (owner of the *Deseret Morning News*). Under the terms of this JOA agreement, the Salt Lake City JOA is responsible for performing all the business functions of *The Salt Lake Tribune* and the *Deseret Morning News,* including advertising and circulation sales, production and distribution; however, the Salt Lake City JOA does not own any of the fixed assets used in its operations. Instead most of those assets are owned by its affiliate, Salt Lake Newspapers Production Facilities, LLC ("SLNPF"), 58% of which entity is owned directly by the Company and 42% of which entity is owned by Deseret News Publishing Company. SLNPF leases those assets to the Salt Lake City JOA; however, management of SLNPF is shared equally between Kearns-Tribune, LLC and Deseret News Publishing Company. Certain other assets used in the operations of the Salt Lake City JOA are owned solely by Deseret News Publishing Company, which leases those assets directly to the Salt Lake City JOA. Accordingly, the related depreciation is included in "Salt Lake City JOA" income statement data in the following table. News and editorial costs related to *The Salt Lake Tribune* are incurred outside of the Salt Lake City JOA and are the sole responsibility of Kearns-Tribune, LLC. Conversely, Deseret News Publishing Company is solely responsible for the news and editorial costs of the *Deseret Morning News.* The Company records its 58% share of the results of the operations of the Salt Lake City JOA (subject to certain small adjustments) along with the operations of Kearns-Tribune, LLC, which consists principally of editorial costs, miscellaneous revenues outside of the JOA, amortization of intangibles and other direct costs of *The Salt Lake Tribune* in the line item "Income from Unconsolidated JOAs." The Salt Lake City JOA expires in 2020, unless otherwise extended.

*York JOA*

The Company, through its subsidiary, York Newspapers, Inc., owns the masthead of the *York Daily Record,* a daily morning newspaper, *The York Dispatch,* a daily evening newspaper, the *York Sunday News,* as well as a 100% interest in The York Newspaper Company (the York JOA). Under the terms of the York JOA agreement, the York JOA is responsible for all newspaper publishing operations, other than news and editorial, including production, sales, distribution and administration, of *The York Dispatch,* the *York Daily Record* and the *York Sunday News*.

The Company is responsible for the news and editorial content of the *York Daily Record* and *York Sunday News* and a third party is responsible for providing the news and editorial content for *The York Dispatch.* Under the JOA agreement, the Company is entitled to all of the profits and losses of the York JOA and reimburses the third party for the cost of providing editorial and news content in *The York Dispatch* plus a management fee, currently $276,762 per year, indexed annually for inflation. The York JOA expires in 2024, unless otherwise extended.

*Charleston JOA*

The Company, through its subsidiary, Charleston Publishing Company, owns the *Charleston Daily Mail* and a limited partnership interest in Charleston Newspapers Holdings, L.P., which holds a 100% interest in Charleston Newspapers (the "Charleston JOA"). The Company is only responsible for the news and editorial content of the *Charleston Daily Mail*. Under its agreement with Charleston Newspapers Holdings, L.P., the Company is reimbursed for the cost of providing the news and editorial content of the *Charleston Daily Mail* and is paid a management fee. The Company's limited partnership interest does not entitle the Company to any share of the profits or losses of the Charleston JOA, which expires in 2024, unless otherwise extended.

*Detroit JOA*

On August 3, 2005, the Company purchased the stock of The Detroit News, Inc., which included the editorial assets of *The Detroit News*, a daily newspaper published in Detroit, Michigan, and a limited partnership interest in the Detroit Newspaper Partnership, L.P. ("Detroit JOA"), for approximately $25.0 million. The Company is responsible for the news and editorial content of *The Detroit News* pursuant to a JOA agreement for which it is reimbursed. In accordance with the Detroit JOA agreement, the Company receives a fixed preferred distribution each month with possible incremental distributions beginning in 2009 based on profit growth. In February 2009, the Detroit JOA agreement was amended. As amended, the fixed preferred distributions are as follows beginning January 2009: $4.8 million for fiscal year 2009; $4.2 million for fiscal year 2010; $3.6 million for fiscal year 2011; $3.0 million for fiscal year 2012; and at the rate of $1.2 million per fiscal year for all remaining fiscal years until the Company has no remaining unreturned capital, the expected date of which is April 2024. In addition, the amendment provides that from January 2009 through August 2013, the Detroit JOA will make monthly cash distributions to the Company without regard to the level of profits at the Detroit JOA. After August 2013, the Detroit JOA will make monthly distributions to the Company only from and to the extent the Detroit JOA has profits available for distribution. The Detroit JOA expires in 2025, unless otherwise extended.

Because of the structure of the partnership and the Company's ownership interest, the Company's accounting for the investment in the Detroit JOA only includes the preferred distributions it receives from the Detroit JOA, which is different from the Company's accounting for the other unconsolidated JOAs. The Company's investment in The Detroit News, Inc. is included in other long-term assets.

*Unconsolidated JOA Summarized Results*

The following tables present the summarized results of the Company's unconsolidated JOAs in Denver through February 26, 2009 and Salt Lake City, along with related balance sheet data. The Salt Lake City JOA and Denver JOA information is presented at 100%, with the other partners' share of income from the related JOAs subsequently eliminated. The editorial costs, miscellaneous revenues received outside of the JOA, depreciation, amortization, and other direct costs incurred outside of the JOAs by our subsidiaries associated with *The Salt Lake Tribune* and *The Denver Post* through February 26, 2009 are included in the line "Associated Revenues and Expenses."

| | Year Ended June 30, 2009 | | | |
| | SLNPF and Salt Lake City JOA Consolidated | Denver JOA[a] | Associated Revenues and Expenses | Total Income from Unconsolidated JOAs |
|---|---|---|---|---|
| | (Dollars in thousands) | | | |
| *Income Statement Data:* | | | | |
| Total revenues .................................... | $ 112,960 | $ 145,434 | $ 139 | |
| Cost of sales ........................................ | 25,377 | 45,191 | 21,848 | |
| Selling, general and administrative .... | 54,527 | 81,577 | 9,661 | |
| Depreciation and amortization ........... | 6,803 | 8,534 | 1,299 | |
| Other.................................................. | 1,294 | 11,268 | (83) | |
| Total costs and expenses ................. | 88,001 | 146,570 | 32,725 | |
| Net income (loss) ................................ | 24,959 | (1,136) | (32,586) | |
| Partners' share of income (loss) from unconsolidated JOAs ...................... | (9,541) | 568 | — | |
| Income (loss) from unconsolidated JOAs.............................................. | $ 15,418 | $ (568) | $ (32,586) | $ (17,736) |

(a) Includes results for the Denver JOA through December 31, 2008, at which time the Company wrote down its investment in the Denver JOA to $0. Because the Company could not reduce its investment below $0, losses from the Denver JOA for January through February 26, 2009 were not recorded by the Company and are not included in the above Denver JOA results.

| | Year Ended June 30, 2008 | | | |
| | SLNPF and Salt Lake City JOA Consolidated | Denver JOA | Associated Revenues and Expenses | Total Income from Unconsolidated JOAs |
|---|---|---|---|---|
| | (Dollars in thousands) | | | |
| *Income Statement Data:* | | | | |
| Total revenues .................................... | $ 138,350 | $ 334,508 | $ 274 | |
| Cost of sales ........................................ | 30,124 | 91,123 | 29,253 | |
| Selling, general and administrative .... | 51,490 | 179,166 | 13,482 | |
| Depreciation and amortization ........... | 6,470 | 22,584 | 3,692 | |
| Other.................................................. | 1,432 | (115) | (5,431) | |
| Total costs and expenses ................. | 89,516 | 292,758 | 40,996 | |
| Net income ......................................... | 48,834 | 41,750 | (40,722) | |
| Partners' share of income from unconsolidated JOAs ...................... | (19,641) | (20,875) | — | |
| Income from unconsolidated JOAs .... | $ 29,193 | $ 20,875 | $ (40,722) | $ 9,346 |

| | June 30, 2009 | June 30, 2008 | |
|---|---|---|---|
| | SLNPF and Salt Lake City JOA Consolidated | SLNPF and Salt Lake City JOA Consolidated | Denver JOA |
| | (Dollars in thousands) | | |
| **Balance Sheet Data:** | | | |
| Current assets ...................................... | $ 13,632 | $ 19,017 | $ 45,682 |
| Non-current assets .............................. | 73,882 | 84,881 | 194,868 |
| Current liabilities................................ | 18,327 | 15,396 | 56,638 |
| Non-current liabilities........................ | 1,310 | 1,389 | 135,710 |

The Salt Lake City JOA leases certain fixed assets from SLNPF which are included in the Salt Lake City JOA column for purposes of this presentation (eliminating the activity between the two entities). In addition, fiscal year 2008 "Other" includes gain on the sale of buildings in Salt Lake City and Denver, of which the Company's share of the gain on sale was $6.3 million and $4.4 million, respectively.

**Note 7: Investments in California Newspapers Partnership, Texas-New Mexico Newspapers Partnership and Monterey Newspapers Partnership**

*California Newspapers Partnership*

On March 31, 1999, through its wholly owned subsidiary, West Coast MediaNews LLC, the Company formed the California Newspapers Partnership ("CNP") with S.F. Holding Corporation ("Stephens"), and The Sun Company of San Bernardino, California ("Gannett"). MediaNews, Stephens and Gannett's interests in the California Newspapers Partnership are 54.23%, 26.28% and 19.49%, respectively. The Company is the controlling partner and, therefore, the operations of the partnership are consolidated with those of the Company with minority interest reflected for Stephens' and Gannett's interests in the partnership.

At the formation of CNP, the Company contributed long-term debt with a balance of $6.6 million to the partnership. However, in accordance with the partnership agreement, the Company remained liable for the contributed debt. All principal and interest payments associated with this debt were charged to the MediaNews capital account of CNP as a distribution. As of July 1, 2008, the remaining long-term debt consisted of a capital lease. The lease was originally expected to continue through 2019. However, during fiscal year 2009, the Partnership extinguished the lease and the last lease payment was made in June 2009; therefore, no amounts remain outstanding under the capital lease at June 30, 2009. See Note 11: Leases for further discussion. Approximately $0.9 million of principal and interest payments were made in fiscal years 2009 and 2008 by CNP on behalf of the Company.

The California Newspapers Partnership is governed by a management committee. The management committee consists of seven members. MediaNews is entitled to appoint four of the members of the management committee, Stephens is entitled to appoint two, and Gannett is entitled to appoint one. Decisions of the management committee are by majority vote, except that unanimous votes are required for certain actions outside of the ordinary course of business, including asset transfers or sales, asset acquisitions, capital calls, incurrence of debt and certain material changes in the partnership business.

The California Newspapers Partnership agreement also contains transfer of interests restrictions. Transfers may be made only subject to the "right of first offer" of the remaining partners. In addition, where no partner exercises its right of first offer, any sale of a partner's interest must include the right for the remaining partners to "tag-along" and sell their interests to the third-party buyer at the same price. MediaNews has the right to require the other partners to sell their interests to any third party to which MediaNews sells its interest.

Stephens has a separate right to require CNP to purchase its interest in the partnership at fair market value. Upon notification of the exercise of this right and obtaining a valuation of the partnership interest, CNP has two years to complete the purchase. The Company is not currently aware of any intentions on the part of Stephens to exercise its put.

The minority interest liability reflects the fair market value of the net assets at the time they were contributed to CNP by Stephens and Gannett, plus the minority partners' share of earnings, net of distributions since inception. CNP made cash distributions to the Company in the amount of $7.9 million and $44.4 million in fiscal years 2009 and 2008, respectively.

*Texas-New Mexico Newspapers Partnership*

Effective March 3, 2003, MediaNews and Gannett Co., Inc. ("Gannett") formed the Texas-New Mexico Newspapers Partnership ("TNMP"). MediaNews contributed substantially all the assets and operating liabilities of the *Las Cruces Sun-News*, *The Daily Times* (Farmington), *Carlsbad Current-Argus*, *Alamogordo Daily News*, and *The Deming Highlight*, as well as all the weekly and other publications published by these daily newspapers, in exchange for a 33.8% interest in the TNMP. Gannett contributed the *El Paso Times*, located in El Paso, Texas, in exchange for its 66.2% controlling partnership interest. Effective December 26, 2005, MediaNews contributed to TNMP the assets of four daily newspapers published in southern Pennsylvania and Gannett contributed the assets of the *Public Opinion*, published in Chambersburg, PA. Assets contributed by MediaNews included *The Evening Sun* (Hanover), the *Lebanon Daily News*, and MediaNews' interest in the York JOA and the entity that owns the *York Daily Record*, *York Sunday News*, and *The York Dispatch*.

In conjunction with the partners' contributions of newspaper assets to TNMP, the partnership agreement was amended and restated to provide, among other things, that MediaNews has the right to appoint a majority of the members of TNMP's management committee and control the day-to-day operations of TNMP. Effective December 26, 2005, in conjunction with the change in ownership and management, TNMP became a consolidated subsidiary of MediaNews. MediaNews owns 59.4% of TNMP, and Gannett owns the remaining 40.6%.

The minority interest liability reflects the fair market value of the net assets contributed to TNMP by Gannett, plus the minority partners' share of the net worth contributed to TNMP by MediaNews and earnings, net of distributions since December 26, 2005. TNMP made cash distributions to the Company in the amount of $20.5 million and $31.1 million in fiscal years 2009 and 2008, respectively.

*Monterey Newspapers Partnership*

On October 19, 2007, the Company and Stephens formed the Monterey Newspapers Partnership ("Monterey") to which the Company contributed *The Monterey County Herald*, and Stephens paid the Company approximately $27.4 million for a 32.64% interest in the new partnership. The operations of *The Monterey County Herald* continue to be consolidated with the operations of the Company with a minority interest reflected to account for the 32.64% of the partnership owned by Stephens. As a result of the partnership formation, the Company recognized a pre-tax gain of approximately $0.5 million related to the sale of the 32.64% minority interest in *The Monterey County Herald*.

The Monterey Newspapers Partnership is governed by a management committee. The management committee consists of six members. MediaNews is entitled to appoint four of the members of the management committee; Stephens is entitled to two. Decisions of the management committee are by majority vote, except that unanimous votes are required for certain actions outside of the ordinary course of business, including asset transfers or sales, asset acquisitions, capital calls, incurrence of debt and certain material changes in the partnership business.

The Monterey Newspapers Partnership agreement also contains transfer of interest restrictions. Transfers may be made only subject to the "right of first offer" of MediaNews or Stephens. In addition, where no partner exercises its right of first offer, any sale of a partner's interest must include the right for the remaining partner to "tag-along" and sell its interests to the third-party buyer at the same price. MediaNews has the right to require the other partner to sell its interest to any third party to which MediaNews sells its interest.

Stephens has a separate right to require Monterey to purchase its interest in the partnership at fair market value. Upon notification of the exercise of this right and obtaining a valuation of the partnership interest, Monterey has two years to complete the purchase. The Company is not currently aware of any intent on the part of Stephens to exercise its put.

The minority interest liability reflects the contribution made by Stephens for its 32.64% interest in the partnership, plus Stephens' share of earnings, net of distributions since inception. Monterey made cash distributions to the Company in the amount of $2.3 million and $2.7 million in fiscal years 2009 and 2008, respectively.

## Note 8: Hearst Stock Purchase Agreement

On August 2, 2006, the Company and The Hearst Corporation ("Hearst") entered into a Stock Purchase Agreement pursuant to which (i) Hearst agreed to make an equity investment in the Company (such investment did not include any governance or economic rights or interest in the Company's publications in the San Francisco Bay area) and (ii) the Company agreed to purchase from Hearst *The Monterey County Herald* and the St. Paul *Pioneer Press* with a portion of the Hearst equity investment in the Company. The Company subsequently also agreed to purchase from Hearst the Torrance *Daily Breeze* with a portion of the proceeds of such equity investment.

The Hearst transaction discussed above was consummated on October 19, 2007 and the Company issued to Hearst 100 shares of its newly issued Class C Common Stock. Such shares provide Hearst a 31% equity interest in the Company's publications outside the San Francisco Bay area ("non-Bay area business"). The effective date for financial reporting purposes was August 2, 2006, the date of the Stock Purchase Agreement. The purchase price of these shares was approximately $317.6 million, of which approximately $290.6 million was applied to pay the purchase price of *The Monterey County Herald,* the St. Paul *Pioneer Press* and the Torrance *Daily Breeze* and related publications and Web sites, and approximately $27.0 million was paid to the Company in cash at closing (the Company also paid certain direct and incremental costs related to the investment which were applied against the proceeds).

In connection with the consummation of the Hearst equity investment, the Company and members of the Singleton and Scudder families, the beneficial owners of the Company, amended and restated their Shareholders' Agreement to add Hearst as a party and to afford Hearst certain protective rights in respect of its equity investment in the Company's non-Bay area business.

Prior to October 19, 2007, the total purchase price obligation of $311.1 million was reflected in the financial statements and included $290.6 million related to the acquisition cost of the St. Paul *Pioneer Press, The Monterey County Herald* and the Torrance *Daily Breeze.* This obligation was reclassified into shareholders' equity as additional paid-in capital along with Hearst's $27.0 million cash investment net of the direct and incremental costs related to the investment (approximately $4.0 million). The remaining $20.5 million related to the accretion of Hearst's cost of funds was eliminated as an obligation of the Company with a corresponding increase in retained earnings, where the accretion was charged prior to the Hearst equity investment. Hearst's share of accumulated deficit related to the Company's loss attributable to their holding in the Company's Class C Common Stock from August 2, 2006, the date of the Stock Purchase Agreement, through June 30, 2009 was $(196.6) million and is included in consolidated accumulated deficit. Of this amount, $(129.9) million and $(70.2) million relate to the years ended June 30, 2009 and 2008, respectively.

## Note 9: Preferred Stock

On March 31, 2008, the Company issued to The Hearst Corporation 25,000 shares of Series A Preferred Stock with a par value of $0.001 per share and received proceeds of $25.0 million. The Series A Preferred Stock has no voting rights. Hearst is entitled to receive, when declared by the Company's Board of Directors, out of the assets of the Company's non-Bay area business, cumulative preferential cash dividends of the original preferred stock issuance at an annual rate of 8.5%. All dividends payable shall accrue and be cumulative from the date the stock was issued. Hearst shall also be entitled to receive, when declared by the Company's Board of Directors, out of the assets of the non-Bay area business, cumulative additional dividends on the original preferred stock issuance at an annual rate of 8.667%. No dividends may be paid on the Series A Preferred Stock unless, at the time of such payment, all dividends then accrued and payable on the shares of any of the Company's "Senior Stock" as defined have been paid in full. At any time, the Company has the right, at its sole option and election, to redeem in cash any or all of the shares of the Series A Preferred Stock. Hearst, as a Series A Preferred Stock holder, may at any time on or after July 3, 2014, at its sole option and

election, require the Company to redeem in cash any or all of the shares of Series A Preferred Stock outstanding. In October 2008, the Company paid Hearst a dividend of $1.1 million related to the Series A Preferred Stock.

On December 31, 2008, Hearst exchanged the face value of $25.0 million and $15.0 million, respectively, of the Company's 6.875% and 6.375% Senior Subordinated Notes owned by Hearst for 25 shares of Series B Preferred Stock and 15 shares of Series C Preferred Stock in the Company. The Series B and Series C Preferred Stock have an original issue price of $25.0 million and $15.0 million, respectively, and a par value of $0.001. The Series B and C Preferred Stock have no voting rights. Hearst is entitled to receive, when declared by the Company's Board of Directors, out of the Company's non-Bay area businesses, cumulative preferential cash dividends on the Series B and C Preferred Stock at an annual rate of 4.68% and 4.30%, respectively, of the original issue price. All dividends payable shall accrue and be cumulative from the date the stock was issued. No dividends may be paid on the Series B and C Preferred Stock unless, at the time of such payment, all dividends then accrued and payable on the shares of any the Company's "Senior Stock" as defined have been paid in full. At any time, the Company has the right, at its sole option and election, to redeem in cash any or all of the shares of the Series B and C Preferred Stock. Hearst, as a Series B and C Preferred Stock holder, may at any time on or after July 3, 2014, at its sole option and election, require the Company to redeem in cash any or all of the shares of Series B and C Preferred Stock outstanding. The Company recorded the Series B and C Preferred Stock issued in this exchange at fair value as of December 31, 2008, which was $4.5 million and $2.7 million, respectively. The difference between fair value of the Preferred Stock issuances and the carrying value of the Senior Subordinated Notes exchanged of $32.8 million has been recorded as a capital contribution, which will be accreted into Preferred Stock through July 3, 2014 until the carrying value of the Series B and C Preferred Stock issuances equal their respective redemption values.

At June 30, 2009 and 2008, $5.2 million and $1.1 million, respectively, has been accrued for dividends payable for the Series A, B and C Preferred Stock.

## Note 10: Debt

Debt consisted of the following:

| | | June 30, | |
|---|---|---|---|
| | | 2009 | 2008 |
| | | (Dollars in thousands) | |
| Bank Credit Facility (Revolving Portion) | (I) | $ 166,494 | $ 118,700 |
| Bank Term Loan A | (I) | 59,161 | 90,000 |
| Bank Term Loan B | (I) | 105,091 | 142,845 |
| Bank Term Loan C | (I) | 252,359 | 343,000 |
| Various Notes, payable through 2013 | (II) | 17,382 | 19,271 |
| 6.875% Senior Subordinated Notes, due 2013 | (III) | 204,050 | 228,738 |
| 6.375% Senior Subordinated Notes, due 2014 | (IV) | 121,811 | 136,618 |
| DNA Amended Bank Credit Facility | (V) | 78,796 | — |
| | | 1,005,144 | 1,079,172 |
| Less current portion of long-term debt | | (920,901) | (32,083) |
| Long-term debt | | $ 84,243 | $1,047,089 |

### Forbearance Agreement

Effective March 31, 2009, the Company defaulted on its Bank Credit Facility when it did not make the payments of interest and principal that were due on that date. In addition, the Company exceeded the senior and total debt leverage ratio requirements as of that date. As a result of the event of default, the June 30, 2009 balance sheet reflects all of the obligations under the Bank Credit Facility as current.

Effective April 30, 2009, the Company entered into a Forbearance Agreement with its lenders under its Bank Credit Facility. Under the terms of the Forbearance Agreement, effective April 1, 2009, for all loans under the Bank Credit Facility, the margin on all Eurodollar Rate Loans was increased to 4.5%, base rate loans to 3.5% and letter of credit fees to 4.5%. In addition to the interest payable in cash, additional interest of 2.0% will

accrue on all Credit Agreement borrowings, such interest to be payable in cash only upon the expiration of the forbearance agreement. The Forbearance Agreement also requires the Company to maintain minimum levels of cash flow, cash balances and limits the amount of capital expenditures, investments and sales of assets. The forbearance agreement required the Company to designate each unrestricted subsidiary under the Credit Agreement as a restricted subsidiary, and to pledge as additional collateral its share of the real property held for sale at its Boulder and Los Angeles operating units. Further, the Company was required to engage restructuring advisors for itself, as well as fund the cost of the legal and financial advisors hired by the lenders under the Bank Credit Facility. The initial expiration of the Forbearance Agreement was September 30, 2009; however, it was extended to November 30, 2009 and then further extended to March 31, 2010. To date, the majority of the Bank Credit Facility lenders have agreed to a restructuring term sheet (see Note 21: Restructuring and Reorganization Plan for further discussion).

On April 1, 2009, the Company did not make the interest payment on its 6.875% Senior Subordinated Notes due on that date. As a result of the payment default under the 6.875% Senior Subordinated Notes and defaults on the Bank Credit Facility, the Company cross-defaulted on its 6.375% Senior Subordinated Notes. Effective April 30, 2009, the Company also entered into a Forbearance Agreement with Hearst, which owns a majority of the Company's outstanding 6.375% and 6.875% Senior Subordinated Notes. The initial expiration of the forbearance was September 30, 2009, and was extended to November 30, 2009. The forbearance has since been extended to March 31, 2010. As a result of the defaults, the 6.375% and 6.875% Senior Subordinated Notes have been recorded in the June 30, 2009 balance sheet as current obligations of the Company.

### *Significant Debt Terms – Prior to Events of Default Described Above*

I.  On December 30, 2003, the Company refinanced its Bank Credit Facility (the "Bank Credit Facility"). The Bank Credit Facility (prior to being amended as discussed below) provided for borrowings of up to $600.0 million, consisting of a $350.0 million revolving credit facility and a $250.0 million term loan "B" facility.

The following is a summary of the prior amendments to the Bank Credit Facility:

- On August 30, 2004, the Company refinanced term loan "B" with a $100.0 million term loan "A" and a $148.8 million term loan "C."

- On September 8, 2005, the Company refinanced term loan "C" discussed above with a $147.3 million term loan "B," and reduced borrowing margins.

- On August 2, 2006, the Company amended the Bank Credit Facility to authorize a new $350.0 million term loan "C" facility and to approve the purchase of the *Contra Costa Times, San Jose Mercury News, The Monterey County Herald* and the St. Paul *Pioneer Press* by the Company. The $350.0 million term loan "C" facility was borrowed on August 2, 2006 and used, along with revolving credit facility borrowings of $56.3 million, to fund the Company's portion of the purchase price for the *Contra Costa Times* and the *San Jose Mercury News* and the related fees to amend the Bank Credit Facility.

- On September 17, 2007, the Bank Credit Facility was amended to, among other things, increase the consolidated total leverage ratio and the ratio of consolidated senior debt to consolidated operating cash flow (effective June 30, 2007) and lower the ratio of consolidated operating cash flow to consolidated fixed charges for the quarters ending September 30 and December 31, 2007. As a result of the amendment, all borrowing margins for all loan tranches of the Bank Credit Facility were increased by 50 basis points. The Company also voluntarily reduced the revolver under the Bank Credit Facility from $350.0 million to $235.0 million effective October 1, 2007.

- On August 7, 2008, the Bank Credit Facility was amended to change the consolidated total leverage ratio, the ratio of consolidated senior debt to consolidated operating cash flow and the fixed charge coverage ratio effective June 30, 2008 and through December 2009. As a result of the amendment, the revolver was reduced to $175.0 million and interest rate margins increased by 75 basis points for the revolving portion of the Bank Credit Facility, as well as term loans "A" and "B" and 150 basis points for term loan "C." In addition, asset dispositions with net sale proceeds greater than $5.0 million must be used to pay down the

term loans on a pro rata basis. Certain other definitional and structural changes were also made to the Bank Credit Facility.

The following is a summary description of the Bank Credit Facility as amended; however, as previously discussed, the Company has defaulted on the Bank Credit Facility as of March 31, 2009 and has entered into a Forbearance Agreement effective April 30, 2009. As a result of the events of default and the subsequent Forbearance Agreement, certain of these terms were modified as previously discussed. The terms discussed below were the terms prior to the default.

Borrowings under the revolving facility were permitted to be borrowed, repaid and reborrowed without premium or penalty (other than customary breakage costs). Amounts repaid under the term loans "A," "B" and "C" were not available for reborrowing. The Bank Credit Facility is guaranteed by the Company's subsidiaries (with certain exceptions) and secured by first priority liens and security interests in all of the capital stock (or other ownership interests) of each of the Company's and the guarantors' subsidiaries (with certain exceptions) and its interest in the Texas-New Mexico Newspapers Partnership. The Company also pledged its interest in the Denver Newspaper Agency to secure the Bank Credit Facility (subject to certain limitations). The Bank Credit Facility contains a number of covenants that, among other things, restrict the Company's ability and its subsidiaries' ability to dispose of assets, incur additional indebtedness, pay dividends, make capital contributions, create liens on assets, make investments, make acquisitions and engage in mergers or consolidations. In addition, the Bank Credit Facility requires compliance with certain financial ratios, including a maximum consolidated debt to consolidated operating cash flow ratio, a maximum consolidated senior debt to consolidated operating cash flow ratio and a minimum consolidated operating cash flow to consolidated fixed charges ratio. Borrowings under the Bank Credit Facility incurred interest at rates based upon, at the Company's option, either 1) the base rate (the higher of (a) the Federal Funds Rate plus ½ of 1% and (b) Bank of America's prime rate) or 2) Eurodollar rate plus a spread based on the Company's leverage ratio. Term loan "A" required quarterly principal payments as follows: $5.0 million beginning in March 2008 through December 2008; $7.5 million from March 2009 through December 2009; and $12.5 million from March 2010 through September 2010, with the remaining balance due at maturity on December 30, 2010. Term loan "B" interest was based upon, at the Company's option, Eurodollar or base rates, plus a borrowing margin of 2.50% or 1.50%, respectively. Term loan "B" required quarterly principal payments as follows: $0.4 million through December 2009, increasing to $35.2 million from March through September 2010, with the remaining balance due at maturity on December 30, 2010. Term loan "C" interest was based upon, at the Company's option, Eurodollars plus a borrowing margin of 3.75%, or base rate plus a borrowing margin of 2.75%. Term loan "C" required quarterly principal payments as follows: $0.875 million through June 2012; and $82.25 million from June 2012 through March 2013, with the remaining balance due at maturity on August 2, 2013.

In addition to interest, the Company paid an annual commitment fee of 0.25% to 0.375% on the unused portion of the commitment based on the Company's leverage ratio. The Company incurred debt issuance costs of $3.8 million related to the December 31, 2003 $600.0 million Bank Credit Facility, and another $4.9 million related to the amendments to the facility. These debt issuance costs have been capitalized as a deferred charge, and are being amortized on a straight-line basis over the term of the Bank Credit Facility as a component of amortization expense.

II. In connection with various acquisitions, the Company's subsidiaries have issued notes payable to prior owners and assumed certain debt obligations. The notes payable and other debt obligations bear interest at rates ranging from 0.0% to 7.0%. The notes bearing interest at below market rates have been discounted at rates ranging from 9.0% to 16.0%, which reflects the prevailing rate at the date of acquisition. The majority of these notes and other debt obligations are unsecured obligations of the Company. The Company has continued to make payments on these notes; therefore the long-term portion of the amounts due remains classified as long-term at June 30, 2009.

III. In November 2003, the Company sold $300.0 million of its 6.875% Senior Subordinated Notes due 2013 (or "6.875% Notes"). Proceeds from the sale of the 6.875% Notes were reduced by an original issue discount of $2.6 million and debt issuance costs of $6.0 million. The Company reduced the principal amount of the 6.875% Notes by the amount of the original issue discount and is amortizing the discount as a component of interest expense using the effective interest method. The debt issuance costs have been capitalized as a deferred charge and are being amortized on a straight-line basis over the term of the 6.875% Notes as a component of

amortization expense. The indebtedness evidenced by the 6.875% Notes is subordinated and junior in right of payment to obligations under the Bank Credit Facility and related term loans. Prior to the event of default, no principal payments were required on the 6.875% Notes until October 1, 2013, at which time all outstanding principal and interest was due and payable. Semi-annual interest payments were due and payable on October 1 and April 1 of each year. The 6.875% Notes are general unsecured obligations of the Company ranking equal in right of payment with the 6.375% Notes. In fiscal year 2008, the Company repurchased and retired $70.0 million of its 6.875% Senior Subordinated Notes for $35.5 million, including $0.9 million of accrued interest. The Company recognized a gain of $35.1 million associated with these debt extinguishments for the year ended June 30, 2008. In addition, the Company wrote off $0.8 million related to capitalized debt issuance costs. On December 31, 2008, Hearst converted the face value of $25.0 million of the Company's 6.875% Senior Subordinated Notes owned by Hearst to Series B Preferred Stock in the Company. See Note 9: Preferred Stock.

IV. In January 2004, the Company sold $150.0 million of its 6.375% Senior Subordinated Notes due 2014 (or "6.375% Notes"). Proceeds from the sale of the 6.375% Notes were reduced by an original issue discount of $1.4 million and debt issuance costs of $1.8 million. The principal amount of the 6.375% Notes has been reduced by the amount of the original issuance discount, which is being amortized as a component of interest expense using the effective interest method. The debt issuance costs have been capitalized as a deferred charge and are being amortized on a straight-line basis over the term of the 6.375% Notes as a component of amortization expense. The indebtedness evidenced by the 6.375% Notes is subordinated and junior in right of payment to obligations under the Bank Credit Facility and related term loans. Prior to the event of default, no principal payments were required until April 1, 2014, at which time all outstanding principal and interest was due and payable. Semi-annual interest payments were due and payable on January 1 and July 1 of each year. The 6.375% Notes are general unsecured obligations of the Company ranking equal in right of payment with the 6.875% Notes. In fiscal year 2008, the Company repurchased and retired $12.6 million of its 6.375% Senior Subordinated Notes for $6.0 million, including $0.3 million of accrued interest. The Company recognized a gain of $6.9 million associated with these debt extinguishments for the year ended June 30, 2008. In addition, the Company wrote off $0.1 million related to capitalized debt issuance costs. On December 31, 2008, Hearst converted the face value of $15.0 million of the Company's 6.375% Senior Subordinated Notes owned by Hearst to Series C Preferred Stock in the Company. See Note 9: Preferred Stock.

V. As discussed in Note 4: Denver JOA Separation Agreement, in conjunction with the consolidation of the Denver Newspaper Agency beginning February 27, 2009, the Company recorded $76.6 million in borrowings to reflect the fair value of DNA's credit facility borrowings. The amount recorded was based on the DNA Amended Credit Facility entered into by DNA in August 2009. The debt is carried on the June 30, 2009 consolidated balance sheet at $78.8 million and remains non-recourse to the Company. The disclosures in this note, including the five year maturity schedule, reflect the terms of the DNA Amended Credit Facility which were described in detail in Note 5. The difference between the maturity schedule payments below and the total debt recorded in the June 30, 2009 balance sheet relates to the $1.2 million fair value adjustment to the DNA debt that will be accreted between July 1, 2009 and August 26, 2009.

Maturities of long-term debt, including the DNA Amended Credit Facility, for the next five fiscal years and thereafter are shown below (in thousands):

|  | As of June 30, 2009 |
| --- | --- |
| 2010 | $ 920,901 |
| 2011 | 1,136 |
| 2012 | 3,232 |
| 2013 | 3,337 |
| 2014 | 77,248 |
| Thereafter | 494 |
|  | $ 1,006,348 |

Interest paid during the fiscal years ended June 30, 2009 and 2008 was approximately $55.0 million and $79.1 million, respectively. No interest was capitalized in fiscal years 2009 and 2008.

As of June 30, 2008, an $18.4 million letter of credit was issued in favor of an insurance company providing workers' compensation insurance coverage to the Company and its subsidiaries. In April 2009, the issuer of the letter of credit gave notice that it would not renew the arrangement beyond December 2009. As a result, in May 2009, the insurance carrier to which the letter of credit was issued drew down the entire $18.4 million balance in accordance with the terms of the letter of credit. A portion of the drawdown under the letter of credit was to secure obligations of the California Newspapers Partnership, the Texas-New Mexico Newspapers Partnership and the Monterey Newspapers Partnership. As of June 30, 2009, these partnerships had reimbursed the Company $9.0 million for funding their workers compensation obligations with the letter of credit drawdown. At June 30, 2009, letters of credit totaling $8.4 million have been issued in favor of an insurance company providing workers' compensation insurance coverage to the Company and its subsidiaries ($4.4 million), as well as amounts related to the Company's purchasing card program ($4.0 million).

The fair market value of the Company's borrowings under its Bank Credit Facility, its 6.875% Notes and 6.375% Notes and the remaining long-term debt cannot be practically estimated because of the lack of quoted market prices for the securities and management's inability to estimate the fair value without incurring the excessive costs of obtaining an appraisal.

## Note 11: Leases

Assets under capital leases and related accumulated amortization are included in property, plant and equipment in the accompanying consolidated balance sheets. The June 30, 2008 balance includes a building under a capital lease by the California Newspapers Partnership. As previously discussed in Note 7, the lease was originally expected to continue through 2019; however, the Partnership extinguished the lease during fiscal year 2009. As a result of the early termination of the lease, the Company recognized a net $2.3 million gain on extinguishment of the lease obligation comprised of a gain of approximately $5.0 million related to the extinguishment of the capital lease obligation, offset in part by a $2.6 million loss to write off the unamortized capital lease asset, including related costs of disposal. The gain has been reflected in other (income) expense.

The Denver Newspaper Agency, which the Company began consolidating in its financial statements in February 2009, leases certain equipment under capital leases. The June 30, 2009 balances below reflect only the DNA assets under capital leases. These leases are liabilities of DNA and are non-recourse to the Company.

|  | June 30, | | | |
|---|---|---|---|---|
|  | 2009 | | 2008 | |
|  | (Dollars in thousands) | | | |
| Equipment | $ | 2,385 | $ | 6,406 |
| Accumulated amortization | | (335) | | (4,274) |
| Assets under capital leases, net | $ | 2,050 | $ | 2,132 |

Amortization on capital lease assets is included in depreciation expense in the accompanying financial statements.

The Company and its subsidiaries also lease certain facilities and equipment under operating leases, some of which contain renewal or escalation clauses. Rent expense was approximately $19.8 million and $17.8 million during fiscal years 2009 and 2008, respectively. Contingent rentals are not significant. Future minimum payments on capital and operating leases are as follows at June 30, 2009:

|  | Capital Leases | | Operating Leases |
|---|---|---|---|
|  | (Dollars in thousands) | | |
| 2010 | $ | 1,269 | $ 20,963 |
| 2011 | | 500 | 18,538 |
| 2012 | | 402 | 16,675 |
| 2013 | | 587 | 13,978 |
| 2014 | | 204 | 13,204 |
| Thereafter | | 172 | 145,944 |
| Total minimum lease payments | | 3,134 | $ 229,302 |
| Less amount representing interest | | (281) | |
| Present value of net future lease payments | $ | 2,853 | |

## Note 12:  Employee Benefit Plans

*Pension and Postretirement Plans*

In conjunction with the acquisitions of *The Sun* in Lowell, Massachusetts and the *Daily News* in Los Angeles, California, the Company assumed non-contributory defined benefit pension plans, which covered substantially all the employees at the acquired newspapers. *The Sun*'s plan was combined with the frozen plan of New England Newspapers, Inc., a wholly owned subsidiary of the Company. In addition, shortly after the acquisition of *Daily News*, the Company elected to freeze the plan assumed in conjunction with that acquisition. Accordingly, all current service cost under that plan has been terminated. Effective April 1, 2005, the Company froze *The Sun*'s defined benefit plan benefits.

*The Denver Post* sponsors two non-contributory defined benefit pension plans, which cover substantially all its current employees. Both plans provide benefits based on employees' years of service and compensation during the years immediately preceding retirement. Effective December 31, 2008, the Company froze one of the defined benefit plans related to *The Denver Post*'s non-union employees. *The Denver Post* also sponsors postretirement health care and life insurance plans that provide certain union employees and their spouses with varying amounts of subsidized medical coverage upon retirement and, in some instances, continued life insurance benefits until age 65 if the employee retires prior to age 65. Effective August 26, 2009, these plan assets and liabilities were assumed by the Denver Newspaper Agency in connection with the Denver Newspaper Agency's debt restructuring. See Note 4: Denver JOA Separation Agreement. As a result of this assignment and assumption by the Denver Newspaper Agency, *The Denver Post* plans are no longer part of the Company's ERISA control group and at June 30, 2009, represent $17.3 million of the Company's consolidated pension and other post employment benefit plan liability.

In conjunction with the Company's entry into the Separation Agreement with Scripps and the related consolidation of the Denver Newspaper Agency into the Company's financial statements which the Company accounted for under purchase accounting, the Company recorded the assumption of the Denver Newspaper Agency's pension and postretirement benefit plans and obligations. The purchase accounting related to the Denver Newspaper Agency employee benefit plans resulted in the Company recording liabilities of $45.7 million related to pension obligations and $6.5 million related to other postretirement employee benefits. The discount rate used when the Company assumed these plans was 6.75%. These plans are not part of the Company's ERISA control group and at June 30, 2009, represent $40.3 million of the Company's consolidated pension and other post employment benefit plan liability.

Effective June 1, 2009, one of the St. Paul *Pioneer Press* plans was merged into the MediaNews plan.

In conjunction with the Company's August 2, 2006 acquisition of the *San Jose Mercury News* and St. Paul *Pioneer Press*, the Company assumed non-contributory defined benefit pension plans and postretirement employment benefit plans which cover certain union employees at these newspapers. In December 2006, the Company froze the defined benefit plan at the *San Jose Mercury News* effective February 2007. In October 2007, the Company froze the union's defined benefit pension and postretirement healthcare benefit plan at the St. Paul *Pioneer Press* effective December 31, 2007. The Company recognized curtailment gains of $1.2 million related to the freeze of the pension plan and $0.4 million related to the freeze of the postretirement healthcare benefit plan in St. Paul.

The Company sponsors a postretirement healthcare plan for certain former and current Kearns-Tribune, LLC employees that provided subsidized medical coverage for former employees who retired prior to January 1, 2005. Effective January 1, 2005, the Company no longer provides postretirement healthcare coverage for the majority of Kearns-Tribune, LLC employees retiring after that date.

Effective July 1, 2003, the Company adopted an executive retiree medical benefit plan, which provides for health care coverage during the retirement for the eligible participants (corporate officers). There are minimum age and years of service criteria for eligibility for benefits under this plan. Currently, there are no retirees receiving benefits under this plan.

The Company's funding policy for all plans is to make at least the minimum annual contributions required by the Employee Retirement Income Security Act of 1974.

The Company has additional post-employment agreements and obligations, none of which are material individually or in aggregate.

The following tables provide a reconciliation of benefit obligations, plan assets and funded status of the Company's pension and other defined benefit plans as of June 30. The tables also provide the components of net periodic pension cost associated with those plans as of June 30.

| | Pension Plans | | Other Benefits | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| | (Dollars in thousands) | | | |
| **Change in Benefit Obligation** | | | | |
| Benefit Obligation at Beginning of Year | $ 269,521 | $ 284,136 | $ 7,269 | $ 10,204 |
| Service Cost | 1,153 | 1,588 | 347 | 272 |
| Interest Cost | 20,378 | 17,333 | 609 | 593 |
| Acquisition[2] | 125,161 | — | 6,530 | — |
| Curtailment gain | — | (1,618) | — | (1,075) |
| Actuarial Loss (Gain) | 3,419 | (14,276) | (769) | (2,164) |
| Benefits Paid | (19,670) | (17,642) | (546) | (561) |
| Benefit Obligation at End of Year | $ 399,962 | $ 269,521 | $ 13,440 | $ 7,269 |
| **Change in Plan Assets** | | | | |
| Fair Value of Plan Assets at Beginning of Year | $ 238,758 | $ 263,184 | $ — | $ — |
| Actual Loss on Plan Assets | (30,796) | (14,429) | — | — |
| Acquisition[2] | 79,447 | — | — | — |
| Company Contributions | 4,582 | 7,645 | 546 | 561 |
| Benefits Paid | (19,670) | (17,642) | (546) | (561) |
| Fair Value of Plan Assets at End of Year | $ 272,321 | $ 238,758 | $ — | $ — |
| **Reconciliation of Funded Status** | | | | |
| Funded Status | $ (127,641) | $ (30,763) | $ (13,440) | $ (7,269) |
| **Assumptions as of June 30 to Determine Liability** | | | | |
| Discount Rate | 6.75% | 6.75% | 6.75% | 6.75% |
| Expected Return on Plan Assets | 8.00% | 8.00% | N/A | N/A |
| Rate of Compensation Increase | 0.00% | 3.00% | N/A | N/A |
| **Components of Net Periodic Cost** | | | | |
| Service Cost | $ 1,153 | $ 1,588 | $ 347 | $ 272 |
| Interest Cost | 20,378 | 17,333 | 609 | 593 |
| Expected Return on Plan Assets | (20,692) | (20,772) | — | — |
| Amortization of Deferral | 279 | 278 | (128) | (41) |
| Recognized Net Actuarial Loss | 2,017 | 1,363 | (85) | 104 |
| Curtailment (Gain) Loss and Special Termination Benefits | 138 | (1,245) | — | (446) |
| Net Periodic (Benefit) Cost | $ 3,273 | $ (1,455) | $ 743 | $ 482 |
| **Amounts Recognized in Accumulated Other Comprehensive Income (pre-tax and excluding unconsolidated JOA)[1]:** | | | | |
| Net Actuarial (Gain) Loss | $ 84,066 | $ 31,313 | $ (1,491) | $ (807) |
| Prior Service Cost | 2,093 | 2,372 | (583) | (711) |
| Total | $ 86,159 | $ 33,685 | $ (2,074) | $ (1,518) |
| **Amounts Recognized in the Consolidated Balance Sheets Consist of:** | | | | |
| Current Liabilities | $ (28) | $ (49) | $ (1,133) | $ (676) |
| Noncurrent Liabilities | (127,613) | (30,714) | (12,307) | (6,593) |
| Pension Liability | $ (127,641) | $ (30,763) | $ (13,440) | $ (7,269) |

(1) Accumulated other comprehensive income in the table above differs from that reflected in the consolidated balance sheets and consolidated statements of changes in shareholders' equity (deficit) as the consolidated statements reflect the Company's share of accumulated other comprehensive loss from pension and postretirement plans related to its unconsolidated JOAs. Because the Company does not consolidate the related pension plans of the Salt Lake City JOA and, until February 27, 2009, did not consolidate the Denver Newspaper Agency, the information from these plans is accordingly excluded from the above table (June 30, 2009 excludes the Salt Lake City JOA only; June 30, 2008 excludes both the Salt Lake City JOA and the Denver Newspaper Agency). Also, accumulated other comprehensive income as shown above differs from the consolidated statements as the consolidated statements reflect the amounts net of tax and net of minority interest related to one of the plans.

(2) Includes amounts recorded to account for the consolidation of the Denver Newspaper Agency plans effective February 27, 2009.

Pension Plans with Accumulated Benefit Obligation and Projected Benefit Obligation in Excess of Plan Assets were as follows (in thousands):

|  | June 30, | | | |
|---|---|---|---|---|
|  | 2009 | | 2008 | |
| Accumulated Benefit Obligation | $ | 399,910 | $ | 269,010 |
| Projected Benefit Obligation |  | 399,962 |  | 269,521 |
| Fair Value of Plan Assets |  | 272,321 |  | 238,758 |

The following are estimated amounts in accumulated other comprehensive income that the Company expects to recognize in operating expense during the fiscal year ending June 30, 2010 (in thousands):

|  | Pension | | Other Benefits | |
|---|---|---|---|---|
| Amortization of Net Actuarial (Gain)/Loss | $ | 6,233 | $ | (157) |
| Amortization of Prior Service Cost |  | 279 |  | (128) |
| Total | $ | 6,512 | $ | (285) |

The Company's estimates of payments to beneficiaries of its pension plans and other benefits are as follows for each fiscal year ending June 30 (in thousands):

|  | Pension Plans | | Other Benefits | |
|---|---|---|---|---|
| 2010 | $ | 24,706 | $ | 1,132 |
| 2011 |  | 24,374 |  | 1,159 |
| 2012 |  | 25,288 |  | 1,196 |
| 2013 |  | 26,124 |  | 1,196 |
| 2014 |  | 27,122 |  | 1,176 |
| 2015 – 2019 |  | 154,522 |  | 5,724 |

The Company's pension plan allocations at June 30 were as follows:

|  | Target Allocations | Plan Assets | |
|---|---|---|---|
|  |  | Years Ended June 30, | |
|  | 2010 | 2009 | 2008 |
| Asset Category: |  |  |  |
| Equity securities | 70.0% | 65.5% | 66.6% |
| Debt securities | 20.0 | 32.4 | 30.3 |
| Other | 10.0 | 2.1 | 3.1 |
| Total | 100.0% | 100.0% | 100.0% |

The Company's investment policy is to maximize the total rate of return on plan assets to meet the long-term funding obligations of the plan. Plan assets are invested using a combination of active management and passive investment strategies. The Company manages its investment risk through diversification among multiple asset classes, managers, styles and securities. Risk is further controlled both at the manager and asset level by assigning return targets and evaluating performance against these targets. Equity securities include common stocks of large, medium, and small companies which are predominately U.S. based. Fixed-income securities primarily include securities issued or guaranteed by the U.S. government, mortgage-backed securities and corporate debt obligations. Other includes certain real estate investments.

The assumptions used in determining the Company's pension and postretirement benefit obligation can differ from the actual results. As a result of these differences, as well as other external economic factors, the assumptions used are periodically revised and updated. The differences between actual and assumed experience, and the related changes in assumptions, give rise to actuarial gains and losses in the preceding table, which are recognized over the expected service period of active participants. The discount rate used to determine the Company's future pension obligations is based

upon an index of securities with various maturities rated Aa or better as of the respective measurement dates. The increases in compensation level assumptions are based on near-term outlook and only apply to one plan at *The Denver Post*, the St. Paul *Pioneer Press* Mechanical pension plan, and certain Denver Newspaper Agency plans, and assumes no wage increases due to recent wage reductions. All other plans are frozen. The expected long-term rate of return on plan assets is based upon the weighted average expected rate of return and capital market forecasts for each asset class employed.

The Company expects to contribute approximately $6.0 million to $6.5 million to its defined benefit pension plans in fiscal year 2010, of which $1.6 million relates to the Denver Newspaper Agency and is funded exclusively by DNA.

Assumed health care cost trend rates can have a significant effect on the amounts reported for the health care plans. A one-percentage-point change in assumed health care cost trend rates would have the following effect (in thousands):

|  | 1-Percentage Point Increase | | 1-Percentage Point Decrease | |
|---|---|---|---|---|
| Effect on total of service and interest cost components....... | $ | 159 | $ | 133 |
| Effect on postretirement benefit obligation .......................... | $ | 1,263 | $ | 1,086 |

The July 1, 2009 assumed trend rate for the increases in health care costs for its postretirement plans was 8.5% trending down to an ultimate rate of 5.0% by fiscal year 2016. The Company's policy is to fund the cost of providing postretirement health care and life insurance benefits when they are entitled to be received.

### *Deferred Compensation Plan*

The Company sponsors several nonqualified deferred compensation plans, which are offered to certain employees (principally corporate officers, newspaper publishers and senior operational executives). The plans allow participants to defer a portion of their compensation, including bonuses, on a pre-tax basis. Participants in one plan (for publishers) are eligible for a Company match based on their deferrals into the plan, while participants of another plan (corporate) are eligible for a discretionary Company contribution award based on operating results. The Company match and discretionary awards are subject to vesting, over a period of ten years from the date of participation in the plans. No vesting occurs until the participant has completed three or five full years in the plan (depending on the specific plan), after which time the participant is 30% or 50% vested; the residual vesting occurs evenly over the remaining period at 10% per year. The compensation deferrals and Company match earn a return based on notional investment elections made by the individual participants. The discretionary Company contribution awards earn a return equal to the Company's cost of borrowing under its revolving credit agreement, which it may use to fund payments on the deferred compensation obligations. During fiscal year 2009, the nonqualified plan for corporate officers and publishers was amended to offer each participant a one-time election in October 2008 to have all or a portion of the participant's account balance, including both Company contributions and employee deferrals, to be distributed in January 2009. In addition, the amendment fully vests the Company contributions on all account balances as of December 31, 2008. Beginning January 1, 2009, future Company contributions were again subject to the normal vesting rules. These deferred compensation obligations are recorded in the Company's consolidated balance sheets as a component of "Other Liabilities" at the vested value of the deferred compensation, plus the applicable return on investment, and amounted to $0.6 million and $6.9 million at June 30, 2009 and 2008, respectively. In some cases, the Company has made investments in cash surrender value life insurance policies, which may be used at the Company's discretion to fund its deferred compensation liability. The Company's investments in cash surrender value life insurance policies are recorded in the Company's consolidated balance sheets as a component of "Other Assets" and amounted to $0.8 million and $5.1 million at June 30, 2009 and 2008, respectively.

### *Other Retirement Plans*

The Company and several of its newspaper properties participate in retirement/savings plans, and in addition, contribute to several multi-employer plans on behalf of certain union-represented employee groups. The majority of the Company's full-time employees are covered by one of these plans. The Company suspended its matching contribution to its 401(k) retirement/savings plan effective January 1, 2009. Total expense for these plans in the fiscal years ended June 30, 2009 and 2008, was approximately $6.3 million and $7.4 million, respectively.

## Note 13: Income Taxes

The income tax provision consists of the following:

|  | Years Ended June 30, | |
|---|---|---|
|  | 2009 | 2008 |
|  | (Dollars in thousands) | |
| Current: |  |  |
| State | $ 365 | $ 1,705 |
| Federal | — | 400 |
| Deferred: |  |  |
| State | (12,803) | 3,763 |
| Federal | (37,549) | (43,903) |
| Net benefit[a] | $(49,987) | $(38,035) |

(a) Difference to the consolidated income statement is due to the deferred tax benefit included in the provision above related to discontinued operations of $1.1 million and $7.2 million in fiscal years 2009 and 2008, respectively.

A reconciliation between the actual income tax benefit for financial statement purposes and income taxes computed by applying the statutory Federal income tax rate to financial statement loss before income taxes is as follows:

|  | Years Ended June 30, | |
|---|---|---|
|  | 2009 | 2008 |
| Statutory federal income tax rate | 35% | 35% |
| Effect of: |  |  |
| State income tax net of federal benefit | 4 | 6 |
| Valuation allowance | (24) | (29) |
| Book/tax basis difference associated with acquisitions and non-deductible acquisition costs | (5) | (2) |
| Other, net | (2) | (1) |
| Financial statement effective tax rate | 8% | 9% |

Components of the long-term deferred tax assets and liabilities are as follows:

|  | June 30, | |
|---|---|---|
|  | 2009 | 2008 |
|  | (Dollars in thousands) | |
| Deferred tax assets | $ 348,538 | $ 161,904 |
| Valuation allowance | (306,866) | (135,199) |
| Deferred tax assets | 41,672 | 26,705 |
| Deferred tax liabilities | (70,057) | (103,305) |
| Net deferred tax liabilities | $ (28,385) | $ (76,600) |

The Company has recorded valuation allowances at June 30, 2009 and 2008 due to uncertainty related to the future utilization of certain deferred tax assets. Management determined that the deferred tax assets could not offset the deferred tax liabilities associated with goodwill and indefinite lived intangibles and accordingly made a valuation allowance to offset the benefit of the net deferred tax assets from finite lived assets. Based on all available evidence at June 30, 2009, the Company has concluded that the realizability of the net deferred tax assets does not meet the more likely than not threshold under SFAS No. 109, *Accounting for Income Taxes*.

Major components of the Company's net deferred tax liabilities relate to tax credits and net operating loss carryforwards (NOLs), pension obligations, fixed assets, intangible assets and investments in partnerships.

At June 30, 2009, for financial reporting purposes, the Company has approximately $173.8 million of NOLs for federal tax reporting purposes available to offset its future taxable income, which expire in 2019 through 2029 and $1.6 million of alternative minimum tax credit carryforwards. The Company also has approximately $260.9 million of state NOLs and approximately $6.7 million of state tax credits available to offset future state taxable income. The state NOLs expire in 2010 through 2029; $6.2 million of the state tax credits expire in years 2009 through 2018. The remaining $0.5 million in state tax credits do not expire.

The Company made net state and federal income tax payments of approximately $0.4 million and $0.6 million during fiscal years 2009 and 2008, respectively.

## Note 14: Hedging Activities

The Company had a newsprint swap agreement, which became ineffective due to the counterparty becoming insolvent. The Company accounted for the early termination of the swap in accordance with SFAS No. 133, which required the Company to record a liability and a charge to comprehensive income to reflect the fair value of the derivative instrument as of the date prior to that which the hedge was deemed ineffective (during the Company's fiscal year 2002). The original term of the newsprint swap agreement expired in January 2009. The amounts in accumulated other comprehensive loss related to the ineffective hedge were amortized on a straight-line basis and charged to other (income) expense, net over the original terms of the swap agreements as the forecasted newsprint purchase transactions originally contemplated in the hedging arrangements were determined to be probable of occurring. Approximately $0.5 million and $0.8 million, respectively, was reclassified from accumulated other comprehensive loss to earnings for each of the years ended June 30, 2009 and 2008 related to the terminated swap.

As a result of the Company's consolidation of the Denver Newspaper Agency beginning February 27, 2009, the Company recorded a liability associated with interest rate swaps used by the Denver Newspaper Agency to hedge interest payments related to its credit facility borrowings. At June 30, 2009, the Denver Newspaper Agency had interest swap agreements with a notional amount of $60.0 million. Under the agreements, beginning October 2006 through November 2011, DNA receives payments based on LIBOR and made payments based on fixed rates ranging from 4.670% to 5.095% (weighted-average of 4.992%). The interest rate swap agreements were expected to provide an economic hedge against the impact of changes in LIBOR. Beginning October 1, 2008, the contracts did not qualify as a cash flow hedge and changes in the fair value of the hedge were marked to market. Through December 31, 2008, 50% of the changes due to marking to market the fair value of the hedge are reflected in the Company's Income from Unconsolidated JOAs. From February 27, 2009 through June 30, 2009, the changes in the fair value of the hedge of $(1.0) million were recorded in other (income) expense, net, as the hedges were no longer effective. The estimated fair value of the contract at June 30, 2009 was $4.9 million and is recorded in other long-term obligations. The obligations associated with the interest rate swap contracts are non-recourse to the Company.

## Note 15: Treasury Stock

In July 2007, the Company repurchased 21,500 shares of Class A Common Stock from the estate of a beneficial owner of the stock held under the Scudder Family Voting Trust for $3.0 million. The $3.0 million repurchase price was based on the Company's estimate of fair market value of the shares purchased and was funded with borrowings under the Company's Bank Credit Facility. The estate repurchased 1,506 shares of Class A Common Stock held in treasury on October 26, 2007 for approximately $0.2 million.

## Note 16: Commitments and Contingencies

### Commitments

In January 1998, the Company entered into an option agreement in association with the acquisition financing related to one of its newspapers. The option entitles the holder to purchase the assets used in the publication of one of the Company's newspaper properties, which the option holder can currently exercise or put to the Company based on a predetermined formula. The Company estimates the option repurchase price to be no more than $0 at June 30, 2009 and 2008 as a result of the performance of the newspaper and, accordingly, it has not accrued any amounts as of the respective periods. The purchase price of the option could increase in the future. However, an increase in the option

price is unlikely as the twenty-four month trailing cash flows, a significant driver in the option repurchase formula, are negative. The option expires in January 2010 at which time, if the option remains outstanding, the Company would be required to repurchase it at the then option repurchase price as determined by the option agreement. On November 30, 2009, the Company received notification from the holder of the option stating that, since it had not exercised its option, it was entitled to the "Option Cancelation Amount" which it calculated at $8.4 million under the terms of the option agreement. The Company believes the option holder incorrectly calculated the option cancellation value under the terms of the agreement. In fact, the holder of the option acknowledges that it did not have all of the necessary information to fully calculate the "Option Cancelation Amount." The Company intends to vigorously contest any claims for amounts due under the option agreement.

The Company is party to a Shareholder Agreement with the Company's President. The Shareholder Agreement entitles the President, upon termination of his employment following December 31, 2009, by mutual agreement, or as a result of breach by the Company or certain other circumstances, to put to the Company at a price of 100% of the then fair market value (as determined by formula outlined in the Shareholder Agreement) shares of common stock which he owns. The Company also has a call under the Shareholder Agreement to acquire, and the President has a right to put, such shares following termination of his employment under other circumstances at a price equal to a percentage of fair market value (as determined by formula outlined in the Shareholder Agreement), which increases to 100% on December 31, 2009 (at June 30, 2009, the President has 58,199 shares of Class A Common Stock and is entitled to 95% of the fair market value). In the event of his disability, the President also has the right to require MediaNews to purchase at fair market value up to $1.0 million annually of his common stock from time to time during his lifetime. As of June 30, 2009 and 2008, the value of the President's put, as calculated per terms of the Shareholder Agreement, was estimated to be $0.

The amended employment agreement of Mr. William Dean Singleton, the Company's Vice Chairman of the Board and Chief Executive Officer, provides Mr. Singleton the right, in the event of his disability, to require MediaNews to purchase at fair market value his common stock from time to time during his lifetime in an aggregate amount not to exceed $1.0 million in any fiscal year. At June 30, 2009 and 2008, the total estimated cost of the repurchase would be $0.

*Contingencies*

In September 2006, MediaNews and the California Newspapers Partnership were named as defendants in a lawsuit which involves, among other allegations, claims that the carriers and distributors at the Fremont *Argus* are employees and not independent contractors. Although the sole plaintiff in the lawsuit was a carrier and a distributor for the *Argus*, the scope of the litigation potentially includes various publications throughout California owned by both CNP and MediaNews. The plaintiff's allegations include claims that she represents a class of "similarly situated" individuals, and she is seeking class certification. The Company is not in the position at this time to determine the likely outcome of these claims and intends to vigorously defend and contest all such claims, including the class action allegations, and as such has not accrued any amounts as of June 30, 2009, other than the Company's incurred, but not paid, legal costs of defending itself against these actions.

In 2002, a wrongful death action was brought against the Company regarding the death of two members of a family and catastrophic injury to a third. The driver of the plaintiff vehicle was an independent contractor working for a distribution agent engaged by the Company to deliver newspapers. In August 2009, a settlement was reached on all actions related to this matter, the majority of which was covered by insurance. The settlement did not have a material impact on the Company's financial statements.

In May 2004, the Company restructured its interests in Charleston Newspapers ("Charleston JOA") and The York Newspaper Company ("York JOA"). The Company and the other participants in such restructurings subsequently received civil investigative demands from the Department of Justice and provided responsive information and documents concerning the recent restructurings of the Charleston and York JOAs. After discussions with the Antitrust Division staff in 2005, the Company proposed potential amendments to the agreements governing the York JOA to clarify the rights and obligations of the parties to provide for additional performance based compensation to the manager of *The York Dispatch* under certain circumstances. The proposed amendments remain under review at the Antitrust Division. The Company anticipates that any such amendments would not be material to its future operating results.

With respect to the Charleston JOA, the Antitrust Division staff continued their investigation and on May 22, 2007, the U.S. Government filed a lawsuit challenging the amendment to the JOA. In October 2009, the parties reached a tentative agreement on all matters. Under the proposed settlement, the Company would not be obligated to make any payments, but the Company would have an opportunity to purchase shares in the JOA in the future and could receive an increase in the fee it is paid for managing the Charleston Daily Mail, with the amounts in both instances tied to changes in the performance of the newspaper. On October 7, 2009, the court granted a joint motion of all the parties for a 21-day stay for the parties to pursue a final agreement on the settlement. On December 8, 2009, the court granted another stay that will expire January 7, 2010.

The Company is involved in other litigation arising in the ordinary course of business. In management's opinion, the outcome of these legal proceedings will not have a material adverse impact on its financial condition, results of operations, or liquidity.

## Note 17: Related Party Transactions

The Company was party to a consulting agreement with Mr. Richard B. Scudder, the Chairman of the Board of MediaNews, which required annual payments of $300,000. This agreement was terminated in February 2009. During fiscal year 2009, the Company paid Mr. Scudder $200,000. Effective November 30, 2009, Mr. Scudder resigned from the Board of MediaNews.

From 1996 through July 2002, the Company advanced to the Singleton Irrevocable Trust funds to pay the premiums on cash surrender value life insurance policies covering Mr. William Dean Singleton, the Vice Chairman of the Board and Chief Executive Officer of MediaNews, and his wife. The cash surrender value life insurance policies were originally purchased in order to mitigate the impact of estate taxes that may be due on MediaNews stock held in the Singleton Revocable Trust. The Singleton Revocable Trust benefits Mr. Singleton's children. The total amount advanced as of June 30, 2009 and 2008 was $1.5 million. Advances will be repaid when the policy is surrendered or earlier at Mr. Singleton's option. No interest is charged on these advances. See Note 16: Commitments and Contingencies for further discussion of Mr. Singleton's amended employment agreement.

The Company has an employment and shareholder agreement with the Company's CEO and President. See Note 16: Commitments and Contingencies for further discussion.

Mr. Howell Begle, Jr., a board member and general counsel of the Company, was Of Counsel to Hughes Hubbard & Reed LLP, a firm which the Company uses as one of its legal counsel. During fiscal year 2009, Mr. Begle left Hughes Hubbard & Reed LLP, and the Company paid him directly for certain legal services amounting to approximately $29,000 in fiscal year 2009.

The Company is party to a management agreement with CNP, the Texas-New Mexico Newspapers Partnership and the Monterey Newspapers Partnership. Under the terms of these agreements, the partnerships pay the Company a monthly management fee, as described below, which reduces the Company's total corporate overhead, through a reduction of minority interest expense in its consolidated statements of operations. In addition to the services called for in the management agreements, the Company provides additional services to the partnerships, including sales and marketing, Web site hosting and other Internet-based services, general ledger application and accounts payable support, and purchasing and procurement services, including newsprint purchasing. Each of these services is billed monthly to the partnerships without markup. The cost of these services is not included in the management fee.

The CNP management agreement calls for annual management fees of $5.4 million, subject to annual adjustments based on actual costs and the operating performance of CNP. For fiscal years 2009 and 2008, the fee was $5.7 million and $5.6 million, respectively. The Texas-New Mexico Newspapers Partnership agreement provides MediaNews with an annual management fee of approximately $80,000 paid by the partnership, subject to annual adjustments. The Monterey Newspapers Partnership provides MediaNews with an annual management fee of $100,000 paid by the partnership, subject to annual adjustments.

The Company had a management agreement for the management of the combined operations of the *Connecticut Post*, the *News-Times* (Danbury), *The Advocate* (Stamford) and *Greenwich Time* (Greenwich) which provided for the

Company to receive management fees of $800,000 annually, subject to annual adjustments. This agreement was terminated in conjunction with the sale of the *Connecticut Post*. See Note 3: Connecticut Management Agreement and Discontinued Operations.

The Company is party to a management agreement with Fairbanks Daily News Miner, Inc. ("Fairbanks") whereby the Company is paid an annual management fee of approximately $65,000 by Fairbanks. In exchange for the fee, the Company provides some accounting and financial management to Fairbanks, as well as allows Fairbanks to participate in its risk management programs and employee benefit plans at cost, for which they reimburse the Company. At June 30, 2009 and 2008, respectively, the Company had $200,494 and $174,134 recorded in other accounts receivable for amounts due from Fairbanks. The majority of the directors and executive officers of the Company are directors and officers of Fairbanks. Fairbanks is owned 50% by the Scudder Family 1992 Trust, A Voting Trust, of which the beneficiaries are certain family members related to Mr. Richard Scudder, the Chairman of the Company's board of directors, and 50% by the Singleton Irrevocable Trust, for whom the beneficiaries are the children of Mr. William Dean Singleton, the Vice Chairman and CEO of the Company.

As of June 30, 2009, Hearst owned a portion of the Company's outstanding 6.875% and 6.375% Senior Subordinated Notes with a face value of $106.3 million and $62.0 million, respectively; at June 30, 2008, the respective amounts owned were $131.3 million and $77.0 million. Also, as of June 30, 2009 and 2008, Hearst owned $11.9 million and $16.4 million, respectively, of term loans on the Company's Bank Credit Facility. In June 2007, the Company sold an office building in Woodland Hills, California to Hearst. The Company leased back the building for one year to give the Company time to relocate to a smaller office facility. The Company paid $0.5 million and $1.9 million to Hearst for rent in fiscal years 2009 and 2008, respectively.

## Note 18:  Other (Income) Expense, Net

Included in other (income) expense, net are the following items:

|  | Years Ended June 30, | |
|---|---|---|
|  | 2009 | 2008 |
|  | (In millions) | |
| Hedging, net | (0.6) | 0.8 |
| Litigation and settlement[1] | 0.7 | (2.9) |
| Gain on extinguishment of debt and write-off of deferred debt costs | (2.0) | (41.1) |
| Preferred return on Detroit JOA investment | (1.5) | (1.5) |
| Restructuring costs, operational | 14.4 | 7.9 |
| Restructuring costs, debt | 6.0 | — |
| Other | 10.9 | (0.6) |
|  | $  27.9 | $ (37.4) |

(1) Includes legal fees and settlement costs associated with the recovery of fees associated with the Par Ridder litigation resolved in early fiscal year 2008.

## Note 19:  Workforce Reductions and Other Restructuring

The Company is implementing workforce reductions and other restructuring activities at certain of its newspaper properties. The workforce reductions and restructuring costs are related to the consolidation of existing operations, including consolidation of editorial, administration, finance, and production and printing of its newspapers and regional clusters. The Denver Newspaper Agency also has implemented significant workforce reductions and incurred restructuring costs as a part of its new plant project and business reorganization. These restructurings continue to evolve and are thus a work in process. As a result, the Company has not finalized all of its consolidation and workforce reduction programs or made all the announcements regarding such planned workforce reductions as of June 30, 2009. All costs associated with workforce reduction programs and restructuring costs, the majority of which are severance-related, have been or will be recorded in accordance with the provisions of SFAS No. 146, *Accounting for Costs Associated with Exit or Disposal Activities* or EITF Issue 95-3, *Recognition of Liabilities in Connection with a Purchase*

*Business Combination,* as applicable. Under these pronouncements, certain of the costs of the workforce reductions and restructuring costs at the acquired newspapers were treated as additional acquisition costs (for the year ended June 30, 2008, approximately $2.2 million was recorded as acquisition cost) while those related to the newspapers already owned by the Company were expensed (approximately $14.4 million and $7.9 million for the years ended June 30, 2009 and 2008).

## Note 20: Career Restricted Stock Unit Plan

Effective June 29, 2005, the Company adopted a Career Restricted Stock Unit ("RSU") Plan that is intended to encourage retention and reward performance of selected senior management of the Company and its affiliates over a significant period of time.

The RSU Plan is administered by the Company's Board of Directors (or a designated committee). The RSU Plan provides for the award to members of senior management selected by the board (or committee) for participation in the Plan of such number of restricted stock units ("RSUs") at such time or times as determined by the board (or committee) in its discretion. Each RSU represents the right to receive one share of the Company's Class B Common Stock (which is non-voting and does not pay dividends, but which is convertible into Class A in certain circumstances), subject to vesting and other requirements. RSUs granted to a participant vest upon the later to occur of:

- the earlier of (x) the completion of 20 years of continuous service with the Company or its affiliates or (y) attainment of age 67 while still employed by the Company or its affiliates; or

- the date on which the participant (a) has completed at least five years of participation in the RSU Plan and (b) has either 20 years of service with the Company or a combined age and years of service with the Company and or affiliates of at least 72.

RSUs also fully vest upon the occurrence of a "Change in Control" (as defined) and vest pro rata in the event of the participant's death, disability or termination of employment by the Company without cause. Any RSUs not so vested are forfeited upon the participant's termination of employment, unless otherwise determined by the board of directors (or committee) in its sole discretion.

Shares of the Company's Class B Common Stock are issued to holders of vested RSUs upon the earliest of the participant's separation from service, the participant's disability and the occurrence of a "Qualified Change in Control" (as defined).

Recipients of shares issued pursuant to RSUs have the right to require the Company to repurchase a number of shares at their then fair market value (as determined by formula outlined in the RSU Plan) that is sufficient to enable them to pay taxes due in connection with such issuance, provided that the board of directors may suspend such right at any time. At any time following the six-month anniversary of the date of issuance of shares of such Class B Common Stock, the Company has the right to repurchase such shares at their then fair market value (as determined by formula outlined in the RSU Plan). Such repurchase rights will terminate if the Company consummates an initial public offering.

The issuance of up to 150,000 shares of the Company's Class B Common Stock is authorized under the RSU Plan. RSU grants of 12,419 units made to certain executive officers of the Company remain outstanding at June 30, 2009 and 2008. The Company is recognizing expense related to the RSU Plan based on the fair value of the shares at the initial grant date. The fair value of the RSU grants measured as of grant dates was approximately $3.9 million. Approximately $0.8 million and $0.9 million was recognized in selling, general and administrative expense in fiscal years 2009 and 2008, respectively. None of these grants have vested. As of June 30, 2009, the total compensation cost related to nonvested grants not yet recognized was $0.9 million and is expected to be recognized over a remaining weighted average period of approximately 2 years. Based on the formula in the RSU Plan, the current fair market value of the outstanding grants is $0.

## Note 21: Restructuring and Reorganization Plan

Over the past two years, the Company and the newspaper industry have experienced unprecedented declines in advertising revenues due to the current economic recession as well as secular declines in certain advertising categories. In response to these unprecedented revenue declines, the Company significantly reduced its operating costs to preserve

its cash flows. However, despite these cost cutting efforts, the Company experienced a significant decline in its cash flows from operations, resulting in significant asset impairment charges and ultimately defaults under the Company's Bank Credit Facility and Senior Subordinated Notes. The Company has entered into forbearance agreements with the lenders under the Bank Credit Facility and the holder of the majority of both issues of the Senior Subordinated Notes as is more fully described in Note: 10 Debt.

In accordance with the Bank Credit Facility Forbearance Agreement, the Company and the senior lenders have negotiated a plan to restructure the debt under the Bank Credit Facility. The plan of reorganization calls for the senior lenders to forgive approximately $433.0 million of senior debt, leaving the Company with a new term loan facility of approximately $150.0 million. In connection with the debt forgiveness, all of the current outstanding common and preferred stock in the Company would be cancelled. The Company will then be recapitalized with the senior lenders owning a majority of the Company's newly issued Class B common stock, representing substantially all of the common equity of the recapitalized Company. The Company's CEO and President will receive all the shares of newly issued Class A common stock in the Company. The Class A common stock holders will have the right to appoint the majority of the reorganized Company's board of directors.

Under the proposed reorganization plan, the Senior Subordinated Note holders will receive very little recovery, if any.

The Company has not reached a definitive agreement with either its senior lenders or Senior Subordinated Note holders, and the actual reorganization and restructuring of the Company could be substantially different from the terms outlined above. In addition, there are no guarantees that the Company will be able to reach a definitive agreement with its lenders regarding its reorganization and restructuring and, accordingly, continue as a going concern.

The Company plans to commence a solicitation of its senior lenders and holders of subordinated notes on or about December 18, 2009, seeking approval from its creditors of a pre-packaged plan of reorganization under Chapter 11 of the Bankruptcy Code.

## Note 22: Subsequent Event

Effective December 1, 2009, the Company sold the land and building in Valencia, California formerly used to print certain of its newspapers and received net proceeds of approximately $7.8 million. As of June 30, 2009, the land and building were recorded in other current assets as assets held for sale. The accounting for the sale is not expected to have a material impact on the Company's financial condition or results of operations.