# Plan Exhibit 6

New Senior Credit Facility Term Sheet

[THIS PAGE INTENTIONALLY LEFT BLANK]

## SUMMARY OF TERMS AND CONDITIONS

## NEW SENIOR CREDIT FACILITY

Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the plan of reorganization (the "*Plan*") to which this Summary of Terms and Conditions is attached.

| | |
|---|---|
| BORROWER: | Reorganized AMI, a Delaware corporation (whose name will be changed to MediaNews Group, Inc. on the Effective Date; the "*Borrower*"). |
| GUARANTORS: | The New Senior Credit Facility will be guaranteed by each existing and future direct and indirect domestic and, to the extent no material adverse tax consequences would result, foreign wholly-owned subsidiary of the Borrower (collectively, the "*Guarantors*"). All guarantees will be guarantees of payment and not of collection. |
| ADMINISTRATIVE AND COLLATERAL AGENT: | Bank of America, N.A. ("*Bank of America*") will act as sole administrative and collateral agent (the "*Administrative Agent*"). |
| SOLE LEAD ARRANGER AND SOLE BOOKRUNNER: | Banc of America Securities LLC. |
| LENDERS: | The holders of Senior Loan Claims (collectively, the "*Lenders*"). |
| NEW SENIOR CREDIT FACILITY: | An aggregate principal amount of up to $163.875 million will be available through the following facilities: |

*LOC Facility*: $13.875 million four-year letter of credit facility (the "*LOC Facility*"), which will include two tranches of standby letters of credit (each a "*Letter of Credit*"). The "*Tranche A Facility*" will result from an automatic rollover of $6.375 million of the Borrower's existing letters of credit outstanding on the Closing Date under the Senior Credit Agreement; the Lenders holding the revolving loans under the Senior Credit Agreement will continue this extension of credit *pro rata* based on their current participation in such revolving loans. The "*Tranche B Facility*", in the amount of $7.5 million, will be provided as a separate new extension of credit by certain of the Lenders. Letters of Credit will be issued by Bank of America (in such capacity, the "*Fronting Bank*"), and each Lender will purchase an irrevocable and unconditional participation in each Letter of Credit.

*Term Loan Facility*: a $150 million term loan facility (the "*Term Loan Facility*"). No drawings under the Term Loan Facility will occur: each Lender will receive a note issued under the Term Loan Facility in a principal amount representing such Lender's *pro rata* share of the Senior

|  |  |
|---|---|
|  | Loan Claims, in partial satisfaction of its Senior Loan Claim as contemplated by the Plan.<br><br>The LOC Facility and the Term Loan Facility are collectively referred to herein as the "*New Senior Credit Facility*". |
| CLOSING DATE: | The execution of definitive loan documentation, to occur concurrently with the consummation of the Plan (the "*Closing Date*"). |
| INTEREST RATES: | As set forth in Addendum I. |
| MATURITY: | The LOC Facility shall terminate and all amounts outstanding thereunder shall be due and payable in full four years after the Closing Date.<br><br>The Term Loan Facility shall be subject to repayment according to the Scheduled Amortization (as hereinafter defined), with the final payment of all amounts outstanding, *plus* accrued interest, being due four years after the Closing Date. |
| AVAILABILITY/SCHEDULED AMORTIZATION: | The Term Loan Facility will be subject to quarterly amortization of principal, in equal installments, beginning on the last day of the first calendar quarter following the Closing Date, in aggregate amounts for each year as follows: $1.0 million to be payable in the first year, $5.0 million to be payable in the second year, $7.5 million to be payable in the third year, and $7.5 million to be payable over the first three quarters of the fourth year, with the balance payable at maturity (the "*Scheduled Amortization*"). |
| MANDATORY PREPAYMENTS: | In addition to the Scheduled Amortization set forth above, (a) 50% of Excess Cash Flow (to be defined in the loan documentation) beginning with Excess Cash Flow for the fiscal year commencing July 1, 2010 (and payable following the completion of the relevant fiscal year), (b) 100% of all net cash proceeds from sales of property and assets of the Borrower and its subsidiaries (excluding sales of inventory in the ordinary course of business and other exceptions to be agreed upon in the loan documentation, and provided that in the case of sales of property and assets by non-wholly owned subsidiaries, net cash proceeds will include only such proceeds as are distributed to the Borrower or any Guaranteeing Subsidiary), (c) 75% of all net cash proceeds from the issuance of additional equity interests in the Borrower or any of its subsidiaries otherwise permitted under the loan documentation, (d) 100% of all net cash proceeds from the issuance or incurrence after the Closing Date of additional debt of the Borrower or any of its subsidiaries otherwise permitted under the loan documentation (other than the Junior Basket Debt (as hereinafter defined)), and (e) 100% of all net cash proceeds of Extraordinary Receipts (to be defined in the loan documentation and to exclude cash receipts in the ordinary course of business) shall be applied to the prepayment of the New Senior Credit Facility in the following manner: *first*, to the Term Loan Facility (and to the principal installments thereof on a *pro rata* basis); *second*, to cash- |

|  |  |
|---|---|
| | collateralize any Letters of Credit under the Tranche B Facility; and *third*, to cash collateralize any Letters of Credit under the Tranche A Facility. |
| OPTIONAL PREPAYMENTS: | The Borrower may prepay the Term Loan Facility in whole or in part at any time without premium or penalty, subject to reimbursement of the Lenders' breakage and redeployment costs in the case of prepayment of LIBOR loans other than at the end of an interest period. Each such prepayment of the Term Loan Facility shall be applied to the principal installments thereof on a *pro rata* basis. |
| SECURITY: | The Borrower and each of the Guarantors shall grant the Administrative Agent and the Lenders valid and perfected first-priority (subject to certain exceptions to be set forth in the loan documentation) liens and security interests in substantially all of the assets of the Borrower and the Guarantors, including the following: |

(a) All present and future shares of capital stock of (or other ownership or profit interests in) each of its present and future wholly-owned subsidiaries (limited, in the case of each entity that is a "controlled foreign corporation" under Section 957 of the Internal Revenue Code, to a pledge of 66% of the capital stock of each such first-tier foreign subsidiary to the extent the pledge of any greater percentage would result in material adverse tax consequences to the Borrower).

(b) All present and future intercompany debt of the Borrower and each Guarantor.

(c) All of the present and future property and assets, real and personal, of the Borrower and each Guarantor, including, but not limited to, machinery and equipment, inventory and other goods, accounts receivable, owned real estate, leaseholds, fixtures, bank accounts, general intangibles, financial assets, investment property, license rights, patents, trademarks, tradenames, copyrights, chattel paper, insurance proceeds, contract rights, hedge agreements, documents, instruments, indemnification rights, tax refunds and cash.

(d) All proceeds and products of the property and assets described in clauses (a), (b) and (c) above.

The liens and security interests referred to above shall ratably secure the relevant party's obligations in respect of the New Senior Credit Facility, subject to the first-priority claim of obligations in respect of the Tranche B Facility under the LOC Facility and thereafter to secure the other obligations under the New Senior Credit Facility *pro rata*.

CONDITIONS PRECEDENT
TO CLOSING: The closing and the initial extension of credit under the New Senior Credit Facility will be subject to satisfaction of the conditions precedent deemed appropriate by the Administrative Agent and a majority in

number of the members of the Senior Lender Steering Committee including, but not limited to, the following:

(i) The negotiation, execution and delivery of definitive documentation with respect to the New Senior Credit Facility satisfactory to the Administrative Agent and a majority in number of the members of the Senior Lender Steering Committee.

(ii) All filings, recordations and searches necessary or desirable in connection with the liens and security interests referred to above under the section entitled "*Security*" shall have been duly made; all filing and recording fees and taxes shall have been duly paid and any surveys, title insurance, landlord waivers and access letters requested by the Administrative Agent with respect to real property interests of the Borrower and its subsidiaries shall have been obtained. The amount, types and terms and conditions of all insurance maintained by the Borrower and its subsidiaries shall be satisfactory to the Administrative Agent and a majority in number of the members of the Senior Lender Steering Committee; and the Administrative Agent shall have received endorsements naming it, on behalf of the Lenders, as an additional insured or loss payee, as the case may be, under all insurance policies to be maintained with respect to the properties of the Borrower and its subsidiaries forming part of the Lenders' collateral described under the section entitled "*Security*" set forth above.

(iii) The Administrative Agent shall have received (A) satisfactory opinions of counsel to the Borrower and the Guarantors (which shall cover, among other things, authority, legality, validity, binding effect and enforceability of the documents for the New Senior Credit Facility, but not priority of liens) and of appropriate local counsel and such corporate resolutions, certificates and other documents as the Lenders shall reasonably require and (B) satisfactory evidence that the Administrative Agent (on behalf of the Lenders) shall have a valid and perfected first-priority (subject to certain exceptions to be set forth in the loan documentation) lien and security interest in such capital stock and in the other collateral referred to under the section entitled "*Security*" set forth above.

(iv) The Borrower shall have obtained a corporate credit rating from Standard & Poor's Ratings Service ("*S&P*") and a corporate family rating from Moody's Investors Service, Inc. ("*Moody's*"), in each case with respect to the Borrower, and ratings for the New Senior Credit Facility from each of S&P and Moody's.

(v) The confirmation of the Plan by the bankruptcy court and the effectiveness thereof.

CONDITIONS PRECEDENT TO
THE ISSUANCE OR
EXTENSION OF LETTERS
OF CREDIT:   Usual and customary for transactions of this type, including, without limitation, the following: (i) all of the representations and warranties in the loan documentation shall be true and correct in all material respects as of the date of such extension of credit (or, to the extent a different date is specified in such representations and warranties, as of such other date) and (ii) no event of default under the New Senior Credit Facility or incipient default shall have occurred and be continuing, or would result from such extension of credit.

REPRESENTATIONS
AND WARRANTIES:   Usual and customary for transactions of this type, but taking into account the organizational structure of the Borrower and its Subsidiaries to the extent necessary, including, without limitation, the following: (i) legal existence, qualification and power; (ii) due authorization and no contravention of law, contracts, judgments or organizational documents; (iii) governmental and third party approvals and consents; (iv) enforceability; (v) accuracy and completeness of specified financial statements and other information and no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect (to be defined in the loan documentation); (vi) no material litigation (other than certain disclosed litigation), and no adverse change in the status, or the reasonably anticipated financial effect on the Borrower and its subsidiaries, of such disclosed litigation; (vii) no default; (viii) ownership of property (including disclosure of liens, properties, leases and investments); (ix) labor matters; (x) insurance matters; (xi) environmental matters; (xii) tax matters; (xiii) ERISA compliance; (xiv) identification of subsidiaries, equity interests and loan parties; (xv) use of proceeds and not engaging in business of purchasing/carrying margin stock; (xvi) status under Investment Company Act; (xvii) accuracy of disclosure; (xviii) compliance with laws; (xix) intellectual property; (xx) solvency; (xxi) no casualty; and (xxii) collateral documents.

COVENANTS:   Usual and customary for transactions of this type, but taking into account the organizational structure of the Borrower and its Subsidiaries to the extent necessary, including, without limitation, the following:

(a) <u>Affirmative Covenants</u> - (i) delivery of consolidated and consolidating financial statements, budgets and forecasts; (ii) delivery of certificates and other information; (iii) delivery of notices (of any default, material adverse condition, ERISA event, material litigation, material change in accounting or financial reporting practices, disposition of property, sale of equity, incurrence of debt); (iv) payment of obligations; (v) preservation of existence; (vi) maintenance of properties; (vii) maintenance of insurance; (viii) compliance with laws; (ix) maintenance of books and records; (x) inspection rights; (xi) covenant to guarantee obligations, give security; (xii) upstreaming of all distributable cash

5

from joint operating agreement ("*JOA*") entities (subject to the terms of the organizational documents and agreements of such JOAs); (xiii) compliance with environmental laws; (xiv) further assurances; (xv) compliance with terms of leaseholds; (xvi) compliance with material contracts; and (xvii) use of commercially reasonable efforts to maintain a corporate credit rating from S&P and a corporate family rating from Moody's, in each case with respect to the Borrower, and a rating of the New Senior Credit Facility by each of S&P and Moody's.

(b) <u>Negative Covenants</u> - Restrictions on (i) liens; (ii) indebtedness, (including guarantees and other contingent obligations); (iii) investments (including loans and advances); (iv) mergers and other fundamental changes; (v) sales and other dispositions of property or assets; (vi) payments of dividends and other distributions; (vii) changes in the nature of business; (viii) transactions with affiliates; (ix) burdensome agreements; (x) capital expenditures; (xi) amendments of organizational documents; (xii) changes in accounting policies or reporting practices; (xiii) prepayments of other indebtedness; (xiv) modification or termination of documents related to certain indebtedness; and (xv) lease obligations, in each case subject to appropriate baskets and other exceptions as may be agreed upon in the loan documentation taking into account the leveraged nature of the credit under the New Senior Credit Facility.

(c) <u>Financial Covenants</u> - the following:

- Maximum Consolidated Leverage Ratio.

- Minimum Consolidated Fixed Charge Coverage Ratio.

- Restrictions on the incurrence of junior debt that is unsecured and contractually subordinated to the New Senior Credit Facility on terms satisfactory to the Administrative Agent (the "*Junior Debt Basket*").

Financial Covenant levels are to be reflected in the attached Schedule A.[1]

Appropriate adjustments will be made to the definition of "Consolidated EBITDA" (to be defined in the loan documentation) to take account of any non-cash charges attributable to "fresh start" accounting following consummation of the Plan. Each of the ratios referred to above will be calculated on a consolidated basis for each consecutive four fiscal quarter period, except that during the first

---

[1] Please note the applicable covenant levels will be provided in a supplement to the Disclosure Statement in advance of the Voting Deadline (as defined in the Disclosure Statement).

|  |  |
|---|---|
| | year following the Closing Date such calculations shall be made for the period of time since the Closing Date and, where appropriate, annualized. |
| EVENTS OF DEFAULT: | Usual and customary in transactions of this type, but taking into account the organizational structure of the Borrower and its Subsidiaries to the extent necessary, including, without limitation, the following: (i) nonpayment of principal, interest, fees or other amounts (in the case of nonpayment of interest, fees and other amounts, with customary grace periods); (ii) failure to perform or observe covenants set forth in the loan documentation within a specified period of time, where customary and appropriate, after such failure; (iii) any representation or warranty proving to have been incorrect in any material respect when made or confirmed; (iv) cross-default to other indebtedness in an amount to be agreed; (v) bankruptcy and insolvency defaults (with grace period for involuntary proceedings); (vi) inability to pay debts; (vii) monetary judgment defaults in an amount to be agreed and material nonmonetary judgment defaults; (viii) customary ERISA defaults; (ix) actual or asserted invalidity or impairment of any loan documentation; and (x) change of control.

The obligations under the New Senior Credit Facility will share equally and ratably in the collateral granted under the applicable security documents, except that obligations in respect of the Tranche B Facility will have a first-priority claim to distribution of proceeds in the case of post-default payments or bankruptcy or other post-acceleration circumstances following the effective date. |
| ASSIGNMENTS AND PARTICIPATIONS: | *LOC Facility Assignments*: Subject to the consents described below (which consents will not be unreasonably withheld or delayed), each Lender will be permitted to make assignments to other financial institutions in respect of either tranche of the LOC Facility in a minimum amount equal to $500,000 (or, if less, the entire amount of such Lender's interest).

*Term Loan Facility Assignments*: Subject to the consents described below (which consents will not be unreasonably withheld or delayed), each Lender will be permitted to make assignments to other financial institutions in respect of the Term Loan Facility in a minimum amount equal to $1 million (or, if less, the entire amount of such Lender's interest).

*Consents*: The consent of the Borrower will be required unless (i) an Event of Default has occurred and is continuing or (ii) the assignment is to a Lender, an affiliate of a Lender or an Approved Fund (as such term shall be defined in the loan documentation). The consent of the Administrative Agent will be required for any assignment (i) in respect of the LOC Facility to an entity that is not a Lender under the LOC Facility, an affiliate of such Lender or an Approved Fund in respect of such Lender or (ii) of any outstanding term loan to an entity that is not a |

Lender, an affiliate of a Lender or an Approved Fund. The consent of the Fronting Bank will be required for any assignment under the LOC Facility.

*Assignments Generally*: An assignment fee in the amount of $3,500 will be charged with respect to each assignment unless waived by the Administrative Agent in its sole discretion. Each Lender will also have the right, without consent of the Borrower or the Administrative Agent, to assign as security all or part of its rights under the loan documentation to any Federal Reserve Bank.

*Participations*: Lenders will be permitted to sell participations with voting rights limited to significant matters such as changes in amount, rate, maturity date and releases of all or substantially all of the collateral securing the New Senior Credit Facility or all or substantially all of the value of the guaranties of the Borrower's obligations made by the Guarantors.

WAIVERS AND AMENDMENTS:

Amendments and waivers of the provisions of the loan agreement and other definitive credit documentation will require the approval of Lenders holding loans and commitments representing more than 50% of the aggregate amount of the loans and commitments under the New Senior Credit Facility (the "**Required Lenders**"), except that (a) the consent of each Lender shall be required with respect to (i) the amendment of certain of the pro rata sharing provisions, (ii) the amendment of the voting percentages of the Lenders, (iii) the release of all or substantially all of the collateral securing the New Senior Credit Facility, and (iv) the release of all or substantially all of the value of the guaranties of the Borrower's obligations made by the Guarantors; (b) the consent of each Lender affected thereby shall be required with respect to (i) increases or extensions in the commitment of such Lender, (ii) reductions of principal, interest or fees, and (iii) extensions of the final maturity date; (c) any waiver or amendment of the Scheduled Amortization provisions will require the approval of Lenders holding at least 80% of the aggregate amount of the loans under the Term Loan Facility; and (d) any waiver or amendment of the provisions affecting the first-priority claim of obligations in respect of the Tranche B Facility will not be effective without the approval of Lenders holding at least 80% of the aggregate amount of the commitments under the Tranche B Facility.

INDEMNIFICATION:

The Borrower will indemnify and hold harmless the Administrative Agent, each Lender and their respective affiliates and their partners, directors, officers, employees, agents and advisors from and against all losses, claims, damages, liabilities and expenses arising out of or relating to the New Senior Credit Facility, the Borrower's use of the New Senior Credit Facility or the commitments, including, but not limited to, reasonable attorneys' fees (including the allocated cost of internal counsel) and settlement costs. This indemnification shall survive and continue for the benefit of all such persons or entities.

8

| | |
|---|---|
| GOVERNING LAW: | State of New York. |
| PRICING/FEES/ EXPENSES: | As set forth in Addendum I. |
| OTHER: | Each of the parties shall (i) waive its right to a trial by jury and (ii) submit to New York jurisdiction. Neither the Administrative Agent nor any Lender shall be liable for any reason whatsoever for any special, indirect, punitive or consequential damages. |

## ADDENDUM I
## PRICING, FEES AND EXPENSES

**INTEREST RATES:** The interest rates per annum applicable to the New Senior Credit Facility will be LIBOR (which shall be at least 2.50%) *plus* the Applicable Margin (as hereinafter defined). *"Applicable Margin"* means 6.00% per annum, in the case of LIBOR loans.

Interest shall be payable at the end of the interest period.

During the continuance of any default under the loan documentation, the Applicable Margin on obligations owing under the loan documentation shall increase by 2.00% per annum (subject, in all cases other than a default in the payment of principal when due, to the request of the Required Lenders).

**ADMINISTRATIVE AGENT/ COLLATERAL AGENT FEE:** Usual and customary annual administrative fees.

**UNDERWRITING FEE FOR TRANCHE B FACILITY:** 2.00% of each Lender's commitment under the Tranche B Facility shall be payable to such Lender on the Closing Date.

**LETTER OF CREDIT FEES:** Letter of Credit fees shall be payable on the maximum amount available to be drawn under each Letter of Credit at a rate per annum as set forth below. Such fees will be (a) payable quarterly in arrears, commencing on the last day of the first calendar quarter following the Closing Date, and (b) shared proportionately by the Lenders under the LOC Facility.

Letter of Credit fee (on issued Letters of Credit): 6.00%.

Letter of Credit commitment fee: 1.00% per annum shall be payable on the actual daily unused portion of the LOC Facility. Such fee shall be payable quarterly in arrears, commencing on the last day of the first calendar quarter following the Closing Date.

Letter of Credit fronting fee: a fronting fee of 0.25% shall be payable to the Fronting Bank for its own account.

**CALCULATION OF INTEREST AND FEES:** Other than calculations in respect of interest at the Bank of America prime rate (which shall be made on the basis of actual number of days elapsed in a 365/366 day year), all calculations of interest and fees shall be made on the basis of actual number of days elapsed in a 360 day year.

**COST AND YIELD PROTECTION:** Customary for transactions and facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves

|  |  |
|---|---|
|  | without proration or offset and payments free and clear of withholding or other taxes. |
| EXPENSES: | The Borrower will pay all reasonable costs and expenses associated with the administration of all loan documentation, including, without limitation, the legal fees of counsel to the Administrative Agent. The Borrower will also pay the expenses of the Administrative Agent and each Lender in connection with the enforcement of any of the loan documentation. |

## SCHEDULE A
## FINANCIAL COVENANT LEVELS[2]

| Quarter Ending | Maximum Consolidated Leverage Ratio | Minimum Consolidated Fixed Charge Coverage Ratio |
|---|---|---|
| June 30, 2010 | | |
| September 30, 2010 | | |
| December 31, 2010 | | |
| March 31, 2011 | | |
| June 30, 2011 | | |
| September 30, 2011 | | |
| December 31, 2011 | | |
| March 31, 2012 | | |
| June 30, 2012 | | |
| September 30, 2012 | | |
| December 31, 2012 | | |
| March 31, 2013 | | |
| June 30, 2013 | | |
| September 30, 2013 | | |
| December 31, 2013 | | |

---

[2] Please note the applicable covenant levels will be provided in a supplement to the Disclosure Statement in advance of the Voting Deadline (as defined in the Disclosure Statement).