# Plan Exhibit 10

Stockholders' Agreement

[THIS PAGE INTENTIONALLY LEFT BLANK]

**MEDIANEWS GROUP, INC.**
**STOCKHOLDERS' AGREEMENT**

dated as of

_____ __, 2010

# TABLE OF CONTENTS

PAGE

### Article 1
### DEFINITIONS

Section 1.01. Definitions.................................................................................................. 1
Section 1.02. Other Definitional and Interpretative Provisions ................................................ 6

### Article 2
### CORPORATE GOVERNANCE

Section 2.01. Required Class B Director Consents................................................................ 6
Section 2.02. Additional Class B Director Rights ................................................................ 8
Section 2.03. Required Class B Stockholder Consent Rights.................................................... 8
Section 2.04. Voting Restriction On Class A Holders ........................................................... 9
Section 2.05. Termination.............................................................................................. 9

### Article 3
### RESTRICTIONS ON TRANSFER

Section 3.01. General Restrictions On Transfer .................................................................. 9
Section 3.02. Limitations On Transfer.............................................................................. 9
Section 3.03. Legends ................................................................................................ 10
Section 3.04. Appointment and Role of Transfer Agent ...................................................... 13

### Article 4
### TAG-ALONG RIGHTS; PREEMPTIVE RIGHTS

Section 4.01. Tag-Along Rights...................................................................................... 13
Section 4.02. Preemptive Rights .................................................................................... 15
Section 4.03. Termination............................................................................................ 16

### Article 5
### REGISTRATION RIGHTS

Section 5.01. General Restriction on Listing and Demand Rights .......................................... 16
Section 5.02. Listing Rights.......................................................................................... 17
Section 5.03. Demand Registration ................................................................................ 17
Section 5.04. Piggyback Registration .............................................................................. 20
Section 5.05. Lock-Up Agreements ................................................................................ 21
Section 5.06. Registration Procedures ............................................................................. 21
Section 5.07. Indemnification by the Company.................................................................. 24
Section 5.08. Indemnification by Participating Stockholders.................................................. 24

i

Section 5.09. Conduct of Indemnification Proceedings...........................................................25
Section 5.10. Contribution ...................................................................................................25
Section 5.11. Participation in Public Offering ........................................................................26
Section 5.12. Other Indemnification .....................................................................................27
Section 5.13. Cooperation by the Company ...........................................................................27
Section 5.14. No Transfer of Registration Rights...................................................................27
Section 5.15. Limitations on Subsequent Registration Rights.................................................27

Article 6
INFORMATION RIGHTS

Section 6.01. Reports by the Company...................................................................................27
Section 6.02. Termination.....................................................................................................28
Section 6.03. Confidentiality ...............................................................................................28

Article 7
MISCELLANEOUS

Section 7.01. Binding Effect; Assignability; Benefit...............................................................29
Section 7.02. Notices ...........................................................................................................30
Section 7.03. Waiver; Amendment; Termination ...................................................................31
Section 7.04. Other Businesses; Waiver of Certain Duties .....................................................31
Section 7.05. Governing Law ...............................................................................................31
Section 7.06. Jurisdiction.....................................................................................................32
Section 7.07. WAIVER OF JURY TRIAL.............................................................................32
Section 7.08. Specific Enforcement......................................................................................32
Section 7.09. Counterparts; Effectiveness ............................................................................32
Section 7.10. Entire Agreement............................................................................................32
Section 7.11. Severability ....................................................................................................32

Exhibit A        Joinder Agreement

## STOCKHOLDERS' AGREEMENT

STOCKHOLDERS' AGREEMENT dated as of [ ] (this "**Agreement**") among (i) MediaNews Group, Inc., a Delaware corporation (the "**Company**") and (ii) the holders of Class A Common Stock listed on <u>Schedule I</u> hereto, the holders of Class B Common Stock listed on <u>Schedule II</u> hereto, the holders of Class C Common Stock listed on <u>Schedule III</u> hereto and the holders of Warrants listed on <u>Schedule IV</u> hereto (collectively, together with any other Person executing a Joinder Agreement (as defined below) at any time after the date hereof in accordance with the terms of this Agreement, the "**Stockholders**").

### W I T N E S S E T H :

WHEREAS, on [ ], the Company filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

WHEREAS, on [ ], the United States Bankruptcy Court for the District of Delaware in case No. [ ] ( ) entered an order confirming the Plan of Reorganization for the Company pursuant to the Bankruptcy Code (the "**Plan**");

WHEREAS, pursuant to the Plan, the Company was authorized to enter into this Agreement and each Stockholder is deemed to hold its Common Shares (as defined below) or Warrants (as defined below), as applicable, subject to the terms and conditions of this Agreement; and

WHEREAS, each Stockholder is on the date hereof the holder of the number of shares of Common Stock or Warrants, as applicable, as set forth on Schedule I, Schedule II, Schedule III or Schedule IV hereto;

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, the parties hereto agree as follows:

### ARTICLE 1
DEFINITIONS

*Section 1.01. Definitions.* (a)  The following terms, as used herein, have the following meanings:

"**Affiliate**" shall have the meaning assigned to such term in Rule 12b-2 under the Exchange Act.

"**Aggregate Ownership**" means, with respect to any Stockholder or group of Stockholders, the total number of Common Shares owned by such Stockholder or group of Stockholders as of the date of such calculation, calculated on a Fully-Diluted basis.

"**Board**" means the board of directors of the Company.

"**Business Day**" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"**Bylaws**" means the Amended and Restated Bylaws of the Company, as the same may be amended from time to time.

"**Certificate of Incorporation**" means the Sixth Amended and Restated Certificate of Incorporation of the Company, as the same may be amended from time to time.

"**Class A Common Stock**" means the Company's Class A common stock, par value of $0.001 per share.

"**Class A Directors**" means the directors of the Company who are elected by the holders of the Class A Common Stock.

"**Class A Full Conversion Date**" means the date on which all Class A Common Stock has been converted to Class B Common Stock pursuant to the Certificate of Incorporation.

"**Class A Holders**" means, as of any time after the Class A Full Conversion Date, the holders of more than 50% of the shares of Class B Common Stock outstanding at such time held by Persons who were, prior to the Class A Full Conversion Date, holders of Class A Common Stock or transferees of such holders pursuant to Section 3.02(a) or 3.02(b).

"**Class B Common Stock**" means the Company's Class B common stock, par value of $0.001 per share.

"**Class B Directors**" means the directors of the Company who are elected by the holders of the Class B Common Stock.

"**Class C Common Stock**" means the Company's Class C common stock, par value of $0.001 per share.

"**Common Shares**" means shares of Common Stock.

"**Common Stock**" means, collectively, the Class A Common Stock, the Class B Common Stock and the Class C Common Stock.

"**Company Securities**" means (i) the Common Stock, (ii) securities convertible into or exchangeable for Common Stock, (iii) any other equity or equity-linked security issued by the Company and (iv) options, warrants or other rights to acquire Common Stock or any other equity or equity-linked security issued by the Company.

"**Effective Date**" means the date on which the Bankruptcy Court order confirming the Plan becomes a final order.

"**Equity Incentive Plan**" means the equity incentive plan described in the Plan.

2

"**Exchange Act**" means the Securities Exchange Act of 1934 and all rules, regulations and orders issued thereunder, as any of the same may be amended from time to time.

"**FINRA**" means the Financial Industry Regulatory Authority.

"**First Public Offering**" means the first Public Offering after the date hereof.

"**Fully-Diluted**" means all outstanding Common Shares and all Common Shares issuable in respect of Company Securities, *provided* that, if any of the foregoing Company Securities are subject to vesting, the Common Shares subject to vesting shall be included in the definition of "Fully-Diluted" only upon and to the extent of such vesting.

"**GAAP**" means United States generally accepted accounting principles.

"**Initial Plan**" means the Company's Prepackaged Plan of Reorganization dated December 18, 2009.

"**Other Stockholder**" means all Stockholders other than the Tag-Along Seller.

"**Person**" means an individual, corporation, limited liability company, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Public Offering**" means any underwritten public offering of Common Stock, whether involving a primary offering or a combined primary and secondary offering, pursuant to an effective registration statement under the Securities Act other than pursuant to a registration statement on Form S-4 or Form S-8 or any successor or similar form.

"**Qualified Public Offering**" means an underwritten Public Offering involving the sale of at least 15% of the outstanding Common Stock of the Company after giving effect to such Public Offering.

"**Registrable Securities**" means, at any time, any Common Shares and any securities issued or issuable in respect of such Common Shares by way of conversion, exchange, stock dividend, split or combination, recapitalization, merger, consolidation, other reorganization or otherwise until (i) a registration statement covering such Common Shares has been declared effective by the SEC and such Common Shares have been disposed of pursuant to such effective registration statement or (ii) such Common Shares are sold in a public resale under Rule 144 (or any similar provisions then in force) under the Securities Act.

"**Registration Expenses**" means any and all expenses incident to the performance of or compliance with any registration or marketing of securities, including all (i) registration and filing fees, and all other fees and expenses payable in connection with the listing of securities on any securities exchange or automated interdealer quotation system, (ii) fees and expenses of compliance with any securities or "blue sky" laws (including reasonable fees and disbursements of counsel in connection with "blue sky" qualifications of the securities registered), (iii) expenses in connection with the preparation, printing, mailing and delivery of any registration statements, prospectuses and other documents in connection therewith and any amendments or supplements

3

thereto, (iv) security engraving and printing expenses, (v) internal expenses of the Company (including all salaries and expenses of its officers and employees performing legal or accounting duties), (vi) reasonable fees and disbursements of counsel for the Company and customary fees and expenses for independent certified public accountants retained by the Company (including the expenses relating to any comfort letters or costs associated with the delivery by independent certified public accountants of any comfort letters requested pursuant to Section 5.05(h)), (vii) reasonable fees and expenses of any special experts retained by the Company in connection with such registration, (viii) reasonable fees, out-of-pocket costs and expenses of the Stockholders, including one counsel for all of the Stockholders participating in the offering selected by the Stockholders holding the majority of the Registrable Securities to be sold for the account of all Stockholders in the offering, (ix) fees and expenses in connection with any review by the FINRA of the underwriting arrangements or other terms of the offering, and all fees and expenses of any "qualified independent underwriter," including the fees and expenses of any counsel thereto, (x) fees and disbursements of underwriters customarily paid by issuers or sellers of securities, but excluding any underwriting fees, discounts and commissions attributable to the sale of Registrable Securities, (xi) costs of printing and producing any agreements among underwriters, underwriting agreements, any "blue sky" or legal investment memoranda and any selling agreements and other documents in connection with the offering, sale or delivery of the Registrable Securities, (xii) transfer agents' and registrars' fees and expenses and the fees and expenses of any other agent or trustee appointed in connection with such offering, (xiii) expenses relating to any analyst or investor presentations or any "road shows" undertaken in connection with the registration, marketing or selling of the Registrable Securities, (xiv) fees and expenses payable in connection with any ratings of the Registrable Securities, including expenses relating to any presentations to rating agencies and (xv) all out-of pocket costs and expenses incurred by the Company or its appropriate officers in connection with their compliance with Section 5.05(m).

"**Rule 144**" means Rule 144 (or any successor provisions) under the Securities Act.

"**SEC**" means the Securities and Exchange Commission.

"**Sale**" means the occurrence of any of the following events: (i) a bona fide transaction or series of related transactions (including by way of merger, consolidation, sale or issuance of securities or otherwise) if the stockholders of the Company and their respective Affiliates immediately prior to such transaction or transactions do not immediately after the effective date of such transaction or transactions own more than 50% of the voting power in the Company; or (ii) any bona fide sale, lease, license, exchange or other transfer (in one transaction or a series of related transactions) of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole to any Person who is not a stockholder of the Company or an Affiliate of any such stockholder or a member of a "group" with such a stockholder or Affiliate of such stockholder.

"**Securities Act**" means the Securities Act of 1933 and all rules, regulations and orders issued thereunder, as any of the same may be amended from time to time.

"**Subsidiary**" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or

other persons performing similar functions are at the time directly or indirectly owned by such Person.  Without limitation of the foregoing, it is understood that with respect to any matter referred to in Sections 2.01 or 2.03, a Subsidiary of the Company shall only include those entities with respect to whom the Company controls, or has the right to control, such matter.

"**Tag-Along Portion**" means, for any Tag-Along Sale, that number of securities equal to the Aggregate Ownership of Common Shares by the Tagging Person immediately prior to such Transfer *multiplied by* a fraction the numerator of which is the maximum number of Common Shares proposed to be Transferred by the Tag-Along Seller in such Tag-Along Sale and the denominator of which is the Aggregate Ownership of Common Shares by the Tag-Along Stockholders and all Tagging Persons at such time.

"**Time Brokerage Agreements**" means [ ].

"**Transfer**" means, with respect to any Company Securities, to sell, assign, dispose of, exchange, pledge, encumber, hypothecate or otherwise transfer such Company Securities, including by merger, operation of law, bequest or pursuant to any domestic relations order, whether voluntarily or involuntarily and whether directly or indirectly.

"**Warrants**" means the warrants to purchase shares of Class B Common Stock issued pursuant to the Plan.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | |
| Company | Preamble |
| Damages | 5.07 |
| Demand Registration | 5.03(a) |
| Exercise Notice | 4.02 |
| Indemnified Party | 5.09 |
| Indemnifying Party | 5.09 |
| Inspectors | 5.06(g) |
| Issuance Notice | 4.02 |
| Joinder Agreement | 3.01(a) |
| Listing Request | 5.02 |
| Lock-Up Period | 5.05 |
| Maximum Offering Size | 5.03(e) |
| Plan | Preamble |
| Piggyback Registration | 5.04(a) |
| Pro Rata Share | 4.02 |
| Records | 5.06(g) |
| Registering Stockholders | 5.03(a) |
| Request | 3.02(c) |
| Requesting Party | 5.02 |
| Requesting Stockholder | 5.03(a) |
| Stockholder | Preamble |

| | |
|---|---|
| Tag-Along Notice | 4.01(a) |
| Tag-Along Notice Period | 4.01(a) |
| Tag-Along Offer | 4.01(a) |
| Tag-Along Response Notice | 4.01(a) |
| Tag-Along Right | 4.01(a) |
| Tag-Along Sale | 4.01(a) |
| Tag-Along Seller | 4.01(a) |
| Tagging Person | 4.01(a) |
| Transfer Agent | 3.04 |

*Section 1.02. Other Definitional and Interpretative Provisions.* The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular, and words of one gender (or the neuter) shall be held to include the other gender (or the neuter) as the context requires. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof; provided that with respect to any agreement or contract listed on any schedules hereto, all such amendments, modifications or supplements must also be listed in the appropriate schedule. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.

## ARTICLE 2
### CORPORATE GOVERNANCE

*Section 2.01. Required Class B Director Consents.* Without limitation of any approval of the Board pursuant to applicable law, the Certificate of Incorporation, the Bylaws or otherwise, the Company shall not, and shall not permit any of its Subsidiaries to, either directly or indirectly by amendment, merger, consolidation or otherwise, without the affirmative majority vote or written consent of a majority of the Class B Directors, take any of the following actions (including any action by the Board or any committee of the Board), unless such action is specifically authorized pursuant to an annual business plan of the Company or any Subsidiary that has previously been approved by the Board and a majority of the Class B Directors:

(a)     enter into, terminate, purchase any interests or rights of any party to, or make material modifications to, any partnerships, joint operating agreements or other joint ventures;

(b)     amend the Bylaws;

(c)     incur any debt or repurchase debt of the Company or its Subsidiaries in excess of $[  ]*[1] individually, or in the aggregate in an amount in excess of $[  ]* per annum;

(d)     make any capital expenditure in excess of $[  ]* individually, or in the aggregate in an amount in excess of $[  ]* per annum;

(e)     other than transactions with suppliers of goods or services entered in the ordinary course, enter into, amend or modify in any material respect any agreement providing for payments by or to the Company or any Subsidiary in excess of $[  ]* per annum or $[  ]* in the aggregate;

(f)     other than transactions with suppliers of goods or services entered in the ordinary course, acquire (in a single transaction or a series of related transactions) any assets, business or operations in the aggregate with a value of more than $[  ]*;

(g)     sell, transfer, lease, pledge, license or otherwise dispose (in a single transaction or a series of related transactions) of (i) any assets, business or operations in the aggregate with a value of more than $[  ]* or (ii) any assets, business or operations used by any Subsidiary to provide programming or operational services pursuant to the Time Brokerage Agreements;

(h)     reinvest any asset sale proceeds from a transaction or series of transactions in excess of $[  ]*;

(i)     except as otherwise contemplated by the Initial Plan, enter into, modify or amend the employment agreements of senior management of the Company;

(j)     except as otherwise contemplated by the Initial Plan, determine compensation, benefits, perquisites and other incentives for senior management of the Company or its Subsidiaries, or approve or amend any plans or contracts in connection therewith;

(k)     make any determination, grant any approval or take any other action taken by the Board (or any committee of the Board) pursuant to the terms of the employment agreements of senior management of the Company or under the Equity Incentive Plan or any other management incentive plan approved by the Board;

(l)     declare or pay any dividend or other distribution upon any Common Stock of the Company or any of its Subsidiaries (other than dividends and distributions to the Company or a

---

[1] Representing a material amount to be determined.

wholly-owned Subsidiary by a wholly-owned Subsidiary or dividends or other distributions required by the governing instruments or agreements of Subsidiaries that are not wholly-owned);

(m)     enter into, amend or modify in any material respect any transaction with or for the benefit of, any holder of Class A Common Stock, or any Affiliate, "associate" or member of the "immediate family" (as such terms are respectively defined in Rule 12b-2 and 16a-1 of the Exchange Act) of any holder of Class A Common Stock, or any Affiliate of the Company; or

(n)     initiate or effect any Public Offering, other than pursuant to Section 5.02 or 5.03.

*Section 2.02.   Additional Class B Director Rights.*   The Class B Directors shall have the sole and exclusive power and authority to take the following actions by affirmative majority vote or written consent: (i) terminate the employment of either William Dean Singleton or Joseph J. Lodovic, or both, as the case may be, at any time and with or without cause; and (ii) approve any agreements or arrangements entered into by the Company or any of its subsidiaries with William Dean Singleton or Joseph J. Lodovic, as the case may be, in connection with any such termination, including any settlement entered into in connection with their respective employment agreements; *provided*, that the rights of the Class B Directors in this Section 2.02 shall in no way limit the rights of Messrs. Singleton or Lodovic under any such agreement or arrangement.

*Section 2.03.   Required Class B Stockholder Consent Rights.*   Without limitation of any approval of holders of Common Stock pursuant to applicable law, the Certificate of Incorporation, the Bylaws or otherwise, the Company shall not, and shall not permit any of its Subsidiaries to, either directly or indirectly by amendment, merger, consolidation or otherwise, without the prior written consent or affirmative vote of the holders of a majority of the Class B Common Stock (and, to the extent provided in the Certificate of Incorporation, the Class C Common Stock, voting together with the Class B Common Stock as a single class), take any of the following actions (including any action by the Board or any committee of the Board):

(a)     authorize, or increase the number of authorized shares of, any class of capital stock of the Company ranking *pari passu* with or senior to the Common Stock as to dividends or liquidation preference;

(b)     amend the Certificate of Incorporation or Section 3.02 of the Bylaws;

(c)     sell, lease, license or otherwise dispose of all or substantially all of the assets of the Company and its Subsidiaries in a single transaction or a series of related transactions;

(d)     in the case of the Company only, recapitalize, reorganize or consolidate or merge with or into any Person, other than a consolidation or merger of a wholly-owned Subsidiary with or into the Company (with the Company as the surviving entity) or another wholly-owned Subsidiary;

(e)     issue or enter into an agreement to issue capital stock of the Company (or any other Company Securities), except as may be provided for under (x) the Equity Incentive Plan or (y) any other management incentive plan approved by the Board and a majority of the Class B Directors pursuant to Section 2.01; and

8

(f)    redeem, purchase or otherwise acquire any capital stock of the Company (or any other Company Securities) (except for purchases from employees upon termination of employment).

Section 2.04. Voting Restriction On Class A Holders.  Notwithstanding any other provision in the Certificate of Incorporation or this Agreement, only with respect to the requirement that the holders of a majority of the Class B Common Stock separately (voting together with the Class C Common Stock as a single class to the extent provided in the Certificate of Incorporation) vote to approve any of the actions listed in Section 2.03 (but not for purposes of any approval of holders of Common Stock required under applicable law), any shares of Class B Common Stock or Class C Common Stock that are owned by any holder of Class A Common Stock (or any Person controlled by or affiliated with such holder, including any trust of which such holder, or any Affiliate, "associate" or member of the "immediate family" (as such terms are respectively defined in Rule 12b-2 and 16a-1 of the Exchange Act) of such holder, is a trustee or beneficiary) shall for such purposes be deemed to have been voted in proportion as all other Class B Common Stock or Class C Common Stock are voted on such matter (i.e., for, against or abstain).

Section 2.05.  Termination.  Sections 2.01, 2.02, 2.03 and 2.04 shall terminate and be of no further force and effect upon the Class A Full Conversion Date.

ARTICLE 3
RESTRICTIONS ON TRANSFER

Section 3.01.  General Restrictions On Transfer.  (a)  Each Stockholder agrees that it shall not Transfer any Company Securities (or solicit any offers in respect of any Transfer of any Company Securities), except in compliance with the Securities Act, any other applicable securities or "blue sky" laws, and the terms and conditions of the Certificate of Incorporation.  In addition, no Transfer may be made unless the transferee has executed and delivered to the Company an agreement to be bound by this Agreement in the form of Exhibit A hereto (a "**Joinder Agreement**").

(b)    Any attempt to Transfer any Company Securities not in compliance with this Agreement and the Certificate of Incorporation shall be null and void, and the Company shall not, and shall cause the Transfer Agent not to, give any effect in the Company's stock records to such attempted Transfer.

Section 3.02.  Limitations On Transfer.  The following restrictions shall, except for Transfers pursuant to Section 4.01, apply to any Transfer of Common Shares or other Company Securities:

(a)    General Restriction on Class A Common Stock.  A holder of shares of Class A Common Stock shall not Transfer such shares, provided that (i) in the event of the incompetence or death of such holder, such shares may be Transferred to such holder's estate, executor, trustee, administrator, committee or other personal representative, (ii) for estate planning purposes of such holder, such shares may be Transferred to a trust or similar entity the sole beneficiaries of which are such holder or his spouse or lineal descendants (subject to a determination by the

9

majority of the Class B Directors that such Transfer meets the requirements of this clause (ii)), or (iii) such shares may be Transferred as otherwise approved by a majority of the Class B Directors. Any Transfer not in compliance with this Section 3.02(a) shall be void, shall not be recognized by the Company and shall not be registered on the books of the Company.

(b)    <u>Restrictions on Transfer</u>. Except for Transfers pursuant to Section 4.01, no Stockholder shall Transfer any Company Securities to any Person (regardless of the manner in which such Stockholder initially acquired such Company Securities) if the Company reasonably determines that such Transfer would, if effected, result in the Company having 500 or more holders of record of Company Securities (as such concept is understood for purposes of Section 12(g) of the Exchange Act and any relevant rules promulgated thereunder), or if, after giving effect to such Transfer, the Company would otherwise be, or would otherwise be obligated to become, a reporting company under the Exchange Act.

(c)    <u>Requests for Transfer and Authorization of Transfer of Company Securities</u>. A Stockholder who proposes to effect a Transfer pursuant to Sections 3.02(a) or 3.02(b) must submit a request in writing (a "**Request**") that the Company review the proposed Transfer and authorize or not authorize such proposed Transfer. A Request shall include (A) the name, address and telephone number of the proposed transferee, (B) a description of the interest proposed to be transferred to the proposed transferee, (C) the date on which the proposed Transfer is expected to take place, (D) if applicable, reasonably sufficient information (which may, but shall not be required to, include an opinion of counsel) to establish that no registration of such proposed Transfer is required under the Securities Act and all applicable state securities or "blue sky" laws and (E) a request for a determination as to whether the proposed Transfer is prohibited pursuant to Sections 3.02(a) or (b) and to inform the proposed Stockholder of the Company's determination regarding the proposed Transfer. The Company shall, promptly following receipt of a Request, inform the Stockholder proposing the Transfer referred to therein whether such Transfer is permitted pursuant to Section 3.02(a) or 3.02(b), as the case may be and, if such Transfer is permitted, effect such Transfer in accordance with this Agreement. For the avoidance of doubt, the Company shall not deny, pursuant to Section 3.02(b) and this Section 3.02(c), (A) a Transfer by a Stockholder of the Company to another stockholder of the Company or (B) a Transfer of all shares owned by the proposed transferor to a single Person who is treated as a single record holder under the Exchange Act.

(d)    <u>Termination</u>. The provisions of this Article 3 (other than Section 3.02(a)) shall terminate upon the earliest of (i) the resolution of the Board (including, prior to the Class A Full Conversion Date, the approval of a majority of the Class B Directors) to terminate this Article 3 (other than Section 3.02(a)) and (ii) such date that the Company becomes subject to the reporting obligations under Sections 13 or 15(d) of the Exchange Act.

*Section 3.03. Legends.* (a) All Common Shares and other Company Securities issued under the Plan in reliance on the exemption from registration provided under Section 1145 of the Bankruptcy Code and evidenced by notations in a book entry system other than DTC shall include a notation substantially in the following form:

THE SECURITIES EVIDENCED HEREBY ARE SUBJECT TO VARIOUS CONDITIONS INCLUDING CERTAIN RESTRICTIONS ON ANY OFFER, SALE,

DISPOSITION OR TRANSFER AS SET FORTH IN THE STOCKHOLDERS' AGREEMENT DATED AS OF _____, 2010, AS AMENDED FROM TIME TO TIME (THE "STOCKHOLDERS AGREEMENT"). NO REGISTRATION OR TRANSFER OF SUCH SECURITIES WILL BE MADE ON THE BOOKS OF THE CORPORATION UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE CORPORATION WILL FURNISH WITHOUT CHARGE TO EACH HOLDER OF RECORD OF SUCH SECURITIES A COPY OF THE STOCKHOLDERS' AGREEMENT, CONTAINING THE ABOVE REFERENCED RESTRICTIONS ON TRANSFERS OF SECURITIES, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS.

THE SECURITIES EVIDENCED HEREBY HAVE BEEN DISTRIBUTED BY THE CORPORATION IN RELIANCE ON THE EXEMPTION FROM REGISTRATION PROVIDED UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS OR OTHER JURISDICTION WITHIN THE UNITED STATES AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS. AS A CONDITION TO ANY TRANSFER, THE CORPORATION RESERVES THE RIGHT TO REQUIRE, IN ACCORDANCE WITH THE STOCKHOLDERS' AGREEMENT, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE CORPORATION, THAT SUCH REGISTRATION IS NOT REQUIRED.

Any trade confirmation or statement of account sent to Stockholders will bear substantially the same legend. If the Company issues any physical certificates evidencing Common Shares, such Common Shares shall be stamped or otherwise imprinted with substantially the same legend.

Notwithstanding the foregoing, the Company may in its discretion, in connection with Common Shares issued in reliance on the exemption from registration provided under Section 1145 of the Bankruptcy Code and evidenced by notations in a book entry system other than DTC, omit the second paragraph of the above legend from any such Common Shares that the Company determines are being issued to a Stockholder who is not an Affiliate of the Company.

(b)    Except as provided in Section 3.03(a), all Common Shares and other Company Securities issued pursuant to the Equity Incentive Plan or that otherwise constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act and evidenced by notations in a book entry system other than DTC shall include a notation substantially in the following form:

THE SECURITIES EVIDENCED HEREBY ARE SUBJECT TO VARIOUS CONDITIONS INCLUDING CERTAIN RESTRICTIONS ON ANY OFFER, SALE,

DISPOSITION OR TRANSFER AS SET FORTH IN A STOCKHOLDERS' AGREEMENT DATED AS OF _____ __, 2010, AS AMENDED FROM TIME TO TIME (THE "STOCKHOLDERS' AGREEMENT"). NO REGISTRATION OR TRANSFER OF SUCH SECURITIES WILL BE MADE ON THE BOOKS OF THE CORPORATION UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE CORPORATION WILL FURNISH WITHOUT CHARGE TO EACH HOLDER OF RECORD OF SUCH SECURITIES A COPY OF THE STOCKHOLDERS' AGREEMENT, CONTAINING THE ABOVE REFERENCED RESTRICTIONS ON TRANSFERS OF SECURITIES, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS.

THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS. AS A CONDITION TO ANY TRANSFER, THE CORPORATION RESERVES THE RIGHT TO REQUIRE, IN ACCORDANCE WITH THE STOCKHOLDERS' AGREEMENT, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE CORPORATION, THAT SUCH REGISTRATION IS NOT REQUIRED.

Any trade confirmation or statement of account sent to such Stockholders of such Common Shares will bear substantially the same legend. If the Company issues any physical certificates evidencing such Common Shares, such Common Shares shall be stamped or otherwise imprinted with substantially the same legend.

(c)     Common Shares evidenced by notations in a book entry system maintained by DTC shall not bear any legends. Upon transfer of Common Shares into a book entry system maintained by DTC, the Company shall, to the extent permissible, instruct the direct or indirect DTC participant to whom such transfer is made to maintain the applicable legends in its books and records until otherwise directed by the Company.

(d)     Upon termination of this Agreement pursuant to Section 6.02, the holder of any physical certificates representing Common Shares and bearing the first paragraph of the legends set forth in Section 3.03(a) or 3.03(b) shall be entitled to receive from the Company, without expense, new securities of like tenor not bearing the first paragraph of such legend.

(e)     Any holder of a physical certificate representing Common Shares and bearing the second paragraph of the legend set forth in Section 3.03(a) or 3.03(b) (the "**Securities Act Restrictions**"), shall be entitled to have a new certificate issued without the Securities Act Restrictions, and any Stockholder whose Common Shares are evidenced by a book entry notation shall be entitled to have the Company remove the

12

Securities Act Restrictions from the notation, in each case upon delivery to the Company of an opinion of counsel reasonably satisfactory to the Company to the effect that the Securities Act Restrictions are no longer required to ensure compliance with the Securities Act. In the event that any Stockholder requests the removal of the Securities Act Restrictions, the Company shall make a reasonable determination of whether the Securities Act Restrictions can be removed without delivery to the Company of an opinion of counsel, and the Stockholder requesting removal of the Securities Act Restrictions shall provide to the Company any information and/or representations reasonably requested in connection with making such determination or in connection with the delivery of an opinion of counsel to the Company relating to such legend removal. Upon determining that the Securities Act Restrictions can be removed, the Company shall so instruct the Transfer Agent.

       *Section 3.04. Appointment and Role of Transfer Agent.* In connection with its execution of this Agreement, the Company shall appoint [ ] as transfer agent and registrar for the Company Securities who shall serve as such unless and until the Board appoints a successor thereto (such person or any successor thereto, the "**Transfer Agent**"). Such Transfer Agent shall be responsible for maintaining a book entry system for, and maintaining appropriate records of all Transfers of, Company Securities.

ARTICLE 4
TAG-ALONG RIGHTS; PREEMPTIVE RIGHTS

       *Section 4.01. Tag-Along Rights*. (a) Subject to Section 4.01(e), if one or more Stockholders (collectively, the "**Tag-Along Seller**") propose to Transfer, a number of Common Shares equal to or exceeding 50% of the outstanding Common Shares in a single transaction or in a series of related transactions (a "**Tag-Along Sale**"):

       (i)    the Tag-Along Seller shall provide the Company, which shall promptly forward to the Transfer Agent for further distribution to each Other Stockholder, notice of the terms and conditions of such proposed Transfer ("**Tag-Along Notice**"), and offer each Tagging Person the opportunity to participate in such Transfer on the same terms and conditions as the Tag-Along Seller in accordance with this Section 4.01; and

       (ii)    each Other Stockholder may elect, at its option, to so participate in the proposed Transfer in accordance with this Section 4.01 (each such electing Other Stockholder, a "**Tagging Person**").

       The Tag-Along Notice shall identify the number and class of Common Shares proposed to be sold by the Tag-Along Seller ("**Tag-Along Offer**"), the consideration for which the Transfer is proposed to be made, and all other material terms and conditions of the Tag-Along Offer.

       From the date of its receipt of the Tag-Along Notice, each Tagging Person shall have the right (a "**Tag-Along Right**"), exercisable by notice ("**Tag-Along Response Notice**") given to the Tag-Along Seller within 15 Business Days after its receipt of the Tag-Along Notice (the "**Tag-Along Notice Period**"), to request that the Tag-Along Seller include in the proposed

13

Transfer up to a number of Common Shares representing such Tagging Person's Tag-Along Portion, *provided* that each Tagging Person shall be entitled to include in the Tag-Along Sale no more than its Tag-Along Portion of Common Shares and the Tag-Along Seller shall be entitled to include the number of Common Shares proposed to be Transferred by the Tag-Along Seller as set forth in the Tag-Along Notice (reduced, to the extent necessary, so that each Tagging Person shall be able to include its Tag-Along Portion) and such additional Common Shares as permitted by Section 4.01(c), and *provided further* that, if such Tagging Person owns any warrants, such Tagging Person in lieu of exercising warrants that are vested and exercising, may Transfer warrants to the extent vested and exercisable for some or all of that number of Common Shares as would otherwise have constituted its Tag-Along Portion, in which event the price to be received with respect to each such warrant shall be the price per Common Share applicable to the Tag-Along Offer, less the then applicable exercise price of the warrants included in the Tag-Along Sale. Each Tag-Along Response Notice shall include wire transfer or other instructions for payment or delivery of the purchase price for the Common Shares to be sold in such Tag-Along Sale or, if such delivery is not permitted by applicable law, an unconditional agreement to deliver such Common Shares pursuant to this Section 4.01(a) at the closing for such Tag-Along Sale against delivery to such Tagging Person of the consideration therefor. Each Tagging Person that exercises its Tag-Along Rights hereunder (a) authorizes the Company (or the Transfer Agent, if applicable) to record in the Company's books and records the transfer of all of such Tagging Person's Common Shares included in such Tag-Along Sale which are not represented by one or more certificates from the Tagging Person to the purchaser in the Tag-Along Sale and (b) shall deliver all certificates, if any, which represent Common Shares owned by such Tagging Person included in such Tag-Along Sale, duly endorsed for transfer with signatures guaranteed, to the purchaser in the Tag-Along Sale, in the manner and at the address indicated in the Tag-Along Notice, in each case against delivery of the purchase price for such Common Shares. In addition, each Tagging Person, if a participant in the applicable Tag-Along Sale, shall take all action as the transferor or the purchaser in the Tag-Along Sale shall reasonably request as necessary to vest in the purchaser in the Tag-Along Sale all Common Shares owned by such Tagging Person included in such Tag-Along Sale, whether in certificated or uncertificated form, free and clear of all liens, charges and encumbrances of any kind, other than those arising under this Agreement or applicable securities laws.

(b)     If at the termination of the Tag-Along Notice Period any Other Stockholder shall not have elected to participate in the Tag-Along Sale, such Other Stockholder shall be deemed to have waived its rights under Section 4.01(a) with respect to the Transfer of its Common Shares pursuant to such Tag-Along Sale.

(c)     If (i) any Other Stockholder declines to exercise its Tag-Along Rights or (ii) any Tagging Person elects to exercise its Tag-Along Rights with respect to less than such Tagging Person's Tag-Along Portion, the Tag-Along Seller and any other Tagging Persons who elected to exercise their Tag-Along Rights in full shall each be entitled to Transfer, pursuant to the Tag-Along Offer, an additional number of Common Shares held by it equal to its proportionate share (relative to the aggregate number of shares owned by it and the other Stockholders participating in the Tag-Along Sale) the number of Common Shares constituting, as the case may be, the Tag-Along Portion of such Other Stockholder or the portion of such Tagging Person's Tag-Along Portion with respect to which Tag-Along Rights were not exercised.

14

(d)     Notwithstanding anything contained in this Section 4.01, there shall be no liability on the part of the Tag-Along Seller to the Tagging Persons (other than the obligation to return any certificates evidencing Common Shares and authorizations received by the Tag-Along Seller) or any other Person if the Transfer of Common Shares pursuant to Section 4.01 is not consummated for whatever reason. Whether to effect a Transfer of Common Shares pursuant to this Section 4.01 by the Tag-Along Seller is in the sole and absolute discretion of the Tag-Along Seller.

(e)     The provisions of this Section 4.01 shall not apply to any proposed Transfer of any class of Company Securities by the Tag-Along Seller in a Public Offering or a public resale pursuant to Rule 144.

*Section 4.02. Preemptive Rights.* (a) The Company shall give each Stockholder owning issued and outstanding Common Shares notice (an "**Issuance Notice**") of any proposed issuance by the Company of any Company Securities at least 20 Business Days prior to the proposed issuance date. The Issuance Notice shall specify the price at which such Company Securities are to be issued and the other material terms of the issuance. Subject to Section 4.03, each Stockholder shall be entitled to purchase up to such Stockholder's Pro Rata Share of the Company Securities proposed to be issued, at the price and on the terms specified in the Issuance Notice. "**Pro Rata Share**" means, with respect to a Stockholder, the fraction that results from dividing (i) the number of issued and outstanding Common Shares held by such Stockholder (immediately before giving effect to such proposed issuance) by (ii) the total number of issued and outstanding Common Shares (immediately before giving effect to such proposed issuance).

(b)     Each Stockholder who desires to purchase any or all of its Pro Rata Share of the Company Securities specified in the Issuance Notice shall deliver notice to the Company (each an "**Exercise Notice**") of its election to purchase such Company Securities within 15 Business Days of receipt of the Issuance Notice. The Exercise Notice shall specify the number (or amount) of Company Securities to be purchased by such Stockholder and shall constitute exercise by such Stockholder of its rights under this Section 4.02 and a binding agreement of such Stockholder to purchase, at the price and on the terms specified in the Issuance Notice, the number of shares (or amount) of Company Securities specified in the Exercise Notice. If, at the termination of such 15-Business-Day period, any Stockholder shall not have delivered an Exercise Notice to the Company, such Stockholder shall be deemed to have waived all of its rights under this Section 4.02 with respect to the purchase of such Company Securities. Promptly following the termination of such 15-Business Day period, the Company shall deliver to each Stockholder a copy of all Exercise Notices it received (such Exercise Notice shall in any event remain the binding agreement of such Stockholder to purchase, at the price and on the terms specified in the Issuance Notice, the number of shares (or amount) of Company Securities specified therein).

(c)     The Company shall have 90 days from the date of the Issuance Notice to consummate the proposed issuance of any or all of such Company Securities that the Stockholders have not elected to purchase at the price and upon terms that are not materially less favorable to the Company than those specified in the Issuance Notice, provided that, if such issuance is subject to regulatory approval, such 90-day period shall be extended until the expiration of five Business Days after all such approvals have been received, but in no event

15

later than 180 days from the date of the Issuance Notice. If the Company proposes to issue any such Company Securities after such 90-day (or 180-day) period, it shall again comply with the procedures set forth in this Section 4.02.

(d)     Notwithstanding anything in this Section 4.02 to the contrary, the closing date of any proposed issuance of Company Securities to which this Section 4.02 does apply may, at the Company's discretion, occur prior to the expiration of the 20-Business Day period contemplated by Section 4.02(a); provided that in such case each Stockholder entitled to participate in such issuance pursuant to this Section 4.02 shall continue to have the right to exercise its rights under this Section 4.02, by delivering an Election Notice within 15 Business Days of the receipt of the Issuance Notice pursuant to Section 4.02(b), to acquire from the Company the number (or amount) of Company Securities determined in accordance with Section 4.02(a) at the price and on the terms specified in the Issuance Notice, and the closing of such acquisition shall take place as soon as practicable following delivery of such Election Notice (such Election Notice shall in any event remain the binding agreement of such Stockholder to purchase, at the price and on the terms specified in the Issuance Notice, the number of shares (or amount) of Company Securities specified therein).

(e)     Notwithstanding the foregoing, no Stockholder shall be entitled to purchase Company Securities as contemplated by this Section 4.02 in connection with issuances of Company Securities (i) to employees, consultants, officers or directors of the Company or any Subsidiary pursuant to employee benefit plans or arrangements approved by the Board (including upon the exercise of employee stock options granted pursuant to any such plans or arrangements), (ii) as consideration in any bona fide, arm's-length acquisition of all or substantially all of the business or voting stock of any individual or entity or any division, line of business or other business unit of such individual or entity, (iii) issued as an "equity kicker" in connection with any bona fide, arm's-length borrowings, direct or indirect, from financial institutions or other Persons by the Company, (iv) issued in connection with any stock split, stock dividend or recapitalization of the Company, (v) pursuant to a Public Offering or (vi) issued upon exercise, exchange or conversion of any of the foregoing Company Securities (in the case of each of the foregoing clauses, to the extent approved pursuant to Sections 2.01 and/or 2.03, to the extent such approval is required pursuant to such Sections).

(e)     The Company shall not be obligated to consummate any proposed issuance of Company Securities, nor be liable to any Stockholder if the Company has not consummated any proposed issuance of Company Securities pursuant to this Section 4.02 for whatever reason, regardless of whether it shall have delivered an Issuance Notice or received any Exercise Notices in respect of such proposed issuance.

*Section 4.03.  Termination.*  Section 4.01 and Section 4.02 shall terminate and be of no further force and effect upon consummation of a Qualified Public Offering.

ARTICLE 5
REGISTRATION RIGHTS

*Section 5.01.  General Restriction on Listing and Demand Rights.*  In no event shall the Company be required to effect (i) a Listing Request pursuant to Section 5.02 or (ii) a Demand

16

Registration pursuant to Section 5.03, in either case, prior to three years from the Effective Date, unless (A) the Class A Full Conversion Date has occurred or (B) a majority of the Class A Directors have agreed to such Listing Request or Demand Registration, as applicable.

Section 5.02. *Listing Rights.* Subject to Section 5.01, if the Company shall receive a request from (x) the holders of a majority of the outstanding Common Shares or (y) a majority of the Class B Directors (each a "**Requesting Party**") that the Company (i) effect a Qualified Public Offering or (ii) cause the Common Shares of the class (or classes) designated by the Requesting Party to be registered under the Exchange Act and listed or qualified for trading on a national securities exchange or quotation system in the United States designated by the Requesting Party (a "**Listing Request**"), then the Company agrees to use commercially reasonable efforts to promptly take, or cause to be taken, at the Company's expense, all actions and to do, or cause to be done, all things necessary or desirable to approve and effect such Qualified Public Offering or Listing Request, as promptly as practical.

Section 5.03. *Demand Registration.* (a) Subject to Section 5.01, if the Company shall receive a request from (x) the holders of a majority of the outstanding Registrable Securities, if such request would constitute the First Public Offering and a Qualified Public Offering, or (y) for all other requests, the holders of 15% of the outstanding Registrable Securities (in either case, the requesting Stockholders collectively, a "**Requesting Stockholder**") that the Company effect the registration under the Securities Act of all or any portion of such Requesting Stockholder's Registrable Securities, and specifying the intended method of disposition thereof, then the Company shall promptly give notice of such requested registration (each such request shall be referred to herein as a "**Demand Registration**") at least 20 Business Days prior to the anticipated filing date of the registration statement relating to such Demand Registration to the other Stockholders and thereupon shall use its commercially reasonable efforts to effect, as expeditiously as possible, the registration under the Securities Act of:

      (i)      all Registrable Securities for which the Requesting Stockholders have requested registration under this Section 5.03, and

      (ii)      subject to the restrictions set forth in Section 5.03(e) and 5.05, all other Registrable Securities of the same class as those requested to be registered by the Requesting Stockholders that any Stockholders with rights to request registration under 5.04 (all such Stockholders, together with the Requesting Stockholders, and any Stockholders participating in a Piggyback Registration pursuant to Section 5.04, the "**Registering Stockholders**") have requested the Company to register by request received by the Company within 15 Business Days after such Stockholders receive the Company's notice of the Demand Registration,

all to the extent necessary to permit the disposition (in accordance with the intended methods thereof as aforesaid) of the Registrable Securities so to be registered, *provided* that, subject to Section 5.03(d), the Company shall not be obligated to effect more than six Demand Registrations, other than Demand Registration to be effected pursuant to a Registration Statement on Form S-3 (or any successor thereto), for which an unlimited number of Demand Registrations shall be permitted, and *provided further* that the Company shall not be obligated to effect a Demand Registration unless (x) with respect to the First Public Offering, only if such

Demand Registration would constitute a Qualified Public Offering and (y) after the First Public Offering, the aggregate proceeds expected to be obtained from the sale of the Registrable Securities requested to be included in such Demand Registration equals or exceeds $[  ] [2]. In no event shall the Company be required to effect more than one Demand Registration hereunder within any six-month period.

(b)     Promptly after the expiration of the 15-Business Day-period referred to in Section 5.03(a)(ii), the Company will notify all Registering Stockholders of the identities of the other Registering Stockholders and the number of shares of Registrable Securities requested to be included therein.  At any time prior to the effective date of the registration statement relating to such registration, the Requesting Stockholders may revoke such request, without liability to any of the other Registering Stockholders, by providing a notice to the Company revoking such request.

(c)     The Company shall be liable for and pay all Registration Expenses in connection with any Demand Registration, regardless of whether such Registration is effected; provided, however, that the Company shall not in connection with any Demand Registration be liable for the fees and expenses of the Registering Stockholders in excess of $__ [3] in the aggregate.

(d)     A Demand Registration shall not be deemed to have occurred:

(i)     unless the registration statement relating thereto (A) has become effective under the Securities Act and (B) has remained effective for a period of at least 180 days (or such shorter period in which all Registrable Securities of the Registering Stockholders included in such registration have actually been sold thereunder), provided that such registration statement shall not be considered a Demand Registration if, after such registration statement becomes effective, such registration statement is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court; provided, however, that a Demand Registration that fails to satisfy the condition in this clause (i) shall nevertheless be deemed to have occurred if the reason for such failure is due to any act or omission by a Registering Stockholder unless the Company shall have been reimbursed for all out-of-pocket expenses incurred by the Company in connection with such registration; or

(ii)     if the Maximum Offering Size is reduced in accordance with Section 5.03(e) such that less than 66²/₃% of the Registrable Securities of the Requesting Stockholders sought to be included in such registration are included.

(e)     If a Demand Registration involves an underwritten Public Offering and the managing underwriter advises the Company and the Requesting Stockholders that, in its view, the number of shares of Registrable Securities requested to be included in such registration (including any securities that the Company proposes to be included that are not Registrable Securities) exceeds the largest number of shares that can be sold without having an adverse

---

[2] Material amount to be determined.

effect on such offering, including the price at which such shares can be sold (the "**Maximum Offering Size**"), the Company shall include in such registration, in the priority listed below, up to the Maximum Offering Size:

> (i)      first, all Registrable Securities requested to be registered by the Requesting Stockholders and all other Registering Stockholders (allocated, if necessary for the offering not to exceed the Maximum Offering Size, pro rata among such entities on the basis of the relative number of Registrable Securities so requested to be included in such registration by each);

> (ii)      second, any securities proposed to be registered by the Company; and

> (ii)      third, all securities proposed to be registered by Persons other than the Company or Registering Stockholders.

(f)      Upon notice to each Requesting Stockholder, the Company may postpone effecting a registration pursuant to this Section 5.03 on one occasion during any period of six consecutive months for a reasonable time specified in the notice but not exceeding 90 days (which period may not be extended or renewed), if (i) an investment banking firm of recognized national standing shall advise the Company and the Requesting Stockholders in writing that effecting the registration would materially and adversely affect an offering of securities of such Company the preparation of which had then been commenced or (ii) the Company or any of its Subsidiaries is engaged in, or proposes to engage in a material transaction, including a material purchase or sale of assets or securities, financing, merger, consolidation, tender offer or any other material transaction that would require disclosure pursuant to the Exchange Act, and with respect to which the Board of Directors of the Company reasonably has determined in good faith that compliance with this Agreement may reasonably be expected to either materially interfere with the Company's or such Subsidiary's ability to consummate such transaction in a timely fashion or require the Company to disclose material, non-public information prior to such time as it would otherwise be required.

(g)      In addition to the rights of the holders of Registrable Securities pursuant to Section 5.03(a), at any time following the consummation of the First Public Offering, upon the request of the holders of a majority of the Registrable Securities or any Affiliate of the Company who owns at least [  ] [3]% of the outstanding Registrable Securities, the Company shall use its commercially reasonable efforts to file a "shelf" registration statement (the "**Shelf Registration**") with respect to the Registrable Securities on an appropriate form pursuant to Rule 415 (or any similar provision that may be adopted by the SEC) under the Securities Act and to cause such Shelf Registration to become effective and to keep such Shelf Registration in effect until the Stockholders shall no longer hold any Registrable Securities, *provided,* that (x) the Company shall not be obligated to effect more than [three] Shelf Registrations and up to [three] additional Shelf Registrations that are filed at the request of any Affiliate of the Company who owns at least [  ]% [4] of the Registrable Securities, (y) the Company shall not be required to file a

---

[3] Material percentage to be determined.

Shelf Registration pursuant to this Section 5.03(g) in order to effect an underwritten Public Offering (it is understood that the Company may be required to effect an underwritten Public Offering only pursuant to Section 5.03(a) above and (z) the provisions of Section 5.03(f) shall apply to any Shelf Registration pursuant to this Section 5.03(g).

   *Section 5.04. Piggyback Registration.* (a) If the Company proposes to register any Company Securities under the Securities Act (other than a registration on Form S-8, S-4 or F-4, or any successor forms, relating to Common Shares issuable upon exercise of employee stock options or in connection with any employee benefit or similar plan of the Company or in connection with a direct or indirect acquisition by the Company of another Person), whether or not for sale for its own account, the Company shall each such time give prompt notice at least 30 Business Days prior to the anticipated filing date of the registration statement relating to such registration to each Stockholder, which notice shall set forth such Stockholder's rights under this Section 5.04 and shall offer such Stockholder the opportunity to include in such registration statement the number of Registrable Securities of the same class or series as those proposed to be registered as each such Stockholder may request (a "**Piggyback Registration**"), subject to the provisions of Section 5.04(b). Upon the request of any such Stockholder made within 15 Business Days after the receipt of notice from the Company (which request shall specify the number of Registrable Securities intended to be registered by such Stockholder), the Company shall use its commercially reasonable efforts to effect the registration under the Securities Act of all Registrable Securities that the Company has been so requested to register by all such Stockholders, to the extent requisite to permit the disposition of the Registrable Securities so to be registered, *provided* that (i) if such registration involves an underwritten Public Offering, all such Stockholders requesting to be included in the Company's registration must sell their Registrable Securities to the underwriters selected as provided in Section 5.06(f) on the same terms and conditions as apply to the Company or the Requesting Stockholders, as applicable, and (ii) if, at any time after giving notice of its intention to register any Company Securities pursuant to this Section 5.04(a) and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register such securities, the Company shall give notice to all such Stockholders and, thereupon, shall be relieved of its obligation to register any Registrable Securities in connection with such registration. No registration effected under this Section 5.04 shall relieve the Company of its obligations to effect a Demand Registration to the extent required by Section 5.03. The Company shall pay all Registration Expenses in connection with each Piggyback Registration; provided, however, that the Company shall not in connection with any Piggyback Registration be liable for the fees and expenses of the Registering Stockholders in excess of $___ [4] in the aggregate.

   (b)      If a Piggyback Registration involves an underwritten Public Offering (other than any Demand Registration, in which case the provisions with respect to priority of inclusion in such offering set forth in Section 5.03(e) shall apply) and the managing underwriter advises the Company that, in its view, the number of Shares that the Company and such Stockholders intend

---

[4] Material amount to be determined.

to include in such registration exceeds the Maximum Offering Size, the Company shall include in such registration, in the following priority, up to the Maximum Offering Size:

> (i)     first, so much of the Company Securities proposed to be registered for the account of the Company as would not cause the offering to exceed the Maximum Offering Size;

> (ii)    second, all Registrable Securities requested to be included in such registration by any Stockholders pursuant to Section 5.04 (allocated, if necessary for the offering not to exceed the Maximum Offering Size, pro rata among such Stockholders on the basis of the relative number of shares of Registrable Securities so requested to be included in such registration by each); and

> (iii)   third, any securities proposed to be registered for the account of any other Persons with such priorities among them as the Company shall determine.

*Section 5.05. Lock-Up Agreements.* If any registration of Registrable Securities shall be effected in connection with a Public Offering, neither the Company nor any Stockholder shall effect any public sale or distribution, including any sale pursuant to Rule 144, of any Company Securities (except as part of such Public Offering) during the period beginning 14 days prior to the effective date of the applicable registration statement until the earlier of (i) such time as the Company and the lead managing underwriter shall agree and (ii) 180 days (such period, the "**Lock-Up Period**" for the applicable registration statement).

*Section 5.06. Registration Procedures.* Whenever Stockholders request that any Registrable Securities be registered pursuant to Section 5.03 or 5.04, subject to the provisions of such Sections, the Company shall use its commercially reasonable efforts to effect the registration and the sale of such Registrable Securities in accordance with the intended method of disposition thereof as quickly as practicable, and, in connection with any such request:

(a)     The Company shall as expeditiously as possible prepare and file with the SEC a registration statement on any form for which the Company then qualifies or that counsel for the Company shall deem appropriate and which form shall be available for the sale of the Registrable Securities to be registered thereunder in accordance with the intended method of distribution thereof, and use its commercially reasonable efforts to cause such filed registration statement to become and remain effective for a period of not less than 180 days, or in the case of a shelf registration statement, one year (or such shorter period in which all of the Registrable Securities of the Stockholders included in such registration statement shall have actually been sold thereunder).

(b)     Prior to filing a registration statement or prospectus or any amendment or supplement thereto, the Company shall, if requested, furnish to each participating Stockholder and each underwriter, if any, of the Registrable Securities covered by such registration statement copies of such registration statement as proposed to be filed, and thereafter the Company shall furnish to such Stockholder and underwriter, if any, such number of copies of such registration statement, each amendment and supplement thereto (in each case including all exhibits thereto and documents incorporated by reference therein), the prospectus included in such registration

statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424, Rule 430A, Rule 430B or Rule 430C under the Securities Act and such other documents as such Stockholder or underwriter may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such Stockholder.  Each Stockholder shall have the right to request that the Company modify any information contained in such registration statement, amendment and supplement thereto pertaining to such Stockholder and the Company shall use its commercially reasonable efforts to comply with such request, *provided, however*, that the Company shall not have any obligation so to modify any information if the Company reasonably expects that so doing would cause the prospectus to contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

(c)     After the filing of the registration statement, the Company shall (i) cause the related prospectus to be supplemented by any required prospectus supplement, and, as so supplemented, to be filed pursuant to Rule 424 under the Securities Act, (ii) comply with the provisions of the Securities Act with respect to the disposition of all Securities covered by such registration statement during the applicable period in accordance with the intended methods of disposition by the Stockholders thereof set forth in such registration statement or supplement to such prospectus and (iii) promptly notify each Stockholder holding Registrable Securities covered by such registration statement of any stop order issued or threatened by the SEC or any state securities commission and take all reasonable actions required to prevent the entry of such stop order or to remove it if entered.

(d)     The Company shall use its commercially reasonable efforts to (i) register or qualify the Registrable Securities covered by such registration statement under such other securities or "blue sky" laws of such jurisdictions in the United States as any Registering Stockholder holding such Registrable Securities reasonably (in light of such Stockholder's intended plan of distribution) requests and (ii) cause such Registrable Securities to be registered with or approved by such other governmental agencies or authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be reasonably necessary or advisable to enable such Stockholder to consummate the disposition of the Registrable Securities owned by such Stockholder, *provided* that the Company shall not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 5.06(d), (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction.

(e)     The Company shall immediately notify each Stockholder holding such Registrable Securities covered by such registration statement, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the occurrence of an event requiring the preparation of a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading and promptly prepare and make available to each such Stockholder and file with the SEC any such supplement or amendment.

(f)     The Company shall have the right to select an underwriter or underwriters in connection with any Public Offering resulting from any Demand Registration pursuant to Section

22

5.03 or registration of Company Securities by the Company pursuant to 5.04, which underwriter or underwriters may include any Affiliate of any Stockholder, *provided* that prior to the Class A Full Conversion Date, the selection of such underwriter or underwriters shall be subject to the reasonable approval of the majority of the Class B Directors. In connection with any Public Offering, the Company shall enter into customary agreements (including an underwriting agreement in customary form) and take all such other actions as are reasonably required in order to expedite or facilitate the disposition of such Registrable Securities in any such Public Offering, including the engagement of a "qualified independent underwriter" in connection with the qualification of the underwriting arrangements with the FINRA.

(g)    Upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, the Company shall make available for inspection by any Stockholder and any underwriter participating in any disposition pursuant to a registration statement being filed by the Company pursuant to this Section 5.06 and any attorney, accountant or other professional retained by any such Stockholder or underwriter (collectively, the "**Inspectors**"), all financial and other records, pertinent corporate documents and properties of the Company (collectively, the "**Records**") as shall be reasonably necessary or desirable to enable them to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information reasonably requested by any Inspectors in connection with such registration statement. Records that the Company determines, in good faith, to be confidential and that it notifies the Inspectors are confidential shall not be disclosed by the Inspectors unless (i) the disclosure of such Records is necessary to avoid or correct a misstatement or omission in such registration statement or (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction. Each Stockholder agrees that information obtained by it as a result of such inspections shall be deemed confidential and shall not be used by it or its Affiliates as the basis for any market transactions in the Company Securities unless and until such information is made generally available to the public. Each Stockholder further agrees that, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, it shall give notice to the Company and allow the Company, at its expense, to undertake appropriate action to prevent disclosure of the Records deemed confidential.

(h)    The Company shall furnish to each Registering Stockholder and to each such underwriter, if any, a signed counterpart, addressed to such underwriter, of (i) an opinion or opinions of counsel to the Company and (ii) a comfort letter or comfort letters from the Company's independent public accountants, each in customary form and covering such matters of the kind customarily covered by opinions or comfort letters.

(i)    The Company shall otherwise use its commercially reasonable efforts to comply with all applicable rules and regulations of the SEC, and make available to its security holders, as soon as reasonably practicable, an earnings statement or such other document that shall satisfy the requirements of Rule 158 under the Securities Act.

(j)    The Company may require each Stockholder promptly to furnish in writing to the Company such information regarding the distribution of the Registrable Securities as the Company may from time to time reasonably request and such other information as may be legally required in connection with such registration.

23

(k)    Each Stockholder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 5.06(e), such Stockholder shall forthwith discontinue disposition of Registrable Securities pursuant to the registration statement covering such Registrable Securities until such Stockholder's receipt of the copies of the supplemented or amended prospectus contemplated by Section 5.06(e), and, if so directed by the Company, such Stockholder shall deliver to the Company all copies, other than any permanent file copies then in such Stockholder's possession, of the most recent prospectus covering such Registrable Securities at the time of receipt of such notice. If the Company shall give such notice, the Company shall extend the period during which such registration statement shall be maintained effective (including the period referred to in Section 5.06(a)) by the number of days during the period from and including the date of the giving of notice pursuant to Section 5.06(e) to the date when the Company shall make available to such Stockholder a prospectus supplemented or amended to conform with the requirements of Section 5.06(e).

(l)    The Company shall use its commercially reasonable efforts to list all Registrable Securities covered by such registration statement on any securities exchange or quotation system on which any of the Registrable Securities are then listed or traded.

(m)    The Company shall have appropriate officers of the Company (i) prepare and make presentations at any "road shows" and before analysts and rating agencies, as the case may be, (ii) take other actions to obtain ratings for any Registrable Securities and (iii) otherwise use their reasonable best efforts to cooperate as reasonably requested by the underwriters in the offering, marketing or selling of the Registrable Securities.

*Section 5.07.    Indemnification by the Company.*  The Company agrees to indemnify and hold harmless each Stockholder beneficially owning any Registrable Securities covered by a registration statement, its officers, directors, employees, partners and agents, and each Person, if any, who controls such Stockholder within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages, liabilities and expenses (including reasonable expenses of investigation and reasonable attorneys' fees and expenses) ("**Damages**") caused by or relating to any untrue statement or alleged untrue statement of a material fact contained in any registration statement or prospectus relating to the Registrable Securities (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or any preliminary prospectus, or caused by or relating to any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by the Company of any securities laws in connection therewith, except insofar as such Damages are caused by or related to any such untrue statement or omission or alleged untrue statement or omission so made based upon information furnished in writing to the Company by such Stockholder or on such Stockholder's behalf.

*Section 5.08.    Indemnification by Participating Stockholders.*  Each Stockholder holding Registrable Securities included in any registration statement agrees, severally but not jointly, to indemnify and hold harmless the Company, its officers, directors and agents and each Person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the foregoing indemnity from the Company to such Stockholder, but, other than in the case of fraud by such Stockholder, only with respect to

24

information furnished in writing by such Stockholder or on such Stockholder's behalf for use in any registration statement or prospectus relating to the Registrable Securities, or any amendment or supplement thereto, or any preliminary prospectus. As a condition to including Registrable Securities in any registration statement filed in accordance with Article 2, the Company may require that it shall have received an undertaking reasonably satisfactory to it from any underwriter to indemnify and hold it harmless to the extent customarily provided by underwriters with respect to similar securities. No Stockholder shall, other than in the case of fraud by such Stockholder, be liable under this Section 5.08 for any Damages in excess of the net proceeds realized by such Stockholder in the sale of Registrable Securities of such Stockholder to which such Damages relate.

Section 5.09. *Conduct of Indemnification Proceedings*. If any proceeding (including any governmental investigation) shall be instituted involving any Person in respect of which indemnity may be sought pursuant to this Article 5, such Person (an "**Indemnified Party**") shall promptly notify the Person against whom such indemnity may be sought (the "**Indemnifying Party**") in writing and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to such Indemnified Party, and shall assume the payment of all fees and expenses, *provided* that the failure of any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent that the Indemnifying Party is materially prejudiced by such failure to notify. In any such proceeding, any Indemnified Party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (i) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel or (ii) in the reasonable judgment of such Indemnified Party representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that, in connection with any proceeding or related proceedings in the same jurisdiction, the Indemnifying Party shall not be liable for the reasonable fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) at any time for all such Indemnified Parties, and that all such fees and expenses shall be reimbursed as they are incurred. In the case of any such separate firm for the Indemnified Parties, such firm shall be designated in writing by the Indemnified Parties. The Indemnifying Party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent, or if there be a final judgment for the plaintiff, the Indemnifying Party shall indemnify and hold harmless such Indemnified Parties from and against any loss or liability (to the extent stated above) by reason of such settlement or judgment. Without the prior written consent of the Indemnified Party, no Indemnifying Party shall effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Party is or could have been a party and indemnity could have been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability arising out of such proceeding.

Section 5.10. *Contribution*. If the indemnification provided for in this Article 5 is unavailable to the Indemnified Parties in respect of any Damages, then each such Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Damages (i) as between the Company and the Stockholders holding Registrable Securities covered by a registration statement on the one hand and the underwriters on the other, in such proportion as is appropriate to reflect the relative

benefits received by the Company and such Stockholders on the one hand and the underwriters on the other, from the offering of the Registrable Securities, or if such allocation is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits but also the relative fault of the Company and such Stockholders on the one hand and of such underwriters on the other in connection with the statements or omissions that resulted in such Damages, as well as any other relevant equitable considerations and (ii) as between the Company on the one hand and each such Stockholder on the other, in such proportion as is appropriate to reflect the relative fault of the Company and of each such Stockholder in connection with such statements or omissions, as well as any other relevant equitable considerations. The relative benefits received by the Company and such Stockholders on the one hand and such underwriters on the other shall be deemed to be in the same proportion as the total proceeds from the offering (net of underwriting discounts and commissions but before deducting expenses) received by the Company and such Stockholders bear to the total underwriting discounts and commissions received by such underwriters, in each case as set forth in the table on the cover page of the prospectus. The relative fault of the Company and such Stockholders on the one hand and of such underwriters on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company and such Stockholders or by such underwriters. The relative fault of the Company on the one hand and of each such Stockholder on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company and the Stockholders agree that it would not be just and equitable if contribution pursuant to this Section 5.10 were determined by pro rata allocation (even if the underwriters were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph. The amount paid or payable by an Indemnified Party as a result of the Damages referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any such action or claim. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. Each Stockholder's obligation to contribute pursuant to this Section 5.10 is several in the proportion that the proceeds of the offering received by such Stockholder bears to the total proceeds of the offering received by all such Stockholders and not joint.

Section 5.11. *Participation in Public Offering*. No Stockholder may participate in any Public Offering hereunder unless such Stockholder (a) agrees to sell such Stockholder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Persons entitled hereunder to approve such arrangements and (b) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements and the provisions of this Agreement in respect of registration rights.

*Section 5.12. Other Indemnification.*  Indemnification similar to that specified herein (with appropriate modifications) shall be given by the Company and each Stockholder participating therein with respect to any required registration or other qualification of securities under any federal or state law or regulation or governmental authority other than the Securities Act.

*Section 5.13. Cooperation by the Company.*  If any Stockholder shall propose to transfer any Registrable Securities pursuant to Rule 144, the Company shall cooperate, to the extent commercially reasonable, with such Stockholder and shall provide to such Stockholder such information as such Stockholder shall reasonably request.

*Section 5.14. No Transfer of Registration Rights.*  None of the rights of Stockholders under this Article 5 shall be assignable by any Stockholder to any Person acquiring Registrable Securities in any Public Offering or pursuant to Rule 144.

*Section 5.15. Limitations on Subsequent Registration Rights.*  The Company agrees that it shall not enter into any agreement with any holder or prospective holder of any securities of the Company (a) that would allow such holder or prospective holder to include such securities in any Demand Registration or Piggyback Registration unless, under the terms of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that their inclusion would not reduce the amount of the Registrable Securities of the Stockholders included therein or (b) on terms otherwise more favorable than this Agreement.

ARTICLE 6
INFORMATION RIGHTS

*Section 6.01. Reports by the Company.*  The Company agrees to furnish each Stockholder, for so long as such Stockholder owns any issued and outstanding Common Shares:

(a)    as soon as practicable and, in any event, within [45][5] days after the end of each of the first three fiscal quarters, the unaudited consolidated balance sheet of the Company and its Subsidiaries as at the end of such quarter and the related unaudited statement of operations and cash flow for such quarter and for the portion of the fiscal year then ended (including providing such reconciliations as necessary for the evaluation of whether performance targets established by the Equity Incentive Plan and the employment agreements of senior management of the Company are met), in each case prepared in accordance with GAAP, together with a comparison of the figures in such financial statements with the figures for the corresponding portion of the previous fiscal year and a narrative containing the information that would be required in a "Management's Discussion and Analysis" pursuant to Regulation S-K under the Exchange Act;

(b)    as soon as practicable and, in any event, within [90][6] days after the end of each fiscal year, the audited consolidated balance sheet of the Company and its Subsidiaries as at the end of such fiscal year and the related audited statement of operations and cash flow for such

---

[5] Timing to conform to that in the new MNG credit facility.

fiscal year and for the portion of the fiscal year then ended (including providing such reconciliations as necessary for the evaluation of whether performance targets established by the Equity Incentive Plan and the employment agreements of senior management of the Company are met), in each case prepared in accordance with GAAP and certified by the Company's independent public accountants, together with a comparison of the figures in such financial statements with the figures for the previous fiscal year and a narrative containing the information that would be required in a "Management's Discussion and Analysis" pursuant to Regulation S-K under the Exchange Act;

(c)    within sixty Business Days following the end of each of the first, second and third fiscal quarters and within one hundred Business Days following the end of the fourth fiscal quarter of the Company, the Company shall host a conference call with the Stockholders to discuss the business and performance of the Company and its Subsidiaries; and

(d)    as promptly as reasonably practicable, such other information with respect to the Company or any of its Subsidiaries as would be required to be disclosed on Form 8-K under the Exchange Act if the Company were subject to the periodic reporting requirements of Sections 13 or 15(d) of the Exchange Act.

*Section 6.02. Termination.*  Section 6.01 shall terminate and be of no further force or effect when the Company first becomes subject to the periodic reporting requirements of Sections 13 or 15(d) of the Exchange Act.

*Section 6.03. Confidentiality.*  (a)  Each Stockholder agrees that it shall use, and that it shall cause any Person to whom Confidential Information is disclosed pursuant to clause (i) below to use, Confidential Information disclosed to it only in connection with its investment in the Company and not for any other purpose.  Each Stockholder further acknowledges and agrees that it shall not disclose any Confidential Information to any Person, except that Confidential Information may be disclosed:

(i)    to such Stockholder's directors, officers, employees, stockholders, members, partners, agents, counsel, investment advisers or other representatives in the normal course of the performance of their duties or to any financial institution providing credit to such Stockholder, *provided* that such Stockholder shall either (x) so inform any such Person of such Stockholder's obligations hereunder and (A) shall be responsible for any breach hereof by any such Person or (B) such Person agrees to be bound by a confidentiality agreement in form and substance reasonably acceptable to the Company, or (y) with respect to any such Person that is subject to a legal or ethical obligation of confidentiality, inform such Person of such Stockholder's obligations hereunder and direct such Person to keep such Confidential Information confidential in accordance with this Section 6.03;

(ii)    to the extent required by applicable law, rule or regulation (including complying with any oral or written questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process to which a Stockholder is subject, *provided* that, unless prohibited by applicable law or regulation, such Stockholder agrees to give the Company prompt notice of such request(s), to the

28

extent practicable, so that the Company may seek an appropriate protective order or similar relief (and the Stockholder shall reasonably cooperate at the Company's expense, with such efforts by the Company, and shall in any event make only the minimum disclosure required by such law, rule or regulation);

(iii)    to any Person to whom such Stockholder is contemplating a Transfer of its Company Securities, *provided* that such Transfer would not be in violation of the provisions of this Agreement and such potential transferee is advised of the confidential nature of such information and agrees to be bound by a confidentiality agreement consistent with the provisions hereof reasonably acceptable to the Company;

(iv)    to any regulatory authority or rating agency to which the Stockholder or any of its affiliates is subject or with which it has regular dealings, as long as such authority or agency is advised of the confidential nature of such information; or

(v)    if the prior written consent of the Board shall have been obtained.

Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Company or any Stockholder.

(b)    "**Confidential Information**" means any non-public information concerning the Company or any of its Subsidiaries furnished to any Stockholder by or on behalf of the Company, *provided* that the term "Confidential Information" does not include information that (i) is or becomes generally available to the public other than as a result of a disclosure by a Stockholder or its representatives in violation of this Agreement, (ii) was available to such Stockholder on a non-confidential basis prior to its disclosure to such Stockholder or its representatives by the Company, (iii) becomes available to such Stockholder on a non-confidential basis from a source other than the Company after the disclosure of such information to such Stockholder or its representatives by the Company, which source is (at the time of receipt of the relevant information) not, to the best of such Stockholder's knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Company or another Person or (iv) is independently developed by such Stockholder without violating any confidentiality agreement with, or other obligation of secrecy to, the Company.

ARTICLE 7
MISCELLANEOUS

*Section 7.01. Binding Effect; Assignability; Benefit.*    (a)  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors, legal representatives and permitted assigns.  Any Stockholder that ceases to own beneficially any Company Securities shall cease to be bound by the terms hereof (other than (i) the provisions of Sections 5.07, 5.08, 5.09, 5.10 and 5.12 applicable to such Stockholder with respect to any offering of Registrable Securities completed before the date such Stockholder ceased to own any Company Securities and (ii) the provisions of this Article 7).

(b)    Any Person acquiring Company Securities that is required by the terms of this Agreement or any employment agreement or stock purchase, option, stock option or other

29

compensation plan of the Company or any Subsidiary to become a party hereto shall (unless already bound hereby) execute and deliver to the Company a Joinder Agreement.

(c)     Nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto, and their respective heirs, successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

(d)     All of the provisions of this Agreement shall apply to all Company Securities now owned or which may be issued to or acquired by a Stockholder in consequence of any additional issuance, purchase, exchange, conversion or reclassification of stock, corporate reorganization, or any form of recapitalization, consolidation, merger, stock split or stock dividend, or which are acquired by a Stockholder in any other manner.

*Section 7.02. Notices.* All notices, requests and other communications to any party shall be in writing and shall be delivered in person, mailed by certified or registered mail, return receipt requested, or sent by facsimile transmission,

if to the Company to:

MediaNews Group, Inc.
[address]
Attention: [name]
Fax: [number]

with a copy to:

[Name]
[address]
Attention: [name]
Fax: [number]

if to any Stockholder, to the address or fax number for such Stockholder reflected on the books and records of the Company.

All notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt. Any notice, request or other written communication sent by facsimile transmission shall be confirmed by certified or registered mail, return receipt requested, posted within one Business Day, or by personal delivery, whether courier or otherwise, made within two Business Days after the date of such facsimile transmissions.

Any Person that becomes a Stockholder shall provide its address and fax number to the Company.

*Section 7.03.  Waiver; Amendment; Termination.*  (a)  Subject to Section 7.03(b), no provision of this Agreement may be amended, waived or otherwise modified except by an instrument in writing executed by the Company with approval of (w) the Board, and, prior to the Class A Full Conversion Date, (x) Stockholders holding more than 50% (or more than 66-2/3%, in the case of an amendment, waiver or modification of Article 4) of the outstanding Common Shares held by the parties hereto at the time of such proposed amendment or modification, (y) prior to the Class A Full Conversion Date, the holders of more than 50% of the outstanding shares of Class A Common Stock held by them at the time of such proposed amendment or modification and (z) from and after the Class A Full Conversion Date, the Class A Holders at the time of such proposed amendment or modification if such amendment or modification adversely affects the rights of the Class A Holders pursuant to Article 4 (or any definitions in Article 4) or Section 5.03(g) (or any definitions in Section 5.03(g)).  In addition, any party may waive any provision of this Agreement with respect to itself by an instrument in writing executed by the party against whom the waiver is to be effective.

(b)    This Agreement shall terminate upon the closing of a Sale.

*Section 7.04.  Other Businesses; Waiver of Certain Duties.*  (a)  Each Stockholder and each general partner thereof, each member, limited or general partner of each such general partner and each of their Affiliates, officers, directors, shareholders, employees and agents may engage in or possess an interest in any other business venture of any nature or description (including any business venture that is a competitor of the Company), on its own account, or in partnership with, or as an employee, officer, director or shareholder of any other Person.  Each Stockholder and each general partner thereof, each member, limited or general partner of each such general partner and each of their Affiliates, officers, directors, shareholders, employees and agents may (i) engage in, and shall have no duty to refrain from engaging in, separate businesses or activities from the Company or any of its subsidiaries, including business or activities that are the same or similar to, or compete directly or indirectly with, those of the Company or any of its subsidiaries, (ii) do business with any potential or actual customer or supplier of the Company or any of its subsidiaries and (iii) employ or otherwise engage any officer or employee of the Company or any of its subsidiaries.

(b) None of the Stockholders or any of their respective Affiliates shall have any obligation to present any business opportunity to the Company or any of its subsidiaries, even if the opportunity is one that the Company or any of its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so, and no such Person shall be liable to the Company, its stockholders or any of Company's subsidiaries or any Stockholder for breach of any fiduciary or other duty, as a shareholder, by reason of the fact that such Person pursues or acquires such business opportunity, directs such business opportunity to another Person or fails to present such business opportunity, or information regarding such business opportunity, to the Company or any of its subsidiaries.

*Section 7.05.  Governing Law.*  Except to the extent the Delaware General Corporation Law is mandatorily applicable, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflicts of laws rules of such state.

*Section 7.06. Jurisdiction.* The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States District Court for the Southern District of New York or any New York State court sitting in New York City, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of New York, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 7.02 shall be deemed effective service of process on such party.

*Section 7.07. WAIVER OF JURY TRIAL.* EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

*Section 7.08. Specific Enforcement.* Each party hereto acknowledges that the remedies at law of the other parties for a breach or threatened breach of this Agreement would be inadequate and, in recognition of this fact, any party to this Agreement, without posting any bond, and in addition to all other remedies that may be available, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy that may then be available.

*Section 7.09. Counterparts; Effectiveness.* This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original. This Agreement shall become effective on the Effective Date.

*Section 7.10. Entire Agreement.* This Agreement constitutes the entire agreement among the parties hereto and supersedes all prior and contemporaneous agreements and understandings, both oral and written, among the parties hereto with respect to the subject matter hereof and thereof.

*Section 7.11. Severability.* If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

IN WITNESS WHEREOF, the parties hereto have caused this Stockholders' Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

MEDIANEWS GROUP, INC.

By: _____
      Name:
      Title:

EXHIBIT A

<u>JOINDER TO STOCKHOLDERS' AGREEMENT</u>

This Joinder Agreement (this "**Joinder Agreement**") is made as of the date written below by the undersigned (the "**Joining Party**") in accordance with the MediaNews Group, Inc. Stockholders' Agreement dated as of _____, 20__ (as amended, amended and restated or otherwise modified from time to time, the "**Stockholders' Agreement**"), as the same may be amended from time to time.  Capitalized terms used, but not defined, herein shall have the meaning ascribed to such terms in the Stockholders' Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to the Stockholders' Agreement as of the date hereof and shall have all of the rights and obligations of a "Stockholder" thereunder as if it had executed the Stockholders' Agreement.  The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Stockholders' Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.
Date: _____ ___, _____

[NAME OF JOINING PARTY]

By: _____
    Name:
    Title:

Address for Notices:

**SCHEDULE I**

<u>STOCKHOLDERS</u>

**SCHEDULE II**

STOCKHOLDERS

**SCHEDULE III**

STOCKHOLDERS

**SCHEDULE IV**

<u>WARRANTHOLDERS</u>

[THIS PAGE INTENTIONALLY LEFT BLANK]