## IN THE UNITED STATES BANKRUPTCY COURT
## IN THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

*In re*                                                                      :

**AFFILIATED MEDIA, INC.,** [1]                        :    **Chapter 11**

                          **Debtor.**                      :    **Case No. 10-10202 (KJC)**

                                                                             :

                                                                             :

                                                                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## FIRST AMENDED PREPACKAGED PLAN OF
## REORGANIZATION OF AFFILIATED MEDIA, INC.,
## <u>PROPOSED BY AFFILIATED MEDIA, INC.</u>

Affiliated Media, Inc. proposes the following first amended prepackaged chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.

---

[1]    The last four digits of the Debtor's federal tax identification number are 5553.  The Debtor's corporate headquarters and mailing address is 101 W. Colfax Avenue, Suite 1100, Denver, CO 80202.

# TABLE OF CONTENTS

Page

ARTICLE I    DEFINITIONS AND INTERPRETATION ...................................................1

    1.1.  Definitions.................................................................................1
    1.2.  Rules of Interpretation ...............................................................12

ARTICLE II    PROVISIONS FOR PAYMENT OF UNCLASSIFIED
    ADMINISTRATIVE, PROFESSIONAL AND TAX CLAIMS ...................13

    2.1.  Administrative Expense Claims...................................................13
    2.2.  Professional Compensation and Reimbursement Claims .....................14
    2.3.  Priority Tax Claims...................................................................14

ARTICLE III    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ..................14

    3.1.  Introduction.............................................................................15
    3.2.  Classes of Claims Against and Equity Interests in Debtor's Estate.........15

ARTICLE IV    TREATMENT OF CLAIMS AND INTERESTS .........................................16

    4.1.  Class 1: Priority Non-Tax Claims...............................................16
    4.2.  Class 2: Senior Loan Claims....................................................16
    4.3.  Class 3: Other Secured Claims.................................................17
    4.4.  Class 4: General Unsecured Claims...........................................18
    4.5.  Class 5: Subordinated Note Claims. ..........................................18
    4.6.  Class 6: Intercompany Claims..................................................19
    4.7.  Class 7: Securities Litigation Claims..........................................19
    4.8.  Class 8: Old AMI Equity Interests.............................................19
    4.9.  Compliance with Laws and Effects on Distributions ........................19
    4.10.  Reservation of Rights Regarding Claims......................................19

ARTICLE V    IDENTIFICATION OF CLASSES OF CLAIMS AND EQUITY
    INTERESTS IMPAIRED; ACCEPTANCE OR REJECTION OF
    THIS PREPACKAGED PLAN OF REORGANIZATION ...........................19

    5.1.  Holders of Claims and Equity Interests Entitled to Vote.....................19
    5.2.  Presumed Acceptance of Prepackaged Plan ..................................19
    5.3.  Presumed Rejection of Prepackaged Plan......................................20
    5.4.  Acceptance by Impaired Classes ...............................................20
    5.5.  Nonconsensual Confirmation.....................................................20

ARTICLE VI    MEANS OF IMPLEMENTATION AND POST-EFFECTIVE DATE
    GOVERNANCE.........................................................................20

    6.1.  Corporate Action......................................................................20
    6.2.  New Senior Secured Credit Agreement.........................................21

6.3.   Issuance of New Common Stock ...................................................................22
6.4.   Issuance of Subordinated Note Warrants ......................................................22
6.5.   New Stockholders' Agreement ......................................................................22
6.6.   Cancellation of Agreements ..........................................................................22
6.7.   Settlement, Compromise and Release of Guarantee Obligations .................22
6.8.   Surrender of Existing Securities ...................................................................23
6.9.   Cancellation of the Subordinated Notes and Equity Interests ......................24
6.10.  Amended and Restated Employment Agreements .........................................24
6.11.  Equity Incentive Plan ...................................................................................25
6.12.  Incentive Bonus Agreements ........................................................................25
6.13.  Existing Liens ...............................................................................................25
6.14.  Compromise of Controversies ......................................................................25
6.15.  Effectuating Documents; Further Transactions ............................................25
6.16.  Certain Actions Relating To Both the FCC Broadcast Licenses and FCC
       Non-Broadcast Licenses ...............................................................................25
6.17.  Certain Actions Relating Particularly to FCC Broadcast Licenses ..............25
6.18.  Certain Actions Relating Particularly to FCC Non-Broadcast Licenses ...............26

ARTICLE VII       PROVISIONS GOVERNING DISTRIBUTIONS .........................................26

7.1.   Date of Distributions on Account of Allowed Claims ...................................26
7.2.   Sources of Cash for Plan Distribution ..........................................................26
7.3.   Time Bar to Cash Payments ..........................................................................26
7.4.   Disbursement Agent ......................................................................................26
7.5.   Record Date for Distribution ........................................................................26
7.6.   Delivery of Distributions ..............................................................................27
7.7.   Subordinated Note Claims and Senior Loan Claims .....................................27
7.8.   Manner of Cash Payments Under Prepackaged Plan .....................................27
7.9.   Fractional Shares ...........................................................................................28
7.10.  Setoffs and Recoupment ...............................................................................28
7.11.  Exemption from Securities Law ...................................................................28
7.12.  Allocation of Payments .................................................................................28
7.13.  No Postpetition Interest on Claims ...............................................................28

ARTICLE VIII     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
                 LEASES ..........................................................................................29

8.1.   Assumption of Contracts and Leases ............................................................29

ARTICLE IX        CONDITIONS PRECEDENT  TO EFFECTIVE DATE ...............................31

9.1.   Conditions Precedent to Effective Date of Prepackaged Plan ......................31
9.2.   AMI Waiver of Conditions Precedent ...........................................................32
9.3.   Substantial Consummation ...........................................................................32

ARTICLE X         EFFECT OF CONFIRMATION .....................................................................32

10.1.  Vesting of Assets ..........................................................................................32

10.2.    Binding Effect ..................................................................................32
10.3.    Settlements, Releases and Discharges ...............................................32
10.4.    Discharge of the Debtor ....................................................................33
10.5.    Exculpation ......................................................................................33
10.6.    Releases By the Debtor and its Estate................................................33
10.7.    Consensual Releases By Holders of Claims .......................................34
10.8.    Settlement and Compromise Among Debtor, the Guaranteeing
         Subsidiaries and Administrative Agent ..............................................34
10.9.    Waiver of Avoidance Actions.............................................................35
10.10.   Term of Injunctions or Stays.............................................................35
10.11.   Termination of Subordination Rights and Settlement of Related Claims.............36
10.12.   Indemnification Obligations ..............................................................36
10.13.   Limitation on Indemnification ...........................................................37
10.14.   Preservation of Claims......................................................................37
10.15.   No Acquisition of a Majority of Voting Interests.................................37
10.16.   No Change of Control ........................................................................38

ARTICLE XI        RETENTION OF JURISDICTION.................................................38

11.1.    Jurisdiction of the Bankruptcy Court..................................................38

ARTICLE XII       MISCELLANEOUS .....................................................................40

12.1.    Payment of Statutory Fees .................................................................40
12.2.    Payment of Indenture Trustee Fees and Administrative Agent Fees
         Related to Distributions Received Under this Prepackaged Plan ..........40
12.3.    Further Assurances............................................................................40
12.4.    Exhibits Incorporated ........................................................................40
12.5.    Intercompany Claims.........................................................................40
12.6.    Amendment or Modification of this Prepackaged Plan ........................40
12.7.    Inconsistency.....................................................................................41
12.8.    Section 1125(e) of the Bankruptcy Code.............................................41
12.9.    Compliance with Tax Requirements....................................................41
12.10.   Determination of Tax Filings and Taxes .............................................41
12.11.   Exemption from Transfer Taxes .........................................................41
12.12.   Dissolution of any Statutory Committees and Cessation of Fee and
         Expense Payment ..............................................................................42
12.13.   Severability of Provisions in this Prepackaged Plan.............................42
12.14.   Governing Law ..................................................................................42
12.15.   No Admissions...................................................................................42
12.16.   Reservation of Rights.........................................................................42
12.17.   Notices ..............................................................................................43

ARTICLE XIII      Article 1 Definitions ........................................................................1

ARTICLE XIV      Article 2 Corporate Governance ......................................................6

ARTICLE XV       Article 3 Restrictions on Transfer....................................................9

ARTICLE XVI      Article 4 Tag-along Rights; Preemptive Rights..............................13

ARTICLE XVII     Article 5 Registration Rights .........................................................16

ARTICLE XVIII    Article 6 Information Rights...........................................................27

ARTICLE XIX      Article 7 Miscellaneous .................................................................29

Plan Exhibit 1: Amended and Restated Employment Agreements Term Sheets
Plan Exhibit 2: Equity Incentive Plan Term Sheet
Plan Exhibit 3: List of Guaranteeing Subsidiaries
Plan Exhibit 4: Incentive Bonus Agreements Term Sheet
Plan Exhibit 5: Intentionally Omitted
Plan Exhibit 6: New Senior Credit Facility Term Sheet
Plan Exhibit 7: Restated Bylaws
Plan Exhibit 8: Restated Certificate of Incorporation
Plan Exhibit 9: Singleton Warrants Term Sheet
Plan Exhibit 10: Stockholders' Agreement
Plan Exhibit 11: Subordinated Note Warrants Term Sheet
Plan Exhibit 12: Warrant Agreement

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

     1.1.   ***Definitions***.  The following terms used herein shall have the respective meanings set forth below:

     ***6 3/8% Indenture*** means that certain indenture, dated as of January 26, 2004, between AMI (known at that time as MediaNews Group, Inc.) and the Indenture Trustee, pursuant to which the 6 3/8% Notes were issued, as amended by that first supplemental indenture, dated as of April 4, 2008.

     ***6 3/8% Notes*** means those certain 6 3/8% Senior Subordinated Notes due 2014 issued by AMI pursuant to the 6 3/8% Indenture.

     ***6 7/8% Indenture*** means that certain indenture, dated as of November 25, 2003, between AMI (known at that time as MediaNews Group, Inc.) and the Indenture Trustee, pursuant to which the 6 7/8% Notes were issued, as amended by that certain first supplemental indenture, dated as of April 4, 2008.

     ***6 7/8% Notes*** means those certain 6 7/8% Senior Subordinated Notes due 2013 issued by AMI pursuant to the 6 7/8% Indenture.

     ***Administrative Agent*** means Bank of America, N.A. as administrative agent for the Senior Lenders under the Senior Credit Agreement Documents or any duly appointed successor administrative agent.

     ***Administrative Expense Claim*** means a Claim for any right to payment of an administrative expense of the Reorganization Case, of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2) or 507(b) of the Bankruptcy Code, including (i) any actual and necessary costs and expenses of preserving the Estate, (ii) any indebtedness or obligations incurred or assumed by the Debtor during the Reorganization Case and (iii) any compensation for professional services rendered and reimbursement of expenses incurred by the advisors to the Debtor.  Any fees or charges assessed against the estate of the Debtor under section 1930 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 12.1 hereof.

     ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

     ***Allowed*** means, with reference to any Claim or Equity Interest, (a) any Claim or Equity Interest arising on or before the Effective Date (i) as to which the Debtor does not object, or (ii) as to which any objection (by any party) has been determined by a Final Order to the extent any interposed objection is determined in favor of the respective holder, (b) any Claim or Equity Interest as to which the liability of the Debtor and the amount thereof are determined by Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (c) any Claim or Equity Interest expressly allowed hereunder.

***Amended and Restated Employment Agreements*** means the amended and restated employment agreements, on the terms summarized in Plan Exhibit 1, to be entered into between Reorganized AMI, on the one hand, and Mr. Singleton and Mr. Lodovic, respectively, on the other hand.

***AMI*** means Affiliated Media, Inc., a Delaware corporation previously known as MediaNews Group, Inc.

***AMI Group*** means (i) the affiliated group of corporations, within the meaning of section 1504 of the Tax Code, of which AMI is the common parent and (ii) any other group of corporations filing consolidated, combined or unitary tax returns for state or local tax purposes of which AMI is the common parent.

***Bankruptcy Code*** means title 11 of the United States Code, as now in effect or as hereafter amended, to the extent applicable to AMI's Reorganization Case.

***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware or any other court of the United States having jurisdiction over AMI's Reorganization Case.

***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code as now in effect or as hereafter amended to the extent applicable to AMI's Reorganization Case.

***Benefit Plan*** means any employment, compensation, tax-qualified or non-tax qualified pension plan, healthcare, bonus, incentive compensation, sick leave and other leaves, vacation pay, expense reimbursement, dependent care, retirement, savings, workers' compensation, life insurance, disability, dependent healthcare, education, severance or other benefit plans or programs and any individual contract or agreement that has not been terminated or rejected for the benefit of the current or former directors, officers or employees and their eligible dependents of AMI or its Subsidiaries. Benefit Plans and programs include, without limitation, the Pension Plans, the MediaNews Group Retirement/Savings Plan, the MediaNews Group Welfare Benefit Plan, which includes medical coverage, dental coverage, vision coverage, short-term and long-term disability coverage, Accidental Death and Dismemberment coverage, and life insurance, and the AMI cafeteria and flexible spending account plan.

***Board*** means the board of directors of Reorganized AMI, including any duly-formed committee thereof.

***Business Day*** means any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

***Cash*** means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

2

*Causes of Action* has the meaning ascribed to such term in Section 10.14 hereof.

*Claim* has the meaning set forth in section 101(5) of the Bankruptcy Code.

*Class* means any group of substantially similar Claims or Equity Interests classified together hereby pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

*Class A Directors* means directors of the Board elected by holders of Class A New Common Stock.

*Class B Directors* means directors of the Board elected by holders of Class B New Common Stock (or in the case of the initial Class B Directors, designated by the Senior Lender Steering Committee.

*Class A New Common Stock* means the new Class A Common Stock of Reorganized AMI, having the right to elect Class A Directors to the Board and containing other terms as further described in the Disclosure Statement in the section thereof titled "Description of New Common Stock" and as contained in the Restated Certificate of Incorporation, the Restated Bylaws and the Stockholders' Agreement.

*Class B New Common Stock* means the new Class B Common Stock of Reorganized AMI, having the right to elect Class B Directors to the Board and containing other terms as further described in the Disclosure Statement in the section thereof titled "Description of New Common Stock" and as contained in the Restated Certificate of Incorporation, the Restated Bylaws and the Stockholders' Agreement.

*Class C New Common Stock* means the new Class C Common Stock of Reorganized AMI, having the right to vote on limited matters, as further described in the Disclosure Statement in the section thereof titled "Description of New Common Stock" and as contained in the Restated Certificate of Incorporation, the Restated Bylaws and the Stockholders' Agreement.

*Collateral* means any property or interest in property of the Estate subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or other applicable law.

*Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

*Confirmation Hearing* means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of this Prepackaged Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order or orders of the Bankruptcy Court entered pursuant to section 1129 of the Bankruptcy Code confirming this Prepackaged Plan, which shall be in form and substance reasonably satisfactory to the Debtor and the Administrative Agent.

**Cure** means the payment of Cash by the Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), made in the ordinary course of business after the Effective Date pursuant to an executory contract or unexpired lease assumed under section 365 or 1123 of the Bankruptcy Code as necessary to (i) cure a monetary default by the Debtor or (ii) if an objection is filed to the Debtor's proposed assumption or rejection of an executory contract or unexpired lease pursuant to the provisions of this Prepackaged Plan, the amount equal to the unpaid monetary obligations owing by the Debtor and required to be paid pursuant to section 365(b) of the Bankruptcy Code, as may be (x) determined by Final Order or (y) otherwise agreed upon by the parties.

**Debtor** means AMI, and any reference herein to "Debtor" or "AMI" as of a particular date shall be deemed to refer to the same entity regardless of the name under which it was doing business at the time referenced.

**Disbursement Agent** means any Person in its capacity as a disbursement agent under Section 7.4 hereof.

**Disclosure Statement** means that certain disclosure statement relating to this Prepackaged Plan, including all exhibits and schedules thereto including this Prepackaged Plan and certain Plan Supplements, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and rule 3017 of the Bankruptcy Rules.

**Effective Date** means the first Business Day on which all the conditions precedent to the Effective Date specified in Section 9.1 hereof shall have been satisfied or waived as provided in Section 9.2 hereof and upon the filing of a notice by the Debtor of the occurrence of the Effective Date; provided, however, that if a stay, injunction or similar prohibition of the Confirmation Order is in effect, the Effective Date shall be the first Business Day after such stay, injunction or similar prohibition is no longer in effect

**EIP Effective Date Distribution** means the number of shares (or share equivalents) of Class B New Common Stock granted, or reserved for issuance in respect of awards granted, on the Effective Date under the Equity Incentive Plan, which will be a number of shares (or share equivalents) representing up to approximately 11.1% of the total number of shares of New Common Stock issued, or reserved for issuance in respect of awards granted, on the Effective Date (including the Senior Lender Common Stock Distribution).

**Equity Incentive Plan** means the plan, described in Plan Exhibit 2, to be adopted by Reorganized AMI, pursuant to which eligible members of management of Reorganized AMI and its Subsidiaries may be awarded a number of shares (or share equivalents) representing up to 12% of the issued and outstanding New Common Stock (without giving effect to the possible exercise of any of the Subordinated Note Warrants or the Singleton Warrants).

**Equity Interest** means the interest of any holders of equity securities of the Debtor represented by issued and outstanding shares of common or preferred stock or other instruments evidencing a present ownership interest in the Debtor, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

4

*ERISA* has the meaning assigned to such term in section 8.1(h) hereof.

*Estate* means the estate of the Debtor as created under section 541 of the Bankruptcy Code.

*FCC* means the Federal Communications Commission or any successor governmental agency performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

*FCC Broadcast Licenses* means the television and radio broadcast licenses and other licenses, authorizations, waivers and permits that are issued from time to time by the FCC and used in the operation of the television and radio broadcast businesses of the AMI Group.

*FCC Broadcast License Related Assets* means certain assets necessary to render broadcast service, including, but not limited to, transmission equipment, antennae and rights to transmission and antennae sites.

*FCC Non-Broadcast Licenses* means all licenses, authorizations, waivers and permits that are issued from time to time by the FCC to the AMI Group other than the FCC Broadcast Licenses.

*FCC Trust* means the liquidating trust created by the FCC Trust Agreement, to be established pursuant to an order of the Bankruptcy Court, which will take title to the FCC Broadcast Licenses and FCC Broadcast License Related Assets owned by the AMI Group, subject to all necessary consent of the FCC.

*FCC Trust Agreement* means the liquidating trust agreement governing the FCC Trust.

*FCC Trustee* is the collective reference to the individuals who will serve as the trustees of the FCC Trust.

*Final Order* means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, stayed, or amended, and as to which (a) the time to appeal, petition for certiorari or move for a stay, new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 may be filed with respect to such order or judgment.

*Forbearance Agreement* means the agreement among certain of the Senior Lenders, the Debtor and the Guaranteeing Subsidiaries dated as of April 30, 2009 (as amended or supplemented from time to time) providing the terms of forbearance by the Senior Lenders with respect to certain defaults by the Debtor and the Guaranteeing Subsidiaries under the Senior Credit Agreement Documents and encompassing the Restructuring Support Agreement.

*General Unsecured Claim* means any Claim against the Debtor that is not an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Senior Loan Claim, an Intercompany Claim, an Other Secured Claim or a Subordinated Note Claim, and will not include Claims that are disallowed or released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of this Prepackaged Plan or otherwise.

*Guarantee Obligations* has the meaning assigned to such term in Section 6.7 of this Prepackaged Plan.

*Guaranteeing Subsidiaries* means the guaranteeing subsidiaries under the Senior Credit Agreement and listed in Plan Exhibit 3.

*Guarantor Settlement* has the meaning assigned to such term in Section 6.7 of this Prepackaged Plan.

*Incentive Bonus Agreements* is the collective reference to the individual agreements, described in Plan Exhibit 4, with certain officers and key employees of AMI and a Subsidiary of AMI, not including Messrs. Singleton and Lodovic, dated January 2010, providing for the payment of cash bonuses to such individuals in the aggregate amount of approximately $1.6 million, which bonuses will vest and become payable (i) 50% on the day after the Effective Date and (ii) 50% on the first anniversary of the Effective Date.

*Indemnified Person* has the meaning assigned to such term in Section 10.12 of this Prepackaged Plan.

*Indentures* means the 6 7/8% Indenture and the 6 3/8% Indenture.

*Indenture Trustee* means The Bank of New York Trust Company, N.A. and/or its successors, as indenture trustee under each of the Indentures.

*Intercompany Claim* means any Claim against AMI by any Affiliate and any claim against any Affiliate by AMI.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*LOC Facility* means the letter of credit facility to be provided to Reorganized AMI pursuant to the New Senior Secured Credit Agreement, which facility will be secured by first-priority Liens on substantially all of the assets of Reorganized AMI and of the guarantors, and guaranteed by the Guaranteeing Subsidiaries.

*Local Bankruptcy Rules* means the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware, as now in effect or as hereafter amended to the extent applicable to AMI's Reorganization Case.

*MNG Plan* has the meaning assigned to such term in Section 8.1(h) hereof.

*New Common Stock* means, collectively, the Class A New Common Stock, Class B New Common Stock and Class C New Common Stock, each par value $0.001 per share.

*New Senior Credit Facility* means the Term Loan Facility, together with the LOC Facility.

*New Senior Secured Credit Agreement* means the new senior secured credit agreement, which shall be substantially on the terms summarized in Plan Exhibit 6.

*New Senior Secured Credit Documents* means the New Senior Secured Credit Agreement, the New Senior Secured Term Notes and all other documents comprising the definitive documentation of the New Senior Credit Facility, including, without limitation, all collateral and security documents and any intercreditor agreements.

*New Senior Secured Term Notes* means the notes issued by Reorganized AMI to the holders of the Senior Loan Claims pursuant to the New Senior Secured Credit Agreement, which notes will be guaranteed by the Guaranteeing Subsidiaries and secured by first-priority liens on substantially all of the assets of Reorganized AMI and of the Guaranteeing Subsidiaries.

*Old AMI Equity Interest* means any Equity Interest in AMI existing immediately prior to the Effective Date.

*Other Secured Claim* means any Secured Claim against the Debtor (other than a Senior Loan Claim).

*PBGC* has the meaning assigned to such term in Section 8.1(h) hereof.

*Pension Plan* has the meaning assigned to such term in Section 8.1(h) hereof.

*Person* means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

*Petition Date* means the date on which the Debtor files its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

*Plan Documents* means this Prepackaged Plan, together with all Plan Exhibits and all documents described or contemplated herein to be included in the Plan Supplements, including, as the case may be, the documents comprising, or summarized by, the Plan Exhibits.

*Plan Exhibit* means an exhibit to this Prepackaged Plan, which may be altered, amended, modified or supplemented by Plan Supplements with the consent of the Senior Lender Steering Committee. Such Plan Exhibits include (i) the term sheet of the principal terms and conditions of the Amended and Restated Employment Agreements, (ii) the term sheet of the principal terms and conditions of the Equity Incentive Plan, (iii) the list of Guaranteeing Subsidiaries under the Senior Credit Agreement, (iv) the term sheet of the principal terms and conditions of the Incentive Bonus Agreements, (v) the term sheet of the principal terms and conditions of the New Senior Secured Credit Documents, (vi) the Restated Bylaws, (vii) the Restated Certificate of Incorporation, (viii) the term sheet of the principal terms and conditions of the Singleton Warrants, (ix) the Stockholders' Agreement, (x) the term sheet of the principal terms and conditions of the Subordinated Note Warrants and (xi) the Warrant Agreement.

*Plan Supplements* means, collectively, the documents, agreements, instruments, schedules and exhibits and forms or, as applicable, summaries thereof, specified in this Prepackaged Plan or amending Plan Exhibits, to be filed with the Bankruptcy Court not later than two (2) days prior to the Confirmation Hearing, including the list of the initial members of the Board that have been identified as of such date and officers of the Reorganized Debtor, to be selected in accordance with Section 6.1(c) hereof, each in form and substance reasonably acceptable to the Senior Lender Steering Committee and the Administrative Agent, including any alteration, amendment, modification or supplement.

*Prepackaged Plan* means this first amended prepackaged plan of reorganization, including the exhibits and schedules hereto and documents contained in the Plan Supplements.

*Priority Non-Tax Claim* means an unsecured Claim entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

*Priority Tax Claim* means any unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Pro Rata* means the proportion that a Claim in a particular class bears to the aggregate amount of all Claims in such class, except in cases where Pro Rata is used in reference to multiple classes, in which case Pro Rata means the proportion that a Claim in a particular class bears to the aggregate amount of all Claims in such multiple classes.

*Qualified Individual* means, in respect of any individual nominated or otherwise proposed to be elected as a member of the Board, that such individual satisfies independence and other criteria set forth in the Restated Certificate of Incorporation, provided that each of Mr. Singleton and Mr. Lodovic shall be deemed a Qualified Individual regardless of whether he meets any such criterion.

*Released Parties* means (i) any holder of Senior Loan Claims; (ii) the Administrative Agent; (iii) if Class 5 accepts this Prepackaged Plan, any holder of Subordinated Note Claims; (iv) if Class 5 accepts this Prepackaged Plan, the Indenture Trustee; (v) the current and former (each as of the Effective Date) directors and officers of the Debtor; (vi) the Debtor and the Guaranteeing Subsidiaries; (vii) any professional advisors, attorneys, accountants,

investment bankers, restructuring consultants, financial advisors, sub-advisors, managers, and managing and executive directors of the Released Parties described in clauses (i) through (vi) above; provided, however, that professional advisors and attorneys in clause (vii) shall only include those that provided services related to the transactions contemplated by this Prepackaged Plan, and/or the Restructuring Support Agreement (and any predecessor restructuring transaction), including the acquisition of any financing related to any such transactions; and (viii) without duplication, the directors, officers, Affiliates, partners, members, representatives and employees of the parties described in clauses (i) through (iv) and (vii) above.

      *Reorganization Case* means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor on January 22, 2010, in the United States Bankruptcy Court for the District of Delaware and styled In re Affiliated Media, Inc.

      *Reorganized AMI* means AMI on and after the Effective Date.

      *Reorganized Debtor* means Reorganized AMI.

      *Restated Bylaws* means the second amended and restated bylaws to be adopted by AMI upon the Effective Date, which shall be substantially in the form to be included in Plan Exhibit 7, with any modifications that are (i) required to be consistent with the provisions of this Prepackaged Plan and the Bankruptcy Code and (ii) reasonably satisfactory to the Senior Lender Steering Committee.

      *Restated Certificate of Incorporation* means the sixth amended and restated certificate of incorporation to be adopted by AMI and filed with the Secretary of State of the State of Delaware prior to or on the Effective Date, which shall be substantially in the form to be included in Plan Exhibit 8, with any modifications that are (i) required to be consistent with the provisions of this Prepackaged Plan and the Bankruptcy Code and (ii) reasonably satisfactory to the Senior Lender Steering Committee.

      *Restructuring Support Agreement* means that certain Second Supplement to Forbearance Agreement and Restructuring Support Agreement dated as of November 30, 2009 between the Debtor, the Guaranteeing Subsidiaries, the Administrative Agent and certain of the Senior Lenders.

      *St. Paul Guild Plan* has the meaning assigned to such term in Section 8.1(h) hereof.

      *San Jose Plan* has the meaning assigned to such term in Section 8.1(h) hereof.

      *Secured Claim* means, with respect to any Claim against the Debtor, that portion which, pursuant to section 506 of the Bankruptcy Code, is (a) secured by a valid, perfected and enforceable security interest, Lien, mortgage or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtor in and to property of the relevant estate, to the extent of the value of the holder's interest in such property as of the relevant determination date or (b) Allowed as such pursuant to the terms of this Prepackaged Plan (subject to the occurrence of the Effective Date).

The defined term Secured Claim includes any Claim to the extent that it is: (i) subject to an offset right under applicable law and (ii) a secured claim against the Debtor pursuant to sections 506(a) and 553 of the Bankruptcy Code.

*Secured Tax Claim* means any Secured Claim against the Debtor that, absent its secured status, would be entitled to priority under section 507(a)(8) of the Bankruptcy Code.

*Securities Litigation Claim* means any Claim against AMI (i) arising from rescission of a purchase or sale of shares, notes or any other securities of AMI or an affiliate of AMI, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws, misrepresentations or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (iv) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that AMI made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of securities or (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims.

*Senior Credit Agreement* means that certain Credit Agreement, dated as of December 30, 2003, among AMI, as borrower, the Guaranteeing Subsidiaries, as guarantors, the Senior Lenders from time to time party thereto, Bank of America, N.A., as administrative agent, The Bank of New York, as syndication agent, and Fleet National Bank and Wachovia Bank, National Association, as co-documentation agents, as amended, restated, supplemented and/or otherwise modified from time to time.

*Senior Credit Agreement Documents* means all documents entered into in connection with the Senior Credit Agreement, including without limitation the Loan Documents as defined in the Senior Credit Agreement, including without limitation the Forbearance Agreement and the guarantees incorporated into the Senior Credit Agreement, and the pledge agreements executed by certain of AMI's Subsidiaries pursuant thereto.

*Senior Lender Common Stock Distribution* means an aggregate number of shares of Class B New Common Stock and Class C New Common Stock such that, after giving effect to the issuance thereof and to the EIP Effective Date Distribution, the Senior Lender Common Stock Distribution represents no less than approximately 88.9% of the total number of shares of New Common Stock issued, or reserved for issuance in respect of awards granted, on the Effective Date.

*Senior Lender Emergence Payment* means a payment on the Senior Loan Claims to be paid in Cash on the Effective Date, in an amount equal to (i) the product of (w) 2.00% and (x) the aggregate principal amount of all loans outstanding under the Senior Credit Agreement as of April 1, 2009, divided by (y) 360 and multiplied by (z) the number of days elapsed between April 1, 2009 and the Effective Date plus (ii) the Senior Loan Non-Principal Claims. For the avoidance of doubt, solely for purposes of calculating the Senior Lender Emergence Payment, the last day of the Forbearance Period, as defined in the Forbearance Agreement and the Restructuring Support Agreement, will be considered to be the Effective Date.

**Senior Lenders** means the lenders from time to time party to the Senior Credit Agreement.

**Senior Lender Steering Committee** means the committee of Senior Lenders organized by the Administrative Agent to act as a steering committee, the size and membership of which are determined from time to time by the Administrative Agent in its sole and absolute discretion. Approval by a majority in number of the members of the Senior Lender Steering Committee shall constitute approval of the Senior Lender Steering Committee for all purposes under this Prepackaged Plan.

**Senior Loan Claim** means a Claim (other than the obligation to pay the Senior Lender Emergence Payment) arising under the Senior Credit Agreement Documents or otherwise arising in connection with the Senior Credit Agreement.

**Senior Loan Non-Principal Claims** means all amounts in respect of the non-contingent obligations under the Senior Credit Agreement Documents, other than principal, that remain unpaid as of the Effective Date, including without limitation (a) the accrued fees, expenses, costs and other charges of the Administrative Agent (including of its counsel and advisors that are authorized to be paid under the Senior Credit Agreement, including but not limited to the fees and expenses of Davis Polk & Wardwell LLP, Dow Lohnes PLLC, Richards, Layton & Finger, P.A. and FTI Consulting, Inc.), (b) accrued letter of credit fees and (c) an amount equal to the accrued and unpaid interest as of the Effective Date on the principal amount of all loans outstanding under the Senior Credit Agreement, applying the rate specified as the "Applicable Rate" in Section 7(a) of the Forbearance Agreement. For the avoidance of doubt, Section 7(a) of the Forbearance Agreement (to which reference is made for the meaning of the capitalized terms used but not defined in this sentence) provides that from and after April 1, 2009, the Applicable Rate for all Loans (whether Revolving Loans, Tranche A Term Loans, Tranche B Term Loans or Tranche C Term Loans) shall be, in the case of Eurodollar Rate Loans, 4.50% and, in the case of Base Rate Loans, 3.50%, and the Applicable Rate for Letter of Credit fees shall be 4.50%.

**Singleton Warrants** means warrants issued pursuant to the Amended and Restated Employment Agreement to Mr. Singleton, having the terms and conditions set forth in Plan Exhibit 9.

**Stockholders' Agreement** means the stockholders agreement to be entered into on the Effective Date by the holders of the New Common Stock to be issued on the Effective Date, Reorganized AMI, and the holders of the Subordinated Note Warrants, substantially in the form attached as Plan Exhibit 10, with any modifications that are (i) required to be consistent with the provisions of this Prepackaged Plan and the Bankruptcy Code and (ii) reasonably satisfactory to the Senior Lender Steering Committee.

**Subordinated Debt** means the obligations of the Debtor under the Indentures.

**Subordinated Notes** means the 6 3/8% Note and the 6 7/8% Note, collectively.

11

**Subordinated Note Claim** means any Claim arising under or in connection with either of the Indentures or the 6 3/8% Notes or the 6 7/8% Notes issued thereunder, including without limitation, any fees, expenses or other amounts payable to the Indenture Trustee pursuant to the Indentures.

**Subordinated Note Warrants** means warrants that may be issued, pursuant to and under the circumstances set forth in Section 6.4 herein, to each holder of a Subordinated Note Claim, having the terms and conditions set forth in <u>Plan Exhibit 11</u> and <u>Plan Exhibit 12</u>.

**Subsidiary** means, with respect to any Person, any other Person as to whom such first Person directly or indirectly (a) owns or controls the majority of equity interests, (b) owns or controls the majority of voting interests or (c) has the power to elect or nominate a majority of the board of directors (or other persons having similar functions).

**Tax Code** means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury regulations promulgated thereunder.

**Term Loan Facility** means the New Senior Secured Term Notes in the aggregate principal amount of $150 million.

**Time Brokerage Agreements** means the agreements between certain members of the AMI Group and the FCC Trust, pursuant to which the AMI Group members, subject to the ultimate control and oversight of the FCC Trustee as and to the extent required by the rules and policies of the FCC, will provide certain programming and operational services to the FCC Trust in connection with the radio and television broadcasting operations to be conducted by the FCC Trust on and after the assignment of the FCC Broadcast Licenses and certain associated assets to the FCC Trust pursuant to Bankruptcy Court approval and FCC consent.

**Warrant Agreement** means the warrant agreement to be entered into on the Effective Date by Reorganized AMI in favor of the holders named therein, substantially in the form attached hereto as <u>Plan Exhibit 12</u>.

    1.2.   **Rules of Interpretation**. For purposes of this Prepackaged Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) unless otherwise specified, any reference in this Prepackaged Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference in this Prepackaged Plan to an existing document, schedule or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document, schedule or exhibit, as it may have been or may be amended, modified or supplemented; (d) any reference to a Person as a holder of a Claim or Equity Interest includes that Person's successors and assigns; (e) unless otherwise specified, all references in this Prepackaged Plan to articles are references to articles of this Prepackaged Plan; (f) unless otherwise specified, all references in this Prepackaged Plan to exhibits are references to exhibits hereto or in the Plan Supplements; (g) the words "herein," "hereof" and "hereby" refer to this

Prepackaged Plan in its entirety rather than to a particular portion of this Prepackaged Plan; (h) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with this Prepackaged Plan, the rights and obligations arising pursuant to this Prepackaged Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) captions and headings to articles of this Prepackaged Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Prepackaged Plan; (j) unless otherwise set forth in this Prepackaged Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form in this Prepackaged Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (l) all references to docket numbers of documents filed in the Debtor's Reorganization Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, as applicable to the Debtor's Reorganization Case, unless otherwise stated; and (n) any immaterial effectuating provisions may be interpreted by the Reorganized Debtor after the Effective Date in such a manner that is consistent with the overall purpose and intent of this Prepackaged Plan all without further Bankruptcy Court order.

In computing any period of time prescribed or allowed by this Prepackaged Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

## PROVISIONS FOR PAYMENT OF UNCLASSIFIED ADMINISTRATIVE, PROFESSIONAL AND TAX CLAIMS

2.1.    *Administrative Expense Claims*.  Each holder of an Allowed Administrative Expense Claim will receive payment in full in Cash of the unpaid portion of such Allowed Administrative Expense Claim (a) in the case of professional fees and expenses for professionals and advisors retained by the Debtor, as soon as practicable after Bankruptcy Court approval thereof, or, in the case of professionals retained by the Debtor in the ordinary course of its business, if any, on such terms as are customary between the Debtor and such professionals; (b) with respect to all other holders of Allowed Administrative Expense Claims, on the later of (i) the Effective Date and (ii) the date on which such payment would be made in the ordinary course of the Debtor's business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions; or (c) with respect to any Claim described in clauses (a) and (b) above, as otherwise agreed by the holder of such Claim and the Debtor. Disputed but not yet Allowed Administrative Expense Claims will receive payment on the later of (i) the date such disputed Allowed Administrative Expense Claim becomes Allowed and (ii) the date on which such payment would be made in the ordinary course of the Debtor's business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions; provided, however, that Allowed Administrative Expense Claims with respect

to liabilities incurred by the Debtor in the ordinary course of business during the Reorganization Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

The Senior Loan Non-Principal Claims shall be Allowed Administrative Expense Claims (and not of the type described in Section 2.2 below) and shall be payable as such in Cash on the Effective Date as part of the Senior Lender Emergence Payment. However, it is contemplated that payments on account of the items listed in the definition of Senior Loan Non-Principal Claims will be paid to the Administrative Agent and the Senior Lenders during the Reorganization Case, and the Administrative Agent and the Senior Lenders shall be entitled to retain all such payments as Allowed Administrative Expense Claims.

2.2. **_Professional Compensation and Reimbursement Claims_**. Except as provided in Section 2.1 hereof, all Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is sixty (60) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtor is authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

2.3. **_Priority Tax Claims_**. Except to the extent that a holder of an Allowed Priority Tax Claim against the Debtor agrees with the Debtor to a different treatment or has been paid by the Debtor prior to the Effective Date, each holder of an Allowed Priority Tax Claim shall, at the Debtor's election where applicable, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim: (a) be paid in full, in Cash, on, or as soon as reasonably practicable after, the later of the Effective Date and the date on which such Claim becomes an Allowed Claim, in accordance with the terms of any agreement between the Debtor and such holder, as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business; (b) be paid in Cash in regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) be paid such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The categories of prepetition Claims and Equity Interests are classified for all purposes, including voting, confirmation, and distribution, pursuant to this Prepackaged Plan as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Senior Loan Claims | Impaired | Yes |
| Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Subordinated Note Claims | Impaired | Yes |
| Class 6 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| Class 7 | Securities Litigation Claims | Impaired | No (deemed to reject) |
| Class 8 | Old AMI Equity Interests | Impaired | No (deemed to reject) |

### 3.1.    *Introduction*.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified, and the respective treatment of such unclassified claims is set forth in Article II of this Prepackaged Plan.

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest is of the type described in such Class and such Claim or Equity Interest has not been paid, released, or otherwise settled prior to the Effective Date. A Claim or Equity Interest may be bifurcated and classified in other Classes to the extent that any portion of the Claim or Equity Interest is of a type described in such other Classes.

### 3.2.    *Classes of Claims Against and Equity Interests in Debtor's Estate*.

*Class 1:  Priority Non-Tax Claims*

Class 1 consists of all Priority Non-Tax Claims against the Debtor.

*Class 2:  Senior Loan Claims*

Class 2 consists of all Senior Loan Claims.

*Class 3:  Other Secured Claims*

Class 3 consists of separate sub-Classes, one for each Other Secured Claim against the Debtor. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code.

*Class 4:  General Unsecured Claims*

Class 4 consists of all General Unsecured Claims.

*Class 5:  Subordinated Note Claims*

Class 5 consists of all Subordinated Note Claims.

*Class 6:  Intercompany Claims*

Class 6 consists of all Intercompany Claims.

*Class 7:  Securities Litigation Claims*

Class 7 consists of all Securities Litigation Claims.

*Class 8:  Old AMI Equity Interests*

Class 8 consists of all Old AMI Equity Interests.

## ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS

4.1.    ***Class 1: Priority Non-Tax Claims***.  On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which such Priority Non-Tax Claim becomes an Allowed Claim and (c) the date on which such Priority Non-Tax Claim becomes payable pursuant to any agreement between the Debtor and the holder of such Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim, either (i) Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim or (ii) such different treatment as to which the Debtor and such holder shall have agreed in writing.

4.2.    ***Class 2: Senior Loan Claims***.  The Senior Loan Claims shall be Allowed in full, without setoff, subordination, avoidance, reduction, defense, recharacterization or counterclaim, in the aggregate principal amount of $590 million, plus all accrued and unpaid interest and other amounts payable under the Senior Credit Agreement and not paid as of the Effective Date.

Each holder of Senior Loan Claims, in full satisfaction, settlement, compromise, release, and discharge of and in exchange for the remaining amount of the Senior Loan Claims, including without limitation all such Claims against the Guaranteeing Subsidiaries (other than as otherwise provided in Section 6.7), shall receive on the Effective Date its Pro Rata share, in the aggregate, of (a) with respect to the outstanding principal amount of all loans outstanding under the Senior Credit Agreement, the Term Loan Facility, the Senior Lender Common Stock Distribution and the amount expressed by clause (i) of the definition of the Senior Lender

16

Emergence Payment and (b) in the case of contingent reimbursement obligations with respect to letters of credit outstanding under the Senior Credit Agreement, the Tranche A Facility (as defined in the New Senior Credit Facility Term Sheet). The Senior Lender Emergence Payment in respect of the Senior Loan Non-Principal Claims shall be paid for the benefit of the holders of Senior Loan Claims as such holders' interests may appear.

The Senior Lenders shall accept the distributions on account of the Senior Loan Claims and, in respect of the settlement and compromise of the Guarantee Obligations, the benefits conferred by the Guaranteeing Subsidiaries in the Guarantor Settlement, in full satisfaction, settlement, compromise, release, and discharge of and in exchange for all Claims arising under the Senior Credit Agreement Documents, including without limitation all such Claims against the Guaranteeing Subsidiaries, which Claims against the Guaranteeing Subsidiaries the Senior Lenders are releasing, settling and compromising hereby in exchange for, and subject to, (i) the execution by each of the Guaranteeing Subsidiaries of a guaranty of the New Senior Credit Facility in form and substance acceptable to the Senior Lender Steering Committee as of the Effective Date, (ii) the settlement, compromise and release by the Debtor and the Guaranteeing Subsidiaries of all Claims and causes of action against the Senior Lenders and/or the Administrative Agent of and from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or thereafter arising, at law, in equity, or otherwise, based in whole or in part upon any act, omission, transaction, event or other occurrence taking place before the Effective Date that relate to the Senior Credit Agreement and Senior Credit Agreement Documents (including the Forbearance Agreement and Restructuring Support Agreement ) and the transactions contemplated thereby, and (iii) the granting by the Guaranteeing Subsidiaries of first priority Liens on substantially all property of the Guaranteeing Subsidiaries securing the guarantees referenced in subclause (i) of this sentence pursuant to security agreements in form and substance acceptable to the Senior Lender Steering Committee. Each Senior Lender, by its acceptance of its Pro Rata share of the Term Loan Facility and the Senior Lender Common Stock Distribution, shall be deemed to have accepted, and become a party to and bound by, the New Senior Secured Credit Agreement as of the Effective Date, whether or not it has furnished a signature page thereto executed by it.

4.3. ***Class 3: Other Secured Claims***. Class 3 consists of a separate sub-Class for each Other Secured Claim. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code. The holder of any Other Secured Claim shall retain its legal and equitable rights unaltered by the confirmation or consummation of this Prepackaged Plan.

At the option of the Debtor, (a) the legal, equitable, and contractual rights of the holder of an Allowed Other Secured Claim shall be reinstated in accordance with the provisions of section 1124(2) of the Bankruptcy Code, (b) any holder of an Allowed Other Secured Claim shall be treated in accordance with an agreement between such holder and the Debtor or (c) the holder of the Allowed Other Secured Claim shall be paid in full on the Effective Date. To the extent that any Allowed Other Secured Claim shall be treated as set forth in subclause (c) above, the treatment applicable to each holder of such Allowed Other Secured Claim shall be disclosed

in a filing made with the Bankruptcy Court no later than seven (7) days prior to the Confirmation Hearing.

To the extent an Other Secured Claim is an Allowed Secured Tax Claim, except to the extent that the holder of such Allowed Secured Tax Claim against the Debtor agrees to a different treatment or has been paid by Debtor prior to the Effective Date, each holder of an Allowed Secured Tax Claim shall, in full satisfaction, release, and discharge of such Allowed Secured Tax Claim: (i) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date; (ii) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtor and such holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business; or (iii) be treated on such other terms and conditions as are acceptable to the Debtor and the holder of such Claim.

The Debtor's failure to object to any Other Secured Claim shall be without prejudice to the Debtor's or the Reorganized Debtor's right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Other Secured Claim holder. Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all prepetition Liens on property of the Debtor held with respect to an Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreement governing such Claim until such Allowed Claim is paid in full unless otherwise satisfied, as agreed by the holder of such Allowed Claim. Nothing in this Section 4.3 or elsewhere in this Prepackaged Plan shall preclude the Debtor or the Reorganized Debtor from challenging the validity of any alleged Lien on any asset of the Debtor or the value of the property that secures any alleged Lien.

4.4. ***Class 4: General Unsecured Claims.***  Class 4 consists of General Unsecured Claims. The holder of any General Unsecured Claim shall retain its legal and equitable rights unaltered by the confirmation or consummation of this Prepackaged Plan.

4.5. ***Class 5: Subordinated Note Claims.***

(a) With Class 5 Acceptance:

If sufficient votes accepting this Prepackaged Plan are received from holders of Claims in Class 5 to constitute an acceptance of this Prepackaged Plan by such Class pursuant to section 1126(c) of the Bankruptcy Code, then each holder of an Allowed Claim in such accepting Class shall be entitled to receive Subordinated Note Warrants issued pursuant to the terms and conditions of the Warrant Agreement and Plan Exhibit 11, and each such holder shall receive its Pro Rata share of the Subordinated Note Warrants in full satisfaction, settlement, compromise, release, and discharge of and in exchange for the remaining amount of its Subordinated Note Claim.

(b) Without Class 5 Acceptance:

If sufficient votes accepting this Prepackaged Plan are not received from holders of Claims in Class 5 to constitute an acceptance of this Prepackaged Plan by such Class pursuant

18

to section 1126(c) of the Bankruptcy Code, then no holder of a Claim in Class 5 shall be entitled to receive any distribution from the Debtor or the Estate on account of its Subordinated Note Claims, which will be discharged pursuant to this Prepackaged Plan.

4.6. **_Class 6: Intercompany Claims._** With respect to each Intercompany Claim against the Debtor, the legal, equitable and contractual rights of the holder of such Intercompany Claim shall be reinstated or, with the consent of the holder, may be adjusted, continued, or capitalized, either directly or indirectly or in whole or in part.

4.7. **_Class 7: Securities Litigation Claims._** With respect to any Securities Litigation Claim, the legal, equitable and contractual rights of the holder of such Claim shall be canceled, and no holder of a Claim in Class 7 shall be entitled to receive any distribution from the Debtor or the Estate.

4.8. **_Class 8: Old AMI Equity Interests._** All Old AMI Equity Interests shall be canceled as of the Effective Date.

4.9. **_Compliance with Laws and Effects on Distributions._** In connection with the consummation of this Prepackaged Plan, the Reorganized Debtor will comply with all withholding and reporting requirements imposed by federal, state, local or foreign taxing authorities, and all distributions hereunder will be subject to applicable withholding and reporting requirements. In order to satisfy withholding tax obligations, the Reorganized Debtor will need to withhold and remit to taxing authorities a portion of the Cash that would otherwise be distributable under this Prepackaged Plan to certain employees and former employees of the Reorganized Debtor with Allowed General Unsecured Claims.

4.10. **_Reservation of Rights Regarding Claims._** Except as otherwise explicitly provided in this Prepackaged Plan, nothing shall affect the Debtor's or the Reorganized Debtor's rights, defenses, and counterclaims, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### ARTICLE V

### IDENTIFICATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS IMPAIRED; ACCEPTANCE OR REJECTION OF THIS PREPACKAGED PLAN OF REORGANIZATION

5.1. **_Holders of Claims and Equity Interests Entitled to Vote._** Each of Classes 2 and 5 is entitled to vote to accept or reject this Prepackaged Plan.

5.2. **_Presumed Acceptance of Prepackaged Plan._** Each of Classes 1, 3, 4 and 6 is unimpaired by this Prepackaged Plan. Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in such Classes are conclusively presumed to have accepted this Prepackaged Plan and the votes of such holders will not be solicited.

19

5.3.   ***Presumed Rejection of Prepackaged Plan.***  Each of Classes 7 and 8 shall not receive any distribution under this Prepackaged Plan on account of such Claims or Equity Interests.  Pursuant to section 1126(g) of the Bankruptcy Code, the holders of Claims and Equity Interests in such Classes are presumed to have rejected this Prepackaged Plan and the votes of such holders will not be solicited.

5.4.   ***Acceptance by Impaired Classes.***  Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted this Prepackaged Plan if the holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on this Prepackaged Plan have voted to accept this Prepackaged Plan.  Because each of Classes 2 and 5 is impaired, the votes of holders of Claims in such Classes will be solicited.

5.5.   ***Nonconsensual Confirmation***.  If Class 5 shall not accept this Prepackaged Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtor intends to request that the Bankruptcy Court confirm this Prepackaged Plan under section 1129(b) of the Bankruptcy Code over the objection of Class 5.

## ARTICLE VI

## MEANS OF IMPLEMENTATION AND POST-EFFECTIVE DATE GOVERNANCE

6.1.   ***Corporate Action***.

(a)   General.  Upon the occurrence of the Effective Date, all actions contemplated by this Prepackaged Plan shall be deemed authorized and approved in all respects, including (i) adoption or assumption, as applicable, of the agreements with existing management, (ii) selection of the directors and officers for the Reorganized Debtor, (iii) the issuance and distribution of the New Common Stock, (iv) entry into the Warrant Agreement, (v) the issuance and distribution of the Subordinated Note Warrants, (vi) entry into the New Senior Credit Facility, (vii) the issuance of the New Senior Secured Term Notes, (viii) adoption of the Incentive Bonus Agreements, (ix) entry into the Amended and Restated Employment Agreements, (x) the issuance and distribution of the Singleton Warrants, (xi) the adoption of the Restated Certificate of Incorporation and Restated Bylaws, (xii) entry into the Stockholders' Agreement, (xiii) adoption of the Equity Incentive Plan and (xiv) all other actions contemplated by this Prepackaged Plan (whether to occur before or on the Effective Date).  All matters provided for in this Prepackaged Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with this Prepackaged Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity security holders, directors or officers of the Debtor or the Reorganized Debtor.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by this Prepackaged Plan (or necessary or desirable to effect the transactions contemplated by this Prepackaged Plan) in the name of and on behalf of the

20

Reorganized Debtor, including (x) the Subordinated Note Warrants, (y) the New Senior Secured Credit Documents (including the New Senior Secured Credit Agreement and the New Senior Secured Term Notes to be issued pursuant thereto) and (z) any and all other agreements, documents, securities and instruments relating to the foregoing. Without limiting the foregoing, the Equity Incentive Plan shall be deemed to have been unanimously approved by the stockholders of Reorganized AMI pursuant to section 303 of the Delaware General Corporation Law.

(b)    Restated Certificate of Incorporation and Restated Bylaws. The Restated Bylaws and the Restated Certificate of Incorporation attached hereto as Plan Exhibits 7 and 8, respectively, shall be (i) consistent with the provisions of this Prepackaged Plan and the Bankruptcy Code and (ii) satisfactory to the Senior Lender Steering Committee. The Restated Certificate of Incorporation will, among other things, (A) authorize the New Common Stock and (B) pursuant to section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. Any modification to the Restated Certificate of Incorporation as originally filed may be filed after the Confirmation Date and may become effective on or prior to the Effective Date. After the Effective Date, the Reorganized Debtor may file an amended and restated certificate of incorporation (or other formation documents, if applicable) with the Secretary of State in any appropriate jurisdiction.

(c)    Board of Directors of Reorganized AMI. On the Effective Date, the operation of Reorganized AMI shall become the general responsibility of its Board, subject to, and in accordance with, the Restated Certificate of Incorporation, the Restated Bylaws, and the Stockholders' Agreement. The Board shall initially be comprised of seven members. So long as any shares of Class A New Common Stock remain outstanding, the holders of Class A New Common Stock will elect four Class A Directors, and except in the case of the initial Class B Directors (who shall be designated by the Senior Lender Steering Committee), the holders of Class B New Common Stock will elect three Class B Directors. The identities of the initial Class A Directors, as designated by the holders of the Class A New Common Stock, and the initial Class B Directors, as designated by the Senior Lender Steering Committee that have been identified as of the date the Plan Supplements are filed, shall be disclosed in the Plan Supplements.

(d)    Officers of Reorganized AMI. The individuals currently serving as the senior officers of AMI will continue to serve in the same capacities through and following the Effective Date subject to any changes disclosed in the Plan Supplements. After the Effective Date, the selection and removal of officers of Reorganized AMI shall be as provided in the respective Restated Certificate of Incorporation and Restated Bylaws or other organizational documents of Reorganized AMI.

6.2.    *New Senior Secured Credit Agreement.* On the Effective Date, the New Senior Secured Credit Documents (including the New Senior Secured Credit Agreement), and the New Senior Secured Term Notes will be executed and delivered and the Reorganized Debtor and the Guaranteeing Subsidiaries are authorized to issue the New Senior Secured Credit

Documents without the need for any further corporate action and without further action by the holders of Claims or Equity Interests.

6.3. ***Issuance of New Common Stock.*** On the Effective Date, the Class A New Common Stock shall be issued and distributed to Messrs. Singleton and Lodovic pursuant to the Amended and Restated Employment Agreements, and Class B New Common Stock and, if necessary, Class C New Common Stock, shall be issued and distributed on behalf of AMI to the holders of Allowed Senior Loan Claims. Each holder of a Claim that is entitled to receive a portion of the Senior Lender Common Stock Distribution pursuant to this Prepackaged Plan will be issued Class B New Common Stock, provided that any such holder (a) shall be entitled to receive all or a portion of its shares of the Senior Lender Common Stock Distribution in the form of Class C New Common Stock if such holder informs the Debtor of its intent to receive such Class C New Common Stock by such date as will be announced by the Debtor in a filing on the Bankruptcy Court's docket and (b) could be required to instead receive all or a portion of its shares of the Senior Lender Common Stock Distribution in the form of Class C New Common Stock if such holder would otherwise hold five percent (5%) or more of the voting rights to elect members of the Board and such holder or any of its attributable principals already holds, independent of its prospective interest in AMI, any other interest in media subject to FCC regulation that would result in a violation of FCC rules by AMI or delay or impede the grant of consents and approvals of the FCC necessary to implement this Prepackaged Plan.

6.4. ***Issuance of Subordinated Note Warrants.*** If Class 5 votes to accept this Prepackaged Plan, on the Effective Date, Subordinated Note Warrants will be issued and distributed on behalf of AMI to holders of Subordinated Note Claims pursuant to the Warrant Agreement and Plan Exhibit 11 and in all cases shall be governed by the Stockholders' Agreement.

6.5. ***New Stockholders' Agreement***. By their acceptance of New Common Stock, Subordinated Note Warrants and/or the Singleton Warrants under this Prepackaged Plan thereof, all Persons receiving New Common Stock, Subordinated Note Warrants and/or the Singleton Warrants pursuant to this Prepackaged Plan are deemed to be parties to and bound by the Stockholders' Agreement (including for this purpose any shares of New Common Stock issued upon the exercise of the Subordinated Note Warrants and/or the Singleton Warrants or shares of New Common Stock issued under the Equity Incentive Plan).

6.6. ***Cancellation of Agreements.*** On the Effective Date, the Senior Credit Agreement Documents and the Indentures shall be canceled and shall be of no further force and effect except as to obligations between parties other than the Debtor and its Affiliates.

6.7. ***Settlement, Compromise and Release of Guarantee Obligations.*** By voting in favor of this Prepackaged Plan, Class 2 (the Senior Loan Claims), and each holder of a Claim in Class 2, agrees that the obligations, liabilities and claims arising under any and all (a) guarantees of the Guaranteeing Subsidiaries of obligations under the Senior Credit Agreement and (b) other agreements and obligations of the Guaranteeing Subsidiaries under the Senior Credit Agreement Documents (<u>collectively</u>, the "**Guarantee Obligations**") shall be settled and compromised as provided in the next sentence (the "**Guarantor Settlement**"). The

Senior Lenders shall accept the distributions on account of the Senior Loan Claims and, in respect of the settlement of the Guarantee Obligations, the benefits conferred by the Guaranteeing Subsidiaries in the Guarantor Settlement, in full satisfaction, settlement, compromise, release, and discharge of and in exchange for all Claims arising under the Senior Credit Agreement Documents, including without limitation all such Claims against the Guaranteeing Subsidiaries, which Claims against the Guaranteeing Subsidiaries the Senior Lenders are releasing, settling and compromising hereby in exchange for, and subject to, (i) the execution by each of the Guaranteeing Subsidiaries of a guaranty of the New Senior Credit Facility in form and substance acceptable to the Senior Lender Steering Committee as of the Effective Date, (ii) the settlement, compromise and release by the Debtor and the Guaranteeing Subsidiaries of all Claims and causes of action against the Senior Lenders and/or the Administrative Agent of and from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or thereafter arising, at law, in equity, or otherwise, based in whole or in part upon any act, omission, transaction, event or other occurrence taking place before the Effective Date that relate to the Senior Credit Agreement and Senior Credit Agreement Documents (including the Forbearance Agreement and Restructuring Support Agreement ) and the transactions contemplated thereby, and (iii) the granting by the Guaranteeing Subsidiaries of first priority Liens on substantially all property of the Guaranteeing Subsidiaries securing the guarantees referenced in subclause (i) of this sentence pursuant to security agreements in form and substance acceptable to the Senior Lender Steering Committee.

6.8.    ***Surrender of Existing Securities.*** If Class 5 votes to accept this Prepackaged Plan and therefore holders of Subordinated Note Claims receive Subordinated Note Warrants under the terms of this Prepackaged Plan, each holder of a Subordinated Note Claim shall surrender its note(s) to the Indenture Trustee or in the event such note(s) are held in the name of, or by a nominee of, The Depository Trust Company, the Reorganized Debtor shall seek the cooperation of The Depository Trust Company to provide appropriate instructions to the Indenture Trustee. No distributions under this Prepackaged Plan shall be made for or on behalf of such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from The Depository Trust Company shall be received by the Indenture Trustee or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee as applicable, which satisfaction may require such holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtor, the Reorganized Debtor, and the Indenture Trustee harmless in respect of such note and any distributions made on account thereof. Upon compliance with this Section 6.8 by a holder of any note, such holder shall, for all purposes under this Prepackaged Plan, be deemed to have surrendered such note. Any holder that fails to surrender such note or to satisfactorily explain its non-availability to the Indenture Trustee within one (1) year after the Effective Date shall be deemed to have no further Claim against the Debtor and the Reorganized Debtor (or their property) or the Indenture Trustee in respect of such Claim and shall not participate in any distribution under this Prepackaged Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtor by the Indenture Trustee and any such security shall be canceled. In the event that Class 5 votes to reject this Prepackaged Plan, the notes representing the Subordinated Debt shall be canceled and extinguished, and of no further force

23

and effect pursuant to Section 4.5(b). Such canceled notes shall be worthless, and neither Reorganized AMI nor any of its Affiliates shall have any obligations whatsoever under such notes.

6.9.    ***Cancellation of the Subordinated Notes and Equity Interests***. On the Effective Date, except to the extent otherwise provided herein, all notes, instruments, certificates and other documents evidencing (a) the 6 3/8% Notes, (b) the 6 7/8% Notes and (c) the Equity Interests shall be canceled, and the obligations of the Debtor thereunder and in any way related thereto shall be fully satisfied, released and discharged; provided, however, that such cancellation shall not itself alter the obligations or rights of any third parties (apart from the Debtor, its Affiliates and the Subordinated Note Claim holders) under such notes, instruments, certificates or other documents, including, but not limited to, any applicable rights to indemnification or to seek contribution from any party other than the Debtor or its Affiliates with respect to such notes, instruments, certificates or other documents. With respect to the Subordinated Notes, on the Effective Date, except to the extent otherwise provided in this Prepackaged Plan, the Indentures and any similar agreements, including, without limitation, any related note, guaranty or similar instrument of the Debtor shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and discharged (i) with respect to all obligations owed by the Debtor under any such agreement and (ii) except to the extent provided herein below, with respect to the respective rights and obligations of the Indenture Trustee under the Indentures against the holders of Subordinated Note Claims. Solely for the purpose of clause (ii) in the immediately preceding sentence, only the following rights of the Indenture Trustee shall remain in effect after the Effective Date: (A) rights as trustee, paying agent and registrar, including but not limited to any rights to payment of fees, expenses and indemnification obligations and liens securing such rights to payment including, but not limited to, from or on property distributed under this Prepackaged Plan to the Indenture Trustee (but excluding any other property of the Debtor, the Reorganized Debtor or its Estate), (B) rights relating to distributions to be made to the holders of the 6 3/8% Notes or the 6 7/8% Notes by the Indenture Trustee from any source, including, but not limited to, distributions under this Prepackaged Plan including, without limitation, any Liens on distributions to the holders that may be provided to the Indenture Trustee pursuant to the Indentures (but excluding any other property of the Debtor, the Reorganized Debtor or its Estate), (C) rights relating to representation of the interests of the holders of the 6 3/8% Notes or the 6 7/8% Notes by the Indenture Trustee in the Reorganization Case to the extent not discharged or released by this Prepackaged Plan or any order of the Bankruptcy Court and (D) rights relating to participation by the Indenture Trustee in proceedings and appeals related to this Prepackaged Plan. Notwithstanding the continued effectiveness of such rights after the Effective Date, such Indenture Trustee shall have no obligation to object to Claims against the Debtor and the Indenture Trustee shall have no obligation to locate certificated holders of the 6 3/8% Notes or the 6 7/8% Notes who fail to surrender the 6 3/8% Notes and/or the 6 7/8% Notes in accordance with Section 6.8 of this Prepackaged Plan.

6.10.    ***Amended and Restated Employment Agreements.*** On the Effective Date, Reorganized AMI shall enter into the Amended and Restated Employment Agreements, and they shall immediately become effective.

24

6.11.    ***Equity Incentive Plan.***  The Equity Incentive Plan shall go into effect on the Effective Date.

6.12.    ***Incentive Bonus Agreements.***  On the day after the Effective Date, AMI shall make the payments due on such date under the Incentive Bonus Agreements.

6.13.    ***Existing Liens.***  Except as otherwise provided in this Prepackaged Plan, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall continue in effect notwithstanding the occurrence of the Effective Date.  Any Liens on assets of AMI securing obligations of AMI and the Guaranteeing Subsidiaries under the Senior Credit Agreement and Senior Credit Agreement Documents shall continue in effect securing obligations under the New Senior Secured Credit Documents (including the New Senior Secured Credit Agreement).

6.14.    ***Compromise of Controversies.***  In consideration for the distributions and other benefits provided under this Prepackaged Plan, the provisions of this Prepackaged Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under this Prepackaged Plan and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019.

6.15.    ***Effectuating Documents; Further Transactions.***  The chief executive officer, the president, the chief financial officer, the general counsel or any other appropriate officer of the Debtor, or of the Reorganized Debtor, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Prepackaged Plan. The secretary or assistant secretary of the Debtor, or the Reorganized Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

6.16.    ***Certain Actions Relating To Both the FCC Broadcast Licenses and FCC Non-Broadcast Licenses.***  On or after the Petition Date, the Debtor, to comply with the rules and policies of the FCC, promptly shall file or cause to be filed applications with the FCC for consent to the transfer of control of the FCC Broadcast Licenses and FCC Non-Broadcast Licenses held by members of the AMI Group from control by AMI to control by AMI as debtor-in-possession.

6.17.    ***Certain Actions Relating Particularly to FCC Broadcast Licenses.***  Pursuant to a separate order of the Bankruptcy Court, the Debtor shall establish the FCC Trust. Upon receipt of necessary approvals from the FCC, the FCC Broadcast Licenses and FCC Broadcast License Related Assets as specified by the FCC Trust Agreement that are held by certain members of the AMI Group shall be assigned to AMI and then immediately to the FCC Trust (and for the benefit of AMI and Reorganized AMI; provided that the Liens of the Senior Lenders in certain of the FCC Broadcast License Related Assets shall attach to the beneficiary's interest in the proceeds of the FCC Trust).  Concurrent with the assignment of the FCC Broadcast Licenses and FCC Broadcast License Related Assets, certain members of the AMI Group and the FCC Trust shall enter into the Time Brokerage Agreements.  Pursuant to this

Prepackaged Plan, the Bankruptcy Court shall retain jurisdiction over the FCC Trust after the Effective Date.

6.18. ***Certain Actions Relating Particularly to FCC Non-Broadcast Licenses***. The Debtor shall file with the FCC as promptly as possible after the Petition Date all applications necessary to obtain the necessary FCC consent for the transfer of control of the FCC Non-Broadcast Licenses held by members of the AMI Group from control by AMI (as debtor-in-possession) to control by Reorganized AMI.

## ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

7.1. ***Date of Distributions on Account of Allowed Claims.*** Unless otherwise provided herein, any distributions and deliveries to be made under this Prepackaged Plan shall be made on the Effective Date or as soon as practicable thereafter. In the event that any payment or act under this Prepackaged Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

7.2. ***Sources of Cash for Plan Distribution.*** Except as otherwise provided in this Prepackaged Plan or Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtor's and the Reorganized Debtor's operations and Cash on hand.

7.3. ***Time Bar to Cash Payments.*** Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Reorganized Debtor by the holder of the Allowed Claim to whom such check was originally issued. Any Claim in respect of such a voided check shall be made on or before the first anniversary of the date on which such distribution or payment was made. If no Claim is made as provided in the preceding sentence, all Claims in respect of voided checks shall be discharged and forever barred and such unclaimed distributions shall revert to the Reorganized Debtor, notwithstanding any federal or state escheat laws to the contrary.

7.4. ***Disbursement Agent.*** Reorganized AMI, as Disbursement Agent, or such other Person designated by Reorganized AMI as Disbursement Agent, shall make all distributions under this Prepackaged Plan on the Effective Date. A Disbursement Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

7.5. ***Record Date for Distribution.*** Distributions shall only be made to the record holders of Allowed Claims as of the Confirmation Date. On the Confirmation Date, at the close of business for the relevant register, all registers maintained by AMI and Reorganized AMI, and each of their respective agents, successors and assigns, shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to

26

distributions under this Prepackaged Plan. AMI and Reorganized AMI, and all of their respective agents, successors and assigns shall have no obligation to recognize, for purposes of distributions pursuant to or in any way arising from this Prepackaged Plan (or for any other purpose), any Claims that are transferred after the Confirmation Date. Instead, they shall be entitled to recognize only those record holders set forth in the registers as of the Confirmation Date, irrespective of the number of distributions made under this Prepackaged Plan or the date of such distributions. Furthermore, if a Claim (other than a Senior Loan Claim) is transferred twenty (20) or fewer calendar days before the Confirmation Date, the Disbursement Agent shall make distributions to the transferee only if the transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

 If any dispute arises as to the identity of a holder of an Allowed Claim that is entitled to receive a distribution pursuant to this Prepackaged Plan, the Disbursement Agent or the servicers, as applicable, may, in lieu of making such distribution to such Person, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

 7.6. ***Delivery of Distributions.*** Subject to Bankruptcy Rule 9010, all distributions to holders of Allowed Claims shall be made at the address of such holder as set forth in the books and records of the Debtor. In the event that any distribution to any holder is returned as undeliverable, the Disbursement Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursement Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtor and the Claim of any other holder to such property or interest in property shall be discharged and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.

 7.7. ***Subordinated Note Claims and Senior Loan Claims.*** (a) The Indenture Trustee shall be deemed to be the holder of all Subordinated Note Claims, for purposes of distributions to be made hereunder, and all distributions on account of such notes shall be made to or on behalf of the Indenture Trustee. The Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Subordinated Note Claims. As soon as practicable following compliance with the requirements set forth in Section 6.8 of this Prepackaged Plan, the Indenture Trustee shall arrange to deliver such distributions to or on behalf of such noteholders.

 (b) For purposes of distributions to be made hereunder, all distributions on account of the Senior Loan Claims shall be made at the direction of the Administrative Agent in accordance with the Senior Credit Agreement Documents and shall be distributed by the Debtor or the Disbursement Agent.

 7.8. ***Manner of Cash Payments Under Prepackaged Plan.*** At Reorganized AMI's option, any Cash payment to be made hereunder may be made by a check or wire transfer

or as otherwise required or provided in applicable agreements, or as agreed by Reorganized AMI and the claimant.

7.9.    ***Fractional Shares.***  No fractional shares of New Common Stock or Subordinated Note Warrants shall be distributed and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to this Prepackaged Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock or Subordinated Note Warrants that is not a whole number, the actual distribution of shares of New Common Stock or Subordinated Note Warrants shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Common Stock and number of Subordinated Note Warrants to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

7.10.    ***Setoffs and Recoupment.***  Except with respect to the Senior Loan Claims and otherwise as provided in this Prepackaged Plan, the Debtor may, but shall not be required to, set off against or recoup from any Claim or Claims of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such Claim it may have against such claimant.

7.11.    ***Exemption from Securities Law.***  The issuance of the New Common Stock, the Subordinated Note Warrants (and the New Common Stock for which such Subordinated Note Warrants are exercisable), the New Senior Secured Term Notes (if applicable, including any guarantees issued in connection therewith), and any other securities issued pursuant to this Prepackaged Plan and any subsequent sales, resales or transfers, or other distributions of any such securities shall be exempt from any federal or state securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

7.12.    ***Allocation of Payments.***  In the case of distributions with respect to Claims pursuant to this Prepackaged Plan (other than the Senior Lender Emergence Payment), the amount of any Cash and the fair market value of any other consideration received by the holder of such Claim will be allocable first to the principal amount of such Claim (as determined for federal income tax purposes), and then, to the extent of any excess, the remainder of the Claim.

7.13.    ***No Postpetition Interest on Claims.***  Unless otherwise specifically provided for in this Prepackaged Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

## ARTICLE VIII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1.    ***Assumption of Contracts and Leases.***  On the Effective Date, the Debtor shall assume each executory contract and unexpired lease to which it is a party pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such contract or lease (i) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (ii) is the subject of a motion to reject filed by the Debtor on or before the Confirmation Date or (iii) is set forth in a schedule as an executory contract or unexpired lease to be rejected, if any, filed by the Debtor as part of Plan Supplements.  The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, subject to the occurrence of the Effective Date.

(a)    To the extent applicable, all executory contracts of the Reorganized Debtor assumed pursuant to this Prepackaged Plan shall be deemed modified such that the transactions contemplated by this Prepackaged Plan shall not be a "change of control," however such term may be defined in the relevant executory contract, and any required consent under any such contract or lease shall be deemed satisfied by the confirmation of this Prepackaged Plan, and all executory contracts assumed pursuant to this Prepackaged Plan shall be assumed notwithstanding any provisions therein that purport to modify AMI's rights, or the rights of any Affiliate of AMI, thereunder as a result of AMI's commencement of the Reorganization Case.

(b)    Each executory contract assumed pursuant to this Prepackaged Plan (or pursuant to other Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Prepackaged Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

(c)    In the event that any license granted to the Debtor by a governmental unit, and in effect immediately prior to the Effective Date, is considered to be an executory contract and is not otherwise terminated or rejected by the Debtor, such license shall be deemed to be assumed pursuant to section 365 of the Bankruptcy Code under this Prepackaged Plan; provided, however, that the assumption of the licenses issued by the FCC shall be subject to compliance with the rules and regulations of the FCC.

(d)    Any monetary amounts required as cure payments on each executory contract and unexpired lease to be assumed pursuant to this Prepackaged Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or upon such other terms and dates as the parties to such executory contracts or unexpired leases otherwise may agree.  If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute.

(e)     **The Debtor hereby gives notice that the Cure amounts for each such contract and lease shall be zero dollars unless noticed on a schedule filed by AMI hereafter.**

(f)     All Claims arising out of the rejection of executory contracts and unexpired leases must be served upon the Debtor and its counsel within thirty (30) days after the date of entry of an order of the Bankruptcy Court approving such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Debtor, its Estate, and its property.

(g)     Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, or as otherwise provided in this Prepackaged Plan, all benefits subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed hereunder. On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, Reorganized Debtor shall continue to pay all retiree benefits (within the meaning of, and subject to the limitations of, section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtor has obligated itself to provide such benefits. Nothing herein shall: (a) restrict the Debtor's or Reorganized Debtor's right to modify the terms and conditions of the retiree benefits (including without limitation, the Debtor's or Reorganized Debtor's right of termination and amendment thereunder), as otherwise permitted pursuant to the terms of the applicable plans, non-bankruptcy law, or section 1114(m) of the Bankruptcy Code; or (b) be construed as an admission that any such retiree benefits are owed by the Debtor or Reorganized Debtor.

(h)     Pursuant to this Prepackaged Plan, the Reorganized Debtor shall continue after the Effective Date its three single-employer tax-qualified defined-benefit pension plans (the MediaNews Group Defined Benefit Plan for Certain Employees (the "**MNG Plan**"), the Northwest Publications Pension Plan for Guild Employees of Saint Paul Division (the "**St. Paul Guild Plan**"), and the San Jose Mercury-News Inc. Amended Retirement Plan Covering Employees Represented by the San Jose Newspaper Guild (the "**San Jose Plan**") collectively referred to as the "**Pension Plans**"), each of which is a qualified defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), in each case, in accordance with the terms of such Pension Plan. As part of the continuation of each of the Pension Plans, the Reorganized Debtor shall meet the minimum funding standards under ERISA and the Tax Code, pay all insurance premiums owed to the Pension Benefit Guaranty Corporation (the "**PBGC**"), and administer and operate each Pension Plan in accordance with its terms and ERISA and the Tax Code. Nothing in this Prepackaged Plan is intended to release or discharge any statutory liability or obligation of the Debtor or the Reorganized Debtor with respect to the PBGC or any of the Pension Plans. Neither the PBGC nor any of the Pension Plans shall be enjoined or precluded from enforcing such liability as a result of this Prepackaged Plan.

(i)     The MediaNews Group SERP, a non-qualified deferred compensation plan maintained by the Debtor, and the Debtor's company owned life insurance policies and any

agreements, documents or instruments relating thereto, shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed hereunder.

(j)    As of the Effective Date, any and all equity-based plans of the Debtor entered into before the Effective Date (including, without limitation the MediaNews Group, Inc. Career RSU Plan and any stock option plans), and any other agreements, or documents relating to such plans, shall be terminated.  To the extent that such plans, agreements, or documents are considered to be executory contracts, such plans, agreements or documents shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to section 365 of the Bankruptcy Code under this Prepackaged Plan.

(k)    Reorganized AMI shall continue, in accordance with its ordinary course of business, after the Effective Date, to provide and administer (i) payroll services for the benefit of its employees and the employees of its Subsidiaries and Affiliates and (ii) Benefit Plans (subject to the terms of such Benefit Plans and as they may be amended and/or terminated from time to time).

## ARTICLE IX

## CONDITIONS PRECEDENT TO EFFECTIVE DATE

9.1.    ***Conditions Precedent to Effective Date of Prepackaged Plan.***  The occurrence of the Effective Date of this Prepackaged Plan is subject to satisfaction of the following conditions precedent:

(a)    Confirmation Order.  The Clerk of the Bankruptcy Court shall have entered the Confirmation Order in the Debtor's Reorganization Case and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

(b)    Execution and Delivery of Other Documents.  All other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of this Prepackaged Plan, including the Plan Documents and the New Senior Secured Credit Documents, shall have been, in each case, approved by the Senior Lender Steering Committee in its sole discretion and effected, duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived in accordance with their respective terms.

(c)    Corporate Formalities.  The Restated Certificate of Incorporation shall be filed with the Secretary of State of the State of Delaware contemporaneously with the Effective Date.

(d)    FCC Matters.  Either, (i) (A) the FCC Trust shall have been established, approval by the Bankruptcy Court and the FCC of the assignment of the FCC Broadcast Licenses and FCC Broadcast License Related Assets to the FCC Trust shall have been received and such assignments shall have been effectuated; (B) the Time Brokerage Agreements shall be in effect; and (C) approval by the FCC of the applications, if any, for the transfer of control of the FCC Non-Broadcast Licenses from AMI (as debtor-in-possession) to Reorganized AMI shall have

been received or (ii) other steps reasonably acceptable to the Senior Lender Steering Committee shall have been taken to comply with any applicable FCC requirements and regulations.

(e)    Other Acts.  Any other actions the Debtor, in consultation with the Senior Lender Steering Committee, determines are necessary to implement the terms of this Prepackaged Plan shall have been taken.

9.2.    *AMI Waiver of Conditions Precedent.*  Each of the conditions precedent in Section 9.1 (except for Section 9.1(a)) hereof may be waived, in whole or in part, by the Debtor, with approval of the Senior Lender Steering Committee, without notice or an order of the Bankruptcy Court.

9.3.    *Substantial Consummation.*  Substantial consummation of this Prepackaged Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

## ARTICLE X

## EFFECT OF CONFIRMATION

10.1.    *Vesting of Assets.*  Except as otherwise provided in this Prepackaged Plan, on the Effective Date all property comprising the Estate shall revest in the Debtor and, ultimately, in the Reorganized Debtor, free and clear of all Liens, Claims and Equity Interests (other than as expressly provided herein). Except as otherwise provided in this Prepackaged Plan, the Debtor, as the Reorganized Debtor, shall continue to exist on and after the Effective Date as a separate Person with all of the powers available to such Person under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.  On and after the Effective Date, the Reorganized Debtor shall be authorized to operate its businesses, and to use, acquire or dispose of assets without supervision or approval by the Bankruptcy Court, and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

10.2.    *Binding Effect.*  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Prepackaged Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under this Prepackaged Plan and whether or not such holder has accepted this Prepackaged Plan.

10.3.    *Settlements, Releases and Discharges.*  The settlements, releases and discharges of Claims and Causes of Action described in this Prepackaged Plan, including releases by the Debtor and by holders of Claims, constitute good faith compromises and settlements of the matters covered thereby and are consensual.  Such compromises and settlements are made in exchange for consideration and are in the best interest of holders of Claims, are fair, equitable and reasonable and are integral elements of the resolution of the Reorganization Case in accordance with this Prepackaged Plan. Each of the discharge, release, indemnification and exculpation provisions set forth in this Prepackaged Plan (a) is within the

jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b) and 1334(d) of title 28 of the United States Code, (b) is an essential means of implementing this Prepackaged Plan pursuant to section 1123(a)(5) of the Bankruptcy Code, (c) is an integral element of the transactions incorporated into this Prepackaged Plan, (d) confers material benefit on, and is in the best interests of, the Debtor, its Estate and its creditors, (e) is important to the overall objective of this Prepackaged Plan to finally resolve all Claims among or against the parties-in-interest in the Reorganization Case with respect to the Debtor and (f) is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

10.4.  ***Discharge of the Debtor.***  Except to the extent otherwise provided in this Prepackaged Plan or the Confirmation Order, the treatment of all Claims against or Equity Interests in the Debtor under this Prepackaged Plan shall be in exchange for and in complete satisfaction, discharge and release of, all Claims against or Equity Interests in the Debtor of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon (other than the Senior Loan Non-Principal Claim and subject to payment in full of the Senior Lender Emergence Payment) from and after the Petition Date, or against its Estate or properties or interests in property.  Except as otherwise provided in this Prepackaged Plan or the Confirmation Order, upon the Effective Date, all Claims against and Equity Interests in the Debtor shall be satisfied, discharged and released in full exchange for the consideration provided under this Prepackaged Plan.  Except as otherwise provided in this Prepackaged Plan or the Confirmation Order or under the terms of the documents evidencing the New Senior Credit Facility, all Persons shall be precluded from asserting, against the Debtor, the Reorganized Debtor, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date and from asserting against the Guaranteeing Subsidiaries any Claim under the Senior Credit Agreement Documents.  In accordance with the foregoing, except as provided in this Prepackaged Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other debts and liabilities of the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtor or the Reorganized Debtor at any time, to the extent such judgment is related to a discharged Claim.

10.5.  ***Exculpation.***  To the extent permitted by applicable law and approved by the Bankruptcy Court, the Released Parties shall not have any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, or arising out of, the negotiation of the Restructuring Support Agreement, the negotiation and the pursuit of approval of the Disclosure Statement, this Prepackaged Plan or the solicitation of votes for, or confirmation of, this Prepackaged Plan, the funding of this Prepackaged Plan, the consummation of this Prepackaged Plan, or the administration of this Prepackaged Plan (except for any liability that results from willful misconduct as determined by a Final Order) or the property to be distributed under this Prepackaged Plan and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Prepackaged Plan.

10.6.  ***Releases By the Debtor and its Estate.***  Except for the right to enforce this Prepackaged Plan, the Debtor shall, on its own behalf and on behalf of its Estate, effective upon the occurrence of the Effective Date, be deemed to forever release, waive and discharge the

Released Parties (except the Guaranteeing Subsidiaries) of and from any and all Claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise. Such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Party in respect of any express contractual obligation of any such party effective from and after the Effective Date, *provided* that no Person who votes to reject this Prepackaged Plan will receive the benefit of a release. On the Effective Date, each Guaranteeing Subsidiary will provide each holder of a Senior Loan Claim and the Administrative Agent a release of such scope in partial consideration for the Guarantor Settlement contemplated hereby.

10.7. ***Consensual Releases By Holders of Claims.*** Except for the right to enforce this Prepackaged Plan, each Person who votes to accept this Prepackaged Plan shall be deemed to forever release, waive and discharge the Released Parties, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise that is based on, relates to, or in any manner arises from, in whole or in part, the Debtor, the Debtor's restructuring, the Reorganization Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in this Prepackaged Plan, the business or contractual arrangements between the Debtor and any Released Party relating to the restructuring of Claims prior to or in the Reorganization Case or the negotiation, formulation or preparation of this Prepackaged Plan, or any related agreements, instruments or other documents. Except as otherwise provided herein, upon the Effective Date, all such holders of Claims and their affiliates shall be forever precluded and enjoined from prosecuting or asserting any such discharged Claim against the Debtor or any Affiliates, including any Guaranteeing Subsidiary. Notwithstanding the foregoing, in the event that this Prepackaged Plan is not confirmed, no party shall be deemed to have released or shall release any claims or be released hereby. Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Party in respect of any express contractual obligation of any such Released Party incurred in connection with this Prepackaged Plan or, except as provided in Sections 10.6, 10.7 and 10.8 hereof with respect to the Guaranteeing Subsidiaries, of any express contractual obligation of any non-Debtor party due to any other non-Debtor party.

10.8. ***Settlement and Compromise Among Debtor, the Guaranteeing Subsidiaries and Administrative Agent.*** On the Effective Date, all holders of Senior Loan Claims shall be deemed to have granted a release to the Guaranteeing Subsidiaries and to have released the Administrative Agent from any claims arising therefrom or in connection therewith, and the Guaranteeing Subsidiaries shall be unconditionally relieved from any liability under the Senior Credit Agreement Documents or in connection with the Senior Loan Claims; provided that such release is dependent upon and only effective upon (a) the execution by each of the Guaranteeing Subsidiaries of a guaranty of the New Senior Credit Facility in form and substance

34

acceptable to the Senior Lender Steering Committee as of the Effective Date, (b) the settlement, compromise and release by the Debtor and the Guaranteeing Subsidiaries of all Claims and Causes of Action (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or thereafter arising, at law, in equity, or otherwise against the Senior Lenders and/or the Administrative Agent, based in whole or in part upon any act, omission, transaction, event or other occurrence taking place before the Effective Date that relate to the Senior Credit Agreement and the Senior Credit Agreement Documents (including the Forbearance Agreement and Restructuring Support Agreement ) or the transactions contemplated thereby and (c) the granting by the Guaranteeing Subsidiaries of first priority Liens on substantially all property of the Guaranteeing Subsidiaries securing the guarantees referenced in subclause (a) of this sentence pursuant to security agreements in form and substance acceptable to the Senior Lender Steering Committee.

Pursuant to Bankruptcy Rule 9019, the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of the good faith settlement and compromise of the claims among the Debtor, the Guaranteeing Subsidiaries, the Senior Lenders and the Administrative Agent embodied in this Prepackaged Plan, which approval shall be based on factual findings included in the Confirmation Order that such settlement and compromise is: (i) fair, equitable and reasonable; (ii) necessary and essential to the Debtor's successful reorganization; (iii) in exchange for good and valuable consideration provided by the Debtor, the Guaranteeing Subsidiaries, the Senior Lenders and the Administrative Agent; (iv) warranted by the exceptional and unique circumstances of the Debtor's reorganization; and (v) consistent with public policy and due process principles.

10.9.    ***Waiver of Avoidance Actions.***  Effective as of the Effective Date, the Debtor shall have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or other applicable law that belong to the Debtor and/or which the Debtor could have prosecuted as debtor or debtor-in-possession against the Released Parties relating to distributions made on account of interest or other obligations under and relating to the Senior Credit Agreement or the Subordinated Debt.

10.10.    ***Term of Injunctions or Stays.***

(a)    Except as otherwise expressly provided herein, and except with respect to enforcement of this Prepackaged Plan, all Persons who have held, hold or may hold any Claim against, or Equity Interest in, the Debtor as of the Effective Date will be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind in any forum with respect to such Claim or Equity Interest against the Reorganized Debtor, the Guaranteeing Subsidiaries or their respective property, (ii) the enforcement, attachment, collection or recovery in any manner or by any means any judgment, award, decree or order against the Reorganized Debtor, the Guaranteeing Subsidiaries or their respective property, with respect to such Claim or Equity Interest, (iii) creating, perfecting or enforcing any Lien or other encumbrance of any kind against the Reorganized Debtor, the Guaranteeing Subsidiaries or against any property or interests in property of the

Reorganized Debtor or the Guaranteeing Subsidiaries, as applicable, with respect to any such Claim or Equity Interest, (iv) asserting a right of setoff, subrogation or recoupment of any kind against any obligation due from the Reorganized Debtor, the Guaranteeing Subsidiaries or against any property or interests in property of the Reorganized Debtor or the Guaranteeing Subsidiaries, with respect to such Claim or Equity Interest, (v) commencing or continuing any action, in any forum, that does not comply or is inconsistent with the provisions of this Prepackaged Plan and (vi) pursuing any such Claim released pursuant to Section 10.6, 10.7 or 10.8 hereof.

(b)    Unless otherwise provided herein, all injunctions or stays arising under or entered during the Debtor's Reorganization Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

10.11.  ***Termination of Subordination Rights and Settlement of Related Claims.*** The classification and manner of satisfying all Claims and Equity Interests under this Prepackaged Plan takes into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise.  All subordination rights that a holder of a Claim or Equity Interest may have with respect to any distribution to be made under this Prepackaged Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be enjoined permanently.  Accordingly, distributions under this Prepackaged Plan to holders of Allowed Claims will not be subject to payment of a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

10.12.  ***Indemnification Obligations.***  Notwithstanding anything to the contrary herein, subject to the occurrence of the Effective Date, the obligations of the Debtor as provided in the Debtor's certificate of incorporation and bylaws as in effect through the Effective Date and under applicable law or other applicable agreements as in effect through the Effective Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of, the current and former directors, officers and employees of the Debtor (including in the case of officers and employees serving as directors, managers, officers and employees of any Affiliate of the Debtor or as trustee (or similar position) of any employee benefit plan or trust (or similar Person) of AMI and its Subsidiaries, in such capacities) against any damages, liabilities, obligations, claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, shall survive confirmation of this Prepackaged Plan, remain unaffected thereby after the Effective Date and not be discharged under section 1141 of the Bankruptcy Code or otherwise, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Petition Date.  Any Claim based on the Debtor's obligations herein shall not be subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

As of the Effective Date, the Restated Certificate of Incorporation and/or Restated Bylaws shall provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, directors and officers and employees of the Debtor (including in the case of officers and employees serving as directors, managers, officers and employees of any Affiliate of the Debtor or as trustee (or similar position) of any employee benefit plan or trust (or similar Person) of AMI and its Subsidiaries, in such capacities), who were directors, officers or employees of the Debtor at any time prior to the Effective Date at least to the same extent as provided in the certificate of incorporation and bylaws of AMI in effect on the Petition Date, against any damages, liabilities, obligations, claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, in connection with any event occurring before the Petition Date.

The Debtor and the Reorganized Debtor shall indemnify and hold harmless (i) the Administrative Agent, (ii) the Senior Lender Steering Committee, (iii) the Senior Lender Steering Committee's individual members, (iv) the respective advisors, officers, directors and employees of the parties described in clauses (i) through (iii) hereof, and (v) each of their respective successors and assigns (collectively, the "**Indemnified Persons**"), to the full extent lawful, from and against all losses, claims, damages, and liabilities incurred by them that are related to or arise out of (a) the formulation, negotiation and pursuit of the confirmation or consummation of this Prepackaged Plan or (b) the Indemnified Persons' consideration of other proposals for the reorganization of the Debtor under chapter 11 of the Bankruptcy Code.

10.13. *Limitation on Indemnification.* Notwithstanding anything to the contrary set forth in this Prepackaged Plan or elsewhere, the Reorganized Debtor shall not be obligated to indemnify and hold harmless any Person or entity for any claim, cause of action, liability, judgment, settlement, cost or expense that results from such Person's fraud or willful misconduct as determined by a Final Order.

10.14. *Preservation of Claims.* Except as otherwise provided in this Prepackaged Plan, including Sections 10.5, 10.6, 10.7 and 10.9, as of the Effective Date, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, any action, cause of action, liability, obligation, right, suit, debt, sum of money, damage, judgment, claim and demand whatsoever, whether known or unknown, at law, in equity or otherwise (collectively, "**Causes of Action**") accruing to the Debtor shall become assets of the Reorganized Debtor, and the Reorganized Debtor shall have the authority to commence and prosecute such Causes of Action for the benefit of the Estate of the Debtor. After the Effective Date, the Reorganized Debtor shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such Causes of Action without approval of the Bankruptcy Court.

10.15. *No Acquisition of a Majority of Voting Interests.* The confirmation and consummation of this Prepackaged Plan, and the issuance of New Common Stock pursuant thereto, shall not, and shall not be deemed to, constitute or result in an acquisition of a majority of the voting interests of AMI or any of its Subsidiaries for purposes of any agreement to which AMI or any of its Subsidiaries is a party.

10.16. *No Change of Control*.  Neither the confirmation or consummation of this Prepackaged Plan nor the consummation of any or all transactions contemplated hereby shall constitute or effect a change in control under any agreement to which AMI, Reorganized AMI or any Affiliate of AMI is a party.

## ARTICLE XI

## RETENTION OF JURISDICTION

11.1. *Jurisdiction of the Bankruptcy Court*.  Unless otherwise provided for herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, or related to, the Debtor's Reorganization Case and this Prepackaged Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)  To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b)  To determine any and all adversary proceedings, applications and contested matters in the Debtor's Reorganization Case and grant or deny any application involving the Debtor that may be pending on the Effective Date;

(c)  To ensure that distributions to holders of Allowed Claims are accomplished as provided in this Prepackaged Plan;

(d)  To hear and determine any timely objections to Administrative Expense Claims or to proofs of claim and equity interests, including any objections to the classification of any Claim or Equity Interest, and to allow or disallow any disputed claim in whole or in part;

(e)  To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f)  To issue such orders in aid of execution of this Prepackaged Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)  To consider any amendments to or modifications of this Prepackaged Plan, or to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(h)  To hear and determine all applications of retained professionals under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)  To hear and determine any dispute concerning the compromise by and between the Senior Lenders, the Debtor and the Guaranteeing Subsidiaries, and the Senior

Lenders' release of all Claims arising under the Senior Credit Agreement Documents, including the release of all Claims against the Guaranteeing Subsidiaries;

(j)    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Prepackaged Plan, the Confirmation Order, the Plan Supplements, any transactions or payments contemplated by the Restructuring Support Agreement including this Prepackaged Plan or any agreement, instrument or other document governing or relating to any of the foregoing;

(k)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(l)    During the period of time that the FCC Trust is in place, to enter and implement such orders as may be necessary or appropriate regarding the actions of the FCC Trust pursuant to this Prepackaged Plan and the FCC Trust Agreement, including, without limitation, orders regarding the FCC Trustee's operating decisions over the Broadcast Operations;

(m)    To hear any other matter not inconsistent with the Bankruptcy Code;

(n)    To hear and determine all disputes involving the existence, scope and nature of the discharges granted under Sections 10.3 and 10.4 hereof;

(o)    To hear and determine all disputes involving or in any manner implicating the exculpation provisions granted under Section 10.5 hereof;

(p)    To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any Person with the consummation or implementation of this Prepackaged Plan;

(q)    To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with this Prepackaged Plan with respect to any Person;

(r)    To enter a final decree closing the Debtor's Reorganization Case;

(s)    To hear and determine all disputes relating to whether the confirmation and consummation of this Prepackaged Plan, and the issuance of New Common Stock pursuant thereto, shall have, or shall be deemed to, constitute or result in an acquisition of a majority of the voting interests of AMI or any of its Affiliates for purposes of any agreement to which AMI or any of its Affiliates is a party;

(t)    To hear and determine all disputes relating to the effect of this Prepackaged Plan under any agreement to which AMI, Reorganized AMI or any Affiliate of AMI is a party; and

(u)    To hear and determine all disputes relating to whether any third party consent is required for the assumption under this Prepackaged Plan of any executory contract.

## ARTICLE XII

## MISCELLANEOUS

12.1.    **Payment of Statutory Fees.**  All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

12.2.    **Payment of Indenture Trustee Fees and Administrative Agent Fees Related to Distributions Received Under this Prepackaged Plan.**  If the holders of Claims in Class 5 vote to accept this Prepackaged Plan, the Reorganized Debtor shall pay all reasonable and documented fees, costs and expenses incurred by the Indenture Trustee in connection with the distributions required pursuant to this Prepackaged Plan.  The Reorganized Debtor shall pay all reasonable and documented fees, costs and expenses incurred by the Administrative Agent in connection with the distributions required pursuant to this Prepackaged Plan and the implementation of any provisions of this Prepackaged Plan.  Notwithstanding the foregoing, the fees, costs and expenses discussed in this Section 12.2 in respect of the Administrative Agent and the Indenture Trustee shall only be paid in the event that this Prepackaged Plan is confirmed and the Effective Date occurs.

12.3.    **Further Assurances.**  The Debtor or the Reorganized Debtor, as applicable may file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Prepackaged Plan.

12.4.    **Exhibits Incorporated.**  All exhibits to this Prepackaged Plan, including the Plan Exhibits and the Plan Supplements, are incorporated into and are a part of this Prepackaged Plan as if fully set forth herein.

12.5.    **Intercompany Claims.**  Notwithstanding anything to the contrary herein, on or after the Effective Date, any claims held by AMI against one of its Affiliates may be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged to the extent reasonably determined appropriate by the Debtor.

12.6.    **Amendment or Modification of this Prepackaged Plan.**  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, alterations, amendments or modifications of this Prepackaged Plan or the Plan Exhibits may be proposed in writing jointly by the Debtor and the Senior Lender Steering Committee at any time prior to or after the Confirmation Date, but prior to the Effective Date.  Holders of Claims that have accepted this Prepackaged Plan shall be deemed to have accepted this Prepackaged Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder; provided, however, that any holders of Claims who were deemed to accept this Prepackaged Plan because such Claims were unimpaired shall continue to be deemed to accept

this Prepackaged Plan only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired.

12.7.    **Inconsistency.**  In the event of any inconsistency among this Prepackaged Plan, the Disclosure Statement and any exhibit to the Disclosure Statement, the provisions of this Prepackaged Plan shall govern.

12.8.    **Section 1125(e) of the Bankruptcy Code.**  As of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of this Prepackaged Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  The Debtor (and each of its successors, predecessors, control persons, members, Affiliates, agents, directors, officers, employees, investment bankers, financial advisors, accountants, attorneys and other professionals and any officer or employee serving as a director, manager, officer or employee of any Affiliate of the Debtor or trustee (or similar position) of any employee benefit plan or trust (or similar person) of the debtor or its Affiliates) has participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities under this Prepackaged Plan.  Accordingly, such entities and individuals shall not be liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Prepackaged Plan or the offer and issuance of the securities under this Prepackaged Plan.

12.9.    **Compliance with Tax Requirements.**  In connection with this Prepackaged Plan and all instruments issued in connection herewith and distributed hereunder, any party issuing any instruments or making any distribution under this Prepackaged Plan, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under this Prepackaged Plan shall be subject to any withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under this Prepackaged Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instruments or making any distribution under this Prepackaged Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or distributing party for payment of any such tax obligations.

12.10.    **Determination of Tax Filings and Taxes.**  The Reorganized Debtor shall have the right to request an expedited determination of its tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.  The Reorganized Debtor shall have the right, at its expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of the AMI Group.

12.11.    **Exemption from Transfer Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities (including issuance of warrants) under or in connection with this Prepackaged Plan, the creation of any

41

mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Prepackaged Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Prepackaged Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

12.12. *Dissolution of any Statutory Committees and Cessation of Fee and Expense Payment.* Any statutory committees appointed in the Debtor's Reorganization Case shall be dissolved on the Effective Date. The Reorganized Debtor shall not be responsible for paying any fees and expenses incurred by the advisors and any statutory committees after the Effective Date.

12.13. *Severability of Provisions in this Prepackaged Plan.* If prior to the entry of the Confirmation Order, any term or provision of this Prepackaged Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, upon the consent of the Senior Lender Steering Committee, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of this Prepackaged Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Prepackaged Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.14. *Governing Law.* Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to this Prepackaged Plan or Plan Supplements provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties and obligations arising under this Prepackaged Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

12.15. *No Admissions.* If the Effective Date does not occur, this Prepackaged Plan shall be null and void in all respects, and nothing contained in this Prepackaged Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor, (b) prejudice in any manner the rights of the Debtor or any other party in interest or (c) constitute an admission of any sort by the Debtor or other party in interest.

12.16. *Reservation of Rights.* Except as expressly set forth herein, this Prepackaged Plan shall have no force and effect unless and until the Bankruptcy Court has entered the Confirmation Order and the Effective Date has occurred. The filing of this Prepackaged Plan, any statement or provision contained in this Prepackaged Plan, or the taking of any action by the Debtor or any other party with respect to this Prepackaged Plan shall not be

and shall not be deemed to be an admission or waiver of any rights of the Debtor or any other party with respect to Claims or Equity Interests or any other matter.

      12.17. ***Notices.*** All notices, requests, and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

    (a)    if to the Debtor, to:

        101 West Colfax Avenue, Suite 1100
        Denver, Colorado  80202
        Facsimile:  (303) 954-6320
        Attention:  Joseph J. Lodovic, IV
        E-mail: jlodovic@medianewsgroup.com

          with copies to:

        Hughes Hubbard & Reed LLP
        One Battery Park Plaza
        New York, New York  10004
        Facsimile:  (212) 422-4726
        Attention:  James Modlin, Esq. and
                 Kathryn A. Coleman, Esq.
        E-mail: modlin@hugheshubbard.com
               kcoleman@hugheshubbard.com

    (b)    if to the Administrative Agent or the Senior Lender Steering Committee, to:

        Bank of America, N.A.
        Bank of America Plaza
        Mail Code: TX1-492-14-11
        901 Main St.
        Dallas, TX 75202
        Facsimile:  (877) 206-8432
        Attention:  Antonikia (Toni) L. Thomas, AVP, Agency Management
                 Officer, Global Corporate and Commercial Banking Client
                 Service
        E-mail:     antonikia.l.thomas@bankofamerica.com

with copies to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York  10017
Facsimile:  (212) 607-7996
Attention:  John Fouhey, Esq. and
          Damian Schaible, Esq.
E-mail:  john.fouhey@davispolk.com
        damian.schaible@davispolk.com

Dated: March 2, 2010

Respectfully submitted,

AFFILIATED MEDIA, INC.

By: _Ronald A. Mayo_____

Ronald A. Mayo
Vice President and Chief Financial Officer

COUNSEL:

Derek Abbott, Esq.
Morris, Nichols Arsht & Tunnell
1201 North Market Street, 18th Floor
Wilmington, Delaware  19899
(302) 658-9200
        -and-
James Modlin, Esq.
Kathryn A. Coleman, Esq.
Eric J. Fromme, Esq.
Hughes Hubbard & Reed LLP
Attorneys for the Debtor
One Battery Park Plaza
New York, New York  10004
(212) 837-6000