Lenders' release of all Claims arising under the Senior Credit Agreement Documents, including the release of all Claims against the Guaranteeing Subsidiaries;

       (j)      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Prepackaged Plan, the Confirmation Order, the Plan Supplements, any transactions or payments contemplated by the Restructuring Support Agreement including this Prepackaged Plan or any agreement, instrument or other document governing or relating to any of the foregoing;

       (k)      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

       (l)      During the period of time that the FCC Trust is in place, to enter and implement such orders as may be necessary or appropriate regarding the actions of the FCC Trust pursuant to this Prepackaged Plan and the FCC Trust Agreement, including, without limitation, orders regarding the FCC Trustee's operating decisions over the Broadcast Operations;

       (m)      To hear any other matter not inconsistent with the Bankruptcy Code;

       (n)      To hear and determine all disputes involving the existence, scope and nature of the discharges granted under Sections 10.3 and 10.4 hereof;

       (o)      To hear and determine all disputes involving or in any manner implicating the exculpation provisions granted under Section 10.5 hereof;

       (p)      To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any Person with the consummation or implementation of this Prepackaged Plan;

       (q)      To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with this Prepackaged Plan with respect to any Person;

       (r)      To enter a final decree closing the Debtor's Reorganization Case;

       (s)      To hear and determine all disputes relating to whether the confirmation and consummation of this Prepackaged Plan, and the issuance of New Common Stock pursuant thereto, shall have, or shall be deemed to, constitute or result in an acquisition of a majority of the voting interests of AMI or any of its Affiliates for purposes of any agreement to which AMI or any of its Affiliates is a party;

       (t)      To hear and determine all disputes relating to the effect of this Prepackaged Plan under any agreement to which AMI, Reorganized AMI or any Affiliate of AMI is a party; and

(u)     To hear and determine all disputes relating to whether any third party consent is required for the assumption under this Prepackaged Plan of any executory contract.

## ARTICLE XII

## MISCELLANEOUS

12.1.     ***Payment of Statutory Fees.***  All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

12.2.     ***Payment of Indenture Trustee Fees and Administrative Agent Fees Related to Distributions Received Under this Prepackaged Plan.***  If the holders of Claims in Class 5 vote to accept this Prepackaged Plan, the Reorganized Debtor shall pay all reasonable and documented fees, costs and expenses incurred by the Indenture Trustee in connection with the distributions required pursuant to this Prepackaged Plan.  The Reorganized Debtor shall pay all reasonable and documented fees, costs and expenses incurred by the Administrative Agent in connection with the distributions required pursuant to this Prepackaged Plan and the implementation of any provisions of this Prepackaged Plan.  Notwithstanding the foregoing, the fees, costs and expenses discussed in this Section 12.2 in respect of the Administrative Agent and the Indenture Trustee shall only be paid in the event that this Prepackaged Plan is confirmed and the Effective Date occurs.

12.3.     ***Further Assurances.***  The Debtor or the Reorganized Debtor, as applicable may file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Prepackaged Plan.

12.4.     ***Exhibits Incorporated.***  All exhibits to this Prepackaged Plan, including the Plan Exhibits and the Plan Supplements, are incorporated into and are a part of this Prepackaged Plan as if fully set forth herein.

12.5.     ***Intercompany Claims.***  Notwithstanding anything to the contrary herein, on or after the Effective Date, any claims held by AMI against one of its Affiliates may be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged to the extent reasonably determined appropriate by the Debtor.

12.6.     ***Amendment or Modification of this Prepackaged Plan.***  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, alterations, amendments or modifications of this Prepackaged Plan or the Plan Exhibits may be proposed in writing jointly by the Debtor and the Senior Lender Steering Committee at any time prior to or after the Confirmation Date, but prior to the Effective Date.  Holders of Claims that have accepted this Prepackaged Plan shall be deemed to have accepted this Prepackaged Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder; provided, however, that any holders of Claims who were deemed to accept this Prepackaged Plan because such Claims were unimpaired shall continue to be deemed to accept

this Prepackaged Plan only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired.

12.7. ***Inconsistency.*** In the event of any inconsistency among this Prepackaged Plan, the Disclosure Statement and any exhibit to the Disclosure Statement, the provisions of this Prepackaged Plan shall govern.

12.8. ***Section 1125(e) of the Bankruptcy Code.*** As of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of this Prepackaged Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtor (and each of its successors, predecessors, control persons, members, Affiliates, agents, directors, officers, employees, investment bankers, financial advisors, accountants, attorneys and other professionals and any officer or employee serving as a director, manager, officer or employee of any Affiliate of the Debtor or trustee (or similar position) of any employee benefit plan or trust (or similar person) of the debtor or its Affiliates) has participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities under this Prepackaged Plan. Accordingly, such entities and individuals shall not be liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Prepackaged Plan or the offer and issuance of the securities under this Prepackaged Plan.

12.9. ***Compliance with Tax Requirements.*** In connection with this Prepackaged Plan and all instruments issued in connection herewith and distributed hereunder, any party issuing any instruments or making any distribution under this Prepackaged Plan, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under this Prepackaged Plan shall be subject to any withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under this Prepackaged Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instruments or making any distribution under this Prepackaged Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or distributing party for payment of any such tax obligations.

12.10. ***Determination of Tax Filings and Taxes.*** The Reorganized Debtor shall have the right to request an expedited determination of its tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date. The Reorganized Debtor shall have the right, at its expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of the AMI Group.

12.11. ***Exemption from Transfer Taxes.*** Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities (including issuance of warrants) under or in connection with this Prepackaged Plan, the creation of any

mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Prepackaged Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Prepackaged Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

12.12. ***Dissolution of any Statutory Committees and Cessation of Fee and Expense Payment.*** Any statutory committees appointed in the Debtor's Reorganization Case shall be dissolved on the Effective Date. The Reorganized Debtor shall not be responsible for paying any fees and expenses incurred by the advisors and any statutory committees after the Effective Date.

12.13. ***Severability of Provisions in this Prepackaged Plan.*** If prior to the entry of the Confirmation Order, any term or provision of this Prepackaged Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, upon the consent of the Senior Lender Steering Committee, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding such holding, alteration or interpretation, the remaining terms and provisions of this Prepackaged Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Prepackaged Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.14. ***Governing Law.*** Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to this Prepackaged Plan or Plan Supplements provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties and obligations arising under this Prepackaged Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

12.15. ***No Admissions.*** If the Effective Date does not occur, this Prepackaged Plan shall be null and void in all respects, and nothing contained in this Prepackaged Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor, (b) prejudice in any manner the rights of the Debtor or any other party in interest or (c) constitute an admission of any sort by the Debtor or other party in interest.

12.16. ***Reservation of Rights.*** Except as expressly set forth herein, this Prepackaged Plan shall have no force and effect unless and until the Bankruptcy Court has entered the Confirmation Order and the Effective Date has occurred. The filing of this Prepackaged Plan, any statement or provision contained in this Prepackaged Plan, or the taking of any action by the Debtor or any other party with respect to this Prepackaged Plan shall not be

and shall not be deemed to be an admission or waiver of any rights of the Debtor or any other party with respect to Claims or Equity Interests or any other matter.

       12.17. ***Notices.*** All notices, requests, and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

       (a)    if to the Debtor, to:

           101 West Colfax Avenue, Suite 1100
Denver, Colorado 80202
Facsimile: (303) 954-6320
Attention: Joseph J. Lodovic, IV
E-mail: jlodovic@medianewsgroup.com

             with copies to:

           Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Facsimile: (212) 422-4726
Attention: James Modlin, Esq. and
                Kathryn A. Coleman, Esq.
E-mail: modlin@hugheshubbard.com
                kcoleman@hugheshubbard.com

       (b)    if to the Administrative Agent or the Senior Lender Steering Committee, to:

           Bank of America, N.A.
Bank of America Plaza
Mail Code: TX1-492-14-11
901 Main St.
Dallas, TX 75202
Facsimile: (877) 206-8432
Attention: Antonikia (Toni) L. Thomas, AVP, Agency Management
                Officer, Global Corporate and Commercial Banking Client
                Service
E-mail:     antonikia.l.thomas@bankofamerica.com

43

with copies to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York  10017
Facsimile:  (212) 607-7996
Attention:  John Fouhey, Esq. and
               Damian Schaible, Esq.
E-mail:  john.fouhey@davispolk.com
          damian.schaible@davispolk.com

Dated: March 2, 2010

Respectfully submitted,

AFFILIATED MEDIA, INC.

By:/s/ Ronald A. Mayo
    Ronald A. Mayo
    Vice President and Chief Financial Officer

COUNSEL:

Derek Abbott, Esq.
Morris, Nichols Arsht & Tunnell
1201 North Market Street, 18th Floor
Wilmington, Delaware  19899
(302) 658-9200
        -and-
James Modlin, Esq.
Kathryn A. Coleman, Esq.
Eric J. Fromme, Esq.
Hughes Hubbard & Reed LLP
Attorneys for the Debtor
One Battery Park Plaza
New York, New York  10004
(212) 837-6000

45

# Plan Exhibit 1

Amended and Restated Employment Agreements
Term Sheets

**Summary of Terms**

**Amended and Restated Employment Agreement by and between Affiliated Media, Inc. (the "Company") and William Dean Singleton (the "Agreement")**

The Agreement will have a term ending June 30, 2013 and will automatically renew for additional one-year terms absent notice to the contrary by either party. It will provide for a base salary of $634,000 (in addition to a base salary of $360,000 with annual 5% cost of living adjustments which he is entitled to receive under a separate employment agreement with the Denver Post Corporation) and a grant under the Equity Incentive Plan of restricted stock units covering (or restricted shares of) Class B New Common Stock representing approximately 6% of the Company's outstanding New Common Stock, and warrants to purchase shares of Class B New Common Stock representing 8% of the Company's outstanding New Common Stock. Mr. Singleton is entitled under the Agreement to those benefits that are generally made available to executive personnel of the Company and to annual payments to defray the costs of term life insurance that currently has an annual premium of approximately $50,000. Under the Agreement, Mr. Singleton will serve as Chairman of the Board of Directors and Chief Executive Officer of the Company and is eligible for an annual bonus of up to $500,000, depending on actual attainment of performance targets.

Mr. Singleton will also be subject to a noncompetition agreement that survives until one year after his employment termination.

Upon his employment termination by the Company without cause or resignation by him for good reason (as defined in the Agreement), Mr. Singleton will be entitled to his base salary and certain of his benefits for the remainder of his employment term plus one year and his annual bonus (to the extent the applicable performance criteria are attained) for the year of employment termination. Upon his employment termination due to non-renewal of the Agreement by the Company, Mr. Singleton shall be entitled to his base salary and certain of his benefits for one year.

Mr. Singleton will also be entitled to indemnification and liability insurance coverage with respect to any claims arising as a result of his duties, responsibilities or positions held with the Company.

**Summary of Terms**

**Amended and Restated Employment Agreement by and between Affiliated Media, Inc. (the "Company") and Joseph J. Lodovic, IV (the "Agreement")**

The Agreement will have a term ending June 30, 2013 and will automatically renew for additional one-year terms absent notice to the contrary by either party. It provides for a base salary of $1,006,000 and a grant under the Equity Incentive Plan of restricted stock units covering (or restricted shares of) the Company's Class B New Common Stock representing approximately 3% of the Company's outstanding New Common Stock. Mr. Lodovic will be entitled to those benefits that are generally made available to executive personnel of the Company. Mr. Lodovic will serve as President of the Company and be eligible for an annual bonus of up to $500,000, depending on actual attainment of performance targets. He will also be entitled to a special transaction and incentive bonus consisting of (i) $250,000 (which has already been earned) for the successful restructuring of The Denver Newspaper Agency LLC, (ii) an additional $250,000 (which has already been earned) for the commencement of the Solicitation on or prior to December 18, 2009 and (iii) an additional $250,000 if a Lender Class Accepted Plan (as defined in the Restructuring Support Agreement) is confirmed on or before March 31, 2010 and consummated by April 14, 2010 (or, if such conditions are not met, $125,000 if such a plan is confirmed by April 30, 2010 and consummated by May 14, 2010), each of which is payable 50% on the Effective Date and 50% on the first anniversary of the Effective Date.

Mr. Lodovic will also be subject to a noncompetition agreement that survives until one year after his employment termination.

Upon his employment termination by the Company without cause or resignation by him for good reason (as defined in the Agreement), Mr. Lodovic shall be entitled to his base salary and certain of his benefits for the remainder of his employment term plus one year and his annual bonus (to the extent the applicable performance criteria are attained) for the year of employment termination. Upon his employment termination due to nonrenewal of the Agreement by the Company, Mr. Lodovic shall be entitled to his base salary and certain of his benefits for one year.

Mr. Lodovic will also be entitled to indemnification and liability insurance coverage with respect to any claims arising as a result of his duties, responsibilities or positions held with the Company.

## SCHEDULE 1

**Amended and Restated Employment Agreement by and between the Company and William Dean Singleton**

**Amended and Restated Employment Agreement by and between the Company and Joseph J. Lodovic, IV**

Each of Mr. Singleton and Mr. Lodovic is entitled to an annual bonus under his particular employment agreement, subject to achievement of annual EBITDA[1] performance targets as follows:

### EBITDA ($ in millions)

| Percentage of Target Bonus Earned | Fiscal Year ending 6/30/11 | Fiscal Year ending 6/30/12 | Fiscal Year ending 6/30/13 |
|---|---|---|---|
| 50% bonus ($250,000) | $38.3 | $41.2 | $47.8 |
| 100% bonus ($500,000) | $42.1 | $45.3 | $52.6 |

---

1.  EBITDA, for purposes of measuring the Company's annual performance against the targets set forth in the Amended and Restated Employment Agreements between the Company and each of William Dean Singleton and Joseph J. Lodovic, IV, means "Consolidated EBITDA" as defined in the Credit Agreement dated as of the Effective Date among the Company, as borrower, Bank of America, N.A. as administrative agent and collateral agent and the various lenders from time to time party thereto, which amount shall be reported in the Company's annual compliance certificate to be delivered to the administrative agent in connection therewith.

# Plan Exhibit 2

Equity Incentive Plan Term Sheet

**Summary of Terms**
**Affiliated Media, Inc. (the "Company") 2010 Equity Incentive Plan**

The Equity Incentive Plan provides for the grant, on or after the Effective Date, of restricted stock units, restricted shares, stock options, and stock appreciation rights and other equity-like incentives covering shares of Class B New Common Stock of the Company and representing up to 12% of the issued and outstanding shares of New Common Stock of the Company, including for such purpose the shares reserved for issuance under the Equity Incentive Plan (without giving effect to the possible exercise of any of the Subordinated Note Warrants or the Singleton Warrants). Any grants thereunder after the Effective Date (or any new equity incentive plan), and any exercise of authority or discretion under the Plan, will be subject to approval by a majority of the Class B Directors.

The initial grants shall be grants of restricted stock units (or restricted shares), with the following terms:

*Amount*
- Mr. Singleton and Mr. Lodovic, in the aggregate:        approximately 9%
- Other senior management:                                        approximately 2%
- The balance is available for future senior management grants (including but not limited to new hires), subject to the approval of a majority of the Class B Directors.

*Dividend and Other Rights*
- Restricted stock units will be entitled to receive dividend equivalents, whether or not vested and will have voting rights.
- Restricted shares will, unless and until forfeited, have voting and dividend rights, whether or not vested, and recipients of any restricted shares may make an election under section 83(b) of the Tax Code in connection with their grants.

*Vesting*
- 50% of each grant shall vest in equal annual installments over a three-year period commencing on the Effective Date.
- 50% of each grant shall vest in equal annual installments over a three-year period, subject in each instance to achievement of EBITDA performance targets.
- In general, upon an employment termination without cause or resignation for good reason, the award holder shall retain any already vested RSUs (or shares), plus the vesting of any time-vested RSUs (or shares) will be accelerated, but any unvested performance-vested RSUs (or shares) shall be forfeited. However, solely in the case of Messrs. Singleton and Lodovic, (i) upon a termination without cause or resignation for good reason, if a performance target for the year of employment termination is met, he shall vest in a pro rata portion of award based on the number of days in the year of termination (and, to the extent the cumulative target is met for such year, he shall vest in the performance vested shares allocable to any prior year that had not previously vested), and (ii) good reason shall include a resignation within two months after the conversion of all of the outstanding shares of Class A New Common Stock into Class B New Common Stock.
- Upon a resignation without good reason or termination of employment for cause, all unvested RSUs (or shares) are forfeited.
- Upon a change of control of the Company or a Qualified Public Offering, in each case subject to the transaction demonstrating a benchmark level of value for the holders of the Senior Lender Common Stock Distribution, all unvested RSUs (or shares) shall vest.

*Repurchase Rights*
- Upon a termination for cause, all vested shares are subject to a call by the Company at the lesser of cost or fair market value. If an employee's termination is by reason of death, disability, termination without cause or resignation (with or without good reason), all vested shares are subject to a call by the Company at fair market value. Upon any such termination, the call notice is to be provided within 180 days of employment termination and the call consummated within 60 days after the notice is given.
- Award holders do not have a put right but are entitled to customary piggyback registration and tag-along rights.
*Other*
Shares underlying RSUs will be deposited in a revocable grantor trust established by the Company with an institutional trust company for delivery upon settlement of vested RSUs.

## SCHEDULE 1

## Affiliated Media, Inc. (the "Company") 2010 Equity Incentive Plan ("Equity Plan")

50% of RSUs initially granted under the Equity Plan will vest upon achievement of EBITDA[1] performance targets ("**Performance RSUs**") on an annual or cumulative basis as follows:

| Vesting Date | Percentage of Performance RSUs Vesting | Annual EBITDA Target (in millions) |
| --- | --- | --- |
| 6/30/11 | One-sixth | $38.3 |
|  | Two-sixths | $42.1 |
| 6/30/12 | One-sixth | $41.2 |
|  | Two-sixths | $45.3 |
| 6/30/13 | One-sixth | $47.8 |
|  | Two-sixths | $52.6 |

---

1.  EBITDA, for purposes of measuring the Company's annual performance against the targets set forth in the award agreements under the Equity Plan, means "Consolidated EBITDA" as defined in the Credit Agreement dated as of the Effective Date among the Company, as borrower, Bank of America, N.A. as administrative agent and collateral agent and the various lenders from time to time party thereto, which amount shall be reported in the Company's annual compliance certificate to be delivered to the administrative agent in connection therewith.

# Plan Exhibit 3

List of Guaranteeing Subsidiaries

## List of Guaranteeing Subsidiaries

- ALASKA BROADCASTING COMPANY, INC., an Alaska corporation.
- CHARLESTON PUBLISHING COMPANY, a Delaware corporation.
- CONNECTICUT NEWSPAPERS PUBLISHING COMPANY, a Delaware corporation.
- THE DENVER POST CORPORATION, a Delaware corporation.
- THE DETROIT NEWS, INC., a Michigan corporation.
- EASTERN COLORADO PUBLISHING COMPANY, a Delaware corporation.
- GRAHAM NEWSPAPERS, INC., a Delaware corporation.
- KEARNS-TRIBUNE, LLC, a Delaware limited liability company.
- LADN HOLDINGS, LLC, a Delaware limited liability company.
- LONG BEACH PUBLISHING COMPANY, a Delaware corporation.
- LOS ANGELES DAILY NEWS PUBLISHING COMPANY, a Delaware corporation.
- LOWELL INTERNET MEDIA PUBLISHING COMPANY, INC., a Delaware corporation.
- LOWELL PUBLISHING COMPANY, a Delaware corporation.
- MEDIANEWS GROUP INTERACTIVE, INC., a Delaware corporation.
- MNG PAPER COMPANY, LLC, a Delaware limited liability company.
- NATIONAL MEDIA, INC., a California corporation.
- NEW ENGLAND INTERNET MEDIA PUBLISHING, INC., a Delaware corporation.
- NEW ENGLAND NEWSPAPERS, INC., a Delaware corporation.
- NIMITZ PAPER COMPANY, a Delaware corporation.
- NORTHWEST NEW MEXICO PUBLISHING COMPANY, a Delaware corporation.
- NORTHWEST PUBLICATIONS, LLC, a Delaware limited liability company.
- PIONEER PRESS DIGITAL, LLC, a Delaware limited liability company.
- PIONEER PRESS TARGETED PUBLICATIONS, LLC, a Delaware limited liability company.
- RATE WATCH, INC., a Delaware corporation.
- STAR PUBLISHING GROUP, INC., a Texas corporation.
- TORRANCE HOLDINGS, LLC, a Delaware limited liability company.
- TWIN CITIES NEWSPAPER SERVICE, LLC, a Minnesota limited liability company.
- UTAH MEDIA, INC., a Delaware corporation.
- VAN BUREN & COLORADO, LLC, a Texas limited liability company.
- WEST COAST MEDIANEWS LLC, a Delaware limited liability company.

# Plan Exhibit 4

Incentive Bonus Agreements Term Sheet

## Summary of Terms

### Incentive Bonus Agreements

Incentive Bonus Agreements provide for bonuses of $1.6 million in the aggregate to certain key employees (excluding Mr. Singleton and Mr. Lodovic) of Affiliated Media, Inc. (the "**Company**") and a subsidiary of the Company.

The purpose of the Incentive Bonus Agreements is to encourage continued performance and contributions to the Company and its subsidiaries on the part of the members of the Company's management team who are party to the Incentive Bonus Agreements.

Each Incentive Bonus Agreement stipulates the bonus amount and provides that it vests in two equal installments. The first installment vests and becomes payable on the day after the Effective Date and the second installment vests and is paid one year later. An employee must remain employed as of each payment date in order to be entitled to payment; provided, however, that any portion of the bonus that has not been paid at the time of an employment termination without cause shall vest on the termination and be paid not later than March 15th of the year following the year of termination.

The Incentive Bonus Agreements are not funded and the assets used to pay the bonuses are subject to the general claims of creditors. Nothing contained in an Incentive Bonus Agreement is intended to provide a guarantee or assurance of continued service by the participant.

# Plan Exhibit 5

Intentionally Omitted

# Plan Exhibit 6

New Senior Credit Facility Term Sheet

**EXHIBIT 6**

## SUMMARY OF TERMS AND CONDITIONS

## NEW SENIOR CREDIT FACILITY

Capitalized terms not otherwise defined herein have the same meanings
as specified therefor in the plan of reorganization (the "*Plan*") to which
this Summary of Terms and Conditions is attached.

**BORROWER:**     Reorganized AMI, a Delaware corporation (whose name will be changed to MediaNews Group, Inc. on the Effective Date; the "*Borrower*").

**GUARANTORS:**     The New Senior Credit Facility will be guaranteed by each existing and future direct and indirect domestic and, to the extent no material adverse tax consequences would result, foreign wholly-owned subsidiary of the Borrower (collectively, the "*Guarantors*"). All guarantees will be guarantees of payment and not of collection.

**ADMINISTRATIVE AND COLLATERAL AGENT:**     Bank of America, N.A. ("*Bank of America*") will act as sole administrative and collateral agent (the "*Administrative Agent*").

**SOLE LEAD ARRANGER AND SOLE BOOKRUNNER:**     Banc of America Securities LLC.

**LENDERS:**     The holders of Senior Loan Claims (collectively, the "*Lenders*").

**NEW SENIOR CREDIT FACILITY:**     An aggregate principal amount of up to $163.875 million will be available through the following facilities:

*LOC Facility*: $13.875 million four-year letter of credit facility (the "*LOC Facility*"), which will include two tranches of standby letters of credit (each a "*Letter of Credit*"). The "*Tranche A Facility*" will result from an automatic rollover of $6.375 million of the Borrower's existing letters of credit outstanding on the Closing Date under the Senior Credit Agreement; the Lenders holding the revolving loans under the Senior Credit Agreement will continue this extension of credit *pro rata* based on their current participation in such revolving loans. The "*Tranche B Facility*", in the amount of $7.5 million, will be provided as a separate new extension of credit by certain of the Lenders. Letters of Credit will be issued by Bank of America (in such capacity, the "*Fronting Bank*"), and each Lender will purchase an irrevocable and unconditional participation in each Letter of Credit.

*Term Loan Facility*: a $150 million term loan facility (the "*Term Loan Facility*"). No drawings under the Term Loan Facility will occur: each

Lender will receive a note issued under the Term Loan Facility in a principal amount representing such Lender's *pro rata* share of the Senior Loan Claims, in partial satisfaction of its Senior Loan Claim as contemplated by the Plan.

The LOC Facility and the Term Loan Facility are collectively referred to herein as the "*New Senior Credit Facility*".

**CLOSING DATE:** The execution of definitive loan documentation, to occur concurrently with the consummation of the Plan (the "*Closing Date*").

**INTEREST RATES:** As set forth in Addendum I.

**MATURITY:** The LOC Facility shall terminate and all amounts outstanding thereunder shall be due and payable in full four years after the Closing Date.

The Term Loan Facility shall be subject to repayment according to the Scheduled Amortization (as hereinafter defined), with the final payment of all amounts outstanding, *plus* accrued interest, being due four years after the Closing Date.

**AVAILABILITY/SCHEDULED AMORTIZATION:** The Term Loan Facility will be subject to quarterly amortization of principal, in equal installments, beginning on the last day of the first calendar quarter following the Closing Date, in aggregate amounts for each year as follows: $1.0 million to be payable in the first year, $5.0 million to be payable in the second year, $7.5 million to be payable in the third year, and $7.5 million to be payable over the first three quarters of the fourth year, with the balance payable at maturity (the "*Scheduled Amortization*").

**MANDATORY PREPAYMENTS:** In addition to the Scheduled Amortization set forth above, (a) 50% of Excess Cash Flow (to be defined in the loan documentation) beginning with Excess Cash Flow for the fiscal year commencing July 1, 2010 (and payable following the completion of the relevant fiscal year), (b) 100% of all net cash proceeds from sales of property and assets of the Borrower and its subsidiaries (excluding sales of inventory in the ordinary course of business and other exceptions to be agreed upon in the loan documentation, and provided that in the case of sales of property and assets by non-wholly owned subsidiaries, net cash proceeds will include only such proceeds as are distributed to the Borrower or any Guaranteeing Subsidiary), (c) 75% of all net cash proceeds from the issuance of additional equity interests in the Borrower or any of its subsidiaries otherwise permitted under the loan documentation, (d) 100% of all net cash proceeds from the issuance or incurrence after the Closing Date of additional debt of the Borrower or any of its subsidiaries otherwise permitted under the loan documentation (other than the Junior Basket Debt (as hereinafter defined)), and (e) 100% of all net cash proceeds of Extraordinary Receipts (to be defined in the loan documentation and to exclude cash receipts in the ordinary course of business) shall be applied to the prepayment of the New Senior Credit

Facility in the following manner: *first*, to the Term Loan Facility (and to the principal installments thereof on a *pro rata* basis); *second*, to cash-collateralize any Letters of Credit under the Tranche B Facility; and *third*, to cash collateralize any Letters of Credit under the Tranche A Facility.

**OPTIONAL PREPAYMENTS:**

The Borrower may prepay the Term Loan Facility in whole or in part at any time without premium or penalty, subject to reimbursement of the Lenders' breakage and redeployment costs in the case of prepayment of LIBOR loans other than at the end of an interest period. Each such prepayment of the Term Loan Facility shall be applied to the principal installments thereof on a *pro rata* basis.

**SECURITY:**

The Borrower and each of the Guarantors shall grant the Administrative Agent and the Lenders valid and perfected first-priority (subject to certain exceptions to be set forth in the loan documentation) liens and security interests in substantially all of the assets of the Borrower and the Guarantors, including the following:

(a)   All present and future shares of capital stock of (or other ownership or profit interests in) each of its present and future wholly-owned subsidiaries (limited, in the case of each entity that is a "controlled foreign corporation" under Section 957 of the Internal Revenue Code, to a pledge of 66% of the capital stock of each such first-tier foreign subsidiary to the extent the pledge of any greater percentage would result in material adverse tax consequences to the Borrower).

(b)   All present and future intercompany debt of the Borrower and each Guarantor.

(c)   All of the present and future property and assets, real and personal, of the Borrower and each Guarantor, including, but not limited to, machinery and equipment, inventory and other goods, accounts receivable, owned real estate, leaseholds, fixtures, bank accounts, general intangibles, financial assets, investment property, license rights, patents, trademarks, tradenames, copyrights, chattel paper, insurance proceeds, contract rights, hedge agreements, documents, instruments, indemnification rights, tax refunds and cash.

(d)   All proceeds and products of the property and assets described in clauses (a), (b) and (c) above.

The liens and security interests referred to above shall ratably secure the relevant party's obligations in respect of the New Senior Credit Facility, subject to the first-priority claim of obligations in respect of the Tranche B Facility under the LOC Facility and thereafter to secure the other obligations under the New Senior Credit Facility *pro rata*.

**CONDITIONS PRECEDENT**

**TO CLOSING:**    The closing and the initial extension of credit under the New Senior Credit Facility will be subject to satisfaction of the conditions precedent deemed appropriate by the Administrative Agent and a majority in number of the members of the Senior Lender Steering Committee including, but not limited to, the following:

(i)     The negotiation, execution and delivery of definitive documentation with respect to the New Senior Credit Facility satisfactory to the Administrative Agent and a majority in number of the members of the Senior Lender Steering Committee.

(ii)    All filings, recordations and searches necessary or desirable in connection with the liens and security interests referred to above under the section entitled "*Security*" shall have been duly made; all filing and recording fees and taxes shall have been duly paid and any surveys, title insurance, landlord waivers and access letters requested by the Administrative Agent with respect to real property interests of the Borrower and its subsidiaries shall have been obtained.  The amount, types and terms and conditions of all insurance maintained by the Borrower and its subsidiaries shall be satisfactory to the Administrative Agent and a majority in number of the members of the Senior Lender Steering Committee; and the Administrative Agent shall have received endorsements naming it, on behalf of the Lenders, as an additional insured or loss payee, as the case may be, under all insurance policies to be maintained with respect to the properties of the Borrower and its subsidiaries forming part of the Lenders' collateral described under the section entitled "*Security*" set forth above.

(iii)   The Administrative Agent shall have received (A) satisfactory opinions of counsel to the Borrower and the Guarantors (which shall cover, among other things, authority, legality, validity, binding effect and enforceability of the documents for the New Senior Credit Facility, but not priority of liens) and of appropriate local counsel and such corporate resolutions, certificates and other documents as the Lenders shall reasonably require and (B) satisfactory evidence that the Administrative Agent (on behalf of the Lenders) shall have a valid and perfected first-priority (subject to certain exceptions to be set forth in the loan documentation) lien and security interest in such capital stock and in the other collateral referred to under the section entitled "*Security*" set forth above.

(iv)    The confirmation of the Plan by the bankruptcy court and the effectiveness thereof.

**CONDITIONS PRECEDENT TO
THE ISSUANCE OR
EXTENSION OF LETTERS**

**OF CREDIT:**                 Usual and customary for transactions of this type, including, without limitation, the following: (i) all of the representations and warranties in the loan documentation shall be true and correct in all material respects as of the date of such extension of credit (or, to the extent a different date is specified in such representations and warranties, as of such other date) and (ii) no event of default under the New Senior Credit Facility or incipient default shall have occurred and be continuing, or would result from such extension of credit.

**REPRESENTATIONS AND WARRANTIES:**   Usual and customary for transactions of this type, but taking into account the organizational structure of the Borrower and its Subsidiaries to the extent necessary, including, without limitation, the following (applicable on the Effective Date only as appropriate): (i) legal existence, qualification and power; (ii) due authorization and no contravention of law, contracts, judgments or organizational documents; (iii) governmental and third party approvals and consents; (iv) enforceability; (v) accuracy and completeness of specified financial statements and other information and no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect (to be defined in the loan documentation); (vi) no material litigation (other than certain disclosed litigation), and no adverse change in the status, or the reasonably anticipated financial effect on the Borrower and its subsidiaries, of such disclosed litigation; (vii) no default; (viii) ownership of property (including disclosure of liens, properties, leases and investments); (ix) labor matters; (x) insurance matters; (xi) environmental matters; (xii) tax matters; (xiii) ERISA compliance; (xiv) identification of subsidiaries, equity interests and loan parties; (xv) use of proceeds and not engaging in business of purchasing/carrying margin stock; (xvi) status under Investment Company Act; (xvii) accuracy of disclosure; (xviii) compliance with laws; (xix) intellectual property; (xx) solvency; (xxi) no casualty; and (xxii) collateral documents.

**COVENANTS:**                 Usual and customary for transactions of this type, but taking into account the organizational structure of the Borrower and its Subsidiaries to the extent necessary, including, without limitation, the following:

(a) Affirmative Covenants - (i) delivery of consolidated and consolidating financial statements, budgets and forecasts; (ii) delivery of certificates and other information; (iii) delivery of notices (of any default, material adverse condition, ERISA event, material litigation, material change in accounting or financial reporting practices, disposition of property, sale of equity, incurrence of debt); (iv) payment of obligations; (v) preservation of existence; (vi) maintenance of properties; (vii) maintenance of insurance; (viii) compliance with laws; (ix) maintenance of books and records; (x) inspection rights; (xi) covenant to guarantee obligations, give security; (xii) upstreaming of all distributable cash from joint operating agreement ("*JOA*") entities (subject to the terms of the organizational documents and agreements of such

5

JOAs); (xiii) compliance with environmental laws; (xiv) further assurances; (xv) compliance with terms of leaseholds; (xvi) compliance with material contracts; and (xvii) obtain, and use of commercially reasonable efforts to maintain, a corporate credit rating from S&P and a corporate family rating from Moody's, in each case with respect to the Borrower, and a rating of the New Senior Credit Facility by each of S&P and Moody's.

(b) <u>Negative Covenants</u> - Restrictions on (i) liens; (ii) indebtedness, (including guarantees and other contingent obligations); (iii) investments (including loans and advances); (iv) mergers and other fundamental changes; (v) sales and other dispositions of property or assets; (vi) payments of dividends and other distributions; (vii) changes in the nature of business; (viii) transactions with affiliates; (ix) burdensome agreements; (x) capital expenditures; (xi) amendments of organizational documents; (xii) changes in accounting policies or reporting practices; (xiii) prepayments of other indebtedness; (xiv) modification or termination of documents related to certain indebtedness; and (xv) lease obligations, in each case subject to appropriate baskets and other exceptions as may be agreed upon in the loan documentation taking into account the leveraged nature of the credit under the New Senior Credit Facility.

(c) <u>Financial Covenants</u> - the following:

- Maximum Consolidated Leverage Ratio.

- Minimum Consolidated Fixed Charge Coverage Ratio.

- Restrictions on the incurrence of junior debt that is unsecured and contractually subordinated to the New Senior Credit Facility on terms satisfactory to the Administrative Agent (the "***Junior Debt Basket***").

Financial Covenant levels are to be reflected in the attached Schedule A.

Appropriate adjustments will be made to the definition of "Consolidated EBITDA" (to be defined in the loan documentation) to take account of any non-cash charges attributable to "fresh start" accounting following consummation of the Plan. Each of the ratios referred to above will be calculated on a consolidated basis for each consecutive four fiscal quarter period, except that during the first year following the Closing Date such calculations shall be made for the period of time since the Closing Date and, where appropriate, annualized.

**EVENTS OF DEFAULT:**     Usual and customary in transactions of this type, but taking into account the organizational structure of the Borrower and its Subsidiaries to the extent necessary, including, without limitation, the following:

(i) nonpayment of principal, interest, fees or other amounts (in the case of nonpayment of interest, fees and other amounts, with customary grace periods); (ii) failure to perform or observe covenants set forth in the loan documentation within a specified period of time, where customary and appropriate, after such failure; (iii) any representation or warranty proving to have been incorrect in any material respect when made or confirmed; (iv) cross-default to other indebtedness in an amount to be agreed; (v) bankruptcy and insolvency defaults (with grace period for involuntary proceedings); (vi) inability to pay debts; (vii) monetary judgment defaults in an amount to be agreed and material nonmonetary judgment defaults; (viii) customary ERISA defaults; (ix) actual or asserted invalidity or impairment of any loan documentation; and (x) change of control.

The obligations under the New Senior Credit Facility will share equally and ratably in the collateral granted under the applicable security documents, except that obligations in respect of the Tranche B Facility will have a first-priority claim to distribution of proceeds in the case of post-default payments or bankruptcy or other post-acceleration circumstances following the effective date.

**ASSIGNMENTS AND PARTICIPATIONS:**

*LOC Facility Assignments*:   Subject to the consents described below (which consents will not be unreasonably withheld or delayed), each Lender will be permitted to make assignments to other financial institutions in respect of either tranche of the LOC Facility in a minimum amount equal to $500,000 (or, if less, the entire amount of such Lender's interest).

*Term Loan Facility Assignments*:   Subject to the consents described below (which consents will not be unreasonably withheld or delayed), each Lender will be permitted to make assignments to other financial institutions in respect of the Term Loan Facility in a minimum amount equal to $1 million (or, if less, the entire amount of such Lender's interest).

*Consents*:   The consent of the Borrower will be required unless (i) an Event of Default has occurred and is continuing or (ii) the assignment is to a Lender, an affiliate of a Lender or an Approved Fund (as such term shall be defined in the loan documentation).   The consent of the Administrative Agent will be required for any assignment (i) in respect of the LOC Facility to an entity that is not a Lender under the LOC Facility, an affiliate of such Lender or an Approved Fund in respect of such Lender or (ii) of any outstanding term loan to an entity that is not a Lender, an affiliate of a Lender or an Approved Fund.   The consent of the Fronting Bank will be required for any assignment under the LOC Facility.

*Assignments Generally*:   An assignment fee in the amount of $3,500 will be charged with respect to each assignment unless waived by the Administrative Agent in its sole discretion.   Each Lender will also have

the right, without consent of the Borrower or the Administrative Agent, to assign as security all or part of its rights under the loan documentation to any Federal Reserve Bank.

*Participations*:  Lenders will be permitted to sell participations with voting rights limited to significant matters such as changes in amount, rate, maturity date and releases of all or substantially all of the collateral securing the New Senior Credit Facility or all or substantially all of the value of the guaranties of the Borrower's obligations made by the Guarantors.

**WAIVERS AND AMENDMENTS:**

Amendments and waivers of the provisions of the loan agreement and other definitive credit documentation will require the approval of Lenders holding loans and commitments representing more than 50% of the aggregate amount of the loans and commitments under the New Senior Credit Facility (the "***Required Lenders***"), except that (a) the consent of each Lender shall be required with respect to (i) the amendment of certain of the pro rata sharing provisions, (ii) the amendment of the voting percentages of the Lenders, (iii) the release of all or substantially all of the collateral securing the New Senior Credit Facility, and (iv) the release of all or substantially all of the value of the guaranties of the Borrower's obligations made by the Guarantors; (b) the consent of each Lender affected thereby shall be required with respect to (i) increases or extensions in the commitment of such Lender, (ii) reductions of principal, interest or fees, and (iii) extensions of the final maturity date; (c) any waiver or amendment of the Scheduled Amortization provisions will require the approval of Lenders holding at least 80% of the aggregate amount of the loans under the Term Loan Facility; and (d) any waiver or amendment of the provisions affecting the first-priority claim of obligations in respect of the Tranche B Facility will not be effective without the approval of Lenders holding at least 80% of the aggregate amount of the commitments under the Tranche B Facility.

**INDEMNIFICATION:**

The Borrower will indemnify and hold harmless the Administrative Agent, each Lender and their respective affiliates and their partners, directors, officers, employees, agents and advisors from and against all losses, claims, damages, liabilities and expenses arising out of or relating to the New Senior Credit Facility, the Borrower's use of the New Senior Credit Facility or the commitments, including, but not limited to, reasonable attorneys' fees (including the allocated cost of internal counsel) and settlement costs.  This indemnification shall survive and continue for the benefit of all such persons or entities.

**GOVERNING LAW:**

State of New York.

**PRICING/FEES/ EXPENSES:**

As set forth in Addendum I.

**OTHER:**    Each of the parties shall (i) waive its right to a trial by jury and (ii) submit to New York jurisdiction.  Neither the Administrative Agent nor any Lender shall be liable for any reason whatsoever for any special, indirect, punitive or consequential damages.

**ADDENDUM I**
**PRICING, FEES AND EXPENSES**

**INTEREST RATES:** The interest rates per annum applicable to the New Senior Credit Facility will be LIBOR (which shall be at least 2.50%) *plus* the Applicable Margin (as hereinafter defined). "*Applicable Margin*" means 6.00% per annum, in the case of LIBOR loans.

Interest shall be payable at the end of the interest period.

During the continuance of any default under the loan documentation, the Applicable Margin on obligations owing under the loan documentation shall increase by 2.00% per annum (subject, in all cases other than a default in the payment of principal when due, to the request of the Required Lenders).

**ADMINISTRATIVE AGENT/**
**COLLATERAL AGENT FEE:** Usual and customary annual administrative fees.

**UNDERWRITING FEE FOR**
**TRANCHE B FACILITY:** 2.00% of each Lender's commitment under the Tranche B Facility shall be payable to such Lender on the Closing Date.

**LETTER OF**
**CREDIT FEES:** Letter of Credit fees shall be payable on the maximum amount available to be drawn under each Letter of Credit at a rate per annum as set forth below. Such fees will be (a) payable quarterly in arrears, commencing on the last day of the first calendar quarter following the Closing Date, and (b) shared proportionately by the Lenders under the LOC Facility.

Letter of Credit fee (on issued Letters of Credit): 6.00%.

Letter of Credit commitment fee: 1.00% per annum shall be payable on the actual daily unused portion of the LOC Facility. Such fee shall be payable quarterly in arrears, commencing on the last day of the first calendar quarter following the Closing Date.

Letter of Credit fronting fee: a fronting fee of 0.25% shall be payable to the Fronting Bank for its own account.

**CALCULATION OF**
**INTEREST AND FEES:** Other than calculations in respect of interest at the Bank of America prime rate (which shall be made on the basis of actual number of days elapsed in a 365/366 day year), all calculations of interest and fees shall be made on the basis of actual number of days elapsed in a 360 day year.

**COST AND YIELD**
**PROTECTION:** Customary for transactions and facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves

without proration or offset and payments free and clear of withholding or other taxes.

**EXPENSES:**    The Borrower will pay all reasonable costs and expenses associated with the administration of all loan documentation, including, without limitation, the legal fees of counsel to the Administrative Agent. The Borrower will also pay the expenses of the Administrative Agent and each Lender in connection with the enforcement of any of the loan documentation.

**SCHEDULE A**
**FINANCIAL COVENANT LEVELS**

| Quarter Ending | Maximum Consolidated Leverage Ratio | Minimum Consolidated Fixed Charge Coverage Ratio |
|---|---|---|
| June 30, 2010 | 5.125x | 1.70x |
| September 30, 2010 | 5.125x | 1.40x |
| December 31, 2010 | 5.125x | 1.20x |
| March 31, 2011 | 5.125x | 1.20x |
| June 30, 2011 | 5.125x | 1.10x |
| September 30, 2011 | 5.00x | 1.10x |
| December 31, 2011 | 4.75x | 1.10x |
| March 31, 2012 | 4.75x | 1.05x |
| June 30, 2012 | 4.625x | 1.05x |
| September 30, 2012 | 4.375x | 1.05x |
| December 31, 2012 | 4.125x | 1.05x |
| March 31, 2013 | 4.00x | 1.05x |
| June 30, 2013 | 3.75x | 1.05x |
| September 30, 2013 | 3.50x | 1.10x |
| December 31, 2013 | 3.50x | 1.10x |

# Plan Exhibit 7

Restated Bylaws

# AMENDED AND RESTATED BYLAWS

## OF

## MEDIANEWS GROUP, INC.

\* \* \* \* \*

### ARTICLE 1
### OFFICES

Section 1.01. *Registered Office.* The registered office of the Corporation shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 1.02. *Other Offices.* The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

Section 1.03. *Books.* The books of the Corporation may be kept within or without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

### ARTICLE 2
### MEETINGS OF STOCKHOLDERS

Section 2.01. *Time and Place of Meetings.* All meetings of stockholders shall be held at such place, either within or without the State of Delaware, on such date and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a designation by the Board of Directors).

Section 2.02. *Annual Meetings.* Unless directors are elected by written consent in lieu of an annual meeting as permitted by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("**Delaware Law**"), an annual meeting of stockholders, commencing with the year 2011, shall be held for the election of directors and to transact such other business as may properly be brought before the meeting. Stockholders may, unless the certificate of incorporation of the Corporation (the "**Certificate of Incorporation**") otherwise provides, act by written consent to elect directors.

Section 2.03. *Special Meetings.* Special meetings of stockholders may be called by the Board of Directors or the Chairman of the Board and shall be called by the Secretary at the request in writing of holders of record of at least twenty-five percent of the outstanding capital stock of the Corporation entitled to vote.

Section 2.04. *Director Nominations.* Prior to the date on which all Class A Common Stock (as defined in the Certificate of Incorporation) has been converted to Class B Common Stock (as defined in the Certificate of Incorporation) pursuant to the Certificate of Incorporation (such date, the **"Class A Full Conversion Date"**), (i) nominations by the Corporation of persons for election to the Board of Directors of the Corporation as Class A Directors (as defined in the Certificate of Incorporation) shall be made by a majority of the Class A Directors then in office and (ii) nominations by the Corporation of persons for election to the Board of Directors of the Corporation as Class B Directors (as defined in the Certificate of Incorporation) shall be made by a majority of the Class B Directors then in office.

Section 2.05. *Notice of Meetings and Adjourned Meetings; Waivers of Notice.* (a) Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Unless otherwise provided by Delaware Law, such notice shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder of record entitled to vote at such meeting. Unless these Bylaws otherwise require, when a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time, place, if any, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, or after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

(b)    A written waiver of any such notice signed by the person entitled thereto, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 2.06. *Quorum.* Unless otherwise provided under the Certificate of Incorporation or these Bylaws and subject to Delaware Law, the presence, in person or by proxy, of the holders of a majority of the outstanding capital stock of the Corporation entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders present in person or represented by proxy shall adjourn the meeting, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified.

Section 2.07. *Voting.* (a) Unless otherwise provided in the Certificate of Incorporation and subject to Delaware Law, each stockholder shall be entitled to one vote for each outstanding share of capital stock of the Corporation held by such stockholder. Any share of capital stock of the Corporation held by the Corporation shall have no voting rights. Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, in all matters other than the election of directors, the affirmative vote of the majority of the shares of capital stock of the Corporation present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders. Subject to the rights of the holders of any series of preferred stock to elect additional directors under specific circumstances, directors shall be elected by a plurality of the votes of the shares of capital stock of the Corporation present in person or represented by proxy at the meeting and entitled to vote on the election of directors.

(b)      Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to a corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, appointed by an instrument in writing, subscribed by such stockholder or by his attorney thereunto authorized, or by proxy sent by cable, telegram or by any means of electronic communication permitted by law, which results in a writing from such stockholder or by his attorney, and delivered to the secretary of the meeting. No proxy shall be voted after three (3) years from its date, unless said proxy provides for a longer period.

(c)      Votes may be cast by any stockholder entitled to vote in person or by his proxy. In determining the number of votes cast for or against a proposal or nominee, shares abstaining from voting on a matter (including elections) will not be treated as a vote cast.

Section 2.08. *Action by Consent.* (a) Unless otherwise provided in the Certificate of Incorporation, any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding capital stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of stockholders to take the action were delivered to the Corporation as provided in Section 2.08(b).

(b)      Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this section and Delaware Law to the Corporation, written consents signed by a sufficient

number of holders to take action are delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

Section 2.09. *Organization.* At each meeting of stockholders, the Chairman of the Board, if one shall have been elected, or in the Chairman's absence or if one shall not have been elected, the director designated by the vote of the majority of the directors present at such meeting, shall act as chairman of the meeting. The Secretary (or in the Secretary's absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting) shall act as secretary of the meeting and keep the minutes thereof.

Section 2.10. *Order of Business.* The order of business at all meetings of stockholders shall be as determined by the chairman of the meeting.

## ARTICLE 3
## DIRECTORS

Section 3.01. *General Powers.* Except as otherwise provided in Delaware Law or the Certificate of Incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

Section 3.02. *Number, Election and Term Of Office.* The number of directors which shall constitute the whole Board shall be fixed from time to time by resolution of the Board of Directors but shall not be less than three or more than nine, *provided* that prior to the Class A Full Conversion Date, the number of directors which shall constitute the whole Board shall be seven. The directors shall be elected at the annual meeting of the stockholders by written ballot, except as provided in Section 2.02 and Section 3.12 herein, and each director so elected shall hold office until such director's successor is elected and qualified or until such director's earlier death, resignation or removal. Directors need not be stockholders.

Section 3.03. *Quorum and Manner of Acting.* Unless the Certificate of Incorporation or these Bylaws require a greater number, a majority of the total number of directors shall constitute a quorum for the transaction of business, and the affirmative vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, *provided* that at least two Class B Directors must be present at a meeting to constitute a quorum. When a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Board of Directors may transact any business which might have been transacted at the original meeting. If a quorum shall not be present at any meeting of the Board of Directors the directors present thereat shall adjourn the meeting, from time to time, without notice other than announcement at the meeting, until a quorum shall be present, *provided* that if the failure of at least two Class B Directors to be present causes such failure of quorum, the directors present thereat may reschedule the meeting for another time or place (at least 24 hours thereafter) and at such rescheduled meeting, the Board of Directors may transact any business which might have been

transacted at the original meeting without the requirement that two Class B Directors be present for purposes of quorum.

Section 3.04. *Time and Place of Meetings.* The Board of Directors shall hold its meetings at such place, either within or without the State of Delaware, and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a determination by the Board of Directors).

Section 3.05. *Annual Meeting.* The Board of Directors shall meet for the purpose of organization, the election of officers and the transaction of other business, as soon as practicable after each annual meeting of stockholders, on the same day and at the same place where such annual meeting shall be held. Notice of such meeting need not be given. In the event such annual meeting is not so held, the annual meeting of the Board of Directors shall be held at such place either within or without the State of Delaware, on such date and at such time as shall be specified in a notice thereof given as hereinafter provided in Section 3.07 herein or in a waiver of notice thereof signed by any director who chooses to waive the requirement of notice.

Section 3.06. *Regular Meetings.* After the place and time of regular meetings of the Board of Directors shall have been determined and notice thereof shall have been once given to each member of the Board of Directors, regular meetings may be held without further notice being given.

Section 3.07. *Special Meetings.* Special meetings of the Board of Directors may be called by the Chairman of the Board or the President and shall be called by the Chairman of the Board, President or Secretary on the written request of three directors or, prior to the Class A Full Conversion Date, on the written request of a majority of the Class B Directors (as defined in the Certificate of Incorporation). Notice of special meetings of the Board of Directors shall be given to each director at least three days before the date of the meeting in such manner as is determined by the Board of Directors.

Section 3.08. *Committees.* The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation, *provided* that prior to the Class A Full Conversion Date, each committee shall have at least one Class B Director (as defined in the Certificate of Incorporation) as a member. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to the following matter: (a) approving or adopting, or recommending to the stockholders, any action or matter expressly required by Delaware Law to be submitted to the stockholders for approval or (b) adopting,

amending or repealing any bylaw of the Corporation. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

Section 3.09. *Action by Consent.* Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions, are filed with the minutes of proceedings of the Board of Directors or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.10. *Telephonic Meetings.* Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or such committee, as the case may be, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 3.11. *Resignation.* Any director may resign at any time by giving notice in writing or by electronic transmission to the Board of Directors or to the Secretary of the Corporation. The resignation of any director shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 3.12. *Vacancies.* Unless otherwise provided in the Certificate of Incorporation, vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director. Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the Certificate of Incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority of directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected. Each director so chosen shall hold office until his or her successor is elected and qualified, or until his or her earlier death, resignation or removal. If there are no directors in office, then an election of directors may be held in accordance with Delaware Law. Unless otherwise provided in the Certificate of Incorporation, when one or more directors shall resign from the Board, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in the filling of other vacancies.

Section 3.13. *Removal.* Except as otherwise provided in the Certificate of Incorporation, any director or the entire Board of Directors may be removed, with or without cause, at any time by the affirmative vote of the holders of a majority of the outstanding capital stock of the Corporation then entitled to vote at any election of directors and the vacancies thus created may be filled in accordance with Section 3.12 herein, *provided* that prior to the Class A Full

Conversion Date, (i) any Class A Director (as defined in the Certificate of Incorporation) may be removed by, and only by, the holders of a majority of the outstanding shares of Class A Common Stock and (ii) any Class B Director (as defined in the Certificate of Incorporation) may be removed by, and only by, the holders of a majority of the outstanding shares of Class B Common Stock.

Section 3.14. *Compensation.* Unless otherwise restricted by the Certificate of Incorporation or these Bylaws and, prior to the Class A Full Conversion Date, subject to the approval of the majority of the Class B Directors (as defined in the Certificate of Incorporation), the Board of Directors shall have authority to fix the compensation of directors, including fees and reimbursement of expenses.

Section 3.15 *Authority of Class B Directors to Retain Separate Advisors.* Prior to the Class A Full Conversion Date, the Class B Directors (as defined in the Certificate of Incorporation), after consultation with the Class A Directors (as defined in the Certificate of Incorporation) but otherwise in their sole and absolute discretion, shall have the power and authority to select and retain, on terms and conditions acceptable to them, at the Corporation's expense, such legal and other advisors as they deem appropriate to assist them in discharging their responsibilities and exercising their rights and authority under the Certificate of Incorporation, the Stockholders' Agreement, these Bylaws and Delaware Law.

ARTICLE 4
OFFICERS

Section 4.01. *Principal Officers.* The principal officers of the Corporation shall be a President, one or more Vice Presidents, a Treasurer and a Secretary who shall have the duty, among other things, to record the proceedings of the meetings of stockholders and directors in a book kept for that purpose. The Corporation may also have such other principal officers, including one or more Controllers, as the Board may in its discretion appoint. One person may hold the offices and perform the duties of any two or more of said offices, except that no one person shall hold the offices and perform the duties of President and Secretary.

Section 4.02. *Election, Term of Office and Remuneration.* The principal officers of the Corporation shall be elected annually by the Board of Directors at the annual meeting thereof. Each such officer shall hold office until his or her successor is elected and qualified, or until his or her earlier death, resignation or removal. The remuneration of all officers of the Corporation shall be fixed by the Board of Directors. Any vacancy in any office shall be filled in such manner as the Board of Directors shall determine.

Section 4.03. *Subordinate Officers.* In addition to the principal officers enumerated in Section 4.01 herein, the Corporation may have one or more Assistant Treasurers, Assistant Secretaries and Assistant Controllers and such other subordinate officers, agents and employees as the Board of Directors may deem necessary, each of whom shall hold office for such period as the Board of Directors may from time to time determine. The Board of Directors may delegate to any principal officer the power to appoint and to remove any such subordinate officers, agents or employees.

Section 4.04. *Removal.* Except as otherwise permitted with respect to subordinate officers, any officer may be removed, with or without cause, at any time, by resolution adopted by the Board of Directors.

Section 4.05. *Resignations.* Any officer may resign at any time by giving written notice to the Board of Directors (or to a principal officer if the Board of Directors has delegated to such principal officer the power to appoint and to remove such officer). The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 4.06. *Powers and Duties.* The officers of the Corporation shall have such powers and perform such duties incident to each of their respective offices and such other duties as may from time to time be conferred upon or assigned to them by the Board of Directors.

ARTICLE 5
CAPITAL STOCK

Section 5.01. *Uncertificated Shares.* The shares of the Corporation shall be uncertificated shares, provided that the Board of Directors of the Corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be certificated shares. Except as otherwise provided by law, the rights and obligations of the holders of uncertificated shares and the rights and obligations of the holders of shares represented by certificates of the same class and series shall be identical. Every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of the Corporation by the Chairman or Vice Chairman of the Board of Directors, or the President or Vice President, and by the Treasurer or an assistant Treasurer, or the Secretary or an assistant Secretary of such Corporation representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue. A Corporation shall not have power to issue a certificate in bearer form.

Section 5.02. *Transfer Of Shares.* Subject to the limitations set forth in the Stockholders' Agreement, dated as of [●], 2009 (the "Stockholders' Agreement"), shares of the stock of the Corporation may be transferred on the record of stockholders of the Corporation by the holder thereof or by such holder's duly authorized attorney upon surrender of a certificate therefor properly endorsed or upon receipt of proper transfer instructions from the registered holder of uncertificated shares or by such holder's duly authorized attorney and upon compliance with appropriate procedures for transferring shares in uncertificated form, unless waived by the Corporation.

Section 5.03. *Authority for Additional Rules Regarding Transfer.* The Board of Directors shall have the power and authority to make all such rules and regulations as they may deem expedient concerning the issue, transfer and registration of certificated or uncertificated

shares of the stock of the Corporation, as well as for the issuance of new certificates in lieu of those which may be lost or destroyed, and may require of any stockholder requesting replacement of lost or destroyed certificates, bond in such amount and in such form as they may deem expedient to indemnify the Corporation, and/or the transfer agents, and/or the registrars of its stock against any claims arising in connection therewith, *provided* that prior to the Class A Full Conversion Date, any of the foregoing actions shall require the approval of a majority of the Class B Directors (as defined in the Certificate of Incorporation) then in office.

## ARTICLE 6
## INDEMNIFICATION

Section 6.01. *Nature of Indemnity.* Each person (and the heirs, executors or administrators of such person) who was or is a party or is threatened to be made a party to, or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer, of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee, fiduciary or other agent of another corporation or of a partnership, joint venture, trust, employee benefit plan or other enterprise (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity or in any other capacity shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment) against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection with such proceeding) and such indemnification shall inure to the benefit of his or her heirs, executors and administrators; *provided,* however, that, except as provided in Section 6.02 hereof, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. The right to indemnification and advancement conferred in this Article 6 shall be contract rights and shall continue as to any indemnitee who has ceased to serve the Corporation in an official capacity. The Corporation may, by action of its Board of Directors, provide indemnification and advancement to employees and agents of the Corporation with the same scope and effect as the indemnification and advancement of directors and officers set forth in this Article 6.

Section 6.02. *Procedure for Indemnification.* Any indemnification of an indemnitee under Section 6.01 of this Article 6 or advancement of expenses under Section 6.05 of this Article 6 shall be made promptly, and in any event within 60 days after the written request therefor has been received by the Corporation; *provided,* however, that, in the case of advancement, such claim shall be paid within 20 days after the written request therefor has been received by the Corporation. If a claim for indemnification under Section 6.01 or advancement of expenses under Section 6.05 is not paid, in whole or in part, within the applicable period, the right to indemnification or advances as granted by this Article 6 shall be enforceable by the indemnitee in any court of competent jurisdiction. To the fullest extent permitted by law, such

indemnitee's costs and expenses incurred in connection with successfully establishing his or her right to indemnification or advancement, in whole or in part, in any such action, or, in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking shall also be paid by the Corporation. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition) and, in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standards of conduct under Delaware Law, but the burden of such defense shall be on the Corporation. Neither the failure of the Corporation (including its directors who are not a party to such action, a committee of such directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct under Delaware Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

Section 6.03. *Exclusivity.* The rights to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article 6 shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the certificate of incorporation, bylaw, agreement, vote of stockholders or disinterested directors or otherwise.

Section 6.04. *Insurance.* The Corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss asserted against such person and incurred by such person in any such capacity or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under Delaware Law.

*Section 6.05. Expenses.* Expenses (including attorney's fees) incurred by an indemnitee in defending a proceeding shall be paid by the Corporation in advance of such proceeding's final disposition and promptly as incurred by the indemnitee; *provided,* however, that, if Delaware Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right of appeal that such indemnitee is not entitled to be indemnified by the Corporation for such expense under this Section 6.05 or otherwise. Such expenses incurred by employees and agents may be so paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

*Section 6.06. Nature of Rights.* Any amendment, alteration or repeal of this Article 6 that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment or repeal.

ARTICLE 7
GENERAL PROVISIONS

Section 7.01. *Fixing the Record Date.* (a) In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided* that the Board of Directors may fix a new record date for the adjourned meeting.

(b)     In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by Delaware Law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by Delaware Law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is